# Exhibit 1

-----------------------------------------------------------------X
In the Matter of the Claim of

JOSIAH GALLOWAY,

                                                Claimant,

        -against-

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, OFFICE OF THE
NASSAU COUNTY DISTRICT ATTORNEY,
INCORPORATED VILLAGE OF HEMPSTEAD
and INCORPORATED VILLAGE OF HEMPSTEAD
POLICE DEPARTMENT,

                                            Respondents.
-----------------------------------------------------------------X

NOTICE OF CLAIM

TO:    COUNTY ATTORNEY OF NASSAU COUNTY
         Attorney for Respondent **County of Nassau**
         One West St.
         Mineola, NY 11501

         NASSAU COUNTY POLICE DEPARTMENT
         Respondent
         Police Headquarters
         1490 Franklin Ave.
         Mineola, NY 11501

         OFFICE OF THE NASSAU COUNTY DISTRICT ATTORNEY
         Respondent
         262 Old Country Road
         Mineola, NY 11501

         DEBRA URBANO-DiSALVO, ESQ.
         Village Attorney
         Incorporated Village of Hempstead
         99 Nichols Court
         Hempstead, NY 11550

TO: INCORPORATED VILLAGE OF HEMPSTEAD POLICE DEPARTMENT
Respondent
99 Nichols Court
Hempstead, NY 11550

PLEASE TAKE NOTICE that the undersigned claimant hereby makes claim and demand against you as follows:

1. The name and post-office address of each claimant and claimant's attorney is:

| | |
|---|---|
| Josiah Galloway<br>Claimant<br>8 Acorn Circle, Apt. 102<br>Towson, MD 21286 | Law Offices of Thomas F. Liotti, LLC<br>Primary Attorneys/Lead Counsel for Claimant<br>600 Old Country Road, Suite 530<br>Garden City, NY  11530<br>(516) 794-4700 |
| | Joseph F. DeFelice, Esq.<br>Co-Counsel for Claimant<br>125-10 Queens Blvd.<br>Kew Gardens, NY 11415<br>(718) 261-3358 |

2. The nature of the claim: The Claimant was caused by these Respondents to be wrongfully arrested, accused, falsely imprisoned, charged, prosecuted, defamed, convicted and sentenced, all in violation of his State and Federal Constitutional and civil rights. The Claimant was falsely imprisoned for more than ten (10) years beginning in 2008 and not being released until September 13, 2018, when all of the charges against him were dismissed on the Nassau County prosecutor's motion as joined in by the defense. See Indictment No.: 1315N-2008.

The County of Nassau, the Nassau County Police Department, Office of the Nassau County District Attorney, the Incorporated Village of Hempstead and the Incorporated Village of Hempstead Police Department have shown a pattern of violating the civil rights of those who are falsely accused, particularly those in the minority community. *Monell v. New York City*

2

*Department of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978). See also, *Restivo, et al v. Nassau County*, Docket No. 2: 2006 cv 06720, 2014 U.S. Dist. Lexis 188474 (E.D.N.Y., J. Seybert) denying the County's motion for a new trial, aff'd *Restivo v. Hessemann*, No. 14-4662 (2d Cir. 2017 ). This claimant is an African-American. See also, *People v. Brown*, 78 A.D. 2d 861, 432 N.Y.S. 2d 630 (1980); *People v. John Daly,* (County Court, Nassau County, Hon. Donald DeRiggi), 20 A.D.2d 542, 799 N.Y.S.2d 537 (2nd Dept. 2005); 5 N.Y.3d 882 (2005); 57 A.D.3d 914 (2d Dept., 2008), where the *People* failed to disclose 12 statements which were both *Brady* and *Rosario* material. See also, Liotti, Thomas F. and Fasano, H. Raymond, Disparate Sentencing In Nassau County, The Attorney of Nassau County, October, 1997 at 5. This article concerns a State Bar Association report which showed that minorities in Nassau County were sentenced more severely than Caucasians. See also, *People v. Justin Shaw*, Ind. No.: 01239N-2011; Liotti, Thomas F. and Smith, Drummond, (Mis) Identification In Criminal Cases A Leading Cause Of Wrongful Convictions, Verdict, April, 2013, vol. 19, no. 2, cover and lead article and 1-11. A copy of that article is annexed as Exhibit **"A."** The District Attorney Madeline Singas, Esq., opposed the adoption by the State Legislature and Governor of S. 2412 - D/A. 5285 creating a commission on prosecutorial conduct. See, District Attorney Madeline Singas, Op-Ed Newsday, Bill to Oversee DAs Misses The Point, Newsday, August 16, 2018. See also, *Maxwell v. The Incorporated Village of Hempstead*, (99-CV-974[AS], EDNY)[1] and

---

[1] Mr. Liotti was retained to represent the family of and the Estate of Paul Maxwell, a 28 year old black man, shot and killed by Hempstead Village Police. Mr. Liotti commenced a wrongful death and civil rights action. See Vitello, Paul, How did Poet-Genius Finally Come Undone?, Newsday, July 30, 1998 at A8; East, Georgia, A Father In Search Of Answers, Son Was Shot By Police, Newsday, August 6, 1998 at A3 and A32; Reynolds, Jeffrey L., Who Needs Denis Dillon, Hempstead Leaders Form Independent Board To Probe Shooting By Cop, Long Island Voice, August 27-September 2, 1998 at 8; Reynolds, Jeffrey L., L.I. Topic, Can We Cool

*Carrillos v. Inc. Village of Hempstead,* (E.D.N.Y. 11-cv-5775, Hon. Joseph Bianco, decided February 20, 2015, N.Y.L.J., Decisions of Interest, March 5, 2015 at 17 (dec.nylj.com/1202719533846).

