# Exhibit 2

STATE OF NEW YORK
COURT OF CLAIMS

-----------------------------------------------------------------X

JOSIAH GALLOWAY,

Claimant,

-against-

THE STATE OF NEW YORK,

Defendant.

-----------------------------------------------------------------X

Claim Number: **132020**

**PROPOSED AMENDED VERIFIED CLAIM**

Claimant **Josiah Galloway**, as and for his Amended Verified Claim against defendant, by his attorneys, The Law Offices of Thomas F. Liotti, LLC, alleges as follows:

**PARTIES AND JURISDICTION**

1. At all material times hereinafter set forth, the claimant **Josiah Galloway** was a resident of the State of New York at the time of the incident complained of and has recently moved to 8 Acorn Circle, Apt. 102, Towson, MD 21286.

2. The attorneys for the claimant are as follows: Primary/Lead Counsel: the Law Offices of Thomas F. Liotti, LLC, with offices located at 600 Old Country Road, Suite 530, Garden City, New York 11530; Telephone number: (516) 794-4700; Co-Counsel: Joseph F. DeFelice, Esq., 125-10 Queens Boulevard, Kew Gardens, New York 11415; Telephone number: (718) 261-3358.

3. Defendant The State of New York, is a sovereign state of the United States of America.

4. Jurisdiction is based upon the New York State Court of Claims Act, Article II, Section 8-b, "Claims for unjust conviction and imprisonment."

5. In compliance with the New York State Court of Claims Act, Article II, Section 10, this claim is served and filed with 90 days of September 13, 2018, when all charges were dismissed against the Claimant based on the Nassau County prosecutor's motion pursuant to CPL §440.10(1)(g) and "in the interests of justice" as joined in by the defense. See Indictment No.: 1315N-2008.

## STATEMENT OF FACTS

6. The Claimant was arrested on June 5, 2008 in regard to a charge of attempted murder and related charges for a crime which allegedly occurred on May 28, 2008. The Claimant was 21 years of age at the time. He was arraigned on June 7, 2008 on a Nassau County Felony Complaint under Docket No.: 2008NA-014711. The charges to which the Claimant herein pled not guilty consisted of Criminal Possession Of A Weapon - 2nd Degree, a violation of Penal Law § 265.03 (a C felony), and Assault in the 2nd Degree: With Intent To Cause Serious Physical Injury, a violation of Penal Law § 120.05(1) (a D felony). Following his indictment under Docket No.: 01315N-2008, the Claimant was arraigned on June 30, 2008, in the Nassau County Court and charged with the following violations of New York's Penal Law:

June 30, 2008
**Arraigned**

- Assault - 1st: Intent To Cause Serious Injury With Weapon

| PL 120.10 Sub 01 | Class B | Felony | NCIC 1399 |
|---|---|---|---|

- Attempted Murder: Intention

| PL 125.25 Sub 01 | Class B | Felony | NCIC 0999 |
|---|---|---|---|

- Assault - 1st: Intent To Disfigure Dismember Or Disable

| | | | |
|---|---|---|---|
| PL 120.10 Sub 02 | Class B | Felony | NCIC 1399 |

- Criminal Use Of A Firearm - 1st Degree: Commit Violent Class B Felony

| | | | |
|---|---|---|---|
| PL 265.09 Sub 01 | Class B | Felony | NCIC 5299 |

- Criminal Possession Of A Weapon - 2nd Degree: Loaded Firearm

| | | | |
|---|---|---|---|
| PL 265.03 Sub 01B | Class C | Felony | NCIC 5293 |

- Crim Possess Weapon-2: Loaded Firearm-Other Than Person's Home/business

| | | | |
|---|---|---|---|
| PL 265.03 Sub 03 | Class C | | NCIC 5299 |

7. The Claimant was remanded without bail. The Claimant had a prior criminal record as reflected on his "rap sheet," also known as a NYSIS Report, which is the data provided by the New York State Criminal Justice Service Agency regarding the Claimant's prior criminal history.

8. The Claimant was indicted by a Nassau County Grand Jury on June 16, 2008, Indictment No.: 1315N-08.

9. Following a jury trial in February and March, 2009, the Claimant was convicted of all charges on March 9, 2009.

10. The Claimant was sentenced on November 23, 2009 to a 25-year term of imprisonment. At the time of Claimant's release from custody on September 13, 2018, he has been wrongfully imprisoned and incarcerated continuously from the time of his arrest on June 5, 2008 until September 13, 2018, for a total period of ten (10) years, three (3) months and eight (8) days. The claimant remained in the Nassau County Jail from approximately June 5, 2008 until January 22, 2010 at which time he was transferred to the New York State Department of Corrections (DOCS) where he remained until September 13, 2018. See transcript of September 13, 2018 vacating the conviction of the claimant attached as Exhibit **"A"** and a copy of the records from the Nassau County Correctional Center and the DOC attached as Exhibit **"B"**.

11. What follows is a summary of police, prosecutorial and judicial misconduct taken from the defendant's post-verdict motion, pursuant to CPL § 210.20(n) and 330.30; and the trial record. From the record, the following was also revealed (numbered references are from the trial record):

- The arrest by Police of the Claimant, Josiah Galloway followed a number of overly suggestive and grossly improper identification and line-up procedures. More specifically, the alleged victim, Jorge Anyosa saw the distinct characteristics of the assailant and provided a detailed description of the assailant, which clearly did not match the description of Mr. Galloway. Nevertheless, the evidence shows that the Police Officers that investigated this matter, engaged the witnesses in several improper identification procedures which caused the witnesses to provide a circumstantial identification of Mr. Galloway as the alleged assailant.

- Mr. Anyosa also gave a description of the assailant - being between five foot ten inches and to five foot eleven inches. Mr. Anyosa described that the assailant had a short hair cut (*Id.* at 218:17-19) and further described the assailant as a male black, 25 - 30 years of age (*Id.* at 461:1-3) and further described that the assailant spoke with an accent (*Id.* at 461:15-17).

- On or about June 6, 2008, Mr. Galloway was arrested in connection with the alleged shooting by the Hempstead Police Department. *Infra.* The Nassau County Police then appeared at the Hempstead Police Department to process the arrest of Mr. Galloway. (*Id.* at 440:9-24). During that time they conducted two photo arrays containing photos that depicted Mr. Galloway with a hair style different from that which he possessed at the instant time and in May of 2008.

- After observing that Mr. Galloway's hairstyle at that time did not match the description given by the alleged victim, the detective declined to go forward with the lineup (*Id.* at 451:21 - 452:1). Detective Lipson, the lead Detective in the investigation, noticed that Mr. Galloway's hair was different than the description given by the victim/witness as well as the witness. (*Id.* at 517:5). Nevertheless, the detective did not discuss this obvious and exculpatory information with the other officers. (*Id.* at 518 and 520).

- On August 14, 2008, the second day that the detectives sought to place Mr. Galloway in a lineup, Mr. Galloway's hair was still long, as it had been in May of 2008. However, on this occasion, Mr. Galloway's hair was braided and/or in "cornrows." (*Id.* at 475). The detective agreed that Mr. Galloway's hairstyle never matched the description given by the victim/witness. (*Id.* at 476:9-17).

- The witness/victim, Mr. Anyosa, was never shown any photographs of Mr. Galloway with braids or an afro - which were the hairstyles that Mr. Galloway actually had or could have had on the date of the shooting. (*Id.* at 244:23 - 245:9; *see also,* 254:5-15). Indeed, every photograph or viewing of Mr. Galloway that was shown to the witness/victim by the police featured Mr. Galloway with short hair or wearing a baseball cap. More specifically, any and all characteristics of Mr. Galloway that were exculpatory and/or did not match the description of the alleged assailant were intentionally covered up or hidden from the victim and the witness during the identification procedures of the police. (*Id.* at 245).

- During the lineup, the subjects, including Mr. Galloway, were instructed to wear baseball caps to cover up their hair. *Infra.* Mr. Anyosa testified that the police instructed him to ignore the subjects' hair. (*Id.* at 250:21 - 251:8). Mr. Anyosa was told to "look at the face, that's all." (*Id.*).

- The victim/witness Mr. Anyosa and the other eyewitness, Mr. Hernandez, both confirmed that the alleged assailant did not have an afro or cornrows on the night of the shooting. (*Id.* at 278 - 287). After indicating their familiarity with the hairstyles, both of the aforementioned witnesses testified that they would have been easily able to identify if the assailant had an afro or cornrows. (*Id.*). Both of the aforementioned witnesses confirmed that they were never shown Mr. Galloway's hair and/or hair style as it was in May of 2008 (which was an afro and/or cornrows) at anytime. (*Id.*). In fact, during the lineups in which both witnesses participated, the witnesses were not allowed to see Mr. Galloway's hair. (*Id.*). Thus, Mr. Galloway was deprived of his right to be viewed in a non-suggestive process.

- In sum, following the suggestion by the Hempstead Police Department that Mr. Galloway was the suspect in the shooting, Mr. Galloway became just that - the prime, and indeed the only, suspect. Following this information from the Hempstead Police, the arresting police officers unreasonably attempted to make Mr. Galloway fit the description of the suspect. The suggestive nature of the police's identification procedures are apparent as described above. Likewise, the fact that Mr. Galloway did not have access to the type of car driven by the perpetrator and would need to wear glasses in order to see, were likewise factors that set Mr. Galloway apart.

- Still, when faced with the identification of Mr. Galloway in the lineup and in the photo array, Mr. Galloway's distinguishing and exculpatory characteristics were covered up and/or made absent from the identification process. Thus, the identification process was tainted in all ways possible against Mr. Galloway.

● During his summation, the prosecutor made statements to the jury that were not based upon the facts or evidence of the case and sought to cause the jury to assume the role of community defenders and avengers, which was clearly prejudicial and improper as a matter of law.

● The Prosecutor Also Improperly Vouched For The credibility Of The Prosecution's Witnesses While Impermissibly Prejudicing The Defense's Witnesses.

● The People improperly impeached the credibility of their own witness - Robert Ogletree. (*Id.* at 89:25 - 90.3). In addition, the improper statements made by the prosecutor in an attempt to persuade the jury that Mr. Galloway had allegedly altered his appearance during trial in order to mislead the jury panel directly, the prosecutor then went further and insinuated that Mr. Galloway and his defense counsel doubted each individual jury member's ability to make rational determinations of fact.

