# EXHIBIT A

Proceedings

1      SUPREME COURT OF THE STATE OF NEW YORK

2      COUNTY OF NASSAU:   CRIMINAL TERM PART 85

3      - - - - - - - - - - - - - - - - - - -x

4      THE PEOPLE OF THE STATE OF NEW YORK,

5                     -against-                Indictment

6      JOSIAH GALLOWAY,                      No. 1315N-08

7                              Defendant.

8      - - - - - - - - - - - - - - - - - - -x

9                              November 7, 2008
                               262 Old Country Road
10                             Mineola, New York

11     B E F O R E:

12          HON. PHILIP GRELLA,
                       Acting Supreme Court Justice
13

14     A P P E A R A N C E S:

15          (SAME AS PREVIOUSLY NOTED)

16

17                              JANINE M. COLASANTI,
                                Official Court Reporter
18

19          ****     ****     ****     ****

20

21                    THE CLERK:  This is the case of the People

22          versus Josiah Galloway, Indictment 1315N of 2008.

23                    This is a Huntley/Wade/Dunaway hearing

24          continued from yesterday.

25                    Are the People ready to proceed?


                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross  151

1            MR. LaROCCA:  The People are ready.

2            THE CLERK:  Is the defense ready?

3            MR. BREWINGTON:  The defense is ready.

4            THE CLERK:  This is continued from the 5th.

5            THE COURT:  Let's recall the witness and

6        then Mr. Brewington will continue from that point.

7                Before we start, does either side have any

8        kind of application?

9            MR. LaROCCA:  No, your Honor.  Thank you.

10            MR. BREWINGTON:  None.

11            THE COURT:  Okay.  Let's recall the witness.

12            MR. LaROCCA:  Detective DeCaro.

13    C H A R L E S    D E C A R O,    having been previously

14        duly sworn by the Clerk of the Court, resumed the

15        witness stand and further testified as follows:

16            MR. BREWINGTON:  May I inquire, your Honor?

17            THE COURT:  Yes.

18    CROSS-EXAMINATION

19    BY MR. BREWINGTON: (Continuing)

20        Q.  Detective DeCaro, in your testimony when we were

21     last here, which was Wednesday, you indicated that it was

22     the nose that made you think that the person in the sketch

23     looked like Mr. Galloway; is that correct?

24        A.  Yes, that was one of the facial features.

25        Q.  I just want to be clear, your testimony was you

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross          152

1    specifically said, The nose, correct?

2         A.  Okay, correct.

3         Q.  Yes?

4         A.  Yes.

5         Q.  And with regard to the nose, can you tell us how

6    many other noses like Mr. Galloway's you had seen before?

7                   MR. LaROCCA:  Objection, your Honor.

8                   THE COURT:  Sustained.

9         Q.  What was the distinctive aspect of Mr. Galloway's

10   nose that led you to call for the copy of the sketch?

11        A.  It was very similar.  It was similar in shape.

12   It resembled the drawing.

13        Q.  And, sir, the drawing which is in evidence as

14   Defendant's B --

15                   MR. BREWINGTON:  Can we hand this to the

16        witness, please.

17        Q.  Would you agree with me, based on your view of

18   the drawing, that the drawing has a person depicted with a

19   square jaw -- excuse me, a square cheekbone?

20                   MR. LaROCCA:  Objection, your Honor.

21                   THE COURT:  Sustained.

22        Q.  How would you describe the cheekbone features in

23   B?

24                   MR. LaROCCA:  Objection.

25                   THE COURT:  Sustained.

                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross         153

1      Q.  Sir, what was the description, as you understood

2   it, of the person that was eventually depicted in the

3   sketch, please?

4              MR. LaROCCA:  Objection.

5              THE COURT:  I'll allow that.

6      A.  I really don't remember the description.  I just

7   remember seeing the picture every day that I sat at my

8   desk, staring at me.

9      Q.  Did you ever learn, at the time that you called

10  for a photo array, what the description was that was given

11  of the suspect?

12     A.  When I obtained a copy of the sketch, there was a

13  description on there, I believe.

14     Q.  What was the description on the sketch, as you

15  understood it, please?

16     A.  I believe --

17             MR. LaROCCA:  Objection.

18             THE COURT:  Sustained.

19     Q.  Did you understand that the description given of

20  the person that allegedly shot the victim in this case was

21  a person who was a light-skinned black?

22             MR. LaROCCA:  Objection.

23             THE COURT:  I'll allow that question.

24     A.  Can you please repeat, sir?

25     Q.  Sure.  Did you ever learn that the description of

Det. DeCaro - People - Cross    154

1   the person that allegedly shot this victim in this case

2   was a light-skinned black?

3          A.  Later, when I obtained a copy of the sketch.

4          Q.  Would you agree with me that Mr. Galloway is not

5   light skinned?

6          A.  I wouldn't call him dark skinned.  I'm looking at

7   him now.  He doesn't appear dark skinned to me.

8          Q.  Sir, my question called for a yes or no answer.

9              MR. LaROCCA:  Objection.

10             THE COURT:  Go on to the next question.

11         Q.  Would you agree with me that Mr. Galloway is not

12  a light-skinned black African-American man?

13             MR. LaROCCA:  Objection.

14             THE COURT:  The question is, do you agree or

15         you do not agree?

16         A.  I do not agree with you, sir.

17             THE COURT:  Next question.

18             MR. BREWINGTON:  Sir, the rights card, which

19         is in evidence as People's 10, I believe it is, may I

20         have that shown to the witness.

21         Q.  That card was -- the time on it was 4:30 a.m.,

22  correct?

23         A.  Yes, sir.

24         Q.  And that would be at 4:30 a.m. on what day,

25  please?

Janine M. Colasanti, RPR, OCR

1        A.   June 6, 2008.

2        Q.   And you first came in contact with Mr. Galloway

3    at 12:30 that morning, correct?

4        A.   No, sir.

5        Q.   When did you first come in contact with

6    Mr. Galloway?

7        A.   Contact, meaning getting to the office?  I got to

8    the Hempstead Armory at approximately one a.m.

9        Q.   And you began speaking to Mr. Galloway almost

10   immediately, correct?

11       A.   No.

12       Q.   How long did it take for you, after you reached

13   the Armory, to speak to Mr. Galloway, if you got there at

14   one o'clock?

15       A.   It took us a while, because -- by the time we got

16   our paperwork together.

17       Q.   Sir, my question was, how long?

18       A.   A few hours.

19       Q.   So you took a few hours until you first spoke to

20   Mr. Galloway after one o'clock; is that correct?

21       A.   Yes, sir.

22       Q.   So what time did you first begin speaking to

23   Mr. Galloway?

24       A.   A few hours into it.  I would say, roughly,

25   before the rights card, before I introduced myself.  He

1    was down the hall in a separate room.  His codefendant was

2    talking.

3         Q.  Do you have a time when you first began speaking

4    to Mr. Galloway?  I'm going to ask if you can answer my

5    question yes or no.  If you can answer the questions I

6    pose, let me know.  If you can't, let me know that, too.

7         A.  I introduced myself, who I was.

8         Q.  It was a minute or two before when?

9         A.  4:30.

10        Q.  Sir, so, therefore, if it was a minute or two

11   before 4:30, would you agree with me that at no time prior

12   to that card was Mr. Galloway advised of any rights?  You

13   would agree with that, right?

14        A.  Not by me or anyone I was with.

15        Q.  You don't know of anyone that advised him of his

16   rights a minute or two before you presented him, as you

17   said, with the card, right?

18        A.  It was myself and Detective D'Arienzo.  We

19   advised him of his rights together.

20        Q.  My question called for a yes or no.  Can you

21   answer that?

22        A.  I am not aware of anyone else advising him of his

23   rights besides me.

24        Q.  Sir, at the time that you first questioned

25   Mr. Galloway, you attempted, based on your testimony, to

1    get a written statement from him about another incident?

2         A.  Right -- I'm sorry.  Could you please repeat that

3    question?

4         Q.  Before you questioned Mr. Galloway, according to

5    your testimony, you attempted to get a written statement

6    from him about another incident; isn't that right?

7         A.  Before I questioned Mr. Galloway?

8         Q.  Before you questioned Mr. Galloway about this

9    alleged incident.

10        A.  Oh, yes.

11        Q.  What time was that?

12        A.  That was after I advised him of his rights.  I

13   wasn't there for this.

14        Q.  I'm sorry?

15        A.  I wasn't there for the shooting at the cab stand.

16        Q.  Sir, let me just ask you this question.  I'm

17   trying to be very clear.

18        A.  Okay.

19        Q.  You attempted to obtain a statement from

20   Mr. Galloway prior to asking him any questions about the

21   matter that brings us before Judge Grella; is that

22   correct?

23        A.  The matter before Judge Grella is the shooting at

24   the cab stand, yes.

25        Q.  You also stated that the first time you gave

Det. DeCaro - People - Cross          158

1    Mr. Galloway his rights was sometime around 4:30, correct?

2         A.  Correct.

3         Q.  So, therefore, any statements that you claim that

4    you obtained, any statement -- withdrawn.

5              So, therefore, no rights were given prior to any

6    other statements taken from him, correct?  Do you

7    understand my question?

8              THE COURT:  I don't understand the question.

9         A.  I don't understand it.  I'm sorry, sir.

10             MR. BREWINGTON:  Thank you, Judge.

11        Q.  What time was the alleged written statement that

12   you claim you took from Mr. Galloway?

13        A.  For which incident, sir?

14        Q.  For the incident other than what is before Judge

15   Grella.

16             MR. LaROCCA:  Objection.  Just for clarity

17        sake.

18             THE COURT:  Rephrase.

19             MR. BREWINGTON:  Sure.

20        Q.  There was an alleged statement taken about  --

21   withdrawn.

22             MR. BREWINGTON:  Let me do it this way,

23        Judge.  I apologize.

24        Q.  You allege that you took a written statement from

25   Mr. Galloway about punching someone in the face, correct?

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross                159

1      A.  Yes.  I believe that was the matter at the 590

2   building.

3      Q.  And isn't it true that you allege, or you have

4   stated, that that was taken at 4 a.m.?

5      A.  I don't recall that.  I would have to see the

6   statement.

7      Q.  Do you have the statement in your records?

8      A.  I should.

9              THE WITNESS:  If I can check, your Honor?

10              THE COURT:  Okay.  Has this been marked for

11       ID?

12              MR. LaROCCA:  I don't believe it has.

13              THE COURT:  Why don't we mark it for ID.

14              (Whereupon, People's Hearing Exhibit 13

15       was marked for identification, only.)

16              THE COURT OFFICER:  People's 13 for

17       identification.

18              MR. BREWINGTON:  May we show it to the

19       witness, please.

20      Q.  Sir, do you have that document before you?

21      A.  Yes, sir.

22      Q.  Does that help refresh your recollection what

23   time you claim that statement was taken?

24              MR. LaROCCA:  Excuse me.  May I just know

25       what 13 is?  I'm not clear on it.


Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross          160

1                THE COURT:  Detective, you're looking at

2        People's 13 for ID?

3                THE WITNESS:  Yes, sir.

4                THE COURT:  And you asked to review it to

5        refresh your recollection?

6                THE WITNESS:  Yes, sir.

7                THE COURT:  Would you just tell us what that

8        is?

9                THE WITNESS:  This is a written statement I

10       obtained from Mr. Galloway for the Detective Division

11       case 3-27-67-08.

12               THE COURT:  Is that referred to as the 590

13       incident?

14               THE WITNESS:  Yes, the 590 incident.

15               THE COURT:  Is everyone comfortable with

16       that statement?

17               MR. BREWINGTON:  Yes.

18               MR. LaROCCA:  I would just point out to the

19       Court, I think that is also Exhibit 11 for

20       identification, which I have here.

21               MR. BREWINGTON:  It may be.  I don't have

22       those records, Judge.

23               THE COURT:  11 was a copy.  13 is the

24       original.  We will let them both remain.

25               At this time, I want to go on the record and

                 Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross       161

1        apologize to the clerk who corrected me earlier.

2    BY MR. BREWINGTON:  (Continuing)

3        Q.  Sir, can you answer my question?

4        A.  Does it help me, yes.

5        Q.  How does it help you, in terms of what time?

6        A.  Because Detective Lipson was with me when I

7    secured the statement.  Detective Lipson wasn't back in

8    the office until after five o'clock from when he got back

9    from Glen Head from showing that second photo-pack to the

10   victim.  It has to be after five o'clock.  It takes a

11   couple of minutes to get from Glen Head back to Hempstead.

12       Q.  Would it be accurate to say that statement,

13   according to you, would have been taken after the claimed

14   statements that you allege Mr. Galloway said about him

15   shooting at someone from across the corner?

16       A.  That statement he made was after we thought we

17   were done.

18       Q.  What time?

19       A.  After we finished with this one and talking about

20   the other one, he brought that up to our attention.  I

21   wasn't aware of that shooting.

22       Q.  I'm asking you what time in the morning?

23       A.  I want to say, it had to be light out.  It had to

24   be probably close to seven.

25       Q.  Close to seven o'clock?

Det. DeCaro - People - Cross          162

1       A.  Yes, because we weren't aware of that.  We had

2   the detective -- I can tell you because we had the

3   detective who was on that case.  He had to bring that

4   information to us.  He was working a day tour, and they

5   start at 7 a.m.

6       Q.  Sir, let me ask you to take a look at what has

7   been previously marked for identification as Defendant's

8   D, which has been previously shown to you.  Do you have

9   that?

10      A.  Yes, sir.

11              MR. BREWINGTON:  Judge, at this time, I

12          would like to move that into evidence, please, D, as

13          part of the material provided by the District

14          Attorney's office.

15              MR. LaROCCA:  Objection.

16              THE COURT:  Let me take a look at it.

17              Inasmuch as there is no objection,

18          Defendant's D.

19              MR. LaROCCA:  I did object.

20              THE COURT:  Did you say objection?

21              MR. LaROCCA:  Yes.  Then you said you wanted

22          to look at it.

23              THE COURT:  Objection sustained.

24              MR. BREWINGTON:  Please place it before the

25          witness again, for identification.

Det. DeCaro - People - Cross    163

1        Q.  Looking at D for identification, does that help

2    refresh your recollection about when the alleged statement

3    was taken about the shooting of the gun across the street?

4        A.  It has to do with photographs at 3:20 and at

5    5 a.m.

6        Q.  The top part, sir.  I don't want you to read from

7    it.  Just tell us if that helps you.

8        A.  I'm sorry.  I'm not familiar with this form.

9        Q.  Does that help refresh your recollection about

10   the time that the alleged statement concerning punching

11   Marky in the face took place?

12       A.  Yes.  There are two different times on here, sir.

13       Q.  Does that help refresh your recollection, sir?

14       A.  It says the approximate time was 4:30 a.m.

15            THE COURT:  The question is, does that help

16       refresh your recollection?

17            THE WITNESS:  Yes, this is the time that is

18       on there.

19            THE COURT:  Detective, listen, a specific

20       question was posed.  And the question was, does that

21       item help you to refresh your recollection?

22            THE WITNESS:  Yes.

23            THE COURT:  It either does or it doesn't.

24            THE WITNESS:  Yes.

25       Q.  And you refreshed your recollection at this

Det. DeCaro - People - Cross        164

1      time -- is that the written statement that you took at

2      4 p.m. on 6/6; is that right?

3              A.  It says 4:30.

4              Q.  Well, that's the oral statement; isn't it, sir?

5              A.  He would have to tell me before I write it.

6              Q.  What is your refreshed recollection?

7              A.  4:30.  I know I was with Mr. Ogleytree for a

8      while.

9              Q.  What statement was given at 4:30?

10                 MR. LaROCCA:  Can we get an a.m., p.m.?

11                 MR. BREWINGTON:  We'll get that.

12                 MR. LaROCCA:  I object.  I'm asking for it

13             now, because it's not clear.

14                 THE COURT:  The witness didn't give an a.m.

15             or a p.m.  He said, 4:30.  The defense will be

16             entitled to pose a question referring to 4:30.

17                 Overruled.

18             Q.  Which statement was taken at 4:30?  When you tell

19     us 4:30, is that morning or evening?

20             A.  It would have to be morning.  And I said, the

21     oral statement.

22             Q.  Was there a written statement taken at 4 a.m.?

23             A.  No.  I don't believe there was.

24             Q.  Was there a written statement taken at 4 p.m.?

25             A.  I don't think I was -- it might have been.  I can

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross      165

1   get a crime report.  Like I said, I was there for two

2   days.  I was there into the next day.  I would have to

3   check the crime report.

4        Q.  You don't know without looking into some records?

5        A.  Correct.  I was there for about two days.

6              MR. BREWINGTON:  Please, Judge, may he do

7         that?

8              THE COURT:  Sure.

9        Q.  Please tell us what document you are looking at

10   when you do look at it.

11       A.  Once I find it.

12       Q.  Sure.

13             THE WITNESS:  Excuse me, your Honor.  My

14        notes from that yellow legal pad, they were put into

15        evidence.  I don't have that.

16             THE COURT:  The DA has some documents that

17        he wants to hand up to the witness, which I'll

18        permit.

19             MR. BREWINGTON:  Yes, Judge.  I believe

20        those were marked for identification, Judge.

21             THE COURT:  Those items are.

22             MR. LaROCCA:  Exhibit 8, which is the note

23        Detective DeCaro signed.

24             MR. BREWINGTON:  For ID.

25             THE CLERK:  I believe the other is 12 for

                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross          166

1          ID.

2                    MR. LaROCCA:  Exhibit 12 for ID.

3                    THE COURT:  Please hand both of those items

4          to the witness.

5          A.  Okay.

6          Q.  Do you have an answer for my question?

7          A.  Please repeat the question.

8          Q.  Did you take the written statement that you claim

9      was taken at 4 p.m.?

10         A.  Yes.

11         Q.  So it was taken --

12         A.  That was after.  Like I said, that was after the

13     fact.  Now I'm seeing everything.  We weren't there -- we

14     didn't -- we weren't there for the shooting on Hutchinson

15     and Tennessee.  We didn't know about that.  I have no

16     paperwork on that.  That was after the whole fact.

17                   MR. BREWINGTON:  Judge, move to strike as

18         nonresponsive.

