UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
JEFFREY BLAKE,

                Plaintiff,

- against -

MICHAEL S. RACE, et al.,

                Defendants.
------------------------------------------------------X

**ORDER**

01 CV 6954 (SJ)

On October 19, 2001, plaintiff Jeffrey Blake commenced this lawsuit against four individually named New York City police detectives, Richard Brew, David Carbone, Philip Saurman, and supervising officer, Michael Race, alleging that due to the wrongful conduct of these officers, Blake was framed for a double homicide, the Felix/Denny murders, that he did not commit. As a consequence, he served seven years in prison before the District Attorney's Office joined with Blake's counsel to successfully vacate the conviction, exonerating Blake of all charges. This lawsuit, seeking redress for the deprivation of Mr. Blake's rights, asserts that: (1) the defendants fabricated evidence; (2) defendants violated their obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963); (3) defendants lacked probable cause to arrest, imprison and prosecute Mr. Blake; and (4) defendants failed to investigate certain information that would have shown that the testimony of police informant, Dana Garner, was false.

With respect to the second basis for his claims, plaintiff alleges that the defendant officers failed to provide the Assistant District Attorney ("ADA"), who was prosecuting the case, with certain Brady material concerning the informant, Dana Garner. Specifically, plaintiff alleges that

1

on June 25, 1990, Garner told these detectives, who were working in the 75th Precinct at the time, that he had seen Mr. Blake commit a double homicide several days earlier on June 18, 1990. At the time that Garner first described this event to the detectives, Garner failed to mention that earlier on the very same day that he walked into the precinct - - June 25, 1990 - - he had allegedly witnessed the homicide of another man named Diaz. It was not until two days later, on June 27, 1990, that Garner mentioned the June 25, 1990 homicide to the defendant officers. Plaintiff asserts that Garner's failure to mention a homicide that he claimed to have seen only hours before he walked into the precinct to report a homicide that occurred several days earlier should have raised serious questions regarding Garner's credibility and constituted Brady material that should have been disclosed to the prosecutor, as well as to the defense. However, plaintiff alleges that because defendants failed to disclose this information to the ADA prior to trial, this crucial impeachment evidence was never disclosed to Blake's attorneys.

During the course of discovery, plaintiff's counsel questioned the defendant officers regarding their knowledge of Garner's revelation about the murder on June 25, 1990 and whether they disclosed the information to the ADA. According to their testimony, defendants Saurman and Carbone denied knowing about the chronology of Garner's visits to the precinct and his disclosure of the earlier homicide and therefore, they claimed they were unaware of any exculpatory information which needed to be turned over to the ADA. (Defs.' Letter, dated Oct. 15, 2004, at 2). Although it is unclear what defendant Brew actually knew about the issue, Brew testified that he did not speak to the ADA about the Blake case at all. (Id.) The only defendant who acknowledges that he was aware that Garner knew about the Diaz murder but failed to mention it during the visit when he identified Blake as a participant in the Felix/Denny murders

2

was defendant Race. Race testified that although aware of Garner's failure to mention the Diaz homicide, Race did not consider this information to constitute exculpatory information that he was required to disclose to the prosecutor. (Id. (citing Race Dep. Tr. at 184-86)).

In an effort to obtain an unequivocal statement from the ADA that he was never told about Garner's omission, plaintiff's counsel also contacted ADA Catalano, who is not a named defendant in the case. According to plaintiff's counsel, ADA Catalano indicated orally during a phone conversation with counsel that he would speak to his supervisors about signing an affidavit regarding these issues. Subsequently, counsel to the District Attorney, Dino Amaroso, contacted plaintiff's counsel and indicated that there would be no problem proceeding by affidavit and he requested that plaintiff's counsel draft one for review. After plaintiff's counsel had sent the draft affidavit and Mr. Amaroso had agreed to the contents of the proposed affidavit prepared by plaintiff's counsel, plaintiff's counsel received a letter from the Assistant Corporation Counsel assigned to represent the individual defendants in this case,[1] indicating that the Corporation Counsel would henceforth also be representing ADA Catalano and the District Attorney's Office in this matter. When plaintiff's counsel thereafter contacted Mr. Amaroso, it was confirmed that the Corporation Counsel would be representing the District Attorney's Office and that ADA Catalano had been advised not to sign the affidavit.

