**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
***Josiah Galloway v. Nassau County, et al. (Case No. 19-CV-5026)***

**Report Date: March 4, 2021**

# I. Overview and Credentials of Dr. Dysart

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification expert since 2006. In September 2019, I was contacted and ultimately retained by attorneys representing Mr. Josiah Galloway to review materials in the above referenced case and provide my opinions regarding the eyewitness identification procedures and evidence relating to the 2009 conviction of Mr. Galloway for the attempted murder of Mr. Jorge Anyosa in May 2008. I am being compensated for expert services in this case at a rate of $325/hr.

In 2018, the Nassau County District Attorney's office's Conviction Integrity Unit filed a motion for Mr. Galloway's conviction to be vacated and the charges dismissed. The motion was granted and Mr. Galloway was subsequently released in 2018. Further, in its application to vacate the conviction, the Nassau County District Attorney's office acknowledged that Mr. Galloway is innocent of the attempted murder of Mr. Anyosa on May 15, 2008.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 70 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in the Conviction Review Unit in the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as *Appendix A*.

***Curriculum Vitae:*** My complete academic curriculum vitae is attached to this report as *Appendix B*. This document includes a complete list of my publications and presentations.

   ***Publications:***    I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article,

1

and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

*Presentations:* I have given more than 165 presentations on eyewitness identification before professional psychological organizations and at conferences attended by judges, lawyers, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

## II. Materials Reviewed in this Case

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with available relevant materials related to the identification of their client, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the following materials, plus other materials cited in this report:

1. University of Michigan National Registry of Exonerations page: https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5387
2. Dismissal hearing transcript
3. Second Amended Complaint
4. ECAB # 4749/08 – Miscellaneous Report
5. Composite sketch of suspect and description (05/19/08)
6. Composite Intelligence Bulletin with sketch of suspect and description (5/20/08)
7. News Release document (updated 6/8/08)
8. News Release document (6/8/08)
9. Wilmer Hernandez statement to police, handwritten (5/15/08)
10. Wilmer Hernandez photo array (black and white copy; 6/6/08)
11. Wilmer Hernandez photo array Supplemental Deposition (6/6/08)
12. Live lineup details document with names of lineup members
13. Photographs of live lineup (viewed by Hernandez and Anyosa)
14. Wilmer Hernandez live lineup Supplemental Deposition
15. Wilmer Hernandez grand jury testimony
16. Wilmer Hernandez trial testimony
17. Wilmer Hernandez deposition testimony (12/8/20)
18. Jorge Anyosa statement to police, handwritten (6/6/08)
19. Jorge Anyosa photo array (black and white copy; 6/6/08)
20. Jorge Anyosa photo array Supplemental Deposition (6/6/08)
21. Jorge Anyosa live lineup Supplemental Deposition (8/14/08)
22. Jorge Anyosa grand jury testimony
23. Jorge Anyosa trial testimony
24. Jorge Anyosa deposition testimony (9/24/20)
25. Galloway police booking photos – redacted
26. Galloway mugshot photographs (9/19/07; 6/5/08)
27. Galloway photograph depicting afro hair style (8/5/08)
28. Galloway photographs (3) depicting cornrow hair style (P. 9864)
29. Galloway trial testimony
30. Dr. Sherman trial testimony
31. Sheryl Anania deposition transcript and Exhibits 1-3 (9/11/20)
32. Det. Bischoff deposition transcript and Exhibits (10/1/20)
33. Det. Lipson grand jury testimony
34. Det. Lipson hearing testimony

35. Det. Lipson trial testimony
36. Det. Lipson deposition testimony and Exhibits (11/11/20)
37. PO Horowitz grand jury testimony
38. PO Horowitz trial testimony
39. PO Horowitz deposition testimony and Exhibits (10/5/20)
40. Det. Ross hearing testimony
41. Det. Ross trial testimony
42. Det. Ross deposition testimony and Exhibits (11/16/20)
43. Det. Strange deposition testimony and Exhibits (10/6/20)
44. Mr. Larocca deposition testimony and Exhibits (10/27/20)
45. Det. Decaro deposition testimony and Exhibits (10/9/20)
46. Det. D'Luginski trial testimony
47. Det. D'Luginski deposition testimony and Exhibits (10/14/20; 11/23/20)

In addition to the above listed materials, I have specifically requested a copy of the Nassau County eyewitness identification policies and procedures that were in place in May 2008 and any current policies and procedures. As of the date of submission of this report, I have not received these documents and understand that they are not yet in the possession of Mr. Galloway's counsel. When I receive these documents, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

## III. Brief Summary of the Case

In the early morning hours of May 15, 2008, Mr. Jorge Anyosa and Mr. Wilmer Hernandez, both drivers for Taxi Latino, were waiting for fares outside the Hempstead train station. Mr. Hernandez was double-parked and speaking with Mr. Anyosa when an unknown male honked his horn for Mr. Hernandez to move his vehicle. Mr. Hernandez complied but an argument ensued and the male exited his vehicle and came face-to-face with both Mr. Hernandez and Mr. Anyosa. After a short interaction, approximately 2 minutes, the male got back in his vehicle and left the area. Mr. Hernandez and Mr. Anyosa both received dispatches to pick up fares and left the train station. Mr. Anyosa returned approximately 20 minutes later and, as he was parked with his vehicle turned off, the male returned. He spoke to Mr. Anyosa through a rolled down window and then shot Mr. Anyosa in the face before fleeing in his vehicle. Mr. Anyosa believed that this was the same male with whom he and Mr. Hernandez had previously argued with. Other witnesses were at the scene and called police. Mr. Hernandez returned to the train station before Mr. Anyosa was transported to the hospital but Mr. Hernandez did not witness the shooting.

Mr. Hernandez and Mr. Anyosa both were interviewed about their observations. The male was described as a light-medium skinned black male, 25-30 years of age, 5'10-5'11" tall – approximately the same height as the two drivers – with short hair, cut close to the head. He was also described as having an accent but the origin of the accent was not known. His vehicle was described as being a 2001-2002 dark gray Toyota Corolla with dark tinted windows.

On May 19, 2008, Det. Bischoff was asked by Det. D'Luginski, the carrying detective on the case, to go to the hospital to work with Mr. Anyosa to create a composite sketch of the perpetrator. During this process, Mr. Anyosa was unable to speak due to his facial injuries and instead communicated with Det. Bischoff using hand movements and writing. The resultant composite sketch was distributed to the Nassau County Police Department and Hempstead Police Department. The Composite Intelligence Bulletin included a description of the perpetrator's physical characteristics, the vehicle, and a brief description of the crime.

No suspects were developed in the case between May 15, 2008 and June 5, 2008. In the late evening hours of June 5, 2008, Mr. Josiah Galloway and Mr. Robert Ogletree were arrested together by Hempstead Police Department officers on an unrelated case.

It is unclear from this point precisely how Mr. Galloway became a suspect in the Anyosa shooting. For example, one account of the events suggests that Robert Ogletree – through the course of an interrogation for an unrelated robbery investigation – told police that Galloway had told him that he had shot a cab driver that he had an argument with. In a different timeline of the events. Det. Decaro testified that after he obtained pedigree information from Mr. Galloway in the early morning hours of June 6, 2008 and before he started interviewing him, Mr. Galloway reminded him of the composite sketch (created by Mr. Anyosa) and that he then instructed Det. Lipson to create a photo array with Mr. Galloway to show to Hernandez and Anyosa. Regardless of the timing of the information alleged to have been given by Mr. Ogletree, it appears that Det. Decaro instructed Det. Lipson to create the arrays with Galloway as the suspect due to a resemblance to the composite sketch even though it was not Decaro's case and he did not have any conversation with Det. D'Luginski about the arrays. Det. Decaro testified that he did not consider the full perpetrator description – written at the bottom of the Composite document – when he instructed Det. Lipson to create and administer the photo arrays but testified at his deposition that he could have done this.

