1                                                        1

2      UNITED STATES DISTRICT COURT

3      EASTERN DISTRICT OF NEW YORK

4      ---------------------------------------------x

5      JOSIAH GALLOWAY,

6                              Plaintiff,

7              -against-    Docket No. 19-cv-5026

8                              (AMD)(ARL)

9      NASSAU COUNTY; THE INCORPORATED VILLAGE OF
       HEMPSTEAD; Police Officer STEVEN HOROWITZ,
10     Shield No. 144; Detective MATTHEW ROSS,
       Shield No. 834; Detective CHARLES DECARO,
11     Shield No. 1047; Detective RONALD LIPSON,
       Shield No. 1296; Detective THOMAS D'LUGINSKI,
12     Shield No. 7900; Detective GEORGE DARIENZO,
       Shield No. 1038; Detective KEVIN CUNNINGHAM,
13     Shield No. 112; Detective Sergeant RICHARD
       DORSI; Detective RENE B. YAO; Detective CARL
14     STRANGE, Shield No. 1225; Detective JOSEPH P.
       SORTINO; JOHN and JANE DOE 1-20,

15                             Defendants.

16     ---------------------------------------------x

17

18                             TELECONFERENCE

19                             JUNE 15, 2021

20                             10:15 A.M.

21          **EXAMINATION OF LORI MAGLIARO,** a

22     nonparty witness, held at the above date and

23     time, pursuant to Notice, taken before Daniel

24     Rodriguez, a Reporter and Notary Public of

25     the State of New York.

```
 1                                                    2
 2     A P P E A R A N C E S:
 3
 4        ELEFTERAKIS, ELEFTERAKIS & PANEK, LLP
 5             Attorneys for Plaintiff
 6             80 Pine Street
 7             38th Floor
 8             New York, New York 10005
 9        BY:  GABRIEL HARVIS, ESQ. and
10             BAREE FETT, ESQ.
11
12
13        SOKOLOFF STERN, LLP
14             Attorneys for County Defendants
15             179 Westbury Avenue
16             Carle Place, New York 11514
17        BY:  BRIAN SOKOLOFF, ESQ.
18             File No. 190164
19
20        HARRIS BEACH, PLLC
21             Attorneys for Village Defendants
22             333 Earle Ovington Boulevard
23             Suite 901
24             Uniondale, New York 11553
25        BY:  WILLIAM J. GARRY, ESQ.
```

3

(Appearances continued:)


   THE LAW OFFICE OF THOMAS LIOTTI, LLC
         Attorney for Non-Party Witness
         600 Old Country Road
         Suite 530
         Garden City, New York 11530
   BY:  THOMAS LIOTTI, ESQ.

```
 1                      Lori Magliaro                6
 2              today.
 3                      If at any time you don't
 4              understand a question that I ask,
 5              will you let me know?
 6                      THE WITNESS:  Yes.
 7                      MR. SOKOLOFF:  Similarly if
 8              at any time you need to take a
 9              break let me know, and that won't
10              be a problem.
11      EXAMINATION BY
12      MR. SOKOLOFF:
13          Q.    How, if at all, did you prepare for
14      today's deposition?
15          A.    I didn't.
16          Q.    You signed an affidavit on
17      January 4, 2020, correct?
18          A.    2021, yes.
19          Q.    Oh, 2021, right.  It was notarized
20      on January 4, 2020.
21                  Are you familiar with that
22      affidavit?
23          A.    Vaguely.
24          Q.    When was the last time you saw it?
25          A.    January.
```

```
 1                      Lori Magliaro                7
 2          Q.    Why did you prepare that affidavit?
 3          A.    I didn't prepare it personally.
 4          Q.    Who prepared it?
 5          A.    Mr. Liotti.
 6          Q.    Did you direct him to prepare it?
 7          A.    No, we -- no.
 8          Q.    How did it come about that that
 9    affidavit was created by Mr. Liotti?
10          A.    We had a discussion and he wanted
11    it, I guess.
12          Q.    Is everything in the affidavit
13    true?
14          A.    No.
15          Q.    I'm going to show you this
16    affidavit.
17                Can you see it on your screen?
18          A.    Yes.  I have to make it bigger
19    though.
20          Q.    I can make it bigger too.  Like
21    that?
22          A.    That's good.
23          Q.    So you say that Mr. Liotti prepared
24    this?
25          A.    Yes.
```

**ON TIME COURT REPORTING**
**516-535-3939**

*Lori Magliaro*                        8

1

2      Q.    So I'd like to go through this

3   affidavit and find out what's true in it and

4   what isn't true.

