UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOSIAH GALLOWAY,

                              Plaintiff,

          -against-

NASSAU COUNTY; THE INCORPORATED VILLAGE
OF HEMPSTEAD; Police Officer STEVEN HOROWITZ,
Shield No. 144; Detective MATTHEW ROSS, Shield No.
834; Detective CHARLES DECARO, Shield No. 1047;
Detective RONALD LIPSON, Shield No. 1296; Detective
THOMAS D'LUGINSKI, Shield No. 7900; Detective
GEORGE DARIENZO, Shield No. 1038; Detective
KEVIN CUNNINGHAM, Shield No. 112; Detective
Sergeant RICHARD DORSI; Detective RENE B. YAO;
Detective CARL STRANGE, Shield No. 1225; JOHN and
JANE DOE 1-20,

                              Defendants.

Docket No.
19-cv-5026 (AMD) (ARL)


# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY SOKOLOFF STERN LLP


**SOKOLOFF STERN LLP**
*Attorneys for County Defendants*
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500
File No.: 190164

*Of Counsel:*
      Brian S. Sokoloff

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 1

ARGUMENT ............................................................................................................................. 13

    POINT I:    NO CONFLICT PRECLUDES REPRESENTATION OF ALL NASSAU COUNTY
               DEFENDANTS ............................................................................................... 13

    POINT II:    ALL COUNTY DEFENDANTS EXECUTED CONFLICT WAIVERS. ................................ 22

CONCLUSION .......................................................................................................................... 23

# TABLE OF AUTHORITIES

CASES

Board of Ed. of City of New York v. Nyquist,
  590 F.2d 1241 (2d Cir. 1979) ............................................................................ 14

Coggins v. County of Nassau,
  615 F. Supp. 2d (EDNY 2009) ..................................................................... 14, 20

Cresswell v. Sullivan & Cromwell,
  922 F.2d 60 (2d Cir. 1990) ............................................................................... 13

Drag Racing Technologies, Inc. as D.R.T., Inc. v. Universal City Studios, Inc.,
  2003 WL 1948798 (SDNY 2003) ...................................................................... 23

Dunton v. County of Suffolk,
  729 F.2d 903 (2d Cir. 1984) ............................................................................. 13

Glueck v. Lonathan Logan, Inc.,
  653 F.2d 746 (2d Cir. 1981) ............................................................................. 13

Gordon v. Norman,
  788 F.2d 1194 (6th Cir. 1986) .......................................................................... 14

Leather v. Ten Eyck,
  2 Fed. Appx. 145 (2d Cir. 2001) ....................................................................... 14

Lieberman v. City of Rochester,
  681 F. Supp. 2d 418 (WDNY 2010) ................................................................. 14

Monell v. Department of Soc. Services of the City of New York,
  436 U.S. 658 (1978) .......................................................................................... 13

People v. Perkins,
  61 A.D.3d 780 (2d Dep't 2009) ........................................................................... 2

Rodick v. City of Schenectady,
  1 F.3d 1341 (2d Cir. 1993) ............................................................................... 14

Russo v. City of Bridgeport,
  479 F.3d 196 (2d Cir. 2007) ............................................................................... 6

Smith v. City of New York,
  611 F. Supp. 1080 (SDNY 1985) ...................................................................... 23

*U.S. v. Schwarz,*
   283 F.3d 76 (2d Cir. 2002) ........................................................................... 18, 19

*Vegetable Kingdom, Inc. v. Katzen,*
   653 F. Supp. 917 (NDNY 1987) .......................................................................... 23

*Weintraub v. Bd. of Educ. of the City Sch. Dist. of City of New York,*
   2001 WL 984933 (EDNY 2001) ............................................................................. 14

STATUTES

42 U.S.C. § 1983 ......................................................................................... 14, 17
N.Y. C.P.L. § 440.10 ........................................................................................... 6
N.Y. Gen. Mun. L. §50-l ................................................................................... 7, 21

## PRELIMINARY STATEMENT

Plaintiff's motion to disqualify defense counsel is an ill-timed and ill-supported attempt to take out the defense counsel who inconveniently for Plaintiff has vigorously defended this case from day one. Nearly two years after asserting the allegations Plaintiff claims supports a conflict-based attorney disqualification, after close to twenty depositions and production of thousands of pages of documents, and after never even hinting at a conflict, Plaintiff moves now to disqualify counsel.

Plaintiff's motion not only fails to identify – with evidence -- any specific conflicts among defendants, but it also ignores what movant has known for over a year: Nassau County's full indemnification of every individual Nassau County defendant, including against punitive damages. It also omits case law from this Court directly on point.

Even if the Court discerns a conflict, each Nassau County defendant has executed a written conflict waiver, further dooming this motion.

## STATEMENT OF FACTS

At around 1:30 a.m. on May 15, 2008, Jorge Anyosa was shot in the face while in Village of Hempstead. ¶ 19.[1] The victim and a witness observed the shooter, "describing him as a black male, 25-30 years old, approximately 5'10"-5'11", with close-cropped or shaved hair, an accent and no glasses or distinguishing facial features." ¶ 20.#

On June 5, 2008, Village of Hempstead police officers arrested Plaintiff on charges "unrelated to the Anyosa shooting." ¶ 33–34. Plaintiff claims these unrelated charges were "later dismissed in their entirety," but he does not allege when. ¶ 34. Plaintiff does not—and cannot—allege a lack of probable cause for the arrest on those charges.

---

[1] All citations to "¶" refer to the paragraphs of the Fourth Amended Complaint. [DE 114].

While Plaintiff was in police custody, unidentified defendants constructed photo arrays "using an old, outdated photograph of plaintiff." ¶ 38. In the presence of Lipson and Horowitz (a Hempstead officer), Anyosa selected plaintiff from the photo array as the perpetrator. ¶ 39. Lipson and Horowitz allegedly "told Anyosa that he had selected the 'right guy.'" ¶ 40. The officers also allegedly told Anyosa that "plaintiff had already been identified by another witness." ¶ 98. On June 16, 2008, a grand jury indicted Plaintiff for the attempted murder of Anyosa. ¶ 46.

