


179 WESTBURY AVENUE, CARLE PLACE, NEW YORK 11514 PHONE (516) 334-4500 FAX (516) 334-4501 WWW.SOKOLOFFSTERN.COM

BRIAN S. SOKOLOFF
BSOKOLOFF@SOKOLOFFSTERN.COM

February 9, 2022

Hon. Ann M. Donnelly
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

**VIA ECF**

Re: *Galloway v. Nassau County, et al.*
Docket No. 19-cv-5026 (AMD)(JO)

Dear Judge Donnelly:

I represent the Nassau County Defendants. I write at the Court's invitation to discuss the small or non-existent role Nassau County Assistant District Attorney Sheryl Anania will have in the trial. This Court invited this submission at the hearing on January 11, 2022 and updated the deadline for such submission on January 25, 2022.

The Universe of Anania Testimony

The place to find Ms. Anania's role in this matter (and to discern whether she would appear at trial, and about what) is in her deposition, taken by Plaintiff on September 11, 2020. I annex the complete transcript as Exhibit "A" and cite its pages as "Dep. p. x."

Ms. Anania is the Executive Assistant District Attorney in the Nassau County District Attorney's Office, where she has worked since 2006. Dep. pp. 9-10. She has been in charge of the Conviction Integrity Unit since 2013. *Id.*, p. 11. She also oversees the Appeals Bureau and is in charge of a program called Closer to the Crib. *Id.*, p. 10. Before working in Nassau, she was an Assistant District Attorney in Brooklyn for twenty-five years. *Id.*, p. 11.

As head of the Conviction Integrity Unit, Ms. Anania's job is to interview witnesses. The goal in such investigations is to find out what happened in the case. One of the things they could learn is if a conviction were obtained in violation of the law. *Id.*, p. 13. Conviction reviews try to figure out if the person who was convicted was innocent of the crime. *Id.*, p. 14.

There is no practice to report misconduct by police to the Police Department if a conviction review finds police misconduct. This has not happened yet. No rule prevents Ms. Anania from making a criminal referral about police misconduct. *Id.*, pp 15-17.

Ms. Anania conducted the reinvestigation of the Galloway conviction. One of the executives in her office and Mike Walsh, Chief of the Major Office Bureau, told her that someone called into the office claiming to have information showing Galloway may not be guilty of the crime for which he was convicted ten years earlier. They asked her to step in and look at it. *Id*., p 17.

By the time Ms. Anania got involved, they had spoken to the woman, saying she knew who really committed the crime. Ms. Anania's colleagues had come up with the name of the person the caller identified. *Id*., p. 18.

Thus, by the time Ms. Anania began her work on the matter, there had been an allegation that Galloway was not guilty and information about the person who allegedly committed the crime. Ms. Anania's goal was to investigate this and see where it went. *Id*., p. 21. In the deposition, Ms. Anania identified the notes she made during her investigation. *Id*.

Her notes begin by talking about the person who made the first report to the District Attorney: "Contacted DA two months ago, called tip line and then called Hempstead PD and then spoke to Mike Walsh [of the DA's office]." *Id*., p. 22.

Ms. Anania brought the caller ("N.J.")[1] into her office and, along with a colleague, Martin Meaney, interviewed the initial caller. (Mr. Meaney is a senior ADA in the Major Offense Bureau.) At the interview, Ms. Anania showed N.J. a photo of the new suspect to ask if that was who she was referring to. It was. Ms. Anania wanted to make sure N.J. had no affiliation with Galloway. *Id*., pp. 25, 27, and 32.

Before interviewing N.J., Ms. Anania read through the District Attorney's file on the Galloway case. She read through some of the witnesses' trial testimony. *Id*., p. 32-3.

The new suspect was K.S. *Id*., p. 37. In her interview with N.J., Ms. Anania learned that N.C., the girlfriend of the newly suspected perpetrator, drove a 2003 or 2004 gray Toyota Corolla, the type of car eyewitnesses said was involved with the crime. *Id*., p. 34.[2] N.J. also gave Ms. Anania the names of other people with knowledge of the crime, who may have been present when N.C. made admissions about the crime. *Id*., p. 38-9.

N.J. also told Ms. Anania that N.C. (girlfriend of K.S.) made admissions indicating that N.C. may have been involved in the shooting. In particular, N.J. reported that N.C. said she was in the car at the time of the shooting and cleaned blood from the car after the shooting. *Id*. pp. 39-40. Ms. Anania's investigation could not corroborate that. *Id*., p. 41. When Ms. Anania interviewed N.J., N.J. no longer had a relationship with N.C. *Id*., p. 45.

