# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

JOSIAH GALLOWAY,

        Plaintiff,

    -against-

NASSAU COUNTY, et al.,

        Defendants.

**PLAINTIFF'S LOCAL CIVIL RULE 56.1(b) COUNTERSTATEMENT**

19 CV 5026 (AMD) (JMW)

    Pursuant to Rule 56.1(b) of the Local Civil Rules and Rule 4.B.i of the Individual Practices of this Honorable Court, plaintiff respectfully submits the following counterstatement to defendants' joint Loc. Civ. R. 56.1(a) statement in connection with their application for a pre-motion conference:

1. Plaintiff Josiah Galloway ("plaintiff" or "Mr. Galloway") is a resident of Nassau County, New York. *See* Fourth Amended Complaint ("FAC") (**Exhibit A**), at ¶12.

   Response: **Undisputed**. However, plaintiff respectfully notes that an unverified pleading – as cited by defendants here – is inadmissible at summary judgment. *See* Loc. Civ. R. 56.1(d) and this Court's Individual Practice Rule 4.B.i. (requiring citation to "admissible evidence"). In any event, this assertion is immaterial because this is a § 1983 action arising under this Honorable Court's original federal question jurisdiction.

2. Defendant Nassau County ("County") is a municipal corporation organized under the laws of the state of New York. *See https://www.nassaucountyny.gov/*

   Response: **Undisputed**.

3. Defendant Incorporated Village of Hempstead ("Village") is a municipal corporation organized under the laws of the state of New York. *See* Village Answer (**Exhibit C**), at ¶14.

Response: **Undisputed**. However, this is improperly supported.

4. At all relevant times, Defendant Steven Horowitz ("Det. Horowitz") was a member of the Village of Hempstead Police Department ("HPD") with the rank of Officer. *See* **Exhibit C**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

5. At all relevant times, Defendant Matthew Ross ("Det. Ross") was a member of the Nassau County Police Department ("NCPD") with the rank of Detective. *See* County Answer (**Exhibit B**), at ¶15.

Response: **Undisputed**. However, this is improperly supported.

6. Defendant Charles Decaro ("Det. Decaro") is, and at all relevant times was, a member of the NCPD with the rank of Detective. *See* **Exhibit B**, at ¶15. Det. Decaro was assigned to the NCPD Third Squad for thirteen (13) years from 2005 to 2018. *See* Det. Decaro EBT Transcript (**Exhibit O**)*,* p. 28, ln. 2-4, ln. 23-25.

Response: **Undisputed**. However, given that the events at issue took place in June 2008, plaintiff respectfully submits that defendant Decaro's assignments from 2009-2018 are immaterial.

7. At all relevant times, Defendant Ronald Lipson ("Det. Lipson") was a member of the NCPD with the rank of Detective. *See* **Exhibit B**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

8. Defendant Thomas Dluginski ("Det. Dluginski") is, and at all relevant times was, a member of the NCPD with the rank of Detective. *See* **Exhibit B**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

9. Defendant George Darienzo ("Det. Darienzo") is, and at all relevant times was, a member of the NCPD with the rank of Detective. *See* **Exhibit B**, at ¶15.

Response: **Disputed**. According to defendants, "George Darienzo was promoted and his current position with the NCPD is Detective Lieutenant." *See* Defendants' Loc. Civ. R. 56.1(a) Statement ("Def. 56.1") at Page 3, Fact 9, n.2. This is also improperly supported.

10. At all relevant times, Defendant Kevin Cunningham ("Det. Cunningham") was a

member of the HPD with the rank of Detective.  *See* **Exhibit C**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

11. At all relevant times, Defendant Richard Dorsi ("Det. Sgt. Dorsi") was a member of the NCPD with the rank of Detective Sergeant.  *See* **Exhibit B**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

12. Defendant Rene B. Yao ("Det. Yao") is, and at all relevant times was, a member of the NCPD with the rank of Detective.  *See* **Exhibit B**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

13. Defendant Carl Strange ("Det. Strange") is, and at all relevant times was, a member of the NCPD with the rank of Detective.  *See* **Exhibit B**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

14. At all relevant times, Defendant Joseph Sortino ("Det. Sortino") was a member of the HPD with the rank of Detective.  *See* **Exhibit C**, at ¶15.

Response: **Undisputed**. However, this is improperly supported.

15. On May 15, 2008, at approximately 1:10 a.m., Mr. Jorge Anyosa ("Anyosa") was at the intersection of West Columbia Street and Main Street in the Village of Hempstead, County of Nassau, located approximately half of a block from the Hempstead Train Station. *See* Criminal Trial Transcript (**Exhibit D**) p. 368, ln. 25 – p. 369, ln. 1-3; p. 373, ln. 6-9; *see also* Grand Jury Transcript (**Exhibit E**) p. 12, ln. 9-18.

Response: **Undisputed**.

16. Anyosa was working as a cab driver for Taxi Latino and regularly worked at or near the Hempstead Train Station and Bus Terminal on West Columbia Street in the Village of Hempstead. *See* **Exhibit D**, p. 368, ln. 9-24; *see also* **Exhibit E**, p. 12, ln. 6-8.

Response: **Undisputed**.

17. Anyosa was seated in his taxi cab (sic) while parked on West Columbia Street, and was talking to his co-worker Wilmer Hernandez ("Hernandez"), who was double

parked in his own taxi cab (sic). *See* **Exhibit D**, p. 369, ln. 6-16; *see also* **Exhibit E**, p. 13, ln. 12-15.

Response: **Undisputed**.

18. While Anyosa and Hernandez were talking, a gray sedan "came behind and start[ed] to blow the horn like crazy. [Hernandez] went to make a U-turn, go around, come back again." **Exhibit D**, p. 373, ln. 15-17; p. 374, ln. 3-6; *see also* **Exhibit E,** p. 13, ln. 17-25.

Response: **Disputed as to the description of the vehicle**. Mr. Hernandez told police on the day of the shooting that the perpetrator was driving a 4-door Toyota. Mr. Hernandez testified that he knows cars well and knows the difference between a Toyota and a Honda and a Mazda. Trial transcript, annexed to the Declaration of Gabriel P. Harvis dated September 28, 2022 ("Harvis Decl.") as Exhibit 1 ("Trial Tr."), pp. 373, 475-76; Hernandez Written Statement, annexed to the Harvis Decl. as Exhibit 3. Another witness, Salvatore Rubinano, confidently provided the same description of the Toyota to police on the date of the shooting and further described the Toyota as missing a front left hubcap. *See* Rubinano Statement, annexed to the Harvis Decl. as Exhibit 15. On June 6, 2008, Mr. Hernandez and Mr. Anyosa went to the Hempstead Armory police station (after selecting Mr. Galloway from a photo array earlier that day) to view vehicles. Separately, they were shown two cars, a Mazda and a Honda. Mr. Hernandez testified at trial that the Mazda was more like the car the person was driving and he did not recognize the Honda. Trial Tr., Harvis Decl., Exhibit 1, pp. 470-71. Neither the Mazda nor the Honda were positively identified by either witness. Although Mr. Anyosa and Mr. Hernandez initially told police that it was a Toyota they saw, by trial in 2009, neither recalled the make or model of the car. *Id.* at p. 373 (Anyosa), p. 464 (Hernandez). *See* Eyewitness Identification Expert Report of Dr. Jennifer E. Dysart, annexed to the Harvis Decl. as Exhibit 4 ("Dysart Report"), pp. 8-9 (analyzing vehicle identification evidence in context of broader record).

Plaintiff does not dispute that the driver of the Toyota, now known to be Kenton Sherwood,[1] honked "like crazy" or that Hernandez attempted to make a U-turn.

---

[1] In the 2018 investigation that led to plaintiff's exoneration, Nassau County identified Kenton Sherwood as the perpetrator after linking Sherwood to a grey Toyota Corolla belonging to Natasha Cheney that was regularly used by Sherwood in 2008 and interviewing witnesses with knowledge of Sherwood's criminal culpability, including witnesses to whom Sherwood had confessed including Ms. Cheney, who was apparently semiconscious in the backseat when Sherwood

19. The driver of the gray sedan proceeded to exit the vehicle and began arguing and screaming with Anyosa and Hernandez. *See* **Exhibit D**, p. 373, ln. 19-23, p. 374, ln. 16-18; *see also* **Exhibit E**, p. 14, ln. 13-14. This driver was described as a black male and made a gesture with his hand indicating he had a gun. *See* **Exhibit D**, p. 375, ln. 9-12, p. 376, ln. 18-21, p. 465, ln. 18-21; *see also* **Exhibit E**, p. 8, ln. 1-2; p. 15, ln. 7-15.

Response: **Disputed as to the description of the driver**. As explained by plaintiff's eyewitness identification expert Dr. Jennifer E. Dysart,

> Mr. Galloway was significantly different than the descriptions of the perpetrator provided by Mr. Anyosa and Mr. Hernandez on several important features.
>
> **Height**: In his trial testimony, Mr. Anyosa testified that the person he argued with was eye-to-eye, face-to-face with him [Trial Tr., Harvis Decl., Exhibit 1, p. 376] and that Mr. Anyosa is 5'9"-5'10" tall. [*Id.*] He then testified that the person was between 5'9" and 5'11" [*Id.* at p. 376, 416] Mr. Hernandez testified that the person who exited the car was the same height as him and he is 5'9-5'10". Mr. Galloway is between 5'5"-5'6" tall. This is a significant difference that, if it had been made known to Mr. Anyosa in 2008, would have altered the course of this case because in his 8/8/18 interview with Sheryl Anania, Mr. Anyosa indicated that he wished police had told him that Mr. Galloway was 5'6" tall because he would have told them that Mr. Galloway was not the perpetrator. In his 2020 deposition, Det. D'Luginski testified that he became aware that Mr. Galloway was not 5'11" tall yet did not tell Mr. Anyosa or Mr. Hernandez because he "didn't think it was pertinent to the case at that time". [Deposition Transcript of Thomas Dluginski, annexed to the Harvis Decl. as Exhibit 34 ("Dluginski Dep."), p. 266] During the live lineup,

---

shot Anyosa and helped clean blood from the Toyota. *See* Memoranda of DA Investigator Thomas Bidell dated August 6, 2018 (DA3451), August 28, 2018 (DA3480-81), September 6, 2018 (3442-43) and September 7, 2018 (DA3440-41), annexed to the Harvis Decl. as Exhibit 5 ("Bidell Memos"). Anyosa also identified Sherwood as the perpetrator. *See* Memorandum dated August 28, 2018 (DA3448-49), annexed to the Harvis Decl. as Exhibit 5; *see also* Notes of Thomas Bidell (DA3366-3406), annexed to the Harvis Decl. as Exhibit 6; Notes of Sheryl Anania, annexed to the Harvis Decl. as Exhibit 7 ("Anania notes"). These official findings, contained in business records admissible under Fed. R. Evid. 803(8)(a)(iii) & 803(6), formed the basis of Nassau County's successful motion, pursuant to NYCPL § 440.10(1)(g), to vacate plaintiff's state court conviction. *See* Draft Remarks of Nassau County Executive ADA and Conviction Integrity Unit ("CIU") Chief Sheryl H. Anania (P11545), annexed to the Harvis Decl. as Exhibit 8 (reflecting Ms. Anania's revisions). A note in the CIU's file also suggests that a call regarding Sherwood was placed to the Nassau County tip line "the day after it happened." *See* Reinvestigation Notes of Michael Walsh, annexed to the Harvis Decl. as Exhibit 9, P8245; Deposition Testimony of Michael Walsh, annexed to the Harvis Decl. as Exhibit 10, p. 20 (discussing tip line note).

Mr. Galloway's true height also was concealed from the witnesses.

**Hair**: Mr. Anyosa recalled that the perpetrator has short hair "cut [short] to the head" maybe an inch in length. [Trial Tr., Harvis Decl., Exhibit 1, p. 441] and it was not cornrows or braids. [*Id*. at 418]. He also testified that the photo of Mr. Galloway with braids shown by defense attorney at trial was completely different than the hair of the shooter. [*Id*. at 445]. Mr. Hernandez testified that the perpetrator had short black hair about a half inch in length. Mr. Hernandez also testified that he knows the difference between short hair, afros, braids, and corn rows. [*Id*. at 465, 476-79]. At the trial, PO Horowitz testified that Mr. Galloway had messy cornrows when he was arrested on June 5, 2008 [*Id*. at 539], suggesting that the cornrows had been in for some time.

**Age**: At trial, Mr. Hernandez testified consistently with his initial description of the perpetrator's age, which he observed to be 26-30 years. Mr. Anyosa described the perpetrator as being between 25 and 30 years of age. At the time of his arrest, Mr. Galloway was 21 years old.

**Accent**: Both witnesses described the perpetrator as having an accent of an unknown origin. Mr. Galloway does not have an accent.

**Skin tone**: In his trial testimony, Mr. Anyosa indicated that the perpetrator was a light skinned black male. [Trial Tr., Harvis Decl., Exhibit 1, p. 376]. In his interview with police on May 15, 2008, Mr. Hernandez indicated that the person he argued with had a light complexion. Various arrest documents for Mr. Galloway indicate that he is a dark skinned black male.

**Teeth**: In his trial testimony, Mr. Hernandez said that he didn't notice anything unusual about the person's face or teeth when he was talking with him [*Id*. at 479] from a distance of about 3 feet. [*Id*. at 482]. In the composite description, Mr. Anyosa provided information to Det. Bischoff that included "no oddities noticed" and in his trial testimony he indicated that he didn't notice anything about the perpetrator's teeth. [*Id*. at 420]. On May 15, 2008, Mr. Galloway was missing his top front (left) tooth. When he smiled or showed his teeth, the missing tooth was noticeable. [Trial Tr., Harvis Decl., Exhibit 1, p. 922-25 (Dr. Sherman)].

Dysart Report, Harvis Decl., Exhibit 4, pp. 7-8 (emphasis in original) (footnotes omitted) (cleaned up).

Plaintiff does not dispute that there was an argument or that Kenton Sherwood gesticulated.

20. The driver of the gray sedan came within a few feet of Anyosa and Hernandez. *See* **Exhibit D**, p. 375, ln. 20-25, p. 376, ln. 1; *see also* **Exhibit E,** p. 7, ln. 11-15, p. 16, ln. 2-5.  There was nothing covering the driver's face. *See* **Exhibit D**, p. 376, ln. 10-13.  Anyosa and Hernandez were both able to clearly see the driver's face. *See* **Exhibit D,** p. 374, ln. 22-25 – p. 375, ln. 1; p. 482, ln. 16-18; *see also* **Exhibit E**, p. 7, ln. 16-17.

    Response: **Disputed.** In addition to his face, Anyosa and Hernandez were also able to observe Kenton Sherwood's height, hair, teeth, complexion, age and accent. *See supra* at Response 19 (collecting testimony); *infra* at Response 25 & Figure 1; *see also* Initial Police Interviews of Wilmer Hernandez and Jorge Anyosa, annexed to the Harvis Decl. as Exhibit 49 ("Initial Interviews"). However, the encounter's stressfulness and cross-racial aspect made Anyosa and Hernandez's identifications objectively less reliable and more prone to identification error. *See* Dysart Report, Harvis Decl., Exhibit 4, pp. 20-21. In any event, Anyosa testified that the shooter was at least his height and told the CIU he "wishes police had told him" plaintiff was 5'6" because "he would have told him Josiah didn't do it." *See* Anania Notes, Harvis Decl., Exhibit 7 at 11456; Trial Tr., Harvis Decl, Exhibit 1, pp. 376, 416 (describing shooter as 5'10").

21. After the argument, the driver of the gray sedan drove away from the scene.  *See* **Exhibit D**, p. 377, ln. 24-25 – p. 378, ln. 1-9; p. 465, ln. 1-9; *see also* **Exhibit E**, p. 16, ln. 2-9.

    Response: **Disputed**. After the argument, Kenton Sherwood drove away from the scene in Natasha Cheney's 2003 gray Toyota Corolla that was missing a front left hubcap. *See* Bidell Memos, Harvis Decl., Exhibit 5, at DA3480 (indicating that, in 2008, Sherwood drove Cheney's Toyota "like it was his own car").

22. After the driver left the scene, Anyosa was dispatched to Taylor Street in Hempstead, located about 5 minutes from the Hempstead Train Station. *See* **Exhibit D,** p. 378, ln. 10-16.  Hernandez was dispatched to pick someone up and drove away from the Hempstead Train Station. *See* **Exhibit D**, p. 466, ln. 8-12.  No one showed up for Anyosa to pick up in his taxi cab (sic), so Anyosa drove back to the Hempstead Train Station. *See* **Exhibit D,** p. 378, ln. 19-21; *see also* **Exhibit E,** p. 16, ln. 17-23.

    Response: **Undisputed.**

23. Anyosa parked his car in the Hempstead Train Station parking lot approximately twenty minutes after the initial argument with the driver of the gray sedan. *See* **Exhibit D**, p. 379, ln. 7-19; *see also* **Exhibit E**, p. 16, ln. 22 – p. 17, ln. 13.

   Response: **Undisputed.**

24. While Anyosa was sitting in his parked car, he heard someone say, "What you going to do now, mother fucker?" *See* **Exhibit D**, p. 380, ln. 10-11; *see also* **Exhibit E**, p. 17, ln. 19-25.

   Response: **Disputed in part.** Plaintiff agrees that Anyosa heard remarks like this from the shooter, but it is undisputed that the shooter Anyosa heard was Kenton Sherwood and not plaintiff. *See* Deposition Testimony of Sheryl Anania, annexed to Harvis Decl. as Exhibit 11 ("Anania Dep."), p. 53, ln. 5-p. 54, ln. 20; p. 34, ln. 9-p. 41, ln. 16, p. 56, ln. 9-p. 59, ln. 2 (discussing CIU investigation establishing Sherwood's guilt); Transcript of Exoneration Proceeding on September 13, 2018, annexed to the Harvis Decl. as Exhibit 12 ("Exoneration Proceeding Tr."), p. 3, ln. 9-24; p. 4, ln. 14-18 (representing to state court that plaintiff is innocent and describing Sherwood as the "actual perpetrator"); Nassau County Defendants' Letter to Court dated September 17, 2021 (DE #130), annexed to the Harvis Decl. as Exhibit 13 ("DE #130"), p. 2 ("Ms. Anania…is…a high-ranking member of the District Attorney's Office, an arm of Nassau County. As a result, she is no non-party stranger to this case; *she is a 'representative' of Nassau County.*") (footnote omitted) (emphasis added); New York Rule of Professional Conduct 3.8(c)(2)(B)-(C) & (d); n.1, *supra.*

25. Anyosa recognized the same black male as the driver he had argued with earlier in the morning pointing a gun at him. *See* **Exhibit D**, p. 380, ln. 11-16, 23-24; *see also* **Exhibit E**, p. 17, ln. 21-25 – p. 18, ln. 1-5. The driver was sitting in his car, with his window rolled down, pointed a gun at Anyosa and then shot him. *See* **Exhibit D**, p. 381, ln. 8-9; *see also* **Exhibit E**, p. 17, ln. 21-25, p. 18, ln. 6-11.

