WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER, LLP
Attorneys for County Defendants
1133 Westchester Avenue
White Plains, NY  10604
(914) 323-7000
Attn:   John A. Vitagliano
        Peter A. Meisels

HARRIS BEACH, PLLC
Attorneys for Hempstead Defendants
333 Earle Ovington Blvd., Suite 901
Uniondale, NY  11533
(516) 880-8484
Attn:   William Garry
        Daniel Hallak

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

JOSIAH GALLOWAY,

          Plaintiff,

    -against-

NASSAU COUNTY; THE INCORPORATED VILLAGE
OF HEMPSTEAD; Police Officer STEVEN HOROWITZ,
Shield No. 144; Detective MATTHEW ROSS, Shield No.
834; Detective CHARLES DECARO, Shield No. 1047;
Detective RONALD LIPSON, Shield No. 1296; Detective
THOMAS DLUGINSKI, Shield No. 7900; Detective
GEORGE DARIENZO, Shield No. 1038; Detective
KEVIN CUNNINGHAM, Shield No. 112; Detective
Sergeant RICHARD DORSI; Detective JOSEPH P.
SORTINO,

          Defendants.

-------------------------------------------------------------------- x

Docket No.  19-CV-5026
(AMD) (JMW)

**DEFENDANTS' JOINT
STATEMENT OF
UNDISPUTED MATERIAL
FACTS PURSUANT TO
LOCAL RULE 56.1**

Defendants Nassau County, Detectives Charles Decaro, Thomas Dluginski and George

Darienzo, retired Detectives Matthew Ross and Ronald Lipson, and retired Detective Sergeant

Richard Dorsi (the "County Defendants"), as well as Defendants the Incorporated Village of

7139405v.1

Hempstead, Police Officer Steven Horowitz, Detective Kevin Cunningham and Detective Joseph P. Sortino (the "Village Defendants"), respectfully submit the following statement of material undisputed facts pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Eastern District of New York.

## Parties

1.      Plaintiff Josiah Galloway ("plaintiff" or "Mr. Galloway") is a resident of Nassau County, New York. *See* Fourth Amended Complaint ("FAC") (**Exhibit A**), at ¶12.[1]

2.      Defendant Nassau County ("County") is a municipal corporation organized under the laws of the state of New York. *See https://www.nassaucountyny.gov/*

3.      Defendant Incorporated Village of Hempstead ("Village") is a municipal corporation organized under the laws of the state of New York. *See* Village Answer (**Exhibit C**), at ¶14.

4.      At all relevant times, Defendant Steven Horowitz ("Det. Horowitz") was a member of the Village of Hempstead Police Department ("HPD") with the rank of Officer. *See* **Exhibit C**, at ¶15.

5.      At all relevant times, Defendant Matthew Ross ("Det. Ross") was acting in his official capacity as a member of the Nassau County Police Department ("NCPD") with the rank of Detective. *See* County Answer (**Exhibit B**), at ¶15.

6.      Defendant Charles Decaro ("Det. Decaro") is, and at all relevant times was acting in his official capacity as a member of the NCPD with the rank of Detective.  *See* **Exhibit B**, at ¶15.  Det. Decaro was assigned to the NCPD Third Squad for thirteen (13) years from 2005 to 2018. *See* Det. Decaro EBT Transcript (**Exhibit O**)*,* 28:2-4; 28:23-25.

---

[1]  All exhibits referenced herein are annexed to the accompanying declaration of John A. Vitagliano, Esq.

7139405v.1

7.      At all relevant times, Defendant Ronald Lipson ("Det. Lipson") was acting in his official capacity as a member of the NCPD with the rank of Detective. *See* **Exhibit B**, at ¶15.

8.      Defendant Thomas Dluginski ("Det. Dluginski") is, and at all relevant times was acting in his official capacity as a member of the NCPD with the rank of Detective. *See* **Exhibit B**, at ¶15.

9.      Defendant George Darienzo ("Det. Darienzo") is, and at all relevant times was acting in his official capacity as a member of the NCPD with the rank of Detective.[2] *See* **Exhibit B**, at ¶15.

10.      At all relevant times, Defendant Kevin Cunningham ("Det. Cunningham") was a member of the HPD with the rank of Detective. *See* **Exhibit C**, at ¶15.

11.      At all relevant times, Defendant Richard Dorsi ("Det. Sgt. Dorsi") was acting in his official capacity as a member of the NCPD with the rank of Detective Sergeant. *See* **Exhibit B**, at ¶15.

12.      At all relevant times, Defendant Joseph Sortino ("Det. Sortino") was a member of the HPD with the rank of Detective. *See* **Exhibit C**, at ¶15.

## Pertinent Facts

### Initial Altercation at the Hempstead Train Station

13.      On May 15, 2008, at approximately 1:10 a.m., Mr. Jorge Anyosa ("Anyosa") was at the intersection of West Columbia Street and Main Street in the Village of Hempstead, County of Nassau, located approximately half of a block from the Hempstead Train Station. *See* Criminal Trial Transcript (**Exhibit D**), 368:25-369:3, 373:6-9; *see also* Grand Jury Transcript (**Exhibit E**), 12:9-18.

---

[2] George Darienzo was promoted and his current position with the NCPD is Detective Lieutenant.

14.    Anyosa was working as a cab driver for Taxi Latino and regularly worked at or near the Hempstead Train Station and Bus Terminal on West Columbia Street in the Village of Hempstead. *See* **Exhibit D**, 368:9-24; *see also* **Exhibit E**, 12:6-8.

15.    Anyosa was seated in his taxi cab while parked on West Columbia Street, and was talking to his co-worker Wilmer Hernandez ("Hernandez"), who was double parked in his own taxi cab. *See* **Exhibit D**, 369:6-16; *see also* **Exhibit E**, 13:12-15.

16.    While Anyosa and Hernandez were talking, a gray sedan "came behind and start[ed] to blow the horn like crazy. [Hernandez] went to make a U-turn, go around, come back again." **Exhibit D**, 373:15-17; 374:3-6; *see also* **Exhibit E**, 13:17-25.

17.    The driver of the gray sedan proceeded to exit the vehicle and began arguing and screaming with Anyosa and Hernandez. *See* **Exhibit D**, 373:19-23; 374:16-18; *see also* **Exhibit E**, 14:13-14.

18.    This driver of the gray sedan was described as a black male and made a gesture with his hand indicating he had a gun. *See* **Exhibit D**, 375:9-12; 376:18-21; 465:18-21; *see also* **Exhibit E**, 8:1-2; 15:7-15.

19.    The driver of the gray sedan came within three (3) feet of Anyosa and Hernandez. *See* **Exhibit D**, 375:20-376:1; 464:1-9; *see also* **Exhibit E**, 7:11-15; 15:9-16:5.

20.    There was nothing covering the driver's face. *See* **Exhibit D**, 376:10-13.

21.    Anyosa and Hernandez were both able to clearly see the driver's face. *See* **Exhibit D**, 374:22-375:1; 482:16-18; 483:24-484:6; *see also* **Exhibit E**, 7:16-17.

22.    Anyosa and Hernandez argued with the driver of the gray sedan for approximately two (2) or three (3) minutes. *See* **Exhibit D**, 375:13-16; 464:22-465:7; 483:24-484:3.

23.    Anyosa and Hernandez were right next to the driver of the gray sedan, and were

-4-

looking at the driver, when they were arguing with him. *See* **Exhibit D**, 375:13-16; 464:22-465:7; *see also* **Exhibit E**, 7:11-15; 5:9-16:5.

24.     After the argument, the driver got back into the gray sedan and drove away from the scene. *See* **Exhibit D**, 377:24-378:9; 465:1-9; *see also* **Exhibit E**, 16:2-9.

25.     After the driver left the scene, Anyosa was dispatched to Taylor Street in Hempstead, located about 5 minutes from the Hempstead Train Station. *See* **Exhibit D**, 378:10-16.

26.     Hernandez was dispatched to pick someone up and drove away from the Hempstead Train Station. *See* **Exhibit D**, 466:8-12.

27.     No one showed up for Anyosa to pick up in his taxi cab, so Anyosa drove back to the Hempstead Train Station. *See* **Exhibit D**, 378:19-21; *see also* **Exhibit E**, 16:17-23.

<u>Shooting of Anyosa</u>

28.     Anyosa parked his car in the Hempstead Train Station parking lot approximately twenty minutes after the initial argument with the driver of the gray sedan. *See* **Exhibit D**, 379:7-19; *see also* **Exhibit E**, 16:22-17:13.

29.     While Anyosa was sitting in his parked car, he heard someone say, "What you going to do now, mother fucker?" *See* **Exhibit D**, 380:10-11; *see also* **Exhibit E**, 17:19-25.

30.     Anyosa recognized the same black male as the driver he had argued with earlier in the morning pointing a gun at him.  *See* **Exhibit D**, 380:11-24; *see also* **Exhibit E**, 17:21-18:5.

31.     The driver was sitting in his car, with the window rolled down, pointed a gun at Anyosa and then shot him.  *See* **Exhibit D**, 381:8-9; *see also* **Exhibit E**, 17: 21-25; 18:6-11.

32.     Anyosa was shot in the face by this same driver he argued with earlier in the morning. *See* **Exhibit D**, 380:14-18; 382:3-4; *see also* **Exhibit E**, 17:21-25; 18:6-21.

33.   The driver of the gray sedan was in his car between 15 and 20 feet from Anyosa when he shot Anyosa in the face. *See* **Exhibit D**, 437:3-8; *see also* **Exhibit E**, 23:13-21.

34.   After shooting Anyosa, the driver of the gray sedan fled the scene. *See* **Exhibit D**, 382:8-9.

35.   On May 15, 2008, at approximately 1:30 a.m., Eric Harrison ("Harrison") was in front of the Hempstead Train Station when he heard what sounded like a gun shot. *See* **Exhibit D**, 338:5-20; *see also* Supporting Deposition of Eric Harrison (**Exhibit F**).

36.   Harrison then saw a gray colored car drive away. *See* **Exhibit D**, 340:10-11; 341:13-14; *see also* **Exhibit F**.

37.   Harrison saw Anyosa sitting in the driver's side of his cab, noticed that he was shot in the face, that there was blood leaking from Anyosa's face, and called the police. *See* **Exhibit D**, 341:19-342-6; *see also* **Exhibit F**.

38.   On May 15, 2008, at approximately 1:30 a.m., Salvatore Rubinano ("Rubinano") was at the Hempstead Train Station and heard a noise that sounded like a backfire. *See* Supporting Deposition of Salvatore Rubinano (**Exhibit G**).

39.   Rubinano looked up, saw a black male inside the driver's seat of a gray car, and saw the same male drive away down Columbia Street. *See* **Exhibit G**.

40.   Rubinano also saw Anyosa in the front seat of his taxi cab with a lot of blood on his face. *See* **Exhibit G**.

41.   On May 15, 2008, between 1:36 a.m. and 1:37 a.m., HPD Police Officer Eugene Este ("P.O. Este"), HPD Police Officer Shury ("P.O. Shury") and HPD Police Officer Derek Warner ("P.O. Warner") responded to the shooting at the Hempstead Train Station. *See* **Exhibit D**, 362:20-23; *see also* NCPD Serious Incident Time Log (**Exhibit H**).

7139405v.1

42.    After Anyosa was shot, Hernandez arrived back at the Hempstead Train Station; Hernandez was not present when Anyosa was shot. *See* **Exhibit D**, 466:10-20; *see also* **Exhibit E**, 8:22-9:6; *see also* Supporting Deposition of Wilmer Hernandez (**Exhibit I**).

43.    Anyosa was transported to Winthrop University Medical Center and was admitted for nine (9) days. *See* **Exhibit D**, 335:22-24; 383:19-23.

