UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

JOSIAH GALLOWAY,                                            :       Docket No.
                                                            :       19-CV-5026 (AMD) (JMW)
                                           Plaintiff,       :
                                                            :
                      -against-                             :
                                                            :
NASSAU COUNTY; THE INCORPORATED VILLAGE                     :
OF HEMPSTEAD; Police Officer STEVEN HOROWITZ,               :
Shield No. 144; Detective MATTHEW ROSS, Shield No.          :
834; Detective CHARLES DECARO, Shield No. 1047;             :
Detective RONALD LIPSON, Shield No. 1296; Detective         :
THOMAS DLUGINSKI, Shield No. 7900; Detective                :
GEORGE DARIENZO, Shield No. 1038,                           :
                                                            :
                                                            :
                                           Defendants.      :

-------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## COUNTY DEFENDANTS' MOTION FOR RECONSIDERATION

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Attorneys for County Defendants
1133 Westchester Avenue
White Plains, NY  10604
(914) 323-7000

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................1

I.      No Reasonable Jury Could Conclude that Ross Failed to Intervene, or Directly Participated, With Any Alleged Constitutional Violation Prior to the Line-Up, or that Ross Failed to Intervene With Conduct Where He was a Direct Participant ....................................................................................................3

II.      No Reasonable Jury Could Conclude that Lipson, Decaro, or Darienzo Failed to Intervene, or Directly Participated, With Any Alleged Constitutional Violation Associated with the Non-Suggestive Line-Up ................3

III.     Magliaro's Unreliable, Recanted and Hearsay Affidavit, Which Lacks All Degrees of Trustworthiness, Does Not Create a Genuine Issue of Material Fact .....................................................................................................................4

IV.     Since this Court Found That the Line-Up Was Not Suggestive, By Law, there is No Fair Trial Claim Upon Which Plaintiff can Proceed Related to the Line-Up ...........................................................................................................5

V.      All Defendants Are Entitled to Qualified Immunity for Any Alleged Violation Associated With the Line-Up Based on the Objectively Reasonable Standard ...............................................................................................6

VI.     No Reasonable Jury Could Conclude that Dluginski Failed to Intervene, or Directly Participated, With Any Alleged Constitutional Violation Associated With Ogletree's Statement, and at the Very Least, Dluginski is Entitled to Qualified Immunity ............................................................................7

VII.    The Court Inappropriately Relied on Ogletree's Inadmissible Former Testimony; Any Claim Associated With Ogletree Must Be Dismissed .................8

VII.    Darienzo, Dluginski, and Decaro Did Not Directly Participate, or Fail to Intervene, With Any Violation Associated With the Administration of the Photo Arrays, and at the Very Least, Are Entitled to Qualified Immunity ...........10

IX.     No Defendant Can Be Held Liable for the Alleged Pre-Identification Comment to Hernandez that a Suspect was in Custody Prior to the Photo Array Procedure, and At the Very Least, all Defendants Are Entitled to Qualified Immunity ...............................................................................................11

X.      No Defendant Can Be Held Liable for the Alleged Pre-Identification Comment to Anyosa that Hernandez Identified the Right Person, the

Alleged Post-Identification Confirmatory Remark After the Photo Array, or the Alleged Speculative Post-Identification Remark to Hernandez After the Line-Up ...................................................................................................................12

XI.     Any Alleged, Speculative Evidence That Anyosa Was Shown More Than One (1) Photo Array Does Not Create an Issue of Material Fact, and Assuming *Arguendo* That This Occurred, Lipson Cannot Be Held Liable for Any Fair Trial Claim .......................................................................................14

XII.    This Court Failed To, as Required, Assess the Reliability of All Identification Procedures, Which, Based on the Undisputed Facts, Were Independently Reliable, and No Defendant Can Be Held Liable for a Fair Trial Claim Based on a Theory of Suggestive Identification Procedures .............15

XIII.   Lipson and All Defendants Are Entitled to Qualified Immunity for Any Alleged Pre-Identification Comments and Post-Identification Confirmatory Remarks Comments to Hernandez or Anyosa Since, in 2008, it Was Not Clearly Established That These Alleged Comments Would Violate a Person's Constitutional Rights.................................................................................18

XIV.    Dluginski Cannot Be Liable for Malicious Prosecution, and at the Very Least, Dluginski is Entitled to Qualified Immunity................................................21

XV.     Decaro and Darienzo Cannot Be Liable for Malicious Prosecution, and at the Very Least, They are Entitled to Qualified Immunity .....................................23

XVI.    No Reasonable Jury Could Conclude that Plaintiff's Constitutional Rights Were Violated Based on the Statements/Language in the Felony Complaints ...................................................................................................................24

XVII.   Assuming *Arguendo* that the Photo Array Identification Procedures Were Suggestive, Probable Cause Exists, the Issues of Fact Do Not Rebut the Presumption of Probable Cause Created by the Indictment, the Malicious Prosecution Claim Must Fail, and At the Very Least, All Defendants are Entitled to Qualified Immunity ...........................................................................24

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Abdur Raheem v. Kelly*,
   257 F.3d 122 (2d Cir. 2001)........................................................................6, 15

*Anderson v. Creighton*,
   483 U.S. 635 (1987)....................................................................................6, 7

*Annunziata v. City of N.Y.*,
   2008 U.S. Dist. LEXIS 42097 (S.D.N.Y. May 28, 2008).........................................8

*Arizona v. Youngblood*,
   488 U.S. 51 (1988).....................................................................................15

*Aschcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................1, 2

*Askew v. Lindsay*,
   45 F.4th 573 (2d Cir. 2022) ..........................................................................8

*Bellamy v. City of N.Y.*,
   2017 U.S. Dist. LEXIS 75306 (E.D.N.Y. May 17, 2017) *rev'd on other
   grounds* 914 F.3d 727 .............................................................................8, 9

*Bernard v. United States*,
   25 F.3d 98 (2d Cir. 1994).............................................................................22

*Blau v. Suffolk County*,
   2016 U.S. Dist. LEXIS 12934 (E.D.N.Y. Feb. 3, 2016)........................................23

*Brisco v. Ercole*,
   565 F.3d 80 (2d Cir. 2009)............................................................................19

*Burch v. Blockbuster, Inc.*,
   No. 03-CV-2990, 2005 WL 8158056 (N.D. Ala. July 15, 2005) ...........................8

*Burgess v. DeJoseph*,
   725 F. App'x 36 (2d Cir. 2018) ......................................................................22

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
   769 F.2d 919 (2d Cir. 1985)........................................................................5, 8

*Cerrone v. Brown*,
   246 F.3d 194 (2d Cir. 2001).......................................................................6, 18

*City of Tahlequah v. Bond,*
      142 S. Ct. 9 (2021)...............................................................................................18

*Dawkins v. New York,*
      2011 U.S. Dist. LEXIS 91150 .............................................................................15

*Demosthene v. City of N.Y.,*
      831 F. App'x 530 (2d Cir. 2020) .......................................................................2, 3

*District of Columbia v. Wesby,*
      138 S. Ct. 577 (2018).........................................................................................18

*Doe v. N.Y.C. Dep't of Soc. Servs.,*
      709 F.2d 782, 789 (2d Cir. 1983)...........................................................................1

*Dubois v. Cunningham,*
      2022 U.S App. LEXIS 16830 (2d Cir. June 17, 2022) ..........................................22

*Fappiano v. City of N.Y.,*
      2014 U.S. Dist. LEXIS 179584 (E.D.N.Y. Dec. 31, 2014) *aff'd* 640 F. App'x
      115 (2d Cir. 2016) *cert. denied* 580 U.S. 934 (2016)....................................12, 14, 25

*Figueroa v. Mazza,*
      825 F.3d 89 (2d Cir. 2016)....................................................................................2

*Foster v. California,*
      394 U.S. 440, 89 S.Ct. 1127, 22 L. Ed. 2d 402 (1969)..........................................19

*Ganek v. Leibowitz,*
      874 F.3d 73 (2d Cir. 2017).................................................................................7, 10

*Grant v. City of N.Y.,*
      2019 U.S. Dist. LEXIS 37791 (E.D.N.Y. Mar. 8, 2019) ........................................22

*Greene v. City of N.Y.,*
      2017 U.S. Dist. LEXIS 37243 .........................................................................8, 23

*Hamilton v. City of N.Y.,*
      2019 U.S. Dist. LEXIS 56606 (E.D.N.Y. Mar. 18, 2019) ........................................5

*Haywood v. Bureau of Immigration,*
      372 F. App'x 122 (2d Cir. 2010) .......................................................................3, 4

*Hodge v. City of Long Beach,*
      433 F. App'x 17 (2d Cir. 2011) .............................................................................5

*Horn v. Sammon,*
      2014 U.S. Dist. LEXIS 179754 (S.D.N.Y. Dec. 23, 2014) ......................................8

*Hoyos v. City of N.Y.*,
 999 F. Supp.2d 375 (E.D.N.Y. 2013) *aff'd* 650 F. App'x 801 (2d Cir. 2016)........................23

*Israel v. Odom*,
 521 F.2d 1370 (7th Cir. 1975) ...............................................................................6

*Jarrett v. Headley*,
 802 F.2d 34 (2d Cir. 1986)....................................................................................20

*Jenkins v. City of N.Y.*,
 478 F.3d 76 (2d Cir. 2007).....................................................................................24

*Kee v. City of New York*,
 12 F.4th 150 (2d Cir. 2021) ...................................................................................8

*Keith v. City of N.Y.*,
 2014 U.S. Dist. LEXIS 166469 (S.D.N.Y. Dec. 1, 2014) *aff'd* 641 F. App'x 63
 (2d Cir. 2016)...............................................................................................22, 25

*Kulak v. City of N.Y.*,
 88 F.3d 63 (2d Cir. 1996).....................................................................................11

*Learning Annex Holdings, LLC v. Rich Global, LLC*,
 860 F. Supp. 2d 237 (S.D.N.Y. 2012).......................................................................2

*Lichtenberg v. Besicorp Grp. Inc.*,
 28 F. App'x 73 (2d Cir. 2002) ...............................................................................2

*Matter of Liotti*,
 2024 N.Y. App. Div. LEXIS 1286, 2024 NY Slip Op 01310 (2d Dep't Mar.
 13, 2024) ..........................................................................................................5

*Malarczyk v. Lovgren*,
 2023 U.S. App. LEXIS 30909 (2d Cir. Nov. 21, 2023).................................................22

*Manson v. Brathwaite*,
 432 U.S. 98 (1977)..............................................................................................6

*Mara v. Rilling*,
 921 F.3d 48 (2d Cir. 2019).....................................................................................24

*Marom v. City of N.Y.*,
 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) .........................................3, 13

*Martinez v. Simonetti*,
 202 F.3d 625 (2d Cir. 2000)..................................................................................22

*Monclova v. City of New York*,
  2017 U.S. Dist. LEXIS 218039 (E.D.N.Y. Mar. 31, 2017) ......................................8

*Monclova v. City of New York*,
  726 F. App'x 83 (2d Cir. 2018) ......................................8

*Morse v. Spitzer*,
  2012 U.S. Dist. LEXIS 110241 (E.D.N.Y. Aug. 3, 2012) ......................................23

*Murphy v. Metro. Transp. Auth.*,
  548 F. Supp. 2d 29 (S.D.N.Y. 2008) ......................................8

*Neil v. Biggers*,
  409 U.S. 188 (1972) ......................................16, 21

*Norwood v. Mason*,
  524 F. App'x 762 (2d Cir. 2013) ......................................22, 23

*O'Brien v. City of Yonkers*,
  2013 U.S. Dist. LEXIS 43551 (S.D.N.Y. Mar. 22, 2013) ......................................8

*Oquendo v. City of N.Y.*,
  2017 U.S. Dist. LEXIS 223189 (E.D.N.Y. Nov. 15, 2017), *aff'd* 77 F. App'x
  703 (2d Cir. 2019) ......................................23

*Outlaw v. City of Hartford*,
  884 F.3d 351 (2d Cir. 2018) ......................................7

*Panetta v. Crowley*,
  460 F.3d 388 (2d Cir. 2006) ......................................22

*Patterson v. County of Oneida*,
  375 F.3d 206 (2d Cir. 2004) ......................................5, 8

*Perry v. New Hampshire*,
  565 U.S. 228 (2012) ......................................6

*Pettus v. City of N.Y.*,
  2011 U.S. Dist. LEXIS 114129 (E.D.N.Y. Aug. 23, 2011) ......................................8

*Polanco v. City of N.Y.*,
  2018 U.S. Dist. LEXIS 54758 (S.D.N.Y. Mar. 28, 2018) ......................................23

*Ragunauth v. Ercole*,
  2008 U.S. Dist. LEXIS 103892 (E.D.N.Y. Dec. 23, 2008) ......................................17

*Robinson v. City of N.Y.*,
  2017 U.S. Dist. LEXIS 85025 (S.D.N.Y. June 1, 2017) ......................................7, 10

*Ross v. City of N.Y.*,
   2019 U.S. Dist. LEXIS 169762 (E.D.N.Y. Sept. 30, 2019)....................................23

*Schlaepfer v. City of N.Y.*,
   2022 U.S. Dist. LEXIS 175327 (S.D.N.Y. Sept. 27, 2022)...................................23

*Sellers v. M.C. Floor Crafters, Inc.*,
   842 F.2d 639 (2d Cir. 1988)...................................................................................5

*Sexton v. Beaudeaux*,
   138 S. Ct. 2555 (2018)..........................................................................................19

*Shrader v. CSX Transp., Inc.*,
   70 F.3d 255 (2d Cir. 1995)......................................................................................2

*Simmons v. United States*,
   390 U.S. 377 (1968)...............................................................................................19

*Sloley v. Vanbramer*,
   945 F.3d 30, 47 (2d Cir. 2019) ...............................................................................2

*Solomon v. Smith*,
   645 F.2d 1179 (2d Cir. 1981)...........................................................................20, 21

*Stansbury v. Wertman*,
   721 F.3d 84 (2d Cir. 2013)....................................................................................24

*Taylor v. Kuhlmann*,
   36 F. Supp. 2d 534 (E.D.N.Y. 1999) .....................................................................17

*Torres v. City of N.Y.*,
   2017 U.S. Dist. LEXIS 158883 (E.D.N.Y. Sept. 27, 2017)...................................23

