UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Josiah Galloway, | ) |
| | ) |
| *Plaintiff,* | ) Case Number 2:19-cv-05026 |
| | ) (AMD)(JMW) |
| -against- | ) |
| | ) |
| Nassau County; The Incorporated Village | ) |
| of Hempstead; Police Officer Steven | ) **Notice of Appeal** |
| Horowitz, Shield No. 144; Detective | ) |
| Matthew Ross, Shield No. 834; Detective | ) |
| Charles DeCaro, Shield No. 1047; | ) |
| Detective Ronald Lipson, Shield No. 1296; | ) |
| Detective Thomas Dluginski, Shield No. | ) |
| 7900; Detective George Darienzo, Shield | ) |
| No. 1038, | ) |
| | ) |
| *Defendants.* | ) |

Notice is hereby given that defendants Nassau County, Detectives Charles

Decaro, Thomas Dluginski and George Darienzo, and retired Detectives Matthew

Ross and Ronald Lipson, hereby appeal to the United States Court of Appeals for

the Second Circuit from the portion of the trial court's March 29, 2024 order that

[continued on next page]

denied their motion for summary judgment.

Dated: New York, New York
      June 21, 2024

By:_____

    Judy C. Selmeci
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
Attorneys for defendants
Nassau County, Detective Charles
Decaro, Detective Thomas
Dluginski, Detective George
Darienzo, retired Detective
Matthew Ross and retired Detective
Ronald Lipson
150 East 42nd Street
New York, NY  10017
(212) 490-3000
File No.: 12473.00047

To:    All counsel of record via PACER

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                :

**JOSIAH GALLOWAY**,                     :

                   Plaintiff,        :

                                  :   **MEMORANDUM DECISION AND ORDER**

         – against –            :

                                  :   19-CV-5026 (AMD) (JMW)

**COUNTY OF NASSAU**, *et al.*,         :

                                  :

                 Defendant.       :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff, wrongfully convicted of attempting to murder a taxi driver named Jorge Anyosa, brings this case against Nassau County, the Village of Hempstead, and individual law enforcement officers from each entity, alleging malicious prosecution, fabrication of evidence, *Brady* violations, false imprisonment, conspiracy, unlawful pre-trial detention, failure to intervene, and a *Monell* claim.

Before the Court are the defendants' motions for summary judgment. For the reasons explained below, the motions are granted in part and denied in part.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements[1] and relevant portions of the record and are undisputed unless otherwise noted.

---

[1] Citations to the defendants' joint Rule 56.1 statement are to ECF No. 200, which contains the plaintiff's responses to each paragraph. Likewise, citations to the plaintiffs' Rule 56.1 statement are to ECF No. 209, which contains the defendants' joint responses.

## I.      Factual Background

### a.      Jorge Anyosa Is Shot

In the early morning hours of May 15, 2008, Jorge Anyosa was in his parked taxi near Hempstead Train Station, talking to Wilmer Hernandez, who was double-parked in his own taxi cab. (Def. 56.1 ¶¶ 13–15.) At one point, someone drove up behind them and started honking "like crazy." (*Id.* ¶ 16.) The driver got out of his car, argued with Anyosa and Hernandez, and drove away after a few minutes. (*Id.* ¶¶ 17, 22, 24.) Shortly thereafter, Anyosa and Hernandez were dispatched to pick up clients. (*Id.* ¶¶ 25–26.) When Anyosa's passenger did not show up, he returned to the Hempstead Train Station and parked in the lot, about twenty minutes after the argument with the other driver. (*Id.* ¶¶ 27–28.) Anyosa then heard someone say, "What you going to do now, mother fucker?" (*Id.* ¶¶ 29–31.) He saw the driver from the earlier argument in his car with the window rolled down. (*Id.* ¶ 30.) He pointed a gun at Anyosa, shot him in the face, and fled. (*Id.* ¶¶ 32–34.) A bystander heard the gunshot, saw Anyosa bleeding from his face, and called the police. (*Id.* ¶ 37.) Anyosa survived the shooting. (*Id.* ¶ 43.) He was transported to Winthrop Hospital, where he had surgery, but suffered permanent nerve damage and scarring to his face. (*Id.* ¶¶ 43–44.)

Nassau County Police Department ("NCPD") Detective Thomas D'Luginski was assigned to investigate the shooting and arrived at the scene just before 2:00 a.m. on May 15, 2008. (*Id.* ¶¶ 48–50.) He viewed footage taken by the MTA Bus Terminal in Hempstead of the vicinity of the shooting, which showed both cars but did not show the shooter clearly. (*Id.* ¶¶ 54–56.)

On May 19, 2008, Detective D'Luginski asked Detective Thomas Bischoff, a sketch artist, to meet Anyosa at Winthrop Hospital and prepare a composite sketch of the shooter. (*Id.* ¶¶ 64, 67–68.) Detective Bischoff interviewed Anyosa and completed a composite sketch, which

was circulated to several police agencies and precincts. (*Id.* ¶¶ 73–74.) The composite sketch included a description of the shooter: a 25 to 30 year old man, 5'10" tall, with short black hair and a medium complexion who spoke with an accent. (Pl. 56.1 ¶¶ 196–97.)

### b.    The Plaintiff Is Arrested for an Unrelated Robbery

On May 27, 2008, Marky Fouse reported to officers of the Village of Hempstead Police Department ("HPD") that "he was a victim of a robbery by [the] plaintiff that took place on Fulton Avenue in the Village of Hempstead." (Def. 56.1 ¶ 78.) On June 5, 2008, at approximately 11:00 p.m., HPD Detective Kevin Cunningham and Police Officer Steven Horowitz arrested the plaintiff and his friend, Robert Ogletree. (*Id.* ¶¶ 76–83.)[2] They drove the plaintiff and Ogletree to the Hempstead Police Armory and contacted the NCPD to take over the investigation. (*Id.* ¶¶ 86–87, 89–93.) NCPD Detectives George Darienzo and Charles DeCaro arrived at the Armory shortly after midnight. (*Id.* ¶ 93.)

Detective DeCaro spoke with the plaintiff, who was 21 years old, 5'5" tall, had braided hair, and no accent. (*Id.* ¶¶ 98–100; Pl. 56.1 ¶¶ 287, 379, 517, 633, 663.) Detective DeCaro thought that the plaintiff resembled the Anyosa shooting suspect depicted in the composite sketch, which had been posted near DeCaro's desk for several weeks. (Def. 56.1 ¶¶ 100–103.)

Detective Darienzo went back to the NCPD Third Squad and got a copy of the composite sketch. (*Id.* ¶ 107.) Detective DeCaro asked NCPD Detective Ronald Lipson to put together two photo arrays with the plaintiff's photograph. (*Id.* ¶ 110.) Detective Lipson created two arrays at around 2:00 a.m. on June 6, 2008; he used the plaintiff's arrest photograph from

---

[2] The parties' 56.1 statements do not identify where the plaintiff was when he was arrested or who called notifying law enforcement of his location.

September 2007, and photographs of five fillers. (*Id.* ¶¶ 113–19.) He then brought the photo arrays to the Armory. (*Id.* ¶ 125.)

### c. Robert Ogletree's Written Statement

At approximately 3:00 a.m., Detective DeCaro interviewed Robert Ogletree "about multiple different incidents." (*Id.* ¶ 130.)[3] Ogletree signed a written statement in which he said that the plaintiff told him that the plaintiff "had to . . . shoot a cab driver over by the chicken place on Jackson." (*Id.* ¶ 133.)[4]

### d. Photo Arrays and Interview of the Plaintiff

#### i. *Hernandez*

In the "early morning" of June 6, 2008, Wilmer Hernandez, the driver who saw the argument that preceded the shooting, went to the Armory to view a photo array. (*Id.* ¶ 136.) He met with Detective Lipson, who created the array, and Officer Horowitz, who arrested the plaintiff the night before. (*Id.* ¶ 138.)

The defendants assert that Hernandez did not know anyone was in custody when he was at the Armory (*id.* ¶ 137), citing his trial testimony:

> **Q:** Okay. Can you tell us, sir, at the time you did come in and that they had you in the precinct, at that time, did you notice anybody in custody? . . .
>
> **A:** No.

(ECF No. 194-5 at 478.) The plaintiff disputes this assertion, citing Hernandez's deposition testimony:

---

[3] The parties dispute the extent to which Detective Darienzo was involved in questioning Ogletree. (*Id.* ¶ 131.)

[4] At that time, "there was a chicken restaurant located . . . [one] block from where [Anyosa] was shot on May 15, 2008." (*Id.* ¶ 135.)

> **Q:** When you arrived at the . . . armory, what happened?
>
> **A:** They told me they had the person who was the cause of the incident, but they wanted to show me pictures . . . .

(ECF No. 194-29 at 31.)

At approximately 3:20 a.m., Hernandez looked at the photo array, and circled the plaintiff's photograph, in position #2. (Def. 56.1 ¶¶ 142–44.) Detective Lipson wrote "a supporting deposition" for the photo array, which Hernandez signed. (*Id.* ¶ 145.)

The plaintiff asserts, citing Hernandez's deposition testimony, that "[a]t some point in the procedure, Lipson revealed [the] plaintiff's identity to Hernandez."

> **Q:** Were you told that the person that you selected in the photograph was named Josiah Galloway?
>
> **A:** I think so. Honestly, I'm not sure. It might have been possible.
>
> **Q:** Do you remember anything about the circumstances in which you were told that the person's name was Josiah Galloway? . . .
>
> **A:** I don't remember, no.
>
> **Q:** Do you know who told you that; [] which of the officers or who it was that told you that? . . .
>
> **A:** No. I don't remember, no.
>
> . . .
>
> **Q:** And then it says "The police told you the name of the person in number two[.]" And then the answer was "Yes," did you say that?
>
> **A:** Yes, that's correct. . . .
>
> **Q:** And sitting here today in the year 2020, do you remember when the police told you that?
>
> **A:** I think it was the day that I went to identify the pictures.