---

Community Tensions In Wake Of Recent Killings By Cops? This Activist Says That A Civilian Complaint Review Board Would Help and, Other Voices, full page article where Mr. Liotti is quoted as follows: "Excessive force by police is generally the product of poor training and/or racism. An independent civilian complaint review board and special statewide prosecutor are desperately needed. This issue is the hottest one in the new frontier of civil rights and criminal justice. Elected officials are ignoring these issues because they are tainted by endorsements and campaign contributions from police groups." Newsday, Currents and Books, September 6, 1998 at B7; and Topping, Robin, Cops Cleared In Fatal Shot, Newsday, October 9, 1998 at A29; Fries, Steven and Cowan, Erin, Cop Honored In Slaying: Spitzer Cites Hempstead Case, Newsday, May 12, 1999 at A3; Vitello, Paul, A Hero? Depends On Perspective, Newsday, May 13, 1999 at A8; McCrummen, Stephanie, Slain Man's Dad Sues Village, Newsday, February 27, 1999 at A23; Williams, Herb. Cover Story, The Silence of the Lambs, On Anniversary of Shooting of Paul Maxwell, Hempstead's Black Clergy Remain Silent on Police Brutality Issue, Community Journal, Roosevelt, New York, August, 1999, Vol. 7, No. 2 at 1 & 3; Evans, Martin C., Anger & Despair, For Many L.I. Blacks, Verdict Yields Frustration Newsday, February 27, 2000 at A4 and A42. See, David Pierson, Father Blames Police Training For Son's Death, Newsday, July 6, 2000 at A30; David Pierson, Long Island, Focus On Officers' Training, Cops Queried In Trial Over Shooting Death, Newsday, July 7, 2000 at A32 and David Pierson, Hempstead Settles Suit, Parents' Loss Spurs Extra Cop Training, Newsday, July 8, 2000 at A7. July 7, 2000, United States District Court Judge Arthur Spatt (E.D.N.Y.). James Murphy, Esq. of Montfort, Healy, Sally and McGuire, adversary. Federal civil rights (§1983) negligence and assault and battery claims involving the wrongful death and killing of Paul Anthony Maxwell, a 28 year old, emotionally disturbed, African American by a white Village of Hempstead police officer who shot him dead while he was naked and allegedly swinging a bat at police officers. Mr. Liotti represented the plaintiff in the civil jury trial. The case was settled after five days on trial. Motions for a directed verdict and summary judgment were denied, plaintiff concluded his case and two defense witnesses testified. James Fyfe, a renowned expert on police procedures and training and representatives from both the Nassau and Hempstead Police Departments testified for the plaintiff as did the Medical Examiner. The case was settled in a "So Ordered" Stipulation for $135,000 plus the Village agreed to establish a mandatory annual two hour course for all police personnel (112 officers) dealing with the handling of emotionally disturbed persons. The Mayor of the Incorporated Village, James Garner, was present, a party to the Stipulation and expressed his condolences on the record; and February 25, 1999 - WOL Radio Washington and Maryland, The Joe Madison Show - Police Brutality and the Maxwell case.

3. The time when, the place where and the manner in which the claim arose: The incident which caused the Claimant to be wrongfully arrested occurred on May 15, 2008, at approximately 1:30 a.m., at West Columbia Street and Main Street near the Long Island Railroad and MTA bus stations. Thereafter in June, 2008, the Claimant was wrongfully arrested and following a trial by jury was convicted on March 9, 2009, by jury verdict, and sentenced on November 23, 2009. Subsequently, the charges against the Claimant were dismissed and he was released from prison on September 13, 2018, after he had been incarcerated for more than ten (10) years. The claim of the Claimant was continuous from May 15, 2008 through September 13, 2018.

4. The items of damage or injuries claimed are : Due to the negligence of the Respondents, the Claimant **Josiah Galloway**, inter alia, sustained: The Claimant has suffered and will continue to suffer a stigma and prejudice because of this wrongful conviction; loss of consortium/society; loss of educational and employment opportunities and loss of prospective advantage. The Claimant is seeking One Hundred Million and 00/100 Dollars ($100,000,000.00) in compensatory and punitive damages together with pre-judgment and post-judgment interest, costs, disbursements and attorneys' fees. The interest claimed for pre-judgment and post-judgment runs and continues to run from 2008. The Claimant will also be compelled to expend great amounts of time and money for legal counsel to pursue this claim and all related matters.