● The Prosecutor Wrongfully and Continually Shifted The Burden On Defendant To Produce Evidence An Improperly Asked The Jury To Draw Negative Inferences From Defendant's Purported Failures To Produce Said Evidence.

● The Court Abused Its Discretion By Forcing The Jury To Continue To Deliberate Despite Their Repeated Notices To The Court Of The Fact That They Were Hopelessly Deadlocked.

● The People's Solicitation Of Testimony From the Witnesses During The People's Direct Case Regarding Photo Identification Of Mr. Galloway Was Unduly Prejudicial To The Defendant.

● Detective Thomas Bischoff, Shield # 1001, was a forensic artist. He was called by the defense and he met with the complainant in the hospital four (4) days after the crime. (820). The victim gave a description of someone who was 25 to 30 years old, 5 foot 10 inches to 5 foot 11 inches and driving a 2001 or 2002 gray or silver Toyota Corolla. (828). The face of the perpetrator was shaven with no visible scars or tattoos and the hair was shaven. (828 - 829). In particular, when shown photos of hair for the sketch, the victim did not pick out any photo with braids. (837). The victim, Mr. Anyosa, signed the back of the sketch to confirm the provided information. (825 - 826). The police had this description at the time Mr. Galloway was stopped and interviewed. Mr. Galloway did not match this description nor did he have an accent (something the complainant said the perpetrator had). Mr. Galloway does have a missing tooth (F #9) which came out from the dentist who testified.

● Robert Ogletree, the People's first witness, who was arrested with Mr. Galloway on June 5, 2008,was a friend of Mr. Galloway. The police showed Mr. Ogletree a sketch, which the police said looked like Mr. Galloway even though it showed a person with short hair and Mr. Galloway had long hair. In fact on June

5, 2008, Mr. Galloway had an afro with little twists or dreads. (301 - 302). The arrest happened while they were in a Honda owned by Ogletree's girlfriend. (273 - 274). Mr. Ogletree said on the witness stand that the police had coached and coerced him into making the statement and had put bits and pieces of his story together and the final product was false. (270 - 272, 299 - 300, 319 -320). In reference to Mr. Galloway saying it was hot up in Nassau, Mr. Ogletree said that referred to Mr. Galloway wanting to leave the area because Mr. Galloway had been shot at by someone (270) and not because of the cab driver incident. The police kept Mr. Ogletree for hours threatening him with all kinds of charges while they sought to get him to implicate Mr. Galloway. (303). This testimony demonstrates how the police were seeking to put this crime on Mr. Galloway and got Mr. Ogletree to sign a statement which he testified that he had only seen a week prior to his testimony. While testimony like this can sometimes be written off as a friend of the defendant recanted. The fact that Mr. Galloway is innocent, as now admitted by the prosecution, can only lead this Court to believe that Mr. Ogletree's testimony about the police misconduct in getting statements from him to pin the case on Mr. Galloway is true!

●Police Officer Steven Horowitz, Shield # 144, acknowledged that the initial report included a composite sketch describing the assailant as 5 foot 10 inches to 5 foot 11 inches with hair "tight to the head" (564 - 565) and described the car the assailant drove as a 2001/2002 Toyota Corolla (565) with a missing front driver side hubcap. (574 - 575). Police Officer Horowitz showed Mr. Anyosa and the other witness, Hernandez (who was present when the assailant first had the argument with them but not present during the shooting) a Mazda belonging to Mr. Galloway's girlfriend both said it looked like the car but they weren't sure. (576 - 577). Police Officer Horowitz noted the composite sketch did not show braids and Mr. Galloway had braids on June 5, 2008. (584). Officer Horowitz had also showed the witness a photo of Mr. Galloway portrayed without any braids and with short hair - this was an approximately year-old photo. (553 - 554). Officer Horowitz had been involved in the stop of Mr. Galloway on June 5, 2008 for an unrelated crime which was eventually a "no true bill." Officer Horowitz said at the time of the stop that Mr. Galloway appeared to be 5 foot 8 inches to 5 foot 10 inches tall with cornrows that were messy and appeared to be coming out. (539). Mr. Galloway later testified that he is 5 foot 5 inches tall.

● The aforesaid witness, Police Officer Steven Horowitz noted the police information from the sketch had the assailant much taller than Mr. Galloway with hair tight to the head and that the car was not positively identified. He also showed a photograph of Mr. Galloway, which was approximately one (1) year old, with short hair. Also the two (2) cars the witnesses were shown were the Mazda, which was a grayish-green color, and the Honda, which was a grayish-blue color, and the Mazda, which the witnesses said looked like the car, did not have a missing hubcap. (575 - 576).

● Detective Matthew Ross, Shield # 834, testified that while Mr. Galloway was in

the cell prior to a scheduled lineup, he saw Mr. Galloway doing cornrows on his own hair (802 - 804) and he admitted that Mr. Gallowy had no grease or comb to do this. Also because Mr. Galloway was so short, Detective Ross had him sit on two (2) telephone books during the lineup so that Mr. Galloway would appear to be the same height as the fillers who were all police officers. (787).

● Detective Ross's testimony is significant in that he gave the jury the impression that Mr. Galloway changed his hair for the lineup. The implication to the jury was that Mr. Galloway was guilty and wanted to change his appearance. Further, having Mr. Galloway sit on two (2) telephone books to make it appear that he is taller than he really is gave the impression to the witnesses of a taller person. As previously stated, Mr. Galloway is only 5 feet 5 inches tall, which is not the height given to the sketch artist or in the initial description. The police had the information of the description in front of them on June 5/6, 2008 and knew that Mr. Galloway did not match the description.

● Mr. Jorge Anyosa was the complainant. Mr. Anyosa first said the assailant was 5 feet 9 inches tall with light black skin and male. (375 - 376). He was so close to him during the first encounter that the person slapped his hand. Mr. Anyosa said that the assailant was his height 5 feet 10 inches/5 feet 11 inches and that he looked directly at his face and never noticed a missing tooth. (419 - 421, 434 - 435). Significantly, Mr. Anyosa said the assailant had an accent (421, 433), that the car had dark tinted windows which the Mazda, the car the police implied was driven by the assailant, did not have. (431 - 432). Mr. Anyosa indicated that he never said that the Mazda was on the scene that evening of May 15, 2008. Mr. Anyosa admitted that the person did not have cornrows or an afro. (442). Mr. Anyosa admitted to telling the sketch artist that the person was 5 feet 10 inches/5 feet 11 inches tall, with short hair and that he never mentioned cornrows or an afro. (418). Mr. Anyosa also admitted that the person who shot him did not have braids. (447). See pages 442 thru 447 for description differences for hair and car.

● Mr. Galloway does not have an accent. Mr. Anyosa had described the shooter as being 5 feet 10 inches/5 feet 11 inches tall and then appears in court and stated at first that the shooter was 5 feet 9 inches tall until he was confronted with his prior description. There was no way that this shooter was 5 feet 5 inches or even 5 feet 6 inches as Mr. Anyosa argued with the shooter face to face. Also, the assailant's car had dark tinted windows while the Mazda, which was the car Mr. Galloway's girlfriend had, did not.

● Wilmer Hernandez, who is a cab driver and was present at the time of the first altercation, was the friend of the complainant. He argued with the assailant at close range standing next to each other and said the assailant was 5 feet 9 inches or 5 feet 10 inches with black, short hair and a black male. (463 - 464, 482). When shown photos of the Honda and Mazda by the police, Mr. Hernandez said the Mazda was "more like" the car driven by the assailant. (467 - 470). Mr. Hernandez described the assailant as having a light complexion and about 26 to

30 years old. Mr. Galloway was approximately 21 years old at the time. Mr. Hernandez said the person did not have braids and was approximately 160 - 170 pounds. (485 - 487).

● The height is not that of Mr. Galloway nor does the hair style match. Also, Mr. Hernandez only said the Mazda was "more like" the car the assailant drove and not that it was the car. Mr. Galloway did testify that he doesn't have a license and due to his eyesight can't drive at night. The defense also presented Mr. Galloway's girlfriend and his mother as alibi witnesses, who both stated they were with Mr. Galloway watching TV. The defense called ADA Joseph LaRocca, who stated the defense had given him names of alibi witnesses and did not put any restrictions on him as to whether he could speak to them but the District Attorney's Office never did speak to the witnesses. (898 - 900).

●Josiah Galloway testified in his own defense. He testified to being at home watching TV and noted that was 5 feet 5 inches tall and 22 years old. (997 -998). Mr. Galloway testified that he had cornrows on June 5, 2008, which was the same hairstyle that he had on the date of the crime. (1004). Mr. Galloway stated that he cannot do his own hair, contrary to Detective Ross's testimony (1005) implying that Mr. Galloway was doing his own hair to look different for the lineup. Mr. Galloway also testified that he cannot drive at night as he cannot see well due to glares. (1008). Neither the Honda nor the Mazda had tinted windows and neither of those cars were missing a hubcap. (1009 - 1010). Mr. Galloway testified that he did not have a Driver's License or Lerner's Permit (1027 - 1028)., that he had no accent and weighed approximately 145 - 150 pounds. (1036).

● This failure to speak to alibi witnesses and the differences in the description of the assailant as compared to Mr. Galloway, the facts that Mr. Galloway does not have an accent and the cars had no tinted windows or missing hubcap, that Mr. Galloway cannot do his own hair, all lead to the conclusion that there was a rush to judgment and the police just wanted to pin this crime on Mr. Galloway.

**HISTORY AND BASIS OF CLAIM**

12. The nature of the claim: The Claimant was wrongfully arrested, accused, falsely imprisoned, charged, prosecuted, defamed, convicted and sentenced, all in violation of his State and Federal Constitutional and civil rights. The Claimant was falsely imprisoned for more than ten (10) years beginning in 2008 and not being released until September 13, 2018, when all of the charges against him were dismissed on the Nassau County prosecutor's motion as joined in by the defense. See Indictment No.: 1315N-2008.