19                   THE COURT:  I'll let the answer stand.

20         Q.  Sir, didn't you testify earlier that the first

21     statement that was taken was the written statement that

22     was about the fight that took place where Marky got

23     punched in the face; isn't that what your prior testimony

24     was?

25         A.  Yes, that's correct.  That was the first --

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross

1      Q.   That's what you claim?

2                MR. LaROCCA:   Judge, I'm going to object and

3           ask that he be allowed to finish.

4                MR. BREWINGTON:   Judge, it was a yes or no.

5                THE COURT:   I didn't hear the full question.

6           So let me hear the question and then I'll hear the

7           objection.

8                MR. LaROCCA:   Thank you.

9      Q.   Didn't you testify in your earlier testimony that

10     the first statement that was taken was a written statement

11     that dealt with Mr. Galloway allegedly punching Marky in

12     the face; yes or no?

13     A.   Yes.

14                THE COURT:   Objection overruled.   The

15           question stands.   The answer stands.

16     Q.   And the first statement that you claim that was

17     taken, you claim was taken on the morning of the 6th,

18     correct, of the 6th, June 6th?

19     A.   Yes, about the 590 incident.

20     Q.   And sir, your testimony just now was that that

21     same statement, the 590 incident, took place and was given

22     in the afternoon, 4 p.m. of the 6th; is that your

23     statement?

24     A.   No, it's not.   I misspoke then.   The first

25     incident was the --

Janine M. Colasanti, RPR, OCR

1          Q.  Sir, you answered my question.  So that we're

2     clear, what statement was it then that was taken at 4 p.m.

3     on the 6th, at the Armory, if it took place there?

4          A.  At 4 p.m.  That would be the last one that he

5     brought to our attention about the Tennessee Avenue.

6          Q.  So based on -- and that would have been

7     4:30 p.m.?

8          A.  Yes.  After we were all done.

9          Q.  I just want to be clear.

10         A.  Yes, in the afternoon.

11         Q.  So when was it that Mr. Galloway, according to

12    your testimony, left the Armory?

13         A.  When they were finished with the arrest process.

14    I don't know what time he was transported.  I didn't

15    transport.

16         Q.  Sir, do you have 11 in front of you right there?

17         A.  I may.

18         Q.  That's the statement about the 590 incident.

19         A.  Isn't 11 and 13 the same?

20         Q.  I believe so.

21         A.  11 is a copy, and 13 is the original.

22         Q.  Yes.  Do you have that?

23         A.  13 I have in front of me.

24         Q.  And it's your testimony that this document was

25    taken at what time?

1       A.  This was in the morning.  This was after 4:30.

2    Approximately 4:30.  This is the first thing we talked

3    about.  That's what I was there for.

4       Q.  And the statement, the alleged verbal statement

5    that you claim was taken about the shooting across the

6    street, what time was that taken?

7       A.  After you brought it to my attention, it was

8    later in the afternoon; at the end, whenever everything

9    was wrapped up.

10      Q.  On what day?

11      A.  Same day, just later that afternoon.

12      Q.  Sir --

13      A.  June 6, 2008.

14      Q.  At about what time?

15      A.  I believe I said it was about 4 p.m., 1600 hours.

16      Q.  At 4 p.m.?

17      A.  Yes.

18      Q.  And that meant that you had been questioning

19   Mr. Galloway, because you were still the person that

20   alleged -- you took that statement, right?

21      A.  Yes.

22      Q.  So you had been questioning Mr. Galloway from

23   sometime after 1 a.m, all the way around to 4 p.m.; is

24   that correct?

25      A.  No, it's not.

                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Cross          170

1      Q.  So did you leave the Armory at any time from the

2    time you arrived there, between 12:30 and 1 a.m, until

3    4 p.m., when you claim this alleged statement was made?

4      A.  No, I did not.

5      Q.  And where was Mr. Galloway?

6      A.  Mr. Galloway was in the middle holding cell down

7    the hall.

8      Q.  And he was, basically, at that time, the person

9    that was the focus of your attention, correct?

10     A.  As well as his codefendant.

11     Q.  I'm sorry?

12     A.  As well as his codefendant, Mr. Ogleytree.

13          MR. BREWINGTON:  Judge, move to strike as

14          unresponsive.

15          THE COURT:  It is not unresponsive.  You

16          asked if he was the person who was the focus of his

17          --

18          MR. BREWINGTON:  And he said, No.  And I

19          said, Who else?

20          THE COURT:  I'll allow it to stand.

21          MR. BREWINGTON:  I understand, Judge.

22     Q.  As you were focusing on Mr. Galloway and his

23    codefendant, I asked you a question before, was he ever

24    fed during that time?  Now that we know that you had him

25    until 4 p.m. the next day, was he fed?

1        A.  I don't recall.  I believe so.  I don't recall.

2        Q.  Did he get anything to drink?

3        A.  I don't recall.

4        Q.  This is a person that you were dealing with

5   face-to-face, right?

6        A.  Yes.

7        Q.  A person that you were trying to get information,

8   soliciting information from, using interrogation, right?

9        A.  Yes.

10       Q.  And you don't know if the person that was under

11  your care, custody and control at that time was fed or

12  given water?

13       A.  I believe he was.  Could I say a hundred percent?

14  I don't know what he ate.  I can't tell you what he drank.

15       Q.  You don't know, do you?

16       A.  No.  I don't recall.

17       Q.  As a matter of fact, sir, as you were talking to

18  Mr. Galloway on that day, did you notice any specific

19  facial -- any features about his dentures, that being his

20  teeth?

21       A.  I don't recall any dentures.

22       Q.  I'm talking about his teeth.  I'm not talking

23  about replacement dentures.  I'm talking about his dental

24  work.

25       A.  You said, Dentures.  I don't recall anything.

Det. DeCaro - People - Cross            172

1        Q.  Did he have any broken teeth?

2        A.  I don't recall any broken teeth.

3        Q.  Sir, at the time that you were asking

4   Mr. Galloway questions from, according to you, 1 a.m.

5   through and including 4 p.m. on the 6th, did you at --

6   withdrawn.

7            From the time that you were asking Mr. Galloway

8   questions on that day, it just wasn't the morning, did you

9   actually see any of the alleged witnesses to the cab

10  shooting present at the Armory?

11       A.  No, I did not.  I spoke to them.  I spoke to

12  them.  I have no --

13            THE COURT:  Detective, if either counsel

14       asks a yes or no question, the only possible answers

15       would be yes or no, or I can't answer that yes or no.

16            THE WITNESS:  I apologize.

17            THE COURT:  You don't have to apologize.

18            And then if either attorney wants to follow

19       up, they can do so.

20            THE WITNESS:  Thank you.

21       Q.  Sir, with regard to Mr. Galloway and his

22  appearance at the time that he was before you, that being

23  on the 6th from the morning until that afternoon, would

24  you agree with me that at all times, based on your

25  testimony, he had braids or cornrows in his head?

1    A.  Yes, I believe he did.

2    Q.  And now that we know the length that he was in

3  your company, would you also agree that during that time

4  you did see the photo arrays which were put together by

5  Detective Lipson?

6    A.  Yes.

7    Q.  And would you also agree that when you saw the

8  photo arrays, which are in evidence as People's 1 and 3 --

9          MR. BREWINGTON:  If we can show that to the

10         witness, Judge.

11         THE COURT:  Okay.

12   Q.  Would you also agree that when you looked at

13  those photographs, that none of the individuals in that

14  photograph, in that array of photographs, had cornrows or

15  braids?

16         MR. LaROCCA:  Objection.

17         THE COURT:  Overruled.

18         You can answer that.

19   A.  Correct.  No one has cornrows or braids.

20   Q.  And would you also agree, sir, that based on your

21  knowledge of the description given of the alleged

22  perpetrator of the shooting of the cabdriver, that there

23  was never any mention of cornrows or braids?

24   A.  I can't answer.

25         MR. LaROCCA:  Objection.

Det. DeCaro - People - Cross     174

1          THE COURT:  I'm going to let his answer

2     stand.

3          Q.  Would you agree with me, sir, that at the time

4     that Mr. Galloway was in front of you, that there was no

5     question in your mind that his hairstyle was in the form

6     of cornrows or braids?

7               MR. LaROCCA:  Objection.  It's been asked

8     and answered.

9               THE COURT:  Sustained.

10          Q.  By the way, sir, at any time while Mr. Galloway

11     was in front of you on that day, did you attempt to try

12     and get a current picture of Mr. Galloway to use as part

13     of a photo array?

14          A.  This was the most current photo we had in our

15     Rogues Gallery, yes.

16               MR. BREWINGTON:  Move to strike as

17     unresponsive.

18               THE COURT:  Would you read the question and

19     answer back?

20               (Whereupon, the court reporter read back

21     the requested testimony.)

22               THE COURT:  The answer is stricken.

23               Can you answer that question?

24               THE WITNESS:  Did I take a snapshot that

25     day?  No.  No, I did not.  I used what I had.


Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Redirect     175

1          Q.  Would you agree with me, what you had did not

2      match the hairstyle that Mr. Galloway had before you on

3      that day?

4                    MR. LaROCCA:  Objection.

5                    THE COURT:  Sustained.

6                    MR. BREWINGTON:  Judge, nothing further of

7           this witness at this time.

8                    THE COURT:  Any redirect?

9                    MR. LaROCCA:  Yes, your Honor.  Thank you.

10    REDIRECT EXAMINATION

11    BY MR. LaROCCA:

12         Q.  Detective DeCaro, when you responded to the

13     Hempstead Armory, roughly what time of the day or night

14     was that?

15         A.  Approximately 1 a.m.

16         Q.  Who were you going there to interview or meet

17     with?

18         A.  Robert Ogleytree and Josiah Galloway.

19         Q.  Which incident were they to be interviewed about?

20                    MR. BREWINGTON:  Objection, Judge.  This is

21           repetitive.  We had this on direct.

22                    MR. LaROCCA:  And on cross.

23                    THE COURT:  It was covered on cross.

24                    MR. BREWINGTON:  He is not bringing anything

25           new.

                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Redirect    176

1          THE COURT:  Overruled.

2          MR. BREWINGTON:  Very well, Judge.

3     A.  I was there for the home invasion, push-in

4  robbery, at the 590 Fulton Avenue incident.

5     Q.  Who was the complainant in that case?

6     A.  Marky Fouse.

7     Q.  And at that point in time, were you there for any

8  other incident?

9     A.  No, I was not.

10    Q.  When you went there, did you meet with Josiah

11 Galloway immediately?

12    A.  No, I did not.

13    Q.  Did you interview both Robert Ogleytree and

14 Josiah Galloway in the course of that morning and

15 afternoon?

16          MR. BREWINGTON:  Objection to the leading

17     form.

18          THE COURT:  Overruled.  You can answer.

19    A.  Yes.  Yes, I did.

20    Q.  Who was the first person that you interviewed?

21    A.  Mr. Ogleytree.

22    Q.  And roughly when was that, if you recall?

23    A.  About a half hour, forty minutes after we got

24 there he was willing to talk to us.  And I had to take

25 advantage, go in and talk to him.

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Redirect      177

1                THE COURT:  Just, if you don't mind, just
2           for purposes of the record, could you give me an
3           approximate time, rather than referring to a half
4           hour before?
5                THE WITNESS:  Shortly before 2 a.m.
6       Q.  Now, when you went there, prior to formally
7    interviewing Josiah Galloway, did you actually see him
8    physically?
9       A.  Yes.
10      Q.  Prior to talking to him about the facts and
11   circumstances of the 590 incident with the complainant,
12   Marky Fouse, did you advise him of his Miranda warnings?
13      A.  Yes.
14                MR. BREWINGTON:  Objection.
15                THE COURT:  Overruled.
16      A.  Yes, sir.
17      Q.  What incident did you talk to him about after
18   advising him of his Miranda warnings, at least in sequence
19   first?
20      A.  The Marky Fouse incident, the 590/600 incident.
21      Q.  But prior to you ending your involvement with him
22   that day, did you have a conversation concerning a street
23   shooting?
24                MR. BREWINGTON:  Objection.
25                THE COURT:  Overruled.

                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Redirect    178

1        A.  Yes.

2        Q.  And when did that conversation come up in

3   relation to any photo arrays that were done; in other

4   words, before, after, whatever?

5        A.  After, sir.

6        Q.  Now, you looked at a document to refresh your

7   recollection as to when the statement concerning the

8   street shooting was made.  Do you recall doing that a

9   little while ago?

10       A.  Yes.

11       Q.  Was that your document?

12       A.  No, it was not.

13       Q.  Was that a document that you are familiar with?

14       A.  No, it is not.

15       Q.  Now, when you say that it refreshes your

16   recollection as to 4 p.m., just to be clear, do you have

17   now a specific recollection that it was 4 p.m., or are you

18   relying on the document itself?

19              MR. BREWINGTON:  Objection.

20              THE COURT:  Overruled.

21       A.  The document helped that it was later in the day.

22       Q.  So it puts it at the end of the process later in

23   the day?

24              MR. BREWINGTON:  Objection.

25              THE COURT:  Overruled.

                Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Recross                                  179

1          MR. BREWINGTON:  It's leading, Judge.

2          THE COURT:  Overruled.

3      A.  Yes, sir.

4      Q.  But as to the specific time, do you have any

5   recollection based on that document or anything else?

6      A.  No.

7      Q.  Do you see Josiah Galloway here today?

8          MR. BREWINGTON:  Objection.

9          THE COURT:  Overruled.

10     A.  Yes, I do.

11     Q.  Could you just point to him and tell us where he

12  is and describe an article of his clothing?

13     A.  Mr. Galloway is in front of me, wearing the white

14  top, at the bench, next to his counsel.

15         MR. LaROCCA:  Your Honor, may the Court

16      reflect the identification of the accused?

17         THE COURT:  Yes.

18         MR. BREWINGTON:  Note my objection.  It

19      wasn't covered on direct or cross-examination.

20     Q.  Was that the person you interviewed on June 6th?

21     A.  Yes.

22         MR. LaROCCA:  Thank you.  Nothing further.

23         THE COURT:  Any recross?

24         MR. BREWINGTON:  Yes.

25


                    Janine M. Colasanti, RPR, OCR

1   RECROSS-EXAMINATION

2   BY MR. BREWINGTON:

3       Q.  How much time did you spend in front of

4   Mr. Galloway, the man you just pointed out, during that

5   morning, sir?

6       A.  How much time?  A few hours.

7       Q.  And he spoke with you, correct?

8       A.  Yes.

9       Q.  You looked at him as he spoke to you, correct?

10      A.  Yes.

11      Q.  You claim that you went there to interview

12  Mr. Ogleytree and Mr. Galloway about the 590 incident; is

13  that correct?

14      A.  Yes, sir.

15      Q.  Would it be accurate to say that with regard to

16  the interview to the 590 incident, that at that point when

17  you did speak to Mr. Galloway, that you took the written

18  statement, correct?

19      A.  Yes.

20      Q.  What time, just so we're clear now, did you take

21  that written statement?  You say you spoke to him pretty

22  much right away, right?

23      A.  Right away.

24      Q.  When you first started speaking to him, that is

25  what you were there for, right?

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Recross                181

1          A.   Yes.

2          Q.   You spoke with him how long after you arrived?

3          A.   That was a few hours.

4          Q.   About what time was that?

5          A.   That I arrived, or the time that I started

6     speaking to him?

7          Q.   That you began speaking to him, sir.

8          A.   That was, roughly, 4:30.

9               THE COURT:  Just so the record is clear,

10        a.m. or p.m.?

11              MR. BREWINGTON:  Very well, Judge.

12              THE WITNESS:  4:30 a.m., sir.

13         Q.   You had been speaking with Mr. Ogleytree for how

14    long?

15         A.   At least an hour and-a-half prior, about the

16    incident.

17         Q.   It would be accurate to say you really hadn't

18    gone in front of or spoken to Mr. Galloway until you

19    eventually went to him about 4:00, 4:30?

20         A.   Correct.

21         Q.   Sir, how was it that you were able to call your

22    partner, Mr. Lipson, prior to three o'clock and tell him

23    to get the sketch of this guy that looked like the person

24    that was sitting right in front of you?

25         A.   I wanted to see who was down the hallway.  I saw

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Recross    182

1   in the room who was there.

2        Q.  Sir, you said you were talking to the man, in

3   your prior testimony, for a while and he was talking to

4   you about the incident.  And then based on that, you

5   looked at his nose and called your partner, Lipson, and

6   told him to give the sketch; isn't that your prior

7   testimony?

8        A.  I don't recall that.

9        Q.  I'm sorry?

10       A.  I don't recall that, sir.

11       Q.  Sir, didn't you testify and tell this judge that

12  you had been questioning Mr. Galloway for a period of

13  time?  You kept saying to him, you look familiar, you look

14  familiar; didn't you say that?

15       A.  I don't recall, sir.

16       Q.  You don't recall your testimony from the day

17  before yesterday?

18       A.  We talked about a lot of things.

19       Q.  I know you did.  My question is, do you remember

20  your testimony from the day before yesterday, yes or no?

21            MR. LaROCCA:  Objection.

22            THE COURT:  Everybody, there was a lot of

23       interrupting going on here, so there will be no more

24       interrupting.

25            Pose your next question.

                  Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Recross          183

1                    MR. LaROCCA:  Your Honor, I object to the

2              line of questioning, it's well beyond the scope of

3              any redirect.

4                    THE COURT:  Sustained.

5                    MR. LaROCCA:  Thank you.

6                    MR. BREWINGTON:  Judge, he opened this door

7              with regard to the timing of it.  I'm exploring the

8              timing of it.

9                    THE COURT:  I agree that the timing of the

10             statements were covered on direct, cross and redirect

11             and now recross.  The timing --

12                   MR. BREWINGTON:  And that's what I'm dealing

13             with, Judge.

14                   THE COURT:  Of the statements.

15                   MR. BREWINGTON:  And that's what I'm dealing

16             with.  Thank you, your Honor.

17                   THE COURT:  Okay.

18        BY MR. BREWINGTON:  (Continuing)

19             Q.  Sir, just so that we're clear, isn't it your

20        testimony that you contacted your partner, Detective

21        Lipson, at the time that you were questioning Mr. Galloway

22        about the 590 incident; yes or no?

23                   MR. LaROCCA:  Objection.  Same objection.

24                   THE COURT:  Now, that aspect wasn't covered

25             on redirect.