Plaintiff now moves to have the Corporation Counsel's Office disqualified from representing the non-party witness, ADA Catalano, based on a "clear conflict of interest." (Pl's.

---

[1] Even though the City of New York is not named as a defendant in this action, the Corporation Counsel's Office has agreed to provide a defense, and represent the individual officers named as defendants in this action pursuant to Section 50-k of the New York General Municipal Law.

3

Letter, dated Oct. 22, 2004, at 2). Plaintiff's counsel further asserts that the Assistant Corporation Counsel's actions in attempting to obstruct the securing of the affidavit "may very well constitute unprofessional and sanctionable conduct." (Id.)

Counsel for defendants respond that there is no conflict presented by their simultaneous representation of the individual officers and the District Attorney's Office. (Defs.' Letter, dated Oct. 15, 2004, at 1). Specifically, defendants contend that because "there would appear to be no conflict between the version of events given [by] the detectives and that given by ADA Catalano, . . . it is not improper for the City Law Department to represent Mr. Catalano as a non-party in this case." (Id. at 2). Indeed, during the conference with this Court held on December 20, 2004, defendants' counsel suggested that the plaintiff's counsel had committed an ethical violation by speaking directly to the ADA when plaintiff's counsel should have known that the District Attorney's Office was represented by the Corporation Counsel of the City of New York.

## DISCUSSION

### A. Standards for a Motion for Disqualification

It is well established that the Court's authority to disqualify an attorney stems from its general supervisory power over the attorneys appearing before it, see Handelman v. Weiss, 368 F. Supp. 258, 263 (S.D.N.Y. 1973); see also United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980), and the determination of disqualification is discretionary in nature. Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975); see also Laker Airways Ltd. v. Pan Am. World Airways, 103 F.R.D. 22, 27 n.4 (D. D.C. 1984). There is a longstanding rule that,

"[w]hen dealing with ethical principles, . . . we

4

> cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent."

Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 (2d Cir. 1977) (quoting United States v. Standard Oil Co., 136 F. Supp 345, 367 (S.D.N.Y. 1955)). Indeed, as the court in Fund of Funds, Ltd, noted, "in deciding questions of professional ethics, men of good will often differ in their conclusion." 567 F.2d at 227. Recognizing this, the Second Circuit has held that the district court's finding will only be overturned upon a showing of abuse of that discretion. Bobal v. Rensselaer Polytechnic Institute, 916 F. 2d 759, 764 (2d Cir. 1990) (citing Hull v. Celanese Corp., 513 F.2d at 571), cert. denied, 499 U.S. 943 (1991).

In considering a motion for disqualification, this Court is mindful of its responsibility to "preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 564-65 (2d Cir. 1973); accord General Motors Corp. v. City of N.Y., 501 F.2d 639, 648 (2d Cir. 1974); see also Fund of Funds Ltd. v. Arthur Andersen & Co., 567 F.2d at 237 (noting that "above all else, we must maintain public trust in the integrity of the Bar"). Indeed, the Second Circuit has held that "any doubt is to be resolved in favor of disqualification." Hull v. Celanese Corp., 513 F.2d at 571; see Baird v. Hilton Hotels Corp., 771 F. Supp. 24, 27 (E.D.N.Y. 1991) (holding that "if there were any doubt as to the propriety of our action, we would resolve it in favor of disqualification'") (quoting Cheng v. GAF Corp., 631 F.2d 1052, 1059 (2d Cir. 1980), judgment vacated on other

5

grounds, 450 U.S. 903 (1981)).