Det. Lipson testified that he was familiar with the composite sketch that Det. Decaro testified looked similar to Mr. Galloway. The composite depicted a black male with short hair and including a detailed description of the perpetrator on the bottom of the Composite including information that the hair was cut close to the head. Despite this, Det. Lipson testified at the Suppression Hearing that he did not have the witnesses' descriptions at the point when he created the arrays, just the name Josiah Galloway. (P. 2021; 2025). When Det. Lipson created the photo array, he used a photograph of Mr. Galloway that was approximately 1 year old where his hair was cut short. This photograph Det. Lipson used did not accurately depict Mr. Galloway's appearance on June 6, 2008 when the photo array was conducted and Mr. Galloway had long hair in cornrow braids. Det. Lipson did not show anyone the array he created before it was administered. (P. 2035)

On June 6, 2008 at 3:45am, Mr. Hernandez was shown the Galloway photo array by Det. Lipson at the Hempstead Armory police station and he allegedly quickly selected Mr. Galloway as the person who shot his friend.[1] On June 6, 2008 at approximately 6:00am, Mr. Anyosa was shown the Galloway photo array at his home and selected Mr. Galloway as the person who shot him. After their selections of Mr. Galloway, both witnesses were informed that they had selected a person named Josiah Galloway.[2]

On August 5, 2008, Nassau County police attempted to conduct a court ordered lineup with Mr. Galloway. When Mr. Galloway appeared with a long afro hair style that was different from 1) what the witnesses observed on the perpetrator, and 2) his hairstyle on the date of his arrest on June 6, 2008, the lineup was cancelled.[3]

On August 14, 2008, Mr. Galloway appeared in a live lineup at the Third Precinct of the Nassau County Police Department. Det. Ross took responsibility for conducting the live lineup because, according to his testimony, he had the most experience running lineups. Det. Ross testified in his deposition that he was trained that Nassau County lineups are always conducted in a seated position and that sheets are placed in

---

[1] Note, Mr. Hernandez did not witness the shooting and thus it is unclear why this statement was allegedly made and written by Det. Lipson on the Supplemental Deposition form.
[2] This is significant because the top of the Supplemental Deposition form had Josiah Galloway listed as the defendant in the case. Det. Lipson testified in 2020 that it was possible that the defendant information was filled out prior to the form being signed by each witness. (P. 152, 187)
[3] Mr. Galloway alleges that detectives threatened to shave his hair using clippers on this date. Det. Ross denies that this took place.

front of the lineup members so that the clothing cannot be seen by the witness. In addition, he testified that he was trained to put hats on all the lineup members so that everyone in the lineup would look the same. The lineup fillers for the August 14 lineup were police officers who matched the general description of black male with short hair. On August 14, it is my understanding that Mr. Galloway's hair was again in cornrows, as it had been on June 6, 2008. During the lineup, Mr. Galloway and all of the lineup fillers were wearing white hats and Mr. Galloway was sitting on 2 phone books so that, according to Det. Ross, all of the lineup members would look the same height. Sheets were then placed over all of the lineup members up to their necks. Mr. Anyosa and Mr. Hernandez again selected Mr. Galloway.

Mr. Galloway was tried in 2009 and convicted of the attempted murder of Mr. Anyosa. He was sentenced to 25 years in prison.

## IV. Brief Summary of Opinions

The Nassau County Conviction Integrity Unit of the Nassau County DA's office agrees that Mr. Galloway is innocent of the crimes against Mr. Anyosa for which he was convicted in 2009 and that another individual, K.S., is likely responsible.[4] However, because the statute of limitations has passed, K.S. cannot be charged in the attempted murder of Mr. Anyosa. The primary evidence against Mr. Galloway in the criminal trial was the testimony Mr. Anyosa and Mr. Hernandez.

Based on my review of the materials, it is my opinion that the identification procedures employed by the Nassau County police department significantly contributed to the misidentification of Mr. Galloway by Mr. Anyosa and Mr. Hernandez. Critical steps in the investigation appear to have been designed to make Mr. Galloway appear more similar to the witnesses' descriptions of the perpetrator than he actually appeared around May 15 – June 6, 2008, thus making it more likely that Mr. Galloway would be selected by the witnesses. For example, although the witnesses described a perpetrator that was their height, where they were "face-to-face", "eye-to-eye" with the perpetrator, Mr. Galloway is nearly 6 inches shorter than this description. In what appears to have been an attempt to make Mr. Galloway more closely resemble the taller description, Defendants Ross and D'Luginski placed all of the lineup members in a seated position and had Mr. Galloway sit on top of two phone books, making him appear taller than he actually is.[5] In addition, sheets were placed across the lineup members from the neck down so as to conceal the phone book manipulation and thus the true height of Mr. Galloway.[6]

I can think of no circumstance where it is appropriate to alter or conceal a suspect's features in order to make that suspect's appearance more consistent with a witness' description of a perpetrator. The

---

[4] When Sheryl Anania showed Mr. Anyosa a photograph of K.S. and asked him who that person is, he indicated that it was the person who had shot him. (P. 57) When she told him that is not who shot him, Mr. Anyosa appeared to her to be surprised. (P. 57)

[5] The lineup form (DA1891) has two options for Detectives to select at the top: seated or standing. Thus, it appears that a standing lineup was an option for Detectives, despite the testimony of Det. Ross who testified that "we can, but we don't" conduct standing lineups. (P. 2227). In fact, Det. Ross testified at the trial that in the 14 years he had been on the job, he had done a hundred lineups "the exact same way". (P. 602). Further, the court order for the lineup indicated that Mr. Galloway was to "stand in a lineup" (rather than simply appear in a lineup).

[6] Det. Ross testified at his deposition that sheets were used so that witnesses could not see clothing. However, I am unclear why covering the clothing was considered an important step in the identification process. The recommendation for conducting photo arrays and lineups is that none of the lineup members should be wearing clothing similar to that described by the witness. There was no indication in the materials I received that Mr. Galloway or any other lineup member was wearing gray jeans and black t-shirt at the lineup. Det. Lipson testified at his 2020 deposition that he has never participated in a lineup where the lineup members did not have a sheet across them. (P. 214-5).

Defendants' actions regarding the identification procedures utilized in this case were repeatedly characterized through their testimony as an attempt to make the identification procedure "more fair" for all involved, including Mr. Galloway. I submit that the Defendant's actions had the opposite effect.

Let me provide an example to support my opinion. Imagine a scenario where a witness to a crime described an unknown perpetrator as missing his right eye. Through the course of their investigation, law enforcement develop a suspect who, in fact, is missing his right eye. While trying to create a photo array, it would be ideal for law enforcement to find 5 fillers who also are missing their right eye and also match the description on other features described by the witness (e.g., gender, race, age, weight, hair color/style, etc.). In this scenario, it likely would be difficult to find 5 such fillers. Thus, in that circumstance, it would be perfectly acceptable for law enforcement to select fillers that match the witness' description on all the features described by the witness except for the missing eye and then show the witness a photo array or lineup where the right eye of all the lineup members is covered (by a patch, for example). This procedure does not alter the suspect's appearance to better match the witness' description – it renders the lineup more fair by removing from consideration a feature that the suspect has that is *consistent with the witness' description*. In this case, the opposite scenario existed. Mr. Galloway did not match Mr. Anyosa and Mr. Hernandez's descriptions of the perpetrator on significant features: height, hair style, skin tone, age, accent, and dental condition. Rather than conclude that, due to all these differences, it is unlikely Mr. Galloway could be the perpetrator, Defendants created identification procedures that made Mr. Galloway's appearance be more consistent with the witnesses' descriptions. With respect to my example of the missing right eye, the Defendant's actions were similar to that of finding a suspect with 2 eyes and then concealing the suspect's right eye for an identification procedure. By removing features that likely otherwise would have eliminated him from consideration by Mr. Anyosa and Mr. Hernandez, their actions increased the likelihood that Mr. Galloway would be selected. Further, one does not have to take my word for it. In 2018, Mr. Anyosa told Sheryl Anania that if he had known Mr. Galloway was 5'6" tall, he would have told police that Mr. Galloway was not the perpetrator.

## V. Basis for Opinions in This Case

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications.[7] As this research relates to the selection of Mr. Galloway as the shooter, I will first discuss the factors known to affect eyewitness identification outcomes that *are* under the control of law enforcement. These factors are known as "system variables" and, in effect, they are the choices made by law enforcement and investigators during the course of evidence collection with eyewitnesses. For example, the use of suggestive or biased procedures have been shown to influence the selection of a suspect by an eyewitness even when that suspect is innocent.