5           First of all, let's go to the end

6   where there's a signature.

7           Is that your signature?

8      A.    Yes.

9      Q.    Where were you when you signed

10  this?

11     A.    I was in Florida.

12     Q.    The date was January 4, 2021, not

13  January 4, 2020?

14     A.    Correct.

15     Q.    Do you know who this notary is?

16     A.    No.  It was someone that I just

17  went to, to have it notarized.  I don't

18  personally know them, no.

19     Q.    First, it says, "I am voluntarily

20  coming forward to give this affidavit because

21  it is true and because I further believe that

22  no one should testify untruthfully under

23  oath."

24           Is that something that you told

25  Mr. Liotti?

```
1                      Lori Magliaro                    9

2          A.    No, I didn't.

3          Q.    So he put that in?

4          A.    Yes.  He did the whole affidavit.

5          Q.    Then it says, "I believe in the

6    Rule of Law and that perjury destroys the

7    law, makes a mockery of it and undermines our

8    system of justice."

9                Is that something that you wanted

10   put in the affidavit?

11         A.    No.  In English -- no, I don't.

12         Q.    Then it says, "I am making this

13   affidavit pro bono publico, without

14   compensation of any kind and with no promises

15   of future consideration of any kind."

16               Then there's a period.

17               Is that something that you wanted

18   in this affidavit?

19         A.    No.

20         Q.    Do you know what that pro bono

21   publico means?

22         A.    No.

23         Q.    Then it says, "I initiated this

24   contact with Thomas F. Liotti, Esquire, one

25   of Mr. Galloway's former attorneys and he has
```

*Lori Magliaro*                    10

1
2    agreed to represent me *pro bono publico* on
3    this matter."
4              First of all, is that a true
5    statement that you initiated contact with
6    him?
7         A.   I spoke with someone prior, then he
8    contacted me.
9         Q.   Who did you speak to prior?
10        A.   My attorney that I had in the past
11   had recommended that I speak to him.
12        Q.   Who is that attorney that you spoke
13   to?
14        A.   My attorney was Nick Marino.
15        Q.   Where is he located?
16        A.   He's retired now.  He was in Nassau
17   County though.
18        Q.   It says here, "He assisted me in
19   the preparation of this affidavit.  My
20   address and phone number are being withheld
21   due to my fear of retribution by the person
22   against whom I am giving this affidavit to
23   wit, Matthew Ross (56), a retired Nassau
24   County Homicide Detective."
25              Was it your wish to withhold your

*Lori Magliaro* 11

1
2  address and phone number from this affidavit?
3      A.    No.
4      Q.    That was Mr. Liotti?
5      A.    Yes.
6      Q.    Then it says, "Mr. Ross and I lived
7  together for two years from approximately
8  August 2018 to November of this year."
9              Is that a true statement?
10     A.    Yes.
11     Q.    Then it says, "Because of a pattern
12 of lies and deceit culminating in his
13 testimony in -- "
14             MR. HARVIS:  "By him."
15             MR. SOKOLOFF:  Sorry?
16             MR. HARVIS:  You missed "by
17         him."
18             MR. SOKOLOFF:  Sorry.  I'll
19         start again.
20     Q.    It says, "Because of a pattern of
21 lies and deceit by him culminating in his
22 testimony in an Examination Before Trial on
23 or about November 9, 2020 I elected to leave
24 him."
25             Is any part of that statement true?

*Lori Magliaro*                                    12

1

2     A.    Not all of it.

3     Q.    What part is true?

4     A.    I left him because we were having

5  issues for a while, so...

6     Q.    Were the issues -- did you leave

7  him because of testimony he gave in an

8  Examination Before Trial?

9     A.    No.

10    Q.    So, generally, without going into

11 detail, what type of issues were you having

12 with him?