Under New York law at that time, photo identifications of a criminal defendant—and any testimony relating to them—were inadmissible at trial to support the prosecution's case-in-chief. *See, e.g.*, P*eople v. Perkins*, 61 A.D.3d 780, 781, 876 N.Y.S.2d 517, 518 (2d Dep't 2009). On June 30, 2008, "upon the application of A.D.A. Joseph LaRocca, an Assistant District Attorney of Nassau County, and upon consent of [Plaintiff's criminal defense attorney]," the criminal court issued an order requiring Plaintiff to submit to a physical lineup procedure. Ex. A at 1;[2] ¶ 47. On August 14, 2008, Plaintiff appeared for the court-ordered lineup. ¶¶ 50–51. "[D]efendants including Ross, Dluginski and Dorsi concealed [plaintiff]'s long hair under a hat and disguised his diminutive stature using a seated lineup with [him] sitting on two phone books." ¶ 51. "[T]he victim and witness" separately identified plaintiff as the perpetrator. ¶ 53.

Plaintiff moved pretrial to suppress, *inter alia*, the photo-array and lineup identifications. ¶ 60; Ex. B; Ex. C.[3] At the hearing, Det. Lipson described the single-blind process he used to create and administer the two photo arrays that he retrieved Plaintiff's photo from the Nassau County Rogues system, put it in an array with five other photos of people with similar characteristics, showed the arrays to the witness and victim, asked if they recognized anyone, and had them circle

---

[2] Exhibit A is the lineup order.

[3] Exhibits B and C are the transcripts of Plaintiff's pretrial hearing.

and sign next to the identified photo and complete a supporting statement. Ex. B at 8:9–10:15, 11:3–17. Plaintiff's new criminal defense counsel, Frederick Brewington, cross-examined Det. Lipson on the photo-array procedures. *Id*. at 26:20–56:25. Det. Ross described the procedures he used organizing and conducting the lineup. Ex. C at 213:12–216:6. He testified that he picked "fillers" based on Plaintiff's description and that all the subjects of the lineup were seated, "covered with sheets," and wore "the same hat." *Id*. at 215:2–6, 18–20. Brewington cross-examined Det. Ross on the lineup procedures. *Id*. at 230:15–248:5, 249:10–19.

Brewington argued the photo-array and lineup identifications procedures were unduly suggestive. *Id*. 257:14–266:5. He attacked the photo array for its use of a photo of Plaintiff "from the past that matched the description" of the perpetrator. *Id*. at 259:6–7. And he argued the lineup "robbed [Plaintiff] of his ability to defend himself in his lineup by taking away the distinguishing factor that didn't match the description [of the perpetrator] but set him apart." *Id*. at 265:5–8.

The criminal court completely denied Plaintiff's suppression motion. ¶ 60. After finding the police had "sufficient probable cause" to arrest Plaintiff on charges unrelated to the Anyosa shooting, Ex. C at 279:1–19, the court ruled:

> [I]t was appropriate, and certainly not in violation of the defendant's rights for Detective DeCaro to put into motion the procedure whereby Mr. Galloway's photograph was placed in a photo array, along with five other individuals who resembled Mr. Galloway in appearance, and for these photographs to be shown to the victim and a witness in the … open investigation [of the Anyosa shooting].
>
> Now, the photo array was shown separately to the victim and to a person who's described as a witness. There was no suggestibility with regard to the photographs. There was no suggestibility with regard to the procedure that was followed. And there was nothing unreasonably or unduly suggestive in the wording that was used by police personnel during the showing of the photo arrays.
>
> And, accordingly, the motion to suppress the viewing of the photo arrays -- or shall I say, the motion to deny the People the opportunity to attempt an in-court trial identification of the defendant based on

the photo arrays is denied, because the photo arrays did not violate the constitutional rights of the defendant.

Now, with regard to the court ordered lineup, the Court finds, according to the testimony and the evidence it was fair, in compliance with the defendant's constitutional and statutory rights. As a matter of fact, he had an attorney present.

…

The Court finds that the use of the hats was an attempt to protect the defendant's rights and to ensure fairness. Furthermore, there was certainly no objection rendered by either the defendant or the attorney who was present.

Similarly, having the individuals sit was also in an attempt to keep things fair, as well as the use of the sheet.

There was nothing that was said or done to coerce or pressure or overly suggest to the individuals who viewed the lineup that they should in any way be unduly directed toward the defendant. And there was nothing unduly suggestive about the procedure of the lineup, the people that were used in the lineup, or any interaction that police personnel had with regard to the civilians who viewed the lineup.

The motion to suppress testimony with regard to the lineup at trial is denied.

*Id*. at 280:1–282:2.

The criminal court thoroughly explored the photo array and lineup procedures again, at Plaintiff's criminal trial. Although the photo-array identification evidence normally was inadmissible at trial, Plaintiff's own attorney "opened the door" to its admission. During his opening statement, Brewington faulted the prosecutor for not mentioning the photo array in the People's opening statement, suggesting "[m]aybe that's because what they did was make the photo pack fit." Ex. D at 256:3–16.[4] This consequential impropriety by Galloway's counsel forced the

---

[4] Exhibit D is an excerpt from the transcript of Brewington's opening statement at Plaintiff's criminal trial, and Exhibits E, F, and G are the transcripts of Det. Lipson's trial testimony, Det. Ross' trial testimony, and Brewington's summation.

trial judge to curatively instruct the jury that "the People were, under the law, forbidden from mentioning the existence of any photographic identification procedure." *Id*. at 261:20–262:12. And when Brewington later tried to suppress the photo array, the court ruled he had "throw[n] the door open." *Id*. at 392:18–395:23.