---

[1] For protection of innocent people, the parties agreed to replace certain names with initials in the deposition transcript.
[2] Ms. Anania later confirmed that N.C. drove a 2003 Toyota Corolla in 2008. Her office had a search done of cars registered to N.C. at the time, and the results showed she had such a car registered to her then. *Id*., p. 55.

Ms. Anania asked N.J. why she was coming forward after all these years. N.J. replied that she wanted someone to know what happened. *Id.*, p. 45. N.J. said the first time she called a tip line was two months before speaking to Ms. Anania. *Id.*, p. 113.

After the meeting, Ms. Anania had a follow-up called with N.J. in which she provided some information about some of K.S.'s family members. *Id.*, p. 46.

After the N.J. interview, Ms. Anania obtained prison phone recordings of Galloway and K.S., the new suspect. The goal was to see if either man made any admissions. Ms. Anania listened to some, not all, recordings, but did not hear any admissions by either man. *Id.*, pp. 42-44.

Ms. Anania had third contact with N.J., when Ms. Anania contacted her to tell her the D.A. would vacate the Galloway conviction. *Id.*, p. 50.

Ms. Anania knew the description of the shooter given by witnesses in the case, and she came to learn that K.S., the new suspect, resembled that description. *Id*. at 36.

In reading the trial transcript, Ms. Anania read the testimony of Robert Ogletree about police coercion of him. Ms. Anania did not speak to Ogletree. She does not remember if she tried to talk to him and he refused or if she could not reach him. *Id.*, p. 51.

Ms. Anania did not speak to any police officers involved in the Galloway investigation. *id.*, p. 52, nor did she speak to the police composite sketch artist. *Id.*, at p. 53.

Ms. Anania noticed that there were discrepancies between the suspect's height as reported by victim Jorge Anyosa and witness Wilmer Hernandez and Galloway's height. *Id*. p. 53.

Of the two identification cab driver witnesses at criminal trial, Anyosa (victim) and Hernandez, Ms. Anania said she spoke only to Anyosa. She does not recall why she did not speak to Hernandez. She thinks she could not reach him. *Id.*, p. 48-49.

Ms. Anania met with Anyosa in her office on August 28, 2018. He came by himself. Ms. Anania does not remember who else was present. *Id.*, p. 56.

Ms. Anania showed Anyosa a photo of K.S. taken from an arrest in March 2008, two months before the shooting of Anyosa, and asked him, "Do you recognize who this is?" Anyosa answered, "That's the person that shot me." Ms. Anania replied, "That's not the person who was convicted." Anyosa was surprised. *Id.*, p. 57.

Ms. Anania talked to Anyosa about the case and what happened during the identification of the photos. Ms. Anania asked Anyosa if the officer(s) directed him who to pick out, and he said no. Anyosa said that, after the photo array, officers told him he had the right person.[3]

Anyosa told Ms. Anania that he is 5'10" or 5'11" and the other person who committed the crime was about his height because he tried to head butt him.[4] *Id*. at p. 58.

The meeting with Anyosa was fairly lengthy, about an hour. He described the crime to Ms. Anania, but she did not take notes of what he said because he testified about the crime at the trial. Anyosa was conversant in English. *Id.*, pp. 61, 63.

In his meeting with Anania, Anyosa said nothing indicative of K.S.'s guilt, Galloway's innocence, or misconduct by police officers. *Id.*, p. 61

Ms. Anania also spoke to Anyosa about the live lineup at which he picked out Galloway. She asked him if anyone influenced him to pick out Galloway, and he said no. *Id*., p. 83.

Ms. Anania spoke to Anyosa again, when she called him to alert him to her office's decision to vacate Galloway's conviction. *Id*., pp. 59-60. Her notes record the conversation, "In court he didn't feel 100 percent sure, but he felt pressure because he knew Wilmer had identified him and detectives said it was the right guy. He wants Josiah to know he is very sorry. He is afraid he might try for revenge. Wants an order of protection. Told him he wouldn't get it and I didn't think he needed it. He wishes the police had told him defendant was 5'6". He would have told them Josiah didn't do it." *Id.*, p. 61.

When, during Ms. Anania's phone call with Anyosa he said he felt pressured, Anania took it as he felt pressure on himself, not that Hernandez pressured him. *Id*., 76. Ms. Anania did not know how Anyosa knew that Hernandez picked out Galloway's photo. *Id*., p. 78.