Response: **Disputed in part.** Plaintiff agrees that Anyosa recognized Kenton Sherwood from the earlier incident, but notes that Sherwood (and Anyosa's description of him) have no connection to Mr. Galloway, who also had a verifiable alibi. *See supra* at Responses 18-19, 24; *see also* Figure 1, *infra*.

| Josiah Galloway | Composite Sketch | Kenton Sherwood |
|---|---|---|
|  | |  |
| Source: Taken by Matthew Ross on Aug. 5, 2008 | Source: County343 | Source: Nassau County District Attorney |
| **Height: 5'5"** | **Height: 5'10"** | **Height: 5'9"** |
| **Hair: Afro or braids** | **Hair: Cut Short (not braids)** | **Hair: Cut Short** |
| **Age: 21** | **Age: 25-30** | **Age: 29** |
| **Accent: None** | **Accent: Yes** | **Accent: Yes (Jamaican)** |
| **Vehicle: None** | **Vehicle: Toyota** | **Vehicle: Toyota** |

*Figure 1* Exhibit 6 to the John Monaghan Deposition, annexed to the Harvis Decl. as Exhibit 14.

26. Anyosa was shot in the face by this same driver he argued with earlier in the morning. *See* **Exhibit D**, p. 380, ln. 14-18; p. 382, ln. 3-4; *see also* **Exhibit E**, p. 17, ln. 21-25, p. 18, ln. 6-21.  The driver of the gray sedan was in his car approximately 20 feet from Anyosa when he shot Anyosa in the face.  *See* **Exhibit D**, p. 437, ln. 3-8; *see also* **Exhibit E**, p. 23, ln. 13-21. After shooting Anyosa, the driver of the gray sedan fled the scene. *See* **Exhibit D**, p. 382, ln. 8-9.

Response: **Disputed in part.** The parties agree that Anyosa was shot in the face by Kenton Sherwood. *See* Anania Dep., Harvis Decl., Exhibit 11, p. 53, ln. 5-p. 54, ln. 20; p. 34, ln. 9-p. 41, ln. 16, p. 56, ln. 9-p. 59, ln. 2 (discussing CIU investigation establishing Sherwood as shooter); Exoneration Proceeding Tr., Harvis Decl., Exhibit 12, p. 3, ln. 9-24; p. 4, ln. 14-18 (representing to state court that plaintiff is innocent and describing Sherwood as the "actual perpetrator"); Nassau County Letter at DE #130, Harvis Decl., Exhibit 13, p. 2 ("Ms. Anania…is…a high-ranking member of the District Attorney's Office, an arm of Nassau County. As a result, she is no non-party stranger to this case; *she is a 'representative' of Nassau County.*")

(footnote omitted) (emphasis added); New York Rule of Professional Conduct 3.8(c)(2)(B)-(C) & (d); n.1, *supra*.

27. On May 15, 2008, at approximately 1:30 a.m., Eric Harrison ("Harrison") was in front of the Hempstead Train Station when he heard what sounded like a gun shot. *See* **Exhibit D**, p. 338, ln. 5-20; *see also* Supporting Deposition of Eric Harrison (**Exhibit F**). Harrison then saw a gray colored car drive away. *See* **Exhibit D**, p. 340, ln. 10-11, p. 341, ln. 13-14; *see also* **Exhibit F**. Harrison saw Anyosa sitting in the driver's side of his cab, noticed that he was shot in the face, that there was blood leaking from Anyosa's face, and called the police. *See* **Exhibit D,** p. 341, ln. 19 – p. 342, ln. 1-6; *see also* **Exhibit F**.

   Response: **Undisputed.**

28. On May 15, 2008, at approximately 1:30 a.m., Salvatore Rubinano ("Rubinano") was at the Hempstead Train Station and heard a noise that sounded like a backfire. *See* Supporting Deposition of Salvatore Rubinano (**Exhibit G**). Rubinano looked up, saw a black male inside the driver's seat of a gray car, and saw the same male drive away down Columbia Street. *See* **Exhibit G**. Rubinano also saw Anyosa in the front seat of his taxi cab with a lot of blood on his face. *See* Exhibit G.

   Response: **Disputed in part.** The witness stated that he saw a "grey Toyota Corolla 4-door" that was "missing the front left hub cap." The witness told police that he "work[s] on cars" and could identify the "model year" of the Toyota Corolla as "2002-2005." Rubinano Statement, Harvis Decl., Exhibit 15. This is the same make and model as the car owned by Natasha Cheney and operated by Kenton Sherwood that was reportedly cleaned of blood following the crime in 2008. *See* Bidell Memos, Harvis Decl., Exhibit 5, DA003451, DA3480. In his initial statements to police on May 15, 2008, Hernandez also described the vehicle as a Toyota with a missing front left hub cap. *See* Hempstead PD Case Report for Anyosa Shooting, annexed to the Harvis Decl. as Exhibit 16; *see also* Nassau County PD Case Report for Anyosa shooting, annexed to the Harvis Decl. as Exhibit 17; *supra* at Response 18.

29. On May 15, 2008, between 1:36 a.m. and 1:37 a.m., HPD Police Officer Eugene Este ("P.O. Este"), HPD Police Officer Shury ("P.O. Shury") and HPD Police Officer Derek Warner ("P.O. Warner") responded to the shooting at the Hempstead Train Station. *See* **Exhibit D**, p. 362, ln. 20-23; *see also* NCPD Serious Incident Time Log (**Exhibit H**).

Response: **Undisputed.**

30. After Anyosa was shot, Hernandez arrived back at the Hempstead Train Station; Hernandez was not present when Anyosa was shot. *See* **Exhibit D,** p. 466, ln. 10-20; *see also* **Exhibit E,** p. 8, ln. 22 – p. 9, ln. 6; *see also* Supporting Deposition of Wilmer Hernandez (**Exhibit I**).

Response: **Undisputed.**

31. Anyosa was transported to Winthrop University Medical Center and was admitted for nine days. *See* **Exhibit D**, p. 335, ln. 22-24, p. 383, ln. 19-23. As a result of being shot, Anyosa had surgery and sustained the following injuries: missing chin bone which was replaced by a metal plate, lost 8 teeth, had his jaw wired shut for two to three months, had multiple surgeries on his tongue, suffered permanent nerve damage in his face and permanent scarring on his chin. *See* **Exhibit D**, p. 384, ln. 14 – p. 386, ln. 5*; see also* **Exhibit E**, p. 19, ln. 9 – p. 21, ln. 20.

Response: **Undisputed.**

32. Hernandez spoke with P.O. Este and signed a written statement. *See* **Exhibit I.** Harrison spoke with P.O. Shury and signed a written statement. *See* **Exhibit F.** Rubinano spoke with P.O. Este and signed a written statement. *See* **Exhibit G.**

Response: **Undisputed.** Anyosa also spoke with P.O. Warner. *See* Initial Interviews, Harvis Decl., Exhibit 49, p. 3.

33. During the early morning of May 15, 2008, Det. Dluginski was working at the NCPD Third Squad and was notified about Anyosa's shooting. *See* **Exhibit D,** p. 622, ln. 11-14; *see also* Det. Dluginski EBT Transcript (**Exhibit J**), p. 42, ln. 10-13. Det. Dluginski was the detective assigned to investigate this shooting. *See* **Exhibit D**, p. 622, ln. 15-18; *see also* **Exhibit J**, p. 50, 7-10.

Response: **Undisputed.**

34. Det. Dluginski drove to the location where Anyosa was shot, and arrived at West Columbia Street in Hempstead at approximately 1:56 a.m. on May 15, 2008. *See* **Exhibit J**, p. 54, ln. 5-15; p. 61, ln. 7-11; *see also* **Exhibit H**. After he arrived, Det. Dluginski spoke with the HPD police officers who were already at the scene. *See* **Exhibit J**, p. 55, ln. 7-13.

Response: **Undisputed.** This is not a material fact.

35. NCPD Crime Scene detectives responded to the Hempstead Train Station and took photographs of the scene, Anyosa's vehicle, bullet fragments, and blood in Anyosa's cab. *See* **Exhibit D**, p. 528, ln. 13-18, p. 529, ln. 4-7, p. 530, ln. 14-21, p. 531, ln. 4-6; *see also* NCDA Trial Exhibits 10, 11, 12, 13, 21, 22, 23, 24 and 25 (**Exhibit K**). NCPD Crime Scene detectives also collected physical evidence including bullet fragments, wadding and some of the victim's teeth. *See* **Exhibit D**, p. 530, ln. 14-21, p. 623, ln. 6-10.

Response: **Undisputed.**

36. Det. Dluginski searched for video in the vicinity of the scene that captured the incident; Det. Dluginski went to the MTA Bus Terminal in Hempstead and viewed video depicting the vicinity of the shooting at the time of the shooting. *See* **Exhibit D,** p. 623, ln. 11-15, p. 678, ln. 23-25; *see also* **Exhibit J**, p. 53, ln. 14-18.

Response: **Undisputed.**

37. Det. Dluginski viewed a video that depicted Anyosa's car and the suspect's car, but was unable to determine the make and model of the suspect's car at that time. *See* **Exhibit D**, p. 643, ln. 3 – p. 644, ln. 1; *see also* **Exhibit J,** p. 68, ln. 23-25 – p. 69, ln. 1-3. After viewing this video, Det. Dluginski was unable to see the physical description of the suspect. *See* **Exhibit J,** p. 69, ln. 4-7. The video from the Hempstead Bus Terminal did not give Det. Dluginski any leads to identify Anyosa's shooter and did not capture the actual shooting incident. *See* **Exhibit J,** p. 70, ln. 7-13, p. 122, ln. 18-22; *see also* **Exhibit D**, p. 697, ln. 2-7.

Response: **Disputed in part**. Dluginski knew from the Rubinano and Hernandez statements that the shooter's vehicle was a 2002-2005 silver or grey Toyota Corolla with a missing front left hubcap. Dluginski also had a description of Kenton Sherwood, the perpetrator, from Hernandez and Anyosa. *See* Responses 18-19, 28, *supra*. At the of the shooting, Natasha Cheney had a Toyota matching this description that Cheney told prosecutors Kenton Sherwood used to drive "like it was his own car." *See* Bidell Memos, Harvis Decl., Exhibit 5 at DA3480.

38. Det. Dluginski left the scene of the shooting on May 15, 2008, at approximately 3:50 a.m. *See* **Exhibit H.**

Response: **Undisputed.** This is not a material fact.

39. After Anyosa was shot and transported to the hospital, Det. Dluginski went to visit

-12-

Anyosa at the hospital. *See* **Exhibit D**, p. 652, ln. 3-5; *see also* **Exhibit J**, p. 275, ln. 17-20.

Response: **Disputed in part.** Defendant Dluginski does not know when, or how long after Anyosa was shot, Dluginiski visited Anyosa the hospital. Trial Tr., Harvis Decl., Exhibit 1, p. 659, ln. 3-15 (Dluginski). However, it is undisputed that, when Dluginski was with Anyosa at the hospital, Anyosa communicated with Dluginski by writing notes that Dluginski made no effort to secure or retain, depriving plaintiff of potential *Brady* evidence. *Id.* at p. 660, ln. 25-p. 661, ln. 10. The surviving notes from that encounter, taken by Dluginski, reflect that Anyosa provided information exculpatory to Mr. Galloway, including that Sherwood had an accent, short hair, stood 5'10" and was 25-30 years old. *See* Note (Exhibit 8 to Dluginski Dep.), annexed to the Harvis Decl. as Exhibit 18.

40. In May of 2008, NCPD Detective Thomas Bischoff ("Det. Bischoff") was assigned to the NCPD Rogues Gallery. *See* Det. Bischoff EBT Transcript (**Exhibit L**), p. 16, ln. 9-11. Det. Bischoff joined the police department in October of 1994 and became a Detective in 2003. *See* **Exhibit L**, p. 14, ln. 23-25 – p. 15, ln. 1-2. As a detective with the NCPD Rogues Gallery, part of Det. Bischoff's duties and responsibilities included preparing composite sketches. *See* **Exhibit L**, p. 15, ln. 19-22; p. 16, ln. 15-17.

Response: **Undisputed.** This is not material.

41. Det. Bischoff received training to become an NCPD composite sketch artist, which included on the job training, as well as an additional three-week training course with the FBI Academy in Quantico Virginia. *See* **Exhibit L**, p. 17, ln. 3-14; p. 18, ln. 18-25 – p. 19, ln. 1-2. This three-week training course was multi-leveled and included composite sketches, facial reconstruction training and sketch artist training. *See* **Exhibit L**, p. 19, ln. 5-7, p. 20, ln. 12-15.

Response: **Undisputed.** Given that plaintiff does not challenge Bischoff's qualifications or his preparation of the composite, this is not material.

42. When constructing a composite sketch, Det. Bischoff would use reference photographs of all different facial features of other people, present these reference photographs to the victim or witness, and would create a composite sketch based on input from the victim or witness. *See* **Exhibit L**, p. 37, ln. 5-19.

Response: **Undisputed.** This is not material to summary judgment.

43. On May 19, 2008, between 8:00 p.m. and 8:30 p.m., Det. Dluginski called the NCPD Rogues Bureau, spoke with Det. Bischoff, and asked Det. Bischoff to meet with Anyosa to complete a composite sketch of Anyosa's shooter. *See* **Exhibit D**, p. 663, ln. 9-12, p. 820, ln. 19- 22, p. 822, ln. 6 – p. 823, ln. 8; p. 832, ln. 24-25 – p. 833, ln. 1.

    Response: **Undisputed.** This is not material.

44. On May 19, 2008, at approximately 9:00 p.m., Det. Bischoff went to Winthrop Hospital and met with Anyosa. *See* **Exhibit D**, p. 823, ln. 6-11; p. 827, ln. 1-5. There were no other police personnel present when Det. Bischoff met with Anyosa to complete the composite sketch. *See* **Exhibit D**, p. 827, ln. 23-25; p. 663, ln. 25 – p. 664, ln. 1-5.

    Response: **Undisputed.**

45. Det. Bischoff wrote down information about the description of the suspect provided to him by Anyosa. *See* **Exhibit L**, p. 60, ln. 9 – p. 61, ln. 2; *see also* Det. Bischoff's Composite Sketch and Notes of Interview with Anyosa (**Exhibit M**) p. 2. Det. Bischoff showed Anyosa several photos, and based on responses from Anyosa, Det. Bischoff completed the composite sketch. *See* **Exhibit D**, p. 835, ln. 10 – p. 836, ln. 21; *see also* **Exhibit M**. Det. Bischoff confirmed Anyosa's description of the shooter by showing Anyosa reference photographs. *See* **Exhibit D**, p. 834, ln. 8-12.

    Response: **Disputed as incomplete**. Plaintiff agrees that Bischoff interviewed Anyosa and prepared a composite sketch, but defendants' statement above omits the substance of the information Anyosa conveyed to Bischoff as reflected in the Interview Notes and Composite Sheet annexed to the Harvis Decl. as Exhibit 2. Anyosa correctly told Bischoff that the perpetrator, now known to be Kenton Sherwood, had hair that was "shaved" and "cut close to the head," was between 25 and 30 years old, stood 5'10"-5'11;" and was driving a dark grey 2001 or 2002 Toyota Corolla. *Id.* Bischoff appropriately included this information in the "Description of the Subject" section of the composite sketch form. *Id*; *see* Dysart Report, Harvis Decl., Exhibit 4, Section VI.2 (pp. 9-10) (Composite Sketch).

46. Det. Bischoff completed one single composite sketch of the suspect after Det. Bischoff's conversation with Anyosa. *See* **Exhibit** D, p. 836, ln. 19-21; *see also* **Exhibit L**, p. 49, ln. 3-4; *see also* **Exhibit M**.

    Response: **Undisputed.** This is not a material fact.

-14-

47. The composite sketch was included in an NCPD Intelligence Bulletin that was circulated to other police agencies and precincts in order to "seek the assistance of other law enforcement agencies." *See* **Exhibit J**, p. 163, ln. 4-15; p. 159 ln. 22 – p. 160, ln. 19; *see also* NCPD Intelligence Bulletin with Composite Sketch (**Exhibit N**).

Response: **Undisputed**.

48. This composite sketch was displayed in the NCPD Third Squad for several weeks on a board directly across from Det. Decaro's desk. *See* **Exhibit O**, p. 83, ln. 17-21; *see also* Pre- Trial Hearing Transcript (**Exhibit P**), p. 78, ln. 1-4, p. 153, ln. 1-8.

Response: **Disputed in part.** The composite sketch is only one component of the bulletin. *See* NCPD Intelligence Bulletin, annexed to the Harvis Decl. as Exhibit 19 ("Bulletin"). In any event, the illustration of Sherwood does not resemble plaintiff and the description contained in the composite and Bulletin exclude plaintiff. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.2 (pp. 9-10) (Composite Sketch); Responses 18-19.

49. Plaintiff was friends with Robert Ogletree. *See* **Exhibit D**, p. 320, ln. 24-25 – p. 321, ln. 1-3. Plaintiff knew Mr. Ogletree his entire life and grew up in the same neighborhood as him. *See* Plaintiff EBT Transcript (**Exhibit Q**) p. 40, ln. 10-12.

Response: **Undisputed**.

50. On or about May 27, 2008, HPD received a complaint from Marky Fouse stating that he was a victim of a robbery by plaintiff that took place on Fulton Avenue in the Village of Hempstead. *See* Plaintiff's Signed Statement (**Exhibit EE**); *see also* **Exhibit Q**, p. 71, ln. 4 – p. 72, ln. 15; *see also* P.O. Horowitz EBT Transcript (**Exhibit S**), p. 57, ln. 13-24, p. 58, ln. 10-25.

Response: **Disputed in part**. The evidence cited by defendants does not support the asserted proposition and both Mr. Galloway and Mr. Ogletree have denied the allegations attributed to Fouse, which were adjudicated as a noncriminal disorderly conduct violation and are immaterial to summary judgment. *See* Deposition Testimony of Josiah Galloway, September 20, 2022 ("Galloway Dep.") annexed to the Harvis Decl. as Exhibit 20, p. 51, ln. 18-p. 52, ln. 25; Plaintiff's 50h Transcript, dated December 20, 2018, annexed to the Harvis Decl., as Exhibit 21, p. 14, ln. 9-23; *see also* Trial Tr., Harvis Decl., Exhibit 1, p. 268, ln. 8-10 (Ogletree) ("They were all false allegations.").

51. On June 5, 2008 at approximately 11:00 pm, plaintiff was in a car with Mr. Ogletree. *See* **Exhibit Q**, p. 39, ln. 11-12, 22-23.

Response: **Undisputed**.

52. On June 5, 2008, HPD Det. Cunningham and P.O. Horowitz received a call notifying them where plaintiff was located. *See* **Exhibit S**, p. 57, ln. 13-24, p. 58, ln. 8-15; *see also* Det. Cunningham EBT Transcript (**Exhibit T**), p. 36, ln. 1-25. HPD Det. Cunningham and P.O. Horowitz then went to that location to arrest plaintiff and Mr. Ogletree for the robbery that occurred on May 27, 2008. *See* **Exhibit S**, p. 57, ln. 20-25, p. 58, ln. 1- 25.

Response: **Undisputed**.

53. On June 5, 2008 at approximately 11:45 pm, while in a car with Mr. Ogletree, plaintiff was placed under arrest by HPD Det. Cunningham and P.O. Horowitz for a May 27, 2008 robbery. *See* **Exhibit P**, p. 207, ln. 15-22; *see also* **Exhibit D**, p. 538, ln. 6-14; *see also* **Exhibit Q**, p. 41, ln. 24 – 42, ln. 2. Mr. Ogletree was also placed under arrest. *See* **Exhibit Q**, p. 41, ln. 8-9.

Response: **Disputed in part**. When the officers seized Mr. Galloway, defendant Cunningham falsely stated there was a warrant for plaintiff's arrest. *See* Galloway Dep., Harvis Decl., Exhibit 20, p. 200, ln. 21-p. 201, ln. 11.