44.    As a result of being shot, Anyosa had surgery and sustained the following injuries: missing chin bone which was replaced by a metal plate, lost 8 teeth, had his jaw wired shut for two to three months, had multiple surgeries on his tongue, suffered permanent nerve damage in his face and permanent scarring on his chin. *See* **Exhibit D**, 384:14-386:5*; see also* **Exhibit E**, 19:9-21:20.

45.    On May 15, 2008, Hernandez spoke with P.O. Este and signed a written statement. *See* **Exhibit I.**

46.    On May 15, 2008, Harrison spoke with P.O. Shury and signed a written statement. *See* **Exhibit F**.

47.    On May 15, 2008, Rubinano spoke with P.O. Este and signed a written statement. *See* **Exhibit G**.

NCPD Begins to Investigate Anyosa Shooting

48.    During the early morning of May 15, 2008, Det. Dluginski was working at the NCPD Third Squad and was notified about Anyosa's shooting. *See* **Exhibit D**, 622:11-14; *see also* Det. Dluginski EBT Transcript (**Exhibit J**), 42:10-13.

49.    Det. Dluginski was the detective assigned to investigate this shooting. *See* **Exhibit D**, 622:15-18; *see also* **Exhibit J**, 50:7-10.

50.    Det. Dluginski drove to the location where Anyosa was shot, and arrived at West

Columbia Street in Hempstead at approximately 1:56 a.m. on May 15, 2008. *See* **Exhibit J**, 54:5-15; 61:7-11; *see also* **Exhibit H**.

51.    After he arrived, Det. Dluginski spoke with the HPD police officers who were already at the scene. *See* **Exhibit J**, 55:7-13.

52.    NCPD Crime Scene detectives responded to the Hempstead Train Station and took photographs of the scene, Anyosa's vehicle, bullet fragments, and blood in Anyosa's cab. *See* **Exhibit D**, 528:13-18; 529:4-7; 530:14-21; 531:4-6; *see also* NCDA Trial Exhibits 10, 11, 12, 13, 21, 22, 23, 24 and 25 (**Exhibit K**).

53.    NCPD Crime Scene detectives also collected physical evidence including bullet fragments, wadding and some of the victim's teeth. *See* **Exhibit D**, 530:14-21; 623:6-10.

54.    Det. Dluginski searched for video in the vicinity of the scene that captured the incident; Det. Dluginski went to the MTA Bus Terminal in Hempstead and viewed video depicting the vicinity of the shooting at the time of the shooting. *See* **Exhibit D**, 623:11-15; 678:23-25; *see also* **Exhibit J**, 53:14-18.

55.    Det. Dluginski viewed a video that depicted Anyosa's car and the suspect's car, but was unable to determine the make and model of the suspect's car at that time. *See* **Exhibit D**, 643:3-644:1; *see also* **Exhibit J**, 68:23-69:3.

56.    While viewing this video, Det. Dluginski was unable to see the physical description of the suspect. *See* **Exhibit J**, 69:4-7.

57.    The video from the Hempstead Bus Terminal did not give Det. Dluginski any leads to identify Anyosa's shooter and did not capture the actual shooting incident. *See* **Exhibit J**, 70:7-13; 122:18-22; *see also* **Exhibit D**, 697:2-7.

58.    Det. Dluginski left the scene of the shooting on May 15, 2008, at approximately

3:50 a.m. *See* **Exhibit H**.

59.    Det. Decaro, Det. Darienzo, Det. Ross, Det. Lipson and Det. Sgt. Dorsi did not respond to the scene of the shooting on May 15, 2008. *See* **Exhibit H**.

60.    After Anyosa was shot and transported to the hospital, Det. Dluginski went to visit Anyosa at the hospital. *See* **Exhibit D**, 652:3-5; *see also* **Exhibit J**, 275:17-20.

Composite Sketch of Anyosa's Shooter

61.    In May of 2008, NCPD Detective Thomas Bischoff ("Det. Bischoff") was assigned to the NCPD Rogues Gallery. *See* Det. Bischoff EBT Transcript (**Exhibit L**), 16:9-11.

62.    Det. Bischoff joined the police department in October of 1994 and became a Detective in 2003. *See* **Exhibit L**, 14:23-15:2.

63.    As a detective with the NCPD Rogues Gallery, part of Det. Bischoff's duties and responsibilities included preparing composite sketches. *See* **Exhibit L**, 15:19-22; 16:15-17.

64.    Det. Bischoff received training to become an NCPD composite sketch artist, which included on the job training, as well as an additional three-week training course with the FBI Academy in Quantico Virginia. *See* **Exhibit L**, 17:3-14; 18:18-19:2.

65.    This three-week training course was multi-leveled and included composite sketches, facial reconstruction training and sketch artist training. *See* **Exhibit L**, 19:5-7; 20:12-15.

66.    When constructing a composite sketch, Det. Bischoff would use reference photographs of all different facial features of other people, present these reference photographs to the victim or witness, and would create a composite sketch based on input from the victim or witness. *See* **Exhibit L**, 37:5-19.

67.    On May 19, 2008, between 8:00 p.m. and 8:30 p.m., Det. Dluginski called the NCPD Rogues Bureau, spoke with Det. Bischoff, and asked Det. Bischoff to meet with Anyosa to

complete a composite sketch of Anyosa's shooter. *See* **Exhibit D**, 663:9-12; 820:19-22; 822:6-823:8; 832:24-833:1.

68.    On May 19, 2008, at approximately 9:00 p.m., Det. Bischoff went to Winthrop Hospital and met with Anyosa. *See* **Exhibit D**, 823:6-11; 827:1-5.

69.    There were no other police personnel present when Det. Bischoff met with Anyosa to complete the composite sketch. *See* **Exhibit D**, 827:23-25; 663:25-664:5.

70.    Det. Bischoff wrote down information about the description of the suspect provided to him by Anyosa. *See* **Exhibit L**, 60:9-61:2; *see also* Det. Bischoff's Composite Sketch and Notes of Interview with Anyosa (**Exhibit M**) p. 2.

71.    Det. Bischoff showed Anyosa several photos, and based on responses from Anyosa, Det. Bischoff completed the composite sketch. *See* **Exhibit D**, 835:10-836:21; *see also* **Exhibit M**.

72.    Det. Bischoff confirmed Anyosa's description of the shooter by showing Anyosa reference photographs. *See* **Exhibit D**, 834:8-12.

73.    Det. Bischoff completed one single composite sketch of the suspect after Det. Bischoff's conversation with Anyosa. *See* **Exhibit D**, 836:19-21; *see also* **Exhibit L**, 49:3-4; *see also* **Exhibit M**.

74.    The composite sketch was included in an NCPD Intelligence Bulletin that was circulated to other police agencies and precincts in order to "seek the assistance of other law enforcement agencies." *See* **Exhibit J**, 163:4-15; 159:22-160:19; *see also* NCPD Intelligence Bulletin with Composite Sketch (**Exhibit N**).

75.    This composite sketch was displayed in the NCPD Third Squad for several weeks on a board directly across from Det. Decaro's desk. *See* **Exhibit O**, 83:17-21; *see also* Pre-Trial

Hearing Transcript (**Exhibit P**), 78:1-4; 153:1-8.

<u>Arrest of Plaintiff and Robert Ogletree</u>

76.    Plaintiff was friends with Robert Ogletree ("Ogletree"). *See* **Exhibit D**, 320:24-321:3.

77.    Plaintiff knew Ogletree his entire life and grew up in the same neighborhood as he did. *See* Plaintiff EBT Transcript (**Exhibit Q**), 40:10-12.

78.    On or about May 27, 2008, HPD received a complaint from Marky Fouse stating that he was a victim of a robbery by plaintiff that took place on Fulton Avenue in the Village of Hempstead. *See* Plaintiff's Signed Statement (**Exhibit EE**); *see also* **Exhibit Q**, 71:4-72:15; *see also* P.O. Horowitz EBT Transcript (**Exhibit S**), 57:13-24; 58:10-25.

79.    On June 5, 2008 at approximately 11:00 pm, plaintiff was in a car with Ogletree. *See* **Exhibit Q**, 39:11-12, 22-23.

80.    On June 5, 2008, HPD Det. Cunningham and P.O. Horowitz received a call notifying them where plaintiff was located. *See* **Exhibit S**, 57:13-24; 58:8-15; *see also* Det. Cunningham EBT Transcript (**Exhibit T**), 36:1-25.

81.    HPD Det. Cunningham and P.O. Horowitz then went to that location to arrest plaintiff and Ogletree for the robbery of Marky Fouse that occurred on May 27, 2008. *See* **Exhibit S**, 57:20-58:25.

82.    On June 5, 2008 at approximately 11:45 pm, while in a car with Ogletree, plaintiff was placed under arrest by HPD Det. Cunningham and P.O. Horowitz for a May 27, 2008 robbery. *See* **Exhibit P**, 207:15-22; *see also* **Exhibit D**, 538:6-14; *see also* **Exhibit Q**, 41:24-42:2.

83.    Ogletree was also placed under arrest. *See* **Exhibit Q**, 41:8-9.

84.    At the time plaintiff was initially arrested by HPD Det. Cunningham and P.O.

Horowitz, he was *not* under arrest for the May 15, 2008 shooting of Anyosa. *See* **Exhibit P**, 279:12-25; *see also* Robert Schalk EBT Transcript (**Exhibit R**), 99:19-24; **Exhibit S**, 77:6-9.

85.    Plaintiff was being arrested only for the May 27, 2008 robbery. *See* **Exhibit EE**; *see also* **Exhibit Q**, 51:12-52:25; 71:10-72:15; *see also* **Exhibit T**, 43:8-19.

86.    After plaintiff and Ogletree were arrested, they were transported to the Hempstead Police Armory located at 216 Washington Street, Hempstead, New York. *See* **Exhibit D**, 539:9-14; *see also* **Exhibit S**, 70:9-11.

87.    On June 6, 2008, at approximately 12:08 a.m., plaintiff and Ogletree arrived at the Hempstead Police Armory. *See* **Exhibit T**, 77:12-22; 78:12-79:3; *see also* HPD Command Log (**Exhibit U**).

88.    Plaintiff was placed in a holding cell by himself. *See* **Exhibit Q**, 42:20-25.

89.    Pursuant to accepted practice, HPD contacted the NCPD Third Precinct to take over the investigation for the robbery that occurred on May 27, 2008. *See* **Exhibit T**, 47:11-23; 50:6-25.

NCPD Detectives Respond to Hempstead Armory

90.    The NCPD Third Squad Detectives would generally handle serious crimes that occurred in the Village of Hempstead. *See* **Exhibit J**, 44:15-25; *see also* **Exhibit T**, 60:12-25.

91.    On June 5, 2008, Det. Decaro was working in the NCPD Third Squad and was responsible for any cases that came in after 9:00 p.m. *See* **Exhibit P**, 58:9-16.

92.    On June 6, 2008, at approximately 12:00 a.m., Det. Decaro received a phone call from HPD requesting NCPD to respond since plaintiff and Ogletree were placed under arrest for the May 27, 2008 robbery. *See* **Exhibit P**, 58:9-59:3.

93.    After receiving this call, Det. Decaro and Det. Darienzo went to the Hempstead

Police Armory and arrived shortly after 12:00 am. *See* **Exhibit O**, 47:20-23; *see also* **Exhibit P**, 59:4-8; 130:9-13; *see also* Det. Darienzo EBT Transcript (**Exhibit V**), 33:9-11.

94.     Det. Decaro and Det. Darienzo responded to the Hempstead Police Armory to investigate a robbery and other crimes, *not* the May 15, 2008 shooting of Anyosa. *See* **Exhibit O**, 55:9-23; *see* **Exhibit P**, 73:6-76:6; *see also* **Exhibit T**, 58:4-11; *see also* **Exhibit V**, 33:15-20.

95.     On June 6, 2008, at 12:12 am, Det. Darienzo conducted an E-Justice search of the plaintiff's criminal history. *See* E-Justice Criminal Repository of Plaintiff (**Exhibit RRR**), p. 1; *see also* **Exhibit V**, 41:22-45:12.