*United States v. Amato*,
   2006 U.S. Dist. LEXIS 43366 (E.D.N.Y. June 27, 2006) *aff'd* 306 F. App'x
   630 (2d Cir. 2009)....................................................................................................8

*United States v. Bagley*,
   473 U.S. 667 (1985)...............................................................................................15

*United States v. Brown*,
   167 F. Supp. 3d 447 (W.D.N.Y. 2016) ..................................................................20

*United States v. DiNapoli*,
   8 F.3d 909 (2d Cir. 1993).........................................................................................8

*United States v. Jarvis*,
   560 F.2d 494 (2d Cir. 1977)...................................................................................20

*United States v. Leonardi*,
    623 F.2d 746 (2d Cir. 1980)............................................................................16, 17, 18, 20

*United States v. Salerno*,
    505 U.S. 317 (1992)...........................................................................................................9

*United States v. Thai*,
    29 F.3d 785 (2d Cir. 1994)........................................................................................19, 20

*United States v. Woodford*,
    2019 U.S. Dist. LEXIS 184496 (E.D.N.Y. Oct. 23, 2019)......................................20

*Vornado Realty Tr. V. Marubeni Sustainable Energy, Inc.*,
    987 F. Supp. 2d 267 (E.D.N.Y. 2013) ...................................................................2

*Watts v. City of Hartford*,
    No. 00-CV-0681, 2004 WL 717132 (D. Conn. Mar. 31, 2004) ............................8

*White v. Pauly*,
    580 U.S. 73 (2017)...........................................................................................................22

*Wilson v. Bantum*,
    1993 U.S. Dist. LEXIS 5924 (E.D.N.Y. Apr. 28, 1993) .................................18, 20

*Wood v. Moss*,
    134 S. Ct. 2056, 2065 n.4 (2014) ..........................................................................1

*Wright v. Smith*,
    21 F.3d 496 (2d Cir. 1994)...........................................................................................11

*Wright v. Undercover Officer*,
    2018 U.S. Dist. LEXIS 143483 (S.D.N.Y. Aug. 22, 2018)...................................8

**Statutes**

42 U.S.C. § 1983.......................................................................................................2, 8, 11, 24

**Rules**

Fed. R. Civ. P. 56(c)(4).................................................................................................5

Fed. R. Evid. 804(a).....................................................................................................8

Fed. R. Evid. 804(b).....................................................................................................8

Fed. R. Evid. 804(b)(1)..............................................................................................8, 9

Fed. R. Evid. 807 ......................................................................................................5, 9

Local Civil Rule 6.3 ...................................................................................................................1

Rule 56.1 ....................................................................................................................................1

**Other Authorities**

Fourth Amendment ...........................................................................................................22, 23

*Black's Law Dictionary* (11th ed. 2019)...........................................................................12, 13

Fed. R. Evid. 804(b)(1) – Notes of Committee on the Judiciary, House Report No.
    93-650 ...................................................................................................................................9

## PRELIMINARY STATEMENT

Defendants Nassau County (the "County"), Detectives Charles Decaro ("Decaro"), Thomas Dluginski ("Dluginski") and George Darienzo ("Darienzo"), and retired Detectives Matthew Ross ("Ross") and Ronald Lipson ("Lipson"), (collectively, the "County defendants"), seek reconsideration, pursuant to Local Civil Rule 6.3, of this Court's March 29, 2024 Decision and Order. *See* ECF No. 220.

It is respectfully submitted that the Court overlooked Supreme Court and Second Circuit controlling precedent, did not consider all relevant undisputed facts on the summary judgment record[1], and incorrectly analyzed the case law cited by the County defendants in their arguments. The Court failed to, as required: individually analyze each defendants' involvement to determine whether they were a direct participant or failed to intervene; continued claims against defendants who were not present when alleged constitutional violations occurred; found unwarranted disputes of material fact based on evidence that is inadmissible, purely speculative or based on conjecture; failed to, as required, assess the independent reliability of the witness's and the victim's identifications; and incorrectly analyzed, or failed to analyze, the doctrine of qualified immunity[2] as related to the various claims. Respectfully, reconsideration of this Court's denial of the County defendants' summary judgment motion must be granted to "correct [] clear error [and] prevent manifest injustice." *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983).

## ARGUMENT

A motion for reconsideration is proper where the moving party demonstrates "that the

---

[1] Citations to defendants' joint Rule 56.1 statement ("Def. 56.1") are to ECF No. 200. Citations to the plaintiff's Rule 56.1 statement ("Pl. 56.1") are to ECF No. 209.

[2] The Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of the litigation," *Wood v. Moss*, 134 S. Ct. 2056, 2065 n.4 (2014), and that qualified immunity confers not merely a defense to liability, but the right "not to stand trial or face the other burdens of litigation." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).

Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion," *Lichtenberg v. Besicorp Grp. Inc.,* 28 F. App'x 73, 74 (2d Cir. 2002), and that those matters "might reasonably be expected to alter the conclusion reached by the [C]ourt." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). The decision to grant or deny a motion for reconsideration remains within the "sound discretion of the district court." *Learning Annex Holdings, LLC v. Rich Global, LLC*, 860 F. Supp. 2d 237, 241 (S.D.N.Y. 2012). Since the denial of a motion for summary judgment is an interlocutory order, "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *See Vornado Realty Tr. V. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 276 (E.D.N.Y. 2013).

Pursuant to § 1983, the Court must address the theories of liability for each of the various defendants and, more specifically, requires an analysis of whether each defendant was personally involved in the purported unconstitutional conduct. The defendants may not be lumped together in this manner if the Court believes that one of them may have violated the Constitution. *See* ECF No. 220, p. 15, n. 12; *Aschcroft*, 556 U.S. at 677 (requiring that each defendant to be shown to be personally involved in a constitutional violation). Moreover, the Court must address whether each of defendants could have intervened in each other's alleged acts. *See* ECF No. 220, p. 37; *Demosthene v. City of N.Y.*, 831 F. App'x 530, 535 (2d Cir. 2020) ("[i]t is axiomatic that claims under § 1983 for [] failure to intervene require[s] personal involvement to trigger liability"); *Sloley v. Vanbramer*, 945 F.3d 30, 47 (2d Cir. 2019). For a failure to intervene claim, "[t]he essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a tacit collaborator in the unlawful conduct of another." *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016).

**I.     No Reasonable Jury Could Conclude that Ross Failed to Intervene, or Directly Participated, With Any Alleged Constitutional Violation Prior to the Line-Up, or that Ross Failed to Intervene With Conduct Where He was a Direct Participant.**

It is ***undisputed***, and plaintiff admitted to this Court at the March 13, 2024 oral argument ("3/13 Tr."), that Ross only became involved ***after*** plaintiff was indicted (*see* 3/13 Tr., 10:12-20), and that Ross' sole involvement is limited to the line-up procedures. *See* 3/13 Tr., 8:11-22, 13:15-20; *see also* Def. 56.1, ¶¶59, 126, 147, 168, 208-09, 272.  Based on plaintiff's judicial admissions to this Court, the undisputed facts, and the controlling law, since Ross was not involved with, or present for, any aspects of the investigation prior to the line-up, no reasonable jury could conclude that Ross failed to intervene, or directly participated with any alleged constitutional violation prior to the line-up procedures. *See Haywood v. Bureau of Immigration*, 372 F. App'x 122, 124 (2d Cir. 2010) (admission made by a party's attorney during a proceeding constitutes a judicial admission); *Demosthene,* 831 F. App'x at 535 (Second Circuit affirmed dismissal of § 1983 claim, including failure to intervene, against defendant who was not present when alleged constitutional violation occurred). Nor could Ross "be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation." *Marom v. City of N.Y.*, 2016 U.S. Dist. LEXIS 28466, at *65-66 (S.D.N.Y. Mar. 7, 2016).

**II.    No Reasonable Jury Could Conclude that Lipson, Decaro, or Darienzo Failed to Intervene, or Directly Participated, With Any Alleged Constitutional Violation Associated with the Non-Suggestive Line-Up.**

Here, the record on summary judgment demonstrates that it is ***undisputed*** that Lipson and Decaro were not present for the line-up and "did not play any role and [were] not involved in conducting or setting up the lineup procedure where plaintiff was the subject of the line-up." *See* Def. 56.1, ¶273.  Thus, no reasonable jury could conclude that they failed to intervene, or directly participated with any alleged violation associated with the line-up procedures.

With respect to Darienzo, the record demonstrates that it is ***undisputed*** that:

- Darienzo was assigned to Hernandez to ensure that Hernandez was separated from everybody else involved in the line-up procedure. *See* Def. 56.1, ¶251.
- Hernandez was brought to a private room in the NCPD Third Precinct with Darienzo. *Id.*, ¶252.
- After Hernandez selected plaintiff, he was escorted back to Darienzo. *Id.*, ¶257.

Darienzo's involvement in the line-up was limited and confined to keeping Hernandez separate from everyone and everything associated with conducting the line-up procedure. The record evidence and the undisputed facts show that Darienzo was not present for the administration of the line-up, and did not assist in preparing or coordinating the line-up procedure.[3] This Court correctly found that the line-up procedures employed were not unduly suggestive. *See* ECF No. 220, p. 21-22. As such, Darienzo would never had known that the plaintiff's rights were allegedly violated, and thus, could not possibly have had a realistic opportunity to intervene. *See* ECF No. 192, p. 30-31. Thus, Darienzo cannot be found to have failed to intervene, or have directly participated with any alleged violation associated with the line-up.

### III. Magliaro's Unreliable, Recanted and Hearsay Affidavit, Which Lacks All Degrees of Trustworthiness, Does Not Create a Genuine Issue of Material Fact.

The Court improperly relied on the affidavit of Lori Magliaro ("Magliaro"), Ross' fiancé, to create an issue of material fact. *See* ECF No. 220, p. 22-23. Plaintiff admitted to this Court that the record is devoid of evidence that Ross was even made aware of the alleged discrepancies between the described shooter and the plaintiff. *See* 3/13 Tr., 9:18-10:4. Plaintiff further admitted to this Court that without Magliaro's affidavit, there is no evidence that Ross violated plaintiff's rights, with plaintiff also admitting, and this Court recognizing, that this affidavit is dubious and weak evidence. *Id.* at 11:2-5; 13:9-14; 21:14-24; *Haywood*, 372 F. App'x at 124. Additional

---

[3] Plaintiff concedes as much as demonstrated by his failure to argue Darienzo was involved with the line-up procedure in his summary judgment opposition papers. *See* ECF No. 202, p. 9-10.

evidence surfaced on March 13, 2024, the same day that this Court held oral argument, demonstrating that this affidavit is meritless and completely unreliable, as Thomas Liotti, the (former) attorney who drafted and prepared this affidavit, was suspended from the practice of law due his misconduct while acting in his capacity as an attorney. *See Matter of Liotti*, 2024 N.Y. App. Div. LEXIS 1286, 2024 NY Slip Op 01310 (2d Dep't Mar. 13, 2024).

This Court overlooked that Magliaro's affidavit is inadmissible hearsay, as it is not based on personal knowledge, is filled with unsupported and conclusory allegations, and as the Court noted in its decision (*see* ECF No. 220, p. 22-23), Magliaro's deposition testimony demonstrates she is not competent to testify as to the matters asserted in the affidavit. Fed R. Civ. P. 56(c)(4); *Patterson v. County of Oneida*, 375 F.3d 206, 219, 221-22 (2d Cir. 2004); *Hodge v. City of Long Beach*, 433 F. App'x 17, 19 (2d Cir. 2011); *Hamilton v. City of N.Y.*, 2019 U.S. Dist. LEXIS 56606, at *34-35 (E.D.N.Y. Mar. 18, 2019) *citing Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988). There is nothing to corroborate this affidavit or to demonstrate that "the statement is supported by sufficient guarantees of trustworthiness" to consider it as admissible evidence. *See* Fed. R. Evid. 807. Thus, Magliaro's affidavit is insufficient to create an issue of material fact.

**IV.    Since this Court Found That the Line-Up Was Not Suggestive, By Law, there is No Fair Trial Claim Upon Which Plaintiff Can Proceed Related to the Line-Up.**

This Court correctly found that the line-up procedures employed were not unduly suggestive. However, contrary to controlling law, this Court erroneously concluded that "there are disputes of material fact about whether Detective Ross used otherwise acceptable line-up procedures with the intent to conceal the plaintiff's height and deprive him of a fair trial." *See* ECF No. 220, p. 23. The Due Process Clause is only violated where an individual is convicted based on identification evidence that has "a very substantial likelihood of irreparable misidentification" due

to police-arranged suggestive circumstances, i.e. a conviction based on unduly suggestive identification evidence. *See Perry v. New Hampshire*, 565 U.S. 228 (2012). The Supreme Court of the United States has held "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.*, at 248. Thus, ***where the identification procedure is not unduly suggestive, there is no Due Process violation***. *Id.* "If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; no further inquiry by the court is required." *Abdur Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) (internal citation omitted). Where, as here, it is undisputed that this Court found that the line-up was not unduly suggestive, whether there was an intent or motive to create suggestive circumstances or deny plaintiff of a fair trial is not material.[4] *Id.*, at 137.

Thus, Ross' (and Dluginski's) intent or motive for using acceptable non-suggestive line-up procedures is irrelevant. As such, any fair trial claim based on the acceptable non-suggestive line-up should be dismissed, and Ross should be dismissed as a named defendant in this lawsuit.

## V.   All Defendants Are Entitled to Qualified Immunity for Any Alleged Violation Associated With the Line-Up Based on the Objectively Reasonable Standard.

Officers are entitled to qualified immunity if their conduct was objectively reasonable. *See Cerrone v.* Brown, 246 F.3d 194, 199 (2d Cir. 2001); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (for qualified immunity, based on objectively reasonable test, a police officer's subjective intent or beliefs are irrelevant).  As the Supreme Court of the United States and Courts throughout the Second Circuit have noted, this standard is objective, "asking not whether the defendant officer

---

[4] *See generally Manson v. Brathwaite*, 432 U.S. 98, 112-14 (1977) (question of whether the police procedures constituted misconduct is not determinative of whether an identification was suggestive); *citing Israel v. Odom*, 521 F.2d 1370, 1374 n.7 (7th Cir. 1975) (where witness emphasized that the assailant was wearing glasses, the "suggestiveness of the identification procedure resulted, not from police motive or misbehavior, but from the fact that [the defendant] was the only lineup participant to be wearing glasses").

acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) *citing Anderson*, 483 U.S. at 640-41.  Since, pursuant to this objective standard, an officer's subjective belief or intent for the conduct is irrelevant, and, as this Court found, the line-up procedures employed were not unduly suggestive, any reasonable police officer would have believed that the practices utilized during the line-up procedures in this case were lawful.  Thus, Ross and all the defendants are entitled to qualified immunity for any conduct associated with, or practices utilized during, the line-up.