(ECF No. 194-29 at 38, 72.) The defendants do not dispute that Hernandez learned the plaintiff's name; they assert, however, that the plaintiff's name was "provided on the supporting deposition form that was completed *after* Hernandez identified the plaintiff from the photo array." (Pl. 56.1 ¶ 356 (the defendants' response) (emphasis added).)

ii.     *Detectives DeCaro and D'Luginski Interview the Plaintiff*

At around 4:30 a.m. on June 6, 2008, Detectives DeCaro and D'Luginski questioned the plaintiff, including about the Anyosa shooting.  (Def. 56.1 ¶¶ 149–50.)  The plaintiff said that he "didn't know anything about" the shooting.  (ECF No. 194-19 at 193.)

iii.     *Anyosa Views the Photographic Array*[5]

At around 5:00 a.m. on June 6, 2008, Detective Lipson drove to Anyosa's home to show him the photograpic array.  (Def. 56.1 ¶ 156.)

According to the plaintiff, Detective Lipson "told Anyosa that Wilmer Hernandez had already selected the 'right person,'" before he showed Anyosa the array.  (ECF No. 202 at 12.)  The plaintiff cites Anyosa's deposition testimony.

> **Q:**  Now, you see how it says that "he knew Wilmer had ID'd him." . . . How did you know that?
>
> **A:**  I think so went to the police station, they told me Wilmer ID'd him before me.
>
> . . .
>
> **Q:**  [B]efore you looked at the photo array, did you know that Wilmer had already picked someone? . . .
>
> **A:**  Yes
>
> **Q:**  Okay.  And did you know . . . that Wilmer had picked Josiah Galloway?
>
> **A:**  No, I don't think so.  They only told me he—he got it.  I think so.  He picked the right person.

(ECF No. 194-67 at 30–31.)  The plaintiff also maintains that Lipson showed Anyosa two or three arrays that included the plaintiff's photograph, and that Anyosa did not identify the plaintiff

---

[5] In the responses to the defendants' 56.1 statement, the plaintiff disputed whether any defendants visited Anyosa early in the morning on June 6, 2008.  (*See* Def. 56.1 ¶¶ 158–59 (the plaintiff's responses).)  However, in his opposition, the plaintiff agrees that officers did visit Anyosa early that morning to conduct the photo array.  (*See* ECF No. 202 at 12.)  Accordingly, the Court concludes that there is no dispute about this issue.

in one or two of the arrays; the plaintiff cites Anyosa's trial testimony that he was shown "two or three" sheets of paper with "six pictures" at a time, and that he did not identify the plaintiff when he viewed at least one of the arrays.  (ECF No. 202 at 12–13; ECF No. 194-5 at 456.)  The defendants dispute that Lipson showed Anyosa more than one array.  (*See* Pl. 56.1 ¶ 703 (the defendants' response).)

### e.    The Plaintiff Is Charged With Shooting Anyosa

At some point on June 6, 2008, Detective DeCaro faxed paperwork to the Early Case Assessment Bureau ("ECAB") of the Nassau County District Attorney's Office ("NCDA"). (Def. 56.1 ¶¶ 170–72; ECF No. 194-68 (ECAB Paperwork).)  Detective DeCaro[6] spoke with a prosecutor on the telephone about "information related to the investigation of the . . . incident with Marky Fouse . . . and the May 15, 2008 shooting of Anyosa."  (Def. 56.1 ¶ 172.)  Detective DeCaro signed the felony complaint charging the plaintiff with attempted murder, assault, and criminal use and possession of a firearm for the May 15, 2008 shooting of Anyosa.  (*Id.* ¶ 174; *see also* ECF No. 194-37 (Felony Complaint.))

In the felony complaint for the shooting, Detective DeCaro stated that he "secured a statement of admission from [the plaintiff] regarding the Anyosa shooting."  (Pl. 56.1 ¶ 147.) Detective DeCaro testified at his deposition that the plaintiff made no such admission:

> **Q:**  Did the [plaintiff] make a Statement of Admission in this case with respect to this crime?
>
> **A:**  In this case, no.
>
> **Q:**  Why does it say that [in the Felony Complaint]?
>
> **A:**  I don't know. . . .
>
> **Q:**  Would you agree that the reference to the defendant's Statement of Admission in this document is an error? . . .

---

[6] The parties dispute whether Detective D'Luginski also spoke to the assistant district attorney in ECAB. (*See* Def. 56.1 ¶ 172.)

> **A:** That is possible.
>
> **Q:** And did you read this document before you signed it?
>
> **A:** I should have.

(ECF No. 194-17 at 196–97 (DeCaro Deposition).)

### f.     Grand Jury Proceedings

NCDA Assistant District Attorney ("ADA") Joseph Larocca was assigned to prosecute the plaintiff for shooting Anyosa. (Def. 56.1 ¶ 184.) He presented the case to a Nassau County Grand Jury on June 10, 2008. (*Id.* ¶ 185; Pl. 56.1 ¶ 393.) The grand jury heard testimony from Detectives Horowitz and Lipson, Anyosa, and Hernandez. (Def. 56.1 ¶ 195.) They also heard testimony about the photo array identifications. (*Id.* ¶ 196.)

On June 16, 2008, the grand jury indicted the plaintiff for the following crimes: (1) attempted murder in the second degree; (2) assault in the first degree; (3) criminal use of a firearm in the first degree, and (4) criminal possession of a weapon in the second degree. (*Id.* ¶ 195.)

### g.     Lineup Procedures

On June 30, 2008, Judge Alan Honorof signed an order requiring the plaintiff to appear in a line-up. (*Id.* ¶ 201.) The judge also ordered the plaintiff not to "alter or remove any scalp or facial hair." (*Id.* ¶ 203.)

On August 5, 2008, the NCPD tried but could not run the line-up because of the change in the plaintiff's hairstyle. (*Id.* ¶ 204.) Although the plaintiff's hair was braided tightly and close to his head on June 6, 2008, he wore his hair in an afro style on August 5, 2008. (*See* Pl. 56.1 ¶ 426.) At his deposition, the plaintiff testified that he took the braids out and washed his hair because his "hair was starting to stink." (ECF No. 194-19 at 82.) When he arrived for the line-up, a detective, whom the parties do not identify, pointed to the plaintiff's hair and said, "your

hair isn't the way it was when you were arrested[,] [s]o we either going to have to cut your hair or you're going to have to go and come back and redo the lineup." (*Id.*) Another officer gestured to a pair of hair clippers. (*Id.* at 82–83.) The plaintiff refused to have his hair cut so the line-up was rescheduled. (*Id.*; Def. 56.1 ¶ 204.)

On August 14, 2008, NCPD Detective Matthew Ross conducted the line-up at the NCPD Third Squad with the plaintiff and five fillers. (*Id.* ¶¶ 208, 231.) Before the line-up, the plaintiff was placed inside an area called the "fishbowl." (Pl. 56.1 ¶ 545.) Detectives had the plaintiff and the fillers wear hats "because nobody else in the lineup ha[d] braids." (ECF No. 194-19 at 83; Def. 56.1 ¶ 225.)[7] The participants were covered with a white sheet from their necks down. (Def. 56.1 ¶ 219.) The plaintiff sat on two phone books. (*Id.* ¶ 221.) The plaintiff's lawyer was present at the line-up and made no objections. (*Id.*¶ 229.)

The plaintiff claimed at his deposition that while he was in the fishbowl a secretary led a "gentleman"[8] whom the plaintiff could not see, past the conference room; she was "trying to block him from looking in the room" but she was "not really doing a good job because he looks anyway." (ECF No. 194-19 at 89.) The plaintiff then put his "head down." (*Id.*)

i. *Anyosa Views the Line-up*

Anyosa arrived at the precinct that afternoon. (*Id.* ¶ 232.) He viewed the line-up, identified the plaintiff, and signed a statement. (*Id.* ¶¶ 239, 244.) Citing Anyosa's deposition testimony, the plaintiff asserts that detectives, whom he does not name, told Anyosa that he "did a good job" and "got the right person." (ECF No. 194-67 at 23–24.) The defendants dispute

---

[7] Detective Richard Dorsi, Detective D'Luginski, and Detective Ross made this decision jointly. (*Id.* ¶ 225.) The parties dispute whether ADA LaRocca was also involved in this decision. (*Id.*)

[8] The plaintiff did not identify this man as either Anyosa or Hernandez.

this. Anyosa did not remember whether officers made this statement after the photo array or the lineup. (*Id.*)

### ii. Hernandez Views the Line-up

Hernandez viewed the line-up separately, and also identified the plaintiff. (Def. 56.1 ¶¶ 249, 257.) Hernandez testified that he recognized the plaintiff from the photo array. (ECF No. 194-29 at 56 (Hernandez Deposition).)

### iii. Lori Magliaro's Testimony About the Line-Up

The plaintiff asserts that Detective Ross later admitted to his then-fiancé, Lori Magliaro, that he "rigged [the] plaintiff's lineup to conceal his height and cause his misidentification." (Pl. 56.1 ¶ 476.) The plaintiff relies on Magliaro's affidavit:

> Mr. Ross told me that Josiah Galloway did not match the description given to them by the victim of the assailant. He told me that his hair was different and they (the police) used clippers on his hair in order to make him look more like the assailant. They contrived a line-up where Josiah wore a baseball cap to conceal the difference in hair and since his height was not the same as the assailants, they made adjustments on that as well to make Josiah look taller. I was present for Mr. Ross' [deposition] and after it, I told him that he lied under oath, that we could no longer live together and I then moved out.