The undersigned Claimant therefore presents this claim for adjustment and payment. You

are hereby notified that unless it is adjusted and paid within the time provided by law from the date of presentation to you, the Claimant intends to commence an action on this claim.

Dated: Garden City, New York
      September 19, 2018

_____
JOSIAH GALLOWAY

_____
LAW OFFICES OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq.
Primary Attorneys/Lead Counsel for Claimant
600 Old Country Road, Suite 530
Garden City, New York 11530
(516) 794-4700

INDIVIDUAL VERIFICATION

STATE OF NEW YORK )
                                            ss.:
COUNTY OF NASSAU )

JOSIAH GALLOWAY, being duly sworn, deposes and says that deponent is the Claimant in the within action; that he has read the foregoing Notice of Claim and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true.

_____
JOSIAH GALLOWAY

Sworn to before me this

19th day of September, 2018.

_____
Notary Public

JEAN M. LAGRASTA
Notary Public, State of New York
No. 30-4683304
Qualified in Nassau County
Commission Expires Oct. 31, 2018

7

# Exhibit A



# VERDICT

NATIONAL COALITION OF CONCERNED LEGAL PROFESSIONALS

VOL. 19  NO. 2  APRIL 2013                                   SUGGESTED DONATION  $5.00

## (Mis)Identification in Criminal Cases
### A Leading Cause of Wrongful Convictions
**Thomas F. Liotti, Esq.**
**Drummond C. Smith, Esq.**

## A Critique of Philosophizing About Lawyers' Ethics
**Monroe H. Freedman, Esq.**

## Annals of Justice: The Cantor's Complaint
**Stephen R. LaCheen, Esq.**



# (Mis)Identification in Criminal Cases
# A Leading Cause of Wrongful Convictions

*by Thomas F. Liotti, Esq. and Drummond C. Smith, Esq.*




Thomas F. Liotti, Esq.　　Drummond Smith, Esq.

*Editor's Note: False identification is one of the nation's leading causes of wrongful convictions. Defense counsel, however, have recently been aided by 30 years of scientific research on memory and perception, showing how unreliable they can be. In this article, Mr. Liotti, using his own experience with experts in witness identification, provides a guide for defense counsel seeking to contest an untrustworthy identification.*

The Oregon Supreme Court recently weighed in on the issue, in an 80-page unanimous opinion in State of Oregon v. Lawson (CF080348; CA A140544; SC S059306, November 29, 2012), which takes into account "current scientific knowledge regarding the effects of suggestion and confirming feedback" and revises the burden of proof required to admit such evidence.

Previously, eyewitness identifications were admissible unless the defense could first establish its unreliability in a pre-trial motion, "even though the state — as administrator of that procedure — controls the bulk of the evidence in that regard. (State of Oregon v. Lawson)." Now, prosecutors must first establish the reliability of the identification before it can be admitted.

Notably, the Oregon Supreme Court did not distinguish whether the tainted memory or false identification was the result of suggestive police procedures or actions of the witnesses themselves (for example, searching on their own for photographs or mug shot websites). In either case, they are inadmissible under the state's evidence code.

In a December 5, 2012 editorial, The New York Times lauded the decision of the Oregon Supreme Court and encouraged other state and federal courts to follow its lead. We concur.

Since becoming a lawyer many moons ago I have been fascinated by the ability of witnesses to identify defendants in criminal cases where presumably the horrible acts unfolding before them might serve as a distraction, while their much-needed retreat ("feet don't fail me now") and corresponding fear of impending death, might lead to a questionable identification. I also vividly recall a grade school exercise where my teacher placed a drawing on the board in front of the class. We were directed to study it. She took it down and then told us to draw what we could recall from the drawing. Well, there were thirty students in that public school class at the Bowling Green Elementary School in East Meadow, Long Island, and there were also thirty very different drawings, none replicating the detail of the original drawing, which I remember as quite primitive.

So it seemed to me even at that young age (I think I was seven) that the ability to identify is controlled by many complex factors, such as vision, the receipt of images by the brain,[1] the recording of them there and our memory[2] in being able to recall the images in the same way they were received.

As I became a Little Leaguer fascinated by our great "American Pastime," I quickly learned that not all ballplayers were great hitters. As I would watch major league games it became apparent that some had the ability to not be distracted by the menacing look of pitchers while keeping their eyes on the ball, even when thrown at 96 m.p.h. This might be dismissed as just good hand-eye coordination, but I became fascinated by the ability of some players to follow the curve, knuckle, cutter and slider, no matter where they were thrown, and in some cases, if Billy Martin was managing, at their heads. Others seemed to have what was then not labeled as an "attention deficit disorder," but rather as "bad reaction time."

## Breakthrough in Understanding Eyewitness Identification

A breakthrough in eyewitness identification occurred in 1965 with criminal defense attorney Patrick M. Wall's book, *Eye Witness Identification in Criminal Cases*.[3] Mr. Wall studied the issues of eyewitness identification in Paris while he completed the requirements for a J.S.D. degree at New York University. I have cherished Mr. Wall's book for all of these years, keeping it in my personal Hall of Fame of artifacts by some of the greats in law. Joining Mr. Wall in the new, uncharted, legal territory were not only several professors, but also the legendary Martin Erdman, a renowned criminal defense attorney associated with the New York Legal Aid Society.