13. The time when, the place where and the manner in which the claim arose: The incident which caused the Claimant to be arrested occurred on May 15, 2008 , at approximately 1:30 a.m., at West Columbia Street and Main Street near the Long Island Railroad and MTA bus stations. Thereafter in June, 2008, the Claimant was arrested and following a trial by jury was convicted on March 9, 2009, by jury verdict, and sentenced on November 23, 2009. Subsequently, the charges against the Claimant were dismissed and he was released from prison on September 13, 2018, after he had been incarcerated for more than ten (10) years. The claim of the Claimant was continuous from May 15, 2008 through September 13, 2018.

14. The Claimant was convicted of attempted murder and related felony charges in the County Court of Nassau County following a jury trial. The Claimant received a sentence of twenty-five (25) years in the Nassau County and New York State prisons. The Claimant served more than ten (10) years in jail following his wrongful arrest in 2008 and sentencing in 2009. After serving ten (10) years in jail and as Claimant's direct appeal was being prepared, the Nassau County District Attorney recognized that there had been a misidentification of the Claimant and that another individual had committed the crimes of which the Claimant was convicted. On September 13, 2018, the Nassau County District Attorney moved to dismiss all of the charges and the Claimant was released from custody. A copy of the Order of the Hon. Teresa K. Corrigan dated September 17, 2018, and entered and filed on September 18, 2018 in the Clerk's Office of the County Court of Nassau County, which vacated the Civil Judgment of November 25, 2009 and vacated and dismissed the Claimant's conviction on September 13, 2018, is annexed hereto as Exhibit **"C."** A copy of the Order of the Hon. Teresa K. Corrigan dated September 17, 2018, and entered and filed on September 18, 2018 in the Clerk's Office of the County Court of Nassau County, which vacated the Restitution/Reparation Judgment ordered

on November 25, 2009, since the case against the Claimant herein was dismissed and the Claimant's conviction was vacated and dismissed on September 13, 2018, is annexed hereto as Exhibit **"D."**

15. Based upon the foregoing and in compliance with Article II, Section 8-b(3), (4) and (5) of the New York State Court of Claims Act, the Claimant has established: (a) that he has been convicted of one or more felonies against the state and was subsequently sentenced to a term of imprisonment, and Claimant has served part of his sentence, having served ten (10) years of his twenty-five year (25) sentence; (b) that he has been pardoned upon the ground of innocence of the crime or crimes for which he was sentenced and the accusatory instrument dismissed; and (c) that the Claimant herein is likely to succeed at a trial in this matter in proving: (i) that he did not commit any of the acts with which he was charged in the accusatory instrument; and (ii) that Claimant's own conduct did not cause or bring about his conviction.

16. The County of Nassau, the Nassau County Police Department, Office of the Nassau County District Attorney, the Incorporated Village of Hempstead and the Incorporated Village of Hempstead Police Department have shown a pattern of violating the civil rights of those who are falsely accused, particularly those in the minority community. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978). See also, *Restivo, et al v. Nassau County*, Docket No. 2: 2006 cv 06720, 2014 U.S. Dist. Lexis 188474 (E.D.N.Y., J. Seybert) denying the County's motion for a new trial, aff'd *Restivo v. Hessemann,* No. 14-4662 (2d Cir. 2017 ). This claimant is an African-American. See also, *People v. Brown*, 78 A.D. 2d 861, 432 N.Y.S. 2d 630 (1980); *People v. John Daly,* (County Court, Nassau County, Hon. Donald DeRiggi), 20 A.D.2d 542, 799 N.Y.S.2d 537 (2nd Dept. 2005); 5 N.Y.3d 882 (2005); 57 A.D.3d 914 (2d Dept., 2008), where the *People* failed to disclose 12 statements which

were both *Brady* and *Rosario* material. See also, Liotti, Thomas F. and Fasano, H. Raymond, Disparate Sentencing In Nassau County, The Attorney of Nassau County, October, 1997 at 5. This article concerns a State Bar Association report which showed that minorities in Nassau County were sentenced more severely than Caucasians. See also, *People v. Justin Shaw*, Ind. No.: 01239N-2011; Liotti, Thomas F. and Smith, Drummond, (Mis) Identification In Criminal Cases A Leading Cause Of Wrongful Convictions, Verdict, April, 2013, vol. 19, no. 2, cover and lead article and 1-11. A copy of that article is annexed as Exhibit **"E."** The District Attorney Madeline Singas, Esq., opposed the adoption by the State Legislature and Governor of S. 2412 - D/A. 5285 creating a commission on prosecutorial conduct. See, District Attorney Madeline Singas, Op-Ed Newsday, Bill to Oversee DAs Misses The Point, Newsday, August 16, 2018. See also, *Maxwell v. The Incorporated Village of Hempstead*, (99-CV-974[AS], EDNY)[1] and

[1]Mr. Liotti was retained to represent the family of and the Estate of Paul Maxwell, a 28 year old black man, shot and killed by Hempstead Village Police. Mr. Liotti commenced a wrongful death and civil rights action. See Vitello, Paul, How did Poet-Genius Finally Come Undone?, Newsday, July 30, 1998 at A8; East, Georgia, A Father In Search Of Answers, Son Was Shot By Police, Newsday, August 6, 1998 at A3 and A32; Reynolds, Jeffrey L., Who Needs Denis Dillon, Hempstead Leaders Form Independent Board To Probe Shooting By Cop, Long Island Voice, August 27-September 2, 1998 at 8; Reynolds, Jeffrey L., L.I. Topic, Can We Cool Community Tensions In Wake Of Recent Killings By Cops? This Activist Says That A Civilian Complaint Review Board Would Help and, Other Voices, full page article where Mr. Liotti is quoted as follows: "Excessive force by police is generally the product of poor training and/or racism. An independent civilian complaint review board and special statewide prosecutor are desperately needed. This issue is the hottest one in the new frontier of civil rights and criminal justice. Elected officials are ignoring these issues because they are tainted by endorsements and campaign contributions from police groups." Newsday, Currents and Books, September 6, 1998 at B7; and Topping, Robin, Cops Cleared In Fatal Shot, Newsday, October 9, 1998 at A29; Fries, Steven and Cowan, Erin, Cop Honored In Slaying: Spitzer Cites Hempstead Case, Newsday, May 12, 1999 at A3; Vitello, Paul, A Hero? Depends On Perspective, Newsday, May 13, 1999 at A8; McCrummen, Stephanie, Slain Man's Dad Sues Village, Newsday, February 27, 1999 at A23; Williams, Herb. Cover Story, The Silence of the Lambs, On Anniversary of Shooting of Paul Maxwell, Hempstead's Black Clergy Remain Silent on Police Brutality Issue, Community Journal, Roosevelt, New York, August, 1999, Vol. 7, No. 2 at 1 & 3; Evans, Martin C., Anger & Despair, For Many L.I. Blacks, Verdict Yields Frustration Newsday, February 27, 2000 at A4 and A42. See, David Pierson, Father Blames Police Training For Son's Death, Newsday, July 6, 2000

*Carrillos v. Inc. Village of Hempstead,* (E.D.N.Y. 11-cv-5775, Hon. Joseph Bianco, decided February 20, 2015, N.Y.L.J., Decisions of Interest, March 5, 2015 at 17 (dec.nylj.com/1202719533846).

**DAMAGES**

17. By reason of all of the foregoing and due solely to the negligence of the Respondent, the Claimant **Josiah Galloway**, has been damaged and has inter alia, sustained, suffered and will continue to suffer a stigma and prejudice because of this wrongful conviction; loss of consortium/society; loss of educational and employment opportunities and loss of prospective advantage. The Claimant is seeking One Hundred Million and 00/100 Dollars ($100,000,000.00) in compensatory and punitive damages together with pre-judgment and post-judgment interest, costs, disbursements and attorneys' fees. The interest claimed for pre-judgment and post-

---

at A30; David Pierson, Long Island, Focus On Officers' Training, Cops Queried In Trial Over Shooting Death, Newsday, July 7, 2000 at A32 and David Pierson, Hempstead Settles Suit, Parents' Loss Spurs Extra Cop Training, Newsday, July 8, 2000 at A7. July 7, 2000, United States District Court Judge Arthur Spatt (E.D.N.Y.). James Murphy, Esq. of Montfort, Healy, Sally and McGuire, adversary. Federal civil rights (§1983) negligence and assault and battery claims involving the wrongful death and killing of Paul Anthony Maxwell, a 28 year old, emotionally disturbed, African American by a white Village of Hempstead police officer who shot him dead while he was naked and allegedly swinging a bat at police officers. Mr. Liotti represented the plaintiff in the civil jury trial. The case was settled after five days on trial. Motions for a directed verdict and summary judgment were denied, plaintiff concluded his case and two defense witnesses testified. James Fyfe, a renowned expert on police procedures and training and representatives from both the Nassau and Hempstead Police Departments testified for the plaintiff as did the Medical Examiner. The case was settled in a "So Ordered" Stipulation for $135,000 plus the Village agreed to establish a mandatory annual two hour course for all police personnel (112 officers) dealing with the handling of emotionally disturbed persons. The Mayor of the Incorporated Village, James Garner, was present, a party to the Stipulation and expressed his condolences on the record; and February 25, 1999 - WOL Radio Washington and Maryland, The Joe Madison Show - Police Brutality and the Maxwell case.

judgment runs and continues to run from 2008. The Claimant will also be compelled to expend great amounts of time and money for legal counsel to pursue this claim and all related matters.

Dated: Garden City, New York
December 4, 2018

JOSIAH GALLOWAY

LAW OFFICES OF THOMAS F. LIOTTI, LLC
By: Thomas F. Liotti, Esq.
Attorneys for Claimant
600 Old Country Road, Suite 530
Garden City, New York 11530
(516) 794-4700

TO: ERIC T. SCHNEIDERMAN, ESQ.
ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
STATE OF NEW YORK
Nassau County Regional Office
200 Old Country Road, Suite 240
Mineola, New York 11501
(516) 248-3302

INDIVIDUAL VERIFICATION

STATE OF NEW YORK )
ss.:
COUNTY OF NASSAU )

JOSIAH GALLOWAY, being duly sworn, deposes and says that deponent is the Claimant in the within action; that he has read the foregoing **Claim** and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true.

JOSIAH GALLOWAY

Sworn to before me this
10th day of December, 2018.