                    Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Recross            184

1            MR. BREWINGTON:  Judge, it's reasonably

2       related to timing, because he has now made a

3       statement -- may I ask the Court if I may speak to

4       the Court outside of the witness's presence, please?

5            THE COURT:  If you don't mind, please.

6            THE WITNESS:  I know my way.

7            (Whereupon, the witness leaves the

8       courtroom.)

9            THE COURT:  I think that I've given both

10      sides some latitude, without letting things go too

11      far afield.  And I think as a result everybody has

12      had more than adequate opportunity to question all

13      the witnesses, direct, cross, redirect, recross.  But

14      we're not really going into the times now that

15      statements were given.  We're kind of going into a

16      challenge with regard to him calling for the photo

17      array and so on and so forth, and that really was not

18      covered on redirect.

19            However, it was certainly covered on direct

20      and cross.  And there is certainly more than enough

21      record, I believe, for you to make argument that I

22      think you're attempting to put on the record now.

23            But I think to go into the questioning now,

24      is well beyond the scope of redirect, and, therefore,

25      well beyond the scope of recross.  If you take issue

Janine M. Colasanti, RPR, OCR

Det. DeCaro - People - Recross      185

1        with that, I'll hear what you have to say.

2                  MR. BREWINGTON:  Judge, I respect the

3        Court's ruling.  The only question I ask that I be

4        allowed to ask is what time was it that this witness

5        allegedly spoke to Detective Lipson in relationship

6        to the time that he took the statement which is

7        before the Court as 11 and 13.

8                  THE COURT:  Okay.  In the spirit of the

9        timing aspect of the redirect, I'll allow that

10       question, and then we'll get on to something else.

11                 MR. BREWINGTON:  Very well, Judge.

12                 THE COURT:  Please bring the witness back.

13                 (Whereupon, the witness resumed the witness

14       stand.)

15                 THE COURT:  Mr. Brewington.

16                 MR. BREWINGTON:  Thank you, Judge.

17   BY MR. BREWINGTON:  (Continuing)

18       Q.  Sir, would you please tell the Court, what time

19   was it that you first called Detective Lipson to put a

20   photo array together in relationship to the time that you

21   alleged that the statement, which is People's 11 and 13,

22   the time that that was taken?  Do you have my question

23   before you?

24       A.  The question, between 11 and 13  -- it's the same

25   document, 13?

                    Janine M. Colasanti, RPR, OCR

Proceedings

1        Q.  Yes, sir.

2        A.  That had to be before three o'clock.

3        Q.  Just so that we're clear, you did not speak to or

4   sit in front of Mr. Galloway to question him until

5   sometime after 4:30, right?

6                MR. LaROCCA:  Objection.  It's compound.

7                THE COURT:  I'll allow it.

8        A.  Sometime about -- repeat the last part, please.

9                MR. BREWINGTON:  Judge, may we have that

10       read back, please?

11               THE COURT:  Okay.

12                (Whereupon, the court reporter read back

13       the requested question.)

14               THE COURT:  Can you answer that that's right

15       or that's not right?

16               THE WITNESS:  That's right, to question him,

17       yes.

18               THE COURT:  Read me back that question,

19       again, please.

20                (Whereupon, the requested question was read

21       back by the court reporter.)

22               MR. BREWINGTON:  Thank you, Judge.

23                Nothing further.

24               THE COURT:  Thank you, Detective.

25               THE WITNESS:  Thank you, sir.


             Janine M. Colasanti, RPR, OCR

Proceedings

1           (Witness excused.)

2           THE COURT:  Let's take a five-minute break,

3      and then we'll go on to the next witness.

4           MR. BREWINGTON:  Very well, Judge.

5            (Whereupon, a short recess was taken.)

6           THE CLERK:  People versus Josiah Galloway,

7      Indictment 1315N of '08.  Hearing continued.

8           Are the People ready?

9           MR. LaROCCA:  The People are ready.

10          THE CLERK:  Is the defense ready?

11          MR. BREWINGTON:  The defense is ready.

12          THE COURT:  Any applications before we

13     continue?

14          MR. LaROCCA:  I would like to advise the

15     Court, I have two witnesses remaining, Detective

16     Cunningham and Detective Ross.  Detective Ross is

17     also involved in a serious matter in the grand jury.

18     He was called over for that, expecting to give very

19     brief testimony.  So I would expect him to be

20     available momentarily, as well.  Just in case he's

21     quick, I don't know for sure if Detective Ross would

22     be outside.

23          THE COURT:  Okay.

24          MR. LaROCCA:  Thank you.  I have no other

25     application.


                Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct    188

1              MR. BREWINGTON:  The only thing I would ask
2         is that the People tell us if there's -- I'm not sure
3         if Detective Cunningham was planned to be called, if
4         there is any additional Rosario --
5              MR. LaROCCA:  I reviewed that matter with
6         Detective Cunningham, and we met beforehand.  There
7         is no additional Rosario.
8              May I?
9              THE COURT:  People, yes.
10   Det. K E V I N   C U N N I N G H A M, Shield #112,
11        assigned to the Hempstead Village Police Department of
12        the Nassau County Police Department, called as a
13        witness on behalf of the People, having been duly
14        sworn by the Clerk of the Court, was examined and
15        testified as follows:
16   DIRECT EXAMINATION
17   BY MR. LaROCCA:
18        Q.  Good morning, Detective Cunningham.
19        A.  Good morning.
20        Q.  Detective, how long have you been a member of the
21   Hempstead Police Department?
22        A.  I'm in my 22nd year.
23        Q.  Were you present on May 27, 2008 when Detective
24   Aichen was speaking with a person by the name of Marky
25   Fouse?

                    Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct    189

1              MR. BREWINGTON:  Objection.

2              THE COURT:  Overruled.

3              MR. BREWINGTON:  Relevance?

4              THE COURT:  Overruled.

5      A.  I was present when the statement was taken, yes.

6      Q.  Did you hear the conversation between Detective

7   Aichen and Marky Fouse?

8              MR. BREWINGTON:  Objection.

9              THE COURT:  Overruled.

10     A.  Yes, I did.

11     Q.  Can you tell us why Marky Fouse was there, and

12  what the sum and substance of that conversation was?

13             MR. BREWINGTON:  Objection.

14             THE COURT:  Overruled.

15             MR. BREWINGTON:  Judge, this is May 27th?

16         Objection.

17             THE COURT:  Detective, just step outside for

18         a moment.

19             (Whereupon, the witness was leaves the

20         courtroom.)

21             THE COURT:  I'll let you put on the record

22         the basis of your objections.

23             MR. BREWINGTON:  Very well, Judge.

24             First, as I understand, we were not told

25         that this witness was going to be part of their

                      Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct      190

1        original case, but I understand he's on the stand.

2              The testimony is now asking for statements

3        given by Marky Fouse, taken on May 27th, on a matter

4        that has been dismissed by the grand jury, that is

5        not actually before us.  The issue of probable cause

6        concerning the incident that allegedly took place on

7        the 15th of May, I believe, is what is relevant.

8              So we're objecting to, both, relevancy and

9        the fact that, from a procedural standpoint, the

10       grand jury has spoken on this.  And that for them to

11       try and formulate probable cause based on this

12       conversation is inappropriate.

13             THE COURT:  You're not suggesting to the

14       Court that because the grand jury dismissed the case,

15       that the facts and circumstances of that case could

16       not be set forth with regard to the issue of probable

17       cause, are you?

18             MR. BREWINGTON:  Judge, I'm not --

19             THE COURT:  To use your phraseology, answer

20       that yes or no.

21             MR. BREWINGTON:  Judge, and I will.  As long

22       as it's consistent throughout, no, I'm not.

23             May I explain at some point?

24             THE COURT:  And, People, am I correct, that

25       based upon, among other things, information provided

                Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct    191

1      by Marky Fouse, that it's your position that that is

2      relevant to the probable cause for Galloway

3      eventually to be in custody when he was spoken to by

4      Detective DeCaro?

5                   MR. LaROCCA:  Yes, your Honor.  And I would

6      say that one, first, I just misspoke a moment ago

7      when I said May 27th.  The incident is May 27th.  The

8      conversation is about May 28th.  I'll deal with the

9      witness with respect to that.

10                  That's the point in time when Marky Fouse

11     gave to Detective Aichen, in Detective Cunningham's

12     presence, the statement to the 590 Fulton Avenue,

13     Hempstead, push-in allegation that led this witness

14     to seek to arrest Josiah Galloway and actually arrest

15     him on June 5th.

16                  So he was present when the interview took

17     place and he made the arrest based on the information

18     flowing from that, which was the only charge at that

19     point known to be against Josiah Galloway.

20                  THE COURT:  Did you want to be heard

21     further, Mr. Brewington?

22                  MR. BREWINGTON:  I believe I stated my

23     point.  It appears to the Court that such testimony

24     would be relevant and also admissible.

25                  Please recall the witness.

                        Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct 192

1          (Whereupon, the witness resumed the witness

2      stand.)

3  BY MR. LaROCCA:  (Continuing)

4      Q.  Detective Cunningham, to go back, I misspoke

5  earlier.  On May 28, 2008, at approximately 2300 hours,

6  were you present when Detective Aichen had a conversation

7  with Marky Fouse?

8      A.  Yes, I was.

9      Q.  Was that concerning an incident that was alleged

10  to have occurred?

11      A.  Yes.

12      Q.  What was the sum and substance of that incident

13  that you heard Marky Fouse describe?

14          MR. BREWINGTON:  Objection.  The relevancy,

15      the sum and substance, Judge?

16          THE COURT:  Overruled.

17      A.  Marky Fouse was reporting that he was a victim of

18  a push-in robbery at his address.

19      Q.  What was that address?

20      A.  590 Fulton Avenue, Apartment 4B, as in boy.

21      Q.  What did he describe concerning the circumstance

22  of that push-in robbery?

23      A.  There was a knock at his door.  He answered his

24  door.  Three male blacks known to him entered with

25  handguns and proceeded to rob him.

Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct   193

1     Q.  When you say known to him, did he identify the

2     three by name?

3     A.  Yes.

4              MR. BREWINGTON:  Objection.

5              THE COURT:  Overruled.

6     A.  Yes, he did.

7     Q.  What names did he give?

8     A.  Robert Ogleytree, Maurice Boyle and Josiah

9     Galloway.

10    Q.  You were present for that conversation?

11    A.  Yes, I was.

12    Q.  Did you act on that conversation with respect to

13    Josiah Galloway and Robert Ogleytree?

14    A.  Yes, I did.

15    Q.  What actions did you take based on their

16    statements provided by Marky Fouse?

17    A.  Approximately a week later I arrested both

18    subjects.

19    Q.  And how did you come to locate them?

20    A.  I had received information of their location.  I

21    responded there.  They were there.  They were placed under

22    arrest and transported back to the Armory.

23    Q.  Did you know them?

24    A.  Yes, I did.

25    Q.  Both by name and by sight?

Janine M. Colasanti, RPR, OCR

Det. Cunningham - People - Direct      194

1        A.  Yes.

2        Q.  Do you recall where that arrest took place?

3        A.  It was on the corner of Windsor and, I believe,

4   Pierson Avenue in the Village of Hempstead.

5        Q.  Had you been asked or directed to do that, or

6   were you acting on your own initiative?

7                 MR. BREWINGTON:  Objection.

8                 THE COURT:  Overruled.

9        A.  As a detective in the Village of Hempstead, I was

10  looking to close the case.

11       Q.  You had direct knowledge of Marky Fouse's

12  allegations?

13       A.  Yes.

14       Q.  How long had you known Josiah Galloway?

15                MR. BREWINGTON:  Objection.

16                THE COURT:  Overruled.

17       A.  Quite a number of years now.

18       Q.  Did you recognize him when you saw him that day?

19       A.  Yes.

20       Q.  Do you see him here in the courtroom today?

21       A.  Yes, I do.

22       Q.  Can you point to him, describe where he is seated

23  and describe an article of his clothing?

24       A.  Male black, sitting at the center of the defense

25  table, wearing a white shirt.


                 Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross   195

1        Q.   When you arrested him --

2                  MR. LaROCCA:  Your Honor, may the Court

3             reflect the identification of the accused?

4                  THE COURT:  Any objection?

5                  MR. BREWINGTON:  No.

6        Q.   When you arrested him, where did you take him?

7        A.   To the Hempstead Police Armory on Washington

8    Street.

9        Q.   Do you know the approximate time of day or night

10   that was?

11       A.   It was in the evening hours.  I don't recall the

12   exact time.

13       Q.   In the evening hours of June 5th?

14       A.   Correct.

15       Q.   Was he interviewed, or did you become aware of

16   the fact that he was interviewed by the Third Squad

17   detectives in the course of the following morning?

18       A.   There came a point in time he was, yes.

19       Q.   But you brought him in for the robbery or the

20   alleged robbery of Marky Fouse?

21       A.   That's correct.

22       Q.   And did Marky Fouse, on May 28, 2008, give a

23   written statement to Detective Aichen concerning the 27th

24   of May 2008 alleged robbery?

25       A.   Yes, he did.

                  Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross          196

1        Q.  And you were present?

2        A.  Yes, I was.

3             MR. LaROCCA:  Thank you.  I have nothing

4        further.

5    CROSS-EXAMINATION

6    BY MR. BREWINGTON:

7        Q.  So where was Marky Fouse on June 5, 2008 when you

8     arrested Mr. Galloway?

9             MR. LaROCCA:  Objection.

10            THE COURT:  I'll allow it.

11       A.  I don't know.

12       Q.  Do you know where he is now?

13            MR. LaROCCA:  Objection.

14            THE COURT:  Sustained.

15       Q.  By the way, when you picked Mr. Galloway up, he

16    was seated in the car, correct?

17       A.  Yes, he was.

18       Q.  Where was the car, again, please?

19       A.  On the corner of Windsor Parkway and I believe it

20    was Pierson Avenue.

21       Q.  And that car was a Honda, right?

22       A.  I'm not a hundred percent sure.

23       Q.  Did you take any notes as to what type of car it

24    was?

25       A.  No.

                  Janine M. Colasanti, RPR, OCR

         1              MR. LaROCCA:  Objection.

         2              THE COURT:  Overruled.

         3         Q.  I'm sorry?

         4         A.  No, I didn't.

         5         Q.  Did you ever impound the car?

         6         A.  The car was brought to the Armory.  I'm not sure

         7    if it was impounded or released back to the Armory.

         8         Q.  Who made arrangements to have the car taken to

         9    the Armory?

        10              MR. LaROCCA:  Objection.  Beyond the scope

        11         of this hearing.

        12              THE COURT:  Sustained.

        13         Q.  Do you recall what type of car Mr. Galloway was

        14    seated in at the time that you arrested him when you say

        15    you noticed him?

        16              MR. LaROCCA:  Objection.

        17              THE COURT:  Overruled.

        18         A.  I don't recall the type of car, no.  It was a

        19    tan-colored vehicle.

        20         Q.  At the time that you arrested Mr. Galloway, you

        21    saw his hairstyle, didn't you?

        22         A.  That night, yes, I did.

        23         Q.  What was it?

        24         A.  I don't recall now.

        25         Q.  So you did speak to Mr. Galloway several times

P.O. Cunningham - People - Cross    198

1    that evening and that morning, didn't you, at the Armory?

2        A.   I brought him into the Armory, then I went to my

3    office.  He was down the hall, and the Third Squad

4    continued the investigation.

5        Q.   Did you speak to Mr. Galloway several times that

6    day and then into the morning?

7        A.   Briefly, yes.

8        Q.   And didn't you speak to Mr. Galloway face-to-face

9    when you leaned toward him and wanted him to testify about

10   an alleged murder that you claim he knew something about?

11   Don't you remember that?

12       A.   No.

13       Q.   I'm sorry?

14       A.   No, I don't.

15       Q.   Sir, when you did speak to Mr. Galloway, do you

16   remember telling him that if he didn't tell you what you

17   wanted to know, you were going to make sure that he gets

18   pinned with something?

19       A.   Absolutely not.

20       Q.   Do you recall, sir, at the time that you were

21   speaking to Mr. Galloway, if you saw what his teeth looked

22   like?

23       A.   If I was speaking to him, I would have seen what

24   his teeth looked like.

25       Q.   As a matter of fact, sir, you saw Mr. Galloway on

1    that evening when you arrested him and you took him into

2    custody, right?

3         A.   Yes.

4         Q.   You spoke with him, right?

5         A.   Yes.

6         Q.   He spoke with you, right?

7         A.   Yes.

8         Q.   And you never noticed anything about his teeth?

9         A.   Not that I remember today, no.

10        Q.   Sir, let me ask you this, do you have any memory

11   of ever noticing anything about his teeth, putting aside

12   what you know today?

13             MR. LaROCCA:  Objection.  I don't think that

14        can be --

15             THE COURT:  Overruled.

16        A.   No, I don't.

17        Q.   You never knew that Mr. Galloway has a broken and

18   missing front tooth, a big hole right in the middle of his

19   face?

20        A.   Not that I know of.

21        Q.   And at the time that you arrested him for that

22   Marky Fouse case -- that case was dismissed, right?

23             MR. LaROCCA:  Objection.

24             THE COURT:  Sustained.

25        Q.   Sir, with regard to the claims made by Mr. Fouse

P.O. Cunningham - People - Cross   200

1    concerning Mr. Galloway, you learned that those matters

2    were not prosecuted, right?

3                   MR. LaROCCA:  Objection.

4                   THE COURT:  Sustained.

5         Q.  Sir, by the way, when you arrested Mr. Galloway

6    on, I think you said it was on the 5th; is that right?

7    What time was that, please?

8         A.  It was in the evening hours.  I don't recall the

9    exact time.

10        Q.  Did you write down any time when you actually

11   took him into custody?

12        A.  He's logged in at the Armory, and it's put over

13   the radio, yes.

14        Q.  When you say logged in at the Armory, there is a

15   written record of that, correct?

16        A.  There should be.  I called --

17        Q.  Sir, yes or no?

18        A.  It wouldn't be at the Armory.  It was

19   headquarters.

20        Q.  Headquarters?

21        A.  Hempstead Police Headquarters.

22        Q.  Do you have that written record here as to what

23   time he was taken into custody and logged in?