At the same time, however, courts have become increasingly "skeptical of motions to disqualify counsel, and they now approach them with cautious scrutiny." Laker Airways Ltd. v. Pan American World Airways Ltd., 103 F.R.D. at 28; see Board of Ed. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) (cited in Mitchell v. Metropolitan Life Ins. Co., 01 CV 2112, 2002 WL 441194, at *3 (S.D.N.Y Mar. 21, 2002)); Society for Good Will to Retarded Children, Inc. v. Carey, 466 F. Supp. 722, 724 (E.D.N.Y. 1979) (noting that "[d]isqualification has a serious and immediate adverse effect by denying the client his choice of counsel").

The Court's analysis begins with an examination of Canons 5 and 9 of the New York State Lawyer's Code of Professional Responsibility (the "Code"), see Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Local Civil Rules 1.3(a)(6); 1.5(b)(5); see also J.P. Morgan Chase Bank v. Liberty Mutual Ins. Co., 189 F. Supp. 2d 20, 22 (S.D.N.Y. 2002), both of which are implicated by counsel's dual representation in this case. The Code defines the ethical guidelines for members of the bar. See Cheng v. GAF Corp., 631 F.2d at 1054; Mitchell v. Metropolitan Life Ins. Co., 2002 WL 441194, at *3; Int'l Union, UAW v. Nat'l Caucus of Labor Comm., 466 F. Supp. 564, 566 (S.D.N.Y. 1979); cf., Handelman v. Weiss, 368 F. Supp. at 263 (noting that even though the Code of Professional Responsibility had not been formally adopted by the Southern District of New York, "courts have looked to the Code primarily as an aid in [their] determination of acceptable practices"). Canon 5 requires an attorney to exercise independent professional judgment on behalf of his client, and Ethical Consideration ("EC") 5-1 explicitly states that: "[n]either [a lawyer's] personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty

6

to his client . . . ." Code, EC 5-1. "If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment." Code, EC 5-15. All doubts should be resolved "against the propriety of the representation." Id. Disciplinary Rule ("DR") 5-105(B) of the Code expressly provides that: "A lawyer shall not continue multiple employment . . . if it would be likely to involve the lawyer in representing differing interests." Code, DR 5-105(B); 22 N.Y.C.R.R. § 1200.24 (2002).

Canon 9 requires a lawyer to "[a]void not only professional impropriety but also the appearance of impropriety." Code, EC 9-6. In applying Canon 9, the Second Circuit has held that in all but the rarest of cases, the mere appearance of impropriety is not enough to disqualify an attorney. See Board of Ed. v. Nyquist, 590 F.2d at 1246-47; see also Flaherty v. Filardi, No. 03 CV 2167, 2004 WL 1488213, at *3 (S.D.N.Y. Jul. 1, 2004). Rather, courts should look at whether the ethical violation would taint the underlying trial. See Board of Ed. v. Nyquist, 590 F.2d at 1246-47; see also Feinberg v. Katz, No. 01 CV 2739, 2003 WL 260571, at *7-*8 (S.D.N.Y. Feb. 5, 2003); Frontline Communications Int'l, Inc. v. Sprint Communications Co. L.P., 232 F. Supp. 2d 281, 288 (S.D.N.Y. 2002); J.P. Morgan Chase Bank v. Liberty Mutual Ins. Co., 189 F. Supp. 2d at 22; Brooks v. Bates, No. 89 CV 4478, 1994 WL 121851, at * 4 (S.D.N.Y. Apr. 7, 1994).