My report will also include a discussion of the factors that are not under the control of law enforcement during their investigation but also have been shown to affect eyewitness reliability. These factors are known as "estimator variables" and examples include a limited opportunity to see a perpetrator and weapon focus effect. In this case, the presence of several estimator variables likely contributed to the witnesses' susceptibility to make an identification error. However, estimator variables are used to explain why a witness might have a weak or limited memory for a person and do not explain why a witness would make a selection of a particular person from a photo array or lineup. That explanation is derived from the procedures themselves. For example, if a witness only saw a perpetrator for 1 second it likely would result in a weak memory for the person but it would not, by itself, explain why the witness selected the suspect from an identification procedure.

---

[7] See Appendix C for a "Brief Background of Eyewitness Research" and a summary of "Eyewitness Error Rates in Actual Cases".

Based on my review of the above materials, the system variables relevant to the selections of Mr. Galloway include:

1) Perpetrator Description Did Not Match Mr. Galloway
2) Composite sketch
3) Photo array Filler Bias
4) Lineup Filler Bias
5) Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator
6) Lack of Pre-identification Warnings/Instructions
7) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
8) Witness Confidence and Post-identification Feedback
9) Post-event Contamination

## VI. Proposed Testimony

Below, I use examples from the scientific literature as well as other sources to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below nor is it meant to represent all of the sources I have reviewed over the last 20+ years that I have been conducting research on the topic of eyewitness identification. Rather the cited sources are meant as a representative sample of the scientific literature on each topic.

In addition to the scientific literature on eyewitness identification, I have also considered relevant documents and materials published by those who are not eyewitness researchers. For example, starting in 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006.[8] Their website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[9]

## 1. Perpetrator Descriptions Did Not Match Mr. Galloway

Mr. Galloway was significantly different than the descriptions of the perpetrator provided by Mr. Anyosa and Mr. Hernandez on several important features.

**Height:** In his trial testimony, Mr. Anyosa testified that the person he argued with was eye-to-eye, face-to-face with him (P. 2419) and that Mr. Anyosa is 5'9"-5'10" tall. (P. 2421). He then testified that the person was between 5'9" and 5'11" (P. 2421, 2462). Mr. Hernandez testified that the person who exited the car was the same height as him and he is 5'9-5'10". Mr. Galloway is between 5'5"-5'6" tall.[10] This is a significant difference that, if it had been made known to Mr. Anyosa in 2008, would have altered the course of this case because in his 8/8/18 interview with Sheryl Anania, Mr. Anyosa indicated that he wished police had told him that Mr. Galloway was 5'6" tall because he would have told them that Mr. Galloway was not

---

[8] Based on the identification forms that were provided to me in this case, it appears that the forms used in 2008 had not been updated since at least 1999. Therefore, any recommendations from the IACP in 2006 would not have been incorporated into the supplemental deposition form used in this case.

[9] Visit: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification

[10] For an unknown reason, PO Horowitz testified at the trial that he observed Galloway to be 5'8"-5'10", (P. 340) suggesting to the jury that Galloway was taller than he actually was. This error is consistent with Mr. Galloway's mugshot (arrest) form on June 6, 2008, where his height is shown as 5'08". Horowitz testified that this pedigree information is not provided by suspects but rather provided by the officer entering the information. (P. 67)

the perpetrator. In his 2020 deposition, Det. D'Luginski testified that he became aware that Mr. Galloway was not 5'11" tall yet did not tell Mr. Anyosa or Mr. Hernandez because he "didn't think it was pertinent to the case at that time". (P. 266). During the live lineup, Mr. Galloway's true height also was concealed from the witnesses.

**Hair:** Mr. Anyosa recalled that the perpetrator has short hair "cut close to the head" maybe an inch in length (P. 2486) and it was *not* cornrows or braids. (P. 2463). He also testified that the photo of Mr. Galloway with braids shown by defense attorney at trial was completely different than the hair of the shooter. (P. 2490). Mr. Hernandez testified that the perpetrator had short black hair about a half inch in length. Mr. Hernandez also testified that he knows the difference between short hair, afros, braids, and corn rows (P. 2510, 2521-24). At the trial, PO Horowitz testified that Mr. Galloway had messy cornrows when he was arrested on June 5, 2008 (P. 340), suggesting that the cornrows had been in for some time.

**Age:** At trial, Mr. Hernandez testified consistently with his initial description of the perpetrator's age, which he observed to be 26-30 years. Mr. Anyosa described the perpetrator as being between 25 and 30 years of age. At the time of his arrest, Mr. Galloway was 21 years old.

**Accent:** Both witnesses described the perpetrator as having an accent of an unknown origin. Mr. Galloway does not have an accent.[11]

**Skin tone**: In his trial testimony, Mr. Anyosa indicated that the perpetrator was a light skinned black male. (P. 2421). In his interview with police on May 15, 2008, Mr. Hernandez indicated that the person he argued with had a light complexion. Various arrest documents for Mr. Galloway indicate that he is a dark skinned black male.[12]

**Teeth:** In his trial testimony, Mr. Hernandez said that he didn't notice anything unusual about the person's face or teeth when he was talking with him (P. 2524) from a distance of about 3 feet. (P. 2527). In the composite description, Mr. Anyosa provided information to Det. Bischoff that included "no oddities noticed" and in his trial testimony he indicated that he didn't notice anything about the perpetrator's teeth. (P. 2465). On May 15, 2008, Mr. Galloway was missing his top front (left) tooth. When he smiled or showed his teeth, the missing tooth was noticeable. (Dr. Sherman trial testimony P. 723-7)

**Vehicle:** Mr. Anyosa and Mr. Hernandez told police on the day of the shooting that the person was driving a 4-door Toyota. Mr. Hernandez testified that he knows cars well and knows the difference between a Toyota and a Honda and a Mazda. (P. 2520-21). On June 6, 2008, Mr. Hernandez and Mr. Anyosa went back to the Hempstead Armory police station (after selecting Mr. Galloway from a photo array earlier that day) to view vehicles. Separately, they were shown two cars, a Mazda and a Honda. Mr. Hernandez testified at trial that the Mazda was more like the car the person was driving and he did not recognize the Honda. (P. 2515). Neither the Mazda nor the Honda were positively identified by either witness.[13]

With respect to research on witness description accuracy, in Professor Garrett's (2011)[14] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description

---

[11] Although it is the case that, technically, everyone has an accent of some type, in the context of witness descriptions, people tend to mention an accent when it is not usual/common or is different from their own.

[12] For some unknown reason, the Composite Intelligence Bulletin describes the perpetrator as a medium skinned black male – a description inconsistent with that provided by Mr. Anyosa at trial.

[13] Although Mr. Anyosa and Mr. Hernandez initially told police that it was a Toyota they saw, by trial in 2009, neither recalled the make/model of the car. (Anyosa P. 2419; Hernandez P. 2509).

[14] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[15]

What is notable about this case is that both witnesses described a perpetrator that was significantly taller than Mr. Galloway, had different hair, was older, had an accent (that Mr. Galloway does not have), and did not mention anything usual about the perpetrator's mouth (where Mr. Galloway was missing a tooth). Therefore, it was not just a single inconsistent factor, but a series of inconsistencies that should have been a concern to law enforcement prior to placing Mr. Galloway in any identification procedure, regardless of any similarity between Mr. Galloway and the composite. That Mr. Galloway was placed into an initial photo array identification procedure despite the inconsistencies between his appearance and the detailed descriptions provided by the witnesses, is a contradiction with a best practice recommendation that there should be an *evidence-based* reason to put a suspect into an identification procedure. According to the American Psychology-Law Society 2020 White Paper on eyewitness identification[16]:

> Conducting lineups in the absence of evidence-based reasons for suspicion is a risk factor for mistaken identification. In the parlance of eyewitness science, making an individual the focus of a lineup in the absence of evidence that the individual is likely to be the culprit (e.g., having only a hunch) contributes to a low base rate for culprit-present lineups (i.e., a high base rate for culprit-absent lineups). (P. 11) By evidence-based suspicion, we mean that there is articulable evidence that leads to a reasonable inference that a particular person, to the exclusion of most other people, likely committed the crime in question.

As described in more detail in Appendix C of this report, eyewitnesses in actual cases often make identification errors and select innocent lineup members as the perpetrator.[17] Thus, it is critical that law enforcement make a concerted effort to ensure that innocent suspects are not placed in jeopardy of being selected by eyewitnesses by cautiously using identification procedures in their investigation.