13    A.    We just had personal relationship

14 issues, you know, that everyone goes through,

15 without getting into detail.  Tried to work

16 on things here and there.  It just wasn't

17 working out.

18    Q.    "6, we were never married, but

19 Mr. Ross privately shared with me the details

20 involving his roles in the arrest, processing

21 and prosecution of Josiah Galloway, who as I

22 understand was wrongfully incarcerated for

23 more than ten years."  Close quote.

24          First of all, did Matthew Ross tell

25 you what involvement he had in the arrest of

*Lori Magliaro*                                    13

2   Josiah Galloway?

3        A.    No, he didn't.

4        Q.    He wasn't involved in Josiah

5   Galloway's arrest, was he?

6               MR. HARVIS:  Objection.

7               How would she possibly know

8          that?

9               MR. SOKOLOFF:  Maybe she

10         knows it.

11              MR. HARVIS:  I can't imagine

12         it would be personal knowledge, but

13         that's fine.  I object.

14       Q.    Do you know if he was involved in

15   the actual arrest of Josiah Galloway?

16       A.    No.

17       Q.    Did he ever tell you that he was

18   involved in arresting Josiah Galloway?

19       A.    No.

20       Q.    Did he ever tell you that he was

21   involved in prosecuting Josiah Galloway?

22       A.    No.

23       Q.    Then it says, "If afforded a copy

24   of his transcripts," that's plural, "I will

25   be able to pinpoint exactly where he lied in

*Lori Magliaro*                    14

1
2      the EBT and Municipal Law Hearing."
3              Now, did he ever have a Municipal
4      Law Hearing?
5          A.    I don't know what that is.
6          Q.    So is that anything that you told
7      Mr. Liotti, that Mr. Ross was involved in a
8      Municipal Law Hearing?
9          A.    No.
10         Q.    Did you tell Mr. Liotti that
11     Mr. Ross lied in a Municipal Law Hearing?
12         A.    No.
13         Q.    Have you ever seen any transcripts
14     of any testimony that Matthew Ross gave?
15         A.    No.
16         Q.    Then it says, "Mr. Ross told me
17     that Josiah Galloway did not match the
18     description given to them by the victim of
19     the assailant."  Close quote.
20             Is that a true statement?  Did
21     Matthew Ross tell you that?
22         A.    No.
23         Q.    Then it says, "He told me his hair
24     was different and they (the police) used
25     clippers on his hair in order to make him

*Lori Magliaro*                                    15

1

2    look more like the assailant."

3              Did Matthew Ross tell you that

4    police used clippers on Josiah Galloway's

5    hair?

6         A.    No.

7         Q.    Then it says, "They contrived a

8    lineup where Josiah wore a baseball cap to

9    conceal the difference in hair, and since his

10   height was not the same as the assailants,

11   they made adjustments on that as well to make

12   Josiah look taller."

13             Did Matthew Ross tell you that?

14        A.    No.

15        Q.    Then it says, "I was present for

16   Mr. Ross' EBT and after it, I told him that

17   he lied under oath and we could no longer

18   live together and I then moved out."

19             Is any part of that statement true?

20        A.    Some of it.

21        Q.    What's true?

22        A.    I was present there for the EBT.

23        Q.    How about the rest of it, that

24   after the EBT you told him that he lied under

25   oath, "We could no longer live together and I

*Lori Magliaro*                                          16

1

2    then moved out"?

3        A.   Again, we were having issues.  So

4    it was in the works of already splitting up.

5        Q.   But did you tell him that he lied

6    under oath?

7        A.   No.

8        Q.   Did you know whether he lied under

9    oath?

10       A.   No.  I think I was mistaken.

11       Q.   Then it says, quote, "I am willing

12   to cooperate in any further investigation of

13   this matter because I truly cannot believe

14   that a police detective sworn to uphold the

15   constitution and protect all of us, would

16   engage in this kind of knowing and deliberate

17   misconduct, which deprived a young man of his

18   youth for more for than ten years, caused him

19   to be confined in the dangerous New York

20   prison system where he was deprived of life,

21   liberty and the pursuit of happiness."  Close

22   quote.  Then that's the end of the sentence.