Det. Lipson testified about the photo-array procedures. Ex. E at 703:4–708:11. The jury heard Lipson explain how he created and administered the photo arrays to the victim and witness. *Id*. Brewington cross-examined Lipson. *Id*. at 709:16–722:2, 724:22–729:17. Det. Ross testified about the lineup procedures, Ex. F at 754:4–764:17, and Brewington cross-examined him extensively. *Id.* at 764:22–800:5, 802:12–805:25, 887:12–895:9. The jury heard the lineup subjects were seated and covered with a sheet, *id*. at 756:16–20, such that the viewing witnesses could not discern Plaintiff's height, which Brewington described as a "distinguishing factor." *Id*. at 777:9–778:6. The jury heard Det. Ross had Plaintiff sit on two phone books. *Id*. at 787:6–8. The jury heard Plaintiff's hair was different from the other subjects seated in the lineup. *Id*. at 786:13–25. The jury heard the lineup subjects each wore the same hat. *Id*. at 757:1–10, 768:15–16, 789:3–11.

During summation, Brewington argued to the criminal court jury "that the police knew that [Plaintiff] was the wrong person from the beginning" and inculpated him through unduly suggestive identifications, including by using an "old picture" of Plaintiff in the photo array and concealing his hair and height during the lineup. Ex. G at 1051:21–1052:17, 1087:21–1097:9; 1100:19–1101:10.

On March 9, 2009, the jury returned a guilty verdict. ¶ 66. Plaintiff moved to set aside the verdict. ¶ 68; Ex. H.[5] He argued the photo-array and lineup procedures were unduly suggestive. *Id*. ¶¶ 8–30. The court denied Plaintiff's motion. ¶ 68.

---

[5] Ex. H is Plaintiff's motion to set aside the verdict.

In early July 2018, a woman contacted the Nassau County District Attorney's office to report "she could no longer remain silent about Plaintiff's conviction." ¶ 69. The Nassau County Conviction Integrity Unit ("CIU) reinvestigated Plaintiff's conviction. ¶ 70. On September 13, 2018, the CIU moved to vacate Plaintiff's conviction pursuant N.Y. C.P.L. § 440.10(1)(g). ¶ 74.

Plaintiff filed this action on September 4, 2019. ECF No. 1. He filed a first amended complaint on October 24, 2019 (ECF No. 9), a second amended complaint on March 31, 2020 (ECF No. 53), and a third amended complaint on October 22, 2020 (ECF No. 80). Against the individual County Defendants, he asserts eight causes of action: i) a § 1983 malicious prosecution claim against Detectives DeCaro, Darienzo, Lipson, and Dluginski; ii) a § 1983 "Fabrication of Evidence/Denial of Fair Trial and *Brady* Violations" claim against all individual defendants; iii) a § 1983 supervisory liability claim against Det. Dorsi; iv) state law false imprisonment and malicious prosecution claims against the County; v) intentional or negligent infliction of emotional distress claims against the County; vi) a § 1983 conspiracy claim against all individual defendants; vii) an "Unlawful Pre-Trial Detention In Violation of the 4th Amendment and *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007)" claim against all individual defendants; and viii) a failure to intervene claim against all individual defendants. The County Defendants answered on November 12, 2020. ECF No. 85.

Plaintiff amended his complaint for a fourth time, to add a *Monell* claim against the County. In the Fourth Amended Complaint ("FAC"), he alleges, in conclusory terms, that the County "employed photo array and lineup procedures that were constitutionally defective and unduly suggestive." ¶ 131. He then alleges "it was Nassau County policy at the time of the disputed events: a. for witness statements to be written by officers; b. for witness interviews, photo arrays and lineups not to be audio- or video-recorded; c. for no record to be made of the confidence of a

witness's selection when a photo array was administered, or of the time it took the witness to make the selection; d. for photo arrays to be administered in a non-blind fashion; e. for officers to disclose the identity of the subject selected to the array viewer; f. to use photographs of a suspect even where the photograph is outdated and the suspect's appearance has changed; g. to conduct repeated identification procedures with the same witness, even after the identity of the suspect was previously revealed; h. where a perpetrator was described as having an accent and the suspect did not, to prohibit the lineup participants from speaking; i. to deprive the suspect of distinguishing characteristics through the use of seated lineups, hats, sheets and phonebooks; and j. to select lineup fillers without accounting for the demographics of the suspect." ¶ 132.

Plaintiff alleges, again in purely conclusory terms and with no reference to any specific underlying constitutional claim, that "the foregoing policies, practices and customs proximately caused the wrongful conviction in this case and the damages sustained by the plaintiff." ¶ 133.

<u>Nassau County Police Indemnification Review Board Indemnifies All Individual Defendants</u>

In December 2019, the Nassau County Police Indemnification Review Board examined all allegations Plaintiff made against defendants Ross, DeCaro, Lipson, Dluginski, Darienzo, and Dorsi. The Board found the acts attributable to each by Plaintiff occurred "while in the proper discharge of said officer(s) duties and within the scope of his/her employment." *See* Exh. I. As such, under N.Y. Gen. Mun. L. §50-l,[6] the Board fully indemnified each officer for the conduct alleged in this suit. In January 2021, after Plaintiff added defendant Yao and Strange to this suit, the Board made the same findings about their alleged actions and granted them the same full indemnification. *See* Exh. J.

---

[6] The letters mention N.Y. Gen. Mun. Law § 50-l, which authorizes Nassau County to "indemnify and save harmless" its police officers in civil actions against police officers "whenver such action, proceeding or judgment is for damages, including punitive or exemplary damages, arising out of a negligent act or other ort of such police officer committed while in the proper discharge of his duties and within the scope of his employment."

7

Thus, by January 2021, Nassau County agreed to indemnify all individual defendants against any damages, including punitive damages.