Anyosa never told Ms. Anania that a police officer pressured him to identify anyone in a photo array, lineup, or in open court. *Id.*, p. 116. Ms. Anania specifically asked Anyosa if anyone pressured him about who to identify in court. *Id*., p. 119.

Ms. Anania met with N.C. (K.S.'s girlfriend) on August 28, 2018, the same day she met with Anyosa. Det. Biddel of the D.A.'s office was also present. *Id*., p. 66-7. In the meeting, N.C. admitted the Toyota Corolla was hers and that K.S. drove it. N.C. said she heard about the cab driver shooting but denied any personal knowledge of it. She denied that K.S. confided in her about it. N.C. denied that it was in K.S.'s nature to do something like that. Det. Biddel reported to Ms.

---

[3] At another point in the deposition, Ms. Anania testified that, although her notes use the plural *officers*, in the meeting Anyosa used the singular: *detective*. *Id*., p. 114.

[4] The size of the shooter compared to Anyosa was not new information. It was the subject of Anyosa's testimony at trial. Anyosa told the jury that the shooter and he were face-to-face, an arm's length away, and their noses and eyes were lined up.

Anania that N.C. was on the phone with K.S. when he asked her to come into the meeting. *Id*. p. 68.

N.C. said she lived near the Hempstead train station [the place of the shooting] in 2008. She agreed that K.S. did bad things but she never knew him to shoot anyone. She said she was going for heart valve replacement surgery and would be out of commission for a few weeks. *Id.*, p. 69.

Ms. Anania spoke to Galloway's criminal defense attorney, Fred Brewington, to tell him that her office was vacating Galloway's conviction. She also spoke to Robert Shalk, the ADA trial counsel at Galloway's trial. He provided nothing relevant to her investigation. *Id*., 71-3.

Ms. Anania made no effort to speak to any of the detectives who investigated the cab driver shooting, and she did not do so. *Id*., p. 85.

Det. Biddel spoke to T.B., a friend of K.S., who told him that K.S. confessed the cab driver shooting to her several years after the shooting. Ms. Anania did not speak to T.B. *Id*., p. 88-89.

Once Ms. Anania learned that T.B. reported K.S.'s confession to the shooting, she was satisfied Galloway was innocent of the Anyosa shooting. *Id*., p. 96. She contacted a former colleague in the Brooklyn D.A.'s office, Mark Hill, to ask him procedurally how to vacate the conviction. *Id*., p. 91. She spoke about vacating the conviction to Joseph DeFelice, the attorney Galloway hired to work on an appeal. *Id*., p. 92. She then spoke to Judge Corrigan, the Administrative Judge, to tell her that what they were going to do. They then vacated the conviction with an oral application before Judge Corrigan. There was no CPL 440 motion. *Id.* at 93.

Ms. Anania drafted a statement to read aloud at the oral hearing. *Id*. at p. 98. I annex the statement hereto as Exhibit "B". Ms. Anania does not know when she drafted it. *Id.* at p. 99. The statement has two cross-outs, and she intended to read it without the crossed-out language. She does not know why she crossed out "Mr. Galloway has not appealed his conviction to date." She also does not know why she crossed out, "This wrongful conviction was not the result of misconduct, but instead a confluence of factors that led to an unjust result and for that, Mr. Galloway, the people apologize sincerely." Dep., p. 100, 102.

In crossing out the language about "not the result of misconduct," Ms. Anania did not intend to indicate that misconduct caused Galloway's conviction. *Id*., p. 117.

Ms. Anania's statement referred to CPL § 440(1)(g), which relates to newly discovered evidence. *Id.*, p. 101. The newly discovered evidence that warranted the reversal of the conviction was from witness N.J. and from T.B. and other evidence that flowed from the statements, like the car N.C. and K.S. had access to. It also included Anyosa's identification of K.S. in Ms. Anania's office. *Id*., p. 102.

Plaintiff deposed Ms. Anania a second time. The salient testimony from the second deposition is already in the Court's record. For completeness, here it is:

> Q. In determining that Mr. Galloway was innocent and that his conviction should be vacated, did your office credit the statements of the victim Jorge Anyosa.
>
> MR. SOKOLOFF: Objection.
>
> A. What statements are you talking about?
>
> Q. The statements[5] that he gave you when you interviewed him about what happened?
>
> A. That was part of it.
>
> Q. Is that a yes?
>
> A. Yes. I would say I credited it, yes.
>
> Q. Okay. Did your investigation find any reason to doubt the veracity of Mr. Anyosa?
>
> MR. SOKOLOFF: Objection.
>
> A. You know, I have to tell you, I didn't – I didn't go further in perusing that because there were so many other things that pointed to someone else committing the crime. So I took it at face value, it didn't really affect my investigation, but I can't say that I did an in depth investigation as to everything that he said to me as to whether it's true or not.