54. At the time plaintiff was initially arrested, he was *not* under arrest for the May 15, 2008 shooting of Anyosa. *See* **Exhibit P**, p. 279, ln. 12-25; *see also* Robert Schalk EBT Transcript (**Exhibit R**) p. 99, ln. 19-24; **Exhibit S**, p. 77, ln. 6-9. Rather, Plaintiff was being arrested for the May 27, 2008 robbery. *See* **Exhibit EE**; *see also* **Exhibit Q**, p. 51, ln. 12-25, p. 52, ln. 1-25, p. 71, ln. 10-24, p. 72, ln. 2-15; *see also* **Exhibit T**, p. 43, ln. 8-19.

Response: **Disputed**. "On 6/5/08 at 11:23 P.M….Josiah Galloway…[was] arrested and charged in [the May 15, 2008 shooting of Anyosa]." Nassau County Public Information Office News Release, annexed to the Harvis Decl. as Exhibit 22; Crime Report for the May 15, 2008 shooting of Anyosa (case 208CR0039551), annexed to the Harvis Decl. as Exhibit 23, p. 2 (also reflecting that Mr. Galloway was arrested for the Anyosa shooting on June 5, 2008 shortly after 11:00 p.m.); Morning Report, annexed to the Harvis Decl. as Exhibit 24, P1109 ("On Thursday 06/05/09 at 11:45 PM…Galloway…[was] stopped on Pierson Ave and Windsor Parkway, Hempstead, in a Honda Civic…and [was] placed under arrest…[and] transported to the Hempstead

Armory for processing [in connection with the Anyosa shooting].”). Plaintiff respectfully submits that this is not a material fact.

55. After plaintiff and Mr. Ogletree were arrested, they were transported to the Hempstead Police Armory located at 216 Washington Street, Hempstead, New York. *See* **Exhibit D**, p. 539, ln. 9-14; *see also* **Exhibit S**, p. 70, ln. 9-11. On June 6, 2008, at approximately 12:08 a.m., plaintiff and Mr. Ogletree arrived at the Hempstead Police Armory. *See* **Exhibit T**, p. 77, ln. 12-22, p. 78, ln. 12 – p. 79, ln. 3; *see also* HPD Command Log (**Exhibit U**). Plaintiff was placed in a holding cell by himself. *See* **Exhibit Q**, p. 42, ln. 20-25.

Response: **Undisputed**. However, this is not a material fact.

56. Pursuant to accepted practice, HPD contacted the NCPD Third Precinct to take over the investigation for the robbery that occurred on May 27, 2008. *See* **Exhibit T**, p. 47, ln. 11-23, p. 50 ln. 6-25. The NCPD investigates and processes all felony arrests made by HPD. *See* **Exhibit T**, p. 50 ln. 6-25, p. 60, ln. 2-25.

Response: **Undisputed**.

57. The NCPD Third Squad Detectives would generally handle serious crimes that occurred in the Village of Hempstead. *See* **Exhibit J**, p. 44, ln. 15-25; *see also* **Exhibit T**, p. 60, ln. 12-25. On June 5, 2008, Det. Decaro was working in the NCPD Third Squad and was responsible for any cases that came in after 9:00 p.m. *See* **Exhibit P**, p. 58, ln. 9-16.

Response: **Undisputed**.

58. On June 6, 2008, at approximately 12:00 a.m., Det. Decaro received a phone call from HPD requesting NCPD to respond since plaintiff and Mr. Ogletree were placed under arrest. *See* **Exhibit P**, p. 58, ln. 9 – p. 59, ln. 3. After receiving this call, Det. Decaro and Det. Darienzo went to the Hempstead Police Armory and arrived shortly after 12:00 am. *See* **Exhibit O**, p. 47, ln. 20-23; *see also* **Exhibit P**, p. 59, ln. 4-8, p. 130, ln. 9-13; *see also* Det. Darienzo EBT Transcript (**Exhibit V**) p. 33, ln. 9-11.

Response: **Undisputed**.

59. Det. Decaro and Det. Darienzo responded to the Hempstead Police Armory to investigate a robbery and other crimes, not the May 15, 2008 shooting of Anyosa. *See* **Exhibit O**, p. 55, ln. 9-23; *see* **Exhibit P**, p. 73, ln. 6 – p. 76, ln. 6; *see also* **Exhibit**

**T**, p. 58, ln. 4-11; *see also* **Exhibit V**, p. 33, ln. 15-20.  Once the NCPD Detectives responded, HPD Officers provided assistance to NCPD Detectives. *See* **Exhibit T**, p. 59, ln. 12 – p. 62, ln. 23; p. 63, ln. 10-23, p. 73, ln. 3-11, p. 79, ln. 4-13.

Response: **Undisputed**. However, this is not a material fact.

60. While at the Hempstead Armory, plaintiff interacted with Det. Decaro and P.O. Horowitz. *See* **Exhibit Q**, p. 43, ln. 21-24.  Plaintiff did not know Det. Decaro and Det. Dluginski prior to his June 5, 2008 arrest. *See* **Exhibit Q**, p. 43, ln. 25-p. 44, ln. 2-6.

Response: **Disputed**. While plaintiff was at the Armory, several officers interacted with Mr. Galloway and developed the evidence that would be used to convict him of Kenton Sherwood's crime.

**Ogletree.** Defendants coerced Robert Ogletree into signing a false statement implicating plaintiff prepared by the officers, which Ogletree recanted on the stand at trial. *See* Ogletree Statement Implicating Plaintiff, annexed to the Harvis Decl. as Exhibit 25 (witnessed by Decaro and Lipson); Ogletree Trial Testimony, annexed to the Harvis Decl. as Exhibit 1, p. 262, ln. 20-274, ln. 21 ("They woke me up three something in the morning to sign the statement that they wrote."); *id.* at, *e.g.*, p. 303, ln. 14-23 ("…They say, You're sure [plaintiff] didn't tell you that he's leaving the next morning because he shot somebody at the chicken spot? They just kept going on and on for hours trying to get him on some chicken spot. And, honestly, Josiah didn't do it. He didn't do that. But I was weak and they coerced it and they got me to sign that paper."); *id.* at, *e.g.*, p. 300, ln. 19-p. 303, ln. 16 ("…They brought a…sketch of somebody and they said, Who does this look like? And I'm telling them, I don't know who that is…They start threatening me and trying to get me to say that it's Josiah, or myself, I guess…I'm, like, Nah, that don't look like him, Josiah got hair. As a matter of fact, he had an afro at the time."); *see also* Ogletree Unsigned Statement Implicating Plaintiff, annexed to the Harvis Decl. as Exhibit 26 (witnessed by Decaro and Lipson); *see also* Ogletree Miranda Form, annexed to the Harvis Decl. as Exhibit 27 (witnessed by Darienzo and Decaro at 3:00 a.m.); see Deposition Testimony of Ronald Lipson annexed to the Harvis Decl. as Exhibit 31 ("Lipson Dep."), p. 175, ln. 15-p. 179, ln. 5 (discussing preparation of unsigned Ogletree statement); *see* Deposition Testimony of Charles Decaro, October 9, 2020 ("Decaro Dep.") annexed to the Harvis Decl. as Exhibit 28, p. 69, ln. 9-18 (testifying that Decaro, Darienzo and Lipson were obtaining the statements from Ogletree); Trial Tr., Harvis Decl., Exh. 1, p. 541, ln. 7-25 (Horowitz) (describing Horowitz's involvement with Ogletree). Ogletree was allegedly *Mirandized* and

questioned about the Anyosa shooting beginning at 3:00 a.m. on June 6, 2008, while Wilmer Hernandez had already made a selection from the photo array by 3:20 a.m. *See* Decaro Dep., Harvis Decl., Exhibit 28, p. 144, ln. 12-18.

Ogletree's contested statement was explicitly cited by prosecutors as supporting the attempted murder charge when the Nassau County District Attorney initially screened the case. *See* ECAB, annexed to the Harvis Decl. as Exhibit 29.

**The Photo Arrays.** Without ever comparing the composite sketch to plaintiff and ignoring the discrepancies between plaintiff and Sherwood's description as reflected in the Bulletin (and affirmatively concealing them), Dluginski and Lipson constructed photo arrays that were objectively biased against Mr. Galloway using an outdated photograph of him that misrepresented his hairstyle. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); Decaro Dep., Harvis Decl., Exhibit 28, p. 84, ln. 19-24; p. 91, ln. 15-23. Independent scientific research by Professor Dysart, plaintiff's eyewitness identification expert, establishes that the arrays constructed by Lipson were statistically biased:

> Mr. Galloway's photograph was chosen as the closest match to the composite sketch by a factor of more than 4 times any other photograph. If the photo array had truly been a fair array where all of the members matched the composite (thus the description) provided by Mr. Anyosa, then you would expect to see each lineup member receive 16.7% of the selections. Clearly, Mr. Galloway's selection rate of 66.3% was a significant deviation from this number and demonstrates a clear bias towards him in this procedure.

Dysart Report, Harvis Decl., Exhibit 4, p. 12.

**The Identifications.** At approximately 3:20 a.m., the defendants brought Wilmer Hernandez to the Armory and told him "[we have] the person who was the cause of the incident" but "want[] to show [you] pictures." Deposition Testimony of Wilmer Hernandez annexed to the Harvis Decl. as Exhibit 30 ("Hernandez Dep."), p. 30, ln. 18-24. When, as here, the suspect is in custody, a lineup should be conducted – such a lineup would have revealed that Mr. Galloway had long hair and was 5'5", while Anyosa and Hernandez knew Sherwood was closer to 5'10" and had very short hair. *See* Dysart Report, Harvis Decl., Exhibit 4, p. 11 & n.26 (noting that the International Association of Chiefs of Police has recommended since 1992 that "if a suspect is in custody that a

-19-

live lineup is preferred over the use of a photo array"). After Hernandez selected plaintiff, Lipson revealed plaintiff's identity to Hernandez. *See* Hernandez Photo Array Deposition, annexed to the Harvis Decl. as Exhibit 35; Lipson Dep., Harvis Decl., Exhibit 31, p. 146, ln. 8-24. Mr. Galloway was not Mirandized until 4:30 a.m., shortly before Detective Lipson visited Jorge Anyosa at his house. Anyosa, who had only recently been discharged from the Hospital, was told by Lipson that he picked the right person and that Hernandez had made the same selection. *See* Anania notes, Harvis Decl., Exhibit 7, 11455. Anyosa was never told plaintiff's height, and said he was not positive in his identification but had been reassured by the officers. *Id.* at p. P11455-456. The officers also disclosed to Anyosa that Wilmer Hernandez had been at the precinct and "ID'd him before me." Deposition Transcript of Jorge Anyosa annexed to the Harvis Decl. as Exhibit 51, p. 29, ln. 9-17.

**The Paperwork**. Decaro and Sortino executed the Crime Report, Case Report and Felony Complaints filed in connection with the false accusation that Mr. Galloway shot Anyosa. *See* Crime Report, annexed as Exhibit 23; Case Report, annexed as Exhibit 17; Felony Complaints, annexed as Exhibit 36.

When Mr. Galloway was booked, defendant Dluginkski entered his height into the system as 5'8", when his actual height is 5'5". *See* Arrest Report, annexed to the Harvis Decl. as Exhibit 33; Dluginski Dep., Harvis Decl., Exhibit 34, p. 223, ln. 8-14. The felony complaints that were filed against plaintiff falsely stated that he had made statements of admission. *See* Response 83, *infra*.

61. When Det. Decaro initially spoke with plaintiff to retrieve pedigree information, he realized that plaintiff resembled the composite sketch of the suspect that was hanging in the NCPD Third Squad across from his desk. *See* **Exhibit O**, p. 74, ln. 8-18; *see also* **Exhibit P**, p. 77, ln. 23 – p. 78, ln. 4; p. 152, ln. 9-12.

Response: **Disputed**. This is not possible because the sketch does not resemble plaintiff and the description rules him out. *See supra* at Responses 19-20, 60 & Figure 1.

62. Det. Decaro's desk in the NCPD Third Squad was right across from a clip board where the suspect's composite sketch was hanging on the wall. *See* **Exhibit O**, p. 83, ln. 13-21. This composite sketch was hanging in the NCPD Third Squad for a few weeks prior to June 5, 2008. *See* **Exhibit P**, p. 77, ln. 25 – p. 78, ln. 4. Det. Decaro saw this composite sketch every day that he sat at his desk for a few weeks. *See* **Exhibit O,** p. 91, ln. 11-14, **Exhibit P**, p. 153, ln. 1-8.

Response: **Disputed**. This is the same as Fact 48. Further, since the Bulletin (of which the sketch is a component) was not prepared until May 20, 2008, *see* Bulletin, Harvis Decl., Exhibit 19, it could only have been hanging for, at most, fifteen calendar days as of June 5, 2008.

63. Det. Decaro was unable to locate this composite sketch while he was at the Hempstead Police Armory. *See* **Exhibit O**, p. 81, ln. 16-23. Det. Decaro called the NCPD Third Squad, spoke with Det. Lipson and asked if the composite sketch was still hanging by Det. Decaro's desk. *See* **Exhibit P**, p. 78, ln. 5-11; *see also* Det. Lipson EBT Transcript (**Exhibit W**) p. 109, ln. 10-14. Det. Lipson told Det. Decaro that the composite sketch was still hanging in front of his desk. *See* **Exhibit P**, p. 78, ln. 5-15; *see also* **Exhibit W**, p. 109, ln. 15-22.

Response: **Disputed in part.** The document at issue is a bulletin containing an illustration of Kenton Sherwood that does not resemble plaintiff and a description of Sherwood at odds with plaintiff's description, not a composite sketch. *See* Bulletin, Harvis Decl., Exhibit 19; Responses 19-20 & Figure 1, *supra*.

64. Det. Darienzo went back to the NCPD Third Squad to pick up a copy of the composite sketch and brought this sketch back to the Hempstead Police Armory. *See* **Exhibit P**, p. 78, ln. 16-18; *see also* **Exhibit W**, p. 111, ln. 14-21.

Response: **Disputed in part.** Darienzo picked up a copy of the Bulletin. *See* Bulletin, Harvis Decl., Exhibit 19; Responses 19-20 & Figure 1, *supra*.

65. Det. Decaro saw the composite sketch and determined that plaintiff resembled the composite sketch. *See* **Exhibit P**, p. 79, ln. 16-22.

Response: **Disputed.** Decaro never compared plaintiff to the sketch of Kenton Sherwood. Decaro Dep., Harvis Decl., Exhibit 28, p. 84, ln. 19-24; p. 91, ln. 15-23. Further, the sketch of Sherwood did not resemble plaintiff and the description of Sherwood, which Decaro did not review, ruled plaintiff out as a suspect. Plaintiff also had a verifiable alibi and is innocent. *See* Response 61, *supra.*

66. Det. Decaro then called Det. Lipson and asked Det. Lipson to put together two (2) photo arrays including plaintiff in both photo arrays. *See* **Exhibit O**, p. 115, ln. 14-16; *see also* **Exhibit P**, p. 79, ln. 16-22; *see also* **Exhibit W**, p. 116, ln. 17 – p. 117, ln. 2.

Response: **Disputed in part**. The photo arrays that Lipson prepared at Decaro's

-21-

request were objectively biased against Mr. Galloway. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); Response 60, *supra*.

67. Prior to being asked to put together photo arrays with plaintiff's photograph, Det. Lipson was not involved in the investigation of May 15, 2008 shooting of Anyosa. *See* **Exhibit P**, p. 6, ln. 25 – p. 7, ln. 11.

Response: **Disputed**. Lipson was personally involved in several aspects of plaintiff's wrongful conviction. *See, e.g.,* Decaro Dep., Harvis Decl., Exhibit 28, p. 69, ln. 9-18 (testifying that Decaro, Darienzo and Lipson were obtaining the statements from Ogletree); Responses 79-86, *infra*.

68. On June 6, 2008, at approximately 2:00 a.m., Det. Lipson created two (2) photo arrays with plaintiff's photograph placed in both photo arrays. *See* **Exhibit P**, p. 17, ln. 5-6; *see also* Pre-Trial Hearing Exhibits 1-4 (**Exhibit X**). At the time he created the two (2) photo arrays with plaintiff's photograph, Det. Lipson did not know what case he was preparing these photo arrays for. *See* **Exhibit W**, p. 128, ln. 13-20.

Response: **Disputed**. Lipson, who would later improperly administer the arrays to Hernandez and Anyosa, knew that Mr. Galloway was the subject of the arrays and constructed them in a manner that was objectively biased against Mr. Galloway. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

69. The photograph of plaintiff that was used in both photo arrays was from September of 2007. *See* **Exhibit D**, p. 704, ln. 9-11.

Response: **Disputed in part.** Plaintiff agrees that the photograph of him was taken in September 2007 but notes that the use of the photograph under the circumstances here – with plaintiff having much longer hair, being in police custody, being innocent, not matching the description and having an alibi – was improper and increased the likelihood that plaintiff would be misidentified. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); *see also*, n.2, *infra*.

70. Det. Lipson used a computer at the NCPD Third Squad to create these two (2) photo arrays. *See* **Exhibit W**, p. 118, ln. 8-19. Det. Lipson used a system on the computer known as "Rogues Gallery", entered plaintiff's name, and plaintiff's photograph appeared. *See* **Exhibit W**, p. 118, ln. 20 – p. 119, ln. 3.

Response: **Undisputed**. Plaintiff agrees that Lipson picked the fillers to create two arrays and notes that the arrays as constructed were objectively biased against plaintiff. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

71. After plaintiff's photograph appeared, Det. Lipson "clicked compare to populate up the five other photos that had similar characteristics, and then when other photos came up I individually went through them and picked them." *See* **Exhibit W**, p. 119, ln. 3-8; *see also* **Exhibit P**, p. 52, ln. 12-17.

Response: **Disputed in part**. Plaintiff agrees that Lipson picked the fillers but notes that the arrays as constructed were objectively biased against plaintiff. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

72. Det. Lipson compared filler photos and selected fillers that looked similar to the plaintiff's photograph to include in the photo array. *See* **Exhibit W**, p. 122, ln. 22 – p. 123, ln. 4; *see also* **Exhibit P**, p. 8, ln.22 – p. 9, ln. 8; p. 53, ln. 16-20; *see also* **Exhibit D**, p. 703, ln. 25 – p. 704, ln. 5; p. 710, ln. 14-18.

Response: **Disputed in part**. Lipson's subjective belief is immaterial, and, in any event, the fillers ultimately selected by Lipson resulted in an array that was objectively skewed and materially increased the likelihood that plaintiff would be selected. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

73. Det. Lipson created these two (2) photo arrays and placed plaintiff's photograph in a different position in each photo array to keep the photo arrays as fair as possible. *See* **Exhibit W**, p. 126, ln. 12-15, p. 127, ln. 3-7; *see also* **Exhibit D**, p. 704, ln. 15 – p. 705, ln. 3.

Response: **Disputed**. First, Lipson's intent is immaterial. Second, the array Lipson created was objectively unfair and resulted in multiple misidentifications. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

74. In 2008, it was not the NCPD's policy to take a photograph of the suspect while he was in custody and include that photograph in a photo array that was going to be presented to victims and/or witnesses. *See* **Exhibit D**, p. 723, ln. 20-25.

Response: **Disputed as misstating the testimony**. In the referenced passage, Lipson only states that he personally has never taken a photograph of a suspect and

substituted it in an array. Lipson says nothing about the NCPD's policy, and the policy, in any event, is immaterial to the question of the due process required by the Fourteenth Amendment. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

75. After the two (2) photo arrays were created, Det. Lipson brought them to the Hempstead Police Armory. *See* **Exhibit P**, p. 9, ln. 11-12.