96.     The results of Det. Darienzo's E-justice search of the plaintiff's criminal history revealed that plaintiff had a prior arrest from September 19, 2007. *See* **Exhibit RRR**, p. 1, 5-6; *see also* **Exhibit V**, 41:22-45:12.

97.     Once the NCPD Detectives responded to the Hempstead Police Armory, HPD Officers provided assistance to NCPD Detectives. *See* **Exhibit T**, 59:12-62:23; 63:10-23; 73:3-11; 79:4-13.

98.     While at the Hempstead Armory, plaintiff interacted with Det. Decaro and P.O. Horowitz. *See* **Exhibit Q**, 43:21-24.

99.     Plaintiff did not know Det. Decaro and Det. Dluginski prior to his June 5, 2008 arrest. *See* **Exhibit Q**, 43:25-44:6.

100.    When Det. Decaro initially spoke with plaintiff to retrieve pedigree information, he realized that plaintiff resembled the composite sketch of the suspect that was hanging in the NCPD Third Squad across from his desk. *See* **Exhibit O**, 74:8-18; *see also* **Exhibit P**, 77:23-78:4; 152:9-12.

101.    Det. Decaro's desk in the NCPD Third Squad was right across from a clip board

7139405v.1

where the suspect's composite sketch was hanging on the wall. *See* **Exhibit O**, 83:13-21.

102.    This composite sketch was hanging in the NCPD Third Squad for a few weeks prior to June 5, 2008. *See* **Exhibit P**, 77:25-78:4.

103.    Det. Decaro saw this composite sketch every day that he sat at his desk for a few weeks. *See* **Exhibit O**, 91:11-14; *see also* **Exhibit P**, 153:1-8.

104.    Det. Decaro was unable to locate this composite sketch while he was at the Hempstead Police Armory. *See* **Exhibit O**, 81:16-23.

105.    Det. Decaro called the NCPD Third Squad, spoke with Det. Lipson and asked if the composite sketch was still hanging by Det. Decaro's desk. *See* **Exhibit P**, 78:5-11; *see also* Det. Lipson EBT Transcript (**Exhibit W**), 109:10-14.

106.    Det. Lipson told Det. Decaro that the composite sketch was still hanging in front of his desk. *See* **Exhibit P**, 78:5-15; *see also* **Exhibit W**, 109:15-22.

107.    Det. Darienzo went back to the NCPD Third Squad to pick up a copy of the composite sketch and brought this sketch back to the Hempstead Police Armory. *See* **Exhibit P**, 78:16-18; *see also* **Exhibit W**, 111:14-21.

108.    Det. Decaro saw the composite sketch and determined that plaintiff resembled the composite sketch. *See* **Exhibit P**, 79:16-22.

109.    Prior to interacting with plaintiff on the early morning of June 6, 2008, Det. Decaro was not involved in the investigation of the shooting of Anyosa. *See* **Exhibit O**, 111:12-112:9.

Det. Decaro Requests Det. Lipson to Create Photo Arrays

110.    Det. Decaro then called Det. Lipson and asked Det. Lipson to put together two (2) photo arrays including plaintiff in both photo arrays. *See* **Exhibit O**, 115:14-16; *see also* **Exhibit P**, 79:16-22; *see also* **Exhibit W**, 116:17-117:2.

111.    Det. Decaro wanted to have photo arrays that included plaintiff's photograph made because plaintiff resembled the composite sketch and to see if a witness or a victim could make an identification for the case. *See* **Exhibit O**, 115:21-116:3.

112.    Prior to being asked to put together photo arrays with plaintiff's photograph, Det. Lipson was not involved in the investigation of May 15, 2008 shooting of Anyosa. *See* **Exhibit P**, 6:25-7:11.

113.    On June 6, 2008, at approximately 2:00 a.m., Det. Lipson created two (2) photo arrays with plaintiff's photograph placed in both photo arrays. *See* **Exhibit P**, 17:5-6; *see also* Pre-Trial Hearing Exhibits 1-4 (**Exhibit X**).

114.    At the time Det. Lipson created the two (2) photo arrays with plaintiff's photograph, he did not know what case he was preparing these photo arrays for. *See* **Exhibit W**, 128:13-20.

115.    The photograph of plaintiff that was used in both photo arrays was from plaintiff's prior arrest in September of 2007. *See* **Exhibit D**, 704:9-11; *see also* **Exhibit R**, 66:19-67:18; *see also* **Exhibit RRR**, p. 1; *see also* **Exhibit V**, 41:22-45:12; *see also* **Exhibit X**; *see also* Photo Array presented to Hernandez (**Exhibit BB**).

116.    Det. Lipson used a computer at the NCPD Third Squad to create these two (2) photo arrays. *See* **Exhibit W**, 118:8-19.

117.    Det. Lipson used a system on the computer known as "Rogues Gallery," entered plaintiff's name, and plaintiff's photograph appeared. *See* **Exhibit W**, 118:20-119:3.

118.    After plaintiff's photograph appeared, Det. Lipson "clicked compare to populate up the five other photos that had similar characteristics, and then when other photos came up I individually went through them and picked them." *See* **Exhibit W**, 119:3-8; *see also* **Exhibit P**, 52:12-17.

119.    Det. Lipson compared filler photos and selected fillers that looked similar to the plaintiff's photograph to include in the photo array. *See* **Exhibit W**, 122:22-123:4; *see also* **Exhibit P**, 8:22-9:8; 53:16-20; *see also* **Exhibit D**, 703:25-704:5; 710:14-18.

120.    Det. Lipson created these two (2) photo arrays and placed plaintiff's photograph in a different position in each photo array to keep the photo arrays as fair as possible. *See* **Exhibit W**, 126:12-15; 127:3-7; *see also* **Exhibit D**, 704:15-705:3.

121.    In 2008, it was not the NCPD's policy to take a photograph of the suspect while he was in custody and include that photograph in a photo array that was going to be presented to victims and/or witnesses. *See* **Exhibit D**, 723:20-25; *see also* **Exhibit R**, 66:19-67:18.

122.    In 2008, the NCPD had a standard procedure for selecting a suspect's photograph to include in a photograph array – "[NCPD has] a program that they can use where you can look for prior mug shots if some – if it exists or an individual's DMV photo.  It's called the Rouges Gallery, R-O-U-G-E-S." *See* **Exhibit R**, 66:19-67:18.

123.    In addition, "the detectives are the ones who pick those photos and potentially the most recent one that was Mr. Galloway's prior arrest photo, which is why that was used.  They do not go out and take a current picture of you walking on the street and put it in a photo pack [*sic*] because it would stick out as opposed to all of the other photos being used in mug shots and DMV photos." *See* **Exhibit R**, 66:19-67:18.

124.    At the time Det. Lipson prepared and created the two (2) photo arrays, Det. Lipson did not know what plaintiff looked like while plaintiff was at the Hempstead Armory. *See* **Exhibit W**, 86:3-87:5.

125.    After the two (2) photo arrays were created, Det. Lipson brought them to the Hempstead Police Armory. *See* **Exhibit P**, 9:11-12.

126.     Det. Dluginski, Det. Decaro, Det. Ross, Det. Darienzo, and Det. Sgt. Dorsi were not involved with the creation of the two (2) photo arrays that Det. Lipson prepared. *See* **Exhibit V**, 66:8-11; 144:8-12 (Darienzo); *see also* **Exhibit O**, 119:11-16, 132:12-20 (Decaro); *see also* **Exhibit W**, 117:15-25 (Lipson); *see also* **Exhibit J**, 182:19-22 (Dluginski); *see also* **Exhibit P**, 123:3-6; 124:4-5; *see also* **Exhibit D**, 703:4-17; *see also* Det. Sgt. Dorsi EBT Transcript (**Exhibit KKK**), 36:16-23; *see also* Det. Ross EBT Transcript (**Exhibit NN**), 113:8-16; 130:15-22.

Robert Ogletree's Written Statement Regarding Plaintiff Shooting a Cab Driver

127.     On June 6, 2008, at approximately 3:00 a.m., Det. Decaro read Ogletree his *Miranda* rights, Ogletree signed the *Miranda* card in the presence of Det. Darienzo and Det. Decaro, and waived his right to remain silent and his right to have counsel present. *See* **Exhibit O**, 53:4-20; 144:1-11; *see also* **Exhibit D**, 305:12-307:8; *see also* Ogletree Miranda Card (**Exhibit Y**); *see also* **Exhibit V**, 50:21-51:15.

128.     Det. Decaro did not substantively question Ogletree until after he read Mr. Ogletree his *Miranda* rights at approximately 3:00 a.m.  *See* **Exhibit O**, 144:8-11.

129.     After Ogletree was read his *Miranda* rights, Ogletree was very cooperative. *See* **Exhibit V**, 55:15-56:11; 57:4-23.

130.     Det. Decaro spoke with Ogletree about multiple different incidents. *See* **Exhibit O**, 145:12-21.

131.     On June 6, 2008, during his interactions with Ogletree, Det. Darienzo did not ask Ogletree any questions, does not remember being present for any questions in connection with the May 15, 2008 shooting of Anyosa, does not recall if the plaintiff's name came up, and was not present when Ogletree signed any written statements. *See* **Exhibit V**, 40:24-41:6; 50:10-20; 52:3-6; 53:17-20; 58:22-25; 63:21-65:3; 81:19-82:14.

132.     Later in the morning of June 6, 2008, Det. Darienzo was relieved by Det. Lipson and Det. Darienzo was not present at the Armory for the full investigation or arrest processing. *See* **Exhibit V**, 54:7-21; 65:14-66:17; *see also* **Exhibit O**, 69:9-14; 76:23-25.

133.     On June 6, 2008, Ogletree signed a written statement, in the presence of Det. Decaro and Det. Lipson, with the following language "Josiah told me that he had to go down to Maryland (Baltimore) area because it was getting hot up in here. He said that he had to 'blam', shoot a cab driver over by the chicken place on Jackson. He said that he felt that it was hot up here, but he was still coming right home." *See* Ogletree signed written statement (**Exhibit Z**); *see also* **Exhibit D**, 266:6-7; *see also* **Exhibit O**, 155:16-156:2; *see also* **Exhibit W**, 163:9-164:14.

134.     On June 6, 2008, Ogletree also signed a written statement, in the presence of Det. Decaro and Det. Lipson, regarding the May 27, 2008 incident involving the plaintiff and Marky Fouse's brother Chris. *See* Ogletree second signed statement (**Exhibit SSS**); *see also* **Exhibit W**, 170:13-173:16.

135.     As of the date of the investigation, there was a chicken restaurant located at the intersection of W. Columbia Street and Main Street, which is one (1) block from Jackson Street in Hempstead, and is less than one (1) block from where the Victim was shot on May 15, 2008. *See* **Exhibit D**, 542:23-544:2.

Photo Array Presented to Wilmer Hernandez

136.     In the early morning of June 6, 2008, Hernandez came to the Hempstead Police Armory to view a photo array. *See* **Exhibit P**, 9:13-23; *see also* **Exhibit D**, 472:23-473:2; 705:7-11; *see also* Wilmer Hernandez EBT Transcript (**Exhibit AA**), 28:13-17.

137.     When Hernandez was at the Hempstead Police Armory, he did not know that anybody was in custody. *See* **Exhibit D**, 473:14-18.

138.    Det. Lipson and P.O. Horowitz met with Hernandez at the Hempstead Police Armory, where Hernandez viewed a photo array. *See* **Exhibit D**, 705:7-18; *see also* **Exhibit AA**, 28:13-17.

139.    Anyosa was not present when Hernandez observed the photo array. *See* **Exhibit E**, 25:23-26:22.

140.    Det. Lipson told Hernandez "[i]'m going to show a series of six photos, if you recognize anybody, please tell me.  And just keep in mind that everybody's facial features and everything changes over time.  So take your time before answering any questions." *See* **Exhibit W**, 138:16-22.