**VI.    No Reasonable Jury Could Conclude that Dluginski Failed to Intervene, or Directly Participated, With Any Alleged Constitutional Violation Associated With Ogletree's Statement, and at the Very Least, Dluginski is Entitled to Qualified Immunity.**

Here, the record on summary judgment demonstrates that it is ***undisputed*** that:

- Dluginski was not working on June 5, 2008, and not working on June 6, 2008 when he was notified that plaintiff was a suspect in the Anyosa shooting and was asked to come in to process the plaintiff's arrest related to this shooting. *See* Def. 56.1, ¶178.
- On June 6, 2008, after Dluginski came into work at the NCPD Third Squad, he drove to the Hempstead Armory ("Armory"), spoke with Decaro about the results of the investigation into the Anyosa shooting, and was not told that Ogletree was coerced into signing a statement about the plaintiff. *Id.*, ¶179; Pl. 56.1, ¶¶199-200.
- Dluginski was not present when, and did not speak with, plaintiff or Ogletree when they were questioned at the Armory on June 6, 2008. *See* Def. 56.1, ¶155.[5]

As Dluginski was not present when, had no knowledge of, and failed to participate in the procurement of Ogletree's statement, or the alleged suppression of how it was procured, no reasonable jury could conclude that he could be liable for any claim, or for failing to intervene, for any conduct related to this statement. At the very least, Dluginski is entitled to qualified immunity.[6]

---

[5] While plaintiff disputes whether Dluginski spoke with the plaintiff at the Armory, plaintiff does not dispute, nor does any evidence in the record suggest, that Dluginski spoke or interacted with Ogletree at the Armory.

[6] *See Ganek v. Leibowitz*, 874 F.3d 73, 90-91 (2d Cir. 2017) (qualified immunity granted on evidence fabrication claim); *Robinson v. City of N.Y.*, 2017 U.S. Dist. LEXIS 85025, at *18-19 (S.D.N.Y. June 1, 2017) (officer entitled to qualified immunity since there was no evidence that he "was aware of, or participated in any fabrication of evidence.").

**VII.    The Court Inappropriately Relied on Ogletree's Inadmissible Former Testimony; Any Claim Associated With Ogletree Must Be Dismissed.**

This Court overlooked a plethora of controlling precedent, including this Court's own previous decisions[7], when it considered Ogletree's former inadmissible trial testimony to create an issue of fact.  As this Court has held, specifically on a § 1983 case excluding former inadmissible hearsay testimony for failure to comply with Fed. R. Evid. 804(b)(1), "[i]n considering motions for summary judgment, _**a court can consider only admissible evidence**_." See Greene v. City of N.Y., 2017 U.S. Dist. LEXIS 37243, at \*55-56 (E.D.N.Y. Mar. 15, 2017) aff'd 742 F. App'x 532 (2d Cir. 2018) (emphasis added). This Court completely disregarded plaintiff's burden to show that Ogletree was unavailable. See Fed. R. Evid. 804(a) and 804(b); Askew v. Lindsay, 45 F.4th 573, 576-77 (2d Cir. 2022). The law cited by this Court is either inapplicable to former testimony evidence or supports that this former testimony should be disregarded on summary judgment.[8]

More importantly, this Court erroneously rationalized, against Supreme Court precedent,

---

[7] Courts throughout the Second Circuit, including this Court, specifically on § 1983 cases, have held that former testimony is inadmissible, at either summary judgment or trial, where all the elements of Fed. R. Evid. 804(b)(1) have not been satisfied. See Greene v. City of N.Y., 2017 U.S. Dist. LEXIS 37243, at \*55-56; Bellamy v. City of N.Y., 2017 U.S. Dist. LEXIS 75306, at \*87-92 (E.D.N.Y. May 17, 2017) rev'd on other grounds 914 F.3d 727 (2d Cir. 2019); Patterson, 375 F.3d at 219-20, 222; United States v. DiNapoli, 8 F.3d 909 (2d Cir. 1993); United States v. Amato, 2006 U.S. Dist. LEXIS 43366 (E.D.N.Y. June 27, 2006) aff'd 306 F. App'x 630, 632 (2d Cir. 2009); Annunziata v. City of N.Y., 2008 U.S. Dist. LEXIS 42097, at \*28-36 (S.D.N.Y. May 28, 2008); O'Brien v. City of Yonkers, 2013 U.S. Dist. LEXIS 43551, at \*23 (S.D.N.Y. Mar. 22, 2013); Wright v. Undercover Officer, 2018 U.S. Dist. LEXIS 143483, at \*14 n.7 (S.D.N.Y. Aug. 22, 2018); Pettus v. City of N.Y., 2011 U.S. Dist. LEXIS 114129, at \*18-20 (E.D.N.Y. Aug. 23, 2011); Horn v. Sammon, 2014 U.S. Dist. LEXIS 179754, at \*4-6 (S.D.N.Y. Dec. 23, 2014).

[8] This Court cites Kee v. City of New York, 12 F.4th 150, 168 (2d Cir. 2021). However, the availability of evidence addressed in Kee is inadmissible hearsay in arrest paperwork, _**not**_ inadmissible former testimony. Id. This Court cites Burlington Coat Factory Warehouse Corp., 769 F.2d at 924. However, the evidence the Second Circuit addressed in Burlington Coat Factory Warehouse Corp. was _**not**_ inadmissible former testimony, and also does not rely on the hearsay evidence because plaintiff made no showing that the "admissible evidence will be available at trial." Id. This Court cites Burch v. Blockbuster, Inc., No. 03-CV-2990, 2005 WL 8158056, at \*1 (N.D. Ala. July 15, 2005), which addressed former testimony pursuant to Fed. R. Evid. 804(b)(1). However, in granting summary judgment, the Court in Burch, _**refused to consider the former transcripts since this inadmissible evidence did not comply with all the elements required by Fed. R. Evid. 804(b)(1).**_ Id. This Court cites Monclova v. City of New York, 726 F. App'x 83, 84-85 (2d Cir. 2018).  However, the evidence the Second Circuit addressed in Monclova was excerpts of from disciplinary hearings that plaintiff was a party to (id.; Monclova v. City of New York, 2017 U.S. Dist. LEXIS 218039 (E.D.N.Y. Mar. 31, 2017)), as opposed to Ogletree's former testimony here where _**none of the defendants were a party to plaintiff's criminal trial**_. This Court cites Murphy v. Metro. Transp. Auth., 548 F. Supp. 2d 29, 43-44 (S.D.N.Y. 2008) and Watts v. City of Hartford, No. 00-CV-0681, 2004 WL 717132, at \*4 n.10 (D. Conn. Mar. 31, 2004). However, the evidence the Courts addressed in Murphy and Watts was _**not**_ inadmissible former testimony.

that since Ogletree is not dead and might be available to testify, the Court can consider his prior testimony, without satisfying the remaining necessary and requisite elements of Fed. R. Evid. 804(b)(1).[9]  Unavailability is just one element.  The Supreme Court of the United States has held that former testimony is not admissible evidence without showing a similar motive, specifically stating "[n]othing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements." *United States v. Salerno*, 505 U.S. 317, 321-22 (1992) (party "had no right to introduce [] former testimony under Rule 804(b)(1) without showing a 'similar motive.'  This Court cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases.").  Here, ***none of the elements of Fed. R. Evid. 804(b)(1) can be satisfied to permit this Court to consider Ogletree's trial testimony as admissible to create an issue of fact***.

Here: (1) the defendants were not parties to plaintiff's criminal trial; (2) ADA Schalk did not represent the defendants at plaintiff's criminal trial; (3) the defendants and the County are not in privity with New York State ("State") or the members of the Nassau County District Attorney's Office; (4) the State was not a predecessor in interest to the County defendants; and (5) the County defendants did not have the same opportunity or motive to cross-examine Ogletree at plaintiff's criminal trial. *See* ECF No. 210, p. 8-9, 16-17; ECF No. 192, p. 14-15; *Bellamy*, 2017 U.S. Dist. LEXIS 75306, at \*87-92.  Pursuant to controlling, black letter law, Ogletree's former testimony is inadmissible[10], should not have been considered by this Court, and cannot create an issue of fact.

---

[9] With respect Fed. R. Evid. 804(b)(1), the Notes of Committee on the Judiciary, House Report No. 93-650, explains "[t]he Committee considered that it is generally unfair to impose upon the party against whom the hearsay evidence is being offered responsibility for the manner in which the witness was previously handled by another party.  The sole exception to this, in the Committee's view, is when a party's predecessor in interest in a civil action or proceeding had an opportunity and similar motive to examine the witness."

[10] There is no basis to consider Ogletree's former testimony pursuant to Fed. R. Evid. 807. *See* ECF No. 220, p. 17 n.13. There is absolutely no corroboration in the record demonstrating that "the statement is supported by sufficient guarantees of trustworthiness."  The record only demonstrates how this testimony is uncorroborated, unreliable, and not trustworthy. *See* ECF No. 210, p. 17; ECF No. 192, p. 20; 3/13 Tr., 25:4-11; Def. 56.1, ¶¶76-77, 309-14.

**VIII.   Darienzo, Dluginski, and Decaro Did Not Directly Participate, or Fail to Intervene, With Any Violation Associated With the Administration of the Photo Arrays, and at the Very Least, Are Entitled to Qualified Immunity.**

Assuming *arguendo* that Hernandez was told that a suspect was in custody prior to viewing the photo array (*see* ECF No. 220, p. 25-26), that Anyosa was told Hernandez selected the right person before Anyosa looked at the photo array (*id.*, p. 24), that Anyosa was told he selected the right person **_after_** he identified the plaintiff from the photo array (*id.*), and that Anyosa was presented with more than one photo array (*id.*, p. 27-28), Darienzo, Dluginski and Decaro cannot be held liable for any claims, including failure to intervene, associated with this conduct.

Here, the record on summary judgment demonstrates that it is **_undisputed_** that:

- Darienzo, Ross, Decaro, and Dluginski were not present when the photo array was administered to Hernandez. *See* Def. 56.1, ¶273.
- Lipson drove to Anyosa's house to present Anyosa with a photo array. *Id.*, ¶156.
- Darienzo, Ross, Decaro, and Dluginski were not present when the photo array was administered to Anyosa. *Id.*, ¶168.
- Darienzo and Lipson never discussed the photo array identification procedures that Lipson presented to Hernandez and Anyosa. *Id.*, ¶166.
- Decaro was never told that Anyosa was informed that he selected the right guy after Anyosa positively identified the plaintiff from the photo array. *Id.*, ¶165.
- Dluginski was never told that Anyosa was told that he selected the right guy after Anyosa positively identified the plaintiff from the photo array. *Id.*, ¶167.

The above undisputed facts show that Darienzo, Dluginski, and Decaro were not present for the administration of the photo arrays to Hernandez and Anyosa, were never informed of any remarks allegedly made to Anyosa during its administration, and were never advised that multiple photo arrays were allegedly presented to Anyosa. Having no knowledge of, and failing to have participated in, the administration of the photo arrays, no reasonable jury could conclude that Decaro, Darienzo, and Dluginski could be liable for any claim, under any theory, for any conduct related to these photo arrays, and at the very least, are entitled to qualified immunity. *See Ganek*, 874 F.3d at 90-91; *Robinson*, 2017 U.S. Dist. LEXIS 85025, at *18-19.

IX.     **No Defendant Can Be Held Liable for the Alleged Pre-Identification Comment to Hernandez that a Suspect was in Custody Prior to the Photo Array Procedure, and At the Very Least, all Defendants Are Entitled to Qualified Immunity.**

No defendant can be held liable for the alleged statement to Hernandez regarding a suspect in custody prior to viewing the photo array. *See* ECF No. 220, p. 25-26.  As in all § 1983 cases, a defendant can only be held liable if they were "personally involved" or "directly participated" in any constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  The evidence referenced by the Court on this issue is insufficient to defeat summary judgment here because it is black letter law that "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *See Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996). There is no evidence to corroborate the identity of the person who allegedly made this statement, whether this statement was made over the phone or in-person, the identity of which police department (if any) the person who made this statement was employed by, and no evidence to connect this alleged statement to any of the defendants to demonstrate personal involvement.

Even accepting this statement as true, this Court correctly concluded that if Hernandez knew that a suspect was in custody prior to viewing an identification procedure, said identification procedure is not unduly suggestive. *See* ECF No. 220, p. 25-26.  However, this Court then inappropriately found whether Hernandez was advised that anyone was in custody was an issue of fact "for a jury to resolve, not the Court of summary judgment," (*id.*, p. 25), and then generalized that there were issues of fact as to whether Hernandez's identification procedures (both the photo array and the line-up) were suggestive. *Id.*, p. 27, 29, 35.  It is error to merge the photo array (taking place on June 6, 2008) and line-up (taking place on August 14, 2008) together and find there are issues of fact for all identification procedures administered to Hernandez.

The **_only_** disputed fact with respect to Hernandez's photo array is whether an unidentified,

-11-

unnamed person told him that a suspect was in custody.  This Court correctly states that this "fact alone does not make the identification procedure unduly suggestive." *Id.*, p. 25.  By application, there can be no finding that Hernandez's photo array was unduly suggestive or that the plaintiff was denied a fair trial as a result of this alleged remark. *See* ECF No. 217, p. 2, n. 9.

As previously relayed to the Court (*id.*), in 2008, there was no clearly established right that informing a witness that a suspect was in custody prior to said witness viewing an identification procedure would violate an individual's constitutional rights.  Plaintiff and this Court cannot point to any such case.   In addition, where a witness is informed of a suspect's name during an identification procedure is neither suggestive, nor a due process violation. *See* ECF No. 192, p. 22. Thus Lipson, and all other defendants, are entitled to qualified immunity.