(ECF No. 208-51 ¶¶ 8–9.) The defendants cite Magliaro's deposition testimony, in which she admitted that not all of the statements in the affidavit were true, said that the plaintiff's attorney prepared the affidavit, and that Detective Ross did not give her "specifics" about any lineups. (ECF No. 206-26 at 8, 27–29.)

> **Q:** So did Matthew Ross ever tell you that he participated in a lineup back when he was a detective, in which the suspect had different hair from the fillers in the lineup? Did he ever tell you that?
>
> **A:** He told me he's participated in many lineups but nothing specifics about anything.

10

> **Q:** So he never told you that he tried to change or did change the hairstyle of a suspect in order to participate in a lineup?
>
> **A:** No.
>
> **Q:** So how did that end up getting into the affidavit that you signed?
>
> **A:** Well, I heard it while he was doing the EBT.
>
> **Q:** Then you went to Mr. Liotti and you told Mr. Liotti that that was a lie?
>
> **A:** I didn't specifically say it was a lie. I just said I wasn't sure that, you know -- I wasn't sure and that's why I wanted to speak to someone. That's all. I didn't really know if I was going to go forward with anything because I was unsure.
>
> **Q:** I understand. I get it. That's fine. I am wondering, what were you unsure about? Were you unsure about whether he had testified truthfully? Is that what you're unsure about?
>
> **A:** Yes.

(*Id.*)

### h.    Pre-Trial Suppression Hearing

Prior to trial, the plaintiff moved to suppress the photo array and lineup identifications. On November 5 and 7, 2008, Judge Philip Grella held a pre-trial suppression hearing at which Detectives Lipson, DeCaro, Cunningham, and Ross testified. (Def. 56.1 ¶ 276.) Judge Grella denied the motion, holding that the pre-trial identification procedures were not unduly suggestive or violative of the plaintiff's rights. (*Id.* ¶¶ 278–89.)

### i.    Trial, Verdict, and Sentencing[9]

The plaintiff went to trial before Judge Alan Honorof and a jury on February 17, 2009. (*Id.* ¶ 302.) The jury heard testimony from Anyosa, Hernandez, Ogletree, detectives, police officers, and the plaintiff. (*Id.* ¶¶ 309–324.)

---

[9] ADA Robert Schalk took over the plaintiff's case from Larocca. (*Id.* ¶ 290.)

Ogletree testified that he did not make the statement attributed to him, and that detectives "made [] up" the story about "some chicken spot." (ECF No. 194-5 at 307–08.) He was "coerced" to "sign the [statement]" because he "was weak" after the officers "kept [him] in there for hours," and "threatened [him] with all kind of charges." (*Id.* at 306–07.)

After approximately four days of deliberations, during which the jury told the judge that they were deadlocked, necessitating an *Allen* charge, the jury convicted the plaintiff of all charges on March 9, 2009. (Pl. 56.1 ¶¶ 700–07; Def. 56.1 ¶ 326.)

On November 23, 2009, the plaintiff was sentenced as a second felony offender to a determinate prison term of 25 years, and five years of post-release supervision. (Def. 56.1 ¶ 327; ECF No. 194-52 at 17.)

### j.    The Plaintiff's Conviction Is Vacated in 2018

In early July 2018, nine years into the plaintiff's sentence, Nadine Johnson called the NCDA and told them that the plaintiff did not shoot Anyosa and was wrongly convicted. (*Id.* ¶¶ 351–52.) A prosecutor in the NCDA Conviction Integrity Unit, Sheryl Anania, investigated the circumstances of the plaintiff's conviction. (ECF No. 208-25 at 18 (Anania Deposition).) As part of that investigation, Anania interviewed Johnson, who told her that Kenton Sherwood was "the actual perpetrator." (*Id.* at 27.) Johnson explained that her friend, Natasha Chaney, was Kenton Sherwood's girlfriend, and that Chaney drove a car that matched the description of the vehicle that Anyosa's assailant drove. (*Id.* at 34–35.) Johnson suspected that Chaney was in the car when Sherwood shot Anyosa, and she said that Chaney cleaned blood out of her car after the Anyosa shooting. (*Id.* at 41–42.) Anania could not corroborate everything Johnson told her. (*Id.* at 27, 39, 42.) Anania also interviewed Anyosa, and showed him a photograph of Kenton Sherwood. (*Id.* at 53, 57.) Anyosa identified Sherwood as the shooter; Anania told him that the

person in the photograph was not the plaintiff. (*Id.* at 58.) Anyosa replied that "the officers had

told him that he had the right person" after he "identified the photograph in the array." (*Id.* at

59.) Anyosa thought that the plaintiff "was about 5 foot 10 or 5-11 maybe" because "the person

that committed this crime was about his height." (*Id.*) Anyosa said that if "police had told him

[the plaintiff] was 5 foot 6[,] [h]e would have told them that Josiah didn't do it." (*Id.* at 59, 61.)

On September 13, 2018, Judge Teresa Corrigan granted the NCDA's application to

vacate the plaintiff's convictions and dismiss the indictment with prejudice. (Def. 56.1 ¶ 355.)

The plaintiff was released from prison. (*Id.*)

## II.    Procedural History

The plaintiff filed this suit on September 4, 2019. (ECF No. 1.) The operative pleading

in this case is the fourth amended complaint. (ECF No. 114.) The plaintiff brings (1) a 42

U.S.C. § 1983 malicious prosecution claim against Police Officer Horowitz, Detectives DeCaro,

Darienzo, Lipson, and D'Luginski (*id.* ¶¶ 85–92); (2) a § 1983 claim alleging fabrication of

evidence, denial of a fair trial, and *Brady* violations against all individually named defendants:

Police Officer Horowitz, Detectives Ross, DeCaro, Lipson, D'Luginski, and Darienzo (*id.* ¶¶ 93–

101); (3) a New York state law claim for false imprisonment and malicious prosecution against

Nassau County and the Village of Hempstead (*id.* ¶¶ 106–112); (4) a § 1983 conspiracy claim

against all individually named defendants (*id.* ¶¶ 117–122); (5) an unlawful pre-trial detention

claim against all individually name defendants (*id.* at ¶¶ 123–125); (6) a § 1983 claim for failure

to intervene against all individually named defendants (*id.* ¶¶ 126–128); and (7) a *Monell* claim

against Nassau County (*id.* ¶¶ 129–133).[10]

---

[10] The plaintiff voluntarily withdrew claims for § 1983 supervisory liability and intentional or negligent
infliction of emotional distress. (ECF No. 187.) The plaintiff also voluntarily withdrew claims against

Nassau County, the NCPD, Detectives DeCaro, D'Luginski, Darienzo, Ross, and Lipson (the "County defendants"), and the Village of Hempstead and Police Officer Horowitz (the "Village defendants") move for summary judgment on all claims.  (ECF Nos. 189, 197.)  The plaintiff opposes.[11]

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions—including pleadings, deposition transcripts, affidavits and other documents in the record—show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant has the burden of showing that there are no genuine disputes of material fact.  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party opposing summary judgment must identify specific facts and affirmative evidence showing that there is a genuine issue for trial.  *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Liberty Lobby*, 477 U.S. at 252.  Moreover, the nonmoving party must do more than

---

defendants Rene Yao, Carl Strange, John and Jane Doe 1-20, Kevin Cunningham, Joseph Sortino, and Richard Dorsi.  (*Id.*; ECF No. 215.)

[11] The Court heard oral argument on March 13, 2024.  (*Minute Order dated Mar. 13, 2024.*)

point to "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). He must instead identify the "specific facts" that demonstrate a genuine issue for trial, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and "offer some hard evidence showing that its version of events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). If the nonmoving party's "evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Liberty Lobby*, 477 U.S. at 249–50 (citation omitted).

The Court views "the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation, internal quotation marks, and alterations omitted).

## DISCUSSION

### I.      Fair Trial

The plaintiff brings a set of claims based on violations of his due process right to a fair trial. He advances three theories: fabrication of evidence, unduly suggestive identification procedures, and suppression of exculpatory evidence. As explained below, genuine issues for trial preclude summary judgment under each theory.[12]

---

[12] The plaintiff brings this claim against the individually named defendants, who argue that not every theory of liability applies to every defendant. The Court denies summary judgment as to this claim under all theories, and thus does not address the theories of liability that apply to each defendant. That will be for the jury to determine.

### a.   Fabrication of Evidence

A plaintiff bringing a § 1983 fair trial claim based on fabrication of evidence must establish that "(1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279–80 (2d Cir. 2016)). "Any information fabricated by an officer can serve as the basis of a claim for a denial of the right to a fair trial." *Garnett*, 838 F.3d at 279. "Such falsified information underlying the claim may be conveyed in documents, or orally, to prosecutors." *Kee*, 12 F.4th at 170. The Second Circuit equates "the fraudulent omission of factual information with the affirmative perpetration of a falsehood, and expressly disclaims any plausible legal distinction between misstatements and omissions." *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *17 (S.D.N.Y. Sept. 29, 2018) (cleaned up).

The plaintiff's fair trial claim for fabrication of evidence arises out of the alleged coercion of Robert Ogletree, which involves only Detectives DeCaro and Darienzo, two of the County defendants. (ECF No. 202 at 19.) Ogletree signed a statement at 3:00 a.m. on June 6, 2008, to the effect that the plaintiff told Ogletree that he shot "a cab driver over by the chicken place on Jackson." (Def. 56.1 ¶ 133.) Ogletree testified at the plaintiff's trial that the statement was not true, and that DeCaro and Darienzo "coerced" him into signing the statement by keeping him at the precinct "for hours," and threatening him with "all kind of charges." (ECF 203-1 at 303–07.)