Thomas F. Liotti is an attorney and Village Justice in Long Island, New York. He is a Fellow in the American Board of Criminal Lawyers (ABCL), a Life Member of the National Association of Criminal Defense Lawyers (NACDL), a former Chair of the Criminal Justice Section of the New York State Bar Association, a Past President of the Criminal Courts Bar Association of Nassau County and the New York State Association of Criminal Defense Lawyers (NYSACDL).

Drummond C. Smith is a former federal and state prosecutor and a Legal Aid Attorney. He is presently an Associate in Mr. Liotti's firm. Mr. Liotti is grateful to Mr. Smith for his assistance in the research and writing of this article.

**4 Verdict**           **(Mis)Identification in Criminal Cases**



Mike Keefe/Denver Post

Mr. Wall impressed me as a legal writer who was able to analyze the phenomenon described in playwright Arthur Miller's *The Crucible*,[4] which portrayed the hysteria of the Salem witch trials, analogizing them to Senator Joseph McCarthy's bogus "witch hunts" for communists. A community engulfed by hysteria and a notorious crime is prone to false accusations and misidentifications.

A half century ago Mr. Wall quoted a prosecutor (Kuh, "Careers in Prosecution Offices," 14 J. *Legal Ed.* 175, 187 n.21 (1961)), who noted that proof that relies wholly on identifications made by eyewitnesses is inherently weak; persons who merely saw a thief or attacker briefly, and under conditions of stress, may — despite the best of intentions — too readily be mistaken.

Wall's genius then made his point that there were two causes of erroneous identification: "1) the normal and universal fallibilities of human sense perception and human memory, and 2) the susceptibility of the human mind to suggestive influences." Wall then continued:

> Jeremy Bentham once stated that "witnesses are the eyes and ears of justice," [citation omitted] and so they are. But those eyes and ears are sometimes defective, for a surprisingly large number of people who are not color blind, who do not need an oculist, and who are supposed to have normal vision, in fact do not have it. They cannot recognize likenesses or differences, nor distinguish variations in form, size, and position as can persons who are normal in that respect.

In a footnote Wall goes on to note that with regard to color-blindness, it has been estimated that between four and eight per cent of all males never experience red or green but see these colors as gray (citations omitted) and that one capital case has been reported where the defendant was identified mainly by the color of his hair and clothes, the identifying witness being, as was later discovered, color-blind. Wall then quotes Wigmore as observing that if we consider:

> that most persons ... have features not sharply distinctive of a few individuals (e.g. simply, a large nose, blue eyes), and that most observers receive only the simplest impressions of features, expressible in only the loosest language (e.g. large nose, dark hair), it is easy to appreciate how often the items ... as recorded, may be items common to many individuals, and yet may cause recognition of sameness.[5]

Wall then quoted a psychologist as pointing out that:

> The difficulty is that there may be certain elements in common between the original object and one which is incorrectly recognized as the original. If one object comprises ABCD and the other CDXY, the CD overlap is enough to mislead anybody, citing Burtt, Applied Psychology 250 (2d ed. 1957).

**No Safety in Numbers**

Quoting Wigmore, Wall then debunked the idea that there was assurance in numbers:

---

**JEFFREY H. SCHWARTZ**

ATTORNEY AT LAW

PRACTICE LIMITED TO PERSONAL INJURY

62 WALDORF COURT
BROOKLYN, NY 11230

TEL: (718) 434-0211
FAX: (718) 421-7125

---

**ROBERT P. LEIGHTON**

ATTORNEY AT LAW

132 NASSAU STREET * SUITE 900
NEW YORK, NY 10038

(212) 267-6019

*In discussing the possibility of erroneous identification, Wigmore once observed that there is a logical value in the number of witnesses who concur in the identification. The soundness of his view cannot be seriously doubted, as is borne out not only by the law of probability, but also by the concern often felt when the only evidence of a defendant's guilt is his identification by a single witness. Here, as elsewhere, there is strength in numbers.*

*However, although there is strength in numbers, there is, as Glanville Williams has pointed out, no real safety. The mere fact that three or four witnesses identify a suspect provides no assurance that they are correct, especially when all have been subjected to a suggestive identification procedure.*

*Indeed, on a number of occasions, even larger numbers of identifying witnesses have erred. In a trial in Massachusetts in 1845, the defendant proved his innocence conclusively and in so doing demonstrated the twelve witnesses who had identified him were all mistaken, 'a fact, as the judge well remarked, almost sufficient to shake all confidence in human testimony.'*

*Cases involving erroneous identifications by 13, 14 and 17 witnesses have been reported, but they are by no means the most extreme examples …. [citations omitted]*



Illustration by Matthew Snow

## A Wrongful Burial Based on Misidentification

The idea of a relative misidentifying a family member was foreign to me until I had the case of Shirley. Shirley was an elderly woman whose son sent her to a camp every summer. One day Shirley collapsed and had to be taken to the hospital. On the way, the camp provided her medical records, or what they thought were hers. Shirley died. Using the records they called relatives, not Shirley's but Sarah's. They had Sarah's records, not Shirley's. They both had the same last name but were not related. Sarah's granddaughter came to identify the body. She mistakenly identified Shirley as Sarah, her grandmother. Shirley's body was sent to Brooklyn where she was placed into Sarah's gravesite. While Sarah's family was sitting Shiva they received a call from Sarah. They thought she was gone. Instead, she was still at the camp enjoying herself. I had my first wrongful burial case based upon a misidentification.