Notary Public

THOMAS F. LIOTTI
Notary Public, State of New York
No. 02LI6080933
Qualified in Nassau County
Commission Expires Sept. 23, 2023

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NASSAU : CRIMINAL TERM PART 41

---------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

-against-

INDICTMENT NO. 1315N/18

JOSIAH GALLOWAY,

Defendant.

---------------------------------------------X

262 Old Country Road
Mineola, New York
September 13, 2018

B E F O R E:

HONORABLE TERESA K. CORRIGAN,
Acting Supreme Court Justice

A P P E A R A N C E S:

THE HONORABLE MADELINE SINGAS
Nassau County District Attorney
BY: SHERYL ANANIA, ESQ., of Counsel
Assistant District Attorney
For the People

JOSEPH F. DeFELICE, ESQ.
125-10 Queens Boulevard, Suite 302
Kew Gardens, New York 11415
For the Defendant

NATALIE M. TURNER-MOLLOY
Senior Court Reporter

                    THE CLERK: This is an add on to the calendar, Indictment 1315N of 2008, People of the State of New York versus Josiah Galloway.

Appearances for the record.

MR. DeFELICE: Good afternoon, Judge, Joseph DeFelice, 125-10 Queens Boulevard, Kew Gardens.

MS. ANANIA: Office of the District Attorney by Sheryl Anania.

THE COURT: Good afternoon.

THE CLERK: Are you Josiah Galloway?

THE DEFENDANT: Yes, ma'am.

THE CLERK: Do you appear here with your attorney, Mr. DeFelice?

THE DEFENDANT: Yes, ma'am.

THE COURT: Is there an application at this time?

MS. ANANIA: Yes. I would like to make a statement for the record.

THE COURT: Please.

MS. ANANIA: If I could, is it all right if I step this way?

THE COURT: You may.

MS. ANANIA: In early July of 2018, an individual called the Nassau County District Attorney's Office with information regarding the 2008 shooting of a cab driver in front of a bus terminal in Hempstead. This individual was

brought in and interviewed by the District Attorney's Conviction Integrity Unit. This individual said that she was aware that the wrong person was convicted of this crime and that she could no longer remain silent. This individual provided details regarding the name of the actual perpetrator and the circumstances surrounding the crime. This information led us to additional witnesses who were unknown at the time of the trial.

Our unit began to gather information seeking to verify this individual's account. Our Conviction Integrity Unit re-interviewed witnesses from Josiah Galloway's trial and found new witnesses that verified this individual's account that someone else had committed the crime.

The individual who we believe actually committed the crime matches the initial description of the shooter and resembles the sketch that was generated by the police. In addition, we discovered that over the years, the actual perpetrator admitted to numerous individuals that he shot a cab driver in Hempstead.

The person who we believe to be the actual perpetrator has a criminal record and is currently serving a prison sentence. Because the statute of limitations for attempted murder is five years, we are unable to prosecute that person who we believe to be the actual perpetrator.

At the time of Mr. Galloway's trial, any and all

exculpatory information was provided by the prosecution to the defense including any discrepancies between the perpetrator's description and Mr. Galloway. These discrepancies were thoroughly explored by the defendant's attorney and argued to the jury.

The defendant and two alibi witnesses also testified. The prosecution called to the stand a friend and former co-defendant of Mr. Galloway who allegedly told the police that Mr. Galloway confessed that he had shot the cab driver. Nonetheless, that witness recanted on the witness stand stating that Mr. Galloway had never confessed to him. After the trial, Mr. Galloway's trial lawyer made a motion to dismiss the jury's verdict which was denied.

When we learned last Friday that there was sufficient evidence to believe that Mr. Galloway was, in fact, innocent, I called Mr. DeFelice, the attorney of record who was completing an appeal on Mr. Galloway's behalf. I then called this Court and asked for the case to be calendared as soon as possible so that we could move to dismiss and release Josiah Galloway. Mr. DeFelice asked that the case be calendered today.

As of this date, no appeal has been filed in this case. Our Conviction Integrity Unit remains committed to reviewing any allegations of wrongful conviction in Nassau County, and I thank Mr. DeFelice for his assistance and to

the Court for calendaring the case so quickly.

I now move in the interest of justice to vacate the conviction of Josiah Galloway under Indictment Number 1315N of 2008 pursuant to CPL Section 440.10(1)(g).

THE COURT: Thank you.

Counsel?

MR. DeFELICE: Well, Judge, first of all, I want to thank Ms. Anania for the work she did on this and the Conviction Integrity Unit. I want to also thank DA Madeline Singas for allowing this investigation to go forward.

Okay, there is nothing that can bring back the ten years that he was in prison, but at least he's got a future now.

I'd ask that the record be sealed, Judge.

THE COURT: All right. Very good.

Mr. Galloway, is there anything you would like to say?

THE DEFENDANT: No, I'm just happy.

THE COURT: I'm happy for you.

Let me commend the District Attorney's Office for their actions in investigating this matter and for expeditiously seeking the vacatur of this conviction and the release of the defendant.

It is now ordered that the convictions entered

under Indictment Number 1315N of 2008 are hereby vacated pursuant to CPL Section 440.10(1)(g). It is further ordered that any orders of protection issued as a result of this trial under Indictment Number 1315N of 2008 are hereby vacated.

It is further ordered that Indictment 1315N of 2008 is dismissed and sealed pursuant to CPL Section 160.50 with the exception of those documents requested by law enforcement for further investigation as agreed upon by both the People and Mr. DeFelice that they can receive.

Additionally, it is ordered that the defendant be discharged from custody and be set free as of this moment.

Good luck to you, Mr. Galloway.

Thank you, everyone.

* * * *

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

Natalie Turner-Molloy

NATALIE M. TURNER-MOLLOY
Senior Court Reporter

# Exhibit B

INQUIRY NASSAU COUNTY SHERIFF'S DEPARTMENT 11/19/18 14:39
FUNCTION: 3 ADDRESS HISTORY JC2M305

NAME: GALLOWAY JOSIAH * ICN: 04010093
LOC: CL: AM SCF MAXA KL RACE: B DOB: 11/22/86 NCC: 08005354

| NCC | ADMITTED | DISCHARGED | ADDRESS | | | |
|---|---|---|---|---|---|---|
| 08005354 | 06/07/08 | 01/22/10 | 153 WINDSOW PKWY | HEMPSTEAD | NY | 11550 |
| 08003497 | 04/10/08 | 04/21/08 | 153 WINDSOW PKWY | HEMPSTEAD | NY | 11550 |
| 06008988 | 10/05/06 | 06/05/07 | 262 E.COLUMBIA ST | HEMPSTEAD | NY | 11550 |
| 06003225 | 04/12/06 | 06/05/06 | 262 E.COLUMBIA ST | HEMPSTEAD | NY | 11550 |
| 06002945 | 04/04/06 | 04/04/06 | 262 E.COLUMBIA ST | HEMPSTEAD | NY | 11550 |
| 05000374 | 01/13/05 | 09/08/05 | 262 E.COLUMBIA ST | HEMPSTEAD | NY | 11550 |
| 04003087 | 04/16/04 | 11/18/04 | 153 WINDSOR PKWY | HEMPSTEAD | NY | 11550 |
| 04001711 | 02/26/04 | 03/12/04 | 153 WINDSOR PKWY | HEMPSTEAD | NY | 11550 |
| 04001028 | 02/04/04 | 02/05/04 | 153 WINDSOR PKWY | HEMPSTEAD | NY | 11550 |
| 04000242 | 01/09/04 | 01/12/04 | 153 WINDSOR PKWY | HEMPSTEAD | NY | 11550 |

YOU ARE ON THE LAST PAGE.

```
INQUIRY              NASSAU COUNTY SHERIFF'S DEPARTMENT        11/19/18 14:41
FUNCTION: 2                 GENERAL CHARGE SUMMARY                    JC2M220

NAME: GALLOWAY          JOSIAH                     *            ICN: 04010093
LOC:            CL: AM  SCF MAXA KL   RACE: B   DOB: 11/22/86   NCC: 08005354
---------------------------------------------------------------- INACTIVE CASE
WARRANT COUNT: 000                                       REMARK: Y INC: 008
FINE:          200.00 SCHG:          140.00 CVF:          0.00 OTH:         0.00
- DKT: 14710/08                      IND:                  SEALED    YO:    CTL:
- DKT: 14711/08                      IND: SCI2380N09       SEALED    YO:    CTL:
- DKT: 14712/08                      IND: IND1315N08       SEALED    YO:    CTL:

- DKT: 24986/07      DCH 06/07/08    IND:                            YO:    CTL: N
  STAT: DSEN 05/01/09  REL: 05/01/09 BOND:            .00     BAIL:           .00
  PL  BMIS 221.10.01   5 POSS MARIJNA 5
  APPEARANCE: 05/01/09 DCH 01 SENT   PARDES           COMP   30DYS NCCC

- DKT: 8356/09       DCH 04/02/09    IND:                            YO:    CTL: N
  STAT: DSEN 11/23/09  REL: 11/25/09 BOND:            .00     BAIL:           .00
  PL  AMIS 205.20.00   2 CNTRABND PRIS-
  APPEARANCE: 11/23/09 DCM 9L SENT   ALEXANDER        COMP   360 DAYS/NCCC

NO MORE DATA AVAILABLE FOR THIS CASE
```

```
INQUIRY              NASSAU COUNTY SHERIFF'S DEPARTMENT       11/19/18 14:41
FUNCTION: O                 SENTENCE COMPUTATION                   JC2M219

  NAME: GALLOWAY          JOSIAH                         *          ICN: 04010093
  LOC:              CL: AM  SCF MAXA KL  RACE: B   DOB: 11/22/86 NCC: 08005354
---------------------------------------------------------------- INACTIVE CASE
SEQUENCE: 02 SENT. DATE: 11 23 09 TOTAL DAYS SENT: 0000360 GOOD TIME: 0000120
WARRANT COUNT: 000                                              USERID: 03367JR
Y SEQ TYPE CRT-NO/FR-DT  TO-DATE  DAYS     FEL    REMARKS
  01  DKT   8356/09                         N     1 YEAR
  01  PCC   000000       000000   00001
  02  JTC   040209       112209   00235

TOTAL CREDIT:      236 TOTAL    LOSS:        0       MINIMUM-REL-DATE: 11/26/09
MAX-REL-DATE: 03/26/10                               ACTUAL   RELEASE: 11 25 09
 LAST PAGE -    ENTER = NEXT TIME SEGMENT, PF3 = RETURN, PF10 = BROWSE FORWARD
```