24        A.  No, I do not.

25        Q.  Did you ever provide that to the DA?

                    Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross   201

1    A.   I did not.

2    Q.   There would be an affidavit?

3    A.   That would be an official police log, yes.

4              MR. BREWINGTON:  Judge, we ask for the log.

5              THE COURT:  Mr. LaRocca?

6              MR. LaROCCA:  I don't have the record.  I'll

7         obtain it as the Court directs.  But I'm not clear if

8         the witness is saying it's his record or just a

9         record.  Either way, if the Court directs, I'll track

10        it down.

11             THE COURT:  I think it would be appropriate

12        for you to obtain it, or a copy of it.  I don't mean

13        the entire log.  I mean a copy of whatever entry

14        pertains to the logging in of this -- of

15        Mr. Galloway.  Other than that, provide it to defense

16        counsel.

17             If you'd like, I'd be glad to facilitate

18        matters by giving you the Court's fax information,

19        and if you can obtain it, have it faxed here.  But I

20        want to make it clear, I'm not taking on any

21        responsibility of -- I'm just trying to help out.

22             MR. BREWINGTON:  Judge, we appreciate the

23        Court's help on that.  I would like to have it as

24        soon as possible.

25             MR. LaROCCA:  As soon as we have a break,

Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross   202

1        I'll put that in motion.

2                    THE COURT:  As soon as we have a break, I'll

3             have you speak to my law secretary, and we'll do what

4             we can.  If there's a problem, we'll deal with the

5             problem.

6                    MR. BREWINGTON:  May I inquire, your Honor?

7                    THE COURT:  Yes.

8        BY MR. BREWINGTON:  (Continuing)

9             Q.  Your best memory, what time was it that you took

10       Mr. Galloway in custody?

11            A.  Like I said, it was in the evening hours.  I

12       don't recall the exact time.

13            Q.  Was it late evening, that being ten, eleven;

14       early evening, six or seven?  Do you have any

15       recollection?

16            A.  Later evening.  It was dark out.

17            Q.  Who else was with you at the time that you took

18       him into custody?

19            A.  Police Officer Steven Horowitz, H-O-R-O-W-I-T-Z,

20       Shield 144, Hempstead Police Department, and Police

21       Officer Dennis Sharp, S-H-A-R-P, Nassau County Police

22       Department BSO.

23            Q.  You know Police Officer Horowitz responded to an

24       event on 5/15/08 concerning the shooting of a taxicab

25       driver, don't you?

                    Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross   203

1        A.  He responded to that scene, yes.

2        Q.  And you knew that at the time that you went and

3    picked up Mr. Galloway, didn't you?

4        A.  No, I did not.

5        Q.  You didn't know that Police Officer Horowitz was

6    involved with the shooting of the cabdriver on 5/15/08?

7        A.  No, I didn't.

8        Q.  When did you first learn that, sir?

9            MR. LaROCCA:  Objection to the whole line of

10           questioning.

11           THE COURT:  I'll allow it.

12       A.  After the fact.  Sometime after that night.

13       Q.  Would it be accurate to say that at the time that

14   you picked up Mr. Galloway with Police Officer Horowitz,

15   that Police Officer Horowitz never said anything about

16   Mr. Galloway allegedly being involved in a incident on

17   5/15/08; is that true?

18           MR. LaROCCA:  Objection.

19           THE COURT:  I'll allow it.

20       A.  That would be correct.

21       Q.  Would it also be accurate to say that at the time

22   that you took Mr. Galloway to the Armory, Police Officer

23   Horowitz went with you, right?

24       A.  To the Armory, that's correct.

25       Q.  And would it also be accurate to say that Police

Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross      204

1    Officer Horowitz remained there for a good part of the

2    night until the morning, right?

3         A.  That would be accurate.

4         Q.  Even while the detective from the Nassau Police

5    Department went in to question Mr. Galloway, right?

6         A.  Police Officer Horowitz would have been in the

7    building, yes.

8         Q.  And do you recall if Police Officer Horowitz

9    spoke to the detectives from Nassau who were questioning

10   Mr. Galloway?

11        A.  I don't know if he did or didn't.

12        Q.  Sir, when you say you don't know, were you

13   present at any time when such conversations took place?

14        A.  Well, when you say speak to, the detectives come

15   in and he's there.  They're going to interact at some

16   point.  What they spoke about, I don't know.

17        Q.  Sir, at the time that you brought Mr. Galloway to

18   the Armory, what time was that that you arrived?

19        A.  Again, I would have to check the police blotter.

20        Q.  So that's another entry that you would need,

21   right?

22        A.  No.  That's the one we spoke about before.

23        Q.  It would show the arrest time that you picked him

24   up and the time you arrived at the Armory?

25        A.  It would show the time he arrived at the Armory,

P.O. Cunningham - People - Cross    205

1   when the phone was picked up, called headquarters, had him

2   logged in the official blotter, who brought him in, what

3   time he was brought in, his address and date of birth.

4        Q.  What time was it that you actually made the

5   arrest; that being, picked him up on the street?

6                   THE COURT:  Let's not get into an argument.

7                   MR. BREWINGTON:  I'll clarify my question,

8        Judge.

9        Q.  What time was it that you actually picked him up,

10  took custody of him?

11       A.  I would have to see Nassau County Form 81, the

12  arrest form.

13       Q.  When you say you would have to see that, did you

14  give some notification to Nassau County as to when you

15  actually picked him up?

16       A.  I would have given him the arrest time, yes.

17       Q.  And that arrest time would have been one that you

18  knew based on writing it down?

19       A.  No.

20       Q.  Just kept it in your head, right?

21       A.  That's correct.

22       Q.  So what time was it?

23       A.  I told you before, I don't recall.

24                   MR. BREWINGTON:  Judge, give me one second.

25       I want to see if I can find that for this gentleman.


                    Janine M. Colasanti, RPR, OCR

1                THE COURT:  Are you referring to what the

2        witness called the PDCN 81?

3                MR. BREWINGTON:  Yes.

4                THE COURT:  Mr. LaRocca, maybe you have one

5        of those.

6                MR. LaROCCA:  If he is referring to the

7        arrest report, yes.

8                THE COURT:  Since Mr. LaRocca has it, do you

9        want it shown to the witness?

10               MR. BREWINGTON:  If I can see what

11       Mr. LaRocca has, so I can compare it.

12               MR. LaROCCA:  I believe he is referring to

13       what is page nine, ten and eleven of the Rosario

14       material.

15               THE COURT:  Do you have a copy of that,

16       Mr. Brewington?

17               MR. BREWINGTON:  I certainly do.

18               THE COURT:  Do you want either his or your

19       copy marked for ID and have it shown to the witness?

20               MR. BREWINGTON:  If we can have one of them

21       marked.  I need to refer to it.  It's nine, ten and

22       eleven, I believe, in the packet.

23               THE COURT:  If you want, we'll fish it out

24       of the Court's exhibit, Court Exhibit I.

25                   (Whereupon, Defendant's Hearing Exhibit E

P.O. Cunningham - People - Cross

1          was marked for identification, only.)

2                    THE COURT:  Just so the record is clear, we

3          now have an item marked for ID that is a copy of the

4          item that was referred to that comes from the Rosario

5          packet that was provided to the Court as Court

6          Exhibit I.  And we've marked that item as Defendant's

7          E.

8                    Mr. Brewington, do you want to have that

9          presented to the witness?

10                   MR. BREWINGTON:  If we could, please.

11    BY MR. BREWINGTON:  (Continuing)

12         Q.  You have Defendant's E for identification before

13    you?

14         A.  Yes, I do.

15         Q.  Does that help refresh your recollection as to

16    what time you say you arrested -- actually, took

17    Mr. Galloway into custody?

18         A.  Yes, it does.

19         Q.  What time is that, sir?

20         A.  2345 hours.

21         Q.  That would be 11:45 p.m.; is that right?

22         A.  That's correct.

23         Q.  Using that time as your approximate time of

24    arrest, what time did you arrive at the Armory?

25         A.  It would be sometime after that.

                    Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross                208

1      Q.  I'm certain of that.  Can you tell us

2   approximately what time?

3      A.  I don't know.  I would have to check the blotter.

4      Q.  When you arrived at the Armory, did you make any

5   phone calls to any other police enforcement individuals?

6      A.  Nassau County Third Squad was notified.

7      Q.  Who did you speak with?

8      A.  I don't recall.

9      Q.  Sir, Defendant's E that is marked for

10  identification, do you recognize this document as a Nassau

11  County Police Department arrest report?

12     A.  Yes.

13     Q.  This is the one that deals with Josiah Galloway

14  on that morning; is that correct?

15     A.  Yes, it does.

16     Q.  Would it also be accurate to say that this

17  contains information relative to Mr. Galloway's pedigree,

18  that being his background information?

19     A.  Yes.

20            THE COURT:  Did you prepare the 81?

21            THE WITNESS:  No, I did not.

22     Q.  But you recognize this document as one that is

23  utilized both by the Police Department of Hempstead and

24  Nassau County, and it is work that deals in police

25  enforcement; is that correct?

Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross    209

1          MR. LaROCCA:  I'm going to object to this --

2          THE COURT:  Sustained.

3     Q.  Did you give any information, other than the

4     time, with regard to this document?

5     A.  Well, I pulled cases.  I don't know if that's the

6     information we're talking about.  Any cases that are on

7     here, if they were Hempstead cases, I pulled them out of

8     the jacket and gave them to the Third Squad when they

9     arrived.

10          THE COURT:  Did anybody question you from

11          Nassau in anticipation of them taking information you

12          gave and putting it into the 81?

13          THE WITNESS:  No.

14          MR. BREWINGTON:  Thank you, Judge.

15     Q.  Other than today, when for the first time did you

16     see this document?

17     A.  Probably that night was the first time.  And then

18     today is the second time.

19     Q.  That being that night of what day?

20     A.  He was arrested on the 5th, so it would be the

21     early morning of the 6th.

22     Q.  That time, based on your review of the document,

23     was it accurate?

24     A.  I never reviewed the document.

25          MR. LaROCCA:  Objection.

                    Janine M. Colasanti, RPR, OCR

P.O. Cunningham - People - Cross     210

1           THE COURT:  Sustained.

2      Q.  Sir, this document, which is Defendant's E for

3  identification, is there anything else that you see on

4  this document that you contributed to it, other than the

5  time that you reported arresting Mr. Galloway?

6           MR. LaROCCA:  Objection.

7           THE COURT:  I'll allow that.

8      A.  I may have been privy to the conversation of what

9  charges were entered, but did I directly put it in here,

10  no.

11           MR. BREWINGTON:  Judge, the only other

12       questions I would have for this witness, I need the

13       other document to follow up on, please.

14           THE COURT:  Okay.

15           Is there any redirect?

16           MR. LaROCCA:  No.

17           THE COURT:  Okay.  Thanks.

18           (Witness excused.)

19           THE COURT:  Are you prepared to call your

20       next witness?

21           MR. LaROCCA:  Yes.  I don't know if he's out

22       there.  I don't know if he's over in the grand jury

23       still.

24           THE COURT:  I'm going to have somebody

25       inquire.

Janine M. Colasanti, RPR, OCR

Det. Ross – People – Direct          211

1              THE CLERK:  They're trying to reach him.  He
2       is not answering his phone.  He's probably in the
3       grand jury.
4              THE COURT:  Let's go off the record.
5                 (Whereupon, a short recess was taken.)
6              THE CLERK:  The case of the People versus
7       Josiah Galloway, Indictment 135N of '08.  Hearing
8       continued.
9              Are the People ready?
10             MR. LaROCCA:  The People are ready.
11             THE CLERK:  Is defense ready?
12             MR. BREWINGTON:  The defense is ready.
13             THE COURT:  Please call your next witness.
14             MR. LaROCCA:  Detective Matt Ross.
15             THE CLERK:  Detective, please step up into
16      the witness box, remain standing and raise your right
17      hand.
18  Det.  M A T T H E W   R O S S, Shield #834, assigned to the
19      Third Squad of the Nassau County Police Department,
20      called as a witness on behalf of the
21      People, having been duly sworn by the Clerk of the
22      Court, was examined and testified as follows:
23  DIRECT EXAMINATION
24  BY MR. LaROCCA:
25      Q.  Good afternoon, Detective Ross.

                    Janine M. Colasanti, RPR, OCR

1          Detective, how long have you been a member of the

2     Nassau County Police Department?

3          A.   I'm in my nineteenth year.

4          Q.   How long have you been at the Third Squad?

5          A.   I'm with the Third Squad about two and-a-half

6     years.

7          Q.   How long as a detective?

8          A.   I'm in my fourteenth year.

9          Q.   Were you working a tour of duty at the Third

10    Squad on August 14th of this year?

11         A.   Yes, I was.

12         Q.   Did you become involved in the arrangement of the

13    lineup involving the defendant, Josiah Galloway?

14         A.   Yes, I did.

15         Q.   Can you tell us how you became involved in that

16    process?

17         A.   I was asked if I could assist or actually run the

18    lineup on that day, which I did.  Detective Dluginski

19    assisted me, along with three other detectives from the

20    Third Squad, along with my supervisor.

21         Q.   Had you been previously involved in the

22    investigation?

23         A.   Not at all.

24         Q.   So when you said, run the lineup, what did that

25    entail?

1      A.  Well, it entailed a lot.  It entailed getting

2   fillers, making sure witnesses were responding to the

3   Third Precinct and keeping -- being kept separate, getting

4   the room ready, speaking with the defense counsel,

5   speaking with yourself, getting Crime Scene there to

6   photograph the lineup.

7      Q.  When you say defense counsel, at the time was

8   that Glenn Hardy?

9      A.  Yes, it was.

10      Q.  And was he present for the lineup proceedings?

11      A.  Yes.

12      Q.  Can you describe the procedure that you used;

13   what you actually did in organizing the lineup; how it was

14   conducted?

15      A.  The first thing I did was to have a detective

16   that was assigned to everybody that was coming to do the

17   lineup.  Detective Strange was assigned to him.  And the

18   witness, Mr. Hernandez, had Detective D'Arienzo assigned

19   to him.

20      Q.  When you say assigned, for what purpose do --

21      A.  Keep them separate from the minute they arrive at

22   the Third Precinct.

23      Q.  Go ahead.

24      A.  When they arrived, they were brought to the

25   second floor, the inspector's office, with that detective.

Det. Ross - People - Direct

1    And at that point, when I had all of the fillers there, I

2    then go and get the defendant from the arrest area.  I

3    bring him into the lineup room.  I asked him and counsel

4    what number they wanted to sit at.  They chose number

5    five.  And the fillers come into the room after that.

6        Q.  Stop there for a moment.  Mr. Hardy was present?

7        A.  Yes.

8        Q.  And you asked him and the defendant what number

9    they wanted in the lineup array?

10       A.  Correct.

11       Q.  Which number did they select?

12       A.  They chose number five.

13       Q.  Did you suggest that number to them in any way?

14       A.  No.

15       Q.  By the way, was it your understanding that this

16   was a court ordered lineup?

17       A.  Yes, it was.

18       Q.  So how did you come to determine who should be

19   the fillers?

20       A.  We go by a description.  Not knowing anything

21   about the case, when I came in earlier that day, Detective

22   Dluginski briefed me on the case and the description of

23   the defendant.  And at that point, we went and got five

24   fillers.

25       Q.  Continue with your description of how the lineup

Det. Ross - People - Direct                215

1    was conducted.

2         A.   Well, once the defendant chooses the number he

3    wants to sit at, the fillers are brought into the room.

4    Then they are covered with sheets, so the only thing that

5    they see is their heads.  They all wore hats in this

6    lineup.

7              After the lineup room is set, I then go and

8    briefly speak with the victim and the witness and explain

9    to them what they're about to do, what they're about to

10   see.

11             A lot of times when they do lineups, the people

12   are very nervous.  You explain to them who's going to be

13   in the room, who's going to speak to them, and really, the

14   procedure of the lineup.

15        Q.   Let me go back to a couple of points.  You said

16   in this case they all wore hats?

17        A.   Correct.

18        Q.   Did they all wear the same hat or different style

19   hats?

20        A.   They all wore the same hat.

21        Q.   Was that procedure discussed with Glenn Hardy,

22   the defendant's attorney?

23             MR. BREWINGTON:  Objection.

24             THE COURT:  Overruled.

25        A.   Yes, it was.

                   Janine M. Colasanti, RPR, OCR

Det. Ross - People - Direct               216

```
 1        Q.  Did he agree to that procedure?

 2                   MR. BREWINGTON:  Objection.

 3                   THE COURT:  Overruled.

 4        A.  Yes, he did.

 5        Q.  Was he present when it was actually carried out?

 6        A.  Yes, he was.

 7        Q.  So now, you said often people are nervous.  But

 8   I'm going to ask you to speak about what you did in this

 9   particular case.  So with that in mind, can you tell us

10   what you did with respect to this particular case?

11        A.  First I spoke to Mr. Anyosa, the victim, because

12   he was going to be the first person that viewed the

13   lineup.  I explained to him that he's going to be taken

14   from the office that he's sitting in, to the lineup room,

15   the viewing room.

16             I explained to him that there were going to be

17   six individuals with similar characteristics.  At that

18   point I told him nobody would speak to him in the lineup

19   room other than Detective Dluginski, the carrying

20   detective.

21             He is instructed to go up to the window, make

22   sure he looks at all six people.  And if he identifies

23   anybody, to tell us what number and where he knows that

24   person from.

25             We then went in to view the lineup.  Myself and
```

Det. Ross - People - Direct

1    Detective Dluginski walked Mr. Anyosa from the inspector's

2    office, to the lineup viewing room.  We entered the

3    viewing room.  Detective Dluginksi and Mr. Anyosa walked

4    up to the window.  I stood directly behind them.  One

5    knock was placed on the window, meaning that the lineup is

6    starting.  There is a detective inside the viewing room

7    that tells everybody, eyes straight.

8         Q.  When you say window, what sort of window is that?

9         A.  You can see in, they can't see you.

10        Mr. Anyosa looked at all six individuals, and

11   twenty-three seconds later he identified the person

12   sitting in number five as the person that shot him in the

13   face.

14        Q.  How do you know it was twenty-three seconds?

15        A.  Because I timed it.

16        Q.  Among the people present, was Mr. Hardy present?

17        A.  Mr. Hardy -- in the viewing room was Mr. Hardy,

18   myself, Detective Dluginksi, Mr. Anyosa, yourself and my

19   sergeant, Detective Sergeant Richard Dawson.