In Dunton v. City of New York, the Second Circuit addressed the potential conflict posed when attorneys for a municipality undertake to represent both the municipality and the individual defendants in a civil action. 729 F.2d 903, 907 (2d Cir. 1984). Noting that prior to 1987, the representation of a municipality would not have created any conflict because municipalities were

7

not considered "persons" under Section 1983 until the decision in Monell v. Department of Social Services, 436 U.S. 658 (1978), the court in Dunton held that "[a]fter Monell the interest of a municipality and its employees as defendants in a section 1983 action are in conflict." Dunton v. County of Suffolk, 729 F.2d at 907. The Court held that "disqualification would have been appropriate . . . even before any proceedings began." Id.; see also Kounitz v. Slaatten, 901 F. Supp. 650, 659 (S.D.N.Y. 1995). Citing its "continuing obligation to supervise the members of its Bar," as well as the "duty 'to exercise that degree of control required by the facts and circumstances of each case to assure the litigants of a fair trial,'" id. at 909 (quoting Koufakis v. Carvel, 425 F.2d 892, 900-01 (2d Cir. 1970)), the court in Dunton found that there was an obligation to inform the litigant of the potential conflict created by the dual representation of his appointed counsel. Id. at 909. The court further noted that the attorneys, as officers of the court, see Clark v. United States, 289 U.S. 1, 12 (1933), also had an independent duty to adhere to the disciplinary rules and to report such incidents, including the potential of serious conflict created by the attorney's multiple representation. See Dunton v. County of Suffolk, 729 F.2d at 909.

Following the decision in Dunton, courts confronted with the potential conflict posed by the dual representation of defendants by a municipality's counsel have "undertaken their Dunton duty to ascertain whether a litigant has been notified of and fully understands a conflict of interest situation and then held that the litigant could choose to continue to retain the municipality's attorney as his counsel." Kounitz v. Slaatten, 901 F. Supp at 659; see also Ricciuti v. N.Y. City Transit Auth., 796 F. Supp 84, 87-88 (S.D.N.Y. 1992); Manganella v. Kejes, 613 F. Supp. 795, 799 (D. Conn. 1985). It is well established that in the context of concurrent representation, the burden of avoiding disqualification shifts to counsel to "'show, at

8

the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation.'" J.P. Morgan Chase Bank v. Liberty Mutual Ins. Co., 189 F. Supp. 2d 20, 23 (S.D.N.Y. 2002) (citation omitted).

B. Application

1. Multiple Representation of the Individual Defendants

In this case, the City of New York has not been sued and is not a party to the action. Neither has the District Attorney's Office or ADA Catalano been sued in this case. The only defendants in the case are the individual police officers who have been sued in their individual and personal capacities.

Thus, technically there is no Dunton issue posed by the representation of all four defendants by the Corporation Counsel's Office. Instead, the potential conflict posed here is more fundamental - - namely, counsel is attempting to represent individuals whose interests and responsibilities for plaintiff's injuries may be vastly different. Specifically, during the course of reviewing the issues related to the plaintiff's motion to disqualify the Corporation Counsel from representing the non-party witness, the ADA, it became clear to this Court that one or more of the four named defendants may have a conflict or potential conflict of interest with the other officers. The evidence suggests that one or more officers may have more knowledge and thus more responsibility than their fellow officers for the conduct alleged to have harmed plaintiff.

The issue which prompted the Court's inquiry into the ADA's knowledge of certain potential impeachment material is a prime example. From a review of the testimony of the four officers, it appears that Sergeant Race was aware of the information but did not believe he was

9

required to relay it to the prosecutor. Two of the officers claim that they were unaware of the sequence of events. As to the last, Detective Brew, it is unclear what he knew. He denied speaking to the prosecutor at all about the case. However, it is alleged in an affidavit by the informant, Garner, that Detective Brew worked with Sergeant Race to feed Garner facts, and would thus have had knowledge of any alleged Brady material. (See Pl's. Letter, dated July 2, 2004, at 3).

The positions of these individual officers presents a clear conflict. At trial, counsel for the officers who claim to have no knowledge would be confronted with the potential trial strategy of blaming Sergeant Race, and possibly Brew, of knowing about the impeachment material and failing to disclose it, despite the fact that it was clearly material subject to disclosure. By representing all four officers, counsel is confronted with the decision whether to make this argument to shift the blame to Race, and possibly Brew, in favor of his other clients, or to take a different approach which would try to protect Race's and/or Brew's interests instead. This is a clear example of the concern expressed by the court in Board of Education v. Nyquist, "where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client." 590 F.2d at 1246 (citations omitted).