## 2. Composite Sketch

On May 19, 2008, four days after being shot and while still in the hospital, Mr. Anyosa was asked to construct a composite sketch of the person who shot him. Det. Bischoff, who had been trained to construct composites at the FBI (Depo. P. 19), was assigned to work with Mr. Anyosa on this task. From his description of this process during his deposition, it appears that Det. Bischoff used a technique where witnesses view photographs of various features of the human face and select from those features those that are similar to the person they are attempting to create a composite sketch of. These features are then drawn by Det. Bischoff to create the sketch. Additional information was also obtained from Mr. Anyosa during this process that was unrelated to the facial composite (e.g., accent, make and model of vehicle) but included in the Composite Intelligence Bulletin.

Not only has research on this topic shown that the mere creation of a sketch can harm a witness' ability to

---

[15] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

[16] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[17] It is notable that despite the fact that a majority of witnesses in actual cases do not select anyone from a photo array, in his 2020 deposition Det. Lipson did not recall if a witness had ever rejected a photo array that he has conducted. However, he has been to arrays where that did happen. (P. 92)

later correctly identify the actual perpetrator (Wells, Charman, & Olson, 2005), and that composites are notoriously of poor quality[18], an examination of the DNA exoneration cases to date show that approximately 27% of the eyewitness misidentification cases included a composite or sketch of the perpetrator. Given that it is relatively rare for law enforcement to use composite sketches in an investigation (Police Executive Research Forum Report to National Institute of Justice, March 2013), the rate of composite sketches in DNA exoneration cases is extremely telling and powerful evidence that sketches can be problematic in the identification of innocent suspects.

**3. Photo array Filler Bias**

The composite drawing created by Det. Bischoff with Mr. Anyosa on June 19, 2008 provides specific details about the perpetrator's physical appearance and characteristics: black male, 25-30 years of age, 5'10"-5'11" tall, thin, 150-160 lbs, hair cut tight to the head, dark eyes, and no oddities noticed. The composite sketch and these additional details *together* represent the full description that Mr. Anyosa provided to law enforcement about the appearance of the person who shot him. Given that Det. Decaro has testified that the basis for putting Mr. Galloway into a photo array procedure was his strong resemblance to the sketch, the sketch, which represents the witness' full description, should have been used as a basis to select fillers for the photo array, after it was decided that an array was going to be conducted.[19]

With respect to the selection of lineup members, a properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers who are known to law enforcement to be innocent of the crime under investigation. When it comes to filler selection, there are many choices law enforcement need to make when deciding which fillers to put in a lineup, including how similar should they be to the suspect and/or the description the witness provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, especially the suspect.[20]

When it comes to how similar the fillers should be to the suspect, researchers have a preference to use a process where all of the features included in the witness' description of the perpetrator should be matched[21] (e.g., gender, age, height, weight, etc.) and all fillers should be plausible alternatives for the suspect based on how the suspect looks – but fillers should not be clones of the suspect.[22] When some of the lineup

---

[18] Research on composites often has individuals create composites of famous individuals or an individual who are known to research participants. A second group of individuals is then asked to indicate whom the composites are meant to represent, similar to how composites are used in actual investigations. The results from these studies typically show very poor recognition performance. See Zahradnikova, B., Duchovicova, S., & Schreiber, P. (2018). Facial composite systems: Review. *Artificial Intelligence Review, 49,* 131-152.

[19] As stated earlier, this description as well as other details (e.g., accent) should have been used first by Det. Decaro to evaluate the match between Mr. Galloway and the perpetrator before any identification procedure was created and conducted.

[20] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement.* United States Department of Justice, Office of Justice Programs.

[21] For example, see Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[22] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen. Consistent with these procedures, in his 2020 deposition testimony, Det. Lipson indicated that you should use the description of the subject that they had interest in when selecting fillers. (P. 51).[23] Other factors to consider in creating fair lineups is the clothing worn by the suspect – and in particular whether it matches the clothing described by the witness – and whether the backgrounds and images in photographs are of similar size and quality.[24]

If a lineup is supposed to have 6 members, all 6 members should be plausible. These, of course, are subjective decisions and thus law enforcement training on how to fairly select fillers for photos and live lineups is highly recommended. In fact, "Train All Law Enforcement Officers in Eyewitness Identification" is the first of 11 recommendations in the National Research Council Report on eyewitness identification.[25]

In this case, on June 6, 2008 Det. Lipson received a call from Det. Decaro who asked him to put together photo arrays containing Mr. Galloway (as the suspect) based on Mr. Galloway's resemblance to the composite sketch created by Mr. Anyosa and Det. Bischoff. (P. 2003). At this time, however, Mr. Galloway was in custody and thus available for a live lineup.[26] Specifically, Det. Decaro told Det. Lipson that he wanted him to put the arrays together because he was interviewing someone who looked like a sketch he had by his desk. (P. 2004). Det. Lipson viewed the composite before creating the photo array but it is unclear how much attention he paid to it at that time. (P. 2040). Det. Lipson testified at his 2020 deposition that he didn't incorporate the sketch at all or look at it when he was creating the photo array. (P. 129). Similarly, PO Horowitz testified at the trial that he had seen the composite sketch and discussed it with Det. Lipson. (P. 357). Horowitz testified at trial that he didn't read the information on the bottom of the sketch and so he too did not consider that Mr. Galloway did not match the height description given by the witnesses when he suspected Galloway of being the shooter. (P. 387-9).

To create the photo array, Det. Lipson testified at the suppression hearing that he put Mr. Galloway's name in the computer system and other individuals with the same characteristics - gender, race, color, hair, mustache[27] – (P. 2005) came up. He then went through the photos and selected photos that looked similar to Mr. Galloway's 2007 arrest photograph (P. 2005) and perhaps used the medium-short hair option in the computer system. (P. 2048-9). It should be noted here that Mr. Galloway was in police custody at the time that the array was being created and thus a very recent – contemporaneous – photograph of him could have been used in this procedure. Det. Lipson testified in his deposition that he did not contemplate using a photograph of Galloway that showed his hair as it was at the Armory (cornrows rather than short hair) and he did not discuss this discrepancy with Det. Decaro or other officers who were present. (P. 179).

After Det. Lipson, along with PO Horowitz, showed the array to Mr. Hernandez and before he showed the array to Mr. Anyosa, Det. Lipson knew that Mr. Galloway did not have hair that was cut short to the head

---

[23] Det. Lipson also testified at the deposition that police can use a photograph of a suspect that does not accurately depict what the suspect looks like (P. 75) although the basis of this opinion is unclear.

[24] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications (2019). Temple Law Review, 92 (1). Available for download at:
https://www.templelawreview.org/lawreview/assets/uploads/2020/01/Third-Circuit-Task-Force_92-Temp.-L.-Rev.-1.pdf

[25] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[26] The IACP, in their 1992 training key on eyewitness identification, recommends that if a suspect is in custody that a live lineup is preferred over the use of a photo array.

[27] Neither of the witnesses described facial hair so it is unclear why this feature was used.

because he had seen him in person at the precinct (P. 2036) and he did nothing to alter or change the array before showing it to Mr. Anyosa. (P. 2037).

It is my opinion that the photo array viewed by Mr. Anyosa and Mr. Hernandez was biased against Mr. Galloway because Mr. Galloway's photograph most closely resembled the sketch. In order to arrive at this conclusion, I conducted a mock witness task that is commonly used in eyewitness identification research. The mock witness task involved showing individuals who have no prior familiarity with the police suspect (Mr. Galloway), the sketch or the photo array and asking them to choose which lineup member looks most like the sketch. In this mock witness task, I posted an image of the photo array viewed by Mr. Anyosa alongside the composite sketch he helped create to a Blackboard link in an undergraduate Psychology and Law class I was teaching in Fall 2020. The class had approximately 230 students registered at the time when the mock witness task was made available.[28] Students were not provided with any context of the task with the exception that their responses may be used in a legal proceeding. Students received no compensation or course credit for their participation. Screen shots of the information posted and the mock witness task itself are included as Appendix D.

In total, 98 students completed the mock witness task. Their responses are presented in the table below.

|  | Position 1 | Position 2 | Position 3 | Position 4* | Position 5 | Position 6 |
|---|---|---|---|---|---|---|
| # selected | 6 | 4 | 5 | 65 | 3 | 15 |
| % selected | 6.1% | 4.1% | 5.1% | 66.3% | 3.1% | 15.3% |

*Mr. Galloway was in position 4 in this array.[29]

As can been seen from the above data, Mr. Galloway's photograph was chosen as the closest match to the composite sketch by a factor of more than 4 times any other photograph. If the photo array had truly been a fair array where all of the members matched the composite (thus the description) provided by Mr. Anyosa, then you would expect to see each lineup member receive 16.7% of the selections. Clearly, Mr. Galloway's selection rate of 66.3% was a significant deviation from this number and demonstrates a clear bias towards him in this procedure.