23            Did you tell Mr. Liotti that you

24   wanted that in the affidavit?

25       A.   No.

1              *Lori Magliaro*                    17

2        Q.    Are those your words or his words?

3        A.    Those are not my words.

4              MR. SOKOLOFF:  I have no

5         further questions.

6              Thank you.

7              Anybody have any questions?

8              MR. GARRY:  I have no

9         questions.

10             MR. HARVIS:  I have some

11        questions.

12             Good morning, Ms. Magliaro.

13             How are you doing?

14             THE WITNESS:  Good morning.

15             How are you?

16             MR. HARVIS:  I am doing

17        well.

18             I am Gabe Harvis.  I'm the

19        attorney who represents Josiah

20        Galloway in lawsuits that he has

21        pending against the State of

22        New York.

23             I'm going to ask you a few

24        questions today and do the best you

25        can to answer them honestly.

*Lori Magliaro*                    19

1

2      Q.    You are swearing to tell the truth,

3  right?

4      A.    Mm-hmm.

5      Q.    Do you know what the word "perjury"

6  means?

7      A.    Yes.

8      Q.    What is perjury?

9      A.    It's when you make untruthful

10  statements under oath.

11      Q.    Do you understand that perjury is a

12  crime that's punishable by penalties

13  including imprisonment?

14      A.    Yes.

15      Q.    Okay.  So your testimony today,

16  which is also under oath, is that you signed

17  a sworn document containing statements that

18  you knew to be false; is that right?

19      A.    No, I didn't -- no, I was mistaken.

20  I had a lot going on.

21      Q.    When you say you were mistaken,

22  what was the mistake?

23      A.    I was mistaken.  This case was not

24  -- I wasn't ever given any names of any cases

25  or anything like that.  It could have been

*Lori Magliaro*                    20

1   just a different case that, you know?

2          So I'm not sure about anything

3   anymore.  I was mistaken and I was going

4   through a lot at the time.  And, honestly, I

5   was a little bit afraid that if I didn't sign

6   this, because once I had already spoken to

7   Mr. Liotti, I was told that the cat was out

8   of the bag and I had to go forward with this,

9   and I tried to not to because I didn't feel

10  sure about it anymore, but I was afraid

11  because I didn't want any further actions

12  taken towards me.

13          Q.   What were you afraid of?

14          A.   I was just afraid that -- I don't

15  really know.  I was just afraid because I

16  wasn't sure.  Then I wasn't represented by

17  anyone.  Because I wasn't sure and I didn't

18  want to go forward with it anymore.

19          Prior to signing the affidavit, I

20  had said that.  I was just, you know, told

21  that it was unethical for him not to go

22  forward with this information now, even

23  though I was unsure about it.  I felt like I

24  didn't have a choice.

*Lori Magliaro*                21

1

2     Q.    When you say that you didn't have a

3    choice, who was it that you were speaking to

4    that gave you the impression that it would be

5    unethical to not sign the affidavit?

6     A.    My attorney.

7     Q.    Who is that?

8     A.    Mr. Liotti.

9     Q.    So before you signed this document

10   you told Mr. Liotti that you didn't want to

11   sign it, and you weren't sure about the

12   information that it contained?

13    A.    Yes.

14    Q.    What were you told at that point?

15    A.    That it was unethical not to go

16   forward, and I needed to speak truth to

17   power.

18    Q.    Then you did then voluntarily

19   though sign this document under penalty of

20   perjury?

21            MR. SOKOLOFF:  Objection.

22    A.    I was afraid because he told me he

23   was representing me, and if I didn't go

24   forward and sign this, then I would have had

25   no representation.  I was still not sure.  So

```
1                    Lori Magliaro              22
2      I didn't feel comfortable going ahead with
3      anything.
4           Q.    Let me just back up for a second.
5                 What was the name of the attorney
6      in Nassau County that was retired that you
7      first contacted about this?
8           A.    My attorney was Nick Marino.
9           Q.    When you first contacted
10     Mr. Marino, what made you contact him?
11          A.    I don't know.  I was going through
12     some stuff and I wasn't sure about the case,
13     you know, that Matt was talking about a
14     different case.  I wasn't sure about the
15     whole thing.  I was present at the EBT but
16     everything was unsure to me.
17          Q.    Okay.
18          A.    So it was just I spoke to my friend
19     about it.  That's all.
20          Q.    Well, you understand now that
21     you've taken an oath to tell the truth today?
22          A.    Yes.
23          Q.    Are you, in fact, testifying
24     truthfully today?
25          A.    Yes, I am.
```