<u>Events Involving Matthew Ross</u>

After his exoneration, Galloway retained Thomas Liotti, a Nassau County attorney to represent him. Mr. Liotti filed two lawsuits: (a) a claim the New York Court of Claims against New York State under Art. II, § 8-b(3), (4), and (5), *see* Exh. K, and (b) the present federal court lawsuit against the County and the individual defendants. [DE-1] Five days after Mr. Liotti filed these cases, Galloway replaced Mr. Liotti with his current lawyer, Gabriel Harvis. [DE-5]. Mr. Liotti filed a notice of lien on any recovery by Galloway. [DE-8].

Retired Detective Matthew Ross is a defendant in this case. His involvement in the Galloway investigation was peripheral. As described above, after Galloway's grand jury indictment, the District Attorney petitioned the criminal court for permission to conduct a post-indictment lineup. The criminal court directed the lineup. Although Galloway's hair was in cornrows at the time of his arrest on June 5, 2008, when he appeared for this lineup on August 5, 2008, he had teased out his hair into a big afro, different from the style at the time of his arrest. FAC ¶ 48. The lineup did not go forward for that reason.

On August 14, 2008, the rescheduled lineup occurred. Galloway's hair again was in cornrows. Matthew Ross, who had experience conducting lineups but who had no other involvement in the shooting investigation, directed the lineup, with assistance from Det. Dluginski. Det. Sgt. Richard Dorsi was present, as was A.D.A. Joseph LaRocca and Galloway's defense lawyer, Glen Hardy. *See* Exhibit L[7] Because none of the black male fillers in the lineup had cornrows, each of the subjects in the lineup wore painters' caps. Because Galloway was shorter

---

[7] Exhibit L contains a list of attendees to the August 14, 2008 lineup.

than the fillers, each of the subjects sat down, covered by a sheet. To disguise Galloway's smaller stature compared to the fillers, he sat on phone books to equalize his height. These actions to disguise Galloway's hair and height occurred in the presence of Galloway's lawyer, were undisputed in the criminal case, and are undisputed in this case.

In November 2020, Plaintiff's counsel deposed Matthew Ross. Because he is in Florida, the deposition occurred virtually. His girlfriend, Lori Magliaro, helped Mr. Ross set up the Zoom connection for the deposition.

In January 2021, Thomas Liotti, long since removed from both cases, surfaced. He wrote a letter to the Nassau DA, and he copied Mr. Harvis (Galloway's current lawyer), and others. His letter says, "Enclosed is an affidavit from Ms. Lori Magliaro attesting to the perjury and misconduct of police officers in [People v. Josiah Galloway].  I am representing Ms. Magliaro [pro bono publico]." *See* Exh. M. The letter enclosed an affidavit from Lori Magliaro, sworn to on January 4, 2020.  The affidavit states, in relevant part:

> 1. I am voluntarily coming forward to give this affidavit because it is true and because I further believe that no one should testify untruthfully under oath.
> . ..
>
> 3. I am making this affidavit pro bono publico, without compensation of any kind and with no promises of future consideration of any kind.
>
> 4. I initiated this contact with Thomas F. Liotti, Esq., one of Mr. Galloway's former attorneys and he has agreed to represent me pro bono publico on this matter. He has assisted me in the preparation of this affidavit. My address and phone number are being withheld due to my fear of retribution by the person against whom I am giving this affidavit, to wit: Matthew Ross (56), a retired Nassau County Homicide Detective.
>
> 5. Mr. Ross and I lived together for two years, from approximately August, 2018 to November of this year. Because of a pattern of lies and deceit by him culminating in his testimony in an Examination Before Trial on or about November 9, 2020 I elected to leave him.

6.	We were never married but Mr. Ross privately shared with me the details involving his roles in the arrest, processing and prosecution of Josiah Galloway, who as I understand it was wrongfully incarcerated for more than ten years.

7.	If afforded a copy of his transcripts, I will be able to pin point exactly where he lied in the EBT and Municipal Law Hearing.

8.	Mr. Ross told me that Josiah Galloway did not match the description given to them by the victim of the assailant. He told me that his hair was different and they (the police) used clippers on his hair in order to make him look more like the assailant. They contrived a line-up where Josiah wore a baseball cap to conceal the difference in hair and since his height was not the same as the assailants, they made adjustments on that as well to make Josiah look taller.

9.	I was present for Mr. Ross' EBT and after it, I told him that he lied under oath, that we could not longer live together and I then moved out.

I contacted Mr. Liotti to ask him, given the absence of Ms. Magliaro's address in the affidavit, if he would accept service of a deposition subpoena for her. He said he would.

On February 23, 2021, Mr. Liotti sent a letter to defense counsel. It said, "Your client's conduct is harassing, bizarre, and defamatory. He must immediately stop or we will file a complaint with the District Attorney's Office and seek a protective order. I am enclosing some of his e-mails to my client." Attached to the letter were emails and texts from Matthew Ross to Lori Magliaro of two types: (a) his angry lashings out at her for her life choices, family, and finances, and (b) professions of love, apology, and requests to reunite. These communications are highly personal and paint a picture of a romantic relationship gone very sour.

Through Mr. Liotti, defense counsel served Ms. Magliaro with a deposition subpoena calling for her deposition on June 15, 2021.

Ms. Magliaro appeared for her deposition on June 15 ,2021, represented by Mr. Liotti. *See* Exhibit "N".[8] She admitted signing the affidavit, but she said Mr. Liotti put statements in the

[8] Exhibit "N" is the transcript of the deposition of Lori Magliaro, taken on June 15, 2021.

affidavit that were not true and told her she had to sign it; she had no choice. Mr. Liotti told her he would not represent her if she did not sign it. In the deposition, she recanted the major allegations in the affidavit. She denied knowing that Matt Ross lied under oath and denied that he told her the things she quotes him saying in the affidavit. On further questioning, she testified that Mr. Liotti told her he had represented Galloway and had a lien on any recovery for his attorneys fees (meaning he will benefit financially if Galloway wins this case).