[5] An understanding of the meaning of "the statements that [Anyosa] gave you when you interviewed him" requires a review of Ms. Anania's earlier testimony about what Anyosa told her when she spoke to him. In her first deposition, Ms. Anania testified to two speaking interactions with Mr. Anyosa. The first was an August 28, 2018 meeting with him her office; she asked him about – and he recounted -- his participation in the police investigation of the cabdriver shooting. Her second interaction with Mr. Anyosa was a September 11, 2018 phone call: Ms. Anania called Mr. Anyosa to notify him that her office would exonerate Galloway after its reinvestigation of the case. Ms. Anania's testimony about the multiple statements she obtained from Mr. Anyosa appear at these pages of the transcript of her September 11, 2020 deposition, Exhibit "A": pp. 56:11 - 59:2, 59:13 - 63:6, 76:22-78:21, and 81:24-84:15 Between the two interactions, Mr. Anyosa gave Ms. Anania *multiple* statements, which prompted her above to ask Mr. Harvis to clarify which Anyosa statement(s) he was asking about: "What statements are you talking about?" Mr. Harvis's response -- "the statements that he gave you when you interviewed him" -- does not specify *which* of Anyosa's multiple statements he wanted to know if "her office" (not her) credited. Because Mr. Harvis never specified what Anyosa statement(s) he was asking her about, the answer he got creates confusion.

[DE-132-1, pp. 137:6 to 138:9.]

Anania Trial Testimony

The bulk of Ms. Anania's testimony relates to facts not in issue in this case: how a tipster led the District Attorney to find evidence that the real shooter (a) confessed to multiple people, (b) had access to an automobile closely matching the car used by the shooter at the time of the shooting, and (c) was identified by the victim when shown the real shooter's photo ten years later. None of that is relevant or admissible in the trial of this matter. K.S. was not a suspect in 2008.

As relates to the actions of the police investigating the shooting in 2008, *at most* Ms. Anania could be asked to testify that Anyosa told her that a police officer told him he picked the right guy after he picked out Galloway's photo in a photo array, a statement she memorialized in her notes. Arguably that testimony would be hearsay because Plaintiff would offer it for its truth: that the officer made the comment. Even if the statement is admitted as non-hearsay or as a hearsay exception, while Detective Lipson denies making the "right guy" statement, the County Defendants to not challenge the accuracy of Ms. Anania's notes and do not deny or contest that Anyosa said that to her. (In Anyosa's deposition, he testified to not remembering either whether the officer made the "right guy" statement or whether he reported it Ms. Anania when he met with her in 2018.)

There would be need or any basis to cross-examine or impeach Ms. Anania about the statement or her notes. In fact, hearsay issue aside, the notes could be admitted by stipulation without even the need for her to testify because there is nothing else relevant she could tell a jury.

We previously briefed extensively the inadmissibility of any opinion by Ms. Anania on whether she found Anyosa credible or whether she credited his statements to her. She made abundantly clear that the District Attorney vacated the conviction based on new evidence, *none of which* involved how the police investigated or prosecuted this case.

In this circumstance, the jury here will need to know simply that Mr. Galloway's conviction was vacated. How or why it was vacated is not for the jury to know because it has no bearing on the conduct of the officers.

Finally, the issue of any opinion by Ms. Anania about whether she believes it improper or unconstitutional for an officer to tell a witness he picked the right guy after the witness's photo array selection has disappeared; Ms. Anania testified she has no idea. Even if she had an opinion – which she does not – her opinion would be inadmissible. First, nobody certified her as an expert, to whom opinion questions like that are restricted. Second, whether the officer behaved legally or constitutionally is a question for the Court in this case, not any witness.

Ms. Anania's role in any trial of this case, if any, barely exists. It would be wildly disproportionate and erroneous to disqualify defense counsel from representing all the Nassau County Defendants at this late stage in this case on this record. As Magistrate Judge Wicks found

there exists no other basis to disqualify counsel. The Court should, therefore, reverse the order of disqualification from Magistrate Judge Wicks.

Thank you for your consideration of this matter

Very truly yours,

SOKOLOFF STERN LLP

Brian S. Sokoloff

BSS/--
Encl.
cc: All counsel of record

**VIA E-CF**