Response: **Undisputed.**

76. On June 6, 2008, at approximately 3:00 a.m., Det. Decaro read Mr. Ogletree his *Miranda* rights and Mr. Ogletree signed the *Miranda* card. *See* **Exhibit O**, p. 53, ln. 4-20; p. 144, ln. 1-11; *see also* **Exhibit D**, p. 306, ln. 23 – p. 307, ln. 8; *see also* Mr. Ogletree Miranda Card (**Exhibit Y**). Det. Decaro did not substantively question Mr. Ogletree until after he read Mr. Ogletree his *Miranda* rights at approximately 3:00 a.m. *See* **Exhibit O**, p. 144, ln. 8-11.

Response: **Disputed**. Ogletree described the events differently: "They coerced it. [T]hey put a picture of [plaintiff] in front of me and said this is the sketch and Josiah is trying to blame it on me. They coerced it all the way through." Trial Tr., Harvis Decl., Exhibit 1, p. 267, ln. 13-17 (Ogletree).

77. Mr. Ogletree signed a written statement with the following language "Josiah told me that he had to go down to Maryland (Baltimore) area because it was getting hot up in here. He said that he had to 'blam', shoot a cab driver over by the chicken place on Jackson. He said that he felt that it was hot up here, but he was still coming right home." *See* Mr. Ogletree signed written statement (**Exhibit Z**); *see also* **Exhibit D**, p. 266, ln. 6-7; *see also* **Exhibit O**, p. 155, ln. 16 – p. 156, ln. 2.

Response: **Disputed**. Describing his interaction with defendants Lipson, Decaro, Horowitz and Darienzo, Ogletree testified "I told them what they told me to tell them. It was coerced, like I said, again, sir." Ogletree Trial Tr, Harvis Decl., Exhibit 1, p. 266, ln. 18-p. 267, ln. 1, 13-17. "I put my signature on that statement. The statement is false, sir." *Id.* at 270, ln. 20-25; *id.* at p. 262, ln. 20-274, ln. 21 ("They woke me up three something in the morning to sign the statement that they wrote."); *id.* at, *e.g.*, p. 303, ln. 14-23 ("…They say, You're sure [plaintiff] didn't tell you that he's leaving the next morning because he shot somebody at the chicken spot? They just kept going on and on for hours trying to get him on some chicken spot. And, honestly, Josiah didn't do it. He didn't do that. But I was weak and they coerced it and they got me to sign that paper."); *id.* at, *e.g.*, p. 300, ln. 19-p. 303, ln. 16 ("…They brought a…sketch

-24-

of somebody and they said, Who does this look like? And I'm telling them, I don't know who that is…They start threatening me and trying to get me to say that it's Josiah, or myself, I guess…I'm, like, Nah, that don't look like him, Josiah got hair. As a matter of fact, he had an afro at the time."); Trial Tr., Harvis Decl., Exhibit 1, p. 541, ln. 7-25 (Horowitz) (describing Horowitz's involvement in interrogating Ogletree); Decaro Dep., Harvis Decl., Exhibit 28, p. 69, ln. 9-18 (testifying that Decaro, Darienzo and Lipson were obtaining the statements from Ogletree); *see also* Ogletree Unsigned Statement Implicating Plaintiff, annexed to the Harvis Decl. as Exhibit 26 (witnessed by Decaro and Lipson); Lipson Dep., Harvis Decl., Exhibit 31 ("Lipson Dep."), p. 175, ln. 15-p. 179, ln. 5 (discussing preparation of unsigned Ogletree statement); *see* n.1, *supra* (discussing the CIU investigation confirming plaintiff's innocence).

78. On the morning of June 6, 2008, Hernandez came to the Hempstead Police Armory to view a photo array. *See* **Exhibit P**, p. 9, ln. 13-23; *see also* **Exhibit D**, p. 472, ln. 23 – p. 473, ln. 2, p. 705, ln. 7-11; *see also* Wilmer Hernandez EBT Transcript (**Exhibit AA**) p. 28, ln. 13-17.   When Hernandez was at the Hempstead Police Armory, he did now (sic) know that anybody was in custody. *See* **Exhibit D**, p. 473, ln. 14-18.

Response: **Disputed**. At approximately 3:20 a.m., the defendants brought Wilmer Hernandez to the Armory and told him "[we have] the person who was the cause of the incident" but "want[] to show [you] pictures." Hernandez Dep., Harvis Decl., Exhibit 30, p. 30, ln. 18-24. The photo array shown to Hernandez was biased against Mr. Galloway, objectively leading, based on the array's construction, to a four-fold increase in the statistical likelihood that Mr. Galloway would be selected. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); *see also id.* at Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp. 17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination); *see also* 30(b)(6) Deposition Testimony annexed to the Harvis Decl. as Exhibit 44 ("30(b)(6) Testimony"), p. 46, ln. 25-p. 47, ln. 5 (acknowledging that a witness should not be told that the subject of an identification procedure is in custody).

79. Det. Lipson and P.O. Horowitz met with Hernandez at the Hempstead Police Armory, where Hernandez viewed a photo array.  *See* **Exhibit D**, p. 705, ln. 7-18; *see also* **Exhibit AA**, p. 28, ln. 13-17.  Det. Lipson told Hernandez "[i]'m going to show

a series of six photos, if you recognize anybody, please tell me. And just keep in mind that everybody's facial features and everything changes over time. So take your time before answering any questions." *See* **Exhibit W**, p. 138, ln. 16-22.

Response: **Disputed**. The array was biased, and the administration flawed and improperly documented. Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); *see also id.* at Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp. 17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination); Hernandez Dep., Harvis Decl., Exhibit 30, p. 30, ln. 18-24.

80. On June 6, 2008, at approximately 3:20 a.m., Hernandez immediately selected plaintiff's photograph from the photo array and identified plaintiff as the person who he had argument with and shot his friend. *See* **Exhibit P**, p. 10, ln. 3-7; *see also* **Exhibit D**, p. 467, ln. 13- 18; *see also* **Exhibit W**, p. 98, ln. 18 – p. 99, ln. 1; *see also* Supporting Deposition for Hernandez Photo Array (**Exhibit CC**). Plaintiff's photograph was in position #2. *See* **Exhibit E**, p. 10, ln. 5- 12; *see also* **Exhibit D**, p. 467, ln. 13-18; *see also* Photo Array presented to Hernandez (**Exhibit BB**). Hernandez circled the plaintiff's photograph and signed his name. *See* **Exhibit BB**; *see also* **Exhibit AA,** p. 45, ln. 18-20.

Response: **Disputed**. Hernandez could not have "identified plaintiff as the person who…shot his friend," given that Hernandez was not present when his friend was shot. *See, e.g.*, Undisputed Fact 30, *supra*. Additionally, neither Lipson nor Horowitz took notes of the interaction with Hernandez (or anything else they did at the Armory), nor did they record any statements by Hernandez or his confidence or the time it took him to select from the array. Lipson spoke to Hernandez after the array was administered but does not recall what was said. *See* Lipson Dep., Harvis Decl., Exhibit 31, p. 66, ln. 10-15, p. 154, ln. 20-p. 157, ln. 17; Steven Horowitz Deposition Testimony ("Horowitz Dep."), Harvis Decl., Exhibit 45, p. 89, ln. 4-8. Lipson likely reinforced Hernandez's misidentification. Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); *see also id.* at Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp.

17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination).

81. Det. Lipson wrote up a supporting deposition for the photo array which was signed by Hernandez and witnessed by Det. Lipson and P.O. Horowitz. *See* **Exhibit CC**; *see also* **Exhibit P**, p. 10, ln. 9-15.

Response: **Disputed**. The preprinted form used by Lipson revealed Mr. Galloway's name to Mr. Hernandez and purports to identify Mr. Galloway as "the person who shot" Anyosa, even though Hernandez was admittedly not present when Sherwood shot Anyosa. *See* Dysart Report, Harvis Decl. Exhibit 4, p. 4 & n.1, n.2; Hernandez Photo Array Deposition, annexed to the Harvis Decl. as Exhibit 35; *supra* at Undisputed Fact 30.

82. On June 6, 2008, at 4:30 a.m., Plaintiff signed a *Miranda* rights card, knew that he didn't have to speak with a police officer, but continued to talk voluntarily. *See* **Exhibit P**, p. 105, ln. 3 – p. 106, ln. 10; p. 156, ln. 10-14; *see also* **Exhibit Q**, p. 60, ln. 21 – p. 62, ln. 2; *see also* Plaintiff Miranda Card (**Exhibit DD**).

Response: **Disputed**. Plaintiff's custodial interrogation was not voluntary, it was conducted overnight in a police precinct while plaintiff's friend, Robert Ogletree, was down the hall being coerced into falsely implicating plaintiff. Indeed, after Mr. Galloway had been questioned for some time, plaintiff was handed a "rights card" to sign; no warnings were given. Galloway Dep., Harvis Decl., Exhibit 20, p. 61, ln. 8-15. In any event, crediting the time on the rights card means that Hernandez was shown the biased array an hour and ten minutes before plaintiff was questioned about the Anyosa shooting. This suggests that the officers never considered evidence plaintiff might offer about his innocence in the shooting, or the exonerating aspects of his appearance, before constructing and administering the arrays. *See* Response 80, *supra*.

83. Plaintiff told Det. Decaro that he heard about the May 15, 2008 shooting of Anyosa on the news and that he went to Baltimore. *See* **Exhibit P**, p. 83, ln. 14-25. Plaintiff also stated that a few weeks before June 6, 2008, he "was going to Baltimore." *See* **Exhibit Q**, p. 106, ln. 11- 12; *see also* **Exhibit D**, p. 1000, ln. 20-24.

Response: **Disputed in part**. It is immaterial whether plaintiff told Decaro he heard about the crime or travelled. Defendant Decaro admitted at his deposition that, contrary to Decaro's sworn allegations in the felony complaints, plaintiff made no statements of admission in connection with the May 15, 2008 shooting of Anyosa.

*See* Signed Felony Complaints, annexed to the Harvis Decl. as Exhibit 36; Decaro Dep., Harvis Decl., Exhibit 28, p. 195, ln. 18-25; *supra* at Responses 19-20.

84. Plaintiff signed a written statement admitting to punching Marky Fouse's brother Chris in the face and taking their marijuana on May 27, 2008. *See* **Exhibit Q**, p. 64, ln. 19-21; *see also* **Exhibit EE**. Plaintiff also signed a written statement and admitted to shooting a gun in a separate incident at another individual named Mr. Hutchinson, who was with Marky Fouse on or about May 28, 2008. *See* **Exhibit Q**, p. 110, ln. 14 – p. 114, ln. 15; *see also* Plaintiff's Second Signed Statement (**Exhibit FF**).

Response: **Undisputed**. This is not material. The Hutchinson case, which was dismissed, involved plaintiff acting in self-defense, and the Fouse allegations, which plaintiff denies, resulted in a noncriminal disposition as a disorderly conduct violation. See Plaintiff's Deposition, Harvis Decl., Exhibit 20, p. 52, ln. 20-25; p. 113, ln. 4-p. 114, ln. 25, p. 120, ln. 2-9; *id.* at p. 131, ln. 9-23.

85. Det. Lipson drove to Anyosa's house to present Anyosa with a photo array. *See* **Exhibit P**, p. 11, ln. 3-5; *see also* **Exhibit D**, p. 390, ln. 2-12. Det. Lipson told Anyosa that he was "going to show him a series of six photos, to take his time and to let me know if he recognizes anybody in the photo. [Det. Lipson] also told [Anyosa] that images and people's facial features change over time. To take his time and look at it as much time as he needed to make a determination." *See* **Exhibit W**, p. 182, ln. 17-25; *see also* **Exhibit P**, p. 11, ln. 7-8.

Response: **Disputed**. Instead of arranging for a lineup procedure during business hours as was called for under the circumstances under established protocols, Lipson woke Mr. Anyosa, who was still freshly wounded, and brought a biased photo array to his home containing an outdated and misleading picture of Mr. Galloway. Lipson took no notes and did not preserve any notes made by Anyosa. Lipson Dep., Harvis Decl., Exhibit 31, p. 66, ln. 10-15, p. 154, ln. 20-p. 157, ln. 17.

86. On June 6, 2008, at 5:00 a.m., Anyosa positively identified plaintiff's photograph from the photo array and identified plaintiff as the person who shot him in the face. *See* **Exhibit P**, p. 11, ln. 6-10; *see also* **Exhibit D**, p. 390, ln. 10-19; *see also* Supporting Deposition for Anyosa Photo Array (**Exhibit GG**); *see also* **Exhibit X**, p. 3; *see also* **Exhibit P**, p. 13, ln. 14-21, p. 26, ln. 2-5. Plaintiff's photograph was in position #4. *See* **Exhibit P**, p. 11, ln. 6-10; *see also* **Exhibit E**, p. 22, ln. 2-17; *see also* **Exhibit D**, p. 390, ln. 10-1; *see also* **Exhibit GG**; *see also* **Exhibit X**, p. 3. Anyosa circled the

plaintiff's photograph and signed his name under plaintiff's photograph in position #4. *See* **Exhibit X**, p. 4; *see also* **Exhibit D**, p. 397, ln. 2-6; *see also* **Exhibit P**, p. 11, ln. 13-17.

Response: **Disputed**. Using an array biased against Mr. Galloway – an innocent man with an alibi – and without disclosing to the seriously injured and half-asleep Anyosa that Mr. Galloway's photograph was outdated and that there were material discrepancies in plaintiff's height, hair, age, features and accent, Lipson improperly administered the array to Anyosa, failing to document Anyosa's confidence or any information regarding the timing of Anyosa's selection. *See* Lipson Dep., Harvis Decl., Exhibit 28, p. 66, ln. 10-15, p. 154, ln. 20-p. 157, ln. 17. Lipson then informed Anyosa that he had picked the "right person" and that Hernandez had made the same selection, impermissibly bolstering Anyosa's initial tainted misidentification. Anyosa described to investigators the corrosive impact Lipson's false assurances had on his confidence: "In court he [Anyosa] didn't feel 100% sure but he felt pressure because he knew Wilmer had [ID'd] him [and] detectives said it was [the] right guy…He wishes police had told him [plaintiff] was 5'6" – he would have told them that Josiah didn't do it." Anania Notes, Harvis Decl., Exhibit 7 at P11448, P11455-11456; Dysart Report, Harvis Decl., Exhibit 4, Section VI.8 (pp. 17-19) (Witness Confidence & Post-Identification Feedback); Section VI.9 (pp. 19-20) (Post-Event Contamination).[2]

87. Det. Lipson wrote up a supporting deposition for the photo array which was signed by Anyosa and witnessed by Det. Lipson. *See* **Exhibit GG**; *see also* **Exhibit P**, p. 11, ln. 13-17.

---

[2] At the pre-trial hearings in plaintiff's criminal case (in November 2008), defendant Lipson testified that on June 6, 2008, he observed plaintiff in custody as depicted in Figure 1, *supra*, i.e., with an afro, but that Lipson nevertheless prepared and administered an array to Hernandez and Anyosa with Mr. Galloway depicted with short hair in an old photograph:



Lipson used this photo in the array he presented to Hernandez and Anyosa on 6/6/08



But according to Lipson's November 2008 hearing testimony, this is how plaintiff looked on 6/6/08

*See* Hearing Testimony annexed to the Harvis Decl. as Exhibit 39, p. 30, ln. 18-p. 38, ln. 15 (Lipson); Lipson Dep., Harvis Decl., Exhibit 31, p. 68, ln. 3-p. 76, ln. 8. At his deposition, defendant Lipson testified that there was no requirement that the photograph used in an array "accurately depict the suspect." *Id.*; *see* Dysart Report, Harvis Decl., Exhibit 4, pp. 10-15 (discussing bias and improprieties in the arrays shown to Hernandez and Anyosa).

Response: **Disputed**. Before preparing the supporting deposition, Lipson falsely informed Anyosa that Anyosa had selected the right person and Lipson also told Anyosa that Hernandez had chosen Mr. Galloway from the array. Anania Notes, Harvis Decl., Exhibit 7, P11448, P11455-11456. Lipson's conduct violated basic protocols and contaminated Anyosa's subsequent identifications. Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Bias); Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.8 (pp. 17-19) (Witness Confidence & Post-Identification Feedback); Section VI.9 (pp. 19-20) (Post-Event Contamination).

88. Det. Decaro processed the police paperwork and signed the felony complaints charging plaintiff with crimes from the May 27, 2008 incident with Marky Fouse and the May 15, 2008 shooting of Anyosa. *See* Felony Complaints for May 27, 2008 incident (**Exhibit HH**); *see also* Felony Complaints for May 15, 2008 shooting (**Exhibit II**). Det. Sortino was the subscribing witness for the Felony Complaints and was otherwise not involved in this investigation. *See* **Exhibit HH**; *see also* **Exhibit II**.

Response: **Disputed**. This assertion is not supported by the record.

**Arrest Report.** The arrest report documenting the arrest of plaintiff for shooting Anyosa was prepared by defendant Lipson and then reviewed and electronically signed by defendant Dorsi at 9:33 p.m. on June 6, 2008. *See* Arrest Report, Harvis Decl., Exhibit 33; Deposition Testimony of Richard Dorsi, annexed to the Harvis Decl. as Exhibit 37, p. 23, ln. 18- p. 28, ln. 17.

**Crime Report.** The crime report for the Anyosa shooting was prepared and signed by defendant Decaro and approved and signed by defendant Sortino. The crime report does not indicate when it was prepared but was printed at 9:26 p.m. on June 6, 2008. *See* NCPD Crime Report, annexed to the Harvis Decl. as Exhibit 23.

**Felony Complaints**. The felony complaints were prepared by defendants Yao and Decaro, executed by Decaro and reviewed and countersigned by defendant Sortino. Signed Felony Complaints, annexed to the Harvis Decl. as Exhibit 36; Decaro Dep., Harvis Decl., Exhibit 28, p. 189, ln. 19-p. 190, ln. 25, p. 191, ln. 14-p. 196, ln. 22; p. 198, ln. 4-p. 201, ln. 21; Deposition Testimony of Joseph Sortino annexed to the Harvis Decl. as Exhibit 47, p. 44, ln. 22-p. 52, ln. 21 (discussing the felony complaints).

89. In the afternoon of June 6, 2008, Det. Dluginski went to Anyosa's house, spoke

with Anyosa, and prepared a statement for Anyosa to sign based on what Anyosa had told him. *See* **Exhibit J**, p. 242, ln. 8-15; p. 247, ln. 7-10; p. 253, ln. 6-16. Anyosa signed this written statement on June 6, 2008 at approximately 4:30 pm. *See* **Exhibit J**, p. 259, ln. 14-22; *see also* Anyosa's signed written statement from June 6, 2008 (**Exhibit JJ**).

Response: **Disputed**. This is impossible, because the statement Dluginski prepared repeatedly identifies the perpetrator as "Josiah Galloway," which is factually inaccurate and something Anyosa could not have known (or told Dluginski) unless it was disclosed to him by the police. *See* Anyosa Statement, annexed to the Harvis Decl. as Exhibit 38 ("Galloway pulled his car up…the same person, Josiah Galloway came back in the same car."). The preparation of this statement by Dluginski further reinforced the misidentification that Lipson and Decaro had caused with their earlier mid-morning administration of the biased photo array to Anyosa, and Lipson's false representation to Anyosa that he had picked the right person.[3] *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); *see also id.* at Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp. 17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination).