141.    No police officer told Hernandez which photograph to select when he was presented with the photo array. *See* **Exhibit AA**, 68:10-16.

142.    On June 6, 2008, at approximately 3:20 a.m., Hernandez immediately selected plaintiff's photograph from the photo array and identified plaintiff as the person who he had an argument with and who shot his friend. *See* **Exhibit P**, 10:3-7; *see also* **Exhibit D**, 467:13-18; *see also* **Exhibit W**, 98:18-99:1; 140:13-141:5; *see also* **Exhibit BB**; *see also* Supporting Deposition for Hernandez Photo Array (**Exhibit CC**).

143.    Plaintiff's photograph was in position #2 in the photo array that was presented to Hernandez. *See* **Exhibit E**, 10:5-12; *see also* **Exhibit D**, 467:13-18; *see also* **Exhibit BB**.

144.    Hernandez circled the plaintiff's photograph and signed his name on the photo array that was presented to him. *See* **Exhibit BB**; *see also* **Exhibit AA**, 45:18-20.

145.    Det. Lipson wrote up a supporting deposition for the photo array which was signed by Hernandez and witnessed by Det. Lipson and P.O. Horowitz. *See* **Exhibit CC**; *see also* **Exhibit P**, 10:9-15.

-19-

146.   After Hernandez selected plaintiff's photograph from the photo array, no police officer told Hernandez that he selected the right guy or that he selected the wrong guy. *See* **Exhibit AA**, 69:3-8; 34:18-23; *see also* **Exhibit W**, 145:20-146:7.

147.   Det. Darienzo, Det. Ross, Det. Decaro, Det. Dluginski, and Det. Sgt. Dorsi were not present when the photo array was administered to Hernandez. *See* **Exhibit V**, 48:2-49:20; *see also* **Exhibit O**, 132:21-133:23; *see also* **Exhibit J**, 182:19-22; 240:17-21; *see also* **Exhibit P**, 123:3-6; 124:4-5; *see also* **Exhibit D**, 703:4-17; *see also* **Exhibit KKK**, 36:16-23; *see also* **Exhibit NN**, 113:8-16; 130:15-22.

Plaintiff's Statements to Law Enforcement

148.   On June 6, 2008, at 4:30 a.m., Plaintiff signed a *Miranda* rights card, knew that he did not have to speak with a police officer, but continued to talk voluntarily. *See* **Exhibit P**, 105:3-106:10; 156:10-14; *see also* **Exhibit Q**, 60:21-62:2; *see also* Plaintiff Miranda Card (**Exhibit DD**).

149.   Det. Decaro questioned plaintiff while at the Hempstead Armory. *See* **Exhibit Q**, 44:20-45:10; 201:23-203:19.

150.   Plaintiff told Det. Decaro that he heard about the May 15, 2008 shooting of Anyosa on the news and that he went to Baltimore. *See* **Exhibit P**, 83:14-25.

151.   Plaintiff also stated that a few weeks before June 6, 2008, he "was going to Baltimore." *See* **Exhibit Q**, 106:11-12; *see also* **Exhibit D**, 1000:20-24.

152.   Plaintiff signed a written statement admitting to punching Marky Fouse's brother Chris in the face and taking their marijuana on May 27, 2008. *See* **Exhibit Q**, 64:19-21; *see also* **Exhibit EE**.

153.   Plaintiff also signed a written statement and admitted to shooting a gun in a separate incident at another individual named Mr. Hutchinson, who was with Marky Fouse on or about

May 28, 2008. *See* **Exhibit Q**, 110:14-114:15; *see also* Plaintiff's Second Signed Statement (**Exhibit FF**).

154.    Plaintiff testified that the statements he signed concerning both the May 27, 2008 robbery and the May 28, 2008 gun incident were accurate, that no one forced him to sign the statements, and that he signed the statements voluntarily. *See* **Exhibit Q**, 64:11-73:17; 110:14-119:19.

155.    Det. Dluginksi was not present when, and did not speak with, the plaintiff or Ogletree when they were questioned at the Hempstead Armory during the morning of June 6, 2008. *See* **Exhibit J**, 174:24-175:5; 180:10-24; 199:6-15.

Photo Array Presented to Jorge Anyosa

156.    Det. Lipson drove to Anyosa's house to present Anyosa with a photo array. *See* **Exhibit P**, 11:3-5; *see also* **Exhibit D**, 390:2-12.

157.    Hernandez was not present when Anyosa observed the photo array. *See* **Exhibit E**, 26:23-25.

158.    Det. Lipson told Anyosa that he was "going to show him a series of six photos, to take his time and to let me know if he recognizes anybody in the photo. [Det. Lipson] also told [Anyosa] that images and people's facial features change over time. To take his time and look at it as much time as he needed to make a determination." *See* **Exhibit W**, 182:17-25; *see also* **Exhibit P**, 11:7-8.

159.    On June 6, 2008, at 5:00 a.m., Anyosa positively identified plaintiff's photograph from the photo array and identified plaintiff as the person who shot him in the face. *See* **Exhibit P**, 11:6-10; *see also* **Exhibit D**, 390:10-19; *see also* Supporting Deposition for Anyosa Photo Array (**Exhibit GG**); *see also* **Exhibit X**, p. 3; *see also* **Exhibit P**, 13:14-21; 26:2-5.

7139405v.1

160.    Plaintiff's photograph was in position #4 in the photo array that was presented to him. *See* **Exhibit P**, 11:6-10; *see also* **Exhibit E**, 22:2-17; *see also* **Exhibit D**, 390:10-19; *see also* **Exhibit GG**; *see also* **Exhibit X**, p. 3.

161.    Anyosa circled the plaintiff's photograph and signed his name under plaintiff's photograph in position #4. *See* **Exhibit X**, p. 4; *see also* **Exhibit D**, 397:2-6; *see also* **Exhibit P**, 11:13-17.

162.    Det. Lipson wrote up a supporting deposition for the photo array which was signed by Anyosa and witnessed by Det. Lipson. *See* **Exhibit GG**; *see also* **Exhibit P**, 11:13-17.

163.    After Anyosa selected plaintiff's photograph from the photo array, no one told Anyosa that he selected the right guy. *See* Anyosa EBT Transcript (**Exhibit MMM**), 16:16-19:11; 39:9-20; *see also* **Exhibit W**, 60:17-61:7; 62:2-10; 63:19-64:9; 106:23-107:5

164.    At Anyosa's deposition, held on September 24, 2020, more than twelve (12) years after he was presented with the photo array on June 6, 2008, Anyosa testified that he does not remember any police officer telling him that he selected the right guy. *See* **Exhibit MMM**, 16:16-19:11, 39:9-20.

165.    Det. Decaro was never told that Anyosa was informed that he selected the right guy after Anyosa positively identified the plaintiff from the photo array. *See* **Exhibit O**, 124:22-25.

166.    Det. Darienzo and Det. Lipson never discussed the photo array identification procedures that Det. Lipson presented to Hernandez and Anyosa. *See* **Exhibit V**, 73:20-25.

167.    Det. Dluginski was never told that Anyosa was told that he selected the right guy after Anyosa positively identified the plaintiff from the photo array. *See* **Exhibit J**, 186:6-187:3; 188:6-18.

168.    Det. Darienzo, Det. Ross, Det. Decaro, Det. Dluginski, and Det. Sgt. Dorsi were

not present when the photo array was administered to Anyosa. *See* **Exhibit V**, 48:2-49:20; *see also* **Exhibit O**, 132:21-133:23; *see also* **Exhibit J**, 182:19-22; 188:6-18; 240:17-21; *see also* **Exhibit P**, 123:3-6; 124:4-5; *see also* **Exhibit D**, 703:4-17; *see also* **Exhibit KKK**, 36:16-23; *see also* **Exhibit NN**, 113:8-16; 130:15-22.

169.     Hernandez never found out if Anyosa selected the same person (the plaintiff) from the photo array identification, and did not tell Anyosa that he made a selection from the photo array. *See* **Exhibit AA**, 38:22-39:6; 41:23-42:2.

Nassau County District Attorney Office Now Involved With the Investigation

170.     The Nassau County District Attorney's Office ("NCDA") has a bureau known as the Early Case Assessment Bureau ("ECAB"). *See* ADA Larocca EBT Transcript (**Exhibit KK**), 16:15-17:9; *see also* **Exhibit O**, 173:23-174:20.

171.     ECAB is staffed by NCDA prosecutors and is an intake bureau where "[p]rior to arrest, generally speaking, [ECAB] receive[s] information from the police. [ECAB] decide[s] whether charges or at least [ECAB] coordinate[s] with the police whether [criminal] charges are to be brought and what they should be." *See* **Exhibit KK**, 16:15-17:9; *see also* **Exhibit O**, 173:23-174:20.

172.     Det. Decaro faxed paperwork over to the NCDA ECAB for a prosecutor to review, and spoke with a prosecutor over the phone, about information related to the investigations of the May 27, 2008 incident with Marky Fouse, the May 28, 2008 incident with Mr. Hutchinson, and the May 15, 2008 shooting of Anyosa. *See* **Exhibit O**, 173:23-176:6; 176:23-177:7; *see also* NCDA ECAB paperwork (**Exhibit NNN**).

173.     After speaking with the NCDA ECAB prosecutor, Det. Decaro processed the police paperwork and the felony complaints charging plaintiff with crimes from the May 27, 2008

-23-

incident with Marky Fouse, crimes from the May 28, 2008 incident with Mr. Hutchinson, and the May 15, 2008 shooting of Anyosa. *See* Felony Complaints for May 27, 2008 incident (**Exhibit HH**); *see also* Felony Complaints for May 15, 2008 shooting (**Exhibit II**); *see also* Felony Complaints for May 28, 2008 incident (**Exhibit QQQ**); *see also* **Exhibit O**, 173:23-176:6; 176:23-177:7.

174.    Det. Decaro signed the felony complaints charging plaintiff with crimes from the May 27, 2008 incident with Marky Fouse and the May 15, 2008 shooting of Anyosa. *See* Felony Complaints for May 27, 2008 incident. *See* **Exhibit HH**; *see also* **Exhibit II**.

175.    Det. Sortino was the subscribing witness for the Felony Complaints for the May 27, 2008 incident with Mark Fouse, and the May 15, 2008 shooting of Anyosa, and was otherwise not involved in this investigation. *See* **Exhibit HH**; *see also* **Exhibit II**.

176.    Det. Darienzo did not play any role in deciding what criminal charges would be brought against plaintiff in connection with the May 15, 2008 shooting of Anyosa, did not speak with anyone from the NCDA ECAB about the facts of the case, and was unaware that Ogletree's written statement about the plaintiff was coerced. *See* **Exhibit V**, 17:24-18:13; 143:9-19; *see also* **Exhibit NNN**.

177.    Det. Lipson did not speak with anyone from the NCDA ECAB about the investigation into the May 15, 2008 shooting of Anyosa at any point in time. *See* **Exhibit W**, 201:15-22.

178.    Det. Dluginski was not working on June 5, 2008 and was not working on June 6, 2008 when he was notified that plaintiff was a suspect in the shooting of Anyosa, and was asked to come in to work to process the plaintiff's arrest for the May 15, 2008 shooting of Anyosa. *See* **Exhibit J**, 168:11-24.

179.     On June 6, 2008, after Det. Dluginski came in to work at the NCPD Third Squad, drove to the Hempstead Armory, spoke with Det. Decaro about results of the investigation into the May 15, 2008 shooting of Anyosa, and was not told that Ogletree was coerced into signing a statement about the plaintiff. *See* **Exhibit J**, 183:12-184:14.

180.     In the afternoon of June 6, 2008, Det. Dluginski went to Anyosa's house, spoke with Anyosa, and prepared a statement for Anyosa to sign based on what Anyosa had told him. *See* **Exhibit J**, 242:8-15; 247:7-10; 253:6-16.

181.     Anyosa signed this written statement on June 6, 2008 at approximately 4:30 pm. *See* **Exhibit J**, 259:14-22; *see also* Anyosa's signed written statement from June 6, 2008 (**Exhibit JJ**).