## X.    No Defendant Can Be Held Liable for the Alleged Pre-Identification Comment to Anyosa that Hernandez Identified the Right Person, the Alleged Post-Identification Confirmatory Remark After the Photo Array, or the Alleged Speculative Post-Identification Remark to Hernandez After the Line-Up.

The Court overlooked summary judgment precedent (*see* ECF No. 192, p. 4), that "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment, and [m]ere conclusory allegations or denials … cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Fappiano v. City of N.Y.*, 2014 U.S. Dist. LEXIS 179584, at *49-50 (E.D.N.Y. Dec. 31, 2014) *aff'd* 640 F. App'x 115 (2d Cir. 2016) *cert. denied* 580 U.S. 934 (2016) (internal citations and quotations omitted). This Court improperly identifies multiple facts in dispute, that when reviewing the record presented on summary judgment, are based on evidence that is clearly speculative, conclusory, conjecture, unreliable, or inadmissible, all of which are insufficient to create an issue of fact.[11]

---

[11] Definition of the word conclusory is "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 362 (11th ed. 2019).  Definition of the word conjecture is "[a] guess;

This Court found an issue of fact because "Hernandez also testified in his deposition that unnamed detectives 'possibly' told him after he identified the plaintiff in the line-up that he selected the right person, but that he was not sure and could not remember." *See* ECF No. 220, p. 26. However, there is ***nothing in the record on summary judgment to support this conjectural and speculative testimony***. As such, this does not create a genuine issue of fact. As further demonstrated below, even if this statement was made to Hernandez, the undisputed facts and the summary judgment record demonstrate that Hernandez's line-up identification was nevertheless independently reliable and, as a result, precludes the finding of any due process violation.

The Court also cherry-picked Anyosa's deposition testimony when inferring that Lipson allegedly told Anyosa that Hernandez had selected the right person (*see* ECF No. 220, p. 24)[12], when a review of his entire testimony demonstrates that Anyosa also testified, "I don't remember, sir, but I think so they told me that or somebody told me or Wilmer told me that probably. I have no idea." *See* ECF No. 194-67 at 29. This is a textbook example of evidence that is "speculative," "conjectural," and "conclusory," and is insufficient to create a material issue of fact.

With respect to the allegation that Lipson[13] told Anyosa that he selected the right guy ***after*** Anyosa selected plaintiff from the photo array, ADA Anania's notes, as previously relayed to this Court (*see* ECF No. 210, p. 10-11; ECF No. 192, p. 18 n. 7) are inadmissible hearsay that lacks all guarantees of trustworthiness. This alleged statement is tainted since it was made ***after*** ADA Anania administered the only unquestionably suggestive identification procedure in this case by presenting a single photograph to Anyosa, over ten (10) years after the shooting. *See* Pl. 56.1, ¶92;

---

supposition; surmise." *Id.*, at 377. Definition of the word speculation is "[t]he practice or an instance of theorizing about matters over which there is no certain knowledge." *Id.*, at 1687.

[12] This fact is not even in dispute on the summary judgment record. *See* Pl. 56.1, ¶458.

[13] Since it is undisputed (*see* Point VIII *supra*) that Lipson was the only defendant present and associated with administering the photo array to Anyosa, he cannot be held liable for failing to intervene for any alleged violation regarding the administration of the photo array to Anyosa. *See Marom*, 2016 U.S. Dist. LEXIS 28466, at *65-66.

-13-

ECF No. 208-3 at 58-59.  Regardless, this Court overlooked Anyosa's deposition testimony as a whole, since he repeatedly testified "[the officers] never said that, when I was picking up, that's the guy. No.  They never say that to me" (*see* ECF No. 194-67 at 24), "[t]he detective never told me ID the right person (*id.*, at 17), that he does not remember this statement being made to him after he selected plaintiff from the photo array, and when he says that this statement was probably made, he was guessing (*id.*, at 40-41).  The evidence relied on to find this dispute of fact is clearly conjecture, conclusory, speculative, and unreliable.

XI.     **Any Alleged, Speculative Evidence That Anyosa Was Shown More Than One (1) Photo Array Does Not Create an Issue of Material Fact, and Assuming *Arguendo* That This Occurred, Lipson Cannot Be Held Liable for Any Fair Trial Claim**.

This Court overlooked controlling precedent when it found that there was a material fact as to whether Lipson showed Anyosa more than one (1) photo array as to plaintiff's fair trial claim based on suppression of evidence. *See* ECF No. 220, p. 27-28, 40.  When reviewing Anyosa's trial transcript on this topic in totality, it is purely conjecture. This Court also makes an impermissible inference to suggest that "[i]f Anyosa looked at a photographic array that included the plaintiff's photograph, and did not identify him," it would have been "exculpatory" evidence. *Id.*, p. 28. All the record evidence shows only one photo array was presented to Anyosa. *See* ECF No. 217, p. 3, n. 12.  There could not possibly have been another photo array with a different photograph of the plaintiff shown to Anyosa.  It is ***undisputed*** that Lipson typed plaintiff's name into the computer system, only one photograph of the plaintiff appeared, and Lipson included it in the photo arrays; this was ***the same photograph of plaintiff that Anyosa selected***. *See* Def. 56.1, ¶¶115-18.

Regardless of this dispute, Courts have held that the failure to disclose additional photo arrays, where a witness did not identify anyone, does not establish a denial of a fair trial and does not constitute material impeachment evidence. *See Fappiano*, 2014 U.S. Dist. LEXIS 179584, at

*45-48 (collecting cases); *Dawkins v. New York*, 2011 U.S. Dist. LEXIS 91150, (E.D.N.Y. Aug. 16, 2011; *United States v. Bagley*, 473 U.S. 667, 676 (1985) (the Supreme Court has rejected any … distinction between impeachment evidence and exculpatory evidence [in the *Brady* context]"); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process."). Thus, Lipson cannot be held liable for any claim associated with this conduct.

**XII.** **This Court Failed To, as Required, Assess the Reliability of All Identification Procedures, Which, Based on the Undisputed Facts, Were Independently Reliable, and No Defendant Can Be Held Liable for a Fair Trial Claim Based on a Theory of Suggestive Identification Procedures.**

The Court's blanket finding that there were issues of fact as to the suggestiveness of the identification procedures (*see* ECF No. 220, p. 23-30) and as to the reliability of the identifications (*id.*, p. 34-35) is based on an incomplete assessment and analysis of controlling law.  As previously relayed to this Court (*see* ECF No. 192, p. 21; ECF No. 217, p. 1), to determine if a pre-trial identification procedure was impermissibly suggestive and a due process violation occurred, the Court must first, when considering the totality of the circumstances, determine if the identification procedure was suggestive. *See Abdur Raheem*, 257 F.3d 122, 133 (2d Cir. 2001).  If the Court finds as such, the Court "***must then determine whether the identification was nonetheless independently reliable.***" *Id.* (emphasis added). Here, the Court did not analyze whether the identification procedures here were independently reliable.  As previously relayed to this Court (*see* ECF No. 217, p. 1-2, n. 5), based on the summary judgment record and undisputed facts, when viewed in the light most favorable to the plaintiff, they were.

The Supreme Court of the United States has set forth the following factors for courts to consider when determining the reliability of a witness's identification: 1) opportunity of the witness to view criminal at the time of the crime; 2) witness' degree of attention; 3) the accuracy

-15-

of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and confrontation. *See United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir. 1980) *citing Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Here, the record on summary judgment demonstrates that it is ***undisputed*** that:

- Anyosa was shot on May 15, 2008. *See* Def. 56.1, ¶¶13, 19-28, 30-34.
- The driver of the gray sedan, described as a black male, got out of his vehicle and began arguing and screaming with Anyosa and Hernandez, who made a gesture with his hand indicating that he had a gun. *Id.*, ¶¶17-18.[14]
- The driver of the gray sedan came within three (3) feet of Anyosa and Hernandez, nothing was covering this driver's face, and both Anyosa and Hernandez were clearly able to see the driver's face. *Id.*, ¶¶19-21.
- Anyosa and Hernandez argued with the driver of this gray sedan for approximately two (2) or three (3) minutes, they were right next to the driver and looking at him when they were arguing with him, and after the argument, the driver got back into his car and drove away from the scene. *Id.*, ¶¶22-24.
- Anyosa came back and parked his car at the Hempstead Train Station parking lot approximately twenty (20) minutes after the initial argument with the driver of the gray sedan, and while sitting in his car, heard someone say "What you going to do now, mother fucker?" *Id.*, ¶¶27-29.
- Anyosa noticed the same person he argued with earlier in the morning sitting in his car with the window down pointing a gun at Anyosa between 15 and 20 feet away, with the same person shooting Anyosa in the face. *Id.*, ¶¶30-33.
- A single composite sketch of the person who shot Anyosa was completed by Det. Bischoff after he had a conversation with Anyosa, with Det. Bischoff confirming the description of Anyosa's shooter by showing Anyosa reference photographs. *Id.*, ¶¶67-73.
- Decaro saw this composite sketch of Anyosa's shooter handing above his desk for several weeks, and on June 6, 2008, saw the composite sketch and determined that plaintiff resembled the composite sketch. *Id.*, ¶¶100-05; Pl. 56.1, ¶¶284-87.
- Lipson created the photo arrays and presented them, separately, to Hernandez and Anyosa on June 6, 2008. *See* ECF No. 220, p. 3-6; Def. 56.1, ¶¶139, 157.
- Plaintiff was in position #2 in the photo array presented to Hernandez, and Hernandez selected the plaintiff.[15] *See* ECF No. 220, p. 5; Def. 56.1, ¶¶142-144.
- Lipson did not tell Anyosa that Hernandez had identified the plaintiff, and Lipson did not tell Anyosa that he picked the right guy from the photo array. *See* Pl. 56.1, ¶¶458-59.
- Prior to testifying in the Grand Jury, Anyosa and Hernandez did not tell ADA

---

[14] While these facts are disputed, as well as those asserted in Def. 56.1, ¶¶29 and 71, the disputes are unwarranted.

[15] The Court overlooked material evidence that Hernandez was confident in his photo array identification of the plaintiff because before Lipson even placed the photo array down, Hernandez selected the plaintiff, and it was "one of the fastest photo arrays [Lipson] ever conducted." ECF No. 194-25 at 141-142.

Larocca that they were pressured into identifying the plaintiff from the photo arrays. *See* Def. 56.1, ¶188.

- Anyosa and Hernandez separately viewed the line-up on August 14, 2008, both individually identified the plaintiff, and Anyosa and Hernandez did not see each other on August 14, 2008 during the line-up procedure. *See* ECF No. 220, p. 9-10; Def. 56.1, ¶¶232-35, 242, 247-53, 258-59.
- The line-up procedures employed were not unduly suggestive. *See* ECF No. 220, p. 21-22.
- Hernandez did not have any doubts about his identification of plaintiff from the line-up.[16] *See* Def. 56.1, ¶270.
- ADA Schalk spoke with Anyosa and Hernandez individually before they testified at plaintiff's criminal trial, and they both indicated that they were certain that plaintiff was the person that they had argued with and that had shot Anyosa on May 15, 2008. *Id.*, ¶315.

Based on the undisputed facts in the summary judgment record evidence, and when analyzing the reliability factors, all identification procedures here were independently reliable. First, viewing the suspect at the time of the crime for 20 to 25 seconds is more than sufficient to render an identification dependable. *See Leonardi*, 623 F.2d at 755-56 (collecting cases). Anyosa and Hernandez argued with the suspect for 2 to 3 minutes, were within 3 feet of the suspect, and were clearly able to see his face since nothing was covering it. Second, the suspect yelled at Anyosa and Hernandez for several minutes and gestured that he had a gun, and then Anyosa observing the same person from only 15 to 20 feet away pointing a gun and shooting him, demonstrates that their attention was clearly focused on the suspect during their interaction. *Id.*, at 756. Third, the accuracy of their descriptions of the suspect was confirmed by the composite sketch resembling the plaintiff. Fourth, Hernandez and Anyosa were confident in their selections of the plaintiff from the photo arrays and the line-up, and this confidence continued all the way through testifying at plaintiff's

---

[16] This Court noted that "Hernandez testified that he recognized the plaintiff from the photo array." ECF No. 220, p. 10. ADA Larocca requested the line-up procedure, which was ordered by the Court. *See* Def. 56.1, ¶¶201-02. It is not improper for multiple identification procedures to be administered to a witness. *See Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 551 (E.D.N.Y. 1999); *Ragunauth v. Ercole*, 2008 U.S. Dist. LEXIS 103892, at *25-26 (E.D.N.Y. Dec. 23, 2008). The Court overlooked that Hernandez testified at his deposition that it did not take long at all to identify plaintiff from the line-up "because [he] was able to observe the person that [he] had the exchange of words at the moment of the argument" (*see* ECF No. 194-29 at 77), and that when Hernandez identified the plaintiff in court, he did so because he recognized the plaintiff as he person who he had the argument with on the street. *Id.*, at 80-81.

-17-

trial.  Lastly, the reliability of an identification can be established with even a 5-month lapse between observation of the crime and the identification procedure. *Id.*, at 756.  Here, Anyosa and Hernandez identified the plaintiff from photo arrays less than 1 month after their interaction with the suspect.  The undisputed record evidence demonstrates that both photo array procedures, where Hernandez and Anyosa individually identified the plaintiff, were independently reliable.  Thus, both photo array identifications were not unduly suggestive, the subsequent line-up procedures and in-court identifications were not tainted, and were properly admitted at trial.  Thus, no due process violation occurred. *See Leonardi*, 623 F.2d at 755-56; *Wilson v. Bantum,* 1993 U.S. Dist. LEXIS 5924, at *11-13 (E.D.N.Y. Apr. 28, 1993).

XIII.   **Lipson and All Defendants Are Entitled to Qualified Immunity for Any Alleged Pre-Identification Comments and Post-Identification Confirmatory Remarks Comments to Hernandez or Anyosa Since, in 2008, it Was Not Clearly Established That These Alleged Comments Would Violate a Person's Constitutional Rights.**

Contrary to the Court's analysis (*see* ECF No. 220, p. 40), in 2008, there was no clearly established right that a post-identification confirmatory remark by an officer to a witness would violate a person's constitutional rights.  In addition, in 2008, there was no clearly established right that a pre-identification remark to a witness that the suspect was already identified by another witness would violate a person's rights. Neither plaintiff nor this Court can cite to any case, with specific similar facts, that demonstrates that this conduct was clearly established in 2008.  Thus, Lipson and all defendants are entitled to qualified immunity. *See Cerrone*, 246 F.3d at 199.