The defendants argue that the Court cannot consider Ogletree's trial testimony on summary judgment because it is hearsay, which could be admitted under Federal Rule of

Evidence 804(b)(1) only if Ogletree is unavailable to testify at trial, "the party against whom the testimony is offered is the same as in the prior proceeding," and "that party had the same motive and opportunity to examine" Ogletree.  (ECF No. 192 at 28.)

It is not necessary to decide at this stage of the litigation whether Ogletree's trial testimony is admissible at the civil trial in this matter.  As long as the plaintiff "can show that admissible evidence would be available at trial, summary judgment is inappropriate at this stage in the litigation."  *Kee*, 12 F.4th at 170 (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).  "[A]s with other forms of sworn testimony, a transcript of trial testimony is admissible evidence on a summary judgment motion [] if it can be presented at trial in an admissible form–for example, [if] the declarant may be available to testify at trial . . . ."  *Burch v. Blockbuster, Inc.*, No. 03-CV-2990, 2005 WL 8158056, at \*1 (N.D. Ala. July 15, 2005).[13]

There is a possibility that Ogletree will be available to testify at the plaintiff's civil trial. *Monclova v. City of New York*, 726 F. App'x 83, 84–85 (2d Cir. 2018).  He is not missing, or deceased; on the contrary, the defendants concede that he is currently in county custody for unrelated crimes.  (*See* ECF No. 210 at 25–26.)  Because Ogletree may very well be available to testify, the Court can consider his prior testimony—that Detectives DeCaro and Darienzo fabricated and coerced Ogletree's statement implicating the plaintiff in the Anyosa shooting—in deciding whether summary judgment is appropriate.  *See Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 43–44 (S.D.N.Y. 2008) (the plaintiff "adduced enough evidence to survive [a] summary judgment motion" where he "appear[ed] able to identify and subpoena all of the

---

[13] The Second Circuit has held that similar evidence is admissible under the residual hearsay exception in Federal Rule of Evidence 807.  *See Monclova*, 726 F. App'x at 84–85.

relevant declarants," and those "individuals may be called at trial to testify"); *Watts v. City of Hartford*, No. 00-CV-0681, 2004 WL 717132, at *4 n.10 (D. Conn. Mar. 31, 2004) (considering hearsay evidence at summary judgment stage because the plaintiff "presumably could identify and subpoena police department personnel with personal knowledge of the matters discussed in the [hearsay]"); *see also Kee*, 12 F.4th at 170 (holding the plaintiff could rely on inadmissible hearsay in documents when deposition testimony "seemed to suggest" that the contents of the documents could be rendered admissible at trial).

Thus, construing the evidence most favorably to the plaintiff, there is a triable issue based on Ogletree's testimony as to whether Detectives DeCaro and Darienzo created false information, forwarded it to NCDA prosecutors, and whether the allegedly false statements were likely to influence the jury's decision. *Kee*, 12 F.4th at 168.

The Village defendants argue that Ogletree's statement "had no influence on the jury's verdict" because it "was never admitted into evidence at trial," and the jury "heard Ogletree's testimony" about coercion. (ECF No. 198 at 38.) While Ogletree's signed statement was not admitted as an exhibit, the jury was well aware of the contents of the statement. The prosecutor highlighted the statement in his opening:

> The defendant, in the days and weeks after these crimes, told one of his friends about it. His name is Robert Ogletree. [T]his is a man, a friend of the defendant, who he confided in about these heinous crimes.
>
> . . .
>
> He . . . told Robert Ogletree that he gotten into an argument not too long ago with a cabby outside a chicken place on Jackson Street and that he had to blam him which means shoot somebody.

(ECF No. 194-5 at 249–50.) The prosecutor also questioned Ogletree about the statement:

**Q:** You didn't tell the Nassau County Police about a conversation that you had with Josiah Galloway that involved him shooting a cab driver on Jackson Street?

**A:** No. I was coerced into that, sir. I told you that. You want me to repeat it one more time?

. . .

**Q:** I just want to be sure, but it's your testimony that the portion that states that Josiah told you that he had to shoot a cab driver by the chicken place on Jackson Street, that part was coerced by the police, right?

**A:** That was coerced.

(*Id.* at 271, 304.) Finally, the prosecutor discussed the statement at length in his summation; the prosecutor urged the jury, in four transcript pages of argument on this subject, to accept the contents of the signed statement as true, and to reject Ogletree's trial testimony that the detectives coerced him into signing the statement:

> Consider who Robert Ogletree is. It's the defendant's friend, one of his very good friends . . . . Robert Ogletree and the defendant were arrested together. They were taken into custody together on June 5th, 2008.
>
> Now, it's interesting the defendant attacks the credibility of Mr. Ogletree in one breath, but then he wants you to believe that the statement was coerced. He can't have it both ways, ladies and gentlemen. . . .
>
> Robert Ogletree was brought to you for one reason, to tell you about the statement he gave the police as it pertains to his friend. You saw that when we asked him about speaking and about testifying, there was no problem. But then when he hits the witness stand, he has a decision to make, talk about the sworn statement he signed or backtrack in front of his friend. You saw his testimony. You witnessed it. You heard how he said this statement was coerced, but when he was asked how it was coerced, he really couldn't answer; how when he was asked you never told anyone that this was coerced, he said nobody ever asked. Have his testimony read back. . . .
>
> [T]here are some very important things about Mr. [O]gletree's statement, that the defendant admitted to him he committed these crimes. First, he was given his Miranda warnings. He was told he had the right to remain silent, the right to an attorney. He signed that card and said he wasn't coerced in signing it. . . . [H]e told the

> police that the defendant had shot a cab driver at a chicken spot
> over on Jackson Street. . . . You heard that he identified that
> statement that he gave to the police, how the defendant admitted to
> him that this happened, that he shot that cab driver near the
> chicken spot.

(ECF No. 194-6 at 517–21.) This record, viewed in the light most favorable to the plaintiff, as it must be, establishes that there is a material question of fact about whether Ogletree's written statement influenced the jury. The prosecution's case was built largely on Hernandez's and Anyosa's identification of the plaintiff as the shooter. The jury deliberated for four days before coming to a verdict; at one point the jury advised the trial judge that they were "deadlocked," prompting the judge to give them an *Allen* charge. (Def. 56.1 ¶¶ 325–26; Pl. 56.1 ¶¶ 700–07; *see Dow v. Virga*, 729 F.3d 1041, 1049 (9th Cir. 2013) ("The evidence against Dow was weak and the prosecutor's arguments undoubtedly had an effect on the jury's decision.") The Court cannot conclude as a matter of law that the contents of Ogletree's statement had no influence on the verdict. *See McIlwain v. City of New York*, No. 16-CV-3133, 2019 WL 988891, at *4 (S.D.N.Y. Mar. 1, 2019) ("[C]hoices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (internal quotation marks omitted)). Nor does the fact that the jury also heard Ogletree's testimony that the statement was coerced "turn what was otherwise a tainted trial into a fair one." *Dow*, 729 F.3d at 1050 (internal quotation marks omitted).

Accordingly, summary judgment is denied as to the plaintiff's fair trial claim based on fabrication of evidence.

### b. Suggestive Identification Procedures

"The due process right to a fair trial is violated if unduly suggestive identification techniques are allowed to taint the trial." *Blackmon v. City of Chicago*, 19-CV-767, 2023 WL

7160639, at *13 (N.D. Ill. Oct. 31, 2023).  "Suggestive procedures are disapproved because they increase the likelihood of misidentification, and it is the admission of testimony carrying such a likelihood of misidentification which violates a defendant's right to due process."  *Rosario v. City of New York*, No. 18-CV-4023, 2021 WL 199342, at *7 (S.D.N.Y. Jan. 20, 2021) (citations omitted).  "In other words, the due process focus is principally on the fairness of the trial, rather than on the conduct of the police."  *Id.* (internal quotation marks omitted).

Unduly suggestive identification procedures can also render subsequent identifications tainted or unreliable.  *Id.* (citing *United States v. Thai*, 29 F.3d 785, 807–08 (2d Cir. 1994)).

### i.    *Photo Array Procedure*

The plaintiff maintains that the photo array was unduly suggestive because Detective Lipson used the plaintiff's arrest photograph from his September 2007 arrest—a year before the photographic array.  (Def. 56.1 ¶¶ 113, 115, 119).  This argument is not persuasive.  The arrest photograph that the detective used was not especially old, and even if it were, it would not, in and of itself, make the array unduly suggestive.  "[T]he mere use of an old photograph, . . . standing alone, do[es] not establish that a photo array is unduly suggestive unless these factors raise a 'substantial likelihood' that Plaintiff would be 'singled out for identification.'"  *Gallimore v. Feliciano*, No. 14-CV-1519, 2015 WL 3856694, at *6 (S.D.N.Y. June 19, 2015); *see also United States v. Matthias*, No. 2016-CR-0025, 2017 WL 2434458, at *5 (D.V.I. June 5, 2017) ("Defendant notes that a more recent photo of Defendant was available.  However, failure to use the most current photo, standing alone, does not render the array suggestive.").

### ii.    *Lineup Procedure*

The plaintiff argues that Detective Ross and Detective D'Luginski conducted a line-up that was unduly suggestive because the plaintiff and the fillers wore hats to cover their hair, were

seated and were covered by sheets so that only their faces were visible.  The procedures

employed were not unduly suggestive.  *Ashby v. Senkowski*, 269 F. Supp. 2d 109, 117 (E.D.N.Y.