## A New Field of Psychology

Courts today are more closely examining what are referred to as "ID cases," where corroborative evidence is limited.[6] Wall's discovery of the legal equivalent of the Rosetta Stone has led to the opening of a whole new field in psychology, namely the science of identification. It is a specialized area even for the psychologists who engage in it.

In New York "notice of identification evidence is not required if the victim and the defendant are known to each other or if the pretrial identification is not the result of police conduct. Similarly, a notice of identification is not required where a victim or witness merely authenticates a surveillance tape of a crime in progress." See

---

LAW OFFICES OF

# James Lance Kaller
*Attorney at Law*

155 MONTGOMERY STREET, SUITE 1004
SAN FRANCISCO, CA 94104
Phone: (415) 362-9134    Fax: (415) 434-1880

---

# Stephen M. Murphy
ATTORNEY AT LAW

## REPRESENTING EMPLOYEES IN CIVIL RIGHTS LITIGATION

353 Sacramento St., Suite 1140
San Francisco, CA 94111
Tel.: (415) 986-1338  Fax: (415) 986-1231
smurphy@justice.com  www.stephenMmurphy.com



Illustration by David Rose

Lawrence N. Gray, Esq., *New York Criminal (Law) Practice*, Third Edition, New York State Bar Association, Chapter 7, *Motion Practice* by Mark J. Mahoney, Esq., at § 7.29 at page 270 (cases cited there are omitted here).

## Examples Illuminate the Issues

While identification issues are complex, a fact pattern illustrating those issues, together with an expert's testimony from a similar case will highlight these points. The fact pattern is derived from the non-jury trial of *People v. Justin Shaw*, Nassau County, Long Island, New York, Indictment #1239N-11, presided over by Hon. Meryl Berkowitz, a County Court Judge. Defense counsel was this writer; the prosecutor was ADA Christine Geier; the defense investigator was Frank Detrano and the identification expert was Nancy Franklin, Ph.D., an Associate Professor at the State University of New York at Stony Brook, a scientist and psychologist specializing in memory and cognition.

The defendant, an African American, 23, was charged with attempted robbery, menacing with a weapon and resisting arrest. He was found not guilty of all charges.

On December 6, 2010 the complainant, an Hispanic, claimed that he was returning home from work at midnight when he heard a voice from behind say that he wanted his money. He ran to the corner, dropping his cell phone, which he said was picked up by the defendant. The complainant then stopped and asked for his cell phone back. He claims that the defendant threw the phone to him, again saying that he wanted his money and flashed a gun at him from his waistband. The complainant testified that the assailant was wearing a "hoodie" and that there was overhead street lighting.

The defendant was apprehended eight months later. A line-up was never conducted and a photo array with a positive identification was not presented. The complainant testified that he always wore glasses and was wearing them that night.

The Prosecutor offered daytime photos of the area. The complainant testified that he recognized the defendant from the neighborhood. The defendant lived across the street. He also said that he saw him at a distance of five feet and that the moon was full. However, National Weather Service records, of which the Court took judicial notice, showed that it was a new moon that night, with only one percent of its face showing. The defense investigation brought in nighttime photos showing the lack of illumination and took measurements indicating that the complainant saw his assailant at 47 feet, not 5 feet.

In Nassau County motions to suppress or dismiss are rarely successful, so I prepared for trial, gathering as much information as possible from all sources, even the tabloids. One story was handed over to me by my client's father, appearing in a newspaper that I ordinarily would not be caught dead reading, but the story caught my eye, leading me to believe that I was on the right track. The article read:

> Thanks to New Jersey, it's been a good week for memory researchers.
>
> The State Supreme Court announced on Wednesday that it will alter the way eyewitness testimony is presented to



Attorneys at Law — For Over 30 years
**Thompson & Thompson, P.C.**
*Specializing in Criminal Defense and Appeals*

1331 Main St., Ste. 320
Springfield, MA 01103

P: 413-739-2100    F: 413-739-2300



*Certified Specialist in Criminal Law*

**Peter Swarth**
ATTORNEY AT LAW

6520 Platt Ave. #557
West Hills, CA 91307
(818) 887-8800

jurors in criminal trials, making it easier for defendants to dispute the oldest — and studies now show, maybe most fallible — type of evidence.