11/14/18 SLOC010 LOCATOR SYSTEM *FPMS* PAGE 001

CHRONOLOGICAL HISTORY DISPLAY

99 CENTRAL OFF

DIN 10A0275 NYSID 01491059H FACILITY OFF COUNTS LOCATION

NAME GALLOWAY, JOSIAH DOB 11/22/86 SEX M E/R NB

| EFFECTIVE DATE | DATE ENTERED | SENDING FACILITY | RECEIVING FAC/ OUTCOUNT LOCATION | TRANSACTION TYPE | CELL |
|---|---|---|---|---|---|
| 01/22/10 | 01/22/10 | | DWNSTATE REC | NEW COMMIT | 02-0H-018 |
| 02/12/10 | 02/12/10 | DWNSTATE REC | SING SING TR | TRANSFER OUT | 02-0E-025 |
| 02/12/10 | 02/12/10 | DWNSTATE REC | SINGSING ABS | INTRANS RECV | 05-0A-18B |
| 02/19/10 | 02/19/10 | SINGSING ABS | SING SING GN | INTRANS SENT | 05-0A-18B |
| 02/19/10 | 02/19/10 | DWNSTATE REC | SING SING TR | TRANSFER IN | 0B-RN-38T |
| 03/15/10 | 03/15/10 | SING SING TR | SING SING GN | INTRANS RECV | 0B-ZS-23S |
| 08/20/10 | 08/20/10 | SING SING TR | UPSTATE SHU | TRANSFER OUT | 0C-02-130 |
| 08/20/10 | 08/20/10 | SING SING TR | DWNSTATE REC | INTRANS RECV | SH-1E-028 |
| 08/23/10 | 08/23/10 | DWNSTATE REC | UPSTATE SHU | INTRANS SENT | SH-1E-028 |
| 08/23/10 | 08/23/10 | SING SING TR | UPSTATE SHU | TRANSFER IN | 10-A1-13B |
| 06/24/11 | 06/24/11 | UPSTATE SHU | CLINTON GEN | TRANSFER OUT | 10-A2-28T |
| 06/24/11 | 06/24/11 | UPSTATE SHU | CLINTON GEN | TRANSFER IN | LF-01-37S |
| 08/25/11 | 08/25/11 | CLINTON GEN | UPSTATE SHU | TRANSFER OUT | SH-UU-019 |
| 08/25/11 | 08/25/11 | CLINTON GEN | UPSTATE SHU | TRANSFER IN | 10-A1-03T |
| 11/21/11 | 11/21/11 | UPSTATE SHU | GRT MEAD GEN | TRANSFER OUT | 10-A2-50T |
| 11/21/11 | 11/21/11 | UPSTATE SHU | DWNSTATE REC | INTRANS RECV | 02-0F-036 |
| 11/22/11 | 11/22/11 | DWNSTATE REC | GRT MEAD GEN | INTRANS SENT | 02-0F-036 |
| 11/22/11 | 11/22/11 | UPSTATE SHU | GRT MEAD GEN | TRANSFER IN | 0E-08-22S |
| 10/19/12 | 10/19/12 | GRT MEAD GEN | UPSTATE SHU | TRANSFER OUT | 0B-1W-28S |
| 10/19/12 | 10/19/12 | GRT MEAD GEN | DWNSTATE REC | INTRANS RECV | SH-1E-015 |
| 10/22/12 | 10/22/12 | DWNSTATE REC | UPSTATE SHU | INTRANS SENT | SH-1E-015 |
| 10/22/12 | 10/22/12 | GRT MEAD GEN | UPSTATE SHU | TRANSFER IN | 10-A1-24T |
| 02/07/13 | 02/07/13 | UPSTATE SHU | FIVE POINTS | TRANSFER OUT | 10-A2-39T |
| 02/07/13 | 02/07/13 | UPSTATE SHU | DWNSTATE REC | INTRANS RECV | 02-0B-014 |
| 02/08/13 | 02/08/13 | DWNSTATE REC | FIVE POINTS | INTRANS SENT | 02-0B-014 |
| 02/08/13 | 02/08/13 | UPSTATE SHU | FIVE POINTS | TRANSFER IN | 10-C2-41B |
| 10/17/13 | 10/17/13 | FIVE POINTS | UPSTATE SHU | TRANSFER OUT | 10-B1-24T |
| 10/17/13 | 10/17/13 | FIVE POINTS | DWNSTATE REC | INTRANS RECV | 02-0E-034 |
| 10/18/13 | 10/18/13 | DWNSTATE REC | UPSTATE SHU | INTRANS SENT | 02-0E-034 |
| 10/18/13 | 10/18/13 | FIVE POINTS | UPSTATE SHU | TRANSFER IN | 09-C1-20T |
| 01/27/14 | 01/27/14 | UPSTATE SHU | ATTICA GEN | TRANSFER OUT | 09-A2-45T |
| 01/27/14 | 01/27/14 | UPSTATE SHU | DWNSTATE REC | INTRANS RECV | 02-0F-019 |
| 01/28/14 | 01/28/14 | DWNSTATE REC | ATTICA GEN | INTRANS SENT | 02-0F-019 |
| 01/28/14 | 01/28/14 | UPSTATE SHU | ATTICA GEN | TRANSFER IN | 0D-41-10S |
| 11/20/15 | 11/20/15 | ATTICA GEN | SHAWANGUNK | TRANSFER OUT | 0C-30-31S |
| 11/20/15 | 11/20/15 | ATTICA GEN | AUBURN DEPOT | INTRANS RECV | 0D-08-23T |
| 11/23/15 | 11/23/15 | AUBURN DEPOT | SHAWANGUNK | INTRANS SENT | 0D-08-23T |
| 11/23/15 | 11/23/15 | AUBURN DEPOT | DWNSTATE REC | INTRANS RECV | 03-0D-026 |
| 11/24/15 | 11/24/15 | DWNSTATE REC | SHAWANGUNK | INTRANS SENT | 03-0D-026 |
| 11/24/15 | 11/24/15 | ATTICA GEN | SHAWANGUNK | TRANSFER IN | 0A-12-08S |
| 02/10/17 | 02/10/17 | SHAWANGUNK | EASTERN GEN | TRANSFER OUT | 0A-12-11S |
| 02/10/17 | 02/10/17 | SHAWANGUNK | DWNSTATE REC | INTRANS RECV | 02-0B-020 |
| 02/13/17 | 02/13/17 | DWNSTATE REC | EASTERN GEN | INTRANS SENT | 02-0B-020 |
| 02/13/17 | 02/13/17 | SHAWANGUNK | EASTERN GEN | TRANSFER IN | WW-21-03B |
| 09/07/17 | 09/07/17 | EASTERN GEN | UPSTATE SHU | TRANSFER OUT | SP-H0-012 |
| 09/07/17 | 09/07/17 | EASTERN GEN | DWNSTATE REC | INTRANS RECV | SH-1E-004 |
| 09/08/17 | 09/08/17 | DWNSTATE REC | UPSTATE SHU | INTRANS SENT | SH-1E-004 |
| 09/08/17 | 09/08/17 | EASTERN GEN | UPSTATE SHU | TRANSFER IN | 09-C2-36T |
| 11/20/17 | 11/20/17 | UPSTATE SHU | CLINTON ANNX | TRANSFER OUT | 09-C2-38T |
| 11/20/17 | 11/20/17 | UPSTATE SHU | CLINTON ANNX | TRANSFER IN | 14-01-12S |

NOTE: THIS REPORT WAS RECONSTRUCTED USING HISTORICAL INMATE MOVEMENT DATA FROM COMPUTER RECORDS, AND IS ONLY AS ACCURATE AS IT WAS MAINTAINED BY THE FACILITY FOR THIS TIME PERIOD.

11/14/18 SLOC010 LOCATOR SYSTEM *FPMS* PAGE 002

CHRONOLOGICAL HISTORY DISPLAY

99 CENTRAL OFF

DIN 10A0275 NYSID 01491059H FACILITY OFF COUNTS LOCATION

NAME GALLOWAY, JOSIAH DOB 11/22/86 SEX M E/R NB

| EFFECTIVE DATE | DATE ENTERED | SENDING FACILITY | RECEIVING FAC/ OUTCOUNT LOCATION | TRANSACTION TYPE | CELL |
|---|---|---|---|---|---|
| 09/11/18 | 09/11/18 | CLINTON ANNX | DWNSTATE REC | INTRANS SENT | 40-02-50S |
| 09/11/18 | 09/11/18 | CLINTON ANNX | DWNSTATE REC | INTRANS RECV | 03-0E-030 |
| 09/13/18 | 09/13/18 | DWNSTATE REC | NASSAU | COURT TRIP | 03-0E-030 |
| 09/13/18 | 09/14/18 | DWNSTATE REC | | DISCH COURT | |

NOTE: THIS REPORT WAS RECONSTRUCTED USING HISTORICAL INMATE MOVEMENT DATA FROM COMPUTER RECORDS, AND IS ONLY AS ACCURATE AS IT WAS MAINTAINED BY THE FACILITY FOR THIS TIME PERIOD.

11/14/18
14:10:16

RECEPTION/CLASSIFICATION SYSTEM
LEGAL DATE COMPUTATION

COMP DATE: 01/22/2010
BY: C240BAC
)

TYPE 20 (BASIC DETERMINATE

DIN: 10A0275 NAME: GALLOWAY, JOSIAH NYSID: 01491059H

CURRENT LOCATION: - DISCH COURT

| | | |
|---|---|---|
| | MAXIMUM TERM | 025 00 00 |
| + | DATE RECEIVED | + 2010 01 22 |
| | INTERIM | 2035 01 21 |
| - | JAIL TIME | - 01 07 21 |
| | MAXIMUM EXPIRATION DATE | 2033 05 31 |
| - | GOOD TIME POSSIBLE | - 003 06 28 |
| | CONDITIONAL RELEASE DATE | 2029 11 03 |

T.A.C. DATE/TYPE 2029 07 INIT

PAROLE HEARING DATE/TYPE 2029 09 CRC
PRS 05 00 00

LIMITED CREDIT TIME POSS 00 06 00
LIMITED CREDIT TIME DATE 2029 05 03

REMARKS:

NOTE: THE PRS INDICATED ON THIS PRINTOUT MAY OR MAY NOT REFLECT THE ACTUAL PRS THAT WAS ENTERED IN THE DATE COMPUTATION AT THAT TIME.