20        Q.  Now, what did you do thereafter?

21        A.  We immediately leave the room.  He goes back to

22   the office that he was in, and Detective Strange is there.

23   And at that time, Detective Strange now takes an

24   identification statement from him.

25        Q.  Would you proceed with what happened next in the

Det. Ross - People - Direct                    218

1   process?

2        A.  I then went into the witness, Mr. Hernandez, and

3   we now took him from that room, back into the viewing

4   room.

5        Q.  And what instructions or conversation, if any,

6   did you have with Mr. Hernandez at that point?

7        A.  Before he went in there, the instructions that

8   were given to both people; what they were going to view,

9   who was going to speak with them, what it was going to be

10  like when he walked up to the window.  To look at all six

11  individuals.  If he identifies anybody, to tell us the

12  number and where he identifies that person from.

13       Q.  Just to be clear, after Mr. Anyosa made the

14  identification, did he have any contact prior to

15  Mr. Hernandez making his identification of Mr. Galloway?

16       A.  No, none whatsoever.

17       Q.  So you went and you explained again to

18  Mr. Hernandez what you previously explained to Mr. Anyosa?

19       A.  Yes.

20       Q.  Was Mr. Anyosa present?

21       A.  No.

22       Q.  And then what did you do with Mr. Hernandez?

23       A.  We left the office where he was situated, to the

24  viewing room, the lineup.

25       Q.  And tell us what happened then.

                    Janine M. Colasanti, RPR, OCR

Det. Ross - People - Direct

1      A.  Mr. Hernandez walked up to the window with

2  Detective Dluginski, with me standing behind him.  Again,

3  one knock was placed on the window for eyes straight.  And

4  nine seconds later Mr. Hernandez identified the person

5  sitting in number five as the person that they had an

6  argument with earlier on the night of the occurrence.

7      Q.  Was Mr. Hardy still present?

8      A.  Yes, he was.

9      Q.  Was I still present?

10      A.  Yes, you were.

11      Q.  With regard to the lineup, itself, was there any

12  photograph taken?

13      A.  Yes.

14      Q.  How?  Explain that, please.

15      A.  As per procedure, before we run the lineup, we

16  have Crime Scene respond to the place where the lineup was

17  being conducted.  And they photograph the lineup as the

18  victims and witnesses would view the lineup.

19      Q.  Were you present when that was done?

20      A.  Yes.

21      Q.  In addition to that, are you familiar with the

22  lineup worksheet?

23      A.  Yes, I am.

24      Q.  What is a lineup worksheet?

25      A.  It's exactly what it states.  It's a worksheet

Det. Ross - People - Direct          220

1    that tells you the fillers, the defendants, who's present,

2    what time the lineup is to be viewed.  Then there is some

3    empty space where you usually write down the detective

4    assigned to each witness and the victim.  It's a worksheet

5    we use.

6         Q.  Did you prepare a worksheet with respect to this

7    particular series of lineups?

8         A.  Yes, I did.

9         Q.  And when in relationship to the lineups did you

10   prepare it?

11        A.  As it -- simultaneously.  I filled out most of it

12   until the lineup was conducted.  And then after the

13   identification, I filled in the times.

14        Q.  Do you have the worksheet and the photographs of

15   the lineup with you today?

16        A.  Yes, I do.

17        Q.  Would you please produce them.

18             MR. LaROCCA:  And can I have the worksheet

19        marked?  I believe we're up to 14 for identification

20        and the photographs following that.

21             (Whereupon, People's Hearing Exhibit 14

22        was marked for identification, only.)

23             MR. LaROCCA:  May I have that shown to the

24        witness, all three.

25        Q.  Detective, would you take a look at number 14,

Janine M. Colasanti, RPR, OCR

Det. Ross - People - Direct

1    please?

2         A.  Okay.

3         Q.  Do you recognize that document?

4         A.  Yes.

5         Q.  What do you recognize that to be?

6         A.  That's the worksheet, the original worksheet I

7    filled out that day.

8         Q.  And you did that at the time that you made the

9    observations and made the entries that are recorded there?

10        A.  Correct.

11        Q.  At the time of the lineup?

12        A.  Correct.

13        Q.  And is it in the same condition it was when you

14   made those entries?

15        A.  Yes.

16        Q.  And does it reflect the times of the lineup and

17   the length of time each witness took to make the

18   identification?

19        A.  Yes, it does.

20        Q.  And who was present?

21        A.  Yes.

22        Q.  And who the fillers were?

23        A.  Yes.

24        Q.  And who the witnesses themselves were?

25        A.  Yes.

Det. Ross - People - Direct

1      Q.   And would you take a look at number 15, please.

2           Do you recognize that?

3      A.   Yes.

4      Q.   What do you recognize it to be?

5      A.   That's the photograph taken the day of the

6  lineup, moments before the victim and the witness viewed

7  the lineup.

8      Q.   And does it fairly represent the condition of the

9  room and where the witnesses were at that time?

10     A.   Yes.

11     Q.   The room and where the members of the lineup

12 were?  Excuse me.

13     A.   Yes, it does.

14     Q.   And would you look at number 16.  Do you

15 recognize that photo?

16     A.   Yes.  It's the same photo, exactly the same

17 photo.

18     Q.   The Crime Scene person took two photos?

19     A.   No, he took one photo.  And it looks like he made

20 two copies of it.

21     Q.   It's identical?

22     A.   Yes.

23     Q.   It appears to be?

24     A.   Yes.

25     Q.   Is it a fair and accurate depiction as to the

Det. Ross - People - Direct     223

1    position and the nature and the observations of the

2    lineup?

3         A.  Yes.

4         Q.  Did Mr. Hardy object in any way to any part of

5    the lineup proceeding?

6              MR. BREWINGTON:  Objection.

7              THE COURT:  Overruled.

8         A.  None whatsoever.

9              MR. LaROCCA:  May I have those documents

10         admitted into evidence for the purposes of this

11         hearing?

12             THE COURT:  Please show them to

13         Mr. Brewington.

14             MR. BREWINGTON:  Voir dire, please, Judge.

15             THE COURT:  Sure.

16             MR. BREWINGTON:  Please put these before the

17         witness, please.

18   VOIR DIRE EXAMINATION

19   BY MR. BREWINGTON:

20        Q.  Sir, looking at 15 and 16, those are two

21   photographs.  Do you have those, Detective?

22        A.  Yes, I do.

23        Q.  You say that's a fair and accurate depiction of

24   what the lineup looked like; is that correct?

25        A.  Correct.

Det. Ross - People - Direct          224

1          Q.   What are the facial features of the person on the

2     number six slot, looking at the photograph?

3          A.   Let me put my glasses on.

4          Q.   Please do.

5          A.   The facial features on number six, had a slight

6     mustache, unshaven.   No --

7          Q.   My question was, looking at the photograph, what

8     are the --

9          A.   Like I said, number six has a mustache and was

10    clean-shaven on his beard.

11         Q.   It is your testimony you can see the facial

12    features of number six on those photographs?

13         A.   I can see the mustache, yes.

14         Q.   Sir, were these photographs taken before or after

15    the witnesses were shown the lineup?

16         A.   Before.

17         Q.   Would it be accurate to say that with regard to

18    what is shown in the photograph, that being in 15 and 16,

19    that's what you saw when you looked through the window?

20         A.   Yes.

21              MR. BREWINGTON:   Judge, we'll ask the Court

22         to take a look at those, please.   We have an

23         objection.

24              THE COURT:   Okay.  I've looked at the items.

25              MR. BREWINGTON:   We object to them, Judge.


                     Janine M. Colasanti, RPR, OCR

1        We believe that if the photographs themselves being

2        offered exactly depict what the lineup was in this

3        situation, the features in number six cannot be

4        determined.  And, therefore, they should not be

5        allowed because they do not appropriately show any

6        features.  And the Court can, by its own evaluation

7        of the records, see that.

8                   THE COURT:  A proper foundation has been

9        laid with regard to their admissibility.  However,

10       the point that you make will be taken into

11       consideration when the trier of fact determines what

12       weight, if any, it should give to the items.

13                   MR. BREWINGTON:  Very well, Judge.  I have

14       my objection to the document, and the Court has made

15       its ruling.

16                   THE COURT:  Was there an objection to 14

17       coming in?

18                   MR. BREWINGTON:  Just, if I can ask a couple

19       of questions on this.

20  VOIR DIRE EXAMINATION

21  BY MR. BREWINGTON:  (Continuing)

22       Q.  Is this your handwriting on 14, sir?

23       A.  Yes.

24       Q.  What time was all of this done?

25       A.  What time was all of what done?

                   Janine M. Colasanti, RPR, OCR

Det. Ross - People - Direct                226

1        Q.  What you wrote on the document.

2        A.  Well, the document, it was prepared mostly before

3    the lineup, but there is some stuff that is added after

4    the lineup or right before the lineup.

5              MR. BREWINGTON:  May I just see that

6         original very quickly, please?

7              Judge, for purposes of the hearing, at this

8         time I will not object to that.

9              THE COURT:  So 14, 15 and 16 for ID are now

10        in evidence as 14, 15, and 16 in evidence

11        respectfully for purposes of the hearing.

12             I'll ask the reporter to so mark them.

13             (Whereupon, People's Hearing Exhibits 14

14        through 16 were marked for identification, only.)

15             MR. LaROCCA:  Could you provide those to the

16        detective, please.

17   DIRECT EXAMINATION

18   BY MR. LaROCCA: (Continuing)

19        Q.  Detective, when you observed the lineup, how far

20   would the witness have been from the six seated people;

21   what would be the distance separating the two?

22        A.  The distance from where I'm sitting, to where you

23   would sit.

24        Q.  Are you talking about the government's chair?

25        A.  Yes.


                  Janine M. Colasanti, RPR, OCR

Det. Ross - People - Direct          227

1        Q.  Can you estimate that, maybe ten, fifteen feet?

2        A.  Ten feet, twelve feet.

3        Q.  And was the lineup room well lit?

4        A.  It was well lit.

5        Q.  Was there any obstruction, other than the one

6    mirror between the witness and the six members there?

7        A.  None.

8        Q.  Were you able to see the individual features of

9    each of the six members of the lineup?

10       A.  Yes, I was.

11       Q.  Regardless of the lighting in the photograph

12   itself?

13              MR. BREWINGTON:  Objection.

14              THE COURT:  Does that conclude your direct?

15              MR. BREWINGTON:  Judge, I had an objection

16        that was outstanding to the last question.

17              THE COURT:  I'm going to overrule the

18        objection and allow the answer to stand.

19              Both sides approach.

20               (Whereupon, there was a bench conference

21        held off the record.)

22              THE COURT:  We're going to break for lunch

23        now, so I'll excuse the detective.  We'll have you

24        back at two.

25              THE WITNESS:  Yes, you will.


                  Janine M. Colasanti, RPR, OCR

Det. Ross - People - Direct                228

1                    (Witness leaves the courtroom.)

2                    THE COURT:  At this time, I also want the

3          record to reflect that it appears that the Hempstead

4          Police Department has, in fact, faxed to my chambers

5          a copy of the item we were talking about.  So I'm

6          going to turn it over to the People, and then to the

7          defense.  It's a two-page document which appears to

8          be a cover sheet and then a page that has the heading

9          176, Friday, June 6, 2008.

10                   MR. BREWINGTON:  Thank you, Judge.

11                   MR. LaROCCA:  Thank you.

12                   THE COURT:  We'll break now, and we'll

13         resume at two o'clock.  Everyone have a nice lunch.

14                   (Whereupon, a luncheon recess was taken.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings

1                  A F T E R N O O N   S E S S I O N

2

3                  THE CLERK:  People verse Josiah Galloway,

4       Indictment 1315N of '08.

5                  Are the People ready?

6                  MR. LaROCCA:  The People are ready?

7                  THE CLERK:  Is defense ready?

8                  MR. BREWINGTON:  Defense is ready.

9                  MR. LaROCCA:  May I place something on the

10      record, your Honor?

11                 THE COURT:  Yes.

12                 MR. LaROCCA:  During the break,

13      Mr. Brewington asked me if I could obtain a full copy

14      of the log sheet that was faxed to the Court, and

15      Detective Cunningham went down to Hempstead and

16      retrieved a copy, on the break.

17                 I've given copies of it to both the Court

18      and Mr. Brewington.  And based on that,

19      Mr. Brewington has advised me that he was not going

20      to seek to recall Mr. Cunningham.

21                 THE COURT:  Why don't we just mark it for

22      identification purposes as a People's exhibit?

23                 THE CLERK:  That will be Exhibit 17.

24                 (Whereupon, People's Hearing Exhibit 17

25      was marked for identification, only.)


                   Janine M. Colasanti, RPR, OCR

Det. Ross - People - Cross                                     230

1                THE COURT OFFICER:  People's 17 for

2           identification.

3                THE COURT:  Mr. Brewington, do you

4           acknowledge receipt of People's 17?

5                MR. BREWINGTON:  Yes, we do.

6                We thank the District Attorney's office for

7           making the effort of getting it, and we appreciate

8           it.

9                MR. LaROCCA:  Thank you.

10               THE COURT:  Let's call the witness.

11               MR. LaROCCA:  Detective Ross.

12   Det. M A T T H E W   R O S S,    having been previously

13        duly sworn by the Clerk of the Court, resumed the

14        witness stand and further testified as follows:

15   CROSS-EXAMINATION

16   BY MR. BREWINGTON:

17               THE CLERK:  Detective, you may resume the

18           stand.  You are still under oath.

19               MR. BREWINGTON:  May I inquire, your Honor.

20               THE COURT:  Yes.

21        Q.  Good afternoon, Detective Ross.

22        A.  Good afternoon.

23        Q.  How was your lunch?

24        A.  Good.

25        Q.  Good.


                        Janine M. Colasanti, RPR, OCR

231

Det. Ross - People - Cross

1          This lineup that you were setting up was pursuant

2    to an order; is that correct?

3          A.  Correct.

4          Q.  Did you actually see the order?

5          A.  No.

6          Q.  Do you know what the order required the defendant

7    to do?

8          A.  I was only told what it said.

9          Q.  Do you know if the order -- were you told if the

10   order required him to stand in a lineup?

11         A.  No.

12         Q.  When a court order comes down, you understand

13   that it is to be followed specifically, correct?

14         A.  Sure.

15         Q.  So if the order did indicate that he was to stand

16   in a lineup, you can conduct a lineup standing up,

17   couldn't you?

18         A.  We can, but we don't.

19         Q.  You indicate that you had gotten certain -- I

20   think your testimony was that you got a description

21   provided to you in order to conduct the lineup; is that

22   correct?

23         A.  Correct.

24         Q.  What was the description that was provided to

25   you?

Janine M. Colasanti, RPR, OCR

232

Det. Ross - People - Cross

1      A.   Male black with short hair.

2      Q.   Who gave you that description?

3      A.   Detective Dluginski.

4      Q.   When you saw Mr. Galloway, did you make any

5   observations of his hair?

6      A.   Yes.

7      Q.   What were the observations?

8      A.   It was up high.

9           MR. BREWINGTON:  Defendant's A in evidence.

10          May I show that to the witness, please?

11          THE COURT:  Okay.

12     Q.   Is that what Mr. Galloway looked like at the time

13   that you first saw him?

14     A.   Yes, pretty close.

15     Q.   And at the time that his hair was like that, sir,

16   what would you characterize that hairstyle to be?

17     A.   What would I call it?  Like an Afro.

18     Q.   Would you agree with me that that's not cut close

19   to the head?

20     A.   I would agree.

21     Q.   The other people that were placed in the lineup,

22   what did their hair look like?

23     A.   They had all short hair.

24     Q.   Would it be accurate to say that Mr. Galloway was

25   the only one with hair that length, as depicted in A that

Janine M. Colasanti, RPR, OCR

Det. Ross - People - Cross

1    is before you?

2         A.  Yes.

3         Q.  Would it be also accurate to say that the

4    description as given by Detective Dluginski indicated that

5    the perpetrator of this crime, the shooter, was described

6    as having hair cut short to the head?

7         A.  Correct.

8         Q.  When you set up this lineup, and the lineup was

9    conducted on August -- what was the date of the lineup?

10        A.  14th.

11        Q.  August 14th, would you agree with me that one of

12   the distinguishing factors between Mr. Galloway and the

13   other people was the length of his hair?

14        A.  Yes.

15        Q.  Sir, what was the height and the description that

16   was given to you, if any?

17        A.  Unknown.

18        Q.  What was the skin color of the individual given

19   to you, if any?

20        A.  I believe medium, medium skin.

21        Q.  Sir, at the time that you did set up this lineup,

22   would it be accurate to say that you found five other

23   individuals who were, essentially, police officers?

24        A.  They were all police officers.

25        Q.  And the five other police officers, when they

Det. Ross - People - Cross

1    came into the precinct, how did they enter into the

2    precinct?

3        A.  They all entered in the rear door and were placed

4    in the kitchen of the Third Squad.

5        Q.  And where was Mr. Galloway at the time that he

6    was in the precinct, other than being in the lineup room?

7        A.  He was in the arrest room.

8        Q.  When he was in the arrest room, were the

9    witnesses there yet?

10       A.  No.

11       Q.  Wouldn't it be accurate to say that the witnesses

12   were brought in by the officers that had responsibility

13   for them, one being an Officer Strange -- or Detective

14   Strange, right?

15       A.  It's Detective Strange, yes.

16       Q.  And when he brought him in, what door did this

17   witness enter through?

18       A.  He did not bring them in.  I brought them in with

19   Detective Dluginksi, in the main door of the Third

20   Precinct.  He was taken upstairs to the second floor, into

21   the inspector's office.

22       Q.  When I say brought them in, who brought them into

23   the precinct?  Who brought them into the precinct, the

24   witnesses?

25       A.  How they got to the precinct?

235

Det. Ross - People - Cross

1      Q.  No.  Once they got into the parking lot -- this

2  is at the Third; is that correct?

3      A.  Yes.

4      Q.  The Third is over on Hillside?

5      A.  Correct.

6      Q.  Once they got to the precinct, who was it that

7  brought them actually into the building?