Another example of conflicting positions is created by the allegation that the officers knew or should have known that Garner's information was false. Based on Garner's statements, plaintiff alleges that Race and Brew threatened Garner and forced him to fabricate testimony against Blake. Brew, in fact, has testified that Race had a reputation for feeding facts to witnesses, thus providing corroboration for Garner's claims. These statements create a clear

10

conflict of interest between Brew and Race and between their interests and those of the other two officers. Counsel for Carbone and Saurman, if not faced with the need to also represent Race and Brew, could make a forceful argument based on this testimony that all the blame should be placed on Race and/or Brew for their conduct in dealing with the informant, Garner. Unlike the problem of joint representation posed in Flaherty v. Filardi, 2004 WL 1488213 at * 2-*3, the attorneys here are "representing parties who have differing interests" and who are "'point[ing] the finger'" at one another.

These are simply two examples of actual and potential conflicts among the interests of the individual defendants in this case. The Court is concerned that because Race was the supervisor, and because the officers had different roles in the case, and thus different levels of knowledge of and contact with the informant, there may be other examples of potential conflict between the officers' respective positions. Thus, this Court has ordered a hearing be held on January 12, 2005, to ascertain whether the officers understand the conflict and wish to seek new counsel. Indeed, given the statements made by Brew about Race, there is a serious question as to whether that conflict is even subject to waiver. See Bonner v. Guccione, 94 CV 7735, 1997 WL 91070, at * 2 (S.D.N.Y. Mar. 3, 1997) (noting that "[s]ometimes a conflict is so severe that a court will refuse to accept a waiver"). The parties will be asked to address that question at the hearing.

2. Representation of ADA Catalano

With respect to the representation of ADA Catalano, the Corporation Counsel's office first argues that there is no conflict that would require its disqualification because the District Attorney's Office ("Office") is not only "absolutely immune" from liability but also because any

11

claim against the Office or its personnel would be time-barred. (Defs.' Letter, dated Nov. 17, 2004, at 1). Counsel further argues that there is no conflict because the ADA's story is consistent with that of the individual officers. Counsel cites the decision in Coleman v. City of New York, No. 98 CV 8761, 1999 U.S. Dist. LEXIS 10405, at *5-*8 (S.D.N.Y. July 8, 1999), to support the position that the Corporation Counsel may represent both defendants and non-party witnesses in a case where the defendants and the witness are all employees of the City or of one of its agencies. In Coleman, the court found that the "Corporation Counsel's discussion with non-adverse City employees about their deposition [] in which the City (or City agency) is a defendant is protected by the City's attorney-client and/or work product privilege regardless of whether the employee also asks for representation in connection with the deposition." Id. at *5. Counsel further argues that in this case, the fact that the City itself is not a defendant does not alter the analysis since the City is responsible for providing the defense to these officers.

The problem with counsel's analysis is that it is dependent on the fact that the positions of the defendants and witness in Coleman were "non-adverse." Here, not only has counsel failed to understand the fact that the interests of the individual defendant officers are clearly adverse, making their joint representation highly problematic, see discussion supra at 9-11, but counsel further fails to understand the potential conflict posed by representing the ADA. The ADA may be subject to absolute immunity from suit, but he is not immune from disciplinary action and possible professional sanction if it were to be determined that the officers had conveyed information to him that he had failed to disclose to the defense. Indeed, the ADA has an interest in defending himself against charges of professional misconduct even if he has no potential liability in this civil litigation. Thus, he is entitled to conflict-free counsel.