An additional concern with respect to the photo array conducted with Mr. Anyosa at approximately 5:00-6:00am on June 6, 2008 is that it is unusual, in my experience, that an (injured) crime victim would be woken up in the early morning hours and be asked to participate in a photo array *when the suspect is already in custody*. This is especially troublesome given that another witness – Mr. Hernandez – had already "positively identified" the suspect from the same photo array only hours earlier. I did not see evidence of an exigent circumstance that would have required waking Mr. Anyosa to conduct this procedure. Further, after Mr. Hernandez had "positively identified" Mr. Galloway from the photo array, Mr. Anyosa should have been spared the task of viewing a photo array and, instead, only been shown the live lineup as soon as it could have been arranged.

### 4. Live Lineup Bias – August 14, 2008

---

[28] A precise count (of the denominator) is not possible because some students dropped the course and the date which they dropped is not available to me.

[29] According to Det. Lipson's 2020 deposition testimony, the Rogue's gallery system for creating arrays allows him to select the position where he wants the suspect to be placed: position 1, 2, or 6. (P. 122) Therefore, it is not clear how Mr. Galloway's photograph appeared in position 4 for Mr. Anyosa's array.

It should be noted here that repeated identification procedures with the same suspect are not a recommended practice (see # 7 below for a detailed explanation). In addition, I have concerns relating to the specific live lineup that was conducted with Mr. Galloway as the suspect on August 14, 2008.

According to the hearing testimony of Det. Ross, he was responsible for conducting and running the identification procedure (P. 2209) although he testified in 2020 that Det. D'Luginksi was tasked with obtaining the fillers (P. 50) and that Ross only ran the procedure. (P. 2209). Det. D'Luginksi testified in 2020 that he contacted other precincts to ask if they have African-American male officers that were available to stand in a lineup. No other characteristics (e.g., age, hair style) were requested and no fillers were rejected (P. 323). In his suppression hearing testimony, Det. Ross indicated that the description he received was "male black, short hair" (P. 2228). Later in his testimony he added that he was also looking for medium skin tone for the filler selection (P. 2241) yet not all of the fillers had a medium skin tone.[30] It appears that all of the lineup fillers in this case were police officers (P. 2229) who responded to a request for fillers and the only criteria that was used in their selection was black male with short hair. The lineup was conducted with all 5 fillers who showed up, (P. 2443) meaning that none were rejected.

As it pertains to Mr. Galloway, he did not match the description of the perpetrator provided by the witnesses. This fact would have been more obvious to the witnesses if the lineup had been conducted with the lineup members in a standing position. As stated above, Mr. Anyosa indicated in 2018 that he would not have chosen Mr. Galloway if he had known his true height. The key opportunity for Mr. Anyosa to see the true height of Mr. Galloway was during the in-person lineup. However, Mr. Galloway's true height was concealed by 1) having him sit on 2 phone books, and 2) placing a sheet over the bodies of the lineup members so that this manipulation could not be seen. Det. Ross testified at trial that he had Galloway sit on 2 phone books during lineup because it was the "policy of the police department". (P. 588) and that if height was an issue in this case (which it was) that taking away Mr. Galloway's height information was not unfair. (P. 595).

Mr. Anyosa testified at trial that one of the detectives at the live lineup on 8/14/08 told him only to look at the faces of the individuals, not the hair. (P. 2494-5). However, it would have been difficult for the witnesses to see the hair because of the lineup members were directed to wear a hat. Det. Ross testified in 2020 that they put white hats on everyone to make the lineup fair so that everyone would look the same. (P. 33-34). But the actual effect of putting hats on all of the lineup members is that they concealed the features of the suspect that did not match the witnesses' observations, as Det. Ross acknowledged in his suppression hearing testimony that Mr. Galloway did not have short hair on August 14, 2008 and instead that it was "high up" in an afro style. (P. 2228).

Det. Ross testified at the suppression hearing that he told Mr. Anyosa that no one in the lineup would speak to him (P. 2212) and witnesses were not explicitly told that they could request for lineup members to speak. (Depo P. 130). The reason this is significant in this case is that both witnesses described a perpetrator who spoke with an accent and Mr. Galloway does not have an accent. If they had been able to hear his voice, it is possible that this would have been a disqualifying feature, like his height, that would have resulted in a lineup rejection.

More detailed opinions regarding the live lineup can only be verified if additional information regarding the pedigree information – age, height, weight/build – of the officer fillers is provided. If this information is made available to me, I reserve the right to edit this and any other relevant sections of my report. Regardless of the lack of availability of the information at this time, Det. Ross gave opinions at various

---

[30] A review of a photograph of the live lineup shows that at least two of the lineup members had very dark complexions (#1 and #6). In fact, the features of filler #6 are not clearly visible in the color copies of the lineup I have received. I have asked if better copies exist and have been informed that they do not.

times that are worthy of mention here. First, Det. Ross testified that he "never used age once" when selecting lineup fillers and didn't consider the age in this case. (P. 2243). He testified that he believes cornrows are the same thing (hairstyle) as hair cut short to the head and short hair. (P. 577, 593). He testified that "they are not there to do height" in live lineups, and you can't tell somebody's height in a lineup (P. 578-9), and height is not a concern in a lineup. (Depo P. 55). In addition, Det. D'Luginski testified in his 2020 deposition that he doesn't know how to explain hairstyles and that, in essence, braided hair is the same as short hair. (P. 196-8) That professional individuals who are in charge of assembling and conducting fair and unbiased identification procedures could hold these beliefs is, frankly speaking, stunning.

### 5. Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator

In this case, Det. Lipson created the photo arrays with Mr. Galloway as the suspect and administered the photo arrays to the two witnesses in this case on June 6, 2008.

In addition to the 1992 and 2006 IACP recommendations to use double-blind administration of photo arrays and lineups, it is now also the law in approximately half of the states that double-blind identification procedures be used.[31] Based on the deposition testimony of Det. Ross, I understand that Nassau County Police Department uses double-blind administration since approximately 2014-2015. (P. 101).

Double-blind administration, where the person conducting an identification procedure does not know who the suspect is, eliminates the possibility that the person conducting the procedure can influence the witness' selection toward the suspect and/or away from a lineup filler. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[32] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[33] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. In this case, both identification procedures were conducted by administrators who knew the identity of the suspect, Mr. Galloway.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[34] in which 234 witnesses viewed a videotaped speech, that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the award if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-

---

[31] New York State Senate Bill S1819, passed in 2017, states that double-blind administration of photo and live lineups shall be used unless impracticable. When impracticable, blinded administration shall be used.

[32] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[33] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[34] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

absent condition 9% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 36% of witnesses chose the innocent suspect.

If double-blind administration had been used in this case, it would have eliminated the possibility that Det. Lipson influenced the witnesses to select Mr. Galloway on June 6, 2008. Although Det. Lipson testified at the hearing that Mr. Hernandez selected Mr. Galloway's photograph before he could even put the array down, (P. 2006) there are no objective recordings of this procedure to verify this information.[35]

## 6. Pre-identification Warnings/Instructions

Neither Mr. Anyosa or Mr. Hernandez were warned prior to viewing the photo array or the live lineup that the actual perpetrator may or may not be present. Instead, Det. Lipson testified at the grand jury that he told Mr. Hernandez to "identify anybody that he recognized" (P. 8052) and testified at the Suppression Hearing that he told Mr. Anyosa to point out anyone he recognized. (P. 2007). PO Horowitz testified at his deposition that there was no *none of the above* option explicitly provided to witnesses. (P. 90)

In his 2020 deposition testimony, Mr. Hernandez recalled that the person who showed him the photo array told him that "they had person who was the cause of the incident, but they wanted to show me pictures, so they showed me a couple – a variety of pictures." (P. 30). In 2018, Mr. Anyosa told Sheryl Anania from the Nassau County CIU that he knew Mr. Hernandez had picked the correct person from the photo array prior to him viewing the array. My Anyosa repeated these claims in his 2020 deposition. (P. 29).