*Lori Magliaro*                                    26

1
2        had different kind of hair from the other
3        people in the lineup?
4                   MR. SOKOLOFF:  Objection.
5            A.    I'm not sure.
6            Q.    When you say you are not sure, what
7        are you not sure about?
8            A.    I don't know.  I don't know what
9        you want me to say.  I'm not sure
10       specifically about -- I'm not sure.
11           Q.    Okay, that's fine.
12                 Let me be clear.  All I want you to
13       do is testify truthfully because you are
14       under oath and you're subject to criminal
15       penalties of perjury if you tell a lie.
16                 So I just want to make sure you
17       understand and that you just tell me the
18       truth as best as you can under oath, okay?
19           A.    Okay.
20           Q.    So did Matthew Ross ever tell you
21       that he participated in a lineup back when he
22       was a detective, in which the suspect had
23       different hair from the fillers in the
24       lineup?  Did he ever tell you that?
25           A.    He told me he's participated in

21 of 23 PageID #:

*Lori Magliaro*                    27

1
2    many lineups but nothing specifics about

3    anything.

4         Q.    So he never told you that he tried

5    to change or did change the hairstyle of a

6    suspect in order to participate in a lineup?

7              MR. SOKOLOFF:  Objection.

8         A.    No.

9         Q.    So how did that end up getting into

10   the affidavit that you signed?

11        A.    Well, I heard it while he was doing

12   the EBT.

13        Q.    Then you went to Mr. Liotti and you

14   told Mr. Liotti that that was a lie?

15        A.    I didn't specifically say it was a

16   lie.  I just said I wasn't sure that, you

17   know -- I wasn't sure and that's why I wanted

18   to speak to someone.  That's all.  I didn't

19   really know if I was going to go forward with

20   anything because I was unsure.

21        Q.    I understand.  I get it.  That's

22   fine.  I am wondering, what were you unsure

23   about?

24              Were you unsure about whether he

25   had testified truthfully?  Is that what

ON TIME COURT REPORTING
516-535-3939

*Lori Magliaro*                                        28

```
 1                                                    28
 2   you're unsure about?
 3          A.    Yes.
 4                MR. LIOTTI:  Note my
 5                objection.
 6          Q.    That's you what caused to contact
 7   Mr. Marino and then Mr. Liotti is the fact
 8   that you were unsure about whether or not his
 9   testimony is truthful?
10          A.    Yeah.
11          Q.    Have your feelings about that
12   changed at all between January of 2021 and
13   now?
14          A.    No --
15                MR. SOKOLOFF:  Objection.
16          A.    No.  No.
17          Q.    What I want to understand is, did
18   you realize that you were signing something
19   that was untrue back in January of 2021 when
20   you signed it?
21          A.    Again, I tried to, prior to signing
22   it, back out of it.
23          Q.    What did you do to try to back out
24   of it?
25          A.    I called my attorney and he advised
```

*Lori Magliaro*                    29

1
2    me I should go forward.
3         Q.    Then you took that advice?
4         A.    Well, yes.
5         Q.    You knew what you were being
6    advised to do was a crime, committing a
7    crime?
8         A.    No.
9         Q.    Well, let's back up because I want
10   to understand.
11              So you understand swearing to
12   something not true is a crime in this
13   country?
14                   MR. SOKOLOFF:  Objection.
15        Q.    Do you understand that?
16        A.    Yes.
17        Q.    I'm trying to understand the
18   reasons -- I want to understand why in this
19   case you elected to sign something under oath
20   that wasn't true.
21              If I understand you correctly, you
22   are saying you had pressure from your lawyer;
23   is that right?
24        A.    I felt pressured I was also going
25   through a lot.  It's the law.  Every time