While representing Ms. Magliaro in her deposition, Mr. Liotti advised Mr. Harvis of the emails he sent to defense counsel. *See id*., pp. 59-60. Mr. Harvis asked for them and defense counsel provided them.[9]

After the deposition, Mr. Liotti sent Plaintiff's and defense counsel a letter with attachments. *See* Exhibit O. He wrote, "I was totally taken aback and shocked by Ms. Magliaro's testimony today wherein she recanted her affidavit. I have written to her to decline any further legal representation of her. I had no advance warning that she intended to recant. I am enclosing copies of e-mails and correspondence sent to and from Ms. Magliaro as well as correspondence written in her behalf. Ms. Magliaro had seen a story in Newsday on the Galloway case and contacted Joseph DeFelice, Esq., whose name appeared together with mine in the story. She informed me that she was present for an EBT[ ] of former Detective Ross and that he, in her opinion, had lied under oath based upon prior statements made to her by him. The inclusion of the reference to the Municipal Law hearing in her affidavit was an inadvertent mistake probably on my part."

---

[9] Mr. Liotti's conduct here is unethical. Putting aside his obvious cajoling to get Ms. Magliaro to sign this affidavit after she expressed hesitation (where he has a financial interest in Galloway obtaining a recovery in this case), he failed to advise Ms. Magliaro about the attorney-client privilege he had with her and even contributed to breaching it by sending out his communications with his client. Beyond that, he failed to consult her about a Fifth Amendment privilege she had before she testified about signing a false affidavit.

The attachments to this letter include some more emails between Matt Ross and Lori Magliaro like the earlier documents Mr. Liotti provided. The newly supplied documents from Mr. Liotti also include important emails between Ms. Magliaro and Mr. Liotti. On December 15, 2020, Ellen Luxmore, a paralegal in Mr. Liotti's office, forwarded an affidavit to Ms. Magliaro, presumably the one she signed or an earlier version; Mr. Liotti did not supply the attachment to the email, but the email describes a draft affidavit for Ms. Magliaro.

Two days later, on December 17, 2020, Ms. Magliaro emailed either Ms. Luxmore or Mr. Liotti: "Since speaking with Mr. Liotti and I truly appreciate him speaking with me and offering to represent me, I've decided to hold off on this just because mentally I've become physically ill and depressed from all the stress that leaving the relationship has caused me alone. I just can't afford to go through any added stress right now, my name being exposed as well and my family is very concerned about me. Please understand my situation and respect what I am going through. I'm taking my life one day at a time right now and trying to heal and get on my feet. Thank you so much for your time and Merry Christmas." *See* Exhibit P.

The next day, on December 18, 2020, Ms. Magliaro e-mailed Ms. Luxmore: "If Mr. Liotti feels I would benefit more from this than the risks, or approach a different way I am open to options." An hour later, Mr. Liotti responded, "Lori: I cannot predict the benefits or risks to you. But, I do have an ethical obligation to report perjury to the Court. I would urge you to speak truth to power." *See* Exhibit Q.

All County Defendants Execute Written Conflict Waivers

After Plaintiff's recent suggestion of a conflict, and after Plaintiff reduced his suggestion to this motion, Sokoloff Stern LLP discussed the matter with each of its clients and urged them to obtain outside advice on whether they should request separate counsel, an option available to them.

As reflected in the attached affidavits, each wants continued representation by Sokoloff Stern LLP, and each waives any actual or potential conflict of interest. *See* Affidavits, Exh. R.

## ARGUMENT

## POINT I:  NO CONFLICT PRECLUDES REPRESENTATION OF ALL NASSAU COUNTY DEFENDANTS

Disqualification of an attorney is a matter committed to the sound discretion of the district court. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). The Second Circuit instructs courts to exercise their power to disqualify reluctantly. *Glueck v. Lonathan Logan, Inc.* 653 F.2d 746, 748 (2d Cir. 1981) ("Recognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted only when a violation of the Canons of the code of Professional Responsibility poses a significant risk of trial taint."). One court has observed that "The disqualification of counsel 'is an extreme and disfavored action in this Circuit." *Wik v. City of Rochester*, 2010WL1142993, *1 (W.D.N.Y. 2010).

*Dunton v. County of Suffolk*, 729 F.2d 903 (2d Cir. 1984) presents a textbook conflict of interest. There, an attorney simultaneously represented a police officer sued in his individual capacity for depriving Plaintiff of his civil rights and a municipality sued for having a policy and practice that led to the civil rights deprivation (*Monell v. Department of Soc. Services of the City of New York*, 436 U.S. 658 (1978)). At trial, counsel, representing the individual and the municipality, argued to the jury that the police officer's actions were those of "an irate husband" and "not even as an officer," which simultaneously exculpated the County from *Monell* liability *and* made qualified immunity harder for the officer. Because the officer's legal and financial interest required the officer to argue that he was following County policy and the County's legal and financial required were best served by arguing that the officer went rogue and did not follow

County policy, the Second Circuit retroactively discerned an attorney conflict in the simultaneous representation. The Circuit remanded for a new trial and advocated future vigilance against such conflicts.

"District courts have interpreted *Dunton* to require disqualification of counsel representing both an individual officer and the municipal employee in Section 1983 cases only where counsel acts in a way that is *actually* against the officer's interests." *Lieberman v. City of Rochester*, 681 F. Supp. 2d 418, 425 (WDNY 2010) (*citing Coggins v. County of Nassau*, 615 F. Supp. 2d at 33 and *Weintraub v. Bd. of Educ. of the City Sch. Dist. of City of New York*, 2001 WL 984933, *2-3 (EDNY 2001)).