Although Dluginski knew there was a significant discrepancy between plaintiff's appearance and the information provided by Anyosa, he never brought it to the attention of Anyosa, which would have resulted in Anyosa's exoneration of plaintiff. *See* Anania Notes, Harvis Decl., Exhibit 7, P11456 ("He wishes police had told him [plaintiff] was 5'6" – he would have told him that Josiah didn't do it."); Dluginksi Dep., Harvis Decl., Exhibit 34, p. 264, ln. 25-p. 266, ln. 17 (admitting that Dluginksi took no steps to make sure that Anyosa was aware of the height discrepancy because Dluginski "didn't think it was pertinent to the case"); *id.* at p. 239, ln. 12-p. 240, ln. 25 (claiming not to remember the events of June 6, 2008 and denying interaction with Anyosa); p. 258, ln. 24-p. 262, ln. 11 (acknowledging his interview of Anyosa and purporting to vouch for its integrity).

---

[3] Given the severity of Jorge Anyosa's injuries on May 15, 2008, his ability to communicate verbally was likely still impaired when Lipson went to his house before dawn on June 6, 2008 to secure the identification and when Dluginski went back to obtain the statement about Mr. Galloway later that day. Any notes generated during these encounters, however, have not been preserved or produced. *See* Response 39, *supra*.

90. Following June 6, 2008, Det. Cunningham had no further involvement in the investigation, arrest and/or prosecution of plaintiff except for testifying at the criminal pre-trial hearing in November of 2008. *See* **Exhibit T**, p. 120, ln. 2-7.

Response: **Disputed.** Detective Cunningham testified that he also participated in a discussion about "what charges were entered" against plaintiff. Hearing Testimony, Harvis Decl., as Exhibit 39, p. 210, ln. 2-10 (Cunningham).

91. Following June 6, 2008, P.O. Horowitz had no further involvement in the investigation, arrest and/or prosecution of plaintiff, except for showing vehicles to witnesses and testifying at the Grand Jury and plaintiff's criminal trial. *See* **Exhibit S**, p. 107, ln. 1-25, p. 113, ln. 11-20.

Response: **Disputed**. Defendant Horowitz was personally involved in several aspects of plaintiff's arrest, misidentification, and wrongful conviction.

Defendant Horowitz: 1) responded to the scene of the Anyosa shooting on May 15, 2008, *see* Grand Jury Testimony annexed to Harvis Decl. as Exhibit 40 ("Grand Jury Tr."), pp. 29-31; 2) arrested plaintiff, *see* Crime Report, Harvis Decl., Exhibit 23; 3) with Decaro, Darienzo and Lipson, coerced Ogletree, *see* Trial Tr., Harvis Decl., Exhibit 1, p. 541, ln. 7-25 (Horowitz) and Trial Testimony, Harvis Decl., Exhibit 1, p. 262, ln. 20-274, ln. 21 (Ogletree) ("They woke me up three something in the morning to sign the statement that they wrote."); 4) with Lipson, administered the biased array to Wilmer Hernandez, *see* Horowitz Trial Testimony, Harvis Decl., Exhibit 1, p. 548, ln. 10- p. 550, ln. 3; 5) presented vehicles with no connection to Sherwood or the crime to Hernandez and Anyosa that were not identified, *see id.* at p. 550, ln. 4- p. 551, ln. 4; 6) testified before the grand jury, *see* Grand Jury Testimony, Harvis Decl., Exhibit 40; and 7) testified at trial, including to dispute Ogletree's coercion claims. *See* Horowitz Trial Testimony, Harvis Decl., Exhibit 1, p. 541, ln. 19-25.

92. After June 6, 2008, Nassau County District Attorney ("NCDA") Assistant District Attorney ("ADA") Joseph Larocca ("ADA Larocca") presented the May 15, 2008 cab shooting to a Nassau County Grand Jury. *See* ADA Larocca EBT Transcript (**Exhibit KK**) p. 24, ln. 1-4. After Det. Horowitz, Det. Lipson, Anyosa and Hernandez testified (*see* **Exhibit E**), the Nassau County Grand Jury indicted Plaintiff for the following crimes related to the May 15, 2008 shooting: 1) NYS Penal Law section 110/125.25(1) – Attempt to Commit Murder in the Second Degree; 2) NYS Penal Law section 120.10(1) – Assault in the First Degree; 3) NYS Penal Law section 120.10(2) – Assault in the First Degree; 4) NYS Penal Law section 265.09(1) –

Criminal Use of a Firearm in the First Degree; 5) NYS Penal Law section 265.03(1)(b) – Criminal Possession of a Weapon in the Second Degree; and 6) NYS Penal Law section 265.03(3) – Criminal Possession of a Weapon in the Second Degree. *See* Nassau County Indictment No. 1315N/2008 (**Exhibit LL**).

Response: **Disputed**. The grand jury evaluating evidence in connection with the Anyosa shooting was not informed, *inter alia*: 1) that Ogletree had been coerced into falsely inculpating plaintiff; 2) that plaintiff was approximately six inches shorter than the perpetrator, was of a different age, had different hair, had no accent and was missing a front tooth; 3) that Anyosa and Hernandez had been shown biased photo arrays containing outdated and misleading pictures of plaintiff; 4) that police had received a tip that Kenton Sherwood, the perpetrator, had committed the crime; 5) that the felony complaints contained material misstatements, including that plaintiff had confessed to shooting Anyosa; 6) that Anyosa had been falsely informed that he selected the right person and that Hernandez had picked the same person; 7) that plaintiff did not have access to a Toyota; 8) that plaintiff had an alibi; or 9) that Anyosa was not confident but was assured by detectives that he had picked the right person. *See generally* Grand Jury Tr., Harvis Decl., Exhibit 40; Dysart Report, Harvis Decl., Exhibit 4.

93. On June 30, 2008, Nassau County Court Judge Alan Honorof issued an order directing plaintiff to participate in a physical line-up procedure. *See* Court Ordered Line-Up (**Exhibit MM**). The application was brought by ADA Larocca, on consent of plaintiff's criminal defense attorney at the time, Glenn Hardy. *See* **Exhibit MM**; *see also* **Exhibit KK**, p. 78, ln. 4-9. The order stated plaintiff's criminal defense attorney may be present and that plaintiff was not to "alter or remove any scalp or facial hair." *See* **Exhibit MM**.

Response: **Disputed**. The order required plaintiff to "stand in" a lineup, where his exonerating height would be readily apparent (as opposed to a seated lineup meant to conceal his height), and allowed plaintiff's attorney, who showed up "at the last minute," to attend only "in the capacity of an observer," i.e. with no ability to make objections. As defendant Ross testified: "I said, 'Glenn [Hardy], you know you are here as a witness. You are here to watch.'…[defense counsel is] only there to witness the lineup." Deposition Transcript of Matthew Ross, November 16, 2020, annexed to the Harvis Decl. as Exhibit 42 ("Ross Dep. I"), p. 85, ln. 22-p. 86, ln. 10; 30(b)(6) Testimony, Harvis Decl. as Exhibit 44, p. 57, ln. 5-24, p. 59, ln. 24-p. 60, ln. 17; Lineup Order annexed to the Harvis Decl. as Exhibit 41; Trial Tr., Harvis Decl., Exhibit 1, p. 1030, ln. 21, p. 1031, ln. 3 (Galloway). Further, there is nothing in

the record to indicate that Mr. Galloway had knowledge of the contents of the order.

94. On August 5, 2008, the NCPD attempted to complete a line-up but were (sic) unable to as a result of plaintiff's hair, and the line-up was postponed. *See* **Exhibit KK**, p. 82, ln. 4-14; *see also* **Exhibit J**, p. 305, ln. 11-22; *see also* **Exhibit Q**, p. 83, ln. 20-24. During this first attempt to conduct a line up, plaintiff's hair was in a different style than at the time of his arrest. *See* **Exhibit Q**, p. 83, ln. 7-8.

Response: **Disputed**. Defendant Ross – who has been accused of perjury by his fiancé, *see, e.g.,* Magliaro Affidavit, annexed to the Harvis Decl. as Exhibit 45 – brandished electric shears and threatened to cut Mr. Galloway's hair in violation of Judge Honorof's order, seeking to remove a key distinguishing characteristic of Mr. Galloway that would, according to Anyosa, have immediately exonerated plaintiff, who was innocent. Galloway Dep., Harvis Decl., Exhibit 20, p. 84, ln. 15-p. 85, ln. 25; Trial Tr., Harvis Decl., Exhibit 1, p. 1014, ln. 14-p. 1015, ln. 15 (Galloway); Anania Notes, Harvis Decl., Exhibit 7, P11456 ("[Anyosa] wishes police had told him [plaintiff] was 5'6" – he would have told him that Josiah didn't do it."); *see* Dysart Report, Harvis Decl., Exhibit 4, Section VI.8 (pp. 17-19) (Witness Confidence & Post-Identification Feedback); Section VI.9 (pp. 19-20) (Post-Event Contamination); 30(b)(6) Testimony, Harvis Decl., Exhibit 43, p. 59, ln. 4-10; *see also, e.g.,* Dluginksi Dep., Harvis Decl., Exhibit 34; p. 264, ln. 25-p. 266, ln. 17 (admitting that Dluginksi, who met Anyosa at length on June 6, 2008, did not mention the five-to-six-inch height discrepancy between plaintiff and Kenton Sherwood because Dluginski "didn't think it was pertinent to the case").

95. Plaintiff's hair was not cut by any member of law enforcement. *See* **Exhibit D**, p. 1029, ln. 2-3; *see also* Jeffrey Noble EBT Transcript (**Exhibit AAA**), p. 85, ln. 12-13.

Response: **Undisputed**. However, the only reason plaintiff's hair was not cut is because Mr. Galloway had the temerity to defy defendant Ross. *See* Trial Tr., Harvis Decl., Exhibit 1, p. 1028, ln. 21-p. 1029, ln. 6 (Galloway); Magliaro Affidavit, Harvis Decl., Exhibit 45, ¶ 8.

96. On August 14, 2008, Det. Ross conducted the plaintiff's physical line-up procedure with other NCPD members. *See* **Exhibit D**, p. 754, ln. 4-16. Prior to conducting the line-up procedure, Det. Ross did not do any work on this investigation. *See* Det. Ross EBT Transcript (**Exhibit NN**) p. 46, ln. 19-22; *see also* **Exhibit P**, p. 212, ln. 21-23.

Response: **Disputed**. Before the lineup took place on August 14, 2008 using police

officer fillers much older than plaintiff who did not resemble him while plaintiff was disguised by a hat, covered with a sheet and seated on two phonebooks, *see* Figure 2, *infra*, defendant Ross, who was running the procedure, allowed a witness, believed to be Anyosa, to be escorted past where Mr. Galloway was being held – a multi-windowed room known as the "fishbowl" – and the witness saw plaintiff, further tainting the procedure. Galloway Dep., Harvis Decl., Exhibit 20, p. 87, ln. 11-p. 88, ln. 20; Trial Tr., Harvis Decl., Exhibit 1, p. 1031, ln. 16-25 (Galloway); Dluginski Dep., Harvis Decl., Exhibit 34, p. 304, ln. 10-16; *see* Responses 94-95, *supra*; Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008).



*Figure 2* Photograph of August 14, 2008 Lineup (P7412), annexed to the Harvis Decl. as Exhibit 50

97. Det. Ross had conducted approximately 25 line-up procedures prior to August of 2008. *See* **Exhibit NN**, p. 28, ln. 20-24. As of August of 2008, all line-up procedures in Nassau County were done in a seated position. *See* **Exhibit NN**, p. 32, ln. 4-6; *see also* **Exhibit D**, p. 777, ln. 5-14; *see also* Nassau County 30(b)(6) witness Detective Lyndon John EBT Transcript (**Exhibit OO**), p. 57, ln. 5-10.

Response: **Disputed in part**. Plaintiff agrees that Nassau County had a policy of conducting seated lineups.[4] This policy was a proximate cause of plaintiff's wrongful conviction.

---

[4] At its deposition pursuant to Fed. R. Civ. P. 30(b)(6), Nassau County acknowledged that standing lineups were permitted in 2008 and that it is easier to determine participants' heights using a standing lineup. (30(b)(6) Witness Testimony, Harvis Decl., Exhibit 44, p. 57, ln. 5-p. 64, ln. 6; *see also* Lineup Form, annexed to the Harvis Decl. as Exhibit 53 (with check boxes for "sitting" and "standing").

With respect to defendant Ross, however, plaintiff respectfully submits that regardless of the number of lineups he may have conducted, his involvement in this case is troubling.

In addition to the perjury allegation by his fiancé Lori Magliaro (based on admissions from Ross related to improprieties in the lineups involving plaintiff, *see* Magliaro Affidavit, Harvis Decl., Exhibit 45, ¶¶ 6-8) defendant Ross testified at his deposition that he had never been disciplined despite having pled guilty to a series of departmental charges for dishonesty, including filing false reports and making false official statements, and being under criminal investigation by the Nassau County District Attorney's office for a pattern of thefts of government property. *See* Ross Dep. I, Harvis Decl., Exhibit 42, p. 16, ln. 12-p. 18, ln. 7.

Indeed, Ross was disciplined in connection with an official finding that he had "submitted a false report to Sergeant Richard Dorsi," a defendant supervisor in this action. Deposition Transcript of Matthew Ross, June 7, 2022, annexed to the Harvis Decl. as Exhibit 43 ("Ross Dep. II"), p. 28, ln. 2-p. 29, ln. 4, p. 49, ln. 15. In another case, Ross was accused of assaulting a suspect with a baseball bat. *See id.* at p. 56, ln. 9-p. 58, ln. 18.

98. Det. Dluginski was assisting Det. Ross with the plaintiff's line-up procedure. *See* **Exhibit D**, p. 754, ln. 14-16. Plaintiff was brought to the NCPD Third Squad for the line-up procedure. *See* **Exhibit D**, p. 757, ln. 17-21. The NCPD detectives requested fillers to appear to the NCPD Third Squad for the line-up procedure, and requested that the fillers be black males. *See* **Exhibit D**, p. 765, ln. 3-9.

Response: **Disputed in part**. Defendant Ross ran the lineup and defendant Dluginski obtained fillers who were police officers "that were available at the time." The officers used as fillers were Black men that were not selected based on their appearance or age. *See* Dluginski Dep., Harvis Decl., Exhibit 34, p. 321, ln. 4-17; Dysart Report, Harvis Decl., Exhibit 4, p. 12.

99. Plaintiff's criminal defense attorney, Glenn Hardy, was present for the line-up procedure and was present for the viewing of the line-up. *See* **Exhibit NN**, p. 82, ln. 7-11; *see also* **Exhibit KK**, p. 80, ln. 21-24; *see also* **Exhibit P**, p. 213, ln. 7-11, p. 214, ln. 6-10. ADA Larocca was also present for the line-up procedure. *See* **Exhibit KK**, p. 80, ln. 25 – p. 81, ln. 2. Mr. Hardy picked for plaintiff to sit in seat #5. *See* **Exhibit P**, p. 214, ln. 1-12; *see also* **Exhibit NN**, p. 83, ln. 18-23; p. 97, ln. 18-22.

Response: **Disputed**. Hardy "came at the last minute right before the lineup was

conducted." Trial Tr., Harvis Decl., Exhibit 1, p. 1030, ln. 2-p. 1031, ln. 3 (Galloway). Mr. Hardy had no say in whether Mr. Galloway wore a hat or was covered by a sheet and was not given an opportunity to object to those aspects of the procedure. Deposition Transcript of Glenn Hardy annexed to the Harvis Decl. as Exhibit 48 ("Hardy Dep."), p. 31, ln. 23-p. 32, ln. 25. Describing his role at the lineup, Mr. Hardy explained: "I am an observer. The only thing I can do is ask that my client be sat in position one, two, three, four, five or six." *Id.* at p. 33, ln. 3-10; *see* Lineup Order, Harvis Decl., Exhibit 41 (authorizing Hardy to attend "in the capacity of an observer"). As defendant Ross, who was running the lineup, explained: "I said, 'Glenn [Hardy], you know you are here as a witness. You are here to watch.'…[defense counsel is] only there to witness the lineup." Ross Dep. I, Harvis Decl., Exhibit 42, p. 85, ln. 21-p. 86, ln. 10. In any event, plaintiff chose his seat in the lineup. Trial Tr., Harvis Decl., Exhibit 1, p. 1030, ln. 21-p. 1031, ln. 6 (Galloway).

100.    The fillers were then brought into the room. *See* **Exhibit P**, p. 215, ln. 2-6.  All participants were covered with a white sheet so that the only thing that the viewers of the line-up could see were the heads and faces of the individuals in the line-up. *See* **Exhibit P**, p. 215, ln. 4-5.  It was NCPD policy to have all articles of clothing covered during a line-up procedure, and it was common for NCPD to use a sheet to accomplish this. *See* **Exhibit D**, p. 801, ln. 4-7.

Response: **Disputed in part**. The sheets were used to conceal plaintiff's appearance and make him appear taller, bigger and more like the perpetrator Kenton Sherwood (and Anyosa's description of Sherwood). Plaintiff agrees that Nassau County had a policy of covering lineup participants with sheets, but notes that this is immaterial to the question of whether, in this instance, the policy of using sheets contributed to plaintiff's misidentification. Defendants concede that using sheets to disguise plaintiff's appearance would be improper. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (Live Lineup Bias – August 14, 2008) (pp. 12-14); 30(b)(6) Dep., p. 46, ln. 25-p. 47, ln. 5.

101.    Plaintiff sat on two phone books during the line-up procedure. *See* **Exhibit D**, p. 787, ln. 6-8.  It was NCPD policy to have all individuals participating in the seated line-up to be the same height. *See* **Exhibit D**, p. 787, ln. 15-16, p. 800, ln. 22 – p. 801, ln. 6; *see also* **Exhibit OO**, p. 50, ln. 20-22.  It was common to have individuals participating in line-up procedure administer by the NCPD to sit on phone books. *See* **Exhibit OO**, p. 51, ln. 1-2.

Response: **Disputed**. The phone books were used to conceal plaintiff's appearance

and make him appear taller, bigger and more like the perpetrator Kenton Sherwood (and Anyosa's description of Sherwood). Plaintiff agrees that Nassau County had a policy of having lineup participants sit on phone books, but notes that this is immaterial to the question of whether, in this instance, the policy of using phonebooks contributed to plaintiff's misidentification. Defendants concede that using the phone books to disguise plaintiff's appearance would be improper. *See* Dysart Report, Harvis Decl., Exhibit 4, § VI.4 (Live Lineup Bias – August 14, 2008) (pp. 12-14); 30(b)(6) Deposition Testimony, p. 46, ln. 25-p. 47, ln. 5; *see also* Trial Tr., Harvis Decl., Exhibit 1, p. 1019, ln. 2-6 (Galloway) ("…Detective Ross, because I sat down and I was shorter than everybody, he came and gave me two phone books. He said sit on the two phone books.").

102.   After discussion with Mr. Hardy, Det. Sgt. Dorsi, Det. Dluginski, ADA Larocca and Det. Ross, it was decided that all of the line-up participants were going to wear hats as a result of plaintiff's hair. *See* **Exhibit P**, p. 215, ln. 15-25; *see also* **Exhibit NN**, p. 95, ln. 10-21; *see also* **Exhibit KK**, p. 109, ln. 7-13.

Response: **Disputed in part**. Plaintiff agrees that Dorsi, Dluginski and Ross decided to conceal plaintiff's braids with a hat. Mr. Hardy was not involved in the decision. *See* Hardy Dep., Harvis Decl., Exhibit 48, p. 31, ln. 23-p. 32, ln. 6; Dluginski Dep., Harvis Decl., Exhibit 340, ln. 15-p. 342, ln. 14 (Ross and Dluginski met and decided that the lineup involving plaintiff would be conducted using hats and sheets).

103.   Mr. Hardy had no objection to the procedure for the line-up, had no objection to all the fillers and plaintiff wearing a hat, and had no objection to having the plaintiff sit on phone books. *See* **Exhibit P**, p. 216, ln. 1-4; *see also* **Exhibit NN**, p. 84, ln 14-18; *see also* **Exhibit AAA**, p. 87, ln. 3 – p. 88, ln. 5.