182.     Following June 6, 2008, Det. Cunningham had no further involvement in the investigation, arrest and/or prosecution of plaintiff except for testifying at the criminal pre-trial hearing in November of 2008. *See* **Exhibit T**, 120:2-7.

183.     Following June 6, 2008, P.O. Horowitz had no further involvement in the investigation, arrest and/or prosecution of plaintiff, except for showing vehicles to witnesses and testifying at the Grand Jury and plaintiff's criminal trial. *See* **Exhibit S**, 107:1-25; 113:11-20.

<u>Nassau County Grand Jury Indictment No. 1315N/2008</u>

184.     After June 6, 2008, NCDA Assistant District Attorney ("ADA") Joseph Larocca ("ADA Larocca") was assigned the cases where plaintiff was charged with crimes from the May 27, 2008 incident with Marky Fouse, crimes from the May 28, 2008 incident with Mr. Hutchinson, and the May 15, 2008 shooting of Anyosa. *See* **Exhibit KK**, 25:15-27:19.

185.     ADA Larocca presented the May 15, 2008 cab shooting to a Nassau County Grand Jury. *See* **Exhibit KK**, 24:1-4.

7139405v.1

186.    Prior to presenting the May 15, 2008 cab shooting to the Grand Jury, ADA Larocca spoke with the detectives involved in the investigation (as well as the other two cases) about Ogletree, the photo array identifications, and statements made by the plaintiff, and also spoke with both Anyosa and Hernandez. *See* **Exhibit KK**, 31:21-32:3; 37:25-38:11; 39:16-24; 54:11-56:10; 61:9-14; 62:13-63:13.

187.    Prior to testifying in the Grand Jury, or at the plaintiff's criminal trial, Anyosa was not given any photographs or photo arrays to review. *See* **Exhibit D**, 454:16-455:15; *see also* **Exhibit E**, 21:24-22:17.

188.    Prior to testifying in the Grand Jury, Anyosa and Hernandez did not tell ADA Larocca that they were pressured into identifying the plaintiff from the photo arrays. *See* **Exhibit KK**, 54:11-56:10.

189.    ADA Larocca also became aware of differences in height and hairstyle of the plaintiff and the perpetrator as described by Anyosa and Hernandez. *See* **Exhibit KK**, 47:16-23; 48:13-49:12; 58:17-59:7; 92:11-25; 99:15-100:16.

190.    ADA Larocca did not believe that the difference in height or the plaintiff having longer hair than the description of the perpetrator as described by Anyosa and Hernandez were distinguishing characteristics. *See* **Exhibit KK**, 93:4-94:13; 99:15-100:16.

191.    When ADA Larocca looked at plaintiff's photograph from the time of his arrest for the three (3) cases, "[he] would have said that [the plaintiff] had short hair … because [he] didn't notice that the dreadlocks weren't simply short hair, it was close to the scalp." *See* **Exhibit KK**, 93:16-21.

192.    ADA Larocca was aware that the plaintiff did not confess or make a confession that he shot Anyosa, but confessed to other crimes. *See* **Exhibit KK**, 61:9-14; 62:13-63:13.

193.    While ADA Larocca was handling the May 15, 2008 shooting of Anyosa, he was not aware of any other suspects other than the plaintiff. *See* **Exhibit KK**, 66:14-22.

194.    While ADA Larocca was handling the May 15, 2008 shooting of Anyosa, he was not aware of any tips that came into the NCDA's office from the public about the incident. *See* **Exhibit KK**, 66:23-67:3.

195.    On June 16, 2008, after Det. Horowitz, Det. Lipson, Anyosa and Hernandez testified (*see* **Exhibit E**), the Nassau County Grand Jury indicted Plaintiff for the following crimes related to the May 15, 2008 shooting:  1) NYS Penal Law section 110/125.25(1) – Attempt to Commit Murder in the Second Degree; 2) NYS Penal Law section 120.10(1) – Assault in the First Degree; 3) NYS Penal Law section 120.10(2) – Assault in the First Degree; 4) NYS Penal Law section 265.09(1) – Criminal Use of a Firearm in the First Degree; 5) NYS Penal Law section 265.03(1)(b) – Criminal Possession of a Weapon in the Second Degree; and 6) NYS Penal Law section 265.03(3) – Criminal Possession of a Weapon in the Second Degree. *See* Nassau County Indictment No. 1315N/2008 (**Exhibit LL**).

196.    The photo arrays presented to Hernandez and Anyosa where they positively identified the plaintiff were not admitted into evidence in the Grand Jury. *See* **Exhibit E**; *see also* **Exhibit X**, p. 1, 3; *see also* **Exhibit P**, 21:10-23:4.

197.    The felony complaints charging plaintiff with the May 15, 2008 shooting of Anyosa was not introduced and never presented as evidence to the Grand Jury. *See* **Exhibit E**; *see also* **Exhibit II**.

198.    Neither Ogletree's written statement, nor any law enforcement interaction with Ogletree at the Armory, was introduced or presented as evidence to the Grand Jury. *See* **Exhibit E**; *see also* **Exhibit Z**.

199.    On June 25, 2008, after the plaintiff was indicted by a Nassau County Grand Jury for the May 15, 2008 shooting of Anyosa – under Indictment No, 1315N/2008 – plaintiff's criminal defense attorney at the time, Glenn Hardy, served NCDA with two (2) notices of alibi, dated June 23, 2008. *See* June 23, 2008 Notices of Alibi (**Exhibit OOO**); *see also* **Exhibit KK**, 56:15-24; 70:16-22.

200.    On October 28, 2008, Nassau County Court Hon. Alan L. Honoroff issued a decision, which was entered and filed with the Nassau County Court Clerk's Office on February 6, 2009, with respect to Nassau County Indictment No. 1315N-2008, finding the evidence presented to the Grand Jury was legally sufficient, and that the grand jury proceeding was not defective. *See* Hon. Honoroff's October 28, 2008 Decision (**Exhibit PPP**).

Court Ordered Line-Up Identification Procedure

201.    On June 30, 2008, Nassau County Court Judge Alan Honorof issued an order directing plaintiff to participate in a physical line-up procedure. *See* Court Ordered Line-Up (**Exhibit MM**).

202.    The application was brought by ADA Larocca, on consent of plaintiff's criminal defense attorney at the time, Glenn Hardy. *See* **Exhibit MM**; *see also* **Exhibit KK**, 78:4-9.

203.    The order stated plaintiff's criminal defense attorney may be present and that plaintiff was not to "alter or remove any scalp or facial hair." *See* **Exhibit MM**.

204.    On August 5, 2008, the NCPD attempted to complete a line-up but were unable to as a result of plaintiff's hair, and the line-up was postponed. *See* **Exhibit KK**, 82:4-14; *see also* **Exhibit J**, 305:11-22; *see also* **Exhibit Q**, 83:20-24.

205.    During this August 5, 2008 attempt to conduct a line up, plaintiff's hair was in a different style than at the time of his arrest. *See* **Exhibit Q**, 83:7-8.

206. Plaintiff's hair was not cut by any member of law enforcement. *See* **Exhibit D**, 1029:2-3; *see also* Jeffrey Noble EBT Transcript (**Exhibit AAA**), 85:12-13.

207. ADA Larocca would not have let a line-up proceed with how plaintiff's hair was on August 5, 2008. *See* **Exhibit KK**, 89:13-90:13.

208. On August 14, 2008, Det. Ross conducted the plaintiff's physical line-up procedure with other NCPD members. *See* **Exhibit D**, 754:4-16.

209. Prior to conducting the line-up procedure, Det. Ross did not do any work on this investigation. *See* **Exhibit NN**, 46:19-22; *see also* **Exhibit P**, 212:21-23.

210. Det. Ross had conducted approximately 25 line-up procedures prior to August of 2008. *See* **Exhibit NN**, 28:20-24.

211. As of August of 2008, all line-up procedures in Nassau County were done in a seated position. *See* **Exhibit NN**, 32:4-6; *see also* **Exhibit D**, 777:5-14; *see also* Nassau County 30(b)(6) witness Detective Lyndon John EBT Transcript (**Exhibit OO**), 57:5-10.

212. Det. Dluginski was assisting Det. Ross with the plaintiff's line-up procedure. *See* **Exhibit D**, 754:14-16.

213. Plaintiff was brought to the NCPD Third Squad for the line-up procedure. *See* **Exhibit D**, 757:17-21.

214. The NCPD detectives requested fillers to appear to the NCPD Third Squad for the line-up procedure, and requested that the fillers be black males. *See* **Exhibit D**, 765:3-9.

215. Plaintiff's criminal defense attorney, Glenn Hardy, was present for the line-up procedure and was present for the viewing of the line-up. *See* **Exhibit NN**, 82:7-11; *see also* **Exhibit KK**, 80:21-24; *see also* **Exhibit P**, 213:7-11; 214:6-10.

216. ADA Larocca was present for the line-up procedure. *See* **Exhibit KK**, 80:25-81:2.

217.    Mr. Hardy requested that plaintiff sit in seat #5. *See* **Exhibit P**, 214:1-12; *see also* **Exhibit NN**, 83:18-23; 97:18-22.

218.    The fillers were then brought into the room where the line-up procedure was to be conducted. *See* **Exhibit P**, 215:2-6.

219.    All participants were covered with a white sheet so that the only thing that the viewers of the line-up could see were the heads and faces of the individuals in the line-up. *See* **Exhibit P**, 215:4-5.

220.    It was NCPD policy to have all articles of clothing covered during a line-up procedure, and it was common for NCPD to use a sheet to accomplish this. *See* **Exhibit D**, 801:4-7; *see also* **Exhibit W**, 214:21-215:3.

221.    Plaintiff sat on two phone books during the line-up procedure. *See* **Exhibit D**, 787:6-8.

222.    It was NCPD policy to have all individuals participating in the seated line-up to be the same height. *See* **Exhibit D**, 787:15-16; 800:22-801:6; *see also* **Exhibit OO**, 50:20-22.

223.    It was common to have individuals participating in line-up procedure administered by the NCPD to sit on phone books. *See* **Exhibit OO**, 51:1-2; *see also* **Exhibit W**, 214:3-7; *see also* **Exhibit V**, 127:17-128:2.

224.    ADA Larocca was aware that the plaintiff sat on two phone books during the line-up, and would have authorized the same, to ensure all of the line-up participants' faces were at the same height and that the line-up was fair. *See* **Exhibit KK**, 102:8-105:7; *see also* **Exhibit R**, 101:3-102:22, 104:22-105:16.

225.    After discussion with Mr. Hardy, Det. Sgt. Dorsi, Det. Dluginski, ADA Larocca and Det. Ross, it was decided that all of the line-up participants were going to wear hats as a result

of plaintiff's hair. *See* **Exhibit P**, 214:25-215:25; *see also* **Exhibit NN**, 95:10-21; *see also* **Exhibit KK**, 109:7-13.

226.    Per ADA Larocca, all of the line-up participants wore hats to ensure that the line-up was fair. *See* **Exhibit KK**, 94:16-97:6.

227.    ADA Larocca "had a higher responsibility to eliminate" any differences between the fillers hair and the plaintiff's hair to ensure that the line-up was fair. *See* **Exhibit KK**, 96:17-97:12.

228.    All line-up participants, including the plaintiff, wore the same type of hat. *See* **Exhibit P**, 215:15-20.

229.    Mr. Hardy had no objection to the procedure for the line-up, had no objection to all the fillers and plaintiff wearing a hat, and had no objection to having the plaintiff sit on phone books. *See* **Exhibit P**, 216:1-4; *see also* **Exhibit NN**, 84:14-18; *see also* **Exhibit AAA**, 87:3-88:5.

230.    The NCPD Crime Scene Unit took a photograph of the fillers and the plaintiff in the line-up procedure. *See* **Exhibit NN**, 126:15-24; *see also* Line-Up Photograph (**Exhibit PP**).