As the Supreme Court has reiterated time and time again, specificity of the facts is important when determining whether an officer's conduct violated a person's constitutional rights, and that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See City of Tahlequah v. Bond*, 142 S. Ct. 9, 11-12 (2021); *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018).  With respect to identification procedures, the Supreme

-18-

Court of the United States[17] has declined to impose a blanket prohibition on specific identification procedures, holding instead that to determine whether an identification procedure violates due process, "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "The determination of whether an identification procedure violates due process is governed by an extraordinarily general standard that hews closely to the facts of a particular case and turns on a court's judgment in evaluating those facts." *Brisco v. Ercole,* 565 F.3d 80, 88 (2d Cir. 2009). And as demonstrated above (*see* Point XII *supra*), the Court is required to determine whether identification procedures that may have been suggestive were independently reliable, which if so, precludes a finding that plaintiff was denied a fair trial.

This Court cites to *United States v. Thai*, 29 F.3d 785, 810 (2d Cir. 1994) when denying qualified immunity related to comments made to Anyosa, and in the parenthetical, merges the general principle regarding the relationship between suggestive police identification procedures, with the remark that a pretrial identification procedure **_may_** be rendered to suggestive through an officer's remarks, and **_may_** tend to reinforce an identification. *See* ECF No. 220, p. 40. However, this Court fails to cite to the portion of *Thai* regarding pre-identification comments to a witness. As *Thai* states, where "the utterance of suggestive comments before an identification is made, the 'principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that

---

[17] The Supreme Court of the United States "has held that pretrial identification procedures violated the Due Process Clause only once, in *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L. Ed. 2d 402 (1969). There, the police used highly suggestive lineups and a 'one-to-one confrontation," which "made it all but inevitable that [the witness] would identify [the defendant]." *Sexton v. Beaudeaux*, 138 S. Ct. 2555, 2559, n.2 (2018).

[that person] was more likely to be the culprit." *Thai*, 29 F.3d at 808 *citing Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986). Here, the plaintiff did not so stand out, and thus both photo arrays administered to Anyosa and Hernandez cannot be rendered unduly suggestive as a result of any alleged pre-identification remark. *See* ECF No. 210, p. 11-13.

In addition, when relying on *Thai*, this Court fails to cite that even if a post-identification confirmatory remark is made, "if the original identification was strong and unequivocal, such misguided post identification remarks or actions will not render it invalid or preclude a subsequent in-court identification." *Thai*, 29 F.3d at 810 *citing Leonardi*, 623 F.2d at 755. This Court then failed to note that, after determining that the identification procedures were independently reliable the Second Circuit in *Thai* found that even with the post-identification confirmatory remarks, ***it was not error for the lower court to allow the witnesses' identification testimony***. *Thai*, 29 F.3d at 811. It cannot be held that *Thai* clearly established that making a post-identification confirmatory remark to a witness was clearly established law, when *Thai* ultimately found that it was not error and not a denial of a person's right to a fair trial and when the subsequent identification testimony was admitted at trial. Court's throughout the Second Circuit, all the way up through 2019, have consistently held that post-identification confirmatory remarks, when reviewing the totality of the facts and circumstances, that are independently reliable, have not tainted subsequent identification procedures or in-court identifications. *See United States v. Jarvis*, 560 F.2d 494, 499 & n.8 (2d Cir. 1977); *Leonardi*, 623 F.2d at 755-56; *Jarrett*, 802 F.2d at 44-45; *Wilson v. Bantum,* 1993 U.S. Dist. LEXIS 5924, at *11-13 (E.D.N.Y. Apr. 28, 1993); *Thai*, 29 F.3d at 811; *United States v. Brown*, 167 F. Supp. 3d 447, 451 (W.D.N.Y. 2016); *United States v. Woodford*, 2019 U.S. Dist. LEXIS 184496, at *16-17 (E.D.N.Y. Oct. 23, 2019).

This Court goes on to cite *Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir. 1981), with the

parenthetical selectively quoting the general principle, ***not the holding***, that "while a witness is always entitled to become surer of an identification, due process precludes the generation of that increased certainty through" suggestive police behavior. *See* ECF No. 220, p. 40. In *Solomon*, there is no allegation that a post-identification confirmatory remark was made to the witness after the witness identified the petitioner in an identification procedure.  However, and as demonstrated above, the Second Circuit in *Solomon* states that "given these permissible procedures, the teaching of *Neil v. Biggers* … is that the admissibility of [the witness's] identification of Solomon at trial depends on its reliability." *Id*.  A review of the facts and the reliability factors in *Solomon* – where the witness selected two (2) different people as the perpetrator, where the criminal defendant "was not in her line of vision the entire time … [and wore a] hood [that] prevented a comprehensive viewing of the face," where the witness's attention was directed to the event as opposed to the assailant, with the witness being subjected to six identification procedures where the police contemporaneously recorded that some were negative/possible  (*id.*, at 1182-87) – are entirely different from the undisputed facts here, which undeniably demonstrate that Hernandez's and Anyosa's identifications were independently reliable.

Thus, as laws related to pre and post-identification comments were not clearly established in 2008, all defendants are entitled to qualified immunity on plaintiff's fair trial claims.

### XIV.   Dluginski Cannot Be Liable for Malicious Prosecution, and at the Very Least, Dluginski is Entitled to Qualified Immunity.

As demonstrated *supra* at Points VI and VIII, the record on summary judgment demonstrates that it is ***undisputed*** that: 1) Dluginski was not present when the photo arrays were administered to Anyosa and Hernandez; 2) Dluginski was not present, and did not interact, with Ogletree at the Armory on June 6, 2008; 3) Dluginski was called into work on June 6, 2008 ***after*** plaintiff's arrest for the June 6, 2008 shooting; and 4) Decaro informed Dluginski about the results

of the investigation into the Anyosa shooting, was not told that Ogletree was coerced into signing a statement, and was not told that there were any issues related to the administered photo arrays.

The Court overlooked the Second Circuit precedent that police officers are entitled to rely on the allegations of fellow police officers.[18]  Even though Dluginski was the carrying detective, he had no involvement on June 6, 2008 until ***after*** plaintiff was arrested for the Anyosa shooting. Since a single positive photo identification is sufficient to establish probable cause, even where the identification may not be 100% reliable, Dluginski was entitled to rely on his fellow officer's representations that Hernandez and Anyosa positively identified plaintiff from the photo arrays. *See Burgess v. DeJoseph*, 725 F. App'x 36, 39 (2d Cir. 2018); *Norwood v. Mason*, 524 F. App'x 762, 765 (2d Cir. 2013); *Keith v. City of N.Y.*, 2014 U.S. Dist. LEXIS 166469, at *47-49 (S.D.N.Y. Dec. 1, 2014) *aff'd* 641 F. App'x 63, 66 (2d Cir. 2016) ("at an absolute minimum, an officer of reasonable competence could have concluded that the probable cause test had been met on the basis of the victim's identification of [plaintiff], which is all that is necessary for qualified immunity to attach.") (internal quotations and citations omitted).

As the Supreme Court of the United States has stated "[n]o settled Fourth Amendment principle requires that officer [arriving late to a scene] to second-guess the earlier steps already taken by his or her fellow officers." *White v. Pauly*, 580 U.S. 73, 80 (2017); *Grant v. City of N.Y.*, 2019 U.S. Dist. LEXIS 37791, at *19 (E.D.N.Y. Mar. 8, 2019). Thus, Dluginski cannot be held liable for malicious prosecution, and at the very least, is entitled to qualified immunity because it was objectively reasonable for him to rely on the representations of his fellow officers that there were two (2) positive photo array's where the plaintiff was identified.

---

[18] *See* ECF No. 210, p. 4-5; ECF No. 192, p. 7; *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000); *Bernard v. United States*, 25 F.3d 98, 102-03 (2d Cir. 1994); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *Dubois v. Cunningham*, 2022 U.S App. LEXIS 16830, at *7-8 (2d Cir. June 17, 2022); *Malarczyk v. Lovgren*, 2023 U.S. App. LEXIS 30909, at *5 (2d Cir. Nov. 21, 2023).

**XV.   Decaro and Darienzo Cannot Be Liable for Malicious Prosecution, and at the Very Least, They are Entitled to Qualified Immunity.**

As demonstrated *supra* at Point VIII, the record on summary judgment demonstrates that it is **_undisputed_** that: 1) Decaro and Darienzo were not present when the photo arrays were administered to Anyosa and Hernandez; 2) Darienzo and Lipson did not discuss the photo array identifications administered; and 3) Decaro and Darienzo were not told that there were any issues with the administered photo arrays. Thus, it was objectively reasonable for them to rely on the representations of their fellow officer (*see* Point XIV *supra*), they cannot be held liable for malicious prosecution, and at the very least, are entitled to qualified immunity.

It is **_undisputed_** that the plaintiff was indicted with no evidence regarding Ogletree or his statement presented to the grand jury. *See* Def. 56.1, ¶¶195, 198.  As such, to overcome the presumption of probable cause created by the indictment, any evidence stemming from Ogletree is not to be considered.[19] *See Greene*, 2017 U.S. Dist. LEXIS 37243, at *67-68 (allegations of coercion will not form basis of malicious prosecution claim where witness does not testify in grand jury, since plaintiff "has made no connection between the defendants' coercive conduct toward witnesses and the indictment."); *Norwood*, 524 F. App'x at 765.  Thus, the same analysis applies as in Point XIV *supra* and Point XVII *infra*.  Therefore, Decaro and Darienzo cannot be held liable for malicious prosecution, and at the very least, are entitled to qualified immunity.

---

[19] Numerous courts in this Circuit have held, "even where plaintiff alleges, as here, that [a] malicious prosecution is based on fabricated evidence, 'the existence of probable cause independent of the fabricated evidence is a defense to [the malicious prosecution] claim.' 'To hold otherwise would untether the malicious prosecution claim from its Fourth Amendment roots.'" *Hoyos v. City of N.Y.*, 999 F. Supp.2d 375, 390 (E.D.N.Y. 2013) *aff'd* 650 F. App'x 801 (2d Cir. 2016); *Morse v. Spitzer*, 2012 U.S. Dist. LEXIS 110241, at *5 (E.D.N.Y. Aug. 3, 2012); *Oquendo v. City of N.Y.*, 2017 U.S. Dist. LEXIS 223189, at *18 n.6 (E.D.N.Y. Nov. 15, 2017), *aff'd* 77 F. App'x 703 (2d Cir. 2019); *Torres v. City of N.Y.*, 2017 U.S. Dist. LEXIS 158883, at *11 (E.D.N.Y. Sept. 27, 2017); *Blau v. Suffolk County*, 2016 U.S. Dist. LEXIS 12934, at *12-13 (E.D.N.Y. Feb. 3, 2016); *Schlaepfer v. City of N.Y.*, 2022 U.S. Dist. LEXIS 175327, at *46 n.21 (S.D.N.Y. Sept. 27, 2022); *Ross v. City of N.Y.*, 2019 U.S. Dist. LEXIS 169762, at *20-21 (E.D.N.Y. Sept. 30, 2019); *Polanco v. City of N.Y.*, 2018 U.S. Dist. LEXIS 54758 (S.D.N.Y. Mar. 28, 2018); ECF No. 192, p. 13.

## XVI.  No Reasonable Jury Could Conclude that Plaintiff's Constitutional Rights Were Violated Based on the Statements/Language in the Felony Complaints.

This Court incorrectly found a material factual dispute related to the information – alleged false statement – contained in the felony complaints (*see* ECF No. 220, p. 34-35), but correctly stated at the March 13, 2024 oral argument that this alleged "false statement never goes anywhere." 3/13 Tr., 18:12-13. This Court overlooked controlling law that there must be causation for a plaintiff to succeed on any § 1983, and the undisputed record evidence, which clearly demonstrates that the alleged false statement was not material to the prosecution's case (*see* ECF No. 210, p. 19-20; Def. 56.1, ¶¶192 and 292), and thus is irrelevant to any of plaintiff's claims.

## XVII.  Assuming *Arguendo* that the Photo Array Identification Procedures Were Suggestive, Probable Cause Exists, the Issues of Fact Do Not Rebut the Presumption of Probable Cause Created by the Indictment, the Malicious Prosecution Claim Must Fail, and At the Very Least, All Defendants are Entitled to Qualified Immunity.

When analyzing plaintiff's malicious prosecution claim, this Court reasoned that there "are key questions of material fact about the reliability of the witnesses' identifications of the plaintiff, and about the extent to which the identification procedures were unduly suggestive." *See* ECF No. 220, p. 36.  This Court appears to have inappropriately lumped in all the identification procedures together when it failed to analyze whether probable cause existed, since the line-up was administered ***after*** plaintiff was indicted. This Court also overlooked controlling Second Circuit law – positive identifications, even if the procedures were suggestive, can support probable cause; the critical question is – was the identification procedure "so defective that, as a matter of law, probable cause could not reasonably be based on it." *Mara v. Rilling*, 921 F.3d 48, 74-75 (2d Cir. 2019)[20] (collecting cases) (internal quotations omitted).  Here, they were not.

---

[20] *See* ECF No. 192, p. 8; *Mara*, 921 F.3d at 75 ("procedures that simply 'increase the odds' that a witness will identify the defendant are not so defective as to preclude reliable for probable cause, while procedures that force the witness to make an identification do rise to that level."); *Stansbury v. Wertman*, 721 F.3d 84, 91 n.7 (2d Cir. 2013) (suggestive one-photo display contributed to probable cause) *quoting Jenkins v. City of N.Y.*, 478 F.3d 76, 93 (2d Cir. 2007).

Hernandez's photo array procedure, by law, was not suggestive. *See* Point IX *supra*. The alleged pre-identification remark to Anyosa that Hernandez already selected the right guy, if accepted as true, does not render Anyosa's photo array procedure suggestive. *See* Points X, XII and XIII *supra*. The alleged post-identification confirmatory remark to Anyosa was made ***after*** Anyosa already positively identified the plaintiff, which was now the second positive photo array identification from two (2) separate witnesses. This is more than sufficient to establish probable cause since the Second Circuit has repeatedly held that a single positive photo identification is sufficient, even where the identification may not be 100% reliable. *See* Point XIV *supra*. There is no requirement to present exculpatory evidence to the grand jury. *See* ECF No. 192, p. 12, n. 5. The alleged suppression of additional photo arrays presented to Anyosa, where Anyosa selected no one, "is not the type of egregious deviation from acceptable practices that strips an indictment of its presumptive force." *Fappiano*, 2014 U.S. Dist. LEXIS 179584, at *37 (victim testified about third photo identification procedure in grand jury, but two prior procedures were never presented).