2003) (line-up conducted with men seated, covered in sheets, wearing hats was not unduly

suggestive); *Neree v. Capra*, No. 17-CV-5434, 2020 WL 2098097, at *7–8 (E.D.N.Y. May 1,

2020) (same); *Roldan v. Artuz*, 78 F. Supp. 2d 260, 272–73 & n.9 (S.D.N.Y. 2000) (line-up of

men of different heights conducted in seated position was not unduly suggestive); *Solis v. Artus*,

No. 09-CV-386, 2012 WL 1252722, at *3 (E.D.N.Y. Apr. 12, 2012) (same); *United States v.

Ríos-Orama*, No. 22-CR-174, 2023 WL 7403602, at *4–5 (D.P.R. Nov. 3, 2023) (same).

The plaintiff claims, nevertheless, that Detective Ross and Detective D'Luginski

employed these procedures in bad faith, so that the lineup would be unduly suggestive—

specifically, so that the witnesses who looked at the line-up would not notice that the plaintiff

was far shorter than the description of the shooter, and that his hair was different.  The plaintiff

cites statements by Lori Magliaro, Detective Ross's ex-fiance, in an affidavit:

> Mr. Ross told me that Josiah Galloway did not match the
> description given to them by the victim of the assailant. . . .  They
> contrived a line-up where Josiah wore a baseball cap to conceal
> the difference in hair and since his height was not the same as the
> assailants, they made adjustments on that as well to make Josiah
> look taller.  I was present for Mr. Ross' [deposition] and after it, I
> told him that he lied under oath, that we could no longer live
> together and I then moved out.

(ECF No. 208-51 ¶¶ 8–9.)  The defendants point out that at her deposition Magliaro testified that

not all of these statements in the affidavit were true, that it was prepared by the plaintiff's

attorney, and that Detective Ross did not give her "specifics" about any lineups.  (ECF No. 206-

26 at 8, 27–29.)

> **Q:**  So did Matthew Ross ever tell you that he participated in a
> lineup back when he was a detective, in which the suspect had
> different hair from the fillers in the lineup?  Did he ever tell you
> that?

22

**A:** He told me he's participated in many lineups but nothing specifics about anything.

**Q:** So he never told you that he tried to change or did change the hairstyle of a suspect in order to participate in a lineup? . . .

**A:** No.

**Q:** So how did that end up getting into the affidavit that you signed?

**A:** Well, I heard it while he was doing the EBT.

**Q:** Then you went to Mr. Liotti and you told Mr. Liotti that that was a lie?

**A:** I didn't specifically say it was a lie. I just said I wasn't sure that, you know—I wasn't sure and that's why I wanted to speak to someone. That's all. I didn't really know if I was going to go forward with anything because I was unsure.

**Q:** I understand. I get it. That's fine. I am wondering, what were you unsure about? Were you unsure about whether he had testified truthfully? Is that what you're unsure about?

**A:** Yes.

(*Id.*) The parties' disputes about Magliaro's conflicting statements are rooted in "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence," which are "matters for the jury, not for the court on a motion for summary judgment." *McClellan*, 439 F.3d at 144 (cleaned up). Thus, there are disputes of material fact about whether Detective Ross used otherwise acceptable line-up procedures with the intent to conceal the plaintiff's height and deprive him of a fair trial. Accordingly, summary judgment on this aspect of the plaintiff's fair trial claim is denied.

> iii.     *Comments to Anyosa and Hernandez*

The plaintiff claims that the photographic array and the line-up were unduly suggestive in other ways.

<u>Comments to Anyosa Before and After the Photo Array.</u>

The plaintiff asserts that Detective Lipson "told Anyosa that Wilmer Hernandez had

already selected the 'right person,'" before Detective Lipson showed Anyosa the array (ECF No.

202 at 12.)  The plaintiff relies on Anyosa's deposition testimony:

> **Q:**  Now, you see how it says that 'he knew Wilmer had ID'd
> him.' . . . How did you know that?
>
> **A:**  I think so went to the police station, they told me Wilmer ID'd
> him before me.
>
> . . .
>
> **Q:**  [B]efore you looked at the photo array, did you know that
> Wilmer had already picked someone?  . . .
>
> **A:**  Yes.
>
> **Q:**  Okay.  And did you know . . . that Wilmer had picked Josiah
> Galloway?
>
> **A:**  No, I don't think so.  They only told me he -- he got it.  I think
> so.  He picked the right person.

(ECF No. 194-67 at 30–31.)

The plaintiff also cites ADA Anania's notes of her interview with Anyosa, in which she

wrote: "[a]fter [Anyosa] id'd photo in array, detective told him he id'd right person."  (ECF 209-

1 at 25.)  At his deposition, Anyosa testified as follows:

> **Q:**  [A]fter you picked out the picture, did they say anything to
> you afterwards?
>
> **A:**  Yeah, afterward, probably, yeah, they did that probably.  They
> say I got the right person.

(ECF No. 194-67 at 24.)

Drawing all inferences in the plaintiff's favor, the record demonstrates that Detective

Lipson told Anyosa before he looked at the photo array that Hernandez had selected the "right

person," and then told him after he identified the plaintiff's photograph that he had also selected

the "right person."  Suggestive comments like these could affect the reliability of Anyosa's

photographic identification, the line-up identification, and any in-court identification.  Telling Anyosa that his friend had selected "the right person" signaled to Anyosa that the perpetrator's photograph was definitely in the array; this could have induced Anyosa to identify someone, when he might otherwise have said that he did not recognize anyone in the array.  And telling Anyosa that he identified the right person in the array tainted the subsequent line-up, as well as the in-court identification.  *Rosario*, 2021 WL 199342, at *7 (unduly suggestive identification procedures can also render subsequent identifications tainted or unreliable (citing *Thai*, 29 F.3d at 807–08)); *see also Burress v. Lincoln & Devon Shell Gas Station*, No. 90-CV-2367, 1992 WL 69989, at *2–3 (N.D. Ill. Mar. 31, 1992).

<u>Suggestive Comments to Hernandez Before the Photo Array and After the Line-Up.</u>

The parties also dispute whether Hernandez knew that someone was in custody when he looked at the photo array.  The defendants assert that Hernandez did not know anyone was in custody when he was at the Armory, relying on the following trial testimony:

> **Q:** Okay.  Can you tell us, sir, at the time you did come in and that they had you in the precinct, at that time, did you notice anybody in custody? . . .
>
> **A:** No.

(ECF No. 194-5 at 478.)  The plaintiff cites Hernandez's deposition testimony:

> **Q:** When you arrived at the . . . armory, what happened?
>
> **A:** They told me they had the person who was the cause of the incident, but they wanted to show me pictures . . . .

(ECF No. 194-29 at 31.)  These conflicting versions of the events are for a jury to resolve, not the Court on summary judgment.  *McClellan*, 439 F.3d at 144.  Of course, if Hernandez knew that someone was in custody, that fact alone does not make the identification procedure unduly suggestive.  *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) ("[t]his Court . . . has held that although the police generally should refrain from informing a witness that the

suspect is in the lineup, a lineup is not unduly suggestive merely because they do"); *Sales v. Harris*, 675 F.2d 532, 538 (2d Cir. 1982) ("[a]s to the lineup, the only hint of suggestiveness emanated from the police officer's statement to [the witness] just prior to viewing the lineup that a suspect was in custody[;] [a]lthough this [C]ourt has expressed disapproval of such a statement, . . . the suggestiveness in this case was minimal since the statement preceded an otherwise acceptable lineup").

However, Hernandez also testified in his deposition that unnamed detectives "possibly" told him after he identified the plaintiff in the line-up that he selected the right person, but that he was not sure and could not remember. (ECF No. 194-29 at 79–80.) Hernandez's uncertainty about whether any such comment was made is a subject that the defendants can explore at a trial, but for purposes of summary judgment, the Court assumes that some detective said this to Hernandez. As explained above, telling a witness that he has identified the right person taints future identification procedures. *See Rosario*, 2021 WL 199342, at *7; *Burress*, 1992 WL 69989, at *2–3.[14]

---

[14] The plaintiff testified that he was in the "fishbowl" before the line-up when a secretary walked a man whom the plaintiff could not see past the conference room; she was "trying to block him from looking in the room" but she was "not really doing a good job because he looks anyway;" the plaintiff then put his "head down." (ECF No. 194-19 at 89.) The parties agree that only Hernandez and Anyosa came to view the line-up; the plaintiff concludes that the person had to be either Hernandez or Anyosa, and that the person saw him before the line-up. Of course, if either Hernandez or Anyosa saw the plaintiff before the line-up, that would have been suggestive. *See Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978) (noting that "eyewitnesses had a pre-lineup opportunity to see" the defendant, which, while it "may simply have been the result of police negligence," it was still suggestive). In the Court's view, however, this evidence is too tenuous to permit the inference that the plaintiff seeks to draw. Just because Hernandez and Anyosa were at the precinct that day does not mean that the person the plaintiff claimed to have seen had to be one of them rather than a witness in a different case or another officer. The plaintiff did not describe the person he saw. Moreover, there is no other evidence that Hernandez or Anyosa saw the plaintiff or knew that he was in custody. Neither one of them testified that he saw the plaintiff before the line-up.

### c. Suppression of Evidence

The plaintiff claims that Decaro and Darienzo withheld material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and denied him a fair trial. *See McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, at *11–12 (S.D.N.Y. Feb. 7, 2013). A plaintiff asserting a *Brady* violation claim must show that "(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State; and (3) prejudice ensued." *Id.* at *11 (cleaned up).