In 75% of known wrongful convictions, false eyewitness testimony plays a large role. And 190 of the 250 first DNA exonerations involved mistaken eyewitness accounts. It's important to note, however, that eyewitnesses are not lying; they really believe that they're telling the truth, and that's why their testimony is so convincing.[7]


Mike Keefe/Denver Post

Finding experts amenable to testifying on behalf of the defense in criminal cases or for plaintiffs in civil cases is never an easy task. I reached out to the National Association of Criminal Defense Lawyers (NACDL) and its affiliate in New York, the New York State Association of Criminal Defense Lawyers (NYSACDL) and the New York State Defenders Association. I received the names and resumés of three potential experts. Following some further research on their cases, articles and other credentials, I settled on Dr. Franklin who had earned her Ph.D. at Stanford; her fees were more than reasonable; she has been qualified as an expert on many occasions and had published widely in the field of memory reconstruction and cognition.

I went to the University to meet with her. She provided me with some of her papers and testimony from



Stanley J. Weinberg, L.C.S.W., B.C.D.
Psychotherapist
Individual / Couples / Group
24 E. 12th Street, Suite 605
NY, NY 10003
212-924-3724

**RICHARD DORN**
ATTORNEY AT LAW

**LEVY RATNER, P.C.**
80 Eighth Avenue, 8th Floor • New York, NY 10011-5126
Tel. (212) 627-8100 • Fax (212) 627-8182
rdorn@levyratner.com • www.levyratner.com





**DOCUMENT MANAGEMENT ISN'T JUST OUR FOCUS... IT'S ALL WE DO!**

CITYSIDE ARCHIVES

888-CITYSIDE (248.9743)
citysidearchives.com

- DOCUMENT MGMT EXPERTS
- STATE OF THE ART FACILITIES
- RECORD STORAGE
- SECURE SHREDDING
- SCANNING PROJECTS
- STORAGE VAULT for WILLS
- MEDIA/TAPE VAULT

LOWER YOUR COSTS: 888.CITYSIDE



Illustration by Bill Robles

other cases in which she had testified. She helped me through the preparation for her direct testimony, giving me more understanding of the field. We agreed that while her testimony could be expansive, that given the facts in our case, we would limit it to seven areas.

Ultimately the following question has to be answered in the affirmative:

> *Question: In your opinion, Dr. Franklin, to a reasonable degree of psychological certainty, is there a general view among experts in your field concerning the reliability of eyewitness identification?*
>
> *Answer: Yes, it is not reliable.*

The People did not have an expert and a further foundation was laid for the expert's testimony by cross-examination of the complainant and the police, bringing into doubt the reliability of the identification even before my witness testified. This was also bolstered by the investigator, with the measurements and photos taken at night and the National Weather Service Reports. The People had a positive photo array of Mr. Shaw by the complainant, which they elected not to use at trial.

Dr. Franklin provided the defense with one of her many papers entitled: *A Brief Guide to Factors that Commonly Influence Identification and Memory for Criminal Events* (© 2010). Dr. Franklin then presented her testimony in seven key areas including: (1) Suggestiveness of I.D., (2) Unconscious transference, (3) Weapons focus, (4) Stress, (5) Duration of exposure, (6) Partial disguise and (7) Cross-race identification. While Dr. Franklin's credentials as an expert were outstanding, they will not be repeated here. Although the People attempted to cross-examine Dr. Franklin, her entire testimony was un-rebutted. The following is an incomplete synopsis of Dr. Franklin's testimony, not a verbatim account, in order to provide a guide to counsel in other cases of like genre.

### Dr. Franklin's Testimony

After laying her credentials on the record, Dr. Franklin began to define memory, the sources of it and cognition. She told the Court that she was not a forensic psychologist and she has not treated patients *per se*. Her knowledge of the field comes from reviewing documents and literature, not from her own laboratory studies. Some of her testimony included:

> *...memory is reconstructed... when you're experiencing an event, you encode selectively from the event that you are experiencing, and not only are you encoding selective pieces, but you're interpreting them, and what gets encoded is your interpretation.*
>
> *The 'Fifty Percent Rule' characterizes the best of circumstances, where you have... perfect lighting and you have... near, good, unobstructed exposure to the other person, and there's no threat, and they're not wearing anything on their*

ORGANIZE WHAT YOU HAVE. FIND WHAT YOU NEED. PUT IT ALL IN ORDER, ONE STEP AT A TIME.

SONYA WEISSHAPPEL
PRESIDENT
**S E R I A T I M**

261 WEST 112TH STREET, 4E
NEW YORK, N Y 10026
TELEPHONE: 646-213-2122 FAX: 212-799-5571
SONYA@SERIATIM
WWW.SERIATIM.NET



**DATASAFE**
INFORMATION MANAGEMENT SOLUTIONS

*DataSafe has over 60 years of experience in helping clients meet internal and regulatory records management requirements, including SOX Compliance.*

- Secure Destruction/Shredding
- Records Storage/Document Storage
- Indexing and Imaging
- Media Storage and Rotation
- Online Backup & Disaster Recovery

Visit us at www.datasafe.com or call 1-800-275-SAFE

*head that might disguise... their hairline or something.*

*Generally what you find, and, of course, there's variations in this, but it's about fifty percent being able to identify the right person, which isn't great, but in addition to that, about a twenty-five percent rate of identifying the wrong person.*

Topically, Dr. Franklin broke down the seven areas of her direct examination with explanations that clarified factors leading to the unreliability of the identification process. Where a pre-trial *U.S. v. Wade*, 388 U.S. 218 (1967) hearing may be held, it is still a matter of strategy as to how much expert testimony the defense will consider using, and whether, if the suppression of the identification is granted, it will lead to a successful outcome at trial.