DIST: IRC (1), GUID & COUNS UNIT (1), INST PAROLE (1), INMATE (1)

# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

SC PART 41

----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

- V -

IND. # 1315N-08

JOSIAH GALLOWAY
LKA: 153 WINDSOR PARKWAY
HEMPSTEAD, NY 11550 (DOB: [redacted]86)
Defendant
----------------------------------------------------------------X

ORDERED, that the Civil Judgement ordered on November 25, 2009, is vacated as the above-captioned case was dismissed and defendant's conviction was vacated and dismissed on September 13, 2018.

So Ordered

ENTERED AND FILED
SEP 18 2018
CLERK'S OFFICE COUNTY COURT NASSAU COUNTY

Teresa K Corrigan

Hon. Teresa K. Corrigan, A.S.C.J
Supervising Judge of the Nassau County Court

HON. TERESA K. CORRIGAN

Mineola, NY
Dated: September 17, 2018

# Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

SC PART 41

---------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

- V -

IND. # 1315N-08

JOSIAH GALLOWAY
LKA: 153 WINDSOR PARKWAY
HEMPSTEAD, NY 11550 (DOB: [redacted]86)

Defendant

---------------------------------------------------------------X

ORDERED, that the Restitution/Reparation Judgment ordered on November 25, 2009, is vacated as the above-captioned case was dismissed and defendant's conviction was vacated and dismissed on September 13, 2018.

So Ordered

ENTERED AND FILED
SEP 18 2018
CLERK'S OFFICE
COUNTY COURT
NASSAU COUNTY

Teresa K Corrigan

Hon. Teresa K. Corrigan, A.S.C.J.
Supervising Judge of the Nassau County Court

HON. TERESA K. CORRIGAN

Mineola, NY
Dated: September 17, 2018

# Exhibit E



NATIONAL COALITION OF CONCERNED LEGAL PROFESSIONALS

VOL. 19 NO. 2 APRIL 2013

SUGGESTED DONATION $5.00

# (Mis)Identification in Criminal Cases

## A Leading Cause of Wrongful Convictions

**Thomas F. Liotti, Esq.**
**Drummond C. Smith, Esq.**

# A Critique of Philosophizing About Lawyers' Ethics

**Monroe H. Freedman, Esq.**

# Annals of Justice: The Cantor's Complaint

**Stephen R. LaCheen, Esq.**



# (MIS)IDENTIFICATION IN CRIMINAL CASES

## A LEADING CAUSE OF WRONGFUL CONVICTIONS

*by Thomas F. Liotti, Esq. and Drummond C. Smith, Esq.*

Thomas F. Liotti, Esq.

Drummond Smith, Esq.

*Editor's Note: False identification is one of the nation's leading causes of wrongful convictions. Defense counsel, however, have recently been aided by 30 years of scientific research on memory and perception, showing how unreliable they can be. In this article, Mr. Liotti, using his own experience with experts in witness identification, provides a guide for defense counsel seeking to contest an untrustworthy identification.*

*The Oregon Supreme Court recently weighed in on the issue, in an 80-page unanimous opinion in* State of Oregon v. Lawson *(CF080348; CA A140544; SC S059306, November 29, 2012), which takes into account "current scientific knowledge regarding the effects of suggestion and confirming feedback" and revises the burden of proof required to admit such evidence.*

*Previously, eyewitness identifications were admissible unless the defense could first establish its unreliability in a pre-trial motion, "even though the state — as administrator of that procedure — controls the bulk of the evidence in that regard.* (State of Oregon v. Lawson)*." Now, prosecutors must first establish the reliability of the identification before it can be admitted.*

*Notably, the Oregon Supreme Court did not distinguish whether the tainted memory or false identification was the result of suggestive police procedures or actions of the witnesses themselves (for example, searching on their own for photographs or mug shot websites). In either case, they are inadmissible under the state's evidence code.*

*In a December 5, 2012 editorial,* The New York Times *lauded the decision of the Oregon Supreme Court and encouraged other state and federal courts to follow its lead. We concur.*

Since becoming a lawyer many moons ago I have been fascinated by the ability of witnesses to identify defendants in criminal cases where presumably the horrible acts unfolding before them might serve as a distraction, while their much-needed retreat ("feet don't fail me now") and corresponding fear of impending death, might lead to a questionable identification. I also vividly recall a grade school exercise where my teacher placed a drawing on the board in front of the class. We were directed to study it. She took it down and then told us to draw what we could recall from the drawing. Well, there were thirty students in that public school class at the Bowling Green Elementary School in East Meadow, Long Island, and there were also thirty very different drawings, none replicating the detail of the original drawing, which I remember as quite primitive.

So it seemed to me even at that young age (I think I was seven) that the ability to identify is controlled by many complex factors, such as vision, the receipt of images by the brain,[1] the recording of them there and our memory[2] in being able to recall the images in the same way they were received.

As I became a Little Leaguer fascinated by our great "American Pastime," I quickly learned that not all ballplayers were great hitters. As I would watch major league games it became apparent that some had the ability to not be distracted by the menacing look of pitchers while keeping their eyes on the ball, even when thrown at 96 m.p.h. This might be dismissed as just good hand-eye coordination, but I became fascinated by the ability of some players to follow the curve, knuckle, cutter and slider, no matter where they were thrown, and in some cases, if Billy Martin was managing, at their heads. Others seemed to have what was then not labeled as an "attention deficit disorder," but rather as "bad reaction time."

### Breakthrough in Understanding Eyewitness Identification

A breakthrough in eyewitness identification occurred in 1965 with criminal defense attorney Patrick M. Wall's book, *Eye Witness Identification in Criminal Cases.*[3] Mr. Wall studied the issues of eyewitness identification in Paris while he completed the requirements for a J.S.D. degree at New York University. I have cherished Mr. Wall's book for all of these years, keeping it in my personal Hall of Fame of artifacts by some of the greats in law. Joining Mr. Wall in the new, uncharted, legal territory were not only several professors, but also the legendary Martin Erdman, a renowned criminal defense attorney associated with the New York Legal Aid Society.

*Thomas F. Liotti is an attorney and Village Justice in Long Island, New York. He is a Fellow in the American Board of Criminal Lawyers (ABCL), a Life Member of the National Association of Criminal Defense Lawyers (NACDL), a former Chair of the Criminal Justice Section of the New York State Bar Association, a Past President of the Criminal Courts Bar Association of Nassau County and the New York State Association of Criminal Defense Lawyers (NYSACDL).*

*Drummond C. Smith is a former federal and state prosecutor and a Legal Aid Attorney. He is presently an Associate in Mr. Liotti's firm. Mr. Liotti is grateful to Mr. Smith for his assistance in the research and writing of this article.*



Mike Keefe/Denver Post

Mr. Wall impressed me as a legal writer who was able to analyze the phenomenon described in playwright Arthur Miller's *The Crucible*,[4] which portrayed the hysteria of the Salem witch trials, analogizing them to Senator Joseph McCarthy's bogus "witch hunts" for communists. A community engulfed by hysteria and a notorious crime is prone to false accusations and misidentifications.

A half century ago Mr. Wall quoted a prosecutor (Kuh, "Careers in Prosecution Offices," 14 J. *Legal Ed*. 175, 187 n.21 (1961)), who noted that proof that relies wholly on identifications made by eyewitnesses is inherently weak; persons who merely saw a thief or attacker briefly, and under conditions of stress, may — despite the best of intentions — too readily be mistaken.

Wall's genius then made his point that there were two causes of erroneous identification: "1) the normal and universal fallibilities of human sense perception and human memory, and 2) the susceptibility of the human mind to suggestive influences." Wall then continued:

> *Jeremy Bentham once stated that "witnesses are the eyes and ears of justice," [citation omitted] and so they are. But those eyes and ears are sometimes defective, for a surprisingly large number of people who are not color blind, who do not need an oculist, and who are supposed to have normal vision, in fact do not have it. They cannot recognize likenesses or differences, nor distinguish variations in form, size, and position as can persons who are normal in that respect.*

In a footnote Wall goes on to note that with regard to color-blindness, it has been estimated that between four and eight per cent of all males never experience red or green but see these colors as gray (citations omitted) and that one capital case has been reported where the defendant was identified mainly by the color of his hair and clothes, the identifying witness being, as was later discovered, color-blind. Wall then quotes Wigmore as observing that if we consider:

> *that most persons ... have features not sharply distinctive of a few individuals (e.g. simply, a large nose, blue eyes), and that most observers receive only the simplest impressions of features, expressible in only the loosest language (e.g. large nose, dark hair), it is easy to appreciate how often the items ... as recorded, may be items common to many individuals, and yet may cause recognition of sameness.*[5]

Wall then quoted a psychologist as pointing out that:

> *The difficulty is that there may be certain elements in common between the original object and one which is incorrectly recognized as the original. If one object comprises ABCD and the other CDXY, the CD overlap is enough to mislead anybody, citing Burtt, Applied Psychology 250 (2d ed. 1957).*

## No Safety in Numbers

Quoting Wigmore, Wall then debunked the idea that there was assurance in numbers:

JEFFREY H. SCHWARTZ
ATTORNEY AT LAW
PRACTICE LIMITED TO PERSONAL INJURY
62 WALDORF COURT
BROOKLYN, NY 11230
TEL: (718) 434-0211
FAX: (718) 421-7125

ROBERT P. LEIGHTON
ATTORNEY AT LAW
132 NASSAU STREET * SUITE 900
NEW YORK, NY 10038
(212) 267-6019

*In discussing the possibility of erroneous identification, Wigmore once observed that there is a logical value in the number of witnesses who concur in the identification. The soundness of his view cannot be seriously doubted, as is borne out not only by the law of probability, but also by the concern often felt when the only evidence of a defendant's guilt is his identification by a single witness. Here, as elsewhere, there is strength in numbers.*

*However, although there is strength in numbers, there is, as Glanville Williams has pointed out, no real safety. The mere fact that three or four witnesses identify a suspect provides no assurance that they are correct, especially when all have been subjected to a suggestive identification procedure.*

*Indeed, on a number of occasions, even larger numbers of identifying witnesses have erred. In a trial in Massachusetts in 1845, the defendant proved his innocence conclusively and in so doing demonstrated the twelve witnesses who had identified him were all mistaken, 'a fact, as the judge well remarked, almost sufficient to shake all confidence in human testimony.'*

*Cases involving erroneous identifications by 13, 14 and 17 witnesses have been reported, but they are by no means the most extreme examples .... [citations omitted]*

TAKE YOUR TIME LOOK AT EACH PICTURE CAREFULLY

Illustration by Matthew Snow

## A Wrongful Burial Based on Misidentification

The idea of a relative misidentifying a family member was foreign to me until I had the case of Shirley. Shirley was an elderly woman whose son sent her to a camp every summer. One day Shirley collapsed and had to be taken to the hospital. On the way, the camp provided her medical records, or what they thought were hers. Shirley died. Using the records they called relatives, not Shirley's but Sarah's. They had Sarah's records, not Shirley's. They both had the same last name but were not related. Sarah's granddaughter came to identify the body. She mistakenly identified Shirley as Sarah, her grandmother. Shirley's body was sent to Brooklyn where she was placed into Sarah's gravesite. While Sarah's family was sitting Shiva they received a call from Sarah. They thought she was gone. Instead, she was still at the camp enjoying herself. I had my first wrongful burial case based upon a misidentification.