8      A.  They walked themselves into the building, to the

9  front desk where the desk officer sits, this is why they

10  are there.  And a phone call is placed up to us, along

11  with Detective Dluginski, to go up to get them.

12      Q.  They were not brought in by a detective.  They

13  came after making an appointment to come at a particular

14  time; is that correct?

15      A.  Correct.

16      Q.  You don't know exactly what time each one of them

17  came into the precinct; is that correct?

18      A.  They came in sometime after three o'clock.  I

19  don't remember the exact time they got there, but sometime

20  after three o'clock.

21      Q.  What time was it that Mr. Galloway reached the

22  precinct?

23      A.  Late morning.  I want to say, somewhere between

24  eleven and twelve.

25      Q.  And he was seated in an office someplace; is that

Janine M. Colasanti, RPR, OCR

Det. Ross - People - Cross

1    correct, Mr. Galloway?

2         A.   Mr. Galloway was seated in the arrest room.

3         Q.   And witnesses came into the main door and were

4    taken where?

5         A.   Upstairs to the second floor, into the

6    inspector's office.

7         Q.   What floor is the arrest room?

8         A.   There are two arrest rooms.  He was in the

9    detective squad arrest room, which is also on the second

10   floor.

11        Q.   In order to go to the place where the witnesses

12   went on the second floor, do they have to go past the

13   arrest room?

14        A.   No.

15        Q.   Is there an arrest room door?

16        A.   Yes.

17        Q.   And that arrest room door can be opened or

18   closed, correct?

19        A.   Yes.

20        Q.   And from when you go up the steps in the Third,

21   isn't it true that you can see into the arrest room when

22   you come up the steps?

23        A.   No, you cannot.

24        Q.   What was the room that the witnesses were taken

25   to?

                    Janine M. Colasanti, RPR, OCR

Det. Ross - People - Cross

1          A.  The inspector's office.

2          Q.  They weren't taken to the same inspector's

3     office, were they?

4          A.  The inspector's office is a huge office with five

5     or six separate offices inside that office.

6          Q.  So when you come up the steps, where is the

7     arrest room that Mr. Galloway was in?

8          A.  You'd have to go through two sets of doors to get

9     into the detective's squad room.  And then it's in the

10    most northwest corner of that room.

11         Q.  And when you get into that room, you can see the

12    arrest room, that being the detective squad room?

13         A.  When you get into what room?

14         Q.  The detective squad room?

15         A.  In some areas you can; some areas you can't.

16         Q.  Mr. Galloway, what type of clothing was he in at

17    the time that he was in the arrest room?

18         A.  Civilian attire.  I don't know exactly what he

19    was wearing.

20         Q.  Wasn't he in orange?

21         A.  No.  I don't believe he was.

22         Q.  Would you tell us, please, sir, with regard to

23    the photograph that's been identified as, I think it's 15

24    and 16, do you have those photographs there?

25              MR. LaROCCA:  They are here.


Janine M. Colasanti, RPR, OCR

Det. Ross - People - Cross                          238

1          MR. BREWINGTON:  May we place those in front

2      of the witness, please.

3          Thank you, Sergeant.

4      Q.  Sir, you indicated these were an accurate

5  depiction of what the lineup would look like, correct?

6      A.  Correct.

7      Q.  Now, Mr. Galloway is positioned in seat number

8  five; is that correct?

9      A.  Correct.

10     Q.  And the hats that were placed on the heads was

11 for what purpose?  Please tell the Court.

12     A.  The hats were placed on the heads of everybody,

13 because the defendant had changed his appearance, as per

14 the court order.

15     Q.  I just want to be clear -- and I thank you for

16 volunteering.  The hats were placed on the heads  --

17 withdrawn.

18         You say that the defendant changed his

19 appearance.  Are you saying that he grew his hair within

20 two weeks, three weeks?

21     A.  No.

22     Q.  So I just want to be clear, you understood that

23 the description of the alleged wrongdoer that shot this

24 gentleman had hair which was cut short to the head, right?

25     A.  It said short hair, yes.


                    Janine M. Colasanti, RPR, OCR

239

Det. Ross - People - Cross

1    Q.  When you say short hair, do you know if the

2    description was, it was hair that was cut short to the

3    head?

4    A.  No.

5    Q.  Would it be accurate to say that at the time that

6    the hats were put on the heads, you decided to put hats on

7    the people's heads?

8    A.  Myself, along with the assistant district

9    attorney and the defense counsel.

10    Q.  I spoke to defense counsel, by the way, this

11    afternoon.  I want to make sure that we're clear.  When

12    you say that the defense counsel decided to put hats on,

13    he didn't make the decision, you and the DA did, right;

14    and then you told him what you were doing, right?

15    A.  We told him that we wanted to put hats on

16    everybody so everybody would look the same.  And he had no

17    objection to doing that.

18            MR. BREWINGTON:  Just for the record, I

19        object to it now, Judge.  If he didn't then, I'm

20        doing it now.

21    Q.  With regard to making everybody look the same,

22    wouldn't you agree with me that one of the major

23    distinguishing factors between everyone in that lineup and

24    Mr. Galloway was the extreme length of his hair?

25    A.  Yes.  That's why we put the hats on.

Janine M. Colasanti, RPR, OCR

240
Det. Ross - People - Cross

1    Q.  So you agree with me that you took away the thing

2    that would make him different and matched the description,

3    right?

4              MR. LaROCCA:  Objection.

5              THE COURT:  Sustained.

6    Q.  You put hats on to take away the distinguishing

7    factor, correct?

8              MR. LaROCCA:  Objection.

9              THE COURT:  Sustained.

10   Q.  You made the determination to place hats on

11   everyone so that the length of his hair could not be seen,

12   correct?

13   A.  Correct.

14   Q.  And you understood that by putting the hats on,

15   you were taking away the ability of any witness to see how

16   long his hair was, correct?

17   A.  I was putting the hats on those individuals to

18   make it fair.

19             MR. BREWINGTON:  Judge, I move to strike

20        that as unresponsive.

21             THE COURT:  Denied.

22             MR. BREWINGTON:  I'm sorry, your Honor.

23             Judge, may I have that question read back so

24        I can hear it, please?

25             THE COURT:  Please read back the statement.

241
Det. Ross - People - Cross

1            (Whereupon, the requested testimony was

2        read back by the reporter.)

3            MR. BREWINGTON:  I move to strike.  I asked,

4        "correct?"  It calls for a yes or no answer.

5            MR. LaROCCA:  Correct is subject to

6        interpretation.

7            MR. BREWINGTON:  Judge, I am so sorry --

8            THE COURT:  Correct is like why.

9        Q.  Sir, you put those hats on the individuals so

10    that the length of Mr. Galloway's hair could not be seen;

11    is that accurate?

12            THE COURT:  That's been asked and answered.

13            MR. BREWINGTON:  Very well.

14        Q.  Sir, when you put the hat on top of

15    Mr. Galloway's hair with all that hair underneath, did the

16    hat sit on top of his head?

17        A.  No.  It sat down, just like everyone else, down

18    on the brim of their forehead.

19        Q.  Let's go to number six in this photograph that's

20    before you, 15 and 16, okay?

21        A.  Okay.

22        Q.  The individual that's there is identified in 14

23    as Jimmy Lee.  Do you know Jimmy Lee?

24        A.  No.

25        Q.  Do you know what Jimmy Lee looks like?

Janine M. Colasanti, RPR, OCR

242

Det. Ross - People - Cross

1      A.  I see the photo.

2      Q.  Take a good look at the photo, sir.  Can you tell

3   me, sir, with regard to the photo, how thick are his

4   eyebrows?

5           MR. LaROCCA:  Objection, your Honor.  We've

6       already been through what can and cannot be seen in

7       the photo.  The photo is in evidence.

8           THE COURT:  The photo speaks for itself.

9       With the understanding that there are some things in

10       that photograph that -- let's put it this way, it

11       could be more visible and more clear than the quality

12       that the picture allows.

13           MR. BREWINGTON:  Does that mean I can't ask

14       the question, Judge?

15           THE COURT:  Right.

16           MR. BREWINGTON:  Well, Judge, then how --

17       objection.  I take an exception to not being able to

18       ask questions about the specifics of the picture that

19       the People claim depicts --

20           THE COURT:  The picture is in evidence.

21   BY MR. BREWINGTON:  (Continuing)

22      Q.  What is the skin tone of the individual in seat

23   number six?

24      A.  If you look at the picture, it looks dark.

25      Q.  And what is the feature of the individual's nose

Janine M. Colasanti, RPR, OCR

243
Det. Ross - People - Cross

1    in six, flat or narrow or otherwise?  Can you tell us

2    please, the jaw in six, is it square or some other way?

3        A.  It looks square.

4        Q.  Sir, do you know?

5        A.  No, I don't know.  You asked me what it looks

6    like.

7        Q.  And isn't it true, sir, in looking at this

8    photograph -- by the way, sir, the individual that is

9    seated in six, just so we're clear, do you know what his

10   height was?

11       A.  No.

12       Q.  And at the time that Mr. Hernandez was asked to

13   look at this lineup, he was the second one; is that

14   correct, Mr. Hernandez?

15       A.  Correct.

16       Q.  You are saying that this is what the lineup

17   looked like, right?

18       A.  Correct.

19       Q.  The same thing for the victim, correct?

20       A.  Correct.

21       Q.  Sir, you testified just a little while ago that

22   the defendant had changed his appearance; do you remember

23   saying that?

24       A.  Yes, I do.

25       Q.  Changed his appearance from what?

Janine M. Colasanti, RPR, OCR

244
Det. Ross - People - Cross

1        A.   From the short hair to having his hair up.

2        Q.   Sir, when you say from the short hair, what do

3    you mean from the short hair?

4        A.   Exactly what I said, when his hair was short.  He

5    now changed it and it's now up high.

6        Q.   Sir, did you ever see him with short hair?

7        A.   I saw an arrest photo of him.

8        Q.   And that arrest photo was from what year?

9        A.   This year.

10       Q.   And the arrest photo showed cornrows; didn't it?

11       A.   Correct.

12       Q.   And you're calling that short hair?

13       A.   Correct.

14       Q.   That's your interpretation of short hair?

15       A.   Yes.

16       Q.   Just so we're clear, the description that you got

17   when you're setting up the lineup was for short hair, not

18   cornrows, correct?

19       A.   Correct.

20       Q.   So if Mr. Galloway had cornrows, you wouldn't

21   have used hats?

22       A.   I don't know if I would have used hats or not.

23       Q.   Because the cornrows would have been different

24   than just short hair, right?

25       A.   Correct.

245
Det. Ross - People - Cross

 1                MR. BREWINGTON:  I have no further questions

 2        of this -- sorry, Judge.  Just one other thing.

 3        Q.  Who was the Crime Scene photographer that took

 4   the photograph?

 5        A.  I don't know.  Can I check the paperwork?  I

 6   don't know his name.

 7        Q.  Was it done electronically, or was it done with

 8   negatives?

 9        A.  He came in with a 35-millimeter camera.  I don't

10   know if it was digital or film.  I don't know.  Although,

11   I think on the front page of that photo it tells you the

12   roll number that I had.  It says, roll one.

13        Q.  And sir, you did say that you looked for six

14   individuals with similar characteristics; is that correct?

15        A.  Correct.

16        Q.  What were the characteristics that you say you

17   were looking for that were similar?

18        A.  Male black, medium skin, short hair.

19        Q.  Is that it, right?

20        A.  Correct.

21        Q.  What was the age group you were looking for, by

22   the way?

23        A.  I don't even know.  I wasn't told an age.

24        Q.  Do you know what the age is of Mr. Shemin?

25        A.  No.  I don't know the age of anyone.

Det. Ross - People - Cross                246

1      Q.   Do you know the age of any of the individuals

2   other than Mr. Galloway?

3      A.   I don't know even know Mr. Galloway's age.

4      Q.   You put a lineup together and you didn't know if

5   you were looking for someone that was 40 or 20, correct?

6      A.   No.

7      Q.   You don't know the ages of the individuals in

8   these photographs, correct?

9      A.   I don't.

10      Q.   Mr. Bellman, Steven, do you know him?

11      A.   I know of him.  I don't know him personally.

12      Q.   Tell the Court how old he is.

13           MR. LaROCCA:  Objection.

14           THE COURT:  He just said he doesn't know the

15      ages.

16      A.   He has been on the job for awhile.  I have no

17   idea.

18      Q.   You said you know him?

19      A.   I said I know of him.

20      Q.   How do you know of him?

21      A.   He is a police officer in Nassau County.  I met

22   him that day.

23      Q.   You did meet him.  Tell us his approximate age.

24           MR. LaROCCA:  Objection.

25           THE COURT:  Sustained.

Det. Ross - People - Redirect        247

1      Q.   Sir, would it be right to say that when you put

2   this lineup together and put these people in the lineup,

3   you made no allowance for them being in the same age

4   group?

5      A.   Age did not determine when I made the lineup.

6      Q.   So the answer to my question is?

7      A.   What I just said.

8      Q.   Would it be accurate to say, sir, when you put

9   this lineup together, that you made no allowances to

10  ensure that these individuals would be in the same age

11  group; is that correct?

12      A.   When I called to get fillers and they arrived,

13  when they came to the precinct, I looked at them.  And

14  then at that point I made sure they were going to fit the

15  criteria.  The criteria, I never looked at age.  I never

16  used age once.

17      Q.   Thank you.  Were there any fillers that came that

18  you rejected?

19      A.   I don't believe so.

20      Q.   So whoever came is who you put in, right?

21      A.   Correct.

22      Q.   Regardless of their age, right?

23      A.   Correct.

24      Q.   Regardless of their hairstyle, right?

25      A.   No.  They all had short hair.

                    Janine M. Colasanti, RPR, OCR

248

Det. Ross - People - Recross

1      Q.  Except for who, your defendant?

2      A.  The defendant.

3      Q.  That being Mr. Galloway, right?

4      A.  Correct.

5              MR. BREWINGTON:  Thank you, Detective Ross.

6              THE COURT:  Any redirect?

7              MR. LaROCCA:  Just very briefly.

8  REDIRECT EXAMINATION

9  BY MR. LaROCCA:

10     Q.  Detective, you were asked whether or not the

11  photographs showed the lineup as it appeared for the first

12  witness and the second witness, correct?

13     A.  Correct.

14     Q.  Was the defendant and his attorney given the

15  option to change his position in the course of the lineup

16  proceedings?

17             MR. BREWINGTON:  Objection.  Beyond scope.

18             THE COURT:  I'm going to allow it.

19     A.  Yes.

20     Q.  Did he ask to change his position?

21     A.  No.

22     Q.  Did his attorney ask to change his position?

23             MR. BREWINGTON:  Objection.

24             THE COURT:  Overruled.

25     A.  No.

Janine M. Colasanti, RPR, OCR

249
Proceedings

1          Q.  Did you endeavor to find and compose a lineup

2     that fairly reflected the characteristics that you were

3     given; male, black, medium skin color, short hair?

4          A.  Yes.

5                    MR. BREWINGTON:  Objection.

6                    THE COURT:  It's leading.  It's sustained.

7                    MR. LaROCCA:  Thank you.  I have nothing

8          further.

9                    THE COURT:  Any recross?

10    RECROSS-EXAMINATION

11    BY MR. BREWINGTON:

12         Q.  There is no better photograph, is there?

13         A.  No, not that I know.

14         Q.  That's the only one?

15         A.  That's what I have.

16         Q.  If anybody wants to see what that lineup looks

17    like, that's the only thing you have available, right?

18         A.  Correct.

19                    MR. BREWINGTON:  No further questions.

20                    THE COURT:  Thank you, Detective.

21                    (Witness excused.)

22                    THE COURT:  People?

23                    MR. LaROCCA:  The People rest.

24                    Thank you, your Honor.

25                    THE COURT:  Does the defense wish to present

Janine M. Colasanti, RPR, OCR

Proceedings                        250

1    a case?

2              MR. BREWINGTON:  Judge, I think that

3    we've -- no.

4              THE COURT:  Are both sides prepared to make

5    an argument, or would both sides prefer that you rely

6    on the record?  Why don't both of you speak for a

7    moment.

8              MR. LaROCCA:  Argument.

9              THE COURT:  What's that?

10             MR. LaROCCA:  I believe we're going to make

11   an argument.

12             THE COURT:  Since it's the defense's motion,

13   I'll allow the defense to go first, and then I'll

14   hear from the People.

15             MR. BREWINGTON:  Judge, thank you.

16             I believe that in this situation we do not

17   know -- I'm going to start first with the Huntley

18   aspect of this case, your Honor.

19             THE COURT:  Okay.

20             MR. BREWINGTON:  With regard to Huntley,

21   there are statements that are made.  I don't believe

22   the People have really identified what statements

23   they claim they are offering.

24             The 710.30 notice which was provided and

25   which we identified as part of the Court's file,

Proceedings

1       indicates that there were statements that were

2       offered, one at 4:30 a.m. and one at 4 p.m. on

3       6/6/08.  They are both alleged to be -- excuse me,

4       one to be oral and one is alleged to be written.

5       They did not offer any written statement into

6       evidence.  So, therefore, Judge, we ask that that be

7       denied immediately.

8               This oral statement that they claim was made

9       at 4:30 a.m., according to the witnesses that have

10      been before this Court, make it clear that they claim

11      that the statement that was made -- again, we have to

12      go by the 710.30 notice, Judge.  The statement that

13      was made allegedly about the shooting across the

14      street, that being the Tennessee Avenue claim, was

15      one that, I believe, they indicated was made sometime

16      later on in the day.  But their notice was, it was

17      made at 4:30 a.m, and that it was oral.

18              I think that's problematic to begin with, no

19      less the credibility of the officers which were

20      flip-flopped with regard to the statements that they

21      claim were made, how they were made, and the notices

22      of Miranda warnings and when they were given.

23              This is particularly true when we have the

24      testimony by Detective Lipson, that he was called

25      prior to 4:30 a.m.  Looking at his testimony, Judge,

Proceedings

1    he says he was called sometime in the early morning,

2    that being one or two o'clock, by his partner.  And

3    that when his partner called him, according to

4    Detective Lipson, he was still at the precinct.  And

5    he was asked to pull together a copy of the sketch

6    that Detective DeCaro claimed was over by his desk.

7    That's important with regard to Huntley because that

8    gives us a time.