12

To the extent that counsel argues that there is no conflict because the ADA's story is consistent with that of the officers and therefore disqualification is not required, the Court does not agree. First, while it is anticipated that the ADA will testify that the officers never told him about Garner's failure to mention the Diaz murder - - a version of events that is consistent with that of the officers' versions - - it is very likely that the ADA will testify that the information about Garner's failure to disclose the Diaz murder was clearly relevant and exculpatory and that the officers should have known that this impeachment information was subject to disclosure under Brady. This testimony would be directly contrary to the interests of Sergeant Race, who admitted knowledge of the information but denied any understanding of his disclosure obligations.

Moreover, while two of the officers have testified during deposition that they do not recall whether they knew about the sequence of Garner's disclosure of the earlier murder, their recollections may be refreshed by other evidence introduced at trial and they may then recall having such knowledge. Thus, there is the potential that at trial they may testify that they were in fact aware of the information and did disclose this information to the prosecutor. As counsel for plaintiff has argued, plaintiff is entitled to know what the prosecutor was told and by whom, what he knew and what he was obligated to do with the information. It may be that the prosecutor gave the officers instructions with respect to investigating the bona fides of Garner's statements, or had other conversations with the officers that would contradict their testimony.[2] Since the prosecutor has not yet been deposed and presumably counsel for defendants has not spoken with

---

[2]Specifically, to the extent that Officers Brew, Carbone and Saurman deny speaking to the prosecutor at all, the prosecutor may be questioned and have conflicting testimony.

13

ADA Catalano directly,[3] it is impossible to say with certainty that there is no conflict here between the prosecutor's testimony and that of the officers.

Finally, plaintiff raised a further concern - - namely, that the Corporation Counsel's instruction to the ADA not to sign an affidavit which the ADA had previously agreed was accurate and truthful - - creates an appearance of impropriety. Although the Corporation Counsel argues that the District Attorney's Office contacted the Corporation Counsel seeking representation, that does not alter the fact that the Corporation Counsel represents four individual police officers whose interests may be in conflict with that of the prosecutor. Certainly, it could be argued that it was in their clients' interests to try to have the prosecutor rephrase his affidavit in a way that was more favorable to the defendants, or to try to shift the blame to the prosecutor and away from their clients, particularly since the prosecutor is not named as a defendant in the case. Although this Court does not draw any conclusion that counsel acted improperly in this regard, their actions violated Canon 9 to the extent that they created this appearance of impropriety, by advising the non-party witness to withdraw his statement. Given plaintiff's position that defendants were in possession of Brady material and knowingly failed to inform the ADA of such, the ADA's testimony about whether he was informed and about whether defendants had reason to know that the information they possessed was Brady material is highly relevant. Whether the District Attorney's Office contacted counsel or not, defendants' counsel's advice could be construed as an effort to suppress the ADA's testimony and to prevent plaintiff's counsel from obtaining a clear statement that the ADA was never informed of this Brady

---

[3]This Court issued an order directing counsel for defendants to refrain from speaking to the ADA directly until this issue of conflict was resolved. (See Defs.' Letter dated Oct. 15, 2004 at 1).

14

material. Indeed, counsel's advice to the ADA to withdraw the affidavit and the ADA's subsequent decision to heed that advice may be utilized by plaintiff during the course of trial for impeachment purposes. If questioned as to why the affidavit was not signed after he agreed to it's contents, the prosecutor may invoke the advice of counsel defense. Should that be the response, the suggestion to the trier of fact would be that counsel for defendants attempted to influence, or did in fact cause, the ADA to change his testimony. While counsel may have a valid reason for explaining that advice, counsel would not be able to testify.