Implying in any way to eyewitnesses that the perpetrator is in the photo array (or that their task merely is to find the perpetrator among the set) encourages witnesses to make a selection from the array. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[36] Taken as a whole, the research shows the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key (#414) on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[37] These best practices also recommend among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no

---

[35] In addition, according to Det. Lipson's testimony and the witness form, Mr. Hernandez identified Mr. Galloway as the person who had shot his friend despite the fact that Mr. Hernandez did not witness the shooting. (P. 2006)

[36] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions, in Cutler (Ed.), *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[37] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement.* United States Department of Justice, Office of Justice Programs.

identification is made, so as to minimize natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array.

## 7. Repeated Identification Procedures, Unconscious Transference and Commitment Effects

Mr. Anyosa and Mr. Hernandez each made three identifications of Mr. Galloway from the following procedures: a photo array, a live lineup, and at trial. Thus, the literature on unconscious transference and commitment are relevant to the facts of this case due to the repeated identification procedures with Mr. Galloway as the suspect that were conducted with both of the witnesses.

Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts (e.g., in a photo array and then in court) are faced with a similar question. The correct answer is for the witness to say, "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. In fact, a meta-analysis on transference from viewing mugshot photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[38]

If an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[39] this is known as "commitment."[40] Thus, it is quite possible that Mr. Galloway was selected by Mr. Anyosa and Mr. Hernandez from the live lineup and in court merely because they had previously selected him from the photo array.[41] The results from any second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution. It is for this reason that psychologists view in-court identifications as mere theatre and not actual independent tests of a witness's memory or ability to identify perpetrators.[42] In each succeeding procedure these witnesses could have become increasingly more committed to their identifications and increasingly certain of their accuracy.

---

[38] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[39] For a review, see Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289.

[40] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006). Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

[41] Mr. Hernandez's 2020 deposition testimony supports this proposition: Q. Did you recognize the person in the lineup from when you had seen him them in the photo array? A. Yes. (P. 55).

[42] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

**8. Witness Confidence & Post-identification Feedback**

Neither Mr. Anyosa nor Mr. Hernandez were asked contemporaneously, at the time of the photo array, how certain they were in their selection of Mr. Galloway. Further, there is no evidence that the words "positively identified" on the Supplemental Deposition form reflected their level of confidence in the selection as these are words that are pre-typed on that form.

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the* **first identification attempt** *with a suspect when certain conditions are met.*[43] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory.[44]

But this relationship can be significantly affected by pre- and post-identification factors. Expressions of confidence *at trial*, however, are relatively **meaningless**[45] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[46]

**Post-identification Feedback**

Ms. Sheryl Anania's deposition and notes indicate that Mr. Anyosa knew that Mr. Hernandez picked the right person from the photo array (P. 82) and that Mr. Anyosa was told he picked the right person. (P. 78) During his deposition, PO Horowitz agreed that it would not be proper for police to tell a witness that they have picked the right person from a photo array. (P. 92). Det. Decaro also testified during his 2020 deposition that witnesses should not be told that they picked the right guy. (P. 124).

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that confidence is easily changed. Confidence malleability is the tendency for an eyewitness to become more (or possibly less) confident in their identification as a function of events that occur after the identification decision, as described above. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about

---

[43] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[44] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361)*.* Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

[45] Ibid.

[46] See Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1989; Leippe, Manion, & Romanczyk, 1991; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979; Wells & Murray, 1984

the accuracy of details in their reports.[47] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as *post-identification feedback*.

**Post-identification feedback** is any information provided to a witness or victim that suggests whether their identification decision was accurate. In this case, the "Supporting Deposition" document that was completed after the photo array with Mr. Anyosa and Mr. Hernandez on June 6, 2008 provided the witnesses with post-identification feedback. Specifically, the defendant's name – Josiah Galloway – is written in a box at the top of the form under the heading "Defendants Name if Know". Later on the form, Josiah Galloway was identified by name as the person that Mr. Anyosa has selected from position #4 and Mr. Hernandez had selected from position #2. The specific words on the form are "now known to me as Josiah Galloway". Thus, both witnesses were given post-identification feedback that they had selected the defendant, Mr. Galloway. Consistent with this documentation, Mr. Hernandez testified at the grand jury that the police told him the name of the person he selected in position #2 from the photo array. (P. 1249). In his June 6, 2008 statement (handwritten by Det. D'Luginski), Mr. Anyosa indicated that the person he selected from the photo array on that same day was "now known to me as Josiah Galloway". Further, after Mr. Mr. Anyosa and Mr. Hernandez selected Mr. Galloway from the live lineup on August 14, 2008, two separate hand written statements written by different detectives (Strange and Darienzo) indicated that each witness had selected the person in position #5 "now known to me as Josiah Galloway". Consistent with his actions in this case, in his 2020 deposition, Det. D'Luginski testified that he had been trained by the Nassau County Police Department to give the name of the criminal defendant to a victim. (P. 255).

In the re-investigation of the case by the Nassau County CIU, Mr. Anyosa was interviewed on August 8, 2018 by Sheryl Anania. In this interview, Mr. Anyosa indicated that after he had selected Mr. Galloway he was told that he had identified the right person. Mr. Anyosa also indicated in this interview that at trial he was not 100% certain about his identification of Mr. Galloway but that he felt pressure because he knew the Mr. Hernandez had identified Mr. Galloway and the detectives told him he had picked the right guy.

In addition, there was a suggestion on the photo array form that Mr. Anyosa and Mr. Hernandez "positively identified" the subject, as these words are pre-typed on the deposition form. However, it is not known how certain Mr. Anyosa and Mr. Hernandez were in their selections because there were no contemporaneous recordings of the identification procedures (or any notes).[48] The words "positively identified" were repeated in the live lineup supporting depositions – documents that were hand written by detectives for each of the witnesses.

In the first research on the post-identification feedback phenomenon, Gary Wells and Amy Bradfield[49] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event,

---

[47] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.

[48] As noted above, Mr. Hernandez also indicated on the Supporting Deposition form that Josiah Galloway was the person "who shot my friend", despite the fact that Mr. Hernandez was not present at the shooting and did not witness the shooting.

[49] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[50]

In sum, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[51] One of the most effective methods of reducing feedback effects is to eliminate police suggestion/ communications by having an officer who does not know the identity of the suspect conduct the identification procedure (i.e., use a double-blind administrator). This safeguard was not used in this case.

### 9) Post-event Contamination

In his 2020 deposition, Mr. Hernandez testified that he and Mr. Anyosa spoke a couple of times between the shooting and the trial. Thus, there exists the possibility that some of their memories could have been influenced or contaminated by the other person.[52] It is not clear that some of detectives informed these witnesses that they should *not* speak with one another, consistent with IACP best practices and the scientific literature on co-witness contamination.

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[53] There are many sources of post-event memory contamination that can affect a witness's memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses, law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Rachel Zajac and Nicola Henderson[54] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed was another participant in the study. Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

The concern with post-event contamination is that it can be difficult to accurately remember the *source* of

---

[50] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

[51] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect. *Applied Cognitive Psychology, 20,* 859–869.

[52] As way of an example, Mr. Hernandez selected Mr. Galloway's photograph from the photo array and indicated that it was the person who shot his friend despite the fact that he did not witness the shooting and was not in the vicinity when the shooting took place.

[53] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[54] Ibid.

our memories and, thus, information learned from others is likely to contaminate our "original" memory for a person or event.

**Estimator Variables**

**1. Effects of Limited Opportunity to Observe at the Time of the Event**

Common sense might suggest that even a brief opportunity to view a person's face allows us to form a mental snapshot of that person, but research shows that the amount of time that a witness views a perpetrator's face significantly impacts the witness's ability to subsequently identify that person. In addition, other conditions at the time of the encounter, including lighting and objects that might alter a witness' attention from the perpetrator's face, can reduce the strength of a witness' memory and make them more vulnerable to suggestive identification procedures and subsequently more likely to make an identification error.[55]

   a) **Time Duration Estimates.** In addition to studying the effects of exposure duration on reliability, researchers have found that a person's retrospective estimate of the amount of time that an interaction or event took often differs from the actual amount of time, with the error often in the direction of overestimating the amount of time.[56] Sometimes the estimate of time is profoundly exaggerated. In one study, participants saw a 30-second simulated bank robbery on videotape.[57] Two days later they were asked some questions about the tape, including how long it lasted. The average estimate of duration was 152 seconds – more than 5 times the actual length. Very few people estimated a duration that was equal to or less than the true value of 30 seconds. Although it was rare, some people produced inordinately long estimates of over 900 seconds. In other words, these individuals remembered a 30-second bank robbery tape as having lasted over 15 minutes. Thus, it is possible that triers of fact will believe, through witness testimony, that the witness had a longer opportunity to view the perpetrator than is in fact true.