Post-*Dunton* cases show the Second Circuit's reluctance to find conflicts in 42 U.S.C. § 1983 cases. In *Leather v. Ten Eyck*, 2 Fed. Appx. 145, 148 (2d Cir. 2001), the Second Circuit explained that "a necessary element of the conflict of interest claim… is that 'counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.'" (citing *Gordon v. Norman*, 788 F.2d 1194, 1998 (6th Cir. 1986), *cert. denied* 533 U.S. 941 (2001)).

In *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993), the Second Circuit found disqualification unnecessary where the city attorney had argued that "officers were acting in their official capacity" and had "advanced and argued all possible defenses available to the officers, including qualified immunity."

No conflict exists here.

<u>The Motion's Timing Speaks Volumes</u>

In *Board of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979), a case cited by Plaintiff, the Second Circuit observed that "disqualification has an immediate adverse

effect on the client by separating him from counsel of his choice, and that *disqualification motions are often interposed for tactical reasons*." (Emphasis added.) Plaintiff's motion fits the bill.

Near the end of a year-plus period of factual discovery in a complex, document-heavy case, and after close to twenty depositions of parties and non-parties, Plaintiff for the first time wants to deny all Nassau County defendants the counsel of their choice. The tactical purpose of this motion – to cost the County money and, at the end of discovery, to deny the County defendants the attorneys who are familiar with the extensive record -- appears from its timing and its weakness.

When Plaintiff filed this suit on September 4, 2019, nearly two years ago, he alleged that defendant Lipson used an outdated photo of Galloway in photo arrays shown to two witnesses. *See* [DE-1, ¶ 29, p. 11]. He also alleged that defendant Ross altered Galloway's height in a post-indictment line-up. [DE-1, ¶ 29, p. 13].[10]

On October 24, 2019, Plaintiff's current counsel, Gabriel Harvis, filed an "Amended Complaint." *See* [DE-9] ("Harvis October 2019 complaint"). Except for Nassau County PD Detectives Yao and Strange, the Harvis October 2019 complaint included all the individual Nassau County Police Department officers he sues today. The Harvis October 2019 complaint included a *Monell* claim against the County based on the same identification procedures – photo arrays and line-up – that are part of his *Monell* claim against the County today. [DE-9, p. 20 ("FOURTH CLAIM – *Monell*"). The Harvis October 2019 complaint essentially made the same claims against the officers involved in the Galloway prosecution as Galloway makes today.

On November 12, 2019, counsel for the Nassau County defendants appeared [DE-31], putting movant on notice of the joint representation he now seeks to scuttle. Except for the recent

---

[10] The photo arrays and line-up were the subjects of extensive pretrial and trial testimony during Galloway's prosecution. The criminal court several times upheld the consitutionality of those procedures. Plaintiff and the counsel who drafted the complaint(s) in this case knew the roles of the Lipson and of Ross in the photo array and line-up from at least when they drafted the pleadings here.

events involving Lori Magliaro, the Harvis October 2019 complaint had all the ingredients of his purported "Officer v. Officer Conflict" and "Officer v. Municipality Conflict." No disqualification motion followed.[11]

On March 31, 2020, Plaintiff again amended the complaint. [DE-53] ("Harvis March 2020 complaint"). This complaint, the Second Amended Complaint, removed a *Monell* claim against Nassau County, but it added defendants Yao and Strange; their roles are peripheral to the essential allegations of the pleading. Plaintiff's counsel provided a redline comparison of the new complaint to its predecessor. It is Exh S. The allegations in the Harvis March 2020 complaint involving Lipson and Ross are the same as the allegations today. No disqualification motion followed.

On October 22, 2020, Plaintiff amended the complaint again. [DE-80] ("Harvis October 2020 complaint"). This amendment added a Hempstead Police Department defendant, Joseph Sortino, claiming Sortino signed a felony complaint against Galloway. It made no change in the essential allegations against the Nassau officers, including Lipson and Ross. No disqualification motion followed.

On May 11, 2021, Plaintiff amended the complaint again. [DE-114] ("Harvis May 2020 complaint"). This complaint restored a *Monell* cause of action against Nassau County based on a claim that some actions of the Nassau County individual defendants followed County policy. *Id*. ¶ 132-3.

After preparing and serving *four* complaints over nearly two years, after defense counsel received and turned over *thousands* of pages of documents in discovery, and after nearly *twenty* depositions, Plaintiff's counsel suddenly decided that counsel for the Nassau County defendants

---

[11] The Harvis October 2019 complaint also sued Village of Hempstead police officers and simultaneously interposed a *Monell* claim against the Village, yet no disqualification motion ensued against the lawyers jointly representing Hempstead officers and the Village of Hempstead.

had a conflict requiring disqualification. In so moving, counsel points to allegations at the heart of his case essentially since day one. Plaintiff's counsel does identify any previous communication from him to defense counsel during the years he has litigated this case identifying or hinting at a conflict or concern over a conflict. There was silence from Plaintiff's counsel about the matter – alleged attorney conflict -- he cites cases to say is responsibility of all sides and the court to supervise.[12]

<u>No officer v. officer conflict</u>

Plaintiff suggests two "officer v. officer" conflicts: (a) Lipson and everyone else and (b) Ross and everyone else. Neither presents a conflict, and neither is enough to deprive any defendant of his counsel of choice.

Plaintiff argues that Det. Lipson prepared the photo arrays and presented them to shooting victim Anyosa and witness Hernandez. He acted alone. Nobody disputes the photos he put in the arrays. Nobody disputes the identifications made by Anyosa and Hernandez; both picked Galloway's photo. Neither Anyosa nor Hernandez claim Lipson told them whom to select. No defendant disputes or contradicts Lipson's testimony. No defendant or County representative argues that Lipson acted outside the course and scope of his employment or violated Nassau Police Department policy. The interests of all defendants align with Lipson.