Response: **Disputed**. Hardy, who was only authorized to attend "in the capacity of an observer," *see* Lineup Order, Harvis Decl., Exhibit 41, "came at the last minute right before the lineup was conducted," Trial Tr., Harvis Decl., Exhibit 1, p. 1030, ln. 2-p. 1031, ln. 3 (Galloway), and was not permitted to provide any input or object to any aspect of the procedure. Hardy Dep., Harvis Decl., Exhibit 48, p. 31, ln. 23-p. 32, ln. 25. Speaking of the lineup, Mr. Hardy explained: "I am an observer. The only thing I can do is ask that my client be sat in position one, two, three, four, five or six." *Id.* at p. 33, ln. 3-10; *see* Lineup Order, Harvis Decl., Exhibit 41 (authorizing Hardy to attend "in the capacity of an observer"). As defendant Ross, who was running the lineup, explained: "I said, 'Glenn [Hardy], you know you are here as a witness. You are here

to watch.'…[defense counsel is] only there to witness the lineup." Ross Dep. I, Harvis Decl., Exhibit 42, p. 85, ln. 22-p. 86, ln. 10.

104.  The NCPD Crime Scene Unit took a photograph of the fillers and the plaintiff in the line-up procedure. *See* **Exhibit NN,** p. 126, ln. 15-24; *see also* Line-Up Photograph (**Exhibit PP**). There were six (6) people in the line-up: the plaintiff and five (5) fillers. *See* **Exhibit PP**.

Response: **Undisputed**.

105.  Anyosa arrived to the NCPD Third Squad in the afternoon of August 14, 2008 to view the line-up. *See* **Exhibit D**, p. 401, ln. 11-21.  Anyosa came to the NCPD Third Squad alone. *See* **Exhibit D**, p. 402, ln. 2-3.

Response: **Undisputed**.

106.  Det. Strange was assigned to Anyosa to ensure that Anyosa was separated from everybody else involved in the line-up procedure. *See* **Exhibit P**, p. 213, ln. 15-22; *see also* Det. Strange EBT Transcript (**Exhibit QQ**) p. 13, ln. 6-23; *see also* **Exhibit D**, p. 745, ln. 8-14.  Anyosa was brought to a room in the NCPD Third Precinct with Det. Strange. *See* **Exhibit QQ**, p. 14, ln. 2-4.

Response: **Disputed**. Anyosa appears to have been brought into contact with plaintiff when plaintiff was in the "fishbowl." Galloway Dep., Harvis Decl., Exhibit 20, p. 87, ln. 11-p. 88, ln. 20; Trial Tr., Harvis Decl., Exhibit 1, p. 1031, ln. 16-24 (Galloway); Dluginski Dep., Harvis Decl., Exhibit 34, p. 304, ln. 10-16; *see* Responses 94-95, *supra*.

107.  Det. Ross spoke with Anyosa about the line-up procedure and gave Anyosa instructions for viewing the line-up. *See* **Exhibit P**, p. 216, ln. 11-24.  It was the practice of Det. Ross to give any witness viewing a line-up instructions prior to viewing the line-up. *See* **Exhibit NN**, p. 73, ln. 23 – p. 74, ln. 25.

Response: **Disputed**. Ross has no recollection of providing instructions to Anyosa or Hernandez. Ross Dep. I, Harvis Decl., Exhibit 42, p. 72, ln. 20-p. 73, ln. 22, p. 77, ln. 17-24. Dluginski testified that he was responsible for escorting both witnesses and that neither one had questions. Dluginski Dep., Harvis Decl., Exhibit 34, p. 338, ln. 3-p. 339, ln. 14.

108.  Anyosa was brought to the line-up viewing area where Det. Ross, Det. Dluginski, Mr. Hardy, Det. Sgt. Dorsi and ADA Larocca were present. *See* **Exhibit P**, p. 216,

ln. 25, p. 217, ln. 16-19. Anyosa viewed the line-up and identified the person seated in position #5, the plaintiff, as the person who shot him in the face. *See* **Exhibit P**, p. 217, ln. 10-13; *see also* **Exhibit D**, p. 403, ln. 4-19.

Response: **Disputed**. Dluginksi was not present when Anyosa misidentified plaintiff. Dluginski Dep., Harvis Decl., Exhibit 34, p. 268, ln. 10-18. Anyosa was not confident but had been told he picked the right guy and previously exposed to plaintiff's face through the earlier, improper photo array. *See* Anania notes, Harvis Decl., Exhibit 7, P11455-456; Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008).

109. No one from NCPD told Anyosa who to select in the line-up. *See* **Exhibit D**, p. 404, ln. 1-8. After Anyosa selected plaintiff, Anyosa was escorted back to Det. Strange. *See* **Exhibit P**, p. 217, ln. 20-24. Anyosa did not have contact with Hernandez between the time he viewed the line-up and when he was brought back to Det. Strange. *See* **Exhibit D**, p. 746, ln. 4-7.

Response: **Disputed**. A defendant detective – either Lipson, Dluginski, or both – caused Anyosa to misidentify plaintiff at the lineup by informing Anyosa, falsely, that he had selected the right person when chose plaintiff from the biased array. *See* Anania notes, Harvis Decl., Exhibit 7, P11455-456; Dysart Report, Harvis Decl., Exhibit 4, Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp. 17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination).

110. On August 14, 2008, at approximately 4:02 p.m., Det. Strange spoke with Anyosa and prepared a written statement for Anyosa to sign. *See* **Exhibit QQ**, p. 40, ln. 19-22; *see also* Anyosa Signed Line-Up Statement (**Exhibit RR**). Det. Strange presented Anyosa with the written statement, and Anyosa signed it. *See* **Exhibit RR**; *see also* **Exhibit QQ**, p. 46, ln. 3-7.

Response: **Disputed**. In accordance with Nassau County policy, Detective Strange prepared a statement reinforcing Anyosa's misidentification of plaintiff, again identifying plaintiff by name to Anyosa and attempting to bolster the lineup by characterizing it as consisting of "6 male blacks with similar characteristics." As with

Anyosa's prior statements, the diction reveals the hand of the police. *See* Anyosa Lineup Statement, annexed to the Harvis Decl. as Exhibit 54.

111.   Det. Strange's only involvement in plaintiff's criminal case was assisting in the August 14, 2008 line-up procedure. *See* **Exhibit QQ** p. 13, ln. 6-13. Det. Strange's sole role was to "stay with [Anyosa], to keep him separated and to take a statement [from Anyosa] after he viewed the lineup." *See* **Exhibit QQ**, p. 13, ln. 20-23. Plaintiff never had any interaction with Det. Strange. *See* **Exhibit Q**, p. 195, ln. 7-10.

Response: **Undisputed**. However, defendant Strange's involvement is sufficient to raise jury questions with respect to his liability. *See* Response 110, *supra.*

112.   On August 14, 2008, Anyosa did not see Hernandez prior to viewing the line-up. *See* **Exhibit D**, p. 402, ln. 12-15; p. 755, ln. 22-25. Anyosa did not view any of the line-up fillers before the line-up was conducted. *See* **Exhibit D**, p. 755, ln. 6-9.

Response: **Disputed**. Anyosa saw plaintiff before the lineup. Galloway Dep., Harvis Decl., Exhibit 20, p. 87, ln. 11-p. 88, ln. 20; Trial Tr., Harvis Decl., Exhibit 1, p. 1031, ln. 16-25 (Galloway); Dluginski Dep., Harvis Decl., Exhibit 34, p. 304, ln. 10-16; *see* Responses 94-95, *supra.*

113.   Hernandez arrived at the NCPD Third Squad in the afternoon of August 14, 2008 to view the line-up. *See* **Exhibit D**, p. 470, ln. 23 – p. 471, ln. 1-4. Hernandez came to the NCPD Third Squad alone. *See* **Exhibit** D, p. 471, ln. 7-8.

Response: **Undisputed**.

114.   Det. Darienzo was assigned to Hernandez to ensure that Hernandez was separated from everybody else involved in the line-up procedure. *See* **Exhibit P**, p. 213, ln. 15-22; *see also* **Exhibit V**, p. 92, ln. 12-17; *see also* **Exhibit D**, p. 748, ln. 2-5. Hernandez was brought to a private room in the NCPD Third Precinct with Det. Darienzo. *See* **Exhibit D**, p. 748, ln. 6-11.

Response. **Disputed**. It may have been Hernandez who saw plaintiff in the "fishbowl." Galloway Dep., Harvis Decl., Exhibit 20, p. 87, ln. 11-p. 88, ln. 20; Trial Tr., Harvis Decl., Exhibit 1, p. 1031, ln. 16-24 (Galloway); Dluginski Dep., Harvis Decl., Exhibit 34, p. 304, ln. 10-16; *see* Responses 94-95, *supra.*

115.   Det. Ross spoke with Hernandez about the line-up procedure and gave Hernandez instructions for viewing the line-up. *See* **Exhibit P**, p. 218, ln. 2-12; *see also* **Exhibit D**, p. 748, ln. 6-13.

**Disputed**. Ross has no recollection of providing instructions to Anyosa or Hernandez. Ross Dep. I, Harvis Decl., Exhibit 42, p. 72, ln. 20-p. 73, ln. 22, p. 77, ln. 17-24. Dluginski testified that he was responsible for escorting both witnesses and that neither one had questions. Dluginski Dep., Harvis Decl., Exhibit 34, p. 338, ln. 3-p. 339, ln. 14.

116. Hernandez was brought to the line-up viewing area where Det. Ross, Det. Dluginski, Mr. Hardy and ADA Larocca were present. *See* **Exhibit P**, p. 218, ln. 2-4, p. 219, ln. 1-8; *see also* **Exhibit KK,** p. 24, ln. 17-19. Hernandez viewed the line-up and identified the person seated in position #5, the plaintiff, as the person who he had an argument with the same day Anyosa was shot. *See* **Exhibit P**, p. 219, ln. 1-6; *see also* **Exhibit D**, p. 471, ln. 18-24.

Response: **Disputed**. Dluginksi was not present when Hernandez misidentified plaintiff. Dluginski Dep., Harvis Decl., Exhibit 34, p. 268, ln. 10-18. Hernandez, who did not see the shooting, admitted at his deposition that he "recognize[d] the person in the lineup from when [he] had seen [him] in the photo array." Hernandez Dep., Harvis Decl., Exhibit 30, p. 55, ln. 9-16. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008).

117. No one from NCPD told Hernandez who to select in the line-up. *See* **Exhibit D**, p. 471, ln. 25 – p. 472, ln. 4; p. 748, ln. 20-24. After Hernandez selected plaintiff, Hernandez was escorted back to Det. Darienzo. *See* **Exhibit D**, p. 749, ln. 3-5. Hernandez did not have contact with Anyosa between the time he viewed the line-up and when he was brought back to Det. Darienzo. *See* **Exhibit D**, p. 472, ln. 5-7; p. 749, ln. 6-10.

Response: **Disputed**. Hernandez's misidentification resulted from the prior flawed procedures to which defendants had subjected him and the improper manner in which they conceived and executed the lineup. Hernandez Dep., Harvis Decl., Exhibit 30, p. 55, ln. 9-16. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008); Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp. 17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination).

118.   On August 14, 2008, at approximately 4:05 p.m., Det. Darienzo spoke with Hernandez and prepared a written statement for Hernandez to sign. *See* **Exhibit V**, p. 106, ln. 6- 17; *see also* Hernandez Signed Line-Up Statement (**Exhibit SS**). Det. Darienzo presented Hernandez with the written statement, and Hernandez signed it. *See* **Exhibit SS**; *see also* **Exhibit V**, p. 103, ln. 10-12.

Response: **Disputed in part**. Plaintiff agrees that Darienzo prepared a statement related to the misidentification that was signed by Hernandez.

119.   On August 14, 2008, Hernandez did not see Anyosa prior to viewing the line-up and did not see Anyosa when he viewed the line-up. *See* **Exhibit D**, p. 471, ln. 13-17; p. 755, ln. 22-25.  Hernandez did not view any of the line-up fillers before the line-up was conducted. *See* **Exhibit D**, p. 755, ln. 6-9.

Response: **Disputed**. It may have been Hernandez who saw plaintiff in the "fishbowl." Galloway Dep., Harvis Decl., Exhibit 20, p. 87, ln. 11-p. 88, ln. 20; Trial Tr., Harvis Decl., Exhibit 1, p. 1031, ln. 16-24 (Galloway); Dluginski Dep., Harvis Decl., Exhibit 34, p. 304, ln. 10-16; *see* Responses 94-95, *supra*.

120.   On August 14, 2008, throughout the line-up process, Det. Ross filled in the NCPD Line-Up Worskeet (sic). *See* **Exhibit P**, p. 219, ln. 24 – p. 220, ln. 13; *see also* **Exhibit NN**, p. 101, ln. 21 – p. 102, ln. 10; *see also* NCPD Line-Up Worksheet (**Exhibit TT**). Per this Line-Up Worksheet, Det. Sgt. Dorsi was the NCPD Third Squad supervisor. *See* **Exhibit TT**.  ADA LArocca and Mr. Hardy were present for the line-up procedure. *See* **Exhibit TT**.

Response: **Disputed in part**. Plaintiff agrees that Ross, Dorsi, Larocca and Hardy were present when plaintiff was misidentified by Anyosa and Hernandez and that Ross completed the form at Harvis Decl., Exhibit 53.

121.   Det. Ross timed how long it took Anyosa and Hernandez to make their line-up selection. *See* **Exhibit P**, p. 217, ln. 14-15; p. 220, ln. 11-13.

Response: **Undisputed**.

122.   Per this Line-Up Worksheet, Anyosa made a selection after viewing the line-up on August 14, 2008 at 4:00 pm, and it took Anyosa 23 seconds to select plaintiff after viewing the line-up. *See* **Exhibit TT**. Per this Line-Up Worksheet, Hernandez made a selection after viewing the line-up on August 14, 2008 at 4:03 pm, and it took Hernandez 9 seconds to select plaintiff after viewing the line-up. *See* **Exhibit TT**.

Response: **Disputed in part.** Plaintiff agrees that Ross wrote these times on the form but disputes the accuracy of the underlying measurements.

123. Prior to conducting the line-up procedure, Det. Ross was not involved in the investigation of Anyosa's May 15, 2008 shooting. *See* Det. Ross EBT Transcript (**Exhibit NN**) p. 46, ln. 19-22; *see also* **Exhibit P**, p. 212, ln. 21-23

Response: **Disputed in part**. Defendant Ross was involved in threatening to shave or cut plaintiff's hair on August 5, 2008, in an effort to deprive him of the exonerating characteristic of his own hair and facilitate his misidentification. Galloway Dep., Harvis Decl., Exhibit 20, p. 84, ln. 15-p. 85, ln. 25; Trial Tr., Harvis Decl., Exhibit 1, p. 1014, ln. 14-p. 1015, ln. 15 (Galloway).

124. Det. Yao did not have any involvement in the photo array identification procedures with respect to the May 15, 2008 shooting of Anyosa. *See* Det. Yao EBT Transcript (**Exhibit UU**) p. 59, ln. 20 – p. 60, ln. 14. Det. Yao did not speak with plaintiff on June 5, 2008, June 6, 2008 or June 7, 2008. *See* **Exhibit UU**, p. 55, ln. 10-14. Det. Yao does not know who Anyosa is and did not speak with Anyosa. *See* **Exhibit UU**, p. 58, ln. 16-20). Det. Yao does not know who Hernandez is and did not speak with Hernandez. *See* **Exhibit UU**, p. 59, ln. 10-19.

Response: **Disputed**. Regardless of Yao's recollection, defendant Yao was the lead detective in the Marky Fouse case who, along with Lipson and Decaro, was part of the third squad team that "investigated" and caused plaintiff to be "charged with other cases," including the Anyosa shooting. Morning Report, Harvis Decl., Exhibit 24, at P1109 ("After investigation by 3rd Squad Det Decaro / Lipson / Yao subjects were charged with other cases.") (cleaned up).

125. Plaintiff does not recall having any interaction with Det. Yao. *See* **Exhibit Q**, p. 194, ln. 22-25. Prior to September 22, 2020, plaintiff has never heard Det. Yao's name. *See* **Exhibit Q**, p. 195, ln. 2-4.

Response: **Disputed**. *See* Prior Response. Plaintiff's recollection is not material, and it is undisputed that defendant Yao prepared the felony complaints that included the material false allegation that plaintiff made a Statement of Admission in connection with the Anyosa shooting, which DeCaro admitted at his deposition is not true. Decaro Dep., Harvis Decl., Exhibit 28, p. 195, ln. 18-25; *see* Signed Felony Complaints, Harvis Decl., Exhibit 36 at P1353-54.

126.   Subsequently, Cheryl Johnson, plaintiff's mother, hired Frederick Brewington as plaintiff's criminal defense attorney. *See* Cheryl Johnson EBT Transcript (**Exhibit VV**) p. 52, ln. 20-23.

Response: **Undisputed**.

127.   On November 5, 2008, and November 7, 2008, a pre-trial suppression hearing was held in front of Nassau County Court Honorable Philip Grella. *See generally* **Exhibit P**. ADA Larocca handled the pre-trial hearing for NCDA and plaintiff was represented by Mr. Brewington. *See generally* **Exhibit P**.

Response: **Undisputed**.

128.   Det. Lipson, Det. Decaro, Det. Cunningham, and Det. Ross testified during the pre- trial suppression hearing. *See* **Exhibit P**, p. 6 – p. 249. Plaintiff's criminal defense attorney, Fred Brewington, cross-examined Det. Lipson, Det. Decaro, Det. Cunningham and Det. Ross on discrepancies in plaintiff's height, hairstyle, lack of accent, age, as well as cross-examined all these witnesses about plaintiff's arrest, questioning, photo array identification procedures, and line-up identification procedure. *See* **Exhibit P**, p. 6 – p. 249.

Response: **Disputed**. Defendants' conduct deprived plaintiff of evidence (and resulted in the creation of evidence against plaintiff) that could have materially impacted the hearings, including, *inter alia*, defendants' coercion of Ogletree and the improprieties in the identification procedures. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); *see also id.* at Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator); Section VI.6 (pp. 15-16) (Pre-identification Warnings/Instructions); Section VI.7 (pp. 16-17) (Repeated Identification Procedures, Unconscious Transference and Commitment Effects); Section VI.8 (pp. 17-18) (Witness Confidence & Post-identification Feedback); Section VI.9 (pp. 19-20) (Post-event Contamination).

129.   On November 7, 2008, after hearing testimony from Det. Lipson, Det. Decaro, Det.Cunningham, and Det. Ross, Hon. Philip Grella issued a decision on the pre-trial hearing. *See* **Exhibit P**, p. 278, ln. 17 – p. 284, ln. 4. Hon. Grella held that during the lineup process and during the questioning process, plaintiff was in lawful custody, and that there was sufficient probable cause when plaintiff was arrested. *See* **Exhibit P**, p. 278, ln. 17 – p. 284, ln. 4.

Response: **Undisputed**. However, given that plaintiff's conviction was vacated and the record before the court below was incomplete, this is immaterial as a matter of law. *See* Response 128, *supra.*

130.    Hon. Grella also held that there was no suggestibility with regard to the procedure followed when Anyosa and Hernandez were presented with photo arrays, and "[t]here was no suggestibility with regard to the procedure that was followed. And there was nothing unreasonably or unduly suggestive in the wording that was used by police personnel during the showing of the photo arrays." *See* **Exhibit P**, p. 280, ln. 11-16.