231.    There were six (6) participants in the line-up: the plaintiff and five (5) fillers. *See* **Exhibit PP**.

232.    Anyosa arrived to the NCPD Third Squad in the afternoon of August 14, 2008 to view the line-up. *See* **Exhibit D**, 401:11-21.

233.    Anyosa came to the NCPD Third Squad alone. *See* **Exhibit D**, 402:2-3.

234.    NCPD Detective Carl Strange ("Det. Strange") was assigned to Anyosa to ensure that Anyosa was separated from everybody else involved in the line-up procedure. *See* **Exhibit P**, 213:15-22; *see also* Det. Strange EBT Transcript (**Exhibit QQ**), 13:6-23; *see also* **Exhibit D**, 745:8-14.

235.    Anyosa was brought to a room in the NCPD Third Precinct with Det. Strange. *See* **Exhibit QQ**, 14:2-4.

236.    Det. Ross spoke with Anyosa about the line-up procedure and gave Anyosa instructions for viewing the line-up. *See* **Exhibit P**, 216:11-24.

237.    It was the practice of Det. Ross to give any witness viewing a line-up instructions prior to viewing the line-up. *See* **Exhibit NN**, 73:23-74:25.

238.    Anyosa was brought to the line-up viewing area where Det. Ross, Det. Dluginski, Mr. Hardy, Det. Sgt. Dorsi and ADA Larocca were present. *See* **Exhibit P**, 216:25-217:19.

239.    Anyosa viewed the line-up and identified the person seated in position #5, the plaintiff, as the person who shot him in the face. *See* **Exhibit P**, 217:10-13; *see also* **Exhibit D**, 403:4-19.

240.    No one from the NCPD told Anyosa who to select in the line-up. *See* **Exhibit D**, 404:1-8.

241.    After Anyosa selected plaintiff, Anyosa was escorted back to Det. Strange. *See* **Exhibit P**, 217:20-24.

242.    Anyosa did not have contact with Hernandez between the time he viewed the line-up and when he was brought back to Det. Strange. *See* **Exhibit D**, 746:4-7.

243.    On August 14, 2008, at approximately 4:02 p.m., Det. Strange spoke with Anyosa and prepared a written statement for Anyosa to sign. *See* **Exhibit QQ**, 40:19-22; *see also* Anyosa Signed Line-Up Statement (**Exhibit RR**).

244.    Det. Strange presented Anyosa with the written statement, and Anyosa signed it. *See* **Exhibit RR**; *see also* **Exhibit QQ**, 46:3-7.

245.    Det. Strange's only involvement in plaintiff's criminal case was assisting in the

August 14, 2008 line-up procedure. *See* **Exhibit QQ**, 13:6-13.

246.    Det. Strange's sole role was to "stay with [Anyosa], to keep him separated and to take a statement [from Anyosa] after he viewed the lineup." *See* **Exhibit QQ**, 13:20-23.

247.    On August 14, 2008, Anyosa did not see Hernandez prior to viewing the line-up. *See* **Exhibit D**, 402:12-15; 755:22-25.

248.    Anyosa did not view any of the line-up fillers before the line-up was conducted. *See* **Exhibit D**, 755:6-9.

249.    Hernandez arrived at the NCPD Third Squad in the afternoon of August 14, 2008 to view the line-up. *See* **Exhibit D**, 470:23-471:4.

250.    Hernandez came to the NCPD Third Squad alone. *See* **Exhibit D**, 471:7-8; *see also* **Exhibit AA**, 59:14-18.

251.    Det. Darienzo was assigned to Hernandez to ensure that Hernandez was separated from everybody else involved in the line-up procedure. *See* **Exhibit P**, 213:15-22; *see also* **Exhibit V**, 92:12-17; *see also* **Exhibit D**, 748:2-5.

252.    Hernandez was brought to a private room in the NCPD Third Precinct with Det. Darienzo. *See* **Exhibit D**, 748:6-11.

253.    Det. Ross spoke with Hernandez about the line-up procedure and gave Hernandez instructions for viewing the line-up. *See* **Exhibit P**, 218:2-12; *see also* **Exhibit D**, 748:6-13.

254.    Hernandez was brought to the line-up viewing area where Det. Ross, Det. Dluginski, Mr. Hardy and ADA Larocca were present. *See* **Exhibit P**, 218:2-4; 219:1-8; *see also* **Exhibit KK**, 24:17-19.

255.    Hernandez viewed the line-up and identified the person seated in position #5, the plaintiff, as the person who he had an argument with the same day Anyosa was shot. *See* **Exhibit**

**P**, 219:1-6; *see also* **Exhibit D**, 471:18-24.

256.    No one from NCPD told Hernandez who to select in the line-up. *See* **Exhibit D**, 471:25-472:4; 748:20-24; *see also* **Exhibit AA**, 78:5-14; 85:21-24.

257.    After Hernandez selected plaintiff, Hernandez was escorted back to Det. Darienzo. *See* **Exhibit D**, 749:3-5.

258.    Hernandez did not have contact with Anyosa between the time he viewed the line-up and when he was brought back to Det. Darienzo. *See* **Exhibit D**, 472:5-7; 749:6-10.

259.    Hernandez does not know if Anyosa came to the NCPD Third Precinct to view the line-up, or if Anyosa in fact did view the line-up, on the same day Hernandez did. *See* **Exhibit AA**, 59:14-60:2.

260.    On August 14, 2008, at approximately 4:05 p.m., Det. Darienzo spoke with Hernandez and prepared a written statement for Hernandez to sign. *See* **Exhibit V**, 106:6-17; *see also* Hernandez Signed Line-Up Statement (**Exhibit SS**).

261.    Det. Darienzo presented Hernandez with the written statement, and Hernandez signed it. *See* **Exhibit SS**; *see also* **Exhibit V**, 103:10-12.

262.    On August 14, 2008, Hernandez did not see Anyosa prior to viewing the line-up and did not see Anyosa when he viewed the line-up. *See* **Exhibit D**, 471:13-17; 755:22-25.

263.    Hernandez did not view any of the line-up fillers before the line-up was conducted. *See* **Exhibit D**, 755:6-9.

264.    On August 14, 2008, throughout the line-up process, Det. Ross filled in the NCPD Line-Up Worskeet. *See* **Exhibit P**, 219:24-220:13; *see also* **Exhibit NN**, 101:21-102:10; *see also* NCPD Line-Up Worksheet (**Exhibit TT**).

265.    Per this Line-Up Worksheet, Det. Sgt. Dorsi was the NCPD Third Squad

supervisor. *See* **Exhibit TT.**

266.    Per this Line-up Worksheet, ADA Larocca and Mr. Hardy were present for the line-up procedure. *See* **Exhibit TT**.

267.    Det. Ross timed how long it took Anyosa and Hernandez to make their line-up selection. *See* **Exhibit P**, 217:14-15; 220:11-13.

268.    Per this Line-Up Worksheet, Anyosa made a selection after viewing the line-up on August 14, 2008 at 4:00 pm, and it took Anyosa 23 seconds to select plaintiff after viewing the line-up. *See* **Exhibit TT**; *see also* **Exhibit P**, 217:14-15; 220:11-13.

269.    Per this Line-Up Worksheet, Hernandez made a selection after viewing the line-up on August 14, 2008 at 4:03 pm, and it took Hernandez 9 seconds to select plaintiff after viewing the line-up. *See* **Exhibit TT**; *see also* **Exhibit P**, 217:14-15; 220:11-13; *see also* **Exhibit AA**, 74:23-76:14.

270.    Hernandez did not have any doubts about his identification of plaintiff from the line-up. *See* **Exhibit AA**, 76:6-77:17; *see also* **Exhibit V**, 141:20-142:19.

271.    It did not take Hernandez a long time to select plaintiff from the line-up as the person that he argued with because he observed plaintiff as the person that he argued with on the street, was very close to the person during the argument, and was able to look at this person right in the face during the argument. *See* **Exhibit AA**, 76:6-77:17; *see also* **Exhibit V**, 141:20-142:19.

272.    Prior to conducting the line-up procedure, Det. Ross was not involved in the investigation of Anyosa's May 15, 2008 shooting. *See* **Exhibit NN**, 46:19-22; *see also* **Exhibit P**, 212:21-23.

273.    Det. Lipson and Det. Decaro did not play any role and was not involved in conducting or setting up the lineup procedure where plaintiff was the subject of the line-up. *See*

**Exhibit W**, 216:5-9; *see generally* **Exhibit O**.

274.    NCPD Detective Rene B. Yao ("Det. Yao") did not have any involvement in the investigation of Anyosa's May 15, 2008 shooting, including no involvement with the identification procedures. *See* Det. Yao EBT Transcript (**Exhibit UU**), 55:10-14; 58:16-20; 59:10-60:14; *see also* **Exhibit Q**, 194:22-195:4.

**Nassau County Court Held NCPD Had Probable Cause to Arrest and Prosecute Plaintiff and that Plaintiff's Constitutional Rights Were Not Violated by the Identification Procedures**

275.    Subsequently, Cheryl Johnson, plaintiff's mother, hired Frederick Brewington as plaintiff's criminal defense attorney. *See* Cheryl Johnson EBT Transcript (**Exhibit VV**), 52:20-23.

276.    On November 5, 2008, and November 7, 2008, a pre-trial suppression hearing was held in front of Nassau County Court Honorable Philip Grella. *See generally* **Exhibit P**.

277.    ADA Larocca handled the pre-trial hearing for NCDA and plaintiff was represented by Mr. Brewington. *See generally* **Exhibit P**.

278.    Det. Lipson, Det. Decaro, Det. Cunningham, and Det. Ross testified during the pre-trial suppression hearing. *See* **Exhibit P**, p. 6-249.

279.    Plaintiff's criminal defense attorney, Fred Brewington, cross-examined Det. Lipson, Det. Decaro, Det. Cunningham and Det. Ross on differences in plaintiff's height, hairstyle, lack of accent, age, as well as cross-examined all these witnesses about plaintiff's arrest, questioning, photo array identification procedures, and line-up identification procedure. *See* **Exhibit P**, p. 6-249.

280.    On November 7, 2008, after hearing testimony from Det. Lipson, Det. Decaro, Det. Cunningham, and Det. Ross, Hon. Philip Grella issued a decision on the pre-trial hearing. *See* **Exhibit P**, 278:17-284:4.

281.    Hon. Grella held that during the lineup process and during the questioning process, plaintiff was in lawful custody, and that there was sufficient probable cause when plaintiff was arrested. *See* **Exhibit P**, 278:17-284:4.

282.    Hon. Grella also held that there was no suggestibility with regard to the procedure followed when Anyosa and Hernandez were presented with photo arrays, and "[t]here was no suggestibility with regard to the procedure that was followed. And there was nothing unreasonably or unduly suggestive in the wording that was used by police personnel during the showing of the photo arrays." *See* **Exhibit P**, 280:11-16.

283.    In addition, Hon. Grella held that the "photo arrays did not violate the constitutional rights of the [plaintiff]." *See* **Exhibit P**, 280:22-23.

284.    Moreover, Hon. Grella held that the court-ordered line-up was "fair, in compliance with the defendant's constitutional and statutory rights. As a matter of fact, he had an attorney present. Neither he nor his attorney objected in any way to any of the procedures." *See* **Exhibit P**, 281:1-5.

285.    Furthermore, Hon. Grella found that the use of the hats during the lineup "was an attempt to protect the [plaintiff's] rights and to ensure fairness. Furthermore, there was certainly no objection rendered by either the defendant or the attorney who was present." *See* **Exhibit P**, 281:9-13.

286.    Hon. Grella held that having the plaintiff and fillers sit, as well as the use of a sheet to cover plaintiff and the fillers was to keep things fair. *See* **Exhibit P**, 281:14-16.