Based on the undisputed facts here, viewed in the light most favorable to the plaintiff, both of the positive photo array identification procedures establish that probable cause existed, the grand jury presumption has not been rebutted, and plaintiff's malicious prosecution claim must fail. At the very least, all the defendants are entitled to qualified immunity. *See Keith*, 2014 U.S. Dist. LEXIS 166469, at *40-51 *aff'd* 641 F. App'x 63, 66; *see* ECF No. 192, p. 34-38.

Dated:     White Plains, New York
           April 12, 2024

                                   Respectfully submitted,

                                   Attorneys for the County Defendants

                                   _____
                                        John A. Vitagliano

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - -  X
 3   JOSIAH GALLOWAY,              :
                                           19-CV-5026(AMD)
 4             Plaintiff,          :

 5        -against-               :
                                           United States Courthouse
 6   COUNTY OF NASSAU, et al.,    :        Brooklyn, New York

 7                                         March 13, 2024
               Defendant.         :        3:00 p.m.
 8    - - - - - - - - - - - - -  X

 9                    TRANSCRIPT OF ORAL ARGUMENT
                  BEFORE THE HONORABLE ANN M. DONNELLY
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:     ELEFTERAKIS ELEFTERAKIS & PANEK
                            80 Pine Street, 38th Floor
13                          New York, NY 10005
                            BY:  GABRIEL HARVIS, ESQ.
14                               BAREE FETT, ESQ.
                                 MICHAEL GLUCK, ESQ.
15

16   For the Defendants:    WILSON, ELSER, MOSKOWITZ, EDELMAN &
                            DICKER LLP
17                          1133 Westchester Avenue
                            West Harrison, NY 10604
18                          BY:  JOHN VITAGLIANO, ESQ.
                                 JANINE MASTELLONE, ESQ.
19
                            HARRIS BEACH PPLC
20                          333 Earle Ovington Blvd., Ste. 901
                            Uniondale, NY 11553
21                          BY: DANIEL S. HALLAK, ESQ.
                                WILLIAM J. GARRY, ESQ.
22
     Court Reporter:        Andronikh M. Barna
23                          225 Cadman Plaza East
                            Brooklyn, New York
24                          (718) 613-2178

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

2

1           THE COURTROOM DEPUTY:  This is civil cause for oral
2    argument.  Docket No. 19-CV-5026, *Galloway v. County of*
3    *Nassau, et al.*
4           Counsel, state your appearances, Plaintiff first.
5           MR. HARVIS:  For the Plaintiff, Your Honor, Gabriel
6    Harvis.
7           Good afternoon.
8           THE COURT:  Good afternoon.
9           MS. FETT:  Good afternoon, Your Honor.
10           Baree Fett for the Plaintiff.
11           THE COURT:  Good afternoon.
12           MR. GLUCK:  Good afternoon.
13           Michael Gluck for the Plaintiff.
14           THE COURT:  Good afternoon.
15           Does everybody have their microphones on?
16           MR. HARVIS:  Yes.
17           THE COURT:  Good.  Okay.
18           MR. HARVIS:  I believe so.
19           THE COURT:  Go ahead.
20           MR. VITAGLIANO:  Good afternoon, Your Honor.
21           John Vitagliano on behalf of Nassau County and the
22    Nassau County Defendants.
23           MS. MASTELLONE:  Good afternoon, Your Honor.
24           Janine Mastellone from Wilson Elser, also for the
25    County Defendants.

3

1      MR. HALLAK:  Good afternoon, Your Honor.

2      Daniel Hallak from Harris Beach on behalf of the

3   Village of Hempstead Defendants.

4      MR. GARRY:  Good afternoon, Your Honor.

5      William Garry, also from Harris Beach for the

6   Village Defendants.

7      THE COURT:  Okay.  So first thing's first.

8   Everybody can stay seated, I can hear you better.  I just want

9   to make sure everybody has access to the microphone.

10      Thing two -- I think I have told you all this

11   before, but bears repeating -- don't talk too fast.  It's very

12   hard on the court reporter and you don't have a good record of

13   your -- well, our court reporter is perfect, so even if you

14   spoke fast she would get it, but don't make her do that.

15      So those are a couple of reminders.

16      This is not a formal oral argument.  It's mostly

17   questions that I have based on your submissions, so that is

18   kind of the way I am going to do it.  If I ask a question,

19   it's really just because I want the answer, don't read

20   anything behind it.  But there are a number of things I just

21   want some clarification on.

22      So in no particular order -- well, you know, let me

23   just start with this *Monell* claim.  I don't understand what

24   the theory is.  As I understand it, it is Nassau County's, the

25   way they did lineups?

4

1      MR. HARVIS:  Right, Your Honor.

2      Detective Ross testified that the reason that he had

3  Plaintiff sit on two phone books and put a hat on his head and

4  covered him in a sheet is because he was following Nassau

5  County's training.

6      THE COURT:  But everybody did that in those days.

7  That's the way all -- so that's the theory, that when lineups

8  were conducted -- I should also say, I am trying to narrow

9  this into what I really think is an issue.  I don't think

10  that's a good argument.  And I think I've talked to -- I don't

11  think it was you who was here before, but about whether this

12  is something that we really need to think about.  Because if

13  we're talking about just the procedure of having a suspect and

14  five fillers in a lineup and minimizing differences by sheets

15  and hats, that I believe is a procedure that has been endorsed

16  certainly by New York State courts on the criminal side, but

17  by federal courts, too.  I really don't see how it could form

18  the basis for a *Monell* claim.

19      MR. HARVIS:  It was me who was here before

20  Your Honor and we have talked about this a little bit, and so

21  let me try to explain where we're coming from.

22      THE COURT:  Okay.

23      MR. HARVIS:  So there's no requirement under a

24  *Monell* claim for the policy that you're challenging to itself

25  be unconstitutional.  We're not saying that they maintained an

5

1   unconstitutional policy.

2        THE COURT:  Okay.

3        MR. HARVIS:  What we're saying is that in a case

4   like this where the described perpetrator is 5'11" and the

5   suspect is 5'5", as applied to Josiah Galloway, a reasonable

6   jury could conclude that a proximate cause of his

7   misidentification, which we know happened, because he's

8   innocent, was the fact that, according to Ross, he was

9   required to go through this process that had the result of

10  concealing what would have otherwise been distinguishing and

11  exonerating qualities that Mr. Galloway had.  It was both his

12  height, because he was five inches shorter than -- at least

13  five inches shorter than the described perpetrator, and his

14  hair, because he had long hair that they covered with a hat.

15  And so --

16        THE COURT:  I'm sorry to interrupt, but you're

17  talking about the facts of this case and I don't think that

18  translates into a *Monell* claim.

19        I have to say just as a practical matter, I don't

20  really know what it gets you in this case because this is a

21  case about alleged constitutional violations against your

22  client and I'm just not familiar with -- is there another case

23  that you can cite that is like this?

24        MR. HARVIS:  Well, I mean, we've cited some cases in

25  our brief.  I think the *Amnesty International* case is the one

6

1  that is the most supportive of our position, which basically
2  says that so long as you're challenging an actual policy of
3  municipality, then that automatically establishes the causal
4  link.  And we have Ross saying that this is a policy.  And we
5  believe a reasonable jury could conclude that this policy, in
6  this case, was a contributing factor to what is an
7  acknowledged misidentification.  And for that reason, we think
8  it raises a jury question that should be considered.
9        THE COURT:  Does anybody else say it's a policy
10 besides a detective from the squad?
11       MR. HARVIS:  Well, he's the person who was
12 responsible for deciding how the -- the record supports that
13 he was the person who played the pivotal role in deciding how
14 the lineup should happen, so we view his testimony as being
15 the most vital and controlling on this issue.
16       THE COURT:  Is he a decision-maker, or?
17       MR. HARVIS:  Well, he decided how they would do the
18 lineup that day.  That's what the D.A. says, that's what the
19 defense attorney says, and that's what he says.
20       And so we don't think that that really was the
21 policy because they had to -- for example, they had to go out
22 and get hats that day because they didn't even have hats at
23 the precinct.  So we think that we kind of have an alternative
24 here, which is that if the jury believes Ross that it was a
25 policy, then they might reasonably conclude that it was a

7

1  contributing factor.  And if they disbelieve him, then it's

2  individual liability against Ross for creating a lineup, like,

3  contrary to policy that, as we said, is a contributing factor

4  to the misidentification.

5       THE COURT:  Maybe it's my own failure of

6  imagination, but this is the way -- and perhaps it's wrong.

7  And I've been out of this business for a while.  But in my

8  experience and reading federal cases and state cases, this is

9  the approved way that lineups are conducted to minimize

10  suggestibility.  And while it may be that you can make an

11  argument that in the particular facts of this case somebody

12  manipulated that policy for their own purposes in this case, I

13  don't see a *Monell* claim here.

14       You know, if you want to go ahead with a *Monell*

15  claim, go ahead.  I feel like you're going to come in second.

16  I could be wrong.  I'm going to continue to read all of, you

17  know, the cases that you submit.  But I don't think that's the

18  key to the case.

19       And just as a practical matter, you're sure this is

20  what you want to go ahead with, that you want Judge Donnelly

21  to spend her energy on?

22       MR. HARVIS:  Well, I don't want Judge Donnelly to

23  spend --

24       THE COURT:  That's why I took the job.  I was just

25  kidding.

8

1      MR. HARVIS:  No, what I was going to say is, you

2 know, in our view, it was -- Detective Ross was brought into

3 the case by attributing his decisions to the policy.  And once

4 he said "policy" and we -- and in our view and I think in, you

5 know -- you know, in our view and I think in the view of a

6 reasonable jury, when you have someone who is -- you know that

7 he is six inches shorter than the described perpetrator.

8      THE COURT:  Well, let me ask you another question

9 about that.

10      MR. HARVIS:  Yeah.

11      THE COURT:  Is Ross -- I do have some sort of

12 factual questions about his involvement.  And in my -- I'm not

13 going to say anything about the 56.1s, but not exactly helpful

14 in trying to figure out what the facts are, because people are

15 always disputing but not really disputing, and so that's just

16 a side note.  But is Ross the one who is brought in because

17 they're doing double-blind lineups?

18      MR. HARVIS:  It's not double-blind.  He's just

19 brought -- it's true that his involvement is limited to the

20 lineups.

21      THE COURT:  Okay.

22      MR. HARVIS:  So that's accurate.

23      THE COURT:  So is there a dispute about what Ross

24 knew when he put the lineup together in terms of the

25 description of the suspect?

9

1      MR. HARVIS:  Well, we know that he knew that

2  Plaintiff was significantly shorter than the other fillers,

3  which is why he put him on phone books to begin with.

4      THE COURT:  But the critical question is, if he were

5  shorter than the other fillers and he was the only short guy

6  and the description were that the person who shot the victim

7  was a short guy, if they didn't put him on the phone books,

8  that would be a suggestive lineup because it would be like

9  having an arrow on the short guy.

10      MR. HARVIS:  Or they could have gotten fillers that

11  were similar in stature, which is what the policy actually

12  says according to the 30(b)(6) witness.

13      THE COURT:  Well, I think it's an overall -- I mean,

14  if they're all short guys, but -- you know, there's an old

15  Richard Pryor skit about this.  But if one person, you know,

16  is 500 pounds and -- you know, I mean, you can't justify that

17  lineup by saying that everybody is short.

18      But then my question about it is, does the record

19  reflect or is there a dispute of fact about what Ross knew

20  about the description, the victim's description of the

21  shooter?

22      MR. HARVIS:  It's not -- I don't think the record is

23  clear, goes one way or the other about what Ross knew.  I

24  don't think there's anything in the record that says that Ross

25  had a conversation where he is made aware of the discrepancies

10

1   between the described shooter and Plaintiff.

2          THE COURT:  Okay.

3          MR. HARVIS:  But what we're saying is that if you --

4   well, I guess that's fair.

5          I mean, we have other officers there who were aware

6   of it, like D'Luginski, who was the lead carrying detective.

7   And so, you know, a bit more of a -- I guess like a common,

8   shared knowledge kind of an argument.

9          THE COURT:  And that's another question about -- I'm

10  kind of -- I'm going to give you guys a chance to talk, I

11  promise.

12         But also just with respect to Ross, I mean, it sort

13  of seemed to me, in reading the submissions, is that Ross

14  becomes involved after there is an indictment.

15         MR. HARVIS:  Correct.

16         THE COURT:  There's a court-ordered lineup.

17         MR. HARVIS:  Right.

18         THE COURT:  Ross is not involved in the

19  investigation, it doesn't sound like.

20         MR. HARVIS:  Correct.

21         THE COURT:  And I don't understand the submissions,

22  but correct me if I'm wrong, to say that he's the one that

23  said good job, you got the right person.

24         MR. HARVIS:  Correct.

25         THE COURT:  So he doesn't do that.

1          MR. HARVIS:  No.

2          THE COURT:  And then it seems to me that without the

3   fiancé's affidavit, which I'll get to in a minute, you

4   wouldn't have anything against Ross.

5          MR. HARVIS:  Right.

6          We have the fiancé saying that he admitted to her

7   that he specifically set up the lineup for the purposes of

8   obtaining a misidentification.

9          And then we have the prior lineup where he attempted

10  to shave Plaintiff's head.

11         THE COURT:  That's not what -- okay, we can -- was

12  Ross involved in that?

13         MR. HARVIS:  It was Ross.

14         THE COURT:  All the Plaintiff says in his deposition

15  is they said that we are going to have to cut your hair and

16  nothing ever happened.

17         MR. HARVIS:  They threatened to cut his hair,

18  basically, and then aborted the lineup when he refused.

19         THE COURT:  Well, if they threatened to cut his hair

20  -- I mean, they rescheduled the lineup.

21         So I'm just reading what the Plaintiff said.  The

22  Plaintiff said:  Your hair didn't look like that before.

23  We're going to either have to cut it -- I can't remember what

24  the language is.  Cut it or reschedule.