As explained above, there is a genuine dispute about whether Detectives DeCaro and Darienzo fabricated the statement in which Ogletree implicated the plaintiff. In addition, there is a genuine dispute about whether Officer Horowitz, and Detectives Lipson, Ross, and D'Luginski obtained identifications under unduly suggestive circumstances that were not disclosed to the plaintiff. This evidence is "material" for purposes of a § 1983 suit because "[t]he tactics [Ogletree] said Defendants used to induce [him]" to make his statement and the tactics uses to induce the identifications "would themselves have been useful for impeachment." *Blackmon*, 2023 WL 7160639, at *13.

At the plaintiff's trial, Anyosa testified that Lipson showed him "two or three" sheets of paper with "six pictures" at a time, and that Anyosa identified the plaintiff's photograph in only one array; he did not identify anyone from the one or two other arrays that Lipson showed him. (ECF No. 194-5 at 456.) Lipson's trial testimony was that he put together two different photo arrays, at DeCaro's request, both of which included the plaintiff's photograph. (Def. 56.1 ¶¶ 113–19.) The plaintiff claims that Detective Lipson suppressed evidence that Anyosa looked at more than one array and did not identify the plaintiff in at least one of the photo arrays. (ECF No. 202 at 20.) The defendants deny that Lipson showed Anyosa more than one array and cite

Anyosa's trial testimony that he did not remember if Lipson showed him more than one array. (*See* Pl. 56.1 ¶ 703 (the defendants' response).)

If Anyosa looked at a photographic array that included the plaintiff's photograph, and did not identify him, that is "favorable" and "exculpatory" evidence that should have been provided to the defense in the plaintiff's criminal case. *McCaffrey*, 2013 WL 494025, at *11. There is a material dispute of fact about whether this happened. Accordingly, summary judgment is denied on the suppression of evidence claim.

### d. Intervening Causes

The defendants argue that even if they did any of the things that the plaintiff claims, "intervening causes" make it appropriate to grant summary judgment on the plaintiff's fair trial claims. They say that their actions did not proximately cause the violations of the plaintiff's rights because (1) the NCDA prosecutors exercised independent judgment in prosecuting the plaintiff, and (2) the plaintiff's defense attorney's decision to offer the photographic arrays into evidence was the superseding cause of the fair trial violation. As explained below, these arguments are unpersuasive.

#### i. ADA's Decision to Prosecute

ADAs LaRocca and Schalk's decisions in connection with the case against the plaintiff are not superseding causes of the alleged violations. The defendants "can be held liable for violating [the plaintiff's] due process rights if they 'misled or coerced the intervening decision-maker such that the decision-maker's conduct was tainted.'" *Bermudez v. City of New York*, 790 F.3d 368, 374–75 (2d Cir. 2015) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). "Moreover, if the ADA was simply not informed of the alleged problems with the evidence, then he could not be a superseding cause of the deprivation of [the plaintiff's] due

process rights." *Id.* at 375 (citing *Myers v. County of Orange*, 157 F.3d 66, 73–74 (2d Cir.1998)). "As a result, even if it is undisputed that [the] ADA [] independently decided to present the [tainted] evidence at trial, [the plaintiff] can still pursue a claim against the investigating officers for depriving him of due process rights if the ADA was not informed of constitutional errors in how the [tainted] evidence was obtained." *Id.*

As explained above, the plaintiff claims that the identification proceedings were suggestive and that detectives withheld exculpatory material; the Court has held that there are material disputes of fact about these claims. Assuming that the plaintiff's allegations are true, as the Court must, there are similarly genuine issues about what the ADAs knew: whether they knew that detectives made suggestive comments to Hernandez and Anyosa, that Anyosa did not identify the plaintiff in one or two photographic arrays, or that detectives coerced Ogletree's statement that the plaintiff admitted shooting someone.[15]

Moreover, the ADAs could have been "misled about this evidence in another way that was not cured by [their] own subsequent interrogation of the witnesses;" "[o]nce the witnesses had adopted a story [] because of a suggestive presentation of photographs [or line-ups]. . . they might very well have decided to stick with that story (or become convinced that it was true), and for that reason have misinformed the ADA[s] [upon] subsequent[] question[ing]." *Bermudez*, 790 F.3d at 375–76. Once Hernandez or Anyosa became convinced that they had identified the right person, because of the unduly suggestive identification procedures, they would have

---

[15] In his deposition, ADA LaRocca testified that Lipson did not tell him that he informed Anyosa that he picked the right guy or that Hernandez had selected the plaintiff from the photo array. (ECF No. 194-39 at 36–38.) He also testified that Detective DeCaro did not tell him that he or "other detective had coached" Ogletree into making "the inculpatory statements" against the plaintiff. (*Id.* at 40.) ADA Schalk also stated in his affidavit that no one told him anything about these alleged violations. (*See* ECF No. 194-76 at 4.)

conveyed that certainty to ADAs, who would never have known about the suggestive

procedures. Anyosa's deposition testimony makes the point:

> **Q:** Did you tell the DA that you felt pressure [to identify the plaintiff]?
>
> **A:** I don't told them pressure. I said I don't—I never say that about—you know. They brought me the whole papers—I mean, the whole documents. Josiah Galloway was the person who shot me, and they already had witness, everything, right? So and I already—I mean, I already picked in the picture the right person. So in my conscious, I guess I was sure he was the one, you know, but I don't know whether it can be the pressure or not, but I mean—I don't know what to say, sir.

(ECF No. 194-67 at 28–29.) Assuming a jury found that the violations occurred—the unduly

suggestive identification procedures, the suppression of exculpatory evidence and the coercive

interview of Ogletree—the jury could also find the prosecutors could not make informed

decisions about the reliability of the evidence because the defendants did not provide them with

the necessary information. In short, the jury could find that the defendants proximately caused

the deprivation of the plaintiff's rights.

> ii. *Defense Counsel's Conduct*

Nor were defense counsel's strategic trial decisions an intervening cause. In his opening

statement, counsel told the jurors that the line-up identifications were unreliable, because of the

photographic arrays:

> Maybe that's because what they did was took a photograph of Mr. Galloway without his hair in cornrows and without his hair in a big 5-inch Afro and showed it to the witness to make it fit.

(ECF No. 194-5 at 259–60.)  ADA Schalk subsequently moved to introduce the photographic identifications, because defense counsel "opened the door" to their admission.  (Def. 56.1 ¶ 307.)[16]  Judge Honorof granted the application.  (*Id.* ¶ 308.)

The defendants argue that the "defense counsel's conduct and decision to open the door[] was the catalyst and sole reason behind the trial court's decision to admit the photo arrays into evidence at trial," and that "[t]his intervening cause cuts off plaintiff's claim for recovery." (ECF No. 192 at 37–38; *see also* ECF No. 198 at 41–42.)  This argument is also unconvincing.

Courts in this Circuit have routinely rejected similar arguments, including Judge Carol Amon.  "This Court is not aware of any decision in this Circuit, nor have Defendants cited any, in which an independent decision by a defendant or defense counsel—rather than by a judge, grand jury, or a prosecutor—was held to be a superseding cause of a defendant's conviction, shielding an officer from an otherwise viable fabrication of evidence claim."  *Hamilton v. City of New York*, No. 15-CV-4574, 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019); *see also Rosario*, 2021 WL 199342, at *7 ("Whether and by whom the photo identifications were offered into evidence at trial does not foreclose Plaintiff's claims based on false evidence in this case.").

Judge Lorna Schofield also rejected this argument.  "Regardless of whether [the witnesses] testified regarding the [tainted] photo identification," witnesses "still testified as to their line-up identification and made in-court identifications of Plaintiff at trial"; "[a]ccordingly, the photo identifications cannot be described as having no impact on the conduct of a criminal trial."  *Rosario*, 2021 WL 199342, at *7 (internal citation omitted).

That sound logic applies in this case.  Counsel's decision to "open the door" to the photographic identification evidence is not an intervening cause that absolves the defendants of

---

[16] At the time of the plaintiff's trial, photographic identifications were inadmissible on a prosecutor's direct case.  *People v. Caserta*, 19 N.Y.2d 18 (1966); *People v. Cioffi*, 1 N.Y.2d 70 (1956).

liability because the unduly suggestive identification procedure still affects the reliability of subsequent identifications, regardless of whether the jury knows about the first suggestive procedure.  (ECF No. 192 at 37); *Rosario*, 2021 WL 199342, at *7.  In this case, Anyosa and Hernandez testified that they identified the plaintiff at separate line-ups, identifications which may also have been the product of unduly suggestive procedures.  They also identified the plaintiff in court.  Thus, if the photographic array procedures were suggestive, they tainted the line-ups and the in-court identifications, regardless of counsel's strategic choices.  Accordingly, summary judgment is denied on this claim.

## II.      Federal and State Law Claims for Malicious Prosecution

The plaintiff brings two malicious prosecution claims: one under § 1983 against Police Officer Horowitz, Detectives DeCaro, Darienzo, Lipson, and D'Luginski; and one under New York law against the same defendants, and Nassau County and the Village of Hempstead.[17] "Claims for malicious prosecution under § 1983 are substantially the same as claims for malicious prosecution under state law."  *Porter v. Port Auth. of N.Y. & N.J.*, No. 15-CV-3558, 2022 WL 991978, at *11 (E.D.N.Y. Mar. 31, 2022) (cleaned up).  The elements of a malicious prosecution claim under New York law are "(1) the initiation or continuation of a criminal

---

[17] The plaintiff brings New York state law malicious prosecution claims against Nassau County and the Village of Hempstead in addition to individually named defendants.  "New York courts have held municipalities liable under a theory of *respondeat superior* for malicious prosecution."  *Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015); *Sankar v. City of New York*, 867 F. Supp. 2d 297, 313 (E.D.N.Y. 2012) ("Unlike claims brought pursuant to [s]ection 1983, under New York state law, municipalities may be held vicariously liable for . . . malicious prosecution under a theory of *respondeat superior.*  This applies even to discretionary actions by police officers where . . . genuine issues of material fact exist as to whether there was probable cause for arrest." (citations omitted)).