**Suggestiveness of I.D**: Dr. Franklin testified that the propensity of our cognitive system is to form perceptions and memories that go well beyond what we actually experience. A person's initial exposure to an event may be limited. Over time, more information becomes available, other people share their experiences, the person may even view video footage, and gradually learns facts that cause them to go back and reinterpret or fill in the original memories. The integrated memory representation is a product of all of these sources and is subject to further change.

Dr. Franklin testified that witnesses bring decision biases with them into the identification procedure. For example, we already know that people have a tendency to choose. This occurs largely because they tend to search for the choice who looks most like their memory of the perpetrator. That is, they make a relative judgment. There will always be someone in the line-up who is that best match, and if this best-matching person is innocent, he or she is at risk of being falsely identified. Many municipalities have adopted line-up procedures that lower the risk of such relative judgments by presenting the choices sequentially, with no indication of how many will be presented, and with each face shown only once. If the witness says "no," the face is not presented again.



Mike Keefe/Denver Post

Dr. Franklin then spoke to the problem of suggestion. She noted what the witness is told before attempting to make identification is crucial. The administrator should admonish the witness that the perpetrator may not be present. In addition, witnesses can be easily swayed by seemingly innocuous questions ("Could that be him?") and seemingly conservative instructions ("Take your time" and "Look at each picture carefully"). These latter instructions may imply to witnesses that the perpetrator is indeed present, resulting in their rate of choosing and of making a false identification increasing.

Dr. Franklin followed this statement by quoting evidence that rapid identifications made by witnesses are more likely to be accurate than those that follow more prolonged scrutiny. Line-up fillers should be selected to match the witness's description. Instead, police officers assembling a line-up often select fillers to match the suspect.

**Unconscious Transference:** Dr. Franklin spoke to unconscious transference and one common variation of it, "Mugshot Exposure," that exemplifies this principle. First, take the generic case of unconscious transference. The witness has seen the person before, but in a different context. The witness is now presented with that person in an identification procedure. Increased fluency of

### Fearonce G. LaLande
ATTORNEY AT LAW

207-01 HILLSIDE AVENUE
QUEENS VILLAGE, NEW YORK 11427
*fglalande@aol.com*

PHONE: (718) 217-7146
FACSIMILE: (718) 217-7149



TOMMASO'S
NORTH BEACH

1042 Kearny Street, San Francisco, CA 94133
Phone (415) 398-9696   Fax (415) 989-9415

*Agostino Crotti*


Mike Keefe/Denver Post

processing indicates to the witness that they have seen the person before without being aware that they have simply seen him dozens of times around the neighborhood during daily activities. Instead, in the potentially suggestive context of an identification procedure, the witness mistakenly says that that person is the perpetrator. The Mugshot Exposure Effect is a type of unconscious transference, and it presents real concerns for the criminal justice system, in which mugshot and line-up identifications are considered to be independent instances of identification. She cautioned that prior exposure to a face will increase the likelihood of selection of that face later.

**Weapons Focus:** Dr. Franklin spoke to the effect of a witness's focus on the presence of a weapon as impairing the memory or the ability to identify the face of the person who is holding the weapon. Dr. Franklin's testimony is supported by her citations to numerous scientific studies and a statistical technique known as meta-analysis, which allows those engaging in the process, such as Dr. Franklin, to combine the samples of various studies and to then present overarching themes and probabilities. She then testified that given the "alpha level of significance" (scientific terms which she explains) she and others have concluded that "the presence of a weapon impairs memory of facial identifications."

**Stress:** Dr. Franklin stated that when a person is being attacked by someone they don't know, the most immediate thing for them to do is to get out of the situation, not to memorize who this person is.

**Duration of Exposure:** Dr. Franklin testified that generally literature supports the fact that less time leads to poorer memory than more time.

**Partial Disguise:** In this case, the assailant was wearing a hoodie and was observed at night. My client was known to often wear a hoodie. The alleged gun was never recovered. The cell phone of the complainant was not offered into evidence by the People.

**Cross-race I.D:** Dr. Franklin testified that there is actually a cognitive processing bias that people have that allows them to differentiate members of their own race better than they can differentiate faces of another race. My client was African-American. The complaining witness was Hispanic. Aside from the complainant, there were no other witnesses to the actual event. My client did not testify.