## A New Field of Psychology

Courts today are more closely examining what are referred to as "ID cases," where corroborative evidence is limited.[6] Wall's discovery of the legal equivalent of the Rosetta Stone has led to the opening of a whole new field in psychology, namely the science of identification. It is a specialized area even for the psychologists who engage in it.

In New York "notice of identification evidence is not required if the victim and the defendant are known to each other or if the pretrial identification is not the result of police conduct. Similarly, a notice of identification is not required where a victim or witness merely authenticates a surveillance tape of a crime in progress." See

LAW OFFICES OF
James Lance Kaller
Attorney at Law
155 MONTGOMERY STREET, SUITE 1004
SAN FRANCISCO, CA 94104
Phone: (415) 362-9134 Fax: (415) 434-1880

Stephen M. Murphy
ATTORNEY AT LAW
REPRESENTING EMPLOYEES IN CIVIL RIGHTS LITIGATION
353 Sacramento St., Suite 1140
San Francisco, CA 94111
Tel.: (415) 986-1338 Fax: (415) 986-1231
smurphy@justice.com www.stephenMmurphy.com



Illustration by David Rose

Lawrence N. Gray, Esq., *New York Criminal (Law) Practice*, Third Edition, New York State Bar Association, Chapter 7, *Motion Practice* by Mark J. Mahoney, Esq., at § 7.29 at page 270 (cases cited there are omitted here).

### Examples Illuminate the Issues

While identification issues are complex, a fact pattern illustrating those issues, together with an expert's testimony from a similar case will highlight these points. The fact pattern is derived from the non-jury trial of *People v. Justin Shaw*, Nassau County, Long Island, New York, Indictment #1239N-11, presided over by Hon. Meryl Berkowitz, a County Court Judge. Defense counsel was this writer; the prosecutor was ADA Christine Geier; the defense investigator was Frank Detrano and the identification expert was Nancy Franklin, Ph.D., an Associate Professor at the State University of New York at Stony Brook, a scientist and psychologist specializing in memory and cognition.

The defendant, an African American, 23, was charged with attempted robbery, menacing with a weapon and resisting arrest. He was found not guilty of all charges.

On December 6, 2010 the complainant, an Hispanic, claimed that he was returning home from work at midnight when he heard a voice from behind say that he wanted his money. He ran to the corner, dropping his cell phone, which he said was picked up by the defendant. The complainant then stopped and asked for his cell phone back. He claims that the defendant threw the phone to him, again saying that he wanted his money and flashed a gun at him from his waistband. The complainant testified that the assailant was wearing a "hoodie" and that there was overhead street lighting.

The defendant was apprehended eight months later. A line-up was never conducted and a photo array with a positive identification was not presented. The complainant testified that he always wore glasses and was wearing them that night.

The Prosecutor offered daytime photos of the area. The complainant testified that he recognized the defendant from the neighborhood. The defendant lived across the street. He also said that he saw him at a distance of five feet and that the moon was full. However, National Weather Service records, of which the Court took judicial notice, showed that it was a new moon that night, with only one percent of its face showing. The defense investigation brought in nighttime photos showing the lack of illumination and took measurements indicating that the complainant saw his assailant at 47 feet, not 5 feet.

In Nassau County motions to suppress or dismiss are rarely successful, so I prepared for trial, gathering as much information as possible from all sources, even the tabloids. One story was handed over to me by my client's father, appearing in a newspaper that I ordinarily would not be caught dead reading, but the story caught my eye, leading me to believe that I was on the right track. The article read:

> *Thanks to New Jersey, it's been a good week for memory researchers.*
>
> *The State Supreme Court announced on Wednesday that it will alter the way eyewitness testimony is presented to*

Attorneys at Law
For Over 30 years
Thompson & Thompson, P.C.
Specializing in Criminal Defense and Appeals
1331 Main St., Ste. 320
Springfield, MA 01103
P: 413-739-2100 F: 413-739-2300

Certified Specialist in Criminal Law
Peter Swarth
Attorney at Law
6520 Platt Ave. #557
West Hills, CA 91307
(818) 887-8800

Case 2:19-cv-05026-AMD-JO Document 1-2 Filed 09/04/19 Page 41 of 45 PageID #: 87

*jurors in criminal trials, making it easier for defendants to dispute the oldest — and studies now show, maybe most fallible — type of evidence.*

*In 75% of known wrongful convictions, false eyewitness testimony plays a large role. And 190 of the 250 first DNA exonerations involved mistaken eyewitness accounts. It's important to note, however, that eyewitnesses are not lying; they really believe that they're telling the truth, and that's why their testimony is so convincing.[7]*

GALAPAGOS ISLANDS
YOU THINK WE ADAPTED WELL... THE MARINE IGUANAS ARE NOW OIL-BREATHERS!
Mike Keefe THE DENVER POST 2001
Mike Keefe/Denver Post

Finding experts amenable to testifying on behalf of the defense in criminal cases or for plaintiffs in civil cases is never an easy task. I reached out to the National Association of Criminal Defense Lawyers (NACDL) and its affiliate in New York, the New York State Association of Criminal Defense Lawyers (NYSACDL) and the New York State Defenders Association. I received the names and resumés of three potential experts. Following some further research on their cases, articles and other credentials, I settled on Dr. Franklin who had earned her Ph.D. at Stanford; her fees were more than reasonable; she has been qualified as an expert on many occasions and had published widely in the field of memory reconstruction and cognition.

I went to the University to meet with her. She provided me with some of her papers and testimony from

L C S W B C D
24 E 12th Street
Individual Suite 605
Couples NY NY 10003
Group

RICHARD DORN
ATTORNEY AT LAW

LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor • New York, NY 10011-5126
Tel. (212) 627-8100 • Fax (212) 627-8182
rdorn@levyratner.com • www.levyratner.com

DOCUMENT MANAGEMENT ISN'T JUST OUR FOCUS... IT'S ALL WE DO!
CITYSIDE ARCHIVES
888-CITYSIDE (248.9743)
citysidearchives.com
DOCUMENT MGMT EXPERTS
STATE OF THE ART FACILITIES
RECORD STORAGE
SECURE SHREDDING
SCANNING PROJECTS
STORAGE VAULT for WILLS
MEDIA/TAPE VAULT
LOWER YOUR COSTS: 888.CITYSIDE



Illustration by Bill Robles

other cases in which she had testified. She helped me through the preparation for her direct testimony, giving me more understanding of the field. We agreed that while her testimony could be expansive, that given the facts in our case, we would limit it to seven areas.

Ultimately the following question has to be answered in the affirmative:

> *Question: In your opinion, Dr. Franklin, to a reasonable degree of psychological certainty, is there a general view among experts in your field concerning the reliability of eyewitness identification?*
>
> *Answer: Yes, it is not reliable.*

The People did not have an expert and a further foundation was laid for the expert's testimony by cross-examination of the complainant and the police, bringing into doubt the reliability of the identification even before my witness testified. This was also bolstered by the investigator, with the measurements and photos taken at night and the National Weather Service Reports. The People had a positive photo array of Mr. Shaw by the complainant, which they elected not to use at trial.

Dr. Franklin provided the defense with one of her many papers entitled: *A Brief Guide to Factors that Commonly Influence Identification and Memory for Criminal Events* (© 2010). Dr. Franklin then presented her testimony in seven key areas including: (1) Suggestiveness of I.D., (2) Unconscious transference, (3) Weapons focus, (4) Stress, (5) Duration of exposure, (6) Partial disguise and (7) Cross-race identification. While Dr. Franklin's credentials as an expert were outstanding, they will not be repeated here. Although the People attempted to cross-examine Dr. Franklin, her entire testimony was un-rebutted. The following is an incomplete synopsis of Dr. Franklin's testimony, not a verbatim account, in order to provide a guide to counsel in other cases of like genre.

### Dr. Franklin's Testimony

After laying her credentials on the record, Dr. Franklin began to define memory, the sources of it and cognition. She told the Court that she was not a forensic psychologist and she has not treated patients *per se*. Her knowledge of the field comes from reviewing documents and literature, not from her own laboratory studies. Some of her testimony included:

> *...memory is reconstructed... when you're experiencing an event, you encode selectively from the event that you are experiencing, and not only are you encoding selective pieces, but you're interpreting them, and what gets encoded is your interpretation.*
>
> *The 'Fifty Percent Rule' characterizes the best of circumstances, where you have... perfect lighting and you have... near, good, unobstructed exposure to the other person, and there's no threat, and they're not wearing anything on their*

ORGANIZE WHAT YOU HAVE. FIND WHAT YOU NEED. PUT IT ALL IN ORDER, ONE STEP AT A TIME.