9            In that time we know that Detective DeCaro

10   would have had to have been speaking to Mr. Galloway

11   in order for him to have said, Your nose, it looks

12   very familiar.  Don't I know you from someplace?

13   Whatever his claim was.  It was the language that he

14   used.

15           His testimony today was that he made no

16   evaluation, did not sit in front of or talk to

17   Mr. Galloway until 4:30 or after.  That makes

18   absolutely no sense, because in order for him to have

19   called Detective Lipson and gotten the sketch brought

20   over to him before 4:30, he would have to have had

21   contact with Mr. Galloway, looked at him and then

22   made this revelation that he looked familiar.

23           Between those two officers, Judge, someone

24   is not being truthful.  And I would say because of

25   both of them not being accurate and untruthful, that

253

Proceedings

1   their testimony should not be believed.  They are not

2   credible.

3          But, Judge, that alone should not be the end

4   of the analysis.  The analysis takes us to the next

5   step, which is, according to Detective DeCaro, that

6   the statement at the point at which he claims that

7   Mr. Galloway all of a sudden became very familiar to

8   him was after 4:30.  That's important, Judge, because

9   when we look at the times, according to the testimony

10  of Lipson, the times when the witnesses saw the photo

11  arrays, the first one was at 3:20 a.m., and the

12  second one was at five o'clock a.m, on the 6th.

13         Therefore, his testimony can't be true,

14  because his first contact, according to him today, at

15  least with Mr. Galloway, was at 4:30 a.m.  A photo

16  array could not have been put together at 3:20 a.m.

17  if he is first making contact with Mr. Galloway at

18  4:30 a.m.  Detective Lipson could not have gone to

19  Glen Head and done a photo array after he did a photo

20  array at the Armory by five o'clock a.m.

21         So the stories and the times don't match up,

22  which raises a question as to why they are

23  manipulating the times to try and somehow fit in this

24  statement, when they really still haven't identified

25  what it is specifically they want the Court to allow

Janine M. Colasanti, RPR, OCR

Proceedings

1    in.

2              Credibility is an important thing in a

3    hearing such as this, Judge.  We believe what is

4    shown to the Court on the Huntley issue is that the

5    statement that they claim they want to use, which I'm

6    not fully clear on, I think it's this thing that

7    something happened on Tennessee Avenue, in a case

8    that was dismissed.  That statement about a shooting

9    across the street, that they claim that Mr. Galloway

10   made, happened at a time that the People have not

11   proven, as is their obligation, that Mr. Galloway was

12   properly noticed, warned, given his Miranda rights,

13   and that it even took place, because they have not

14   been able to solidify for the Court what time it took

15   place.

16             Did it take place in the morning or the

17   afternoon?  All of a sudden it became in the p.m,

18   when the testimony earlier this week on Wednesday was

19   that it all happened in the morning.  Judge, we

20   raised questions with regard to that.

21             And we also ask that the suppression of any

22   statement taken from Mr. Galloway is a must, and that

23   it must take place because the People have not met

24   their burden.  They have not shown that it did not

25   occur under some sense of harassment, or oppressive

255

Proceedings

1      action, or with regard to full notice being given to

2      Mr. Galloway as to what his rights were.

3              The other thing that we did point out,

4      Judge, was that the officer who was in charge of

5      Mr. Galloway at no time indicated that Mr. Galloway

6      was given an opportunity for water or eating.  He

7      said he didn't know.  This is the person who was

8      primarily responsible for this man in custody.  If

9      that doesn't create a coercive situation, I don't

10     know what does.

11             Typically, we know deprivation of both

12     sleep, food and water is something that is not

13     allowed by the Geneva Convention, no less the United

14     States Constitution.

15             Judge, we want to be real clear, with regard

16     to any statements that they claim were taken, that

17     was totally suppressible.  And in this situation,

18     Judge, they have not answered the questions as to how

19     they say what happened, happened in terms of

20     statements taken.

21             If I could turn my attention, Judge, to the

22     issue of probable cause, that being Dunaway.  May I

23     do that, your Honor?

24             THE COURT:  Sure.

25             MR. BREWINGTON:  The People claim that their

Janine M. Colasanti, RPR, OCR

Proceedings

1     basis for arresting Mr. Galloway in this case is

2     based on an action which was alleged to have occurred

3     on the 27th of May.  And that he was picked up by

4     Detective Cunningham and brought to the Armory and

5     questioned, not for one hour or two hours, but held

6     for what we can tell, at least by the records, Judge,

7     seven or eight hours, and questioned numerous times

8     about numerous things.

9               The issue of probable cause, we believe,

10    Judge, hinges on whether or not, with regard to the

11    claims in this case and the claims against him with

12    regard to what happened on the 15th of May, 2008, if

13    there was a basis upon which they had him in custody,

14    whether or not they could question him without

15    allowing him the opportunity to leave.

16              Judge, we have argued and placed before the

17    Court, and I think the district attorney has

18    acknowledged, that the allegations concerning the

19    incident of May 27th were dismissed by the grand

20    jury, and that the dismissal is by a body of

21    authority dealing with the underlying facts of that

22    case.  And that as a result of that, Judge, that the

23    People are relying on that arrest and those

24    allegations as the basis of probable cause.  And that

25    should not allow a finding of probable cause for the

Proceedings

1          holding of Mr. Galloway in this particular case,

2          especially when the statements taken from him, as

3          we've talked before, can't be identified as to when

4          they actually claim that they took that statement

5          from him.  Was it before or after the reason that

6          they claim that they picked him up?  Was it before or

7          after Miranda warnings were given?  The People have

8          not established that.

9                     And as a result of that, Judge, we believe

10         that the Court should find that there was no clear

11         probable cause articulated by the People.  They have

12         not, at this point, moved forward as they are

13         required to do.

14                    As to the final portion, Judge, which would

15         be the photo array and the lineup, we believe that

16         Judge, first, the photo array is misleading from the

17         very beginning.

18                    They had Mr. Galloway before them that

19         morning for a long period of time.  They made no

20         effort to find or get a photograph of Mr. Galloway as

21         he appeared on June 5, 2008.  Instead, what they did

22         was, they went more than a year backwards.  That

23         would be fine, until we get to the fact that

24         Mr. Galloway, Judge, his characteristics on May 15th

25         and his characteristics on June 5th and 6th, could

258

Proceedings

1    not have resembled anything that was depicted in the

2    photographs from 2007.

3              All reasonable people would know that an

4    African-American, such as Mr. Galloway, could not

5    have grown his hair that length, could not have had a

6    bushy Afro that was testified to by Detective Lipson

7    at the time that he was picked up, or could not have

8    had his hair long enough to cornrow, no less, on

9    June 5th.

10             THE COURT:  Would you agree with me that

11   there is no evidence whatsoever as to what

12   Mr. Galloway's appearance was on May 15, 2008; that

13   nobody came in and testified and said that he knew

14   Mr. Galloway, that he had some dealings with Galloway

15   on the 15th, and that Galloway's hair or description

16   was given?

17             MR. BREWINGTON:  Judge, I will agree to

18   that.

19             THE COURT:  Okay.  Thank you.

20             MR. BREWINGTON:  And I agree to that because

21   the reasonable inference of the people, I guess, in

22   our society should understand that what can be drawn

23   is that in order to have hair long enough to cornrow

24   or have a puffy Afro like that, that is not two weeks

25   worth of hair growth.

Janine M. Colasanti, RPR, OCR

Proceedings

259

1           And, Judge, the importance of that is that

2      knowing what they had before them on that day, that

3      being on June 5, 2008, they made no effort to try and

4      make sure that Mr. Galloway, who was depicted in a

5      photo array, appeared as he did in that time frame.

6           What they did was, they got a photograph

7      from the past that matched the description and put

8      him in the photo array, not what he looked like on

9      June 5th, but what he looked like in June of 2007

10     when he was 18 or 19 years of age.

11          The importance of that, Judge -- and,

12     obviously, the Court is asked to, in cases such as

13     this, to draw all reasonable inferences that he can,

14     that are appropriate, based on the evidence that is

15     placed before them.  That for the officers to know

16     that his hair was either in an Afro, as one officer

17     said, on June 5th, or that his hair was in cornrows

18     on June 5th, there still was no reason for them to

19     conduct a photo array that was as suggestive as it

20     was to match up to a description that did not match

21     Mr. Galloway.  It just simply didn't match

22     Mr. Galloway.

23          And that the reasonable inference is that it

24     should not have been allowed and it should not have

25     been done.  And that it was done, essentially,

260

Proceedings

1      because now we know that Detective Horowitz was part

2      of this whole process.  And we got testimony that Mr.

3      Horowitz was part of the June 15th -- excuse me, the

4      May 15th shooting.  All of a sudden, Judge, we start

5      to see what the connection is here.

6                  They made no effort to try and establish

7      with regard to the claims that the perpetrator of

8      this crime that shot this cabdriver was almost

9      six feet tall.  And the claim, according to Detective

10     Lipson or the other detective, that Mr. Galloway is

11     almost six feet tall is ridiculous.  He is five foot

12     five.  It's clear, not only by the police records,

13     it's clear here by looking at him, Judge.  Again, it

14     is a reasonable inference for the Court to see and

15     evaluate.

16                 Judge, we believe that if the Court takes a

17     close look at what took place in terms of this photo

18     array, the Court will be able to determine that --

19     and, again, looking also at the composite sketch,

20     Judge, which is in evidence before the Court, that

21     Mr. Galloway's appearance does not match what it says

22     on the sketch.

23                 It says, first of all, that the person is

24     twenty-five to thirty.  That doesn't match

25     Mr. Galloway.  That the height is 70 to 71 inches.

261

Proceedings

1      That doesn't match Mr. Galloway.  The hair is dark in

2      color, cut tight to the head.  It doesn't say

3      cornrows to the head.  It doesn't say Afro to the

4      head.  It says, cut tight to the head.

5           And even Detective Ross who went out to get

6      fillers knew what he was looking for.  That's why he

7      put a cap on top of these individuals to hide the one

8      distinguishing factor that would have given

9      Mr. Galloway the chance that he was entitled to.

10          They did not provide this Court with regard

11     to Exhibits 15 and 16 that which the Court of Appeals

12     and the Appellate Division and Second Department

13     clearly require, that they must show a photograph of

14     the lineup that gives a clear indication of what the

15     lineup looked like, every one of the people in the

16     lineup, so that they can overcome any claim that it

17     was suggestive.

18          People versus Stokes, 139 AD2d, 785 Second

19     Department, People versus Johnson, 106 AD2d, 469, and

20     People versus Lewis, that's a Supreme Court case,

21     Judge, 20 Misc.3rd 1136A.  Judge, we argue that those

22     cases stand for the proposition that failure of the

23     People to preserve a photo array and lineup for a

24     hearing, and to show that the actual lineup was

25     nonsuggestive, calls for the suppression of the

Janine M. Colasanti, RPR, OCR

263

Proceedings

1    entire lineup as it was conducted.

2              And, Judge, in this case, the Appellate

3    Division is also clear that the using of baseball

4    caps or any other cap for individuals in a lineup is

5    allowed.  I want to be clear that I understand that

6    that is something that can be done.  But the way that

7    it was done here is the inverse reasoning as to why

8    the Court of Appeals and the Appellate Division say

9    that it can be done.

10             Normally caps are used when the individual

11   has a distinctive -- that being the subject of the

12   lineup -- has a distinctive factor that sets him

13   apart from the other persons in the lineup, such so,

14   that that distinctive factor was part of the

15   description.  And, therefore, if he's the only one

16   with that descriptive factor, then that points to

17   him.

18             In this situation, we know that the

19   distinguishing factor was not part of the description

20   given by the witnesses or the claimed description.

21             The distinguishing factor that Mr. Galloway

22   had was the length of his hair.  And the length of

23   his hair was the thing that set him apart, separate

24   and apart from the other people in the lineup; not as

25   a way of pointing him out as being the perpetrator,

263

Proceedings

1    but distinguishing him.  Because if indeed that was

2    his hair, as we are arguing it was, there is no way

3    that these witnesses should not have been allowed to

4    see that, because it would have distinguished him

5    sufficiently to allow them not to select him.

6            As the Court of Appeals and the Appellate

7    Division has indicated, that when a prominent aspect

8    or distinctive haircut exists, that the distinctive

9    haircut, if it was identified by a witness, if you

10   can't get fillers to match that, then you cover it

11   up.

12           Here the distinctive aspects of

13   Mr. Galloway's haircut was the length of his hair.

14   And that should not have been covered up and taken

15   away from him by putting caps on, because it is the

16   inverse reasoning, and actually is contrary to the

17   reasoning of the Appellate Division.

18           Judge, People versus Carolina, 184, AD2d

19   520, deals with that.  You can actually use the caps,

20   but for the purpose -- not for the purpose that we're

21   dealing with here, for the other purpose; that being,

22   when the distinguishing factor sets the defendant

23   apart and makes it so suggestive that he was the

24   person.

25           Here the fact of the length of his hair

Janine M. Colasanti, RPR, OCR

Proceedings

1      would have shown this witness and these witnesses

2      that he wasn't the person, because their unwavering

3      description, according to the People and what they

4      put in, was that it was cut short to the head.  That

5      was not Mr. Galloway's hair length.  It was not his

6      hair length at the time of his arrest.  It was not

7      his hair length at the time of the lineup.  It was

8      not the length of his hair at the time they picked

9      him up.  And it couldn't have been the length of his

10     hair a couple of weeks earlier, because if it's cut

11     short to his head, there is no way you can grow it

12     that long to cornrow it in that time period.

13             Judge, in this situation -- and by the way,

14     Judge, we'll ask the Court not only to look at the

15     Carolina case, but also to note that in People versus

16     Moore, 143 AD2d, 1056, the Court struck and

17     suppressed a pretrial identification of the defendant

18     in a lineup when the defendant was the only one in

19     the lineup with braids.  And the reason they did that

20     was because the braids were figured prominently in

21     the description of the witness.

22             In this case, the description of the

23     witness -- the witnesses as taken by the detectives

24     and what they put in the sketches and everything

25     else, was that this individual had short hair.

Janine M. Colasanti, RPR, OCR

Proceedings

1          I told the Court, and I want to be clear,

2     the reasoning in this case, People versus Moore, is

3     the exact reason why they could not use caps.  They

4     should not have been able to use caps.  Because what

5     they did was, they robbed the defendant of part of

6     his ability to defend himself in his lineup by taking

7     away the distinguishing factor that didn't match the

8     description but set him apart.  And by doing that,

9     Judge, they significantly made this overly

10    suggestive, significantly, because the witnesses said

11    that it was short.  If they saw the longer hair, that

12    would have made a big difference.

13          Therefore, Judge, in this situation, as the

14    detectives all indicate, the length of his hair was

15    not -- no matter how you say big Afro or cornrows, it

16    was not cut short to his head, period, the end.  And

17    as a result of that they made both the lineup and the

18    photo array improperly and overly suggestive.

19          And, Judge, we ask the Court to suppress any

20    of the statements that the People claim they're going

21    to use.  And we don't quite know what they are.

22          With regard to probable cause, there was no

23    probable cause.

24          With regard to the photo array and the

25    lineup, both of those should be suppressed as

                Janine M. Colasanti, RPR, OCR

266

Proceedings

1        inappropriate and overly suggestive actions taken by

2        the police to try and identify the perpetrator,

3        because by doing what they did, they took away

4        Mr. Galloway's rights.

5                        Thank you, Judge.

6                        THE COURT:  Thank you.

7                        Mr. LaRocca.

8                        MR. LaROCCA:  Thank you, your Honor.

9                        Your Honor, if I may, I would like to start

10       with the probable cause issue and start by saying

11       that, essentially, there is no issue.

12                       You heard from Detective Cunningham that he

13       was present when an identified citizen by the name of

14       Marty Fouse gave a statement to the police, a written

15       statement, in Detective Cunningham's presence, that

16       the night before he had been a victim of a push-in

17       burglary robbery at his home at 590 Fulton Avenue, in

18       Hempstead.  And that he knew the three men who had

19       robbed and burglarized him at gunpoint, knew them by

20       name, gave their names, Josiah Galloway, Robert

21       Ogleytree and Maurice Boyle.

22                       Detective Cunningham was present, was

23       familiar with that allegation, that incident.  And

24       based on that allegation and that incident from a

25       known citizen, actively was in pursuit of or looking

Proceedings

1    for the named suspects in that case, including the

2    defendant, Josiah Galloway.

3           They received information on June 5th as to

4    Josiah Galloway's location.  They went to that

5    location within the Town of Hempstead, in Nassau

6    County, observed Josiah Galloway and another subject,

7    Robert Ogleytree, and placed them lawfully under

8    arrest for the allegation raised by Marky Fouse.

9           It is crystal clear that regardless of any

10   determination later, whether he is acquitted at trial

11   or dismissed in a grand jury, probable cause is what

12   they had at that point.

13          It wouldn't matter, for instance, if they

14   had more information later that would have justified

15   that result.  It's whether the information that they

16   had was of a good faith basis and had probable cause

17   to act on that good faith basis.  And they did, they

18   had both.  And they acted on that basis.

19          It is in no way denied or does it lose its

20   persuasive character simply because that charge for

21   which he was arrested was later dismissed by the

22   grand jury.  The grand jury can dismiss the case for

23   any or no reason.  It's within their purview.  It's

24   not the same as a legal determination as to whether

25   probable cause existed for the arrest of Josiah

268

Proceedings

1      Galloway at the time and place that he was arrested

2      on June 5, 2008.

3              Now, that being said, everything that

4      follows is based on that probable cause.  The

5      defendant is in custody, lawfully in custody,

6      lawfully at the Hempstead Police Department, and

7      clearly, lawfully, visible to anyone there who has

8      eyes to see.  And Detective DeCaro has eyes to see

9      the defendant.

10             The probable cause merely places him, for

11     the purposes of this charge, in the Hempstead Police

12     Department and gives Detective DeCaro an opportunity

13     to see him, and then to recognize, or at least

14     believe he recognizes to himself, a similarity

15     between that and the composite sketch that Detective

16     DeCaro has had at his desk at the Third Squad for the

17     two weeks or so since the May 15th incident with the

18     taxicab driver.

19             So all the probable cause does is put Josiah

20     Galloway in a position where his features can be seen

21     by a witness who believes the composite sketch

22     matches.