Indeed, it is axiomatic that an attorney cannot simultaneously represent his client as an advocate and serve as a witness at the same trial. See Int'l Elecs. Corp. v. Flanzer, 527 F.2d 1288, 1294 (2d Cir. 1975); ABA Model Code of Prof'l Responsibility, DR 5-102(A). DR 5-102 of the New York State Lawyer's Code of Professional Responsibility, 22 N.Y.C.R.R. 1200.21 (2002) ("DR 5-102"), reads in relevant part as follows: "[a] lawyer shall not act, or accept employment that contemplates the lawyer's acting, as an advocate on issues of fact before any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client." When there is a question as to whether an attorney will be called as a witness on behalf of his or her client, "any doubt is to be resolved in favor of disqualification" and in favor of the attorney's testifying. Hull v. Celanese Corp., 513 F.2d at 571; see also Papanicolaou v. Chase Manhattan Bank, N.A., 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989); 108th St. Owners Corp. v. Overseas Commodities Ltd., 238 A.D.2d 324, 326, 656 N.Y.S.2d 942, 943 (2d Dep't 1997); Benincasa v. Garrubbo, 141 A.D.2d 636, 639, 529 N.Y.S.2d 797, 800 (2d Dep't 1988); Seeley v. Seeley, 129 A.D.2d 625, 626, 514 N.Y.S.2d 110, 112 (2d Dep't 1987).

15

Case 2:19-cv-05026-AMD-JMW Document 124-17 Filed 08/07/21 Page 16 of 19 PageID #:
Case 1:01-cv-00954-JFB-CLP Document 75 Filed 01/12/05 Page 16 of 19
2107

As the court in MacArthur v. Bank of New York noted, the rule applies when a lawyer "ought to be called as a witness;" and the "test is whether the attorney's testimony could be significantly useful to his client; if so, then he ought to be called." 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981) (emphasis added). For this reason, the "stricture is mandatory: the party cannot choose between the attorney's testimony and his representation." Id. at 1209; see also Drywall Tapers & Pointers of Greater N.Y. Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n., No. 93 CV 154, 1996 WL 1088933, at *4 (E.D.N.Y. Oct. 24, 1996). As a consequence, the court, to protect the integrity of the judicial process, must raise the disqualification issue sua sponte. See Drywall Tapers & Pointers of Greater N.Y. Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n., 1996 WL 1088933 at *4; see also MacArthur v. Bank of N.Y., 524 F.Supp. at 1209-1210 (noting that "where neither party moves for disqualification, the court must intervene to ensure that the mandate of DR 5-102(A) is followed"). The rule "controls irrespective of when the need for the attorney's testimony becomes evident," MacArthur v. Bank of N.Y., 524 F. Supp. at 1210, and disqualification is required even when both the party and counsel to be disqualified oppose disqualification. See id. at 1207. Courts have even declared a mistrial where it became clear that a trial attorney should testify on behalf of his client. See, e.g., Drywall Tapers & Pointers of Greater N.Y., Local 1974 v. Local 530 of Operative Plasters & Cement Masons Int'l Ass'n., 1996 WL 1088933 at *1 (disqualifying trial counsel in the middle of a bench trial where a reliance of counsel defense was raised); see also United States v. McKeon, 738 F.2d 26, 34-35 (2d Cir. 1984) (affirming decision of district court to disqualify trial counsel where it was apparent that counsel ought to be called as a witness).

Thus, any cross-examination of the ADA, suggesting that defendants' counsel attempted to suppress or distort the ADA's testimony, would clearly taint the trial, and could possibly result in a mistrial if the court were to determine that the defendants' or the ADA's interests required an explanation of counsel's advice. See Drywall Tapers & Pointers of Greater N.Y., Local 1974 v. Local 530 of Operative Plasters & Cement Masons Int'l Ass'n., 1996 WL 1088933 at *1; see also Brooks v. Bates, 1994 WL 121851 at * 4 (quoting EC 9-1 which admonishes attorneys "to strive to avoid not only professional impropriety but also the appearance of impropriety"). Thus, under the Second Circuit's test in Board of Ed. v. Nyquist, 590 F.2d at 1246-47, the appearance of impropriety created by the defendants' counsel's action in persuading the ADA to withdraw his statement provides additional support for this Court's conclusion that disqualification of the Corporation Counsel's Office as counsel for ADA Catalano is warranted. See Blue Cross & Blue Shield v. Philip Morris, Inc., 53 F. Supp. 2d 338, 346 (E.D.N.Y. 1999) (noting that in order for the appearance of impropriety to rise to the level requiring disqualification, there must be a "violation of either the duty to preserve client confidences or the duty to exercise independent judgment on the client's behalf"); see also Feinberg v. Katz, 2003 WL 260571 at * 7. Cf. Flaherty v. Filardi, 2004 WL 1488213 at * 3 (noting that generally "mere appearance of impropriety is insufficient to constitute grounds for disqualification of counsel unless the conflict may taint the trial).