   In this case, it is unclear exactly how long Mr. Anyosa and Mr. Hernandez had to view the face of the shooter. Mr. Anyosa testified at trial that the argument lasted two to three minutes. (P. 2420). Mr. Hernandez indicated in his trial testimony that they stood there for about 2 minutes talking with the person who had exited his car. (P. 2510).

   **b) Weapon-focus Effect.**

   Mr. Anyosa testified at the grand jury (P. 10286) and at trial (P. 2425; 2483) that he saw the shooter's gun and was able to describe it as a big black hand gun.

   The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect". As the witness focuses on the weapon, their ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the

---

[55] Det. D'Luginski testified in 2020 that lighting, duration of events and other circumstances can influence what someone sees. (P. 181)

[56] For example, see: Attard & Bindermann (2014). Establishing the duration of crimes: An individual differences and eye-tracking investigation into time estimation. *Applied Cognitive Psychology, 2,* 215–225; Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1,* 3–13; Yarmey, & Yarmey (1997). Eyewitness recall and duration estimates in field settings. *Journal of Applied Social Psychology, 27,* 330–344.

[57] Loftus, Schooler, Boone, & Kline (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology, 1,* 3-13.

ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was first reviewed in a meta-analysis published by Steblay in 1992. The weapon focus effect was statistically significant and demonstrated impairment of identification accuracy. A more recent meta-analysis confirms the findings of the Steblay's 1992 analysis.[58]

## 2. Stress/Arousal

In research related to stress and arousal, Kenneth Deffenbacher and colleagues published a meta-analysis on the effects of stress/arousal on eyewitness performance.[59] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details.  The researchers found that high levels of stress negatively impact both types of memory.  The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates.  Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities. Researchers have also found that even physical exertion, such as running, can cause increases in arousal and result in impaired identification abilities.[60]

Mr. Hernandez and Mr. Anyosa engaged in a heated, face-to-face argument with the perpetrator prior to the shooting. Mr. Anyosa testified that he slapped the man's hand down and considered head butting him during the argument. Mr. Hernandez testified at trial that when he returned to the station after the shooting and saw Mr. Anyosa bleeding, that he Mr. Anyosa was "very nervous and very scared". (P. 2511). Thus, stress and arousal experienced is a factor that could have reduced the strength of the witnesses' memory in this case.

## 3. Cross-race Identification

Mr. Anyosa and Mr. Hernandez are Hispanic and the perpetrator was African-American. Therefore, the literature on cross-race identification is relevant for these witnesses.

Decades of scientific research indicates that mistaken identifications are more prevalent under cross-race conditions. Christian Meissner and Jack Brigham[61] published a review of research on the problem that has been called other-race, cross-race, and own-race bias. Meissner and Brigham analyzed data from 39 research articles, using 91 independent samples and involving nearly 5,000 witness participants. Overall, they reported that the chance of a mistaken identification is 1.6 times greater in other-race situations than in same-race situations. Moreover, witnesses were 1.4 times more likely to correctly identify a previously viewed own-race face as compared with performance on other-race faces.[62]

## VII. Summary of Opinions

---

[58] Fawcett et al. (2013). Of guns and geese: A meta-analytic review of the "weapon focus" literature. *Psychology, Crime & Law,* 19, 35-66.

[59] Deffenbacher , Bornstein, Penrod & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.

[60] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

[61] Meissner, C., & Brigham, J. (2001). Thirty years of investigation the own-race bias in memory for faces: A meta-analytic review. *Psychology, Public Policy, and Law, 7,* 3-35.

[62] Meissner and Brigham's study has been cited over 500 times in the scientific literature since its publication in 2001.

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness's memory and the reliability of the identification procedure. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there is evidence that a lack of reasonable consideration of the mismatch between Mr. Galloway and the perpetrator of this crime along with the use of suggestive identification procedures significantly contributed to the wrongful identification and subsequent conviction of Mr. Galloway. In my professional opinion, if the biased photo array procedure had not been conducted, if the witnesses had not been told that they had selected the right person from this suggestive array, if the witnesses had been able to hear Mr. Galloway's voice to learn that he did not have an accent, if they were able to see his true height, if they had learned that his hair on June 6, 2008 did not match their description of the perpetrator only weeks earlier, and if they had learned that Mr. Galloway had a missing tooth on May 15, 2008, he very likely would not have been selected from the live lineup and thus would not have been prosecuted and convicted for the attempted murder of Mr. Anyosa.

**VIII. Supplemental Materials**

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

If called to testify, I would swear to the truth of these opinions.


_____

Jennifer Dysart, PhD

Appendix A

**List of Criminal & Civil Cases in which Dr. Jennifer Dysart has given testimony as an Eyewitness Identification Expert Witness in Previous Four Years (dated March 3, 2021)**

**California:**
*Andrew Wilson v. City of Los Angeles, et al.*, Case No. 2:18-cv-05775 (April 29, 2020)
*Maurice Caldwell v. City and County of San Francisco and Kitt Crenshaw,* Case No. 12-cv-1892 EDL
   (December 21, 2020)

**Florida:**
*State of Florida v. Michael Keetley,* Case No. 10-18429 (February 19, 2020)

**Illinois:**
*Jacques Rivera v. Reynaldo Guevera, et al.,* Case No. 1:12-cv-04428 (April 25, 2017)
*Jose Montanez v. Reynaldo Guevara, et al.*, Case No. 17-cv-4560 (March 4, 2020)
*Armando Serrano v. Reynaldo Guevara, et al*., Case No. 17-cv-2869 (March 4, 2020)

**Louisiana:**
*Robert Jones v. Leon Cannizzaro, Jr., et al.*, Case No. 2:18-cv-00503 (December 15, 2019)

**Massachusetts**
*Angel Echavarria v. J. Michael Roach, et al.,* Case No. 1:16-cv-11118 (August 5, 2020)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019)

**Ohio:**
*Dewey Jones v. City of Akron, Ohio, et al.,* Case No. 5:14-cv-02618 (November 16, 2017)
*Roger Dean Gillispie v. The City of Miami Township, et al.,* Case No. 3:13-cv-416 (August 27, 2019)

**Appendix B**

**Academic Curriculum Vitae of Jennifer E. Dysart**

March 2021

**JENNIFER E. DYSART**

**Curriculum Vitae**

University Address:
Department of Psychology                    *Email:*      jdysart@jjay.cuny.edu
John Jay College of Criminal Justice        *Phone:* 212.484.1160
524 West 59th Street, 10th Floor
New York, NY  10019

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology) ⌷ *Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

---
**Peer-Reviewed Journal Publications**
---

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39,* 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19,* 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20,* 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170- 175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

---

**Books**

---

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

---

**Book Chapters**

---

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92)*.* Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp.   1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

## Other Publications

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13)*. Thousand Oaks, CA: Sage.

## Peer-Reviewed Conference Presentations

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster to be presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster to be presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology- Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, British Columbia, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law

Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

---

**Invited Judicial Presentations**

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, British Columbia, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory.* Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory.* Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification.* Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, NY, NY.

Dysart, J. E. (2011, June). *Eyewitness identification.* Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification.* Invited speaker at the Ontario Judges Annual conference, Niagara Falls, Ontario, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, Newfoundland, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification.* Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification.* Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions.* Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence.* Invited speaker at the Ontario Court of Justice West Regional Seminar, Ontario, Canada.

Dysart, J. E. (2009, March). *Identification evidence.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification.* Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, Newfoundland, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, Quebec, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, Saskatchewan, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, Prince Edward Island, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June. *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program titled "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

---

**Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences**

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel. Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, Newfoundland, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye- Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes.* Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

---

**Invited Law Enforcement/Investigator Presentations**

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification.* Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification.* Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification.* Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective.* Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, Nova Scotia, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, Saskatchewan, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

## Invited Prosecutor Presentations

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Defense Attorney Presentations

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21ˢᵗ Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

**Invited Law School and University Presentations**

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the "Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

---

**Invited Non-Profit Presentations**

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification*. Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification*. Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.