Plaintiff's woeful attempt at a conflict is, "The seven officers represented by Sokoloff who did not prepare or administer the photo array have good reason to distance themselves from

---

[12] The bad-faith nature of this motion appears in the moving brief's ad hominem last sentence: "Whatever protestations this Court hears from the Sokoloff firm, we ask that the credibility of those assertions be considered in the context of a law firm which has not even attempted to assert that it recognizes the conflict and has sought to address them." That statement is easily turned on its maker; one needs to judge the seriousness of any claims of conflict by against Plaintiff's counsel's years-long failure to raise any such issue. That last ad hominem sentence shows this motion is no "Judge, we just want to make sure going forward that there is no conflict" assurance. It is a motion designed to take out defendants' counsel of their choice in a complicated case when it would be nearly impossible for replacement counsel to get up to speed. *Dunton*'s teaching to be vigilant about conflicts in 42 U.S.C. § 1983 cases is not a license for the timing and tactics of the present motion.

defendant Lipson." *See* Plaintiff's Memo, p. 2. They already *are* distanced from Lipson, as none played any role in the photo array. And, they want Sokoloff Stern, LLP, the law firm representing them from the beginning, to keep doing so. They see no reason, and the Court should see no reason, to disturb their choice.

There is no conflict between Ross and any other defendant, either. Ross, as the detective most experienced in conducting live line-ups, helped set up the court ordered Galloway line-up. Everything Ross did occurred in the open in front of an Assistant District Attorney, in front of other officers, but also in front of Galloway's criminal defense counsel. Plaintiff has not identified any factual dispute about what occurred during that line-up, nor could he. Nobody disputes that Ross followed Nassau Police Department policy when conducting the lineup.

Plaintiff argues for a counsel conflict not based on any conflicting evidence or conflicting interests in the case, but instead on the legally insignificant (and inaccurate) statement "it is hard to imagine that Sokoloff's other clients… would elect to stand trial jointly represented with this defendant [Ross]." Plaintiff's Memo of Law, p. 3. That is exactly what they want.

Lori Magliaro's affidavit does not change the analysis. Fueled and coaxed into submitting it by Galloway's former lawyer during an emotional breakup with Mr. Ross, Ms. Magliaro's affidavit is either irrelevant or easily impeachable.[13] The extra efforts needed to exclude or impeach Magliaro's affidavit do not put his interest at odds with any other defendant.

This case is unlike any invoked by Plaintiff. In *U.S. v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), a severe conflict of interest put the interests of one client against the interests of another client. At

---

[13] Ms. Magliaro offers no first-hand evidence about anything in this case. She claims, for instance, that Det. Ross cut Galloway's hair. Even *Galloway* admits nobody touched his hair. She also claims that, in some unspecified way, Ross lied in his deposition and his "municipal hearing." He had no "municipal hearing." The affidavit, since recanted by Magliaro herself, is a combination rant of an angry recent ex-girlfriend and attempt by a lawyer with a lien to collect on it.

issue in the criminal case was how many police officers were in the bathroom besides Justin Volpe for the abuse of Abner Louima. Counsel for Schwarz argued that nobody besides Volpe was in the bathroom. In so arguing, he discounted evidence showing there was a second officer who was not Schwartz. That evidence tended to exculpate Schwarz, but it inculpated the PBA, Schwarz's lawyer's other client in a civil suit by Louima charging conspiracy by more than one officer.[14] According to the Second Circuit, the interests were so starkly divergent that the two clients could not waive the conflict.

Plaintiff fails to identify evidence showing any conflict between the parties here, much less evidence of the stark conflict presented in *Schwarz*.

*Blake v. Race,* 01-CV-6954 (SJ), DE-75 (SDNY 2005), an unreported decision, also identifies specific evidence putting the interests of multiple parties at odds. In *Blake*, a wrongful conviction case, plaintiff charged multiple defendant police officers with failing to provide the District Attorney with exculpatory *Brady* material. The New York City Corporation Counsel represented not only the officers but the Assistant District Attorney who prosecuted the underlying criminal case. Magistrate Judge Pollack found several conflicts rooted in the specific evidence of the case. First, she said it was likely the Assistant District Attorney would testify that the undisclosed material was relevant and exculpatory and should have been turned over if the officers knew of it, directly contradicting the testimony of one defendant. Second, she said that, while the officers denied remembering the sequence of events related to the putative *Brady* material, "their recollections may be refreshed by other evidence introduced at trial and they may then recall

---

[14] "Wiese [a police officer] stated that he had escorted Louima towards the bathroom with Volpe and had later entered the bathroom during Volpe's assault on Louima, while Bruder stated that had overved Wiese and Volpe escorting Louima to the brathoom. Rather than pursue this strategy, Schwarz contends, Worth advanced the implausible and factually unsupported theory that Volpe acted alone and that Louima fabricated the prsence of a second officer to demonstrate systemic police brutality and to salvage his 'manhood,' all in an effort to obtain an acquittal for Schwarz without having to implicate another member of the PBA [Worth's other client]." *U.S. v. Schwarz,* 283 F.3d at 92.

having such knowledge… Since the prosecutor has not yet been deposed and presumably counsel for defendants has not spoken with ADA Catalano directly, it is impossible to say with certainty that there is no conflict here between the prosecutor's testimony and that of the officers." Finally, Magistrate Judge Pollak was not pleased that the Corporation Counsel instructed the Assistant District Attorney to refrain from signing an affidavit previously promised to Plaintiff.

This case is unlike *Race*. First, Plaintiff here has already deposed the prosecutors involved both in the Galloway prosecution and in the recent DA's Conviction Integrity Unit reinvestigation of the Galloway prosecution. Plaintiff – and everybody else -- knows what they said. Nothing is at odds with the testimony of defendants. The District Attorney found no wrongdoing by police.