Response: **Undisputed**. However, given that plaintiff's conviction was vacated and the record before the court below was incomplete, this is immaterial as a matter of law. *See* Response 128, *supra.*

131.    In addition, Hon. Grella held that the "photo arrays did not violate the constitutional rights of the [plaintiff]." *See* **Exhibit P**, p. 280, ln. 22-23. Moreover, Hon. Grella held that the court-ordered line-up was "fair, in compliance with the defendant's constitutional and statutory rights. As a matter of fact, he had an attorney present. Neither he nor his attorney objected in any way to ant of the procedures." *See* **Exhibit P**, p. 281, ln. 1-5. Furthermore, Hon. Grella found that the use of the hats during the lineup "was an attempt to protect the [plaintiff's] rights and to ensure fairness. Furthermore, there was certainly no object rendered by either the defendant or the attorney who was present." *See* **Exhibit P**, p. 281, ln. 9-13.

Response: **Undisputed**. However, given that plaintiff's conviction was vacated and the record before the court below was incomplete, this is immaterial as a matter of law. *See* Response 128, *supra.*

132.    Hon. Grella held that having the plaintiff and fillers sit, as well as the use of a sheet to cover plaintiff and the fillers was to keep things fair. *See* **Exhibit P**, p. 281, ln. 14-16. In addition, the Court held that "nothing was said or done to coerce or pressure or overly suggest to the individuals who viewed the line-up that they should in any way be unduly directed toward the defendant. And there was nothing unduly suggestive about the procedure of the lineup, the people that were used in the lineup, or any interaction that police personnel had with regard to the civilians who viewed the lineup." *See* **Exhibit P**, p. 281 ln. 17-25.

Response: **Undisputed**. However, given that plaintiff's conviction was vacated and the record before the court below was incomplete, this is immaterial as a matter of

law. *See* Response 128, *supra*.

133.   Finally, the Court held that the two (2) written signed statements by plaintiff and the oral statement made by plaintiff were voluntarily offered, were not the subject of any coercion, were not the subject of any duress, were not the subject of any type of force or pressure from the police department, and that the statements were made after plaintiff was advised of his constitutional Miranda warnings. *See* **Exhibit P**, p. 282, ln. 22 – p. 283, ln. 5.

Response: **Disputed**. The statements at issue are immaterial to summary judgment and as defendants concede, they are in any event not related to the Anyosa shooting and do not constitute Statements of Admission. *See* Decaro Dep., Harvis Decl., Exhibit 28, p. 195, ln. 18-25

134.   On November 13, 2008, Hon. Grella's November 7, 2008 decision denying plaintiff's motion to suppress was entered and filed with the Clerk's Office of the County Court of Nassau County. *See* Hon. Grella's Decision (**Exhibit WW**).

Response: **Undisputed**. This is not a material fact.

135.   A few months before plaintiff's criminal trial, ADA Larocca had a calendar conflict, and ADA Robert Schalk took over plaintiff's case and handled plaintiff's criminal trial. *See* **Exhibit R**, p. 55, ln. 2 – p. 56, ln. 9-14.

Response: **Undisputed**. This is not a material fact.

136.   Mr. Ogletree was produced from jail and met with ADA Schalk a few days before trial. *See* **Exhibit R**, p. 33, ln. 11-15. When ADA Schalk met with Mr. Ogletree, they discussed his signed written statement where he stated that plaintiff had told him he shot a cab driver.  *See* **Exhibit R,** p. 37, ln. 12 – p. 38, ln. 10; *see also* **Exhibit Z**. ADA Schalk "showed [Ogletree] the written statement that he had given to the police and went over it with him and to be clear, at no point in time did he ever say he was coerced, did he ever say he was threatened in any way." *See* **Exhibit R**, 38, ln. 4-9.

Response: **Disputed**. Plaintiff's innocence makes this assertion implausible. Ogletree owed no duty of candor to ADA Schalk – to the extent Ogletree was seeking to reveal the truth of plaintiff's innocence he had reason to approach the situation as he did. Had he told ADA Schalk the truth, he would not have been called at trial.

137.   During this meeting, Mr. Ogletree did *not* make any allegations that his written

statement was coerced. *See* **Exhibit R,** p. 27, ln. 19-23. During this meeting, Mr. Ogletree told ADA Schalk the same thing that he told the NCPD Detectives on June 6, 2008, and said that the written statement that he signed was accurate. *See* **Exhibit R,** p. 25, ln. 1-7, 9-13; p. 44, ln. 14 –p. 45, ln. 12.

Response: **Disputed**. *See* Prior Response.

138.   Hon. Alan L. Honorof presided over plaintiff's criminal trial; the criminal case started with preliminary applications on February 17, 2009. *See* **Exhibit D,** p. 1-12. On February 18, 2009, the process of jury selection commenced, and on February 19, 2009, a full jury was selected and was sworn. *See* **Exhibit D,** p. 26-224. On February 19, 2009, ADA Schalk delivered his opening statement (*see* **Exhibit D,** p. 232-248), and then Mr. Brewington delivered his opening statement (*see* **Exhibit D,** p. 249-260).

Response: **Undisputed**. This is not a material fact.

139.   During ADA Schalk's opening statement, he did not mention that a composite sketch of the suspect was prepared by Det. Bischoff, and he did not mention that Anyosa and Hernandez positively identified plaintiff in the photo arrays that were presented to them. *See* **Exhibit D,** p. 232-248. During Mr. Brewington's opening statement, Mr. Brewington brought up the composite sketch and the photo arrays. *See* **Exhibit D,** p. 249-260.

Response: **Disputed**. Given plaintiff's innocence and that his conviction has been vacated and the indictment dismissed based on new evidence, this is immaterial. Plaintiff disputes this characterization of the record.

140.   While ADA Schalk was only going to present evidence to the jury about the line-up procedure, "during opening statements Mr. Brewington referenced the sketch and referenced he photo pack identifications, which under normal New York State Criminal Procedure Law would never be admitted into evidence, but he opened the door to those items coming into evidence so yes, prior to their testimony I reviewed with them all of the identification procedures when normally I would never go over a photo pack or a sketch with the witness prior to trial because they would have been deemed inadmissible and it could be viewed as some sort of coaching otherwise." *See* **Exhibit R,** p. 124, ln. 16 – p. 125, ln. 4.

Response: **Disputed**. Given the *vacatur* of plaintiff's conviction and the County CIU's innocence finding, the intentions, conduct, evidentiary rulings, etc. of the

-48-

criminal court are immaterial. Plaintiff also disputes this characterization of the record.

141.   Since Mr. Brewington opened the door, Hon. Honoroff permitted ADA Schalk to present evidence to the jury regarding the composite sketch and the photo arrays. *See* **Exhibit R**, p. 66, ln. 14-18, p. 127, ln. 7 – p. 128, ln. 10.

Response: **Undisputed that the court articulated its ruling as such**. However, this is immaterial.

142.   Mr. Ogletree was the first witness to testify at plaintiff's criminal trial. *See* **Exhibit R**, p. 33, ln. 11-15; *see generally* **Exhibit D**, p. 261-262.  Mr. Ogletree first alleged that he was coerced to sign a written statement that plaintiff had told him that he shot a cab driver by the chicken joint was when he testified at plaintiff's criminal trial. *See* **Exhibit R**, p. 21, ln. 13 – p. 50, ln. 17; *see* **Exhibit D**, p. 262-p. 274, p. 297-p. 331.

Response: **Undisputed**. *See* Trial Tr., Harvis Decl., Exhibit 1, p. 262, ln. 20-274, ln. 21 (Ogletree) ("They woke me up three something in the morning to sign the statement that they wrote."); *id.* at, *e.g.*, p. 303, ln. 14-23 ("…They say, You're sure [plaintiff] didn't tell you that he's leaving the next morning because he shot somebody at the chicken spot? They just kept going on and on for hours trying to get him on some chicken spot. And, honestly, Josiah didn't do it. He didn't do that. But I was weak and they coerced it and they got me to sign that paper."); *id.* at, *e.g.*, p. 300, ln. 19-p. 303, ln. 16 ("…They brought a…sketch of somebody and they said, Who does this look like? And I'm telling them, I don't know who that is…They start threatening me and trying to get me to say that it's Josiah, or myself, I guess…I'm, like, Nah, that don't look like him, Josiah got hair. As a matter of fact, he had an afro at the time."); *see also* Ogletree Unsigned Statement, Harvis Decl., Exhibit 26.

143.   The Court deemed Mr. Ogletree as a hostile witness and ADA Schalk was allowed to impeach and cross-examine Mr. Ogletree even though he was a witness for the NCDA. *See* **Exhibit R**, p. 21, ln. 20-21; p. 22, ln. 3-21.

Response: **Undisputed**. This is not a material fact.

144.   ADA Schalk did not investigate Ogletree's claims that he was coerced into signing a statement against plaintiff because he believed he was lying as a result of, among other things, his prior conversation with Mr. Ogletree and Mr. Ogletree's demeanor on the stand. *See* **Exhibit R**, p. 32, ln. 19-24; p. 50, ln. 6-17.  When he testified, Mr.

Ogletree's body language was tense and he did not want to make eye contact with ADA Schalk, with plaintiff or with Mr. Brewington. *See* **Exhibit R,** p. 26, ln. 15-18.

Response: **Disputed**. Schalk testified that he discussed Ogletree's coercion claim with Sheryl Anania, his supervisor at the District Attorney's office who would go on to lead the CIU and exonerate plaintiff a decade later. *See* Schalk Deposition Testimony, annexed to the Harvis Decl. as Exhibit 56, p. 20, ln. 10-p. 24, ln. 21; p. 32, ln. 14-p. 33, ln. 4. Because Ms. Anania's role in plaintiff's prosecution was not revealed at the time of her deposition, plaintiff was unable to question her about whether and to what extent that experience informed Anania's decision to edit a statement to the criminal court made on behalf of the CIU's CPL § 440.10(1)(g) motion. In the original version of her remarks, Anania had written that police misconduct did not contribute to the wrongful conviction, but that line was struck from the version of her remarks placed on the record. Anania Edited Remarks, annexed to the Harvis Decl. as Exhibit 8. While the state of mind and conduct of Schalk, a non-party, is immaterial to summary judgment, plaintiff respectfully again notes that plaintiff's innocence corroborates Ogletree's coercion claims.

145.    ADA Schalk spoke with Anyosa and Hernandez individually before they testified, and they both indicated that they were certain that plaintiff was the person that they had argued with, and that had shot Anyosa on May 15, 2008. *See* **Exhibit R**, p. 125, ln. 20-25.

Response: **Disputed**. Hernandez could not say who shot Anyosa because he did not witness the shooting, and Anyosa told the CIU that he was unsure of the identification, that he had been told that he picked the right person and the same person as his friend, and that he wished police had told him plaintiff was 5'6" because he would have said "Josiah didn't do it." Anania Notes, Harvis Decl., Exhibit 7 at P11448, P11455-11456; Dysart Report, Harvis Decl., Exhibit 4, Section VI.8 (pp. 17-19) (Witness Confidence & Post-Identification Feedback); Section VI.9 (pp. 19-20) (Post-Event Contamination); Hernandez Dep., Harvis Decl., Exhibit 30, p. 55, ln. 9-16 (admitting that when Hernandez viewed the lineup, he "recognize[d] the person in the lineup from when [he] had seen [him] in the photo array").

146.    During the criminal trial, Anyosa identified Galloway as the person who he argued with on May 15, 2008. *See* **Exhibit D**, p. 377, ln. 2-13.

Response: **Disputed in part**. This misidentification was orchestrated by defendants. *See supra* at n.1, n.3, Response 24, Response 60; see *generally* Dysart Report, Harvis Decl., Exhibit 4.

147.   During the criminal trial, Hernandez identified Galloway as the person who he argued with on May 15, 2008. *See* **Exhibit D,** p. 465, ln. 24-25 – p. 466, ln. 1-7.

Response: **Disputed in part**. Using a biased array, Hernandez was initially caused to misidentify plaintiff, which carried over to the lineup, where Hernandez picked plaintiff based on his appearance in the prior array. These flawed, successive procedures increased the likelihood that Hernandez would misidentify plaintiff at trial. Hernandez Dep., Harvis Decl., Exhibit 30, p. 55, ln. 9-16; see *generally* Dysart Report, Harvis Decl., Exhibit 4.

148.   Plaintiff's attorney, Fred Brewington, cross-examined detectives, police officers, witnesses, and Anyosa about discrepancies between the plaintiff and the description of the suspect given by Hernandez and Anyosa. *See generally* **Exhibit D.** This included the height, weight, hair style, plaintiff's lack of accent, plaintiff's teeth, age, vehicle suspect was driving and vehicle suspect was arrested in. *See generally* **Exhibit D.**

**Response: Disputed in part.** As discussed above, plaintiff did not have access to the evidence fairly conduct cross-examination.

149.   Fred Brewington also cross-examined witnesses regarding plaintiff's and suspect's hair. *See generally* **Exhibit D.**  During the commission of the crime, the person who shot Anyosa had "short, cropped [hair], tight to the head was the description given by Mr. Anyosa. It was elicited that Mr. Galloway's hair was potentially in corn rolls. Corn rolls depending on how that are rolled are cropped, short, hair tight to the head. That was litigated at the trial." *See* **Exhibit R,** p. 106, ln. 5-15; *see also generally* **Exhibit D.**

Response: **Disputed in part**. Defendants' citation to the entire trial record and a few lines of the trial prosecutor's hearsay recollection of what he was told about plaintiff's hair is objectionable, and this assertion is immaterial as stated. As Professor Dysart explains in her report,

> Mr. Anyosa recalled that the perpetrator has short hair "cut [short] to the head" maybe an inch in length. [Trial Tr., Harvis Decl., Exhibit 1, p. 441] and it was not cornrows or

braids. [*Id.* at 418]. He also testified that the photo of Mr. Galloway with braids shown by defense attorney at trial was completely different than the hair of the shooter. [*Id.* at 445]. Mr. Hernandez testified that the perpetrator had short black hair about a half inch in length. Mr. Hernandez also testified that he knows the difference between short hair, afros, braids, and corn rows. [*Id.* at 465, 476-79]. At the trial, PO Horowitz testified that Mr. Galloway had messy cornrows when he was arrested on June 5, 2008 [*Id.* at 539], suggesting that the cornrows had been in for some time.

Dysart Report, Harvis Decl., Exhibit 4, p. 8.

150.　On March 2, 2009, plaintiff testified at his criminal trial, and on the same day, rested his case. *See* **Exhibit D**, p. 997-1037, ln. 8-9.

Response: **Disputed**. Other witnesses, including plaintiff's mother, girlfriend and dentist testified truthfully about plaintiff's physical appearance and alibi.

151.　On March 3, 2009, Mr. Brewington delivered his closing statement to the jury (*see* **Exhibit D,** p. 1046-1106), and then ADA Schalk delivered his closing statement (*see* **Exhibit D,** p. 1107-1145). On March 9, 2009, the jury rendered a verdict and found plaintiff guilty of all the criminal charges under Indictment No. 1315N/2008. *See* **Exhibit D,** p. 1244, ln. 19 – p. 1246, ln. 18.

Response: **Undisputed**. However, given that this guilty verdict, and the criminal judgment into which it flowed, were vacated, with the indictment dismissed on the People's motion on the grounds of plaintiff's innocence following an ethically-mandated investigation, this is immaterial to summary judgment.

152.　On November 23, 2009, plaintiff was sentenced to 25 years imprisonment. *See* November 23, 2009 Transcript (**Exhibit XX**) p. 15, ln. 1 – p. 17, ln. 6. Plaintiff also pled guilty to a violation under Superior Court Information No. 2380N/2009 with respect to the May 27, 2008 robbery. *See* **Exhibit XX**, p. 3, ln. 25 – p. 6, ln. 20.

Response: **Undisputed**. However, we respectfully submit that plaintiff's noncriminal plea to disorderly conduct is immaterial.

153.　After plaintiff was convicted after his criminal trial, he moved, pursuant to New York State Criminal Procedure Law ("C.P.L") sections 210.20(1)(h) and 330.30, to

set aside the jury's verdict convicting him of the criminal charges under Indictment No. 1315N/2008 on "the grounds that the verdict was against the weight of the evidence, that the identification of defendant was unduly suggestive, that the prosecutor made improper and inflammatory statements during summation, that the People shifted the burden in that they asked the jury to draw negative inferences from the defendant's failure to produce evidence, that the court abused its discretion, regarding the jury's deliberations, and that the People improperly solicited testimony regarding the showing of photographs to witnesses on their direct case." *See* September 16, 2009 Decision (**Exhibit YY**).

Response: **Undisputed**. However, this is not material.

154. On September 16, 2009, the trial Court held that defense counsel opened the door, and that "in his opening statement, [Mr. Brewington] inferred that the People were improperly hiding evidence of photographic identifications from the jury. In response to the prosecutor's objection, the court gave a curative instruction and allowed the aforementioned testimony." *See* **Exhibit YY**. Plaintiff's motion to set aside the verdict was denied. *See* **Exhibit YY**.

Response: **Undisputed**. However, this is not material.

155. Christopher Todd, Esq. is the Deputy Bureau Chief of the Legal Bureau of the NCPD. *See* Declaration of Christopher Todd, Esq. (**Exhibit ZZ**).

Response: **Disputed in part**. This evidence was not exchanged in discovery and this is not material.

156. On August 6, 2002, the NCPD issued Detective Division Administrative Order 2002-54 titled "Criminal Identification (HIDTA System, Composite Sketch, Lineups & Showups)." *See* **Exhibit ZZ, Exhibit 1**. This NCPD Order was the policy for the NCPD for identification procedures at the time of the investigation, arrest, prosecution and criminal trial of plaintiff. *See* **Exhibit ZZ, Exhibit 1;** *see also* **Exhibit OO**, p. 11, ln. 8-21.

Response: **Disputed**. Other sources constitute defendants' policies, including the County's 30(b)(6) testimony and the testimony of the individual defendants. The record also contains other evidence of defendants' written policies and of other written policies relevant to the issues in dispute that has been exchanged in discovery.

157. Per NCPD Order 2002-54, NCPD detectives conducting line up procedures

were to make every effort "to have the participants in an identification line up match the physical appearance of the subject. Variations of height and clothing may be overcome by seating the participants." *See* **Exhibit ZZ**, **Exhibit 1**, p. 3.

Response: **Disputed**. The policy is immaterial to summary judgment, except to the extent that it establishes the County's liability under *Monell*, and the evidence here is that the officers admittedly did not make any effort, let alone every effort, to have the fillers match plaintiff's physical appearance. *See* Dluginski Dep., Harvis Decl., Exhibit 34, p. 321, ln. 4-17; *see also* Figure 2, *supra*.

158.   The use of hats on all participants (suspect and fillers) in a line up procedure administered by the NCPD was not uncommon. *See* **Exhibit NN**, p. 33, ln. 3 – p. 34, ln. 4; *see also* **Exhibit QQ**, p. 28, ln. 5-9.

Response: **Disputed in part**. Plaintiff agrees, for the purposes of assessing *Monell* liability, that the County had a policy of using hats in its lineup procedures that, given plaintiff's hair and other features, *see* Figures 1 & 2, *supra*, likely contributed to plaintiff's wrongful conviction. However, plaintiff respectfully notes that defendant Ross testified that on August 14, 2008 he had to go out and purchase hats for plaintiff's lineup, suggesting hats were not commonly used in that era. *See* Ross Dep. II, Harvis Decl., Exhibit 43, p. 96, ln. 7-14. In any event, it is undisputed that here defendants Ross, Dorsi, Dluginski and Darienzo used hats to deprive plaintiff of the exonerating characteristic of his hair, which Anyosa and Hernandez each testified was (like his height, age, etc.) inconsistent with that of the perpetrator and, if revealed, would have resulted in plaintiff's exoneration. *See* Response 102, *supra*; Dysart Report, Harvis Decl., Exhibit 4, pp. 3-22.