287.    In addition, the Court held that "nothing was said or done to coerce or pressure or overly suggest to the individuals who viewed the line-up that they should in any way be unduly directed toward the defendant. And there was nothing unduly suggestive about the procedure of

the lineup, the people that were used in the lineup, or any interaction that police personnel had with regard to the civilians who viewed the lineup." *See* **Exhibit P**, 281:17-25.

288.    Finally, the Court held that the two (2) written signed statements by plaintiff and the oral statement made by plaintiff were voluntarily offered, were not the subject of any coercion, were not the subject of any duress, were not the subject of any type of force or pressure from the police department, and that the statements were made after plaintiff was advised of his constitutional Miranda warnings. *See* **Exhibit P**, 282:22-283:5.

289.    On November 13, 2008, Hon. Grella's November 7, 2008 decision denying plaintiff's motion to suppress was entered and filed with the Clerk's Office of the County Court of Nassau County. *See* Hon. Grella's Decision (**Exhibit WW**).

<u>ADA Schalk Assigned to Handle Indictment No. 1315N-2008</u>

290.    A few months before plaintiff's criminal trial, ADA Larocca had a calendar conflict, and ADA Robert Schalk ("Schalk") took over plaintiff's case and handled plaintiff's criminal trial. *See* **Exhibit R**, 55:2-56:14; *see also* Declaration of ADA Schalk (**Exhibit VVV**), ¶¶3-4.

291.    After ADA Schalk took over the plaintiff's case, he reviewed the NCDA case file, which included the photo arrays, witness statements, documentation and photographs associated with the line-up, spoke with the detectives involved in the investigation, and spoke with the former prosecutor assigned to the case, ADA Larocca. *See* **Exhibit R**, 28:22-29:6; 56:9-59:3; 59:20-60:4; *see also* **Exhibit VVV**, ¶¶4-9.

292.    Per ADA Schalk, he did not rely on the felony complaints charging the plaintiff with the shooting of Anyosa as they were irrelevant at the Grand Jury stage, and also irrelevant at plaintiff's criminal trial, since it is the Indictment that controls the trial, not the felony complaints.

*See* **Exhibit VVV**, ¶¶5-8.

293.    ADA Schalk became aware of differences in height and hairstyle of the plaintiff and the perpetrator as described by Anyosa and Hernandez. *See* **Exhibit R**, 67:25-68:19; 71:10-73:22; 77:21-79:10; 80:9-82:25; 102:2-12; 106:5-15; *see also* **Exhibit VVV**, ¶¶10-11.

294.    ADA Schalk did not believe that the difference in height or the plaintiff having longer hair than the description of the perpetrator as described by Anyosa and Hernandez were material discrepancies or distinguishing characteristics. *See* **Exhibit R**, 67:25-68:19; 71:10-73:22; 77:21-79:10; 80:9-82:25; 102:2-12; 106:5-15; *see also* **Exhibit VVV**, ¶¶10-11.

295.    Prior to trial, ADA Schalk listened to an audio-recorded interview between an NCDA prosecutor and plaintiff's mother, Cheryl Johnson, one of plaintiff's alibi witnesses. *See* **Exhibit R**, 9:23-15:22; *see also* **Exhibit D**, 867:21-883:3; *see also* **Exhibit VVV**, ¶¶12-16.

296.    ADA Schalk also reviewed several jail calls between the plaintiff and his girlfriend, Amanda Miranda, another potential alibi witness. *See* **Exhibit VVV**, ¶¶12-16.

297.    A few days before trial, Ogletree was produced from jail and met with ADA Schalk. *See* **Exhibit R**, 33:11-15.

298.    When ADA Schalk met with Ogletree, they discussed his signed written statement where he stated that plaintiff had told him he shot a cab driver. *See* **Exhibit R**, 37:12-38:10; *see also* **Exhibit Z**.

299.    ADA Schalk "showed [Ogletree] the written statement that he had given to the police and went over it with him and to be clear, at no point in time did he ever say he was coerced, did he ever say he was threatened in any way." *See* **Exhibit R**, 38:4-9.

300.    During this meeting, Ogletree did *not* make any allegations that his written statement was coerced. *See* **Exhibit R**, 27:19-23.

301.    During this meeting, Ogletree told ADA Schalk the same thing that he told the NCPD Detectives on June 6, 2008, and said that the written statement that he signed was accurate. *See* **Exhibit R**, 25:1-7, 9-13; 44:14-45:12.

<u>Plaintiff's Criminal Trial – Jury Found Plaintiff Guilty Beyond a Reasonable Doubt</u>

302.    Hon. Alan L. Honorof presided over plaintiff's criminal trial; the criminal case started with preliminary applications on February 17, 2009. *See* **Exhibit D**, p. 1-12.

303.    On February 18, 2009, the process of jury selection commenced, and on February 19, 2009, a full jury was selected and was sworn. *See* **Exhibit D**, p. 26-224.

304.    On February 19, 2009, ADA Schalk delivered his opening statement (*see* **Exhibit D**, p. 232-248), and then Mr. Brewington delivered his opening statement (*see* **Exhibit D**, p. 249-260).

305.    During ADA Schalk's opening statement, he did not mention that a composite sketch of the suspect was prepared by Det. Bischoff, and he did not mention that Anyosa and Hernandez positively identified plaintiff in the photo arrays that were presented to them. *See* **Exhibit D**, p. 232-248.

306.    During Mr. Brewington's opening statement, Mr. Brewington brought up the composite sketch and the photo arrays. *See* **Exhibit D**, p. 249-260.

307.    While ADA Schalk was planning to only present evidence to the jury about the line-up procedure, "*during opening statements Mr. Brewington referenced the sketch and referenced the photo pack identifications, which under normal New York State Criminal Procedure Law would never be admitted into evidence, but he opened the door to those items coming into evidence so yes, prior to their testimony I reviewed with them all of the identification procedures when normally I would never go over a photo pack or a sketch with the witness prior to trial*

*because they would have been deemed inadmissible and it could be viewed as some sort of coaching otherwise." See* **Exhibit R**, 124:16-125:4.

308.    Since Mr. Brewington opened the door, Hon. Honoroff permitted ADA Schalk to present evidence to the jury regarding the composite sketch and the photo arrays. *See* **Exhibit R**, 66:14-18; 127:7-128:10.

309.    Ogletree was the first witness to testify at plaintiff's criminal trial. *See* **Exhibit R**, 33:11-15; *see generally* **Exhibit D**, p. 261-262.

310.    Ogletree first alleged that he was coerced to sign a written statement that plaintiff had told him that he shot a cab driver by the chicken joint was when he testified at plaintiff's criminal trial. *See* **Exhibit R**, 21:13-50:17; *see also* **Exhibit D**, p. 262-274, p. 297-331; *see also* **Exhibit VVV**, ¶17.

311.    Ogletree did not identify a specific detective that coerced him. *See* **Exhibit D**, p. 262-274, p. 297-331 (325:14-17).

312.    The Court deemed Ogletree as a hostile witness and ADA Schalk was allowed to impeach and cross-examine Ogletree even though he was a witness for the NCDA. *See* **Exhibit R**, 21:20-21; 22:3-21.

313.    ADA Schalk did not investigate Ogletree's claims that he was coerced into signing a statement against plaintiff because he believed he was lying as a result of, among other things, his prior conversation with Ogletree and Ogletree's demeanor on the stand. *See* **Exhibit R**, 32:19-24; 50:6-17; *see also* **Exhibit VVV**, ¶¶17-18.

314.    When he testified, Ogletree's body language was tense and he did not want to make eye contact with ADA Schalk, with plaintiff or with Mr. Brewington. *See* **Exhibit R**, 26:15-18.

315.    ADA Schalk spoke with Anyosa and Hernandez individually before they testified,

and they both indicated that they were certain that plaintiff was the person that they had argued with, and that had shot Anyosa on May 15, 2008. *See* **Exhibit R**, 125:20-25; *see also* **Exhibit AA**, 79:7-81:14; *see also* **Exhibit VVV**, ¶¶9-10.

316.    During the criminal trial, Anyosa identified Galloway as the person who he argued with on May 15, 2008. *See* **Exhibit D**, 377:2-13; *see also* **Exhibit AA**, 79:7-81:14.

317.    Anyosa did not feel pressured to select the plaintiff in court during the criminal trial. *See* **Exhibit MMM**, 27:11-28:12.

318.    During the criminal trial, Hernandez identified Galloway as the person who he argued with on May 15, 2008. *See* **Exhibit D**, 465:24-466:7.

319.    No one told Hernandez what he should say or how he should testify prior to testifying at plaintiff's criminal trial. *See* **Exhibit AA**, 79:7-81:14.

320.    Plaintiff's attorney, Fred Brewington, cross-examined detectives, police officers, witnesses, and Anyosa about differences between the plaintiff and the description of the suspect given by Hernandez and Anyosa. *See generally* **Exhibit D.**

321.    Mr. Brewington's cross-examination of detectives, police officers, witnesses, and Anyosa included the height, weight, hair style, plaintiff's lack of accent, plaintiff's teeth, age, vehicle suspect was driving and vehicle suspect was arrested in. *See generally* **Exhibit D.**

322.    Mr. Brewington also cross-examined witnesses regarding plaintiff's and suspect's hair. *See generally* **Exhibit D**.

323.    During the commission of the crime, the person who shot Anyosa had "short, cropped [hair], tight to the head was the description given by Mr. Anyosa. It was elicited that Mr. Galloway's hair was potentially in corn rolls. Corn rolls depending on how they are rolled are cropped, short, hair tight to the head. That was litigated at the trial." *See* **Exhibit R**, 106:5-15; *see*

*also generally* **Exhibit D**; *see also* **Exhibit VVV**, ¶¶9-11.

324.    On March 2, 2009, plaintiff testified at his criminal trial, and on the same day, rested his case. *See* **Exhibit D**, 997:3-1037:9.

325.    On March 3, 2009, Mr. Brewington delivered his closing statement to the jury (*see* **Exhibit D,** p. 1046-1106), and then ADA Schalk delivered his closing statement (*see* **Exhibit D,** p. 1107-1145).

326.    On March 9, 2009, the jury rendered a verdict and found plaintiff guilty of all the criminal charges under Indictment No. 1315N/2008. *See* **Exhibit D**, 1244:19-1246:18.

<u>Plaintiff's Sentencing and Motion to Set Aside the Criminal Jury Verdict</u>

327.    On November 23, 2009, plaintiff was sentenced to 25 years imprisonment. *See* November 23, 2009 Transcript (**Exhibit XX**) 15:1-17:6.

328.    Plaintiff also pled guilty to a violation under Superior Court Information No. 2380N/2009 with respect to the May 27, 2008 robbery. *See* **Exhibit XX**, 3:25-6:20.

329.    After plaintiff was convicted after his criminal trial, he moved, pursuant to New York State Criminal Procedure Law ("C.P.L") sections 210.20(1)(h) and 330.30, to set aside the jury's verdict convicting him of the criminal charges under Indictment No. 1315N/2008 on "the grounds that the verdict was against the weight of the evidence, that the identification of defendant was unduly suggestive, that the prosecutor made improper and inflammatory statements during summation, that the People shifted the burden in that they asked the jury to draw negative inferences from the defendant's failure to produce evidence, that the court abused its discretion, regarding the jury's deliberations, and that the People improperly solicited testimony regarding the showing of photographs to witnesses on their direct case." *See* September 16, 2009 Decision (**Exhibit YY**).

330.    On September 16, 2009, the trial Court held that defense counsel opened the door, and that "in his opening statement, [Mr. Brewington] inferred that the People were improperly hiding evidence of photographic identifications from the jury. In response to the prosecutor's objection, the court gave a curative instruction and allowed the aforementioned testimony." *See* **Exhibit YY.**

331.    Plaintiff's motion to set aside the verdict was denied. *See* **Exhibit YY.**

<u>NCPD Policy and Police Practices</u>

332.    In cases where the victim does not know the suspect who committed a crime, it is common for the police to use identification procedures such as photo arrays and line-ups. *See* **Exhibit AAA**, 20:21-21:6.