25         MR. HARVIS:  Well, they took out a Wahl trimmer.

12

1   And he said --

2            THE COURT:  Pointed to it, according to the

3   Plaintiff.

4            MR. HARVIS:  Okay.

5            And then said, you know -- and he said, basically,

6   over my dead body are you going to be shaving my head.  And so

7   then they did reschedule it.

8            But the reason -- I mean, I think it's worth looking

9   underneath that a little bit because --

10           THE COURT:  Okay.

11           MR. HARVIS:  The reason that they weren't

12  comfortable with him proceeding is because the length of his

13  hair was so obviously distinguishing that they were unprepared

14  to have him in a lineup where his characteristics would have

15  distinguished him from the shooter.  And we have the victim

16  specifically saying that he wishes he had been told about the

17  true height of the Plaintiff because he would have immediately

18  said it wasn't him.

19           THE COURT:  Right.

20           But I'm just getting back to -- I am just trying to

21  identify with Ross --

22           MR. HARVIS:  Yes.

23           THE COURT:  -- that his particular role is as the

24  allegation is, that it's that he purposefully, maliciously

25  followed what most lineups are conducted but knowing that

1  those policies would affect your client badly.

2          MR. HARVIS:  According to him and his fiancé, yes.

3          THE COURT:  According to the fiancé.

4          But then the fiancé, at her deposition, says, well,

5  not everything I say is true.

6          Now, I'm not deciding credibility.  But just looking

7  down the line, I mean, that's something that you all as trial

8  lawyers can worry about.

9          But I don't know what I'm supposed to do with those

10  two things -- I think probably nothing -- that, you know, it's

11  very weak, that, one, that there's kind of a legalese thing

12  written out about what she says and then she says, well, I

13  didn't write it, not all of those things are true.  That's a

14  credibility issue.  That is not really for me to decide.

15          But I just wanted to make sure I understood exactly

16  what it was that Ross is alleged to have done.  And it's just

17  in this particular lineup, correct?

18          MR. HARVIS:  Just in this lineup.

19          THE COURT:  Okay.

20          MR. HARVIS:  Yes.

21          THE COURT:  All right.

22          My second question, just about people that I'm not

23  100 percent sure what they did.

24          I know one of them is Cunningham.

25          MR. HARVIS:  Yeah.

14

1          THE COURT:  And who is the other guy?  With an S,
2    wasn't it?  Sortino?

3          I thought it was Cunningham and Sortino.  I'm just
4    having a difficult time figuring out what it was that they
5    did.

6          MR. HARVIS:  Sure.

7          So Cunningham is present when Plaintiff is arrested.
8    He's one of the officers who arrested him on June 6th.

9          THE COURT:  Okay.

10         MR. HARVIS:  He brings him back.  He remains at the
11   armory for, you know, this 15-hour period when they're
12   conducting their investigation.

13         THE COURT:  Right.

14         MR. HARVIS:  And he participates in a decision
15   regarding what charges will be brought against the Plaintiff.

16         That's pretty much what we have in terms of
17   Cunningham's participation.

18         THE COURT:  And what is wrong with that?  Just
19   remind me.

20         Because this is before any of the -- no, this is
21   after the photo array.

22         MR. HARVIS:  This is all happening afterwards.

23         I mean, we contend -- and we have a concession from
24   DeCaro that this is the case -- that the criminal complaint
25   that was filed contains this false statement claiming that

1    Plaintiff had admitted to the crime.

2              THE COURT:  I remember that.  But what does that

3    have to do with Cunningham?

4              MR. HARVIS:  Well, yeah, I mean, I think it's a fair

5    question.

6              I think that to the extent Cunningham is aware of

7    what's going on, which we allege is this sort of -- quite a

8    bit of misconduct in the course of this 15-hour period.

9              THE COURT:  But don't you have to have him

10   specifically doing something?

11             He's not involved in the photo arrays.

12             MR. HARVIS:  That's correct.

13             THE COURT:  He's not involved, as far as I can tell,

14   in the interview of Ogletree.

15             MR. HARVIS:  That's correct.

16             I agree with Your Honor that of the -- we did take

17   some people out already.

18             THE COURT:  No, I know.

19             MR. HARVIS:  And of the people that we left in, I

20   agree that that's the closest question.  So I'm with

21   Your Honor on that.

22             THE COURT:  If you can think about that.

23             It just a) selfishly gives me less to worry about;

24   b) I don't think people should be in lawsuits if they don't

25   belong in lawsuits.

16

1          MR. HARVIS:  I think that's a fair point,
2    Your Honor.  I think we'd be prepared to withdraw against
3    Cunningham.
4          THE COURT:  Okay.  And I will take it tentatively
5    now.
6          MR. HARVIS:  Yeah.
7          THE COURT:  And then the second fellow, I think it
8    was -- was it Sortino.
9          Was it Sortino?
10          Sorry.
11          MR. HARVIS:  That's okay.  Go ahead.
12          THE COURT:  Let me get my boss here.
13          MR. HARVIS:  Please, yes.  Exactly.
14          (Pause in proceedings.)
15          THE COURT:  So I think I saw two other people:
16    Sortino and Dorsi.
17          MR. HARVIS:  Right.
18          So those, those two people are supervisors.
19          THE COURT:  Okay.
20          MR. HARVIS:  Okay?
21          I'm just saying that because we withdrew our
22    supervisory liability claim.
23          THE COURT:  Right.
24          MR. HARVIS:  So our theory is not that because they
25    were supervisors, they're responsible.

17

1          THE COURT:  Okay.

2          MR. HARVIS:  They have direct involvement and that's

3   made out through documents and their own testimony.

4          Sortino testified that this, what happened at the

5   armory was a joint investigation between Hempstead and Nassau.

6          THE COURT:  Right.

7          MR. HARVIS:  Sortino was the supervisor for

8   Hempstead.  He was sitting at the desk.  Dorsi was a

9   supervisor for Nassau County.  And they both testified that --

10  well, we know that both of them signed all the key documents

11  that were basically summarizing what happened that day.  So,

12  the arrest report --

13         THE COURT:  Slow down just a little.

14         MR. HARVIS:  Oh, sorry.

15         THE COURT:  That's okay.

16         MR. HARVIS:  The arrest report, the crime report.

17  There's something called a -- the case report.  All of those

18  documents were reviewed and signed by both Dorsi and Sortino.

19         And then Dorsi is supervising the detectives who are

20  allegedly involved in the misconduct around the

21  identifications, although we can see that that wouldn't have

22  been disclosed to him.

23         THE COURT:  Right.

24         So just as far as I know, Dorsi is not personally

25  involved in running the lineups, correct?

18

1          MR. HARVIS:  The photo arrays in the armory, no.

2          He is supervising that stuff and signing off on the

3    paperwork and looking at whether or not the --

4          THE COURT:  Same with Sortino?

5          MR. HARVIS:  Sortino signs the criminal complaint,

6    which is the initiating document of the Prosecution which

7    contains a false statement, which we think puts him on the

8    hook for --

9          THE COURT:  What?

10         MR. HARVIS:  Malicious prosecution.  He's initiating

11   a prosecution --

12         THE COURT:  But that false statement never goes

13   anywhere.

14         MR. HARVIS:  Well, it goes to the prosecutors.

15         THE COURT:  But I mean...

16         MR. HARVIS:  That's the whole test under *Garnett* and

17   *Ricciuti*, is whether you forward false information to

18   prosecutors.  It really doesn't -- the question isn't whether

19   it's used further in the proceedings or not, because you could

20   say the same things about Ogletree.

21         I'm sorry.

22         THE COURT:  So Sortino signs off on the complaint,

23   and you're saying that that is forwarding false information

24   because of the...

25         MR. HARVIS:  False statement that says that.

19

1          THE COURT:  The false statement.

2          And that's not a statement that refers to -- well,

3    that you would be contending was false too, because it was

4    Ogletree who said it?

5          MR. HARVIS:  Right.  It's actually -- it's

6    attributed to Plaintiff.

7          THE COURT:  Right.

8          MR. HARVIS:  It's saying that Plaintiff made an

9    omission, when it's conceded and it's undisputed that he never

10   made an omission on the Anyosa shooting.

11         THE COURT:  So let's just start with Dorsi though.

12   He didn't do any of those things.  Should he be in this case?

13   Or do you want to think about it?

14         MR. HARVIS:  I'm happy to think about it.  I mean,

15   I'm very happy to be open to thinking about it.

16         I agree he's not in the absolute core of the -- but,

17   you know, he is reviewing and discussing this with his

18   subordinates.  And I mean...

19         THE COURT:  I don't really think that's enough, but

20   I could be wrong.  I just don't think -- you know, if he is

21   not personally aware of the particular violations that you're

22   describing and there's no supervisory liability, I don't think

23   he can be held liable.

24         Sortino, I don't quite know what the answer is to

25   that.  Because, I mean, I suppose as a practical matter he's

20

1  just going to say he looked at the -- you know, he shouldn't

2  have done it.  But, I mean, it doesn't sound like he was

3  involved in interviewing any witnesses or anything like that.

4        MR. HARVIS:  That's true.

5        THE COURT:  So I would ask you to think about those

6  two people.

7        All right.  Now let me just ask you if you have any

8  response on this question of *Monell*.

9        MR. VITAGLIANO:  Your Honor, for the most part, we

10  rely on our papers.

11        But we do agree with --

12        THE COURT:  Pull up your microphone a bit if you

13  can.

14        MR. VITAGLIANO:  My apologies.

15        THE COURT:  That's okay.

16        MR. VITAGLIANO:  For the most part, we do rely on

17  our papers, which, you know, there's ample case law to show

18  that the way that this lineup was done was conducted pursuant

19  to policy and it's non-duly suggestive.

20        THE COURT:  So what Counsel is saying is that the

21  policy of -- just all of the things?  Is it covering them up?

22  Is it the phone book?  I think what he's saying is that the

23  policy of doing something like concealing somebody's height

24  when it's radically different from the description is a policy

25  that could be the subject of a *Monell* claim.

21

1      MR. VITAGLIANO:  We disagree with that assessment,

2  Your Honor.  Quite frankly, in the record, all of the

3  detectives who were asked about how the lineup was going to

4  proceed stated that the lineup would have proceeded in the

5  exact same way.  The County's 30(b)(6) witness said the lineup

6  proceeded in the exact same way.

7      THE COURT:  Okay.  I think I understand your

8  position on that.

9      Then do you have anything to add about Ross's

10  involvement?  I think you probably are going to rely on your

11  papers there as well.

12      MR. VITAGLIANO:  We are going to rely on our papers,

13  but just one thing to note.

14      In Exhibit 5-A that's annexed to our papers is an

15  affidavit that's completed by Mr. Harvis, who essentially

16  comes out and says, in the court of claims lawsuit that's

17  parallel to this case, that the affidavit that Lori Magliaro

18  signed, Ross's girlfriend, had absolutely no weight.  He

19  called the affidavit dubious.  And now he wants to rely on --

20  he wants to rely on that when trying to keep Detective Ross in

21  the case where he had minimal involvement.

22      THE COURT:  I mean, it is pretty dubious.

23      MR. HARVIS:  I stand by that.  It's a dubious thing,

24  but it can still raise a dispute of fact.

25      THE COURT:  I mean, we're in a slightly different

22

1  position here.  I mean, I'm not telling you all anything you

2  don't know.  I can't resolve these credibility determinations.

3  You know, would it be probably fun for a lawyer to

4  cross-examine somebody like that?  It probably would.  But

5  those are the determining I can't make on summary judgment.

6  But I understand your position, I think.

7           Now, the next question -- well, I wrote this down,

8  but I don't know why I would even ask it.  It was:  Have you

9  discussed settlement?  Obviously very far apart, I would

10  imagine.

11           MR. HARVIS:  We tried in the beginning before

12  Judge Wicks and it didn't -- it took about ten minutes and it

13  didn't go anywhere.

14           THE COURT:  Okay.

15           Do you feel the same way?

16           MR. VITAGLIANO:  At this point in time, yes.

17           THE COURT:  All right.

18           Okay.  Now, Mr. Ogletree, such a mystery.  I know

19  there's probably a dispute about whether his trial testimony

20  would be admissible.  I think the weight of persuasive

21  authority is that because these defendants didn't have a

22  chance to cross-examine him, that the trial testimony would

23  probably not be admissible.  I think there's some cases that

24  go the other way.  But let's say, just starting with that

25  premise, has any -- do we know where he is?

23

1          MR. HARVIS:  I know he was in jail at one point.

2          THE COURT:  Has anybody tried to depose him or tried

3  to get him?

4          MR. HARVIS:  We've taken some steps to try to track

5  him down.

6          I mean, our view was because the evidence at summary

7  judgment doesn't need to be offered in admissible form, that

8  it was not -- there was no reason -- we have great testimony

9  from him in the trial, so why --

10         THE COURT:  Yes, okay, but what if I say you can't

11 introduce that?  I mean, I'm just thinking practically.  I

12 mean, discovery is closed, he has not been deposed.  I'm just

13 trying to figure out practically what would happen.

14         So let's say that there's a trial and then in walks

15 Mr. Ogletree.  They're probably going to object if they didn't

16 get a chance to depose him.

17         MR. HARVIS:  But he was in our initial disclosures.

18 They had every opportunity to.  Nobody prevented them from

19 deposing him.  It was there.  For whatever reason, didn't

20 depose him.

21         THE COURT:  Okay.

22         MR. HARVIS:  I don't think they'll have any success

23 with that.

24         I mean, I think the question is -- I mean, it's a

25 question to be answered at trial.  But I think for these

24

1  purposes in deciding whether there's a dispute of fact about

2  whether the allegations -- because if I may --

3          THE COURT:  I agree with you.

4          MR. HARVIS:  Okay.

5          THE COURT:  I mean, there are cases in which, but I

6  think it's when a witness is deceased --

7          MR. HARVIS:  Exactly.

8          THE COURT:  -- that you can decide it on summary

9  judgment.  That's not this.

10          MR. HARVIS:  Exactly.

11          And we cited to Judge Crotty's opinion in the

12  *Hincapie* summary judgment decision, which is almost identical

13  but the facts are better.  Because in that case, the person

14  who had been coerced didn't even testify at the trial.  It was

15  an unsigned affidavit that Judge Crotty provisionally

16  credited.