Because the Court denies summary judgment on some of the plaintiff's federal law claims and the plaintiff's state law malicious prosecution claims "are so related to claims in the action within the Court's federal question jurisdiction that they form part of the same case or controversy under Article III," the Court retains supplemental jurisdiction over plaintiff's state law claims for . . . malicious prosecution."  *Sankar*, 867 F. Supp. 2d at 313.

proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of

probable cause for commencing the proceeding; and (4) actual malice as a motivation for

defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)

(citations and internal quotation marks omitted); *Broughton v. State*, 335 N.E.2d 310 (N.Y.

1975) (same). Similarly, the elements of malicious prosecution under § 1983 are "(1) that the

defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable

cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and

(4) that the prosecution was terminated in the plaintiff's favor." *Porter*, 2022 WL 991978, at

*11 (internal quotation marks omitted). In addition, the Second Circuit requires that in order "to

sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of

proper legal procedures implicating the claimant's personal liberty and privacy interests under the

Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)

(internal quotation marks omitted); *see also Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215

(2d Cir. 2000) ("In order to allege a cause of action for malicious prosecution under § 1983, [the

plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that

there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth

Amendment rights." (emphasis omitted)).

     The parties agree that the plaintiff was deprived of his liberty and that the case terminated

in his favor. They dispute whether the defendants initiated the prosecution against the plaintiff,

whether there was probable cause to commence the proceeding, and whether the defendants

acted with malice.

### a. Initiation or Continuation of a Criminal Proceeding

The defendants argue that that they did not play sufficiently active roles in initiating or prosecuting the charges against the plaintiff.

An officer initiated or continued a criminal proceeding if he "distorted the process by which plaintiff was brought to trial, such as by creating false information and forwarding it to prosecutors or by withholding relevant and material information from prosecutors." *McGrier v. City of New York*, 2019 U.S. Dist. LEXIS 38688, at \*11 (S.D.N.Y. Mar. 11, 2019) (cleaned up); *see Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable" for initiating or continuing a criminal proceeding.); *Ragland v. City of New York*, 45 Misc. 3d 1218(A), at \*4 (N.Y. Sup. Ct. 2014) ("New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court, or holding back information that might have affected the results, with that defendant's initiation of a malicious prosecution." (quoting *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001))). Courts have found the initiation element satisfied where a defendant officer was involved in creating false evidence "likely to be sent to prosecutors," even if that officer did not himself sign the criminal complaint or forward the information to prosecutors. *Herrera-Amador v. N.Y.C. Police Dep't*, No. 16-CV-5915, 2021 WL 3012583, at \*16–17 (E.D.N.Y. July 16, 2021); *see Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003).

As explained above in connection with the plaintiff's fair trial claims, there is a material factual dispute about whether Detectives Darienzo and DeCaro coerced Ogletree's false statement and whether DeCaro, who spoke to ECAB prosecutors and signed the felony complaint, forwarded it to the prosecutors without alerting them to the coercive circumstances

surrounding the statement.  *Herrera-Amador*, 2021 WL 3012583, at *17 ("Defendant Officer

Lee initiated a criminal proceeding against Plaintiff with his sworn criminal complaint.");

*Tavernier*, 316 F.3d at 138.  Moreover, there are material disputes about whether Detective

Lipson and Officer Horowitz employed suggestive tactics in connection with the photographic

arrays, and whether Detective Lipson did not notify prosecutors that Anyosa failed to identify the

plaintiff in at least one photo array.  *Herrera-Amador*, 2021 WL 3012583, at *17.  Finally, there

are material issues of fact about whether Detectives Ross and D'Luginski conducted line-ups

under unduly suggestive circumstances.  *See id.*

       Accordingly, summary judgment is denied on this claim.

       **b.**     **Probable Cause and Malice**

       The defendants next argue that a reasonable jury could not find a lack of probable cause

or actual malice.  Under New York law, probable cause "is the knowledge of facts, actual or

apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for

prosecuting the defendant in the manner complained of."  *Rosario*, 2021 WL 199342, at *11

(citing *Cardoza v. City of New York*, 29 N.Y.S.3d 330, 340 (1st Dep't 2016) (citation omitted)).

"Indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted

by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or

other police conduct undertaken in bad faith."  *Id.* (cleaned up) (citing *Dufort v. City of New

York*, 874 F.3d 338, 352 (2d Cir. 2017)).  "The presumption may be overcome only by evidence

establishing that the police witnesses have not made a complete and full statement of facts either

to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence,

that they have withheld evidence or otherwise acted in bad faith."  *Id.* (quoting *Rothstein v.

Carriere*, 373 F.3d 275, 283 (2d Cir. 2004)).  Actual malice requires only "that the defendant

must have commenced the criminal proceeding due to a wrong or improper motive, something

other than a desire to see the ends of justice served." *Id.* (quoting *Dufort*, 874 F.3d at 353).

"Actual malice can be inferred when a plaintiff is prosecuted without probable cause." *Id.*

(cleaned up).

"Probable cause is a mixed question of law and fact." *Frost v. N.Y.C. Police Dep't*, 980

F.3d 231, 243 (2d Cir. 2020). "An identification cannot be used to support probable cause if it

was 'so defective that probable cause could not reasonably be based upon it.'" *Rosario*, 2021

WL 199342, at *11 (quoting *Dufort*, 874 F.3d at 348).

As discussed, there are key questions of material fact about the reliability of the

witnesses' identifications of the plaintiff, and about the extent to which the identifications

procedures were unduly suggestive. The witnesses testified about their photographic

identifications in the grand jury. Accordingly, the Court cannot make a probable cause

determination. A reasonable juror could find that the indictment of the plaintiff was procured

through police misconduct. These issues of fact are to be resolved at trial. *See id.*[18]

### III.    False Imprisonment, Unlawful Detention, and Conspiracy Claims

The defendants are entitled to summary judgment on the plaintiff's unlawful detention,

conspiracy, and state law false imprisonment claims, because the plaintiff did not address or

oppose them, and has thus abandoned them. *See Taylor v. City of New York*, 269 F. Supp. 68, 75

(E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for

summary judgment on one ground and the party opposing summary judgment fails to address the

argument in any way"); *Prevost v. City of New York*, 2015 U.S. Dist. LEXIS 171218, at *9

---

[18] Because there are questions of fact to be resolved at trial as to the liability of the individual defendants, there are also questions of fact to be resolved at trial as to the liability of Nassau County and the Village of Hempstead for the state law malicious prosecution claim on a *respondeat superior* theory.

(S.D.N.Y. Dec. 22, 2015) (dismissing § 1983 claim as abandoned where plaintiff does not respond to defendants' summary judgment arguments).

## IV.    Failure to Intervene

The defendants also seek summary judgment on the plaintiff's failure-to-intervene claim against all the defendants.  The defendants say that the plaintiff has not adduced evidence that the defendants violated his constitutional rights, and that even if they did, there is no evidence that the defendants had a realistic opportunity to intervene, or that a reasonable person would know that the plaintiff's constitutional rights were being violated.

"A police officer is liable when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Rosario*, 2021 WL 199342, at *12.

As discussed above, a reasonable jury could find from the evidence that the defendants participated in violating the plaintiff's constitutional rights, either in the production of false evidence or its dissemination.  Whether an officer had "a realistic opportunity to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Sloley v. VanBramer*, 945 F.3d 30, 47 (2d Cir. 2019) (internal quotation marks omitted).

The record demonstrates that there are triable issues of fact as to whether each of the individual defendants reasonably could have intervened in each other's alleged acts. *See Rosario*, 2021 WL 199342, at *12.

## V.      Qualified Immunity

The defendants argue that they are entitled to qualified immunity as a matter of law on the fair trial and malicious prosecution claims.

Under federal law, the affirmative defense of qualified immunity is established by demonstrating that "(1) the right was not clearly established or (2) even if the right was clearly established, it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Elder v. McCarthy*, 967 F.3d 113, 131 (2d Cir. 2020) (quotation marks omitted). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

"[T]he substantive law of [the State] governs the applicability of qualified immunity to [the plaintiff's] state law claims[.]" *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (citation omitted); *accord Ismael v. Charles*, No. 18-CV-3597, 2020 WL 4003291, at *9 n.6 (S.D.N.Y. July 15, 2020). New York law provides government officials qualified immunity on state law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis. *See Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006); *accord Rothman v. City of New York*, No. 19-CV-0225, 2020 WL 2139328, at *4 (S.D.N.Y. May 5, 2020).

For the reasons explained below, deciding whether the defendants are entitled to qualified immunity arguments must await resolution of the factual disputes in this case.

### a.      Fair Trial Claims

At this stage, the Court must draw all reasonable inferences in the plaintiff's favor. The defendants argue that "[n]one of the actions (or failures to act), by the [] defendants violated plaintiff's constitutional rights, it was not clearly established that said actions (or failures to act)

in 2008 were unlawful, and it was objectively reasonable for the defendants to proceed as they did." (ECF No. 192 at 51; *see also* ECF No. 198 at 45.) In making these arguments, the defendants "rely on their version of events as to the investigation, including what occurred during the identification procedures, and that version of events is disputed." *Rosario*, 2021 WL 199342, at *13. As discussed above, a reasonable jury could credit the plaintiff's version of events: that DeCaro and Darienzo coerced Ogletree's statement, that Horowitz, Lipson, Ross, and D'Luginski employed suggestive procedures at the photographic arrays and at the line-up, that Anyosa did not identify the plaintiff in at least one photographic array, and that the defendants withheld this information from the prosecutors.