Following brief closing arguments, the Judge deliberated over lunch and then promptly returned a verdict of "not guilty on all counts." The judge, a former Legal Aid Attorney, was familiar with the fields of memory reconstruction and cognition as they relate to the identification process. To some, the result of not guilty may impress them as a foregone conclusion, but it is one that I might not have achieved but for Dr. Franklin's testimony coupled with my investigator's work and a

KEEP UP THE GOOD WORK,
**CCLP**

HERBERT W. YANOWITZ, ESQ.
ONE EMBARCADERO CENTER SUITE 400
SAN FRANCISCO, CA 94111
(415) 362-1365

MAXWELL M. BLECHER

BLECHER, COLLINS, PEPPERMAN & JOYE

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

SALUTES CCLP
AND THE FIGHT FOR JUSTICE

515 S. FIGUEROA ST., 17TH FLOOR
LOS ANGELES, CA 90071

(213) 622-4222

judge savvy to the evolving and important science of memory reconstruction and cognition.

## Conclusion

In the Fall 2012 issue of the *ABA Criminal Justice* magazine Kristine Hamman noted that in early 2009, the District Attorneys Association of the State of New York (DAASNY) created the Fair and Ethical Administration of Justice Committee, with three subcommittees to address ethics, best practices and mutual assistance.[8]

In April, 2009 the New York State Bar Association formed a task force which issued a report on the causes of wrongful convictions. In October, 2009 that was followed by New York's Chief Judge Jonathan Lippman creating a Justice Task Force to review the causes of wrongful convictions. These and other groups have studied how memory operates, why people confess and the impact of police procedures on identifications and statements of suspects. The Best Practices Sub-Committee found that there were few written, detailed identification procedures in use by law enforcement in the state. New identification procedures were developed and placed online at http://tinyurl.com/d6yeppt and http://tinyurl.com/c3zb9K8.

New York is leading the way for criminal justice system reform. It is a collaborative effort geared to solving some of the most vexing problems. Commendably also the Best Practices Committee, together with the Ethics Committee, have produced a handbook entitled: *The Right Thing: Ethical Guidelines For Prosecutors*. New York's statewide efforts signal the need for the establishment of Best Practices Committees in every state and by every County Bar Association within each state. For example, Cyrus R. Vance, Jr., Manhattan's District Attorney, has created the Conviction Integrity Unit within his office, another courageous move by prosecutors to do "The Right Thing." For too long the criminal justice system has been governed by ignorant, short-sighted policies under the guise of being tough on crime.



Mike Keefe/Denver Post

1 Jonah Lehrer, *How We Decide* (First Mariner Books edition 2010). Also a book review by Thomas F. Liotti of *How We Decide*, The Nassau Lawyer, November, 2011 at 10.

2 Elizabeth F. Loftus and Graham M. Davies, Distortions in the Memory of Children, J. Soc. Issues, No. 2, 1984 at 51, 54. Also, Thomas F. Liotti, Christopher W. Zeh, and Dr. Leah Blumberg Lapidus, Cross-Examining Children in Sexual Abuse Cases, The Attorney of Nassau County, July, 2000 at 5, 12, 13 and 18 and The Cross Examination of Child Witnesses, Verdict, Vol. 6, No. 4, October, 2000 at 11-21.

3 Patrick. M. Wall, *Eye Witness Identification in Criminal Cases* (Charles C. Thomas, Publisher 1965)

4 Arthur Miller, *The Crucible* (The Viking Press, 1953). See also, Thomas Frisble and Randy Garrett, *Victims of Justice Revisited*, (Northwestern University Press (2005)).

5. Wigmore, The Science of Judicial Proof § 251, at 537 (3d ed. 1937).

6 James E. Coleman, Jr., Theresa A. Newman, Neil Vidmar and Elizabeth Zoeller, "Don't I Know You? The Effect of Prior Acquaintance/Familiarity," The Champion, April 2012 at 52; Jonathan Rapping, "Street Crimes, Stress, and Suggestion: Helping the Jury See What The Witness Did Not," The Champion, June 2011 at 22; Joseph F. Savage, Jr. and James P. Devendorf, "Conviction After Misidentification: Are Jury Instructions A Solution," The Champion, June 2011 at 30 and Nancy Steblay, "A Second Look At The Illinois Pilot Program: The Evanston Data," The Champion, June 2011 at 42.

7 Susannah Cahalan, "Trick Of The Eye, Why Witnesses So Often Get It Very Wrong," New York Post, August 28, 2011 at 29.

8 Kristine Hamann, "New York Law Enforcement Creates Best Practices To Prevent Wrongful Convictions," ABA Criminal Justice magazine, Fall 2012, Vol. 27, Number 3 at 36-41.

**Mark A. Gloade, Esq.**

*supports*
Coalition of Concerned
Legal Professionals'
Know Your Law sessions.

---



**Press of Fremont Payne, Inc.**
*Appellate Printers Since 1890*

Typesetting and Duplicating of Briefs, Records and Appendices. Serving and Filing in all New York State and Federal Appellate Courts

55 Broad Street, 3rd Floor • New York, NY 10004
(212) 966-6570 • Fax: (212) 941-0956