SONYA WEISSHAPPEL
PRESIDENT
S E R I A T I M

261 WEST 112TH STREET, 4E
NEW YORK, N Y 10026
TELEPHONE: 646-213-2122 FAX: 212-799-5571
SONYA@SERIATIM
WWW.SERIATIM.NET

DATASAFE
INFORMATION MANAGEMENT SOLUTIONS
DataSafe has over 60 years of experience in helping clients meet internal and regulatory records management requirements, including SOX Compliance.
• Secure Destruction/Shredding • Records Storage/Document Storage
• Indexing and Imaging • Media Storage and Rotation
• Online Backup & Disaster Recovery
Visit us at www.datasafe.com or call 1-800-275-SAFE

*head that might disguise... their hairline or something.*

*Generally what you find, and, of course, there's variations in this, but it's about fifty percent being able to identify the right person, which isn't great, but in addition to that, about a twenty-five percent rate of identifying the wrong person.*

Topically, Dr. Franklin broke down the seven areas of her direct examination with explanations that clarified factors leading to the unreliability of the identification process. Where a pre-trial *U.S. v. Wade*, 388 U.S. 218 (1967) hearing may be held, it is still a matter of strategy as to how much expert testimony the defense will consider using, and whether, if the suppression of the identification is granted, it will lead to a successful outcome at trial.

**Suggestiveness of I.D**: Dr. Franklin testified that the propensity of our cognitive system is to form perceptions and memories that go well beyond what we actually experience. A person's initial exposure to an event may be limited. Over time, more information becomes available, other people share their experiences, the person may even view video footage, and gradually learns facts that cause them to go back and reinterpret or fill in the original memories. The integrated memory representation is a product of all of these sources and is subject to further change.

Dr. Franklin testified that witnesses bring decision biases with them into the identification procedure. For example, we already know that people have a tendency to choose. This occurs largely because they tend to search for the choice who looks most like their memory of the perpetrator. That is, they make a relative judgment. There will always be someone in the line-up who is that best match, and if this best-matching person is innocent, he or she is at risk of being falsely identified. Many municipalities have adopted line-up procedures that lower the risk of such relative judgments by presenting the choices sequentially, with no indication of how many will be presented, and with each face shown only once. If the witness says "no," the face is not presented again.

Mike Keefe/Denver Post

Dr. Franklin then spoke to the problem of suggestion. She noted what the witness is told before attempting to make identification is crucial. The administrator should admonish the witness that the perpetrator may not be present. In addition, witnesses can be easily swayed by seemingly innocuous questions ("Could that be him?") and seemingly conservative instructions ("Take your time" and "Look at each picture carefully"). These latter instructions may imply to witnesses that the perpetrator is indeed present, resulting in their rate of choosing and of making a false identification increasing.

Dr. Franklin followed this statement by quoting evidence that rapid identifications made by witnesses are more likely to be accurate than those that follow more prolonged scrutiny. Line-up fillers should be selected to match the witness's description. Instead, police officers assembling a line-up often select fillers to match the suspect.

**Unconscious Transference:** Dr. Franklin spoke to unconscious transference and one common variation of it, "Mugshot Exposure," that exemplifies this principle. First, take the generic case of unconscious transference. The witness has seen the person before, but in a different context. The witness is now presented with that person in an identification procedure. Increased fluency of

Fearonce G. LaLande
ATTORNEY AT LAW

207-01 HILLSIDE AVENUE
QUEENS VILLAGE, NEW YORK 11427
fglalande@aol.com

PHONE: (718) 217-7146
FACSIMILE: (718) 217-7149

1042 Kearny Street, San Francisco, CA 94133
Phone (415) 398-9696 Fax (415) 989-9415

Agostino Crotti



Mike Keefe/Denver Post

processing indicates to the witness that they have seen the person before without being aware that they have simply seen him dozens of times around the neighborhood during daily activities. Instead, in the potentially suggestive context of an identification procedure, the witness mistakenly says that that person is the perpetrator. The Mugshot Exposure Effect is a type of unconscious transference, and it presents real concerns for the criminal justice system, in which mugshot and line-up identifications are considered to be independent instances of identification. She cautioned that prior exposure to a face will increase the likelihood of selection of that face later.

**Weapons Focus:** Dr. Franklin spoke to the effect of a witness's focus on the presence of a weapon as impairing the memory or the ability to identify the face of the person who is holding the weapon. Dr. Franklin's testimony is supported by her citations to numerous scientific studies and a statistical technique known as meta-analysis, which allows those engaging in the process, such as Dr. Franklin, to combine the samples of various studies and to then present overarching themes and probabilities. She then testified that given the "alpha level of significance" (scientific terms which she explains) she and others have concluded that "the presence of a weapon impairs memory of facial identifications."

**Stress:** Dr. Franklin stated that when a person is being attacked by someone they don't know, the most immediate thing for them to do is to get out of the situation, not to memorize who this person is.

**Duration of Exposure:** Dr. Franklin testified that generally literature supports the fact that less time leads to poorer memory than more time.

**Partial Disguise:** In this case, the assailant was wearing a hoodie and was observed at night. My client was known to often wear a hoodie. The alleged gun was never recovered. The cell phone of the complainant was not offered into evidence by the People.

**Cross-race I.D:** Dr. Franklin testified that there is actually a cognitive processing bias that people have that allows them to differentiate members of their own race better than they can differentiate faces of another race. My client was African-American. The complaining witness was Hispanic. Aside from the complainant, there were no other witnesses to the actual event. My client did not testify.

Following brief closing arguments, the Judge deliberated over lunch and then promptly returned a verdict of "not guilty on all counts." The judge, a former Legal Aid Attorney, was familiar with the fields of memory reconstruction and cognition as they relate to the identification process. To some, the result of not guilty may impress them as a foregone conclusion, but it is one that I might not have achieved but for Dr. Franklin's testimony coupled with my investigator's work and a

KEEP UP THE GOOD WORK,
**CCLP**

HERBERT W. YANOWITZ, ESQ.
ONE EMBARCADERO CENTER SUITE 400
SAN FRANCISCO, CA 94111
(415) 362-1365

MAXWELL M. BLECHER

BLECHER, COLLINS, PEPPERMAN & JOYE

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

SALUTES CCLP
AND THE FIGHT FOR JUSTICE

515 S. FIGUEROA ST., 17TH FLOOR
LOS ANGELES, CA 90071

(213) 622-4222

judge savvy to the evolving and important science of memory reconstruction and cognition.

### Conclusion

In the Fall 2012 issue of the *ABA Criminal Justice* magazine Kristine Hamman noted that in early 2009, the District Attorneys Association of the State of New York (DAASNY) created the Fair and Ethical Administration of Justice Committee, with three subcommittees to address ethics, best practices and mutual assistance.[8]

In April, 2009 the New York State Bar Association formed a task force which issued a report on the causes of wrongful convictions. In October, 2009 that was followed by New York's Chief Judge Jonathan Lippman creating a Justice Task Force to review the causes of wrongful convictions. These and other groups have studied how memory operates, why people confess and the impact of police procedures on identifications and statements of suspects. The Best Practices Sub-Committee found that there were few written, detailed identification procedures in use by law enforcement in the state. New identification procedures were developed and placed online at http://tinyurl.com/d6yeppt and http://tinyurl.com/c3zb9K8.

New York is leading the way for criminal justice system reform. It is a collaborative effort geared to solving some of the most vexing problems. Commendably also the Best Practices Committee, together with the Ethics Committee, have produced a handbook entitled: *The Right Thing: Ethical Guidelines For Prosecutors.* New York's statewide efforts signal the need for the establishment of Best Practices Committees in every state and by every County Bar Association within each state. For example, Cyrus R. Vance, Jr., Manhattan's District Attorney, has created the Conviction Integrity Unit within his office, another courageous move by prosecutors to do "The Right Thing." For too long the criminal justice system has been governed by ignorant, short-sighted policies under the guise of being tough on crime.

Mike Keefe/Denver Post

*1 Jonah Lehrer, How We Decide (First Mariner Books edition 2010). Also a book review by Thomas F. Liotti of How We Decide, The Nassau Lawyer, November, 2011 at 10.*

*2 Elizabeth F. Loftus and Graham M. Davies, Distortions in the Memory of Children, J. Soc. Issues, No. 2, 1984 at 51, 54. Also, Thomas F. Liotti, Christopher W. Zeh, and Dr. Leah Blumberg Lapidus, Cross-Examining Children in Sexual Abuse Cases, The Attorney of Nassau County, July, 2000 at 5, 12, 13 and 18 and The Cross Examination of Child Witnesses, Verdict, Vol. 6, No. 4, October, 2000 at 11-21.*

*3 Patrick M. Wall, Eye Witness Identification in Criminal Cases (Charles C. Thomas, Publisher 1965)*

*4 Arthur Miller, The Crucible (The Viking Press, 1953). See also, Thomas Frisble and Randy Garrett, Victims of Justice Revisited, (Northwestern University Press (2005)).*

*5. Wigmore, The Science of Judicial Proof § 251, at 537 (3d ed. 1937).*

*6 James E. Coleman, Jr., Theresa A. Newman, Neil Vidmar and Elizabeth Zoeller, "Don't I Know You? The Effect of Prior Acquaintance/Familiarity," The Champion, April 2012 at 52; Jonathan Rapping, "Street Crimes, Stress, and Suggestion: Helping the Jury See What The Witness Did Not," The Champion, June 2011 at 22; Joseph F. Savage, Jr. and James P. Devendorf, "Conviction After Misidentification: Are Jury Instructions A Solution," The Champion, June 2011 at 30 and Nancy Steblay, "A Second Look At The Illinois Pilot Program: The Evanston Data," The Champion, June 2011 at 42.*

*7 Susannah Cahalan, "Trick Of The Eye, Why Witnesses So Often Get It Very Wrong," New York Post, August 28, 2011 at 29.*

*8 Kristine Hamann, "New York Law Enforcement Creates Best Practices To Prevent Wrongful Convictions," ABA Criminal Justice magazine, Fall 2012, Vol. 27, Number 3 at 36-41.*

Mark A. Gloade, Esq.

*supports*

Coalition of Concerned Legal Professionals' Know Your Law sessions.

Press of Fremont Payne, Inc.

*Appellate Printers Since 1890*

Typesetting and Duplicating of Briefs, Records and Appendices. Serving and Filing in all New York State and Federal Appellate Courts

55 Broad Street, 3rd Floor • New York, NY 10004
(212) 966-6570 • Fax: (212) 941-0956