23             Now, at that point, Detective DeCaro

24     confirms, gets a copy of the composite sketch,

25     discerns he does believe there are similarities.

Janine M. Colasanti, RPR, OCR

269
Proceedings

1           You have the composite sketch.  You can make

2      your own observations, but that really isn't an

3      issue.

4           He then asks Detective Lipson to perform two

5      photo arrays for the witnesses involved in that case,

6      including the victim in that case.  The witnesses are

7      shown two separate photo arrays.  And Detective

8      Lipson has described to the Court the manner in which

9      he conducted the photo array.  And he generated the

10     most recent one in the Rogues Gallery, and that he

11     was not previously involved in the case.

12          You have the two photo arrays.  And I will

13     point out that in number -- in the Wilmer Hernandez

14     photo array, the defendant is depicted in the number

15     two spot.  And in the Jorge Anyosa photo array, the

16     defendant is depicted in the number five spot.

17          So the police went to the extra effort of

18     doing two photo arrays and not simply using a single

19     copy of the same photo array where the defendant was

20     depicted in different spots.  Not only were the

21     witnesses in separate locations, at different times

22     shown photo arrays, they were shown photo arrays

23     where the numbering was different.  And each time

24     there were identifications.

25          Now, I would also point out, your Honor,

Janine M. Colasanti, RPR, OCR

Proceedings

1          that Detective Lipson certainly didn't have the

2          defendant in front of him when he generated the photo

3          array.  He was at the Third Squad.  The arrest photo

4          which Detective DeCaro has testified about, and which

5          is in evidence, clearly shows that the defendant at

6          the time of his arrest with DeCaro and what could

7          reasonably -- and I would ask the Court to use your

8          own powers of observation -- be described as what

9          appears to be short hair or tight to the head braids.

10         The arrest photo is in evidence.  And it is not

11         markedly different from the short hair in the photo

12         arrays, and that is a distinction without a

13         difference.

14              They acted on the photographs they had.

15         There was no undue suggestion with either witness.

16         And it matches in significant degree the actual

17         appearance of the defendant at the time of his

18         arrest.  And as the Court has pointed out, this is

19         still somewhere in the neighborhood -- well, we can

20         do it precisely.  The incident was alleged to have

21         occurred on May 15th, and the arrest is June 5th.

22         And now we're into the morning of June 6th.

23              Now, there is plenty of time to change the

24         appearance, to do any number of things.  But the

25         point, your Honor, is, the ultimate point is, at that

271
Proceedings

1        point in time, on June 5th and June 6th, there was no

2        great difference in appearance between the way the

3        defendant's hair appeared at the time of his arrest,

4        as depicted in the arrest photo, and the way it

5        appears in the photo arrays, either one of them.

6        They both appear short, close to the head.

7                At the time of the arrest, his cornrows, to

8        the extent you call them that, or his braids, if you

9        use a different term, are tight and close to the

10       head.  And you have the arrest photo to make that

11       determination, as well.

12               With respect to those photo arrays, the only

13       time line that particularly counts with the photo

14       arrays is that there is probable cause for him to be

15       sitting in the Hempstead Armory so that his face can

16       be seen by someone with eyes to see.

17               While we're doing the identification

18       procedure, let me just stay on that track.  Clearly,

19       there was a court ordered lineup here.  The defendant

20       appeared in that lineup.  His attorney was present.

21       His attorney consented to that lineup.  You have

22       testimony that his attorney agreed to the way the

23       lineup was conducted, including the fact that he was

24       present; that they had the right to pick where they

25       were in the lineup; they had the right to change that

272

Proceedings

1      between lineups, and that it was done in accordance

2      with appropriate protocols and procedures.

3               It would have been the height of

4      irresponsibility to allow the defendant to sit in

5      that lineup with his braids undone, his hair teased,

6      and have him stand out as if there were an arrow

7      pointing to him from the other members of the lineup.

8               If you're going to single out the defendant

9      in this case, that would be the perfect way of

10     conducting the lineup, because it draws attention to

11     which one of these six doesn't look like anyone else

12     in that lineup.  And to avoid that, the People, to be

13     fair, and the defense attorney was present and

14     consented, put identical caps on all six individuals,

15     and that lineup was conducted.

16              Regrettably, I would say, to the extent that

17     the photograph flash washes out some feature of some

18     individual, not the defendant, in that lineup, it

19     doesn't change the fairness of the lineup, the

20     characteristics of the lineup, the description by the

21     witness of the lineup, the fact that the attorney was

22     present and did not object in any way to the lineup,

23     and so forth and so on.

24              And the lineup was conducted with meticulous

25     regard for the defendant's rights and to keep any

Proceedings

1   possibility that either witness would see the

2   defendant prior to the lineup, either witness would

3   have a chance to confer before or after concerning

4   the position or procedure of the lineup.  Again, that

5   is described in great detail, and, again, it is done

6   in accordance with the law.

7          With respect to whether they're seated or

8   standing, it is a fair and legally sufficient lineup

9   procedure.

10          Now, with regard to the statement.  The

11  stipulations, I believe, and certainly the voluntary

12  disclosure described two statements.  And contained

13  in the voluntary disclosure, the written statement

14  which involves the incident at 590 Fulton Avenue that

15  Marky Fouse described to the police.  The incident

16  that counsel and I both explained to the Court has

17  been dismissed by the grand jury.  We are not seeking

18  to introduce it.  It is just brought up in the

19  context of this hearing to explain why he was sitting

20  in the Hempstead Armory, so that a detective with

21  eyes to see could see him.  There is nothing about

22  that statement that I am seeking to introduce.

23          Now, I would agree and point out to the

24  Court that his denial when he was asked the questions

25  about his involvement in the taxicab driver incident,

Janine M. Colasanti, RPR, OCR

274

Proceedings

1    this incident, was not noticed here.  And we're not

2    seeking to introduce on our direct case anything with

3    respect to that.

4            However, at the end of this process, when

5    the police are talking about anything else, and

6    talking about the shooting, the defendant

7    volunteers -- and I'll come back to what I was going

8    to say -- but he volunteers information concerning a

9    Tennessee Avenue, Hempstead shooting that Detective

10   DeCaro was completely unaware of, even at that point

11   in time.

12           He had gone there for the 590 Fulton Avenue

13   incident, the May 27th, Marky Fouse incident.  He had

14   seen that the defendant resembled the 5/15 suspect,

15   the taxicab driver shooting, and had acted on that,

16   put that entrain, had gotten denials about that, but

17   had no clue as to any other incident until the

18   defendant raised it himself.

19           And the defendant -- and this is in the

20   710.30 notice -- gave a number of statements

21   concerning that.  But the principal sum and substance

22   of which was reflected in the 710.30 notice, he fired

23   once at the guy Marky was with, he paid $60 for his

24   gun and after the shooting he gave it back to little

25   Tye, referring to that incident.  That was done

275

Proceedings

1       after, as all statements were done, after his rights

2       advisement.

3               The rights card is there, and Detective

4       DeCaro was clear that all statements obtained from

5       the defendant concerning the facts and circumstances

6       of any of the incidents were after the rights

7       advisement.  And he was also clear, at least when we

8       got to it, that the sequence was, as I have

9       described, first talking about the written statement,

10      or what turns out to be the written statement of the

11      590 incident, and then segues into the denials of the

12      taxicab incident.  And last, at some indeterminate

13      point at the end of that process, but on June 6th,

14      the volunteered information about this unrelated

15      Tennessee Avenue shooting in which he describes his

16      possession and use of a handgun.

17              Now, with respect to the contradiction or

18      perceived contradiction between the photo array times

19      and the rights advisement times, I would simply

20      submit to the Court that the witness testified, and

21      even on recross as pointed out, that he did ask

22      Lipson at approximately three o'clock in the morning

23      to get that photo array done.

24              I would submit to the Court that it was

25      clear that he had the opportunity and did make

Janine M. Colasanti, RPR, OCR

276
Proceedings

1      observations of the defendant, Josiah Galloway,

2      during that window between the time he arrived there

3      at the Hempstead Armory, somewhere around

4      one o'clock, and was dealing with Ogleytree and

5      Galloway, until the time he was dealing primarily

6      with Mr. Galloway at 4:30.

7              And it was in that period that he made the

8      physical observations of the defendant's resemblance

9      to the composite sketch that set entrain the photo

10     arrays.  But again I would point out that whole

11     period, from the moment he was called until the

12     moment he left, was post-probable cause.  Any

13     observation at any point in time of the physical

14     characteristics of the defendant would have been

15     legally permissible to act on because there was a

16     legally permissible, legally sufficient basis for him

17     to be at the Hempstead Armory, the defendant, and for

18     the detective to witness it.

19             I would argue, to the extent that there

20     appears to be a contradiction, this contradiction or

21     distinction without a difference is not a credibility

22     issue.  It is, at most, a mistake, at the time that

23     he said things here on the stand, as to when he first

24     physically observed.

25             And if you go back and you look at the times

277

Proceedings

1       and the ways the questions were asked, there are

2       different times, the formulation changes about when

3       you sat down with him and you were staring, looking

4       at him, rather than simply physically observing him.

5       He has this opportunity, but it doesn't contradict

6       that all his testimony is that the rights advisement

7       was followed by a series of three statements spread

8       out over a number of hours.  And that each of the

9       statements about facts and circumstances were as

10      described by the witness.

11             It doesn't contradict the fact that the

12      show-up -- not the show-up, the photo arrays were

13      conducted after probable cause had put the defendant

14      in a position where his physical characteristics

15      could be observed by DeCaro.

16             And it doesn't change the fact that the

17      independent court ordered lineup in August, several

18      months later, when there was a chance to change the

19      appearance, was conducted with fairness and

20      scrupulous regard for the legal rights of the

21      defendant in this case.

22             So given all of that, your Honor, with

23      respect to the statement, we're seeking to be allowed

24      to use the statement concerning the Tennessee Avenue

25      incident that he made to the police.

278

Proceedings

1        And I would point out that it is not the

2    same thing.  And the Court should not conflate, as

3    counsel may have asked you to, the idea that the --

4    because the detective cannot recall what or if he ate

5    or drank, that that's the same as to say that he

6    didn't eat or drink.  That is simply an absence of

7    recollection.

8        There is no evidence in front of the Court

9    that he was coerced, that he was harassed, as counsel

10    has used that term, that he was starved, that he was

11    denied substance or a drink, or that there was any

12    complaint with regard to any of that.

13        So for all of those reasons, I ask that the

14    evidence not be suppressed, and the People be allowed

15    to use it on our direct case as I've described.

16        Thank you.

17        THE COURT:  May I have the exhibits, just

18    the ones that are in evidence.

19        The Court has heard the testimony, seen the

20    witnesses, seen the exhibits, considered the evidence

21    and considered the matter and finds as follows:

22        First of all, the defendant, during the

23    lineup process and during the questioning process

24    was, in fact, in the lawful custody of the police

25    department.

279
Proceedings

1          There was sufficient probable cause when the

2     defendant was arrested.

3          The detective, Detective Cunningham, was

4     present when a citizen gave detailed, credible

5     information that he was the victim of a robbery and a

6     burglary, that he was victimized by three individuals

7     whom he knew, including the defendant, Mr. Galloway.

8          Detective Cunningham knew who Mr. Galloway

9     was.  Detective Cunningham acting within his lawful

10    capacity to do so, had the authority to arrest

11    Mr. Galloway based upon this information.

12         Accordingly, the detective came upon

13    Mr. Galloway and another one of the named

14    individuals, Mr. Ogleytree, as they were seated in

15    the vehicle on a street in Hempstead; and at that

16    time placed Mr. Galloway under arrest, which was his

17    lawful right to do.

18         Now, inasmuch as Mr. Galloway was lawfully

19    in custody when Detective DeCaro interacted with him,

20    there was nothing illegal, improper or inappropriate

21    for Detective DeCaro to think or conclude or feel or

22    suspect that the person before him resembled the

23    sketch on an unrelated matter to what they were

24    investigating at the time, but nonetheless, an active

25    and open investigation.

Proceedings

1              And it was appropriate, and certainly not in

2         violation of the defendant's rights for Detective

3         DeCaro to put into motion the procedure whereby

4         Mr. Galloway's photograph was placed in a photo

5         array, along with five other individuals who

6         resembled Mr. Galloway in appearance, and for these

7         photographs to be shown to the victim and a witness

8         in the aforesaid open investigation.

9              Now, the photo array was shown separately to

10         the victim and to a person who's described as a

11         witness.  There was no suggestibility with regard to

12         the photographs.  There was no suggestibility with

13         regard to the procedure that was followed.  And there

14         was nothing unreasonably or unduly suggestive in the

15         wording that was used by police personnel during the

16         showing of the photo arrays.

17              And, accordingly, the motion to suppress the

18         viewing of the photo arrays -- or shall I say, the

19         motion to deny the People the opportunity to attempt

20         an in-court trial identification of the defendant

21         based on the photo arrays is denied, because the

22         photo arrays did not violate the constitutional

23         rights of the defendant.

24              Now, with regard to the court ordered

25         lineup, the Court finds, according to the testimony

Proceedings

1    and the evidence it was fair, in compliance with the

2    defendant's constitutional and statutory rights.  As

3    a matter of fact, he had an attorney present.

4    Neither he nor his attorney objected in any way to

5    any of the procedures.  The defendant was allowed to

6    pick the spot that he was to occupy.  He was allowed

7    to change the spot if he wanted to do so.  He

8    declined to do so.

9         The Court finds that the use of the hats was

10   an attempt to protect the defendant's rights and to

11   ensure fairness.  Furthermore, there was certainly no

12   objection rendered by either the defendant or the

13   attorney who was present.

14        Similarly, having the individuals sit was

15   also in an attempt to keep things fair, as well as

16   the use of the sheet.

17        There was nothing that was said or done to

18   coerce or pressure or overly suggest to the

19   individuals who viewed the lineup that they should in

20   any way be unduly directed toward the defendant.  And

21   there was nothing unduly suggestive about the

22   procedure of the lineup, the people that were used in

23   the lineup, or any interaction that police personnel

24   had with regard to the civilians who viewed the

25   lineup.

Proceedings

1          The motion to suppress testimony with regard

2     to the lineup at trial is denied.

3          Now, with regard to the statements.  First

4     of all, the Court has found that the defendant was in

5     lawful custody of the police department at all times

6     during the questioning, from the time he was brought

7     into the Armory, from then on.

8          Now, inasmuch as the People indicated

9     they're not going to use on the direct examination

10    the written statement regarding the so-called 590

11    incident, then there is no need for the Court to make

12    a ruling with regard to the Miranda aspects of that

13    statement.

14          On the other hand, the Court finds that the

15    statement was voluntary.

16          With regard to the second statement

17    regarding the taxicab and the denial, the People

18    indicated they're not going to use that on their

19    direct case.  So the Court is going to make no

20    determination with regard to the Miranda aspects, but

21    finds that the statement was given voluntarily.

22          Now, with regard to the last or third

23    statement, the Court finds that the defendant

24    voluntarily offered information regarding the

25    Tennessee Avenue and Hempstead shooting.  It wasn't

283

Proceedings

 1        the subject of any coercion.  It wasn't the subject

 2        of any duress.  It wasn't the subject of any type of

 3        force or pressure from the police department.  It was

 4        done after the defendant was advised of his

 5        constitutional Miranda warnings.

 6               The defendant freely and voluntarily

 7        indicated that he understood the warnings, that he

 8        waived the warnings, was willing to talk to the

 9        police, and then did so.  He talked to them about a

10        number of matters, including this one.

11               And this last one involving the firing of

12        the gun, and paying $60, et cetera, that the People

13        intend to use on their direct case, the Court finds

14        that the statement was taken in compliance with the

15        defendant's constitutional, statutory rights.  He was

16        not pressured in any way.  He was not the subject of

17        the result of coercion.

18               That the defendant made a knowing and

19        intelligent waiver of his Miranda warnings, after

20        having been advised by police personnel, and that the

21        subsequent statement was a product of his free will,

22        after waiving those rights, and is admissible in

23        court.

24               I want to commend both of the attorneys on

25        how they conducted this hearing.  They were both very

Janine M. Colasanti, RPR, OCR

284
Proceedings

1   professional, very prepared and strong advocates, and
2   very complete in all the legal and factual argument
3   and points that were made.  That constitutes the
4   ruling of the Court.
5              MR. BREWINGTON:  Thank you, Judge.  We have
6   our exception.  We note that the Court did rule
7   immediately after our argument.  And we did cite some
8   cases, but, obviously, the Court felt it wasn't
9   necessary to look at.  Thank you.
10             THE CLERK:  What are we doing with this case
11  now?
12             MR. LaROCCA:  Your Honor, if I may suggest,
13  Mr. Brewington and I are both going to be in front of
14  Judge Donnino on Wednesday on a trial matter.  It
15  might be appropriate to put this down for that day,
16  because Judge Donnino can tell us what we are doing.
17             THE COURT:  I'm directing that the attorneys
18  be in front of Judge Donnino at 9 a.m. Wednesday,
19  November 12th, on this matter, on the Galloway
20  matter.
21             MR. LaROCCA:  Thank you, your Honor.
22             MR. BREWINGTON:  Judge Donnino really
23  doesn't start until 9:30.  Is it okay that we come in
24  at 9:30?
25             THE COURT:  Yes.

                  Janine M. Colasanti, RPR, OCR

285

Proceedings

```
1              MR. BREWINGTON:  Thank you.

2              MR. LaROCCA:  Thank you.

3              THE COURT:  I would like to allow the

4      parties to come up and get whatever items are in

5      evidence.

6              Mr. Brewington, were you going to ask me to

7      allow the defendant to have a phone call?

8              MR. BREWINGTON:  Sure.

9              THE COURT:  You will advise his family.

10             MR. BREWINGTON:  Yes, I appreciate that,

11     Judge.

12

13                    *     *     *     *     *

14     CERTIFIED THAT THE FOREGOING IS A TRUE AND ACCURATE

15     TRANSCRIPT, ONLY IF AN ORIGINAL, AND ONLY IF CERTIFIED BY

16     THE COURT REPORTER.

17

18     _____

19              Janine M. Colasanti, RPR,
                Senior Court Reporter

20

21

22

23

24

25
```

Janine M. Colasanti, RPR, OCR