Defendants' counsel respond that the professional misconduct of plaintiff's counsel in contacting the ADA in the first instance somehow vitiates defendants' counsel's own conflict and excuses their conduct. They contend that plaintiff's counsel should have known that the Corporation Counsel represented the ADA and not spoken directly to ADA Catalano without

17

going through his attorney.[4]

However, it is clear that under New York General Municipal Law § 50-K, an individual City official's representation by the Corporation Counsel "is not automatic." Washington v. Lenihan, No. 87 CV 4770, 1996 WL 345950, at *1 n.1 (S.D.N.Y. June 21, 1996). The Corporation Counsel "generally cannot represent a City official until that official is served with a summons and complaint, the official requests representation, and the Office of the Corporation Counsel investigates and finds that the official acted within the scope of his or her employment and did not violate the rules and regulations of the agency." Id. Indeed, in other cases pending before this Court, attorneys from the Corporation Counsel's Office have relied on this section of the General Municipal Law in explaining their lack of authority to accept a subpoena served on a nonparty City official or a summons and complaint for a City official who has not been personally served and requested representation in the action.

Moreover, to the extent that a conflict of interest exists between the interests of the City and an individual City official, the Second Circuit has held that the Corporation Counsel is relieved of his duty to defend the individual as set forth in subsection 50-k(2) of the General Municipal Law. See Mercurio v. City of N.Y., 758 F.2d 862, 864 (2d Cir. 1985); see also Blood v. Board of Ed., 121 A.D.2d 128, 133, 509 N.Y.S.2d 530, 533 (1st Dep't 1986). Thus, it is clear that the Corporation Counsel is subject to the same rules that govern conflicts of interest that apply to all attorneys under Cannons 5 and 9.

---

[4]This Court also notes that there is no concern in this case that plaintiff's motion for disqualification is being exploited for tactical reasons. See Flaherty v. Filardi, 2004 WL 1488213 at *2 (citations omitted); Pfizer, Inc. v. Stryker Corp., 256 F. Supp. 2d 224, 226 (S.D.N.Y. 2003). Rather, the Court is required by Dunton to analyze the joint representation issues raised here.

18

Given plaintiff's counsel's belief that a conflict existed, and the fact that the ADA was immune from suit, it was reasonable for plaintiff's counsel to assume that the ADA would not be represented by the same Assistant Corporation Counsel who is representing the individual officers in this case, and thus not assume that it was an ethical violation for counsel to contact the ADA. Under the circumstances, this Court finds that there is no basis on which to conclude that plaintiff's counsel committed a breach of ethics or deliberately contacted a non-party witness whom he knew to be represented by counsel. At the time the initial contact was made, neither the ADA nor the District Attorney's Office had requested representation from the Corporation Counsel. It was reasonable to assume that if either was represented by counsel or believed that they had counsel, they, being lawyers themselves, would have so informed plaintiff's counsel.

In summary, the Court finds no basis on which to sanction or admonish plaintiff's counsel for his conduct in attempting to obtain an affidavit from the nonparty witness, ADA Catalano. Given the potential conflict between the ADA and the defendants, and given that any suppression or distortion of the ADA's testimony would not only appear improper but might also taint the trial, the Corporation Counsel is hereby disqualified from representing ADA Catalano.

**SO ORDERED.**

Dated: Brooklyn, New York
January 11, 2005

_/s/ Cheryl Pollak_
Cheryl L. Pollak
United States Magistrate Judge

19