---

**Supervision of Doctoral Students at John Jay College of Criminal Justice**

| | |
|---|---|
| 2010 | John DeCarlo (Criminal Justice Doctoral Student)<br>  Topic: Eyewitness Identification Accuracy of Police Officers & Citizens |
| 2009-2011 | Victoria Lawson (Forensic Psychology Doctoral Student)<br>  Topic: Eyewitness Identification |
| 2006-2009 | Anna Rainey (Forensic Psychology Doctoral Student)<br>  Topics: Showups; Cross-race identification |
| 2006-2009 | Brian Wallace (Forensic Psychology Doctoral Student)<br>  Topics: Alibi believability; Mug shot searching. |

## Supervision of Masters Theses at John Jay College of Criminal Justice

2018 – 2020    Elena Christofi
        Topic: 911 Calls: Defense Attorney Survey

2018 – 2019   Samantha Kosziollek
        Topic: 911 Dispatchers

2016 – 2018    Marisa Jaross
        Topic: Composite Sketches

2016 – 2017    Brittany Kassis
        Topic: 911 Dispatchers

2011 – 2012    Tamara Andrade
        Topic: Composite creation in cross-race identifications

2010 – 2011    Jennifer Savion
        Topic: Composite creation in cross-race identifications

2009 – 2010    Lindsey Butera
        Topic: Eye-tracking and lineup accuracy with biased lineups
        Yinglee Wong
        Topic: Cross-race description accuracy of hair/hairstyles
        Nancy Yang
        Topic: Eye-tracking and weapon focus effect

2008 – 2009    Alexander Buijsrogge
        Topic: Cross-race composite creation of famous faces
        Kristin Chong
        Topic: Stranger alibis and identification accuracy
        Victoria Lawson
        Topic: Cross-race showup and lineup accuracy
        Jessica Owens
        Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008    Sarah Kopelovich
        Topic: Cross-race and Accent effects on identification accuracy
        Jason Mandelbaum
        Topic: Cross-race effects in mug shot searching

## Supervision of Master's Theses at Southern Connecticut State University

2005        Lisbeth Fugal
        Topic: Post-identification feedback
        Anna Rainey
        Topic: Cross-race identification and "contact" with other groups

2004    Sandra Soucie
       Topic: CSI Effect

---

**Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University**

2005    Daniel Csuka
       Topic: Multiple Independent Identification Accuracy

---

**Awards and Scholarships**

2017    PSC CUNY research grant ($3,500)

2008    John Jay College Research Assistance Program Grant ($1,000)

2005    Connecticut State University Research Grant ($4,400)

2005    Junior Faculty Research Fellowship, Southern Connecticut State University (9 credits teaching release time for Fall 2005)

2003-2005  Social Sciences and Humanities Research Council of Canada (SSHRC) Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined)

2002    American Psychological Foundation/Council of Graduate Departments of Psychology (APF/COGDOP) Graduate research scholarship ($1,500)

2002    American Psychology-Law Society Grants-in-Aid award ($650)

2001-2003  Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually)

2000-2001  Ontario Graduate Scholarship ($15,000)

1999-2000  Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900)

1998-1999  Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300)

---

**Courses Taught**

**John Jay College of Criminal Justice, New York, NY**
  - Introduction to Psychology (undergraduate course)
  - Psychology and Law (undergraduate course)
  - Forensic Social and Experimental Psychology (undergraduate course)
  - Mental Health Professionals, Social Science and the Law (Masters course)
  - Eyewitness Identification (Masters course)

- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**
- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)
- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**
- Introduction to Psychology (undergraduate course)

---

## University Committee Service

| | |
|---|---|
| 2016 – 2019 | Graduate Studies Council, John Jay College of Criminal Justice |
| 2013 – 2016 | College Council Member, John Jay College of Criminal Justice |
| 2013 – 2016 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2013 – 2014 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |

| | |
|---|---|
| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| | |
|---|---|
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2006 – present | Consultant, eyewitness identification expert |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |

| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

## Reviewing (past and current)

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

## Professional Affiliations

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

## Appendix C

**Brief Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[63] In fact, the National Research Council Report on eyewitness identification titled "Identify the Culprit: Assessing Eyewitness Identification"[64] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

*Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of its three stages: acquisition, retention and retrieval. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of trace evidence in an investigation, can be altered and/or affected through *contamination*. Contamination of a witness' memory can come from many sources including information learned from other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, and other sources. Regardless of the source, however, once a witness' memory has been exposed to post-event information, this information can become entwined in their memory, permanently affecting their account

Numerous factors at each stage affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face/characteristics and length of the retention interval. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage of the memory process can influence the reliability of an eyewitness identification and the witness's subsequent testimony. Examples of police procedures that can affect the accuracy of an identification include the use of pre-lineup/photo array[65] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their 1998 Eyewitness White Paper.[66] The 2020 White Paper[67] maintains the original four best practice recommendations from 1989[68] and adds five new best practice recommendations for the collection and preservation of eyewitness evidence.[69] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations.

---

[63] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[64] Ibid.

[65] The terms "lineup" and "photo array" are used interchangeably in this report, unless noted otherwise.

[66] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647.

[67] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[68] These include: selection of lineup fillers, pre-lineup instructions, use of double-blind procedures, and the collection of a post-identification confidence statement from the witness.

[69] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups when possible.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently numbers as **375**.[70] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[71] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 cases where there was an erroneous eyewitness identification of the innocent defendant, 36% included mistaken identifications from *more* than one eyewitness. In fact, some of the cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[72] In the 2020 White Paper, Dr. Wells and colleagues have summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[73] The researchers note that there have been 11 published articles on the subject with data from over 6,500 witnesses in actual cases. The results show that nearly one quarter of eyewitnesses who view a photo array or lineup choose an innocent filler. Of those who "identify"[74] a person from a photo array or lineup, more than one third (36.8%) choose an innocent filler as the perpetrator. Further, the overall error rate must be higher than one third, as these data do not include the erroneous identifications of innocent suspects (it only includes filler selections). In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" are incorrect. While false identifications of innocent fillers almost invariably do not send those fillers to jail or prison, these choices still constitute identification errors and provide valuable information about the reliability of witnesses and the reliability of identification procedures generally.

---

[70] Visit www.innocenceproject.org for updated information and statistics on DNA exoneration cases nationally.

[71] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[72] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the actual truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to *estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[73] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[74] Witnesses who "identify" an innocent lineup filler are obviously not making this decision because they truly recognize the filler from the crime, so that word is not the correct word to use in such a situation. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person) and mere choosing behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

**Appendix D**

**Mock Witness Task Conducted for this Case**

1) Announcement and link that that was placed on Blackboard for PSY/LAW 370:

 **Mock Witness Composite Exercise** ✓

Thank you for your assistance with this voluntary exercise on composite sketches. The results from this mock witness experiment may be used in an actual legal proceeding and therefore your participation is greatly appreciated. Although this exercise should only take one minute to complete, it is expected that you will take this task seriously and provide an honest response to the (one) question in this survey.

When you start the survey, you will be shown 6 photographs and 1 composite sketch. Your task in this voluntary exercise is to look at the photographs and choose the lineup member that you believe looks the closest (is the best match) to the sketch.

2) What students viewed when they clicked the link above:



Begin: Mock Witness Composite Exercise

**INSTRUCTIONS**

Description

Thank you for your assistance with this voluntary exercise on composite sketches. The results from this mock witness experiment may be used in an actual legal proceeding and therefore your participation is greatly appreciated. Although this exercise should only take one minute to complete, it is expected that you will take this task seriously and provide an honest response to the (one) question in this survey.

When you start the survey, you will be shown 6 photographs and 1 composite sketch. Your task in this voluntary exercise is to look at the photographs and choose the lineup member that you believe looks the closest (is the best match) to the sketch.

Force Completion          This survey can be saved and resumed later.

Due Date                  This Survey is due on December 22, 2020 9:03:00 AM EST.

Click **Begin** to start: Mock Witness Composite Exercise. Click **Cancel** to go back.
You will be previewing this assessment and your results will not be recorded.

*Click Begin to start. Click Cancel to quit.*                    Cancel    Begin

3) Text that appeared above the images in item #4 below:



4) Mock witness task. Students selected a number 1-6 by clicking on box below this image (not shown):