<u>No municipality v. Officer conflict</u>

In *Coggins v. County of Nassau*, 615 F. Supp. 2d 11, 33 (EDNY 2009) (Bianco, J.), as here, the Nassau County Police Officer Indemnification Board found defendant officers acted within the proper discharge of their duties and within the scope of their employment; as here, the Board indemnified the officers. Judge Bianco found that this indemnification aligned the interests of all defendants. "In fact, the interests of the County, Buonora, and Vara appear to be aligned following the Board's March 14, 2008 determination. Even Buonora concedes, 'at the end of the day, due to the final determinations of the Nassau County Police Officer Indemnification Board that both Officer Vara and Officer Buonora acted within the proper discharge of their duties and within the scope of their employment, the County of Nassau, her employer and a party to the action is financially responsible for any verdict or judgment entered against both officers.' (Buonora Mem., at 22.) Thus, any judgment against Buonora will effectively be one against the County."

Here the Nassau County Police Officer Indemnification Board made the same findings against every defendant. Under N.Y. Gen. Mun. Law § 50-l, this finding indemnifies all individual defendants against all damages, including punitive damages.

Plaintiff's counsel received every indemnification letter in discovery, rendering his entire three-plus page discussion of "Officer v. Municipality Conflict" frivolous and in bad faith. *Coggins*, a reported decision of this Court directly on point, appears nowhere in the moving brief.

<u>No District Attorney v. Individual conflict</u>

No conflict exists because defense counsel represented employees of a defendant, Nassau County, at depositions. Plaintiff's argument is bizarre. Plaintiff claims a conflict exists because "Sokoloff… represented the DA witnesses. [plural]. By repeatedly instructing the witness [singular] not to answer, Sokoloff prioritized the interests of the County in avoiding liability over the core fact-finding function of the discovery process." Plaintiff's Memo of Law, p. 11.

On September 11, 2020, Plaintiff's counsel deposed Sheryl Anania, the first witness Plaintiff deposed in the case. Ms. Anania is an employee of the Nassau County District Attorney's Office, and, per force, an employee of Nassau County. At that deposition, Plaintiff's counsel asked her this question, "[W]hether or not it is proper or constitutional, for a police officer to tell a crime victim, that they have identified the right person." *See* Anania Deposition, p. 80-81, annexed as Exhibit 4 to Plaintiff's disqualification motion. Defense counsel objected and invoked a privilege, the attorney work-product doctrine. Plaintiff's counsel, Mr. Harvis, then said, "We'll mark that for a ruling and we'll finish doing the deposition and we'll call Judge [Orenstein] and find out if that's a question that needs to be answered." At the end of the deposition, with all counsel present and available, Mr. Harvis placed no such call. From September 11, 2020 until today, he made no motion to compel an answer.

Instead, Mr. Harvis claims that, by invoking the work-product doctrine, "Sokoloff prioritized the interests of the County in avoiding liability over the core fact-finding function of the discovery process." Plaintiff's Memo of Law, p. 11. One could make the same argument any time an attorney invokes a privilege in a deposition. Any privilege exalts the interests of a witness over the "fact finding function of the discovery process," but that hardly put the lawyer invoking the privilege in a conflict with a party in the case.

At another point, in his brief, Mr. Harvis says, "Sokoloff… impeded their favorable testimony to benefit its [*sic*] clients." Favorable testimony to whom? A conflict would exist if defense counsel sought to suppress testimony that would be helpful to one client but hurtful to another. No conflict exists where counsel invokes a valid privilege where Plaintiff thinks the privileged information will help him. Defense counsel does not need to counsel clients against invoking privileges simply because waiving the witness's privilege will help *plaintiff* obtain favorable evidence. The invocation of the privilege in the Anania deposition was not adverse to the interests of any defendant in the case.

This case is thus unlike the situation in *Blake v. Race*, a case cited by Plaintiff, where (a) the District Attorney had not yet spoken to defense counsel and (b) the court speculated that *Brady* violation alleged by Plaintiff, the District Attorney and the police might be at odds over responsibility for it. Here, the District Attorney's Office has already been deposed and its testimony is not at odds with the police.

There is no conflict stemming from Ms. Anania's deposition.

**POINT II: ALL COUNTY DEFENDANTS EXECUTED CONFLICT WAIVERS.**

Even if a conflict of interest exists here, disqualification is inappropriate. Each defendant has executed an affidavit attesting to his/its understanding of the right to separate counsel, his/its understanding of the issues, his/its understanding of the opportunity to consult outside counsel for

advice on whether separate counsel is in his/its best interests, and his/its choice to continue with representation by Sokoloff Stern LLP. *See* Exhibit R. "Under such circumstances, a court which satisfies itself that consent has been freely and intelligently given should refrain from paternalistically infringing on a party's right to a lawyer of his choice absent compelling factors indicating the attorney's loyalty to his client has been incontrovertibly compromised." *Vegetable Kingdom, Inc. v. Katzen*, 653 F. Supp. 917, 925 (NDNY 1987). *See also Drag Racing Technologies, Inc. as D.R.T., Inc. v. Universal City Studios, Inc.*, 2003 WL 1948798, *4 (SDNY 2003)("Because the defendants have chosen to pursue a united defense against the plaintiffs' charges, and because the defendants have demonstrated their informed consent to joint representation, permitting them to go forward with joint representation does not sufficiently increase the risk of trial taint."), *Smith v. City of New York*, 611 F. Supp. 1080, 1091 (SDNY 1985)("[T]here is substantial authority for the poposition that Canon 5 potential conflicts of interest are adequately dealt with by the clients' informed consent, thereby precluding disqualification under Canon 5.")

## CONCLUSION

The County Defendants ask this Court to deny Plaintiff's motion to disqualify defense counsel, with such other relief as this Court may deem just, equitable, and proper.

Dated: Carle Place, New York
     August 23, 2021

SOKOLOFF STERN LLP
*Attorneys for County Defendants*

Brian S. Sokoloff

Brian S. Sokoloff
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500
File No. 190164