159.   Per NCPD Order 2002-54, "investigating detectives are advised that if a Photo Pack identification has been used prior to an identification lineup, the position of the suspect should be different in the lineup than it was in the Photo Pack." *See* **Exhibit ZZ, Exhibit 1**, p. 3.

Response: **Undisputed**. However, this is not a material fact and the record establishes that the photo arrays prepared by defendant Lipson were biased against plaintiff. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); Decaro Dep., Harvis Decl, Exhibit 28, p. 84, ln. 19—24; p. 91, ln. 15-23.

160.   Per NCPD Order 2002-54, "the investigating detective should maintain a record of all persons, including the attorneys, present in the course of an identification lineup. The position and identification of each individual at all phases will also be

recorded and maintained as evidence." *See* **Exhibit ZZ, Exhibit 1**, p. 4. In addition, photographs should be taken of every phase of the identification lineup; the NCPD Crime Scene Search Section should be requested to photograph the proceedings. *See* **Exhibit ZZ, Exhibit 1**, p. 4.

Response: **Undisputed**. This is not material. *See* Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias); Decaro Dep., Harvis Decl, Exhibit 28, p. 84, ln. 19—24; p. 91, ln. 15-23.

161.   A photo array identification procedure is administered in a double blind fashion when the administrator of the photo array does not know who the suspect is. *See* **Exhibit O**, p. 121, ln. 10 – p. 122, ln. 11; *see also* **Exhibit ZZ, Exhibit 3**, p. 13.; *see also* **Exhibit OO**, p. 17, ln. 12-21; *see also* Jeffrey Noble EBT Transcript (**Exhibit AAA**), p. 25, ln. 10-25.

Response: **Disputed**. As Professor Dysart explains in her report on this topic,

> Double-blind administration, where the person conducting an identification procedure does not know who the suspect is, eliminates the possibility that the person conducting the procedure can influence the witness' selection toward the suspect and/or away from a lineup filler. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect. We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person. The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. In this case, both identification procedures were conducted by administrators who knew the identity of the suspect, Mr. Galloway.

Dysart Report, Harvis Decl., Exhibit 4, p. 14 (citations omitted).

162.   In 2008, the NCPD policy for identification procedures with respect to the

administration of photo arrays was different than it is in 2022; in 2008, the guidelines did not suggest that a photo array was to be administered in a double blind fashion. *See* **Exhibit OO**, p. 19, ln. 4 – p. 20, ln. 6.

Response: **Disputed in part**. Defendants' obligation to fairly administer identification procedures derives from the U.S. Constitution, including the Fourth and Fourteenth Amendments, and is independent of any policy they elect to adopt. It is undisputed that defendants did not use a double-blind array with Hernandez or Anyosa. Dysart Report, Harvis Decl., Exhibit 4, pp. 10-12.

163.   On July 7, 2010, the NCPD Department Notification Number 10-119 was issued. *See* **Exhibit ZZ**, **Exhibit 2.**

Response: **Undisputed.** However, this is immaterial.

164.   On August 9, 2011, the NCPD Department Notification Number 11-115, along with accompany exhibits, was issued and adopted by the NCPD with respect to Identification Procedures. *See* **Exhibit ZZ, Exhibit 3.**

Response: **Undisputed.** However, this is immaterial.

165.   Jeffrey Noble was disclosed as plaintiff's police practices expert and prepared an expert report. *See* Plaintiff's Rule 26(a)(2) disclosure (**Exhibit BBB**); *see also* **Exhibit AAA**, p. 46, ln. 6-14; *see also* Expert Report of Jeffrey J. Noble (**Exhibit CCC**).

Response: **Undisputed.**

166.   In cases where the victim does not know the suspect who committed a crime, it is common for the police to use identification procedures such as photo arrays and line-ups. *See* **Exhibit AAA**, p. 20, ln. 21 – p. 21, ln. 6.

Response: **Undisputed.** However, this is not a material fact.

167.   Jeffrey Noble did not criticize the NCPD detectives for not administering a double blinded (sic) photo array. *See* **Exhibit AAA**, p. 29, ln. 5-7 ("I am not criticizing them in this case for a double blind.").

Response: **Undisputed**. However, plaintiff respectfully notes that Dr. Jennifer E. Dysart, who defendants elected not to depose, is plaintiff's expert on eyewitness identifications and devoted an entire section of her report to the issue of non-blind identification procedures in this case. *See* Dysart Report, Harvis Decl., Exhibit 4,

Section VI.5 (pp. 14-15) (Use of a Non-blind Lineup Administrator Rather Than a Double-blind Administrator).

168.  Other than officers (sic) testimony in this case, Jeffrey Noble does not have any other information or knowledge as to how lineups were conducted in Nassau County in 2008. *See* **Exhibit AAA**, p. 33, ln. 18-23.

Response: **Undisputed**. This is immaterial and plaintiff respectfully notes that Dr. Jennifer E. Dysart, plaintiff's eyewitness identification expert who defendants elected not to depose, lectured to the Nassau County Bar Association in March 2008 and to the Nassau County Legal Aid Society in May 2009. *See* Dysart Report, Harvis Decl., Exhibit 4, C.V. Entries at pp. 35, 38. Professor Dysart's report also discusses several aspects of Nassau County identification procedures that were in force at the time of plaintiff's wrongful conviction. *See id.* at Section VI.4 (Live Lineup Bias – August 14, 2008) (pp. 12-14); *id.* at p. 2, n.2 (discussing Nassau County supporting deposition forms); *id.* at p. 5, n.5 (discussing Nassau County lineup forms); *id.* at p. 7, n.8 (same); *id.* at p. 11, n.23, p. 14 (discussing Nassau County's adoption of double-blind protocols); p. 18 (discussing training); *see also id.* at p. 3 ("In addition to the above listed materials, I have specifically requested a copy of the Nassau County eyewitness identification policies and procedures that were in place in May 2008 and any current policies and procedures. As of the date of submission of this report, I have not received these documents and understand that they are not yet in the possession of Mr. Galloway's counsel. When I receive these documents, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.").[5]

169.  For purposes of generating his expert report in this case, Jeffrey Noble did not review anything from the New York State Division of Criminal Justices Services. *See* **Exhibit AAA**, p. 57, ln. 5 – p. 58, ln. 8.

Response: **Undisputed**. This is immaterial.

170.  Jeffrey Noble is not familiar with the District Attorneys Association of the State of New York ("DAASNY") and is not familiar with the DAASNY Best Practices Committee. *See* **Exhibit AAA**, p. 58, ln. 9-17.

---

[5] If it should please the Court, because of litigation surrounding the disqualification of defendants' prior counsel, a discovery stay was entered on July 16, 2021, shortly after plaintiff's expert reports were produced, and plaintiff was not able to obtain policy documents and 30(b)(6) testimony from Nassau County related to eyewitness identifications until approximately eighteen months after the Noble and Dysart Reports had been prepared and served.

Response: **Undisputed**. This is immaterial as it appears this committee did not issue a publication until after plaintiff was misidentified and wrongfully convicted.

171.   Jeffrey Noble did not review anything from the District Attorneys Association of the State of New York, including their Best Practices Committee, with respect to this case. *See* **Exhibit AAA**, p. 59, ln. 3-14.

Response: **Undisputed**. This is the same as Fact 170, *supra*, and is immaterial for the same reasons.

172.   Jeffrey Noble did not review any policies or procedures of Nassau County concerning the administration of line-ups and photo arrays. *See* **Exhibit AAA**, p. 80, ln. 4-13.

Response: **Undisputed**. However, this is immaterial. *See* Response 168, *supra*.

173.   Jeffrey Noble did not see any training material, and did not search for training material, for how Nassau County trained their police officers in 2008 with respect to identification procedures. *See* **Exhibit AAA**, p. 90, ln. 16 –p. 91, ln. 10.

Response: **Undisputed**. However, this is immaterial. *See* Response 168 & n.6, *supra*.

174.   Jeffrey Noble is not aware of any evidence that Mr. Ogletree told anyone that he was coerced prior to the time that he took the witness stand at plaintiff's criminal trial. *See* **Exhibit AAA**, p. 91, ln. 17-24.

Response: **Undisputed**. However, this is immaterial. *See* Response 136, *supra*.

175.   John Monaghan was disclosed as defendants police practices expert and prepared an expert report for this case. *See* Defendants Rule 26(a)(2) disclosure (**Exhibit DDD**).

Response: **Undisputed**. However, this is immaterial.

176.   John Monaghan relied on a number of documents to prepare an expert report for this case. *See* John Monaghan, EBT Transcript (**Exhibit EEE**) p. 106, ln. 12-16. Included in the documents John Monaghan reviewed was a public article about the District Attorneys Association of the State of New York ("DAASNY"), the DAASNY's Best Practices Committee, and Identification Procedures. *See* **Exhibit DDD**, p. 21, 29-31 (p. 17, 25-27 of Monaghan's Expert Report); *see also* The Prosecutor: Statewide Best Practices Committees for Prosecutors: Leveraging

Experience and New Evidence to Benefit the Criminal Justice System. By Kristine Hamann, October, November, December 2013 (**Exhibit FFF**).

Response: **Disputed in part**. Mr. Monaghan never worked as a detective and never conducted a lineup or photo array (and never worked for Nassau County). As such, Mr. Monaghan is not qualified to provide expert testimony on eyewitness identifications and plaintiff will be moving to preclude his testimony. In any event, the identification procedures defendants conducted in 2008 conflict with the best practices as outlined in the report cited here. *See* New York State Lineup Procedure Guidelines, annexed to the Harvis Decl. as Exhibit 52, p. 2 ("the witness should not be informed that an arrest has been made and that the police have a suspect"); ("The fillers should be similar in appearance to the suspect in the line-up. Similarities should include gender, clothing, facial hair, race, age, height, extraordinary physical features, or other distinctive characteristics."); p. 4 ("Witnesses Cannot Speak to Other Witnesses About the Identification"); p. 7 ("Do Not Comment on the Identification: The administrator should not comment or make gestures on the identification itself by saying things such as: 'Great job' or 'We knew you would recognize him' or even nodding his head in agreement. *Such comments or reactions may subsequently affect the witness' confidence in his or her identification.* The administrator should remain neutral about the identification when speaking with the witness.") (emphasis added); 7-8 ("Do Not Discuss the Identification with other Witnesses: The witness should be told not to discuss what was said, seen or done during the identification procedure with other witnesses, nor should the investigator discuss any other identification procedures with the witness."). *See* New York State Lineup Procedure Guidelines dated February 22, 2011, annexed to the Harvis Decl. as Exhibit 52.

177.   In early July 2018, an individual called the NCDA with information regarding Anyosa's shooting. *See* September 13, 2018 Transcript (**Exhibit GGG**) p. 2, ln. 22-25. This person told the NCDA Conviction Integrity Unit that she was aware that the wrong person was convicted of this crime. *See* **Exhibit GGG**, p. 3, ln. 2-4. This individual provided information and "[t]his information led us to additional witnesses who were unknown at the time of the trial." *See* **Exhibit GGG,** p. 3, ln. 7-8.

Response: **Disputed in part**. Plaintiff agrees that Nadine Johnson contacted the County about Kenton Sherwood in 2018. *See* n.1*, supra* (citing Harvis Decl., Exhibit 6 at DA3368). However, evidence in the record suggests the County might have been notified through its tip line as early as May 16, 2008. *See* Reinvestigation

Notes of Michael Walsh, Harvis Decl. Exhibit 9, P8245; Deposition Testimony of Michael Walsh, Harvis Decl., Exhibit 10, p. 20 (discussing tip line note).

178. "At the time of [plaintiff's] trial, any and all exculpatory information was provided by the prosecution to the defense including any discrepancies between the perpetrator's description and [plaintiff]. These discrepancies were thoroughly explored by the defendant's attorney and argued to the jury. The defendant and two alibi witnesses also testified. The prosecution called to the stand a friend and former co-defendant of [plaintiff] who allegedly told the police that [plaintiff] confessed that he had shot the cab driver. Nonetheless, the witness recanted on the witness stand stating that [plaintiff] had never confessed to him. After the trial, Mr. Galloway's trial lawyer made a motion to dismiss the jury's verdict which was denied." *See* **Exhibit GGG**, p. 3, ln. 25 – p. 4, ln. 13.

Response: **Disputed in part**. The record suggests that the District Attorney should have been aware of improprieties in the identification procedures, including the tactics used to obtain statements from Ogletree and the identifications from Anyosa and Hernandez. While Ms. Anania stated in this passage that prosecutors had not committed misconduct in wrongfully convicting plaintiff, her office did not express the same view regarding the defendant officers. *See* Anania Edited Remarks, Harvis Decl., Exhibit 8.

179. On September 13, 2018, after application by the NCDA, Hon. Teresa Corrigan ordered that plaintiff's convictions under Indictment No. 1315N-2008 were vacated pursuant to C.P.L. section 440.10(1)(g) and that the Indictment was dismissed with prejudice. *See* **Exhibit GGG**; *see also* Hon. Corrigan Decision (**Exhibit HHH**).

Response: **Undisputed**.

180. Between the time of plaintiff's conviction on March 9, 2009, and the time that plaintiff's convictions were vacated and indictment dismissed on September 13, 2018, plaintiff did not file an appeal on his case. *See* **Exhibit GGG**, p. 4, ln. 22-23.

Response: **Disputed in part**. Plaintiff, who defendants concede is innocent, filed a notice of appeal following his conviction and was granted poor person status by order dated February 24, 2012. Plaintiff then filed a motion to restore the appeal to active status and appoint counsel, which was granted by order of the Appellate Division, Second Department dated January 30, 2018. *See* Order, annexed to the Harvis Decl. as Exhibit 57. Plaintiff was exonerated while his assigned counsel, Mr. DeFelice, was finalizing his appeal. *See* Letter Withdrawing Appeal dated

September 18, 2018, annexed to the Harvis Decl. as Exhibit 58.

181. On September 21, 2018, Mr. Galloway served a notice of claim on the County and the Village. *See* Notice of Claim (**Exhibit III**).

Response: **Undisputed**.

182. On December 20, 2018, Mr. Galloway gave sworn testimony at an examination held pursuant to Section 50-h of the New York General Municipal Law. *See* Plaintiff's 50-H Examination Transcript (**Exhibit JJJ**).

Response: **Undisputed**.

183. On September 4, 2019, Mr. Galloway commenced the instant action. *See* D.E. 1.

Response: **Undisputed**.

184. On May 11, 2021, Mr. Galloway filed his FAC. *See* **Exhibit A**.

Response: **Undisputed**.

185. Plaintiff's FAC alleges nine claims for relief: (i) a Section 1983 malicious prosecution claim brought against Det. Horowitz, Det. Cunningham, Det. Decaro, Det. Sortino, Det. Lipson, and Det. Dluginski) (*id.* at ¶¶85-92); (ii) a Section 1983 claim alleging fabrication of evidence, denial of a fair trial and *Brady* violations against all the individual HPD and NCPD detectives named as defendants (*id.* at ¶¶93-101); (iii) a Section 1983 supervisory liability claim against Det. Sgt. Dorsi and Det. Sortino (*id.* at ¶¶102-105); (iv) a New York State Law claim for false imprisonment and malicious prosecution against the County and the Village by *respondeat superior* (*id.* at ¶¶106-112); (v) an intentional or negligent infliction of emotional distress claim against the County and the Village by *respondeat superior* (*id.* at ¶¶113-116); (vi) a Section 1983 conspiracy claim against all individual HPD and NCPD detectives named as defendants (*id.* at ¶¶117-122); (vii) an unlawful pre-trial detention in violation of the Fourth Amendment and *Russo v. Bridgeport,* 479 F.3d 196 (2d Cir. 2007) claim against all individual HPD and NCPD detectives named as defendants (*id.* at ¶¶123-125); (viii) a Section 1983 claim for "failure to intervene" asserted against all individual HPD and NCPD detectives named as defendants (*id.* at ¶¶126-128); and (ix) a *Monell* claim against the County (*id.* at ¶¶129-133).

Response: **Undisputed**.

186.   On May 17, 2021, the County filed their answer to the FAC, denying all of the material allegations and asserting various affirmative defenses.  *See* **Exhibit B.**

Response: **Undisputed**.

187.   On May 20, 2021, the Village filed their answer to the FAC, denying all of the material allegations and asserting various affirmative defenses.  *See* **Exhibit C.**

Response: **Undisputed**.

**Additional material facts alleged to be in dispute**

1.   Dluiginski told Anyosa he picked the right guy on June 6, 2008. Anania Notes, Harvis Decl., Exhibit 7 at P11448, P11455-11456.

2.   Lipson told Anyosa he picked the right guy on June 6, 2008. Anania Notes, Harvis Decl., Exhibit 7 at P11448, P11455-11456.

3.   Lipson or Dluginski told Anyosa Hernandez picked the same person. Anania Notes, Harvis Decl., Exhibit 7 at P11448, P11455-11456.

4.   Anyosa didn't feel confident identifying plaintiff but did so because the detectives told him he picked the right person. Anania Notes, Harvis Decl., Exhibit 7 at P11448, P11455-11456.

5.   Ogletree was coerced. Ogletree Trial Testimony, annexed to the Harvis Decl. as Exhibit 1, p. 262, ln. 20-274, ln. 21; *id.* at, *e.g.*, p. 303, ln. 14-23; *id.* at, *e.g.*, p. 300, ln. 19-p. 303, ln. 16.

6.   The photo arrays were biased. Dysart Report, Harvis Decl., Exhibit 4, Section VI.3 (pp. 10-12) (Photo Array Filler Bias).

7.   The lineups were biased. Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008).

8.   The use of phone books contributed to plaintiff's misidentification at the lineups. Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008).

9.   The use of sheets contributed to plaintiff's misidentification at the lineups. Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August 14, 2008).

10. The use of hats contributed to plaintiff's misidentification at the lineups. Dysart Report, Harvis Decl., Exhibit 4, Section VI.4 (pp. 12-14) (Live Lineup Bias – August

14, 2008)

11. Defendants failed to investigate plaintiff's alibi. *See* Trial Tr., Harvis Decl., Exhibit 1, pp. 17-18.

12. Sortino and Decaro signed false accusatory instruments. Decaro Dep., Harvis Decl., Exhibit 28, p. 195, ln. 18-25; see Signed Felony Complaints, Harvis Decl., Exhibit 36 at P1353-54.

13. Plaintiff does not resemble the composite prepared by Bischoff. Trial Tr., Harvis Decl., Exhibit 1, p. 300, ln. 19-p. 303, ln. 16 (Ogletree).

14. Tonya Barrett or Nadine Johnson called the tip line on June 6, 2008. *See* Reinvestigation Notes of Michael Walsh, Harvis Decl. Exhibit 9, P8245; Deposition Testimony of Michael Walsh, Harvis Decl., Exhibit 10, p. 20 (discussing tip line note).

15. Defendants concealed plaintiff's height from Jorge Anyosa. Dluginksi Dep., Harvis Decl., Exhibit 34, p. 264, ln. 25-p. 266, ln. 17.

Dated: September 28, 2022
     Briarcliff Manor, New York

ELEFTERAKIS, ELEFTERAKIS & PANEK

_____
Gabriel P. Harvis
Baree N. Fett
80 Pine Street, 38th Floor
New York, New York 10005
(212) 323-6880
gharvis@eeplaw.com

*Attorneys for plaintiff Josiah Galloway*