333.    On August 6, 2002, the NCPD issued Detective Division Administrative Order 2002-54 titled "Criminal Identification (HIDTA System, Composite Sketch, Lineups & Showups)." *See* Declaration of Deputy Bureau Chief of the Legal Bureau of the NCPD Christopher Todd, Esq. (**Exhibit ZZ), Exhibit 1**.

334.    This NCPD Order was the policy for the NCPD for identification procedures at the time of the investigation, arrest, prosecution and criminal trial of plaintiff. *See* **Exhibit ZZ, Exhibit 1**; *see also* **Exhibit OO**, 11:8-21.

335.    Per NCPD Order 2002-54, NCPD detectives conducting line up procedures were to make every effort "to have the participants in an identification line up match the physical appearance of the subject. Variations of height and clothing may be overcome by seating the participants." *See* **Exhibit ZZ**, **Exhibit 1**, p. 3.

336.    The use of hats on all participants (suspect and fillers) in a line up procedure administered by the NCPD was not uncommon. *See* **Exhibit NN**, 33:3-34:4; *see also* **Exhibit QQ**,

28:5-9; *see also* **Exhibit W**, 214:13-16.

337.    Per NCPD Order 2002-54, "investigating detectives are advised that if a Photo Pack identification has been used prior to an identification lineup, the position of the suspect should be different in the lineup than it was in the Photo Pack." *See* **Exhibit ZZ, Exhibit 1**, p. 3.

338.    Per NCPD Order 2002-54, "the investigating detective should maintain a record of all persons, including the attorneys, present in the course of an identification lineup. The position and identification of each individual at all phases will also be recorded and maintained as evidence." *See* **Exhibit ZZ, Exhibit 1**, p. 4.

339.    In addition, photographs should be taken of every phase of the identification lineup; the NCPD Crime Scene Search Section should be requested to photograph the proceedings. *See* **Exhibit ZZ, Exhibit 1**, p. 4.

340.    A photo array identification procedure is administered in a double blind fashion when the administrator of the photo array does not know who the suspect is. *See* **Exhibit O**, 121:10-122:11; *see also* **Exhibit ZZ, Exhibit 3**, p. 13; *see also* **Exhibit OO**, 17:12-21; *see also* **Exhibit AAA**, 25:10-25.

341.    In 2008, the NCPD policy for identification procedures with respect to the administration of photo arrays was different than it is in 2022; in 2008, the NCPD guidelines for identification procedures did not suggest that a photo array was to be administered in a double blind fashion. *See* **Exhibit OO**, 19:4-20:6; *see also* **Exhibit O**, 121:3-122:11; *see also* Plaintiff's Rule 26(a)(2) disclosure (**Exhibit BBB**); *see also* **Exhibit AAA**, 46:6-14; *see also* Expert Report of Jeffrey J. Noble (**Exhibit CCC**); *see also* Defendants Rule 26(a)(2) disclosure (**Exhibit DDD**), p. 20-21, 25-26, 29-31 (p. 16-17, 20-21, 25-27 of Monaghan's Expert Report).

342.    In 2008, it was appropriate for members of the NCPD to administer a photo array

in a non-double blind fashion. *See* **Exhibit OO**, 19:4-20:6; *see also* **Exhibit O**, 121:3-122:11; *see also* **Exhibit AAA**, 29:5-7; *see also* **Exhibit DDD**, p. 20-21, 25-26, 29-31 (p. 16-17, 20-21, 25-27 of Monaghan's Expert Report)

343.    In 2009, the District Attorneys Association of the State of New York ("DAASNY") created the Fair and Ethical Administration of Justice Committee, with subcommittees devoted to Best Practices. *See* **Exhibit DDD**, p. 21, 29-31 (p. 17, 25-27 of Monaghan's Expert Report); *see also* John Monaghan, EBT Transcript (**Exhibit EEE**), 106:12-16; *see also* The Prosecutor: Statewide Best Practices Committees for Prosecutors:  Leveraging Experience and New Evidence to Benefit the Criminal Justice System. By Kristine Hamann, October, November, December 2013 (**Exhibit FFF**).

344.    On May 19, 2010, the New York City Police Department and the DAASNY announced guidelines for New York State Identification Procedures, including photo arrays and line-ups. *See* **Exhibit FFF**, p. 3; *see also* **Exhibit DDD**, p. 20-21, 29-31 (p. 16-17, 25-27 of Monaghan's Expert Report); *see also* **Exhibit ZZ, Exhibit 3**.

345.    After the New York State Identification Procedures were announced, the DAASNY Best Practices Committee, in partnership with the New York State Division of Criminal Justice, embarked on a training program throughout New York State. *See* **Exhibit FFF**, p. 3; *see also* **Exhibit ZZ**, **Exhibit 2**; *see also* **Exhibit DDD**, p. 20-21, 25-26, 29-31 (p. 16-17, 20-21, 25-27 of Monaghan's Expert Report).

346.    On July 7, 2010, the NCPD Department Notification Number 10-119 was issued. *See* **Exhibit ZZ**, **Exhibit 2**.

347.    On August 9, 2011, the NCPD Department Notification Number 11-115, along with accompanying exhibits, were issued and adopted by the NCPD with respect to Identification

Procedures. *See* **Exhibit ZZ, Exhibit 3**; *see also* **Exhibit FFF**.

348.    Other than officers testimony in this case, plaintiff's police practices expert Jeffrey Noble does not have any other information or knowledge as to how line-ups were conducted in Nassau County in 2008, did not review any policies or procedures of Nassau County concerning the administration of line-ups and photo arrays, and did not see or search for any training material for how Nassau County trained their police officers in 2008 with respect to identification procedures. *See* **Exhibit AAA**, 33:18-23; 80:4-13; 90:16-91:10; *see also* **Exhibit CCC**.

349.    For purposes of generating his expert report in this case, Jeffrey Noble did not review anything from the New York State Division of Criminal Justices Services, did not review anything from the DAASNY, did not review anything from the DAASNY Best Practices Committee, and is not familiar with the DAASNY or the DAASNY Best Practices Committee. *See* **Exhibit AAA**, 57:5-58:17; *see also* **Exhibit CCC**.

350.    Jeffrey Noble is not aware of any evidence that Mr. Ogletree told anyone that he was coerced prior to the time that he took the witness stand at plaintiff's criminal trial. *See* **Exhibit AAA**, 91:17-24.

<u>NCDA Conviction Integrity Unit Investigation</u>

351.    In early July 2018, an individual called the NCDA with information regarding Anyosa's shooting. *See* September 13, 2018 Transcript (**Exhibit GGG**), 2:22-25.

352.    This person told the NCDA Conviction Integrity Unit that she was aware that the wrong person was convicted of this crime. *See* **Exhibit GGG**, 3:2-4.

353.    This individual provided information and "[t]his information led us to additional witnesses who were unknown at the time of the trial." *See* **Exhibit GGG**, 3:7-8.

354.    "At the time of [plaintiff's] trial, any and all exculpatory information was provided

by the prosecution to the defense including any discrepancies between the perpetrator's description and [plaintiff]. These discrepancies were thoroughly explored by the [plaintiff's criminal defense] attorney and argued to the jury.  The defendant and two alibi witnesses also testified.  The prosecution called to the stand a friend and former co-defendant of [plaintiff] who allegedly told the police that [plaintiff] confessed that he had shot the cab driver.  Nonetheless, the witness recanted on the witness stand stating that [plaintiff] had never confessed to him. After the trial, Mr. Galloway's trial lawyer made a motion to dismiss the jury's verdict which was denied." *See* **Exhibit GGG**, 3:25-4:13.

355.    On September 13, 2018, after application by the NCDA, Hon. Teresa Corrigan ordered that plaintiff's convictions under Indictment No. 1315N-2008 were vacated pursuant to C.P.L. section 440.10(1)(g) and that the Indictment was dismissed with prejudice. *See* **Exhibit GGG**; *see also* Hon. Corrigan Decision (**Exhibit HHH**).

356.    Since plaintiff's convictions under Indictment No. 1315N-2008 were vacated, no person has been arrested, prosecuted, or convicted of shooting Anyosa on May 15, 2008. *See* **Exhibit GGG**, 3:20-24.

357.    Between the time of plaintiff's conviction after trial on March 9, 2009, and the time that plaintiff's convictions were vacated and indictment dismissed on September 13, 2018, plaintiff did not file an appeal on his case. *See* **Exhibit GGG**, 4:22-23.

Procedural History

358.    On September 21, 2018, Mr. Galloway served a notice of claim on the County and the Village. *See* Notice of Claim (**Exhibit III**).

359.    On December 20, 2018, Mr. Galloway gave sworn testimony at an examination held pursuant to Section 50-h of the New York General Municipal Law. *See* Plaintiff's 50-H

Examination Transcript (**Exhibit JJJ**).

360.    On September 4, 2019, Mr. Galloway commenced the instant action. *See* D.E. 1.

361.    On May 11, 2021, Mr. Galloway filed his FAC. *See* **Exhibit A**.

362.    Plaintiff's FAC alleged nine claims for relief: (i) a Section 1983 malicious prosecution claim brought against Det. Horowitz, Det. Cunningham, Det. Decaro, Det. Darienzo, Det. Sortino, Det. Lipson, and Det. Dluginski) (*id.* at ¶¶85-92); (ii) a Section 1983 claim alleging fabrication of evidence, denial of a fair trial and *Brady* violations against all the individual HPD and NCPD detectives named as defendants (*id.* at ¶¶93-101); (iii) a Section 1983 supervisory liability claim against Det. Sgt. Dorsi and Det. Sortino (*id.* at ¶¶102-105); (iv) a New York State Law claim for false imprisonment and malicious prosecution against the County and the Village by *respondeat superior* (*id.* at ¶¶106-12); (v) an intentional or negligent infliction of emotional distress claim against the County and the Village by *respondeat superior* (*id.* at ¶¶113-16); (vi) a Section 1983 conspiracy claim against all individual HPD and NCPD detectives named as defendants (*id.* at ¶¶117-22); (vii) an unlawful pre-trial detention in violation of the Fourth Amendment and *Russo v. Bridgeport,* 479 F.3d 196 (2d Cir. 2007) claim against all individual HPD and NCPD detectives named as defendants (*id.* at ¶¶123-25); (viii) a Section 1983 claim for "failure to intervene" asserted against all individual HPD and NCPD detectives named as defendants (*id.* at ¶¶126-28); and (ix) a *Monell* claim against the County (*id.* at ¶¶129-33).

363.    On May 17, 2021, the County filed their answer to the FAC, denying all of the material allegations and asserting various affirmative defenses. *See* **Exhibit B**.

364.    On May 20, 2021, the Village filed their answer to the FAC, denying all of the material allegations and asserting various affirmative defenses. *See* **Exhibit C**.

365.    On May 15, 2023, plaintiff voluntarily withdrew its third claim (Section 1983

supervisory liability) from the FAC, voluntarily withdrew its fifth claim (intentional or negligent infliction of emotional distress claim against the County and the Village by *respondeat superior*) from the FAC, voluntarily withdrew all claims against Detective Carl Strange, voluntarily withdrew all claims against Detective Rene B. Yao, and voluntarily withdrew all claims against defendants John and Jane Doe 1-20. *See* **Exhibit A**, at ¶¶102-05, 113-16; *see also* May 15, 2023 Rule 41 Stipulation (**Exhibit LLL**).

Dated: White Plains, New York
July 31, 2023

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
*Attorneys for County of Nassau
Defendants*

John A. Vitagliano
Peter A. Meisels

1133 Westchester Avenue
White Plains, NY 10604
(914) 323-7000

HARRIS BEACH PLLC
*Attorneys for Village of Hempstead
Defendants*

William J. Garry, Esq.
Daniel S. Hallak, Esq.
The Omni Building
333 Earle Ovington Blvd.
Uniondale, New York 11553

7139405v.1