17          THE COURT:  Right, I'm not talking about in terms of

18  summary judgment.

19          I'm just talking about it -- you know, I don't mean

20  to rain on anybody's parade, but I don't see myself granting

21  every aspect of the summary judgment.  This case is going to

22  be alive after this, this decision.  I hope that doesn't ruin

23  anybody's world.  But I think there are significant questions

24  of fact about some things.  But what I'm just trying to figure

25  out is, you know, what we're going to do with that.  So okay,

25

1   I think I understand.

2          Do you have anything you want to say about

3   Mr. Ogletree?

4          MR. VITAGLIANO:  Your Honor, Mr. Ogletree is

5   currently incarcerated at the Nassau County Correctional

6   Center.  By the time that these motions for summary judgment

7   were submitted, he was arrested.  And he's recently in there

8   on another pending indictment for Assault 1, so he's currently

9   in there right now.  It's Plaintiff's burden to demonstrate

10  whether or not he's unavailable and Plaintiff's done

11  absolutely nothing to show that he is unavailable.

12         THE COURT:  Just remind me.  Is he unavailable if he

13  takes the Fifth?

14         I don't know that he would have a Fifth Amendment

15  right in --

16         MR. HARVIS:  No.  The whole point of this case is

17  that the statute ran.  That's why they couldn't charge

18  Kenton Sherwood.  It's an attempted murder.

19         THE COURT:  No, but I'm not talking about that.

20         I'm talking about, can he take the Fifth on anything

21  if he's got a pending case?  Probably not.  Probably not.

22         MR. HARVIS:  I'm not sure.  But --

23         THE COURT:  So it doesn't sound like he's

24  unavailable.

25         But I don't think this is something I can decide on

26

1  summary judgment.  I think that the record is what the record

2  is.  And it's just a practical question that I had.

3          MR. HARVIS:  I just want to make one point,

4  Your Honor, which is that independent of whether Ogletree

5  himself testifies, we think that Plaintiff's innocence alone

6  casts a lot of questions onto the statement that was allegedly

7  provided by Robert Ogletree because it has facts that he

8  couldn't have known because --

9          THE COURT:  Let's wait for the trial.

10          MR. HARVIS:  All right.

11          THE COURT:  Okay.  Now just a couple of little

12  questions.

13          Mr. Hardy was the lawyer who represented the

14  Plaintiff at the lineup, correct?

15          MR. HARVIS:  Yes.

16          THE COURT:  And he was there.  He didn't object to

17  anything.  And in your 56.1 response it said he didn't have an

18  opportunity.  What does that mean?

19          MR. HARVIS:  He testified that he wasn't -- wouldn't

20  be permitted to object.  And the lineup order itself says that

21  the defense attorney shall attend the procedure in the

22  capacity of an observer.  That's the language in the order.

23          THE COURT:  But isn't it the case -- I mean, maybe I

24  guess I am showing how old I am, but I thought that was the

25  whole reason why lawyers went to lineups, so they could

27

1  register objections about the composition and about the --

2      MR. HARVIS:  Well, Ross said that he wouldn't have

3  permitted him to do that.  He was --

4      THE COURT:  He wouldn't permit him to say "here's my

5  objection"?

6      MR. HARVIS:  That's what Ross's testimony is.  I can

7  find the paragraph.

8      And we also have -- Hardy has done 3,000 criminal

9  defendants and he said he's never objected once at a lineup.

10  So as a practical matter, I don't think he views that as the

11  purpose of it, because it's never come up for him.

12      THE COURT:  Oh, I guess it was different in

13  Manhattan.  People objected all the time.  They would say they

14  objected to the people that were in the lineup.  I mean,

15  that's the whole point of having a lawyer there.

16      MR. HARVIS:  I would have objected if I was there.

17  That's for sure.

18      THE COURT:  Oh, alright.

19      Do you have anything you want to say about that?

20      MR. VITAGLIANO:  I believe in the record it is

21  pretty clear that defense attorneys do have an opportunity to

22  object from lineups that are run in Nassau County.  But other

23  than that, nothing, Your Honor.

24      MR. HARVIS:  Your Honor, I just want to direct the

25  Court.  It's paragraph 541 of our statement of additional

28

1    facts.

2            THE COURT:  Oh, yes.

3            MR. HARVIS:  I know there are quite of few.

4            THE COURT:  Objection paragraph 541.

5            But go ahead.

6            MR. HARVIS:  When the attorney appears at a lineup,

7    it is strictly as a witness.  That's Ross's testimony, so...

8            I realize there are a lot of paragraphs.

9            THE COURT:  Well, the problem -- I guess this is a

10   plea for -- I really rely on 56.1s and when they're loaded

11   with arguments and multiple statements, they're just no use to

12   me.  And it requires me and, more importantly, my law clerk to

13   go dig in to find out what the basis for it is.  Which I do,

14   but it makes me unhappy.  I mean, I know people, you know,

15   want to make their arguments wherever they can, but the 56.1

16   is not the place to do it.  It just isn't.  And that's why I

17   require them before -- I am sure you feel like I'm a broken

18   record because I think we had this exact conversation.  But

19   it's just that I can't -- it makes it so inefficient for me

20   because I don't know what to do with that.

21           MR. HARVIS:  We really tried to edit it down between

22   when they were done in the letters and then now.

23           THE COURT:  Yes.

24           MR. HARVIS:  But I understand Your Honor's point.

25   It's a lot of facts.

29

1      THE COURT:  Okay.

2      MR. HARVIS:  No doubt.

3      THE COURT:  Well, it's just a lot of words.

4      MR. HARVIS:  Exactly.

5      THE COURT:  And some of it's not really -- some of

6   it is legal argument.

7      All right.  Okay, let's see.

8      Now my next question has to do with qualified

9   immunity.  What I'm going to ask both sides to do, the -- I

10  think it's a 2018 Supreme Court case which is in the context

11  of the Fourth Amendment, an excessive force, but which

12  requires some factual similarity so that the police officers

13  are alerted to whether or not their conduct violates a

14  constitutional right.  What I would like both sides to do is

15  give me a letter not to exceed three pages with cases on that

16  subject addressing -- I can't read my own handwriting.

17     (Pause in proceedings.)

18     THE COURT:  *City of Tahlequah* 142 S. Ct. 9 (2021).

19  Not 2018, but there is also a 2018 case from the Supreme Court

20  that also talks about that as well.

21     So what I would like are cases that show me that --

22  if there are, that in these particular circumstances, I think

23  coercing the statement will probably be a lot easier than some

24  of the lineup things.

25     Because you've got a couple of things that you claim

30

1  are suggestive.  We have somebody in custody.  I don't know if

2  that standing by itself constitutes something that is

3  unconstitutional.  And I take it your argument is the whole

4  confluence of circumstances.

5       So I would like those by a week from today.  And

6  just really, it's fine to just give me the cases.  If you want

7  to put a little summary in there, you can, but I just want to

8  get a little bit more clarity on that.

9       All right.  Hold on for just a second.

10      So I guess just to be -- as I said, so the cites

11 would be for the fabrication of evidence, which would be

12 Ogletree's statement; the suggestive identification

13 procedures, specifically the statements that were allegedly

14 made before and after the --

15      MR. HARVIS:  Photo array?

16      THE COURT:  -- photo array and then the lineup.

17      And then I think in terms of suppression of

18 evidence, there is an allegation that the victim said that he

19 saw a couple of photo arrays and didn't identify anybody in

20 them, and so I think that would also be the suppression of

21 evidence.

22      So yes, if you can give me a letter on that, that

23 would be helpful.

24      Okay.  Let me just confer here for a minute.

25      (Pause in proceedings.)

31

1          THE COURT:  I think I referred to this sort of

2     obliquely before, but in the malicious prosecution context,

3     what does it mean, what is involved and which defendants are

4     involved in initiating or forwarding information.  I know

5     you're contending that the people who signed the complaint.

6          MR. HARVIS:  DeCaro.  That would be Defendant

7     DeCaro.

8          And then Sortino, who under Your Honor's request

9     we're considering whether he's going to remain in the case or

10    not.

11         THE COURT:  Right.

12         And what about -- well, who else?

13         MR. HARVIS:  Well, I think that we think that it's

14    all of the folks that -- we think it's -- well, I think that

15    the initiation is the culmination of this investigation, so

16    the only -- only one person is ever going to be signing a

17    criminal complaint.

18         THE COURT:  Right.

19         MR. HARVIS:  So we think that the analysis is

20    slightly broader than the question of whose signature appears.

21    And we think that we're really talking about DeCaro, Lipson,

22    D'Luginski, and Horowitz who are the people that are --

23         THE COURT:  Horowitz was the arresting officer,

24    right?

25         MR. HARVIS:  Right.  But he's also in there with

32

1   Ogletree.

2           THE COURT:  Oh, yes.  Okay.

3           MR. HARVIS:  So our view would be that those are the

4   officers that -- whose efforts that evening culminated in the

5   criminal complaint that DeCaro signed.

6           So it's, I think, strongest and clearest with

7   respect to DeCaro, but we think the other ones are in there as

8   well because it's a joint venture that they're engaged in.

9           THE COURT:  But again, do I need more specificity

10  than they were in the room or that they --

11          MR. HARVIS:  Well, what we have --

12          THE COURT:  Just something I want you to think about

13  in terms of --

14          MR. HARVIS:  Okay.

15          THE COURT:  And maybe when you submit the letter I

16  will give you an extra page to talk about that.

17          MR. HARVIS:  Well, I mean, what I would say on that

18  is, you know, in a way it's sort of academic only -- I mean,

19  as to the 1983 claims, it matters.  But we have state law

20  claims and valid notices of claims.

21          THE COURT:  Right.

22          MR. HARVIS:  So if it was any Nassau County officer,

23  then Nassau County would be on the hook for the malicious

24  prosecution.

25          THE COURT:  Right.

1    MR. HARVIS:  But I hear what Your Honor -- so we can

2  look at whether the other officers can satisfy the initiation

3  prong.

4    THE COURT:  Yes.  I think it just makes it cleaner.

5    MR. HARVIS:  Yeah.

6    THE COURT:  Because then if you're at a trial you

7  have to sort the whole thing out again, which is hard.

8    MR. HARVIS:  Yeah.  I mean, it's just occurring to

9  me, you know, the phrase is initiation or continuation, and so

10  the officers who are testifying at the Grand Jury and then

11  testifying at the trial, I mean, is that continuation?  We

12  will look at the case law and give that some thought.

13    THE COURT:  Okay.  Yes, I mean, that could -- I

14  think those are more for your trial.

15    MR. HARVIS:  Well, I mean, so Anyosa testified that

16  he was not confident at the trial, but he identified Plaintiff

17  because he felt pressure.  So if that pressure was a result of

18  continuing conversations that he's having, we think that may

19  fall into the continuation concept.

20    But we will look at it, and I appreciate what

21  Your Honor is saying.

22    THE COURT:  I thought it was slightly more nuanced

23  than that.  I mean, it was a very compelling statement.  It

24  was sort of a compelling statement that he -- you know, that

25  everybody told him that, you know, that he knew that

34

1   Josiah Galloway did it, or something like that.  But I'm not

2   quite sure that it answers the question.

3           One other question.  I haven't seen the Grand Jury

4   minutes, but just on the probable cause question, I'm assuming

5   that there was some testimony about the identifications in the

6   Grand Jury?

7           MR. HARVIS:  Both Hernandez and Anyosa testified and

8   Lipson described what happened at the photo array.

9           THE COURT:  Okay.  All right.

10          Oh, they testified about the photo array in the

11  Grand Jury.

12          MR. HARVIS:  Yes.

13          THE COURT:  Oh, because they hadn't had the lineup

14  yet.

15          MR. HARVIS:  Yes, that's right.

16          THE COURT:  Okay.

17          This is totally irrelevant, but are photos arrays

18  now admissible at trial?

19          MR. HARVIS:  I'm not sure.

20          THE COURT:  Because they were not back -- I thought

21  there was a new thing that they are now.

22          MR. VITAGLIANO:  If they're done in a double-blind

23  fashion, yes.  I believe the New York State Criminal Procedure

24  Law was changed in 2017 and I believe -- I forget exactly

25  which section it is, but now if they're done in a double-blind

35

1   fashion and they meet all the certain criteria, they are
2   admissible as evidence.
3           THE COURT:  And what about sketches?  Because
4   they're probably still not admissible on a direct case.
5           MR. VITAGLIANO:  I don't know.  On the top of my
6   head, I don't believe so, but I'm not sure, Your Honor.
7           THE COURT:  Okay.  I was just curious.  All right.
8           Okay.  I appreciate everybody's input.
9           Is there anything that anybody wants to say?
10          I haven't let you guys say very much, but it's not
11  because I'm not thinking about what you said.  I just had
12  particular questions.
13          MS. MASTELLONE:  If you could just clarify,
14  Your Honor, exactly.  I mean, you pointed out a few things
15  that you want us to address in the three-page letter in the
16  context of this Tenth District matter.
17          THE COURT:  The qualified immunity.
18          MS. MASTELLONE:  Okay.
19          THE COURT:  Yes.  Just in terms of what the
20  factual -- I mean, many of them are just intensely factual
21  inquiries.  And my question is whether there are cases that
22  have similar -- the point is, is the officer alerted that the
23  conduct is violative of a constitutional right.  And I don't
24  think it's enough to say -- I mean, I could be wrong about
25  this.  I don't think it's enough to say *Brady* violations or

36

1    suggestive ID procedures.  I think it has to be more specific

2    than that.  But I will let you all do that work for me.  Okay?

3            All right.  Is there anything else anybody wants to

4    say?

5            MR. HARVIS:  Not from the Plaintiff, Your Honor.

6            MR. VITAGLIANO:  No.  Thank you, Your Honor.

7            THE COURT:  Okay.

8            And if you decide you want to settle the case, let

9    me know.

10           MR. HARVIS:  You're okay with that?

11           THE COURT:  Thanks so much.

12           MR. HARVIS:  Thank you, Your Honor.

13           MS. FETT:  Thank you, Your Honor.

14           (Matter concluded.)

15

16                    *     *     *     *     *

17

18   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
19

20       /s/ Andronikh M. Barna              March 15, 2024

     _____         _____
21       ANDRONIKH M. BARNA                  DATE

22

23

24

25