Accordingly, there are issues of fact that must be resolved before the Court can determine whether it was objectively reasonable for the defendants to believe their actions were lawful. *See id.*

The defendants also argue that the plaintiff cannot show the rights he asserts were violated were clearly established in 2008. Drawing all inferences in the plaintiff 's favor, it was clearly established at the time of this investigation and trial that a reasonable official would have understood that fabricating an inculpatory statement and forwarding that information to prosecutors violated the plaintiff's constitutional right to a fair trial. *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."); *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (holding that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors," there, a false confession, "he violates the accused's constitutional right to a fair trial"); *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015) ("[As of 2006,] . . .

39

*Ricciuti* and its progeny, including *Zahrey,* clearly establish[ed] that qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find.") (internal quotations omitted).

Moreover, it was clearly established at the time of this investigation and trial that a reasonable official would have understood that making suggestive comments to witnesses in the process of a photo array or line-up violated the plaintiff's constitutional right to a fair trial. *Thai*, 29 F.3d at 807, 810 (holding that "[a] defendant has a due process right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification," and that "[a]n otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents."); *id.* at 810 ("Conduct such as . . . endorsing the correctness of the selection, 'may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves.'"); *see also Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir. 1981) (holding that "while a witness is always entitled to become surer of an identification, due process precludes the generation of that increased certainty through" suggestive police behavior (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968))).

Finally, suppressing potentially exculpatory information "including impeaching evidence as to the reliability of the testifying witnesses' identifications and other unreported identification procedures" would have clearly violated constitutional rights at the time of the investigation at issue here. *Rosario*, 2021 WL 199342, at *13 (finding the right clearly established since at least the 1990s); *Nnodimele v. Derienzo*, 13-CV-3461, 2016 WL 337751, at *19 (E.D.N.Y. Jan. 27,

40

2016) (finding a clearly established *Brady* violation as of 2007 for failing to turn over exculpatory information related to identification procedures).

### b.      Malicious Prosecution Claims

The defendants maintain that they had "arguable probable cause," and are thus entitled to qualified immunity on the malicious prosecution claims.  "Arguable probable cause" exists if "it [is] objectively reasonable for the officer to believe that probable cause exist[s]" or "officers of reasonable competence could disagree on whether the probable cause test was met."  *Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012).  Since there are material questions of fact about the identifications, the Ogletree statement, and the suppression of evidence, the Court cannot determine at this time whether the defendants had probable cause or arguable probable cause.  *See Rosario*, 2021 WL 199342, at *11; *see also* (*Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) (finding qualified immunity premature because, assuming in favor of the plaintiff that the officer had "fabricated" evidence against him, "it would be objectively unreasonable for [the defendant] to believe he had probable cause to arrest [the plaintiff] if [the defendant] himself fabricated the grounds for arrest," and "[n]o reasonably competent [ ] officers could disagree").

## VI.      *Monell* Claim

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  For a plaintiff "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the

constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *accord Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015).

The plaintiff challenges the County's "identification procedures and practices"—using an "old" photograph in a photo array and minimizing the differences among line-up participants by having them sit (and in the plaintiff's case, sit on telephone books), by covering them with sheets so that only their faces were visible, and using hats to disguise differences in hairstyles. The plaintiff concedes that these procedures and practices are not themselves unconstitutional, but claims that as employed in his case, the procedures deprived him of his constitutional rights. (ECF No. 202 at 26–27; ECF No. 219 at 4–5.) "Where a policy is facially unconstitutional— where it *compels* municipal agents to violate rights—the plaintiff establishes culpability simply by showing that the municipality's application of the policy caused her injury." *Becker v. City of Evansville*, No. 12-CV-182, 2015 WL 328895, at *28 (S.D. Ind. Jan. 26, 2015). But "[w]here the plaintiff alleges that a facially constitutional policy nevertheless *allowed* or *authorized* an agent to violate her rights," as the plaintiff does here, he can only prevail "by proving that the municipality enacted the policy 'with "deliberate indifference" as to its known or obvious consequences.'" *Id.* (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406–407 (1997)). In other words, the plaintiff must show that Nassau County, by employing its identification practices and procedures, "continu[ally] adhere[d] to an approach that they kn[e]w or should [have] know[n] ha[d] failed to prevent tortious conduct by employees.'" *Id.*; *see also Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986) ("Where the custom itself does not establish wrongdoing, there must be evidence of a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts.").

42

The plaintiff has not made the necessary showing. Rather, he alleges only a single incident—this case. *Compare Newton v. City of New York*, 681 F. Supp. 2d 473, 494 & n.144 (S.D.N.Y. 2010) (denying summary judgment where, "[a]lthough [the] alleged policy, custom, or practice [was] not [itself] unconstitutional," the plaintiff produced evidence of "a persistent or widespread" application of the policy resulting in rights violations). By citing only the circumstances of his case, the plaintiff has not shown that Nassau County's deliberate indifference led to the violation of his constitutional rights. *See Becker*, 2015 WL 328895, at *28 ("A plaintiff who can point to only a single unconstitutional application of a facially constitutional policy faces a steep climb. This is because such a plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action—enacting the policy." (internal quotation marks omitted)); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation."). For these reasons, Nassau County is entitled to summary judgment on the plaintiff's *Monell* claim.

## VII. The Village Defendants' Cross-Claims Against the County Defendants

The County defendants seek summary judgment on the Village defendants' cross-claims for contribution and indemnity. The Village defendants have withdrawn these claims. (ECF No. 194-77 (Stipulation of Voluntary Dismissal).) In any event, they are also abandoned. Accordingly, summary judgment is granted.

43

## VIII.  The Plaintiff's Motion to Strike Exhibits

The plaintiff moves to strike the County's policies and procedures, and ADA Schalk's affidavit.

"A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1). "When considering whether to exclude evidence pursuant to Rule 37, courts in this Circuit must consider (1) a party's explanation for the failure to comply with the Federal Rules, (2) the importance of the evidence, (3) the prejudice suffered by the opposing party of having to prepare to meet the new evidence, and (4) the possibility of a continuance."  *Miss Jones LLC v. Shahid*, No. 17-CV-716, 2022 WL 4642716, at *6 (E.D.N.Y. Sept. 30, 2022) (quoting *Richmond v. Gen. Nutrition Ctrs. Inc.*, No. 08-CV-3577, 2012 WL 762307, at *6 (S.D.N.Y. Mar. 9, 2012)).  "The purpose of the rule is to prevent 'sandbagging' an opposing party with new evidence."  *Id.* (quoting *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000)).  "Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with caution."  *Id.*

The plaintiff's motion is denied.  The defendant turned over most of the County's policies and procedures information before discovery closed, and the plaintiff did not object or request to reopen discovery when he received the rest of the material shortly after the discovery deadline passed.  Moreover, the plaintiff does not explain how he has been prejudiced, except to say that "he deposed a different official, Lyndon John, as the County's 30(b)(6) designee on identification policies without the benefit of the records."  (ECF No. 202 at 29.)  This is not sufficient to warrant the "drastic" remedy of striking the exhibit.  *Miss Jones LLC*, 2022 WL 4642716, at *6.

44

On July 31, 2023, the defendants submitted an affidavit from ADA Shalk in which he says that he "was not aware that, and not informed by any detective involved with the investigation that, Mr. Galloway made any admission or confession to shooting Jorge Anyosa," that "Jorge Anyosa [and] Wilmer Hernandez never indicated that they were pressured or coerced into identifying Josiah Galloway from the photo arrays or the line-up, both confirmed their identifications of Mr. Galloway, and both never[wavered] in their identifications of Mr. Galloway," that he "became aware of differences between several physical descriptions of Mr. Galloway and the perpetrator as described by both Jorge Anyosa and Wilmer Hernandez, include difference in height, hair style, age, and the lack of an accent" and he "did not believe that these differences were discrepancies or distinguishing characteristics," and that the "first time that [he] learned that Ogletree claimed his written statement was coerced was when he testified at Mr. Galloway's criminal trial."  (ECF No. 194-76 at 3–5.)  The plaintiff claims that the affidavit "seeks to retroactively immunize the defendants from liability" and includes "matters that plaintiff would have explored with Mr. Schalk at his deposition three years ago."  (ECF No. 202 at 29.)  But there is no reason why the plaintiff could not have asked ADA Shalk about these topics during his deposition.  *See Blake v. City of New York*, No. 05-CV-6652, 2007 WL 1975570, at *5 (S.D.N.Y. July 6, 2007) (denying motion to strike filed with summary judgment motion where plaintiffs were on notice that affiant was a potential witness when his name was produced on documentary evidence during discovery and the plaintiffs failed to depose him).

Accordingly, the motion to strike is denied.

# CONCLUSION

For these reasons, the defendants' motions for summary judgment are granted in part and denied in part. The following claims may proceed:

1. a 42 U.S.C. § 1983 malicious prosecution claim against Police Officer Horowitz, Detectives DeCaro, Darienzo, Lipson, and D'Luginski;

2. a § 1983 claim alleging fabrication of evidence, denial of a fair trial, and *Brady* violations against all individually named defendants: Police Officer Horowitz, Detectives Ross, DeCaro, Lipson, D'Luginski, and Darienzo;

3. a New York state law claim for malicious prosecution against Nassau County and the Village of Hempstead; and

4. a § 1983 claim for failure to intervene against all individually named defendants.

The parties are to file a joint pre-trial order that complies with the Court's Individual Rules within thirty days from the date of this Memorandum and Order.